**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS**

---

**SHERMAN CARTER,**

**Plaintiff,**

**vs.** **NO:________________**

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,**

**Defendant.**

---

**COMPLAINT**

---

COMES NOW Plaintiff, Sherman Carter, and files this Complaint against Defendant, The Lincoln National Life Insurance Company, and for his cause of action alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff, Sherman Carter ("Mr. Carter"), now is, and at all times relevant to this Action was, a resident of Shelby County, Tennessee.

2. Defendant, The Lincoln National Life Insurance Company ("Lincoln"), now is, and at all times relevant to this Action was, an Indiana corporation, conducting insurance business in the State of Tennessee and having its principal offices in Fort Wayne, Indiana. Lincoln may be served process through its registered agent for service of process, Corporation Service Company, located at 135 North Pennsylvania Street, Suite 1610, Indianapolis, Indiana 46204.

3. This Action arises under the Employee Retirement Income Security Act of 1974, as amended, at 29 U.S.C. §§ 1001 *et seq.*, ("ERISA"), specifically 29 U.S.C. §

1132(a)(l)(B) and 1132(a)(3). This Court's jurisdiction is based on 29 U.S.C. § 1132(e)(l).

4. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) as the employee benefit plan that is the subject of this Complaint was entered into in Shelby County, Tennessee, the Plan was administered in Shelby County, Tennessee, and the breach complained of occurred in Shelby County, Tennessee.

**FACTS**

5. In July 2019, and all times relevant to this Action, Mr. Carter was an eligible insured under a disability policy issued to his employer, Ajax Distributing Company of Memphis ("Ajax"), for his benefit. A copy of the Policy containing its terms and conditions is appended hereto, incorporated herein by reference, identified as Exhibit "A" to this Complaint, and hereinafter referred to as the "Policy" or "Plan".

6. At all times relevant hereto, the Policy was and is an "employee welfare benefit plan" and "welfare plan", as defined by 29 U.S.C. § 1002(1), and all subparagraphs thereof.

7. Mr. Carter is a "participant" and "beneficiary" under the Policy issued by Lincoln, as defined by ERISA, 29 U.S.C. § 1001(7). Mr. Carter is, and was at all times material hereto, eligible to receive benefits pursuant to the Policy. Lincoln is, and was at all times material hereto, a fiduciary of the Plan

8. The Policy was issued by Lincoln and marketed as a means of allowing employees of Ajax to continue to receive some percentage of their income in the event that an employee should become disabled, as defined by the Policy, which provides:

> "Total Disability" or "Totally Disabled" will be defined as follows.
> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.

> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

(*Policy, p.20*).

9. At Ajax, Mr. Carter was employed as an off premise delivery driver which required him to drive a large delivery truck and deliver heavy items to retail stores. His job required him to perform physically demanding and stringent activity, such as, but not limited to, climbing in and out of a large truck, lifting heavy objects, bending, and pushing heavy objects, carts, and dollies.

10. On August 5, 2015, Mr. Carter ceased working due to his hip and heart conditions.

11. On August 21, 2015, Mr. Carter was diagnosed with osteoarthritis in his left hip, which resulted in extreme hip pain and weakness in his left leg. His treating orthopedic doctor, Gregory D. Dabov, M.D., recommended surgery and opined that Mr. Carter was unable to work pending completion of the surgery.

12. Surgery was scheduled immediately thereafter for September 21, 2015. Surgery was cancelled due to Mr. Carter's diagnosis or cardiomyopathy.

13. Since 2004, Mr. Carter had been treated for severe, chronic and worsening cardiomyopathy, which is a chronic disease of the heart muscle in which the muscle is abnormally enlarged, thickened, and/or stiffened. The weakened heart muscle loses the ability to pump blood effectively, resulting in irregular heartbeats (arrhythmias) and possibly even heart failure.

14. Mr. Carter's medical file and the opinion of his treating cardiologist, Dan Z. Lan, M.D. ("Dr. Lan"), contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve.

15. On October 21, 2015, Dr. Lan opined that Mr. Carter was unable to work as of September 18, 2015 due to his diagnosis of cardiomyopathy. Dr. Lan performed a cardiac ablation, which is a procedure that can correct heart rhythm problems (arrhythmias). Cardiac ablation works by scarring or destroying tissue in your heart that triggers or sustains an abnormal heart rhythm. In some cases, cardiac ablation prevents abnormal electrical signals from entering your heart and, thus, stops the arrhythmia.

16. Dr. Lan also implanted an implantable cardioverter-defibrillator (ICD) in an effort to control his heart rhythm disorder.

17. On October 21, 2015, Dr. Lan noted Mr. Carter's ejection fraction as 20%. Ejection fraction measures the amount of blood pumped out of your heart's lower chambers or ventricles. An ejection fraction of 20% means a severe left ventricular dysfunction or marked reduction in the pumping ability of the main chamber of the heart.

18. On October 22, 2015, Lincoln granted Mr. Carter short term disability benefits under the Policy, finding that Mr. Carter met all requirements and was unable to perform the material and substantial duties of his job due to his hip and heart conditions.

19. On December 28, 2015, Lincoln required Mr. Carter to apply for disability benefits through the Social Security Administration ("SSA") as Lincoln was entitled to an offset for the long term disability benefits it provided to Mr. Carter in any amount received from the SSA. In Lincoln's December 28, 2015, Letter, Lincoln opined:

> After review of your claim information, we believe that you are a good candidate for SSDI benefits and are likely to meet their eligibility guidelines.

20. Throughout 2016 and through 2020, Mr. Carter, continued to receive treatment for his severe left ventricular dysfunction from cardiologist, Lee Edwin Faulkner, M.D ("Dr. Faulkner"). Dr. Faulkner consistently opined that Mr. Carter was totally disabled and could not

work at all.

21. Mr. Carter's medical file and the opinion of his treating cardiologist, Dr. Faulkner, contain significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve according to Dr. Faulkner. Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. He simply cannot work or he risks heart failure. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

22. On April 12, 2016, Dr. Faulkner informed Lincoln of his opinion that Mr. Carter suffered from a severely depressed ejection fraction of 20%.

23. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%).

24. On June 2, 2017, Dr. Faulkner opined to Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger, or handle.

25. On June 12, 2017, Lincoln completed its investigation into Mr. Carter's claim for

long term disability benefits and determined that Mr. Carter was Totally Disabled form Any Occupation under the Policy.

> We have concluded our investigation into your eligibility for benefits beyond your Own Occupation Period as defined in your policy. We have determined that you are currently Totally Disabled from Any Occupation, and your benefits will continue provided that you remain Totally or Partially Disabled according to the provisions of the policy issued to BarDett, LLC.

26. On June 17, 2017, the Social Security Administrator determined that Mr. Carter met the medical requirements for disability benefits as of August 6, 2015. The SSA thus found that Mr. Carter was unable to perform the duties of any substantial gainful activity.

27. On September 7, 2017, Lincoln informed Mr. Carter that it received notification of his SSA award of disability benefits. Lincoln notified Mr. Carter that his long term disability benefits would be reduced by the amount received from the SSA beginning August 22, 2017, which lowered his long term disability benefits from Lincoln significantly.

28. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%).

29. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling, grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong.

30. On October 30, 3018, despite having previously determined that Mr. Carter was totally disabled from any occupation and entitled to benefits under the Policy, Lincoln reversed its decision and determined, for the first time, that Mr. Carter could perform light and sedentary

work.

31. On April 1, 2019, Mr. Carter timely submitted a first level appeal of Lincoln's adverse benefit determination. On July 12, 2019, Lincoln upheld its denial.

32. Mr. Carter timely filed a second level appeal per the terms of the Policy on January 8, 2020, and on March 21, 2020, Lincoln again upheld its denial finding that Mr. Carter could perform sedentary work.

33. Lincoln's denial of benefits was not supported by substantial medical evidence. Lincoln's own medical reviewers did not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concluded that Mr. Carter is "capable of full-time work based on the available data, but only in sedentary capacity, with no walking, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provided: "[T]he claimant can do sedentary work with no walking, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

34. Sedentary work requires walking occasionally; therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work.

35. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

36. Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require

walking or standing occasionally, up to 1/3 of a workday. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln simply has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

**Relief Under ERISA**

37. This Action is brought pursuant to 29 U.S.C. § 1132(a)(l)(B) to recover benefits justly due to Mr. Carter under the Policy, to enforce his rights under the terms of the Policy, and to clarify his rights to future benefits under the Policy. This Action is also brought pursuant to 29 U.S.C. § 1132(a)(3) by Mr. Carter to enjoin the acts and practices of Lincoln that violate ERISA and to obtain appropriate equitable relief to enforce the provisions and terms of the Policy and the applicable procedural requirements of ERISA, specifically 29 U.S.C. § 1133, 29 C.F.R. § 2560.503-1, and 29 U.S.C. § 1132(c).

38. The above mentioned decisions denying Mr. Carter the rights and benefits due him under the Plan notwithstanding medical evidence to the contrary were arbitrary, illegal, capricious, unreasonable, discriminatory, and not made in good faith. Additionally, Lincoln's acts and practices as described herein violate ERISA's procedural requirements. Mr. Carter is entitled to benefits under the plan and appropriate equitable relief.

39. Lincoln failed to comply with the terms of the Policy. Lincoln failed to

provide Mr. Carter with a full and fair review of his claim as required by 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1 and failed to provide requested documents and information as required by the above referenced provisions of ERISA and by 29 U.S.C. § 1132(c).

40. Upon information and belief, Lincoln has financial incentives to deny claims, and in particular Mr. Carter's claim, and, therefore, has a conflict of interest in determining whether a participant is entitled to benefits.

41. Lincoln allowed its concern over its own financial considerations to influence its decision-making so that it made an arbitrary and capricious determination that Mr. Carter's claim for medical benefits was not covered under the Policy.

42. Lincoln's determinations through its representatives and agents were biased and predisposed to deny Mr. Carter benefits.

43. Mr. Carter was not afforded due process by Lincoln throughout the determination and appeals of his claim. Mr. Carter was deprived, among other things, the right to documents that were requested on numerous occasions. Mr. Carter was not given the opportunity to respond to the determinations of Lincoln due to the numerous procedural violations of ERISA and the Plan. Additionally, Lincoln refused to consider or address documents submitted by Mr. Carter during his claim review and appeals.

44. As a direct and proximate result of the Lincoln's actions, Mr. Carter has been caused to incur attorneys' fees in an amount not now known to Mr. Carter.

45. As a direct and proximate result of Lincoln's actions, Mr. Carter has sustained losses of benefits and damages in an amount not now known to Mr. Carter, but on information and belief, such losses of benefits and damages will approximate the amount of benefits due Mr. Carter in accordance with the Policy.

46. Mr. Carter timely appealed Lincoln's denials of his claims for benefits pursuant to the terms of the Policy; therefore, Mr. Carter has exhausted all of his administrative remedies under the Plan and ERISA. To the extent Mr. Carter inadvertently failed to exhaust his administrative remedies, such failure should be excused. To require Mr. Carter to exhaust his administrative remedies would have been futile, because, among Lincoln's other failures, Lincoln consistently (1) failed to address, consider, or even discuss the basis of its determination that Mr. Carter could perform sedentary work, (2) failed to address, consider, or even discuss the opinions of Mr. Carter's treating medical professionals supporting her claim for benefits, (3) failed to provide Mr. Carter relevant documents in its possession thus denying him the ability to timely appeal or to address the substance of Lincoln's adverse benefit determinations, (4) failed to provide Mr. Carter a full and fair review as required by ERISA, and (5) failed to comply with the terms of the Policy.

## PRAYER FOR RELIEF

**WHEREFORE,** Mr. Carter requests judgment against Lincoln as follows:

1. That Defendant be made to appear and answer this Complaint;
2. That the Court order the Defendant to pay all benefits due to Mr. Carter under the Policy;
3. That the Court award Mr. Carter prejudgment interest on all benefits due him until the date of judgment;
4. That the Court award Mr. Carter attorneys' fees under 29 U.S.C. § 1132(g)(1), court costs and all other reasonable costs incurred;
5. That the Court enjoin any act or practice of the Defendant which

violates any provision of ERISA.

6. That the Court award Mr. Carter other appropriate equitable relief to redress violations of ERISA or to enforce any provisions of ERISA or the terms of the Plan, including, but not limited to, penalties pursuant to 29 U.S.C. § 1132(c).

7. That the Court grant Mr. Carter such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**GLANKLER BROWN, PLLC**

By: /s/ Danielle N. Rassoul
Don L. Hearn, Jr. (#22837)
Danielle N. Rassoul (#36911)
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
Phone (901) 525-1322
Facsimile (901) 525-2389

*Attorneys for Sherman Carter*