# LTD CLAIM PROFILE

**Date:** 12/30/2020 **LFG** **Claim #:** 1150128075

| | | | | | |
|---|---|---|---|---|---|
| **Insurer:** | The Lincoln National Life Insurance Company | **Posted:** | 12/1/2015 | **Location:** | HOME |
| **Policy:** | 00001004922000000 - | **Status:** | EXTENDED | **User ID:** | LAW |
| | Ajax Distributing Company of Memphis, | **Business:** | TRUE LTD | | |

## Claimant Information

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | SHERMAN CARTER | **Phone:** | | **DOB:** | |
| **SSN:** | | **Sex:** | M | **Hire:** | 8/13/2012 |
| **Address:** | | **Ins Eff:** | 7/1/2013 | **Class:** | 4 |
| | | **Occ:** | TRUCK DRIVER, HEAVY (ar**DOT**lustry) | | 905663014 |
| | | **Salary:** | $3,250.00 | **Period:** | Monthly |

## Claim Information

**Special Provisions:** **Min Ben:** $195.00

**Ben:** 60% / 0% **A/S:** % **Age:** 48 **Elim Per:** 90 day

**DLW:** 8/6/2015 **DOD:** 8/7/2015 **S/A:** S **W/R:** N **M/N:** N **D/A:** N **ADL:** **Ben Amt:** $1,950.00

**Max Duration:** RBDSS **Res ID:**

**Diagnosis Pri:** I42.9 Cardiomyopathy, unspecified **Limits:**

**Sec:** M16.9 Osteoarthritis of hip, unspecified **Prognosis:**

**Recovery Date:** 1/15/2034

## Benefit Information

| | | | | | |
|---|---|---|---|---|---|
| **Date Ben Begin:** | 11/5/2015 | **Months Paid:** | 36 | **Actual Age:** | 49 |
| **Modal:** | $581.00 | **Reins:** | $0.00 | **Reserve:** | $0.00 |

## Policy Information

**M/N Limits:** Y **Drug Limits:** Y **Pension Sup:** N **Own Occ:** 24 Mos

**SS Offset:** Primary & Family **Prex:** 3/12

**COLA:** NONE

## Offset Information

| Type | Status | Awarded | Terminated | Mo Amount | Mo Used |
|---|---|---|---|---|---|
| SS EMP | PROCESSED | 2/1/2016 | | $1,369.00 | $1,369.00 |
| SS D EST | TERMINATED | 2/1/2016 | 2/1/2016 | $684.00 | $386.00 |
| SS DEPT | TERMINATED | 2/1/2016 | 7/1/2017 | $684.00 | |
| STD | TERMINATED | 8/21/2015 | 11/22/2015 | $450.00 | $1,755.00 |
| OVERPAID | PROCESSED | 2/5/2018 | 10/5/2022 | $581.00 | $581.00 |
| OVERPAID | RECEIVED | 10/5/2022 | 11/5/2022 | $219.53 | |
| PIB | DISALLOWED | 11/5/2015 | | $325.00 | |

## Dependent Information

| Type | DOB | Name |
|---|---|---|
| Spouse | | SHARRONDA M. CARTER |
| Spouse | | SHARRONDA M. CARTER |

EXHIBIT
3, part 1

**LTD CLAIM PROFILE**

**Date:** 12/30/2020 **LFG** **Claim #:** 1150128075

| | | |
|---|---|---|
| Child | 7/21/1999 | DARIUS CARTER |

**Alert Information**

| Status | Level | Description | Posted | Resolved |
|---|---|---|---|---|
| T | W | REHAB PROFILE | 12/1/2015 | 12/22/2015 |
| T | W | FICA may apply | 12/10/2015 | 12/22/2015 |

**Action Plan**

# Chronological Activity List

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Claimant:** | SHERMAN CARTER | | | **Occupation:** | TRUCK DRIVER, HEAVY (any industry) | | |
| **SSN:** | | **DOB:** | | **Received Date:** | 12/1/2015 | **Months Dis:** | 64 |
| **Claim #:** | 1150128075 | **DOD:** | 8/7/2015 | **Ben:** | $1,950.00 | **Months Pd:** | 36 |
| **Coverage:** | LTD | **Status:** | EXTENDED | | | **Assignee:** | LAW |
| **Policy Holder:** | Ajax Distributing Company of Memphis, | | | | | **Deceased:** | |
| **Case Mgr. Status:** | NONE | | | | | | |

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/1/2015 11:59:07 AM | Action Plan Claim Tasks | 1 | Review Claim for links | Requested | KEAST0 |

LINKS notes:
EE is a 48 yom, Delivery Driver (light occ), dlw -08/06/2015, dod -08/21/2015, Dx: Osteoarthritis, left hip, rtw : undetermined until after surgery
31/31/9, LTD eff 07/01/2013 pre-ex 3/12
Job Description/Physical Requirements - Drive truck and deliver beer to retail stores. Driving, climbing into truck, lifting, bending and pushing carts or dolly.
R/L - no prolonged w orking or standing or sitting.
Sx: 09/21/2015 cancelled due to cardiac clearance
MD Guidelines M16.9 Osteoarthritis of hip, unspecified 0/0/14
approve claim to 10/28/2015 OV w /Heart Dr. to release and set date for Hip sx. - ALIBY6 - Oct 22, 2015 02:29:02 pm

STD max 11/22/2015 9 w ks / LTD BCD 12/19/2015
Regional Sales Office = NASHVILL - ALIBY6 - Nov 02, 2015 02:55:35 pm

***Correction***
LTD BCD 11/19/2015
- ALIBY6 - Nov 02, 2015 03:09:20 pm

Per clinical consult on 11/25/15 claim is supportive beyond std max of 11/22/15:
Clinical Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximatelty 20%. he ahs noted cardiomyopahty and often report SOB w ith inability to prolonged w alk, lift or stand. His lates cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form inidcates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction. TXGROOM - FXAMINI - Nov 25, 2015 04:01:30 pm

Agree w ith roll to LTD - NICBR8 - Nov 30, 2015 03:43:21 pm - KEAST0 - Dec 01, 2015 11:59:23 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/3/2015 | Telephone (IN) | 1 | Sherman Carter | Completed | MA2ST2 |

advised LTD claim is entered in system but not completely put together.

advised to allow a few more buisness days

CE could you call EE w hen an update is available? Thanks

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Telephone (OUT) | 2 | BARDETT LLC | Completed | KEAST0 |

Obc to ER - no pension from ER - ER advised no RTW since 8/6/2015. ER advised that FMLA paperw ork should be on file but w as not able to locate it during the telephone conversation. ER advised that CE provided contact details for ER if FMLA paperw ork is located to send through for file. ER voiced understanding- call ended. - KEAST0 - Dec 07, 2015 10:07:02 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Telephone (OUT) | 3 | SHERMAN CARTER | Completed | KEAST0 |

obc to clmt for initial - phone w ent to VM - CE left VM asking for callback to discuss LT benefits. - KEAST0 - Dec 07, 2015 10:21:05 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Telephone (IN) | 4 | Sherman Carter | Completed | TIXWH6 |

EE calling to check claim status.

xfer to CE

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Telephone (IN) | 5 | SHERMAN CARTER | Completed | KEAST0 |

ibc from clmt - Sherman Carter Initial Interview Guide
Introduction 901 331 5901
1.Introduced and explained reason for call
2.Set expectations for call
a.Length, information needed, etc. - verify info, get background info, more details, about 20 minutes or so.
3.Set expectations for ongoing communication/phone updates
Verify Claimant Information
1.Verify claim information as needed - address, dob, ssn
2.Obtain email address -none-preferred method of communication - mail
3.Confirm spouse and dependent information - Sharronda Carter - 3/1/1972, 7/21/99 - Darius Carter
4.Review Direct Deposit Meta Bank
5.Verify LDW and DOD 8/6/2015 and DOD per Dr. Dabov is 8/21/2015. - w ho did you see in the meantime? FMLA paperw ork?
6.Offsets
a.explain how OIB affects disability payment - any other income? Apart from STD? no
b.Ensure claimant is aw are of their responsibility to notify us of any OIB or earnings, regardless of w hether they think it is an offset (retirement, w ork comp, partial w ork, etc.) - filed for SSDI? - no
c.introduce the Social Security provisions and the requirement for the claimant to file. Medical Information
1.Verify diagnosis - Osteoarthritis of left hip - also cardiomyopathy - had cardiac sx and not cleared for hip sx yet.
a.Primary and Secondary - Osteoarthritis is reason he stopped w orking
b.Any other conditions affecting claimant/co-morbid conditions - see above
2.Claimant's description of condition - see below.
a.History of condition -
b.Symptoms, Prognosis, Treatment plan - needs THR sx, but must be cleared by cardio before sx.
3.List of providers and medications - Dr Faulkner, on heart meds currently. Dr Dabov, receiving any tx for hip?
4.Have claimant give a description of their typical day
a.Independent vs. assisted activities - can do ADLs -
5.What are your RTW goals and plans? Needs surgery on hip before RTW. Clmt advised that he w ould ask w ife (TPA) to get info for FMLA paperw ork submitted.
a.What is Dr. saying about RTW? - Needs to have clearance prior to hip sx.
Work/Education Information
1.Review Job Title and Responsibilities - Delivery Driver - delivering beer to retail stores - driving, lifting, pushing pulling stock w hen delivering.
2.Obtain claimant's description of physical requirements of Job. See above.
3.How long w ith employer/how long in this position - since 2012
4.Discuss aspects of job claimant is and is not able to perform and w hy. - pain in hip, due to OA.
5.Inquire about employers RTW policy, ability to accommodate restrictions, - has been terminated
6.Discuss employers backup plan
a.Who is doing claimant's job - has been terminated
b.How long w ill job be open - terminated
7.Prior jobs w ith this or other employers - still required (see below )
8.Level of education - still required. (clmt advised he w ould contact w ife and ER for FMLA paperw ork)
Closing
1.Review process, timelines - need info about betw een 8/6/15 and 8/21/15. When signed out of w ork. FMLA or otherw ise. Clmt advised he w ould look to get the information. Would have w ife call back regarding paperw ork.
2.Explain definition of disability, ow n occ as performed in national economy.
3.Stress need for ongoing communication and set expectations for phone follow ups -
4.Review Voc Rehab again if appropriate - n/a at this point.
5.Review RTW plan
a.Claimant's RTW conversation w ith Employer and/or Physician
6.Clearly outline claimant's next steps (as appropriate)
- KEAST0 - Dec 07, 2015 01:47:54 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Telephone (OUT) | 6 | SHARRONDA M. CARTER | Completed | KEAST0 |

Obc to TPA - returning call - CE advised w e need to address gap betw een DLW and DOD because otherw ise no bens payable. CE advised that Dr needs to be signing clmt out close to DLW. CE asked if they had copy of FMLA paperw ork - TPA advised that she w ould look and fax in - call ended after CE provided disability fax number to TPA. - KEAST0 - Dec 07, 2015 03:21:10 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Claim Tasks | 1 | Review Claim for links | Completed | KEAST0 |

LINKS notes:

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

EE is a 48 yom, Delivery Driver (light occ), dlw -08/06/2015, dod -08/21/2015, Dx: Osteoarthritis, left hip, rtw : undetermined until after surgery
31/31/9, LTD eff 07/01/2013 pre-ex 3/12
Job Description/Physical Requirements - Drive truck and deliver beer to retail stores. Driving, climbing into truck, lifting, bending and pushing carts or dolly.
R/L - no prolonged w orking or standing or sitting.
Sx: 09/21/2015 cancelled due to cardiac clearance
MD Guidelines M16.9 Osteoarthritis of hip, unspecified 0/0/14
approve claim to 10/28/2015 OV w /Heart Dr. to release and set date for Hip sx. - ALIBY6 - Oct 22, 2015 02:29:02 pm

STD max 11/22/2015 9 w ks / LTD BCD 12/19/2015
Regional Sales Office = NASHVILL - ALIBY6 - Nov 02, 2015 02:55:35 pm

***Correction***
LTD BCD 11/19/2015
- ALIBY6 - Nov 02, 2015 03:09:20 pm

Per clinical consult on 11/25/15 claim is supportive beyond std max of 11/22/15:
Clinical Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximatelty 20%. he ahs noted cardiomyopahty and often report SOB w ith inability to prolonged w alk, lift or stand. His lates cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form inidcates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
TXGROOM - FXAMINI - Nov 25, 2015 04:01:30 pm

Agree w ith roll to LTD - NICBR8 - Nov 30, 2015 03:43:21 pm - KEAST0 - Dec 01, 2015 11:59:23 am

| 12/7/2015 | Claim Tasks | 5 | Open Review | Completed | KEAST0 |
|---|---|---|---|---|---|

Group Information
Date: 12/7/2015
Claimant:Sherman Carter
Claim Number: 1150128075
Policy Id #: 1004922000000
BLOC(Acct Id#)/ CLOC (Claims Location)216753 / 1654674
Group Id/ Group Name: ASBARB - BarDett LLC
Employer/Contact Info:
BME definition:BAE + Comms
Policy info: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.
Special Group? - CAMCARE/ VENCORE/ UCHS/ AXALTA/ DIALYSno
National claim?No
RetirementRequired
Buy up? S or L? check cert screenNo

Additional Information
SSN:
DOB:
Occ and Level: Delivery Driver (medium)
Salary verification: Ardis
DLW: 8/6/2015
DOD: (4 days)8/21/2015
BSD:11/19/2015
COD: 11/19/2017
AO Begin Date:On file
AO Due Date:On file
MBD/MDA: On file

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Last Med Review - Result:STD links supportive until cleared for sx - NOV is 2/2016 w ith cardio.
Is one required prior to approval? Check DXno
Last Time Med Recs w ere Received: 11/24/2015 (APS and abilities form) not med recs.
Auth Form Signed: OMAHA?Yes, yes
Diagnosis: Osteoarthritis
check policy if dx is has limitationNo
MDA Guidelines:
Transferred From:STD
Offsets Present: STD
FICA/FIT/SIT: No 100% EE
Changing BSD? - possibly
Pend letter reminder set if pending?
Interest payable on late payments?no

Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: LINKS Clinical Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.
Job desc provided by ER - Off Premise Delivery Driver - OA exists in AWD under Group Specific Occs- matches eDOT for Truck Driver, Heavy (medium occ) 905.663-014. Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE w ill need details of w hether clmt w as seen by any other providers prior to 8/21/2015 to determine if he w as actively at w ork. ER form indicates that EE received sick pay from 8/7/2015 to 8/17/2015.

Path: CE w ill need to determine w hether clmt w as considered actively at w ork as DLW w as 8/6/2015 and DOD is 8/21/2015 per APS signed by Ortho.
 - KEAST0 - Dec 07, 2015 10:20:14 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 | Referrals | 1 | Occ Analysis | Completed | KEAST0 |

Job desc provided by ER - Off Premise Delivery Driver - OA exists in AWD under Group Specific Occs- matches eDOT for Truck Driver, Heavy (medium occ) 905.663-014. Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly. - KEAST0 - Dec 07, 2015 09:43:26 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/7/2015 8:34:52 AM | Claim Tasks | 2 | Begin AO Investigation | Requested | VKIMBLE |

auth requested mid October 2016 and is not required for AO./ - KEAST0 - Sep 01, 2016 10:59:39 am

mailed out Begin AO letter and requested mr from Dr. Faulkner claim on 30/5 se tc for details
15day f/u in plae to f/u on forms and mr - VKIMBLE - Apr 10, 2017 04:10:36 pm

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | mr rcvd on file ...f/u for AO forms and submit for review - VKIMBLE - Apr 24, 2017 08:57:53 am | | | | |
| | EBF / AUTH on file w ill submit for full medical review 4/28/17 and update SAP /PATH - VKIMBLE - Apr 27, 2017 10:28:17 pm | | | | |
| 12/7/2015 8:35:47 AM | Claim Tasks | 3 | Max Duration Notice | Requested | KAGFA8 |
| 12/7/2015 9:28:47 AM | Claim Tasks | 4 | Ow n Occ - See Contract Language | Requested | KAGFA8 |
| | 06/12/2017- A/O being approved - KAGFA8 - Jun 12, 2017 07:47:06 am | | | | |
| 12/7/2015 9:32:16 AM | Dependents | 1 | SHARRONDA M. CARTER | Spouse | KEAST0 |
| 12/7/2015 9:59:44 AM | Other Income | 1 | Retirement | UNKNOWN | KEAST0 |
| | ER does not provide a pension. - KEAST0 - Dec 07, 2015 10:00:00 am | | | | |
| 12/7/2015 10:16:51 AM | Summary/Assessment/Pa | 1h | INITIAL........................................................ | Requested | KEAST0 |

Summary Notes
INITIAL............................................................................... - KEAST0 - Dec 07, 2015 10:18:12 am
Assessment Notes
SEE PATH TAB - KEAST0 - Dec 07, 2015 10:18:12 am
Path Notes
Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: LINKS Clinical Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.
Job desc provided by ER - Off Premise Delivery Driver - OA exists in AWD under Group Specific Occs- matches eDOT for Truck Driver, Heavy (medium occ) 905.663-014. Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE w ill need details of w hether clmt w as seen by any other providers prior to 8/21/2015 to determine if he w as actively at w ork. ER form indicates that EE received sick pay from 8/7/2015 to 8/17/2015.

Path: CE w ill need to determine w hether clmt w as considered actively at w ork as DLW w as 8/6/2015 and DOD is 8/21/2015 per APS signed by Ortho.
Initial call w ith EE attempted.
Initial call w ith ER completed - ER advised they w ould look for FMLA paperw ork and forw ard to CE if found. - KEAST0 - Dec 07, 2015 10:18:12 am
..............................
Medical Assessment: FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015.
Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - multiple dr's listed on

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | letterhead.<br>Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015.<br><br>PATH: CE w ill review medical and determine path.<br>- KEAST0 - Dec 09, 2015 03:49:42 pm<br>Dr Qureshi is PCP. - KEAST0 - Dec 10, 2015 11:33:42 am<br>Flie is currently at Clinical Review . - KEAST0 - Dec 21, 2015 08:17:58 am<br>...............................<br>Medical Review : Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.<br><br>Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.<br><br>Specific clinical recommendations: Contact Clmt for w ell checks.<br>Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.<br><br>PATH: Clmt is TDOO, unable to RTW due to EF of 20%. SHORT TERM: F/up w ith clmt to get update on condition. LONG TERM: pending short term.<br>(f/up end of January) - KEAST0 - Dec 24, 2015 11:33:16 am | | | | |
| 12/7/2015 1:48:55 PM | Dependents | 2 | DARIUS CARTER | Child | KEAST0 |
| 12/7/2015 1:49:05 PM | Dependents | 3 | SHARRONDA M. CARTER | Spouse | KEAST0 |
| 12/7/2015 3:21:53 PM | Claim Tasks | 6 | Call Employer | Requested | KEAST0 |
| | call ER if FMLA paperw ork not received by now . - KEAST0 - Dec 07, 2015 03:22:16 pm<br><br>received. - KEAST0 - Dec 09, 2015 03:49:55 pm | | | | |
| 12/8/2015 | Telephone (OUT) | 7 | SHERMAN CARTER | Completed | KEAST0 |
| | obc to clmt returning call received after hours. CE left VM advising that she received info from ER regarding FMLA paperw ork and w ould be review ing and get back in touch w ith clmt to advise on claim status. - KEAST0 - Dec 08, 2015 07:41:14 am | | | | |
| 12/8/2015 2:57:34 PM | Documents/Mail | 1 | Email | Received | KEAST0 |
| | 2015-12-07-16.26.39.618920O01<br>email from ER to CE w ith FMLA paperw ork attached. - KEAST0 - Dec 09, 2015 03:39:53 pm | | | | |
| 12/8/2015 2:57:34 PM | Documents/Mail | 2 | FMLA Documents | Received | KEAST0 |
| | 2015-12-07-16.26.39.653920O01<br>FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015 - KEAST0 - Dec 09, 2015 03:42:07 pm | | | | |
| 12/9/2015 | Claim Tasks | 6 | Call Employer | Completed | KEAST0 |
| | call ER if FMLA paperw ork not received by now . - KEAST0 - Dec 07, 2015 03:22:16 pm<br><br>received. - KEAST0 - Dec 09, 2015 03:49:55 pm | | | | |
| 12/9/2015 | Documents/Mail | 4 | Incoming Correspondence | Completed | KEAST0 |
| | 2015-12-08-08.36.02.760880O01<br>w ork note from PCP - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - multiple dr's listed on letterhead. - KEAST0 - Dec 09, 2015 03:44:30 pm | | | | |
| 12/9/2015 | Documents/Mail | 5 | Incoming Correspondence | Completed | KEAST0 |
| | 2015-12-08-10.45.50.580920:O:01<br>Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015. - KEAST0 - Dec 09, 2015 03:48:38 pm | | | | |

# Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/9/2015 | Documents/Mail | 1 | Email | Completed | KEAST0 |
| | 2015-12-07-16.26.39.618920O01<br>email from ER to CE w ith FMLA paperw ork attached. - KEAST0 - Dec 09, 2015 03:39:53 pm | | | | |
| 12/9/2015 | Documents/Mail | 3 | Email | Completed | KEAST0 |
| | 2015-12-08-08.36.02.721880O01<br>email from ER to CE w ith w ork note attached. - KEAST0 - Dec 09, 2015 03:42:43 pm | | | | |
| 12/9/2015 | Documents/Mail | 2 | FMLA Documents | Completed | KEAST0 |
| | 2015-12-07-16.26.39.653920O01<br>FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015 - KEAST0 - Dec 09, 2015 03:42:07 pm | | | | |
| 12/10/2015 | Telephone (OUT) | 8 | SHERMAN CARTER | Completed | KEAST0 |
| | obc to clmt regarding status - CE advised that info received and she w ould send for mgmt review and be able to update clmt on status next w eek. Clmt voiced understanding, call ended. - KEAST0 - Dec 10, 2015 10:54:43 am | | | | |
| 12/10/2015 10:56:08 AM | Claim Tasks | 7 | Call Claimant | Requested | VKIMBLE |
| | call clmt w ith outcome of mgmt review once finished. - KEAST0 - Dec 10, 2015 10:56:32 am<br><br>file has gone for full med review - f/up set. - KEAST0 - Dec 17, 2015 11:22:55 am<br><br>approved - advised clmt - f/up set for end of Jan to get update. - KEAST0 - Dec 28, 2015 11:29:32 am<br><br>NOV for cardio is in 3 months from 11/15. F/up set to get update after NOV. - KEAST0 - Feb 02, 2016 02:36:48 pm<br><br>attempted - try again. - KEAST0 - Feb 29, 2016 02:46:08 pm<br><br>no change - still no sx - CE w ill request updated med recs. - KEAST0 - Mar 02, 2016 08:52:42 am<br><br>requested - f/up to review and contact clmt as required after review . - KEAST0 - Mar 11, 2016 10:28:45 am<br><br>clmt's NOV w ith Dr Faulkner is in June - get update w ith clmt on current status, w hether sx has been scheduled, how LOV w ith Dr Faulkner (cardio) w ent and w hether he has been cleared for hip sx at this point. - KEAST0 - May 11, 2016 11:48:39 am<br><br>NOV is next w eek - ce to f/up w ith clmt after NOV. - KEAST0 - Jun 16, 2016 12:15:29 pm<br><br>f/up to check if no response about reschedule. - KEAST0 - Jun 27, 2016 03:08:24 pm<br><br>attempted update after LOV on 7/5/2016 - f/up to try again and request med recs. - KEAST0 - Jul 06, 2016 01:53:01 pm<br><br>requesting med recs. - KEAST0 - Jul 14, 2016 10:59:47 am<br><br>received med recs and they show no change - CE has asked NDC for clarification on w hether the file w ill need a review based on the med recs received - w aiting for response. - KEAST0 - Jul 20, 2016 07:39:12 am<br><br>reasonable to f/up at COD due to comorbidities. _ f/up is set to request new auth. - KEAST0 - Aug 01, 2016 07:14:34 am<br><br>f/up 15 days. - KEAST0 - Oct 12, 2016 02:48:58 pm<br><br>advised mailed in - check for receipt- call clmt if not received. - KEAST0 - Oct 28, 2016 02:41:31 pm<br><br>received. requesting med recs and GCOD from Dr Faulkner. - KEAST0 - Nov 03, 2016 01:44:57 pm<br><br>received - f/up at COD investigation start date in Feb 2017. - KEAST0 - Nov 23, 2016 12:05:34 pm | | | | |
| 12/10/2015 10:56:35 AM | Claim Tasks | 8 | Update Claim Information | Requested | KEAST0 |
| | review med recs on file and send for mgmt review - KEAST0 - Dec 10, 2015 10:57:01 am<br><br>has gone for full med review . f/up set. - KEAST0 - Dec 17, 2015 11:22:26 am | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/15/2015 8:06:12 AM | Referrals | 2 | Initial Claim Review | Initial | NATNA3 |

Clinical Consultation - Review Referral Template
Demographics
Claimant Name: Sherman Carter
Occupation: Delivery Driver (medium)
Diagnosis: Osteoarthritis of Left Hip.
DLW:8/6/2015
DOD:8/21/2015 (per APS)
COD: 11/5/2017
Current Age: 48
Current Height: 6'0
Current Weight:210
Date of last claimant Phone Call:
Date of Last Clinical Review : 11/25/2015 - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
Current Providers
Name/Specialty/Last Visit Date
Dr Dabov - ortho - 8/21/2015
Dr Faulkner - cardio - 11/10/15, NOV w ith cardio is in Feb 2016.
Dr Lan - cardio - 9/18/2015 (sx ICD placement)

Main Duties of Occupation (Please provide brief description of duties performed):
Off Premise Delivery Driver - Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly
RTW Plan (explain if there is a plan and nature of the plan):
Requires THR but needs cardio clearance prior to sx. (has been terminated by ER)
Most Current APS/Abilities Form/Dr's Note
Date:11/24/2015
Which provider completed:Dr Faulkner (cardio)
Per provider w hat are the current restrictions and limitations?TDOO and AO, requires medical therapy for now.
Per provider w hat can the claimant do?Abilities form (undated, received 11/24/2015) show s occasionally lift up to 10 lbs, occasionally sit. No other abilities.
Surgery
Name of Procedure:PVC ablation w ith ICD implant
Date Performed:9/18/2015
Recent Medical Records Information (Date/Findings)
Physical Exam: Cardio notes -
Assessment / Recommendation /Specific Questions (Provide CE assessment of medical status and any additional claim insight /recommendations or updates for NDC):
Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

LINKS Clinical review Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.

R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible. NOV is Feb 2016.

Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Clmt advises Dr Qureshi is PCP.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015.

CE is submitting for review of records show ing first OV w ith PCP on 8/7/2015 and w ork note advising RTW 8/13/15. DOD per Ortho is 8/21/15 based on first OV. CE is submitting for review of w hether medical records from 8/7/2015 and 8/26/2015 w ould be sufficient to show that clmt w as seeking tx for his dx prior to the date of 8/21/2015. NOV w ith Cardio is 2/2016. - KEAST0 - Dec 15, 2015 08:06:48 am
12-17-15 Changed to clinical review on 12-16-15 and note did not complete. NATNA3 - NATNA3 - Dec 17, 2015 10:25:14 am

| | | | | | |
|---|---|---|---|---|---|
| 12/16/2015 12:36:44 PM | Referrals | 3 | Initial Claim Review | Initial | KEAST0 |

Clinical Consultation - Review Referral Template
Demographics
Claimant Name: Sherman Carter
Occupation: Delivery Driver (medium)
Diagnosis: Osteoarthritis of Left Hip.
DLW:8/6/2015
DOD:8/21/2015 (per APS)
COD: 11/5/2017
Current Age: 48
Current Height: 6'0
Current Weight:210
Date of last claimant Phone Call:
Date of Last Clinical Review : 11/25/2015 - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
Current Providers
Name/Specialty/Last Visit Date
Dr Dabov - ortho - 8/21/2015
Dr Faulkner - cardio - 11/10/15, NOV w ith cardio is in Feb 2016.
Dr Lan - cardio - 9/18/2015 (sx ICD placement)

Main Duties of Occupation (Please provide brief description of duties performed):
Off Premise Delivery Driver - Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly
RTW Plan (explain if there is a plan and nature of the plan):
Requires THR but needs cardio clearance prior to sx. (has been terminated by ER)
Most Current APS/Abilities Form/Dr's Note
Date:11/24/2015
Which provider completed:Dr Faulkner (cardio)
Per provider w hat are the current restrictions and limitations?TDOO and AO, requires medical therapy for now.
Per provider w hat can the claimant do?Abilities form (undated, received 11/24/2015) show s occasionally lift up to 10 lbs, occasionally sit. No other abilities.
Surgery
Name of Procedure:PVC ablation w ith ICD implant
Date Performed:9/18/2015
Recent Medical Records Information (Date/Findings)
Physical Exam: Cardio notes -
Assessment / Recommendation /Specific Questions (Provide CE assessment of medical status and any additional claim insight /recommendations or updates for NDC):
Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

LINKS Clinical review Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.

R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible. NOV is Feb 2016.

Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Clmt advises Dr Qureshi is PCP.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015.

CE is submitting for review of records show ing first OV w ith PCP on 8/7/2015 and w ork note advising RTW 8/13/15. DOD per Ortho is 8/21/15 based on first OV. CE is submitting for review of w hether medical records from 8/7/2015 and 8/26/2015 w ould be sufficient to show that clmt w as seeking tx for his dx prior to the date of 8/21/2015. NOV w ith Cardio is 2/2016. - NATNA3 - Dec 16, 2015 12:37:36 pm
Clinical Review Response

Claimant Name: Sherman Carter
DOB: 1-15-67
Claim Number: 1150128075
DOD: 8-7-15
Date Review Completed: 12-24-15 NATNA3 for KEASTO
COD: 11-5-17

Documents review ed:
9-19-15 Dr. David Z. Lan, Cardiology
9-4-15 to 11-10-15Dr. Lee E Faulkner, Cardiology
8-7-15 to 8-26-15Dr. Mohammed Qureshi, PCP

Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.

Analysis/Rationale: Mr. Carter is a 48 y/o male Delivery Driver (medium) w ith a DOD of 8-7-15 and a diagnosis of Osteoarthritis left hip. APS completed on 10-14-15 by Dr. Gregory D. Dabov w ith a diagnosis of Osteoarthritis left hip and R & Ls' of no prolonged w alking, standing or sitting, to be scheduled for surgery pending cardiac clearance w ith undetermined return to w ork w ith date of initial visit on 8-21-15.
APS completed on 10-21-15 by Dr. Lan w ith a diagnosis of Cardiomyopathy S/P ICD implant on 9-18-15, w ith R & L's of unable to lift/carry greater than 20 lbs. for 6 w eeks and unable to push or pull or raise left arm for 6 w eeks.
APS completed by Dr. Faulkner on 11-24-15 w ith Clmt totally disabled from all occupations secondary to EF of 20%.
Abilities form received on 11-27-15 w ith the ability to sit and lift 10 lbs. occasionally completed by Dr. Faulkner.

Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.

Dr. Faulkner
11-10-15 OVN
Diagnosis: S/P ACID, Cardiomyopathy

**Chronological Activity List**

Clmt presents for cardiac evaluation and clearance for left total hip replacement. Clmt is to follow up in 3 months. PE reveals BP 130/90 and he is to f/u in 3 months.
10-30-15 OVN
Diagnosis: S/P AICD, HTN controlled, Severe Dilated cardiomyopathy
Subjective: Clmt presents for cardiac evaluation and clearance for hip surgery, C/O chest pain but improving. Dr. Lan had prescribed medication post ablation and ICD implant
PE reveals Clmt is to f/u in 2 w eeks for BP re check on 11-10-15 and w ill be re-evaluated for clearance.
9-4-15 OVN
Diagnosis: Severe Cardiomyopathy w orse since last visit.
PE reveals C/O chest pain on the left side of his chest w hile laying dow n, elevated BP. Referred for ACID.

Dr. Qureshi
8-26-15 OVN
Diagnosis: Increased Bilirubin, Hyperlipidemia, Leukopenic, Low back pain, HTN, DJD, Hip Surgery, Abnormal EKG referred.
8-7-15 OVN
Diagnosis: Low Back Pain, Myalgia, Leg pain w ith claudication
Physical exam reveals Clmt is c/o back pain, cramps and spasms, BP 140/96, Work status note dated 8-7-15 w ith out of w ork until 8-13-15.

Dr. Lan
9-18-15 OVN
Clmt had a cardioversion w ith PVC ablation and ICD placement and discharge on 9-19-15.

12-24-15 Call to Dr. Qureshi, PCP @ 901 266-1080, the office is closed today.

Specific clinical recommendations: Contact Clmt for w ell checks.

Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

Nancy Nagle RN
Nurse Disability Consultant
Registered Nurse (GA) - NATNA3 - Dec 24, 2015 10:04:52 am

| | | | | | |
|---|---|---|---|---|---|
| 12/17/2015 | Referrals | 2 | Initial Claim Review | Completed | NATNA3 |

Clinical Consultation - Review Referral Template
Demographics
Claimant Name: Sherman Carter
Occupation: Delivery Driver (medium)
Diagnosis: Osteoarthritis of Left Hip.
DLW:8/6/2015
DOD:8/21/2015 (per APS)
COD: 11/5/2017
Current Age: 48
Current Height: 6'0
Current Weight:210
Date of last claimant Phone Call:
Date of Last Clinical Review : 11/25/2015 - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
Current Providers
Name/Specialty/Last Visit Date
Dr Dabov - ortho - 8/21/2015
Dr Faulkner - cardio - 11/10/15, NOV w ith cardio is in Feb 2016.
Dr Lan - cardio - 9/18/2015 (sx ICD placement)

Main Duties of Occupation (Please provide brief description of duties performed):

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Off Premise Delivery Driver - Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly
RTW Plan (explain if there is a plan and nature of the plan):
Requires THR but needs cardio clearance prior to sx. (has been terminated by ER)
Most Current APS/Abilities Form/Dr's Note
Date:11/24/2015
Which provider completed:Dr Faulkner (cardio)
Per provider w hat are the current restrictions and limitations?TDOO and AO, requires medical therapy for now.
Per provider w hat can the claimant do?Abilities form (undated, received 11/24/2015) show s occasionally lift up to 10 lbs, occasionally sit. No other abilities.
Surgery
Name of Procedure:PVC ablation w ith ICD implant
Date Performed:9/18/2015
Recent Medical Records Information (Date/Findings)
Physical Exam: Cardio notes -
Assessment / Recommendation /Specific Questions (Provide CE assessment of medical status and any additional claim insight /recommendations or updates for NDC):
Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

LINKS Clinical review Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.

R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible. NOV is Feb 2016.

Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Clmt advises Dr Qureshi is PCP.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015.

CE is submitting for review of records show ing first OV w ith PCP on 8/7/2015 and w ork note advising RTW 8/13/15. DOD per Ortho is 8/21/15 based on first OV. CE is submitting for review of w hether medical records from 8/7/2015 and 8/26/2015 w ould be sufficient to show that clmt w as seeking tx for his dx prior to the date of 8/21/2015. NOV w ith Cardio is 2/2016. - KEAST0 - Dec 15, 2015 08:06:48 am
12-17-15 Changed to clinical review on 12-16-15 and note did not complete. NATNA3 - NATNA3 - Dec 17, 2015 10:25:14 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/18/2015 | Telephone (OUT) | 9 | SHARRONDA M. CARTER | Completed | KEAST0 |

obc to TPA - advised that claim currently at full med review - up to 5 business days and w ould provide update after review complete. Possibly middle of next w eek. TPA asked ce to provide update if received sooner, CE advised that she w ould . Call ended. - KEAST0 - Dec 18, 2015 11:58:18 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/22/2015 | Telephone (OUT) | 10 | SHERMAN CARTER | Completed | KEAST0 |

obc to clmt returning VM - CE advised still at review . CE advised that she w ould let clmt know if any additional info needed. Otherw ise w ould get in touch w ith clmt regarding outcome. - KEAST0 - Dec 22, 2015 10:57:16 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/24/2015 | Telephone (OUT) | 11 | SHERMAN CARTER | Completed | KEAST0 |

obc to clmt regarding earlier ibc from clmt asking for status of claim - CE unable to leave vm as mailbox is full. - KEAST0 - Dec 24, 2015 09:48:08 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/24/2015 | Documents/Mail | 7 | Approval Letter LTD | Completed | KEAST0 |

Approval Letter LTDAttachments:Rehab Survey

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/24/2015 | Documents/Mail | 6 | Approval Letter LTD | Completed | KEAST0 |

Approval Letter LTDAttachments:Rehab Survey

| | | | | | |
|---|---|---|---|---|---|
| 12/24/2015 | Referrals | 3 | Initial Claim Review | Completed | KEAST0 |

Clinical Consultation - Review Referral Template
Demographics
Claimant Name: Sherman Carter
Occupation: Delivery Driver (medium)
Diagnosis: Osteoarthritis of Left Hip.
DLW:8/6/2015
DOD:8/21/2015 (per APS)
COD: 11/5/2017
Current Age: 48
Current Height: 6'0
Current Weight:210
Date of last claimant Phone Call:
Date of Last Clinical Review : 11/25/2015 - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
Current Providers
Name/Specialty/Last Visit Date
Dr Dabov - ortho - 8/21/2015
Dr Faulkner - cardio - 11/10/15, NOV w ith cardio is in Feb 2016.
Dr Lan - cardio - 9/18/2015 (sx ICD placement)

Main Duties of Occupation (Please provide brief description of duties performed):
Off Premise Delivery Driver - Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly
RTW Plan (explain if there is a plan and nature of the plan):
Requires THR but needs cardio clearance prior to sx. (has been terminated by ER)
Most Current APS/Abilities Form/Dr's Note
Date:11/24/2015
Which provider completed:Dr Faulkner (cardio)
Per provider w hat are the current restrictions and limitations?TDOO and AO, requires medical therapy for now.
Per provider w hat can the claimant do?Abilities form (undated, received 11/24/2015) show s occasionally lift up to 10 lbs, occasionally sit. No other abilities.
Surgery
Name of Procedure:PVC ablation w ith ICD implant
Date Performed:9/18/2015
Recent Medical Records Information (Date/Findings)
Physical Exam: Cardio notes -
Assessment / Recommendation /Specific Questions (Provide CE assessment of medical status and any additional claim insight /recommendations or updates for NDC):
Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

LINKS Clinical review Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.

R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely

| Posted Date | Category | Seq | Item | Status | User |
| --- | --- | --- | --- | --- | --- |

depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible. NOV is Feb 2016.

Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Clmt advises Dr Qureshi is PCP.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015.

CE is submitting for review of records show ing first OV w ith PCP on 8/7/2015 and w ork note advising RTW 8/13/15. DOD per Ortho is 8/21/15 based on first OV. CE is submitting for review of w hether medical records from 8/7/2015 and 8/26/2015 w ould be sufficient to show that clmt w as seeking tx for his dx prior to the date of 8/21/2015. NOV w ith Cardio is 2/2016. - NATNA3 - Dec 16, 2015 12:37:36 pm
Clinical Review Response

Claimant Name: Sherman Carter
DOB: 1-15-67
Claim Number: 1150128075
DOD: 8-7-15
Date Review Completed: 12-24-15 NATNA3 for KEASTO
COD: 11-5-17

Documents review ed:
9-19-15 Dr. David Z. Lan, Cardiology
9-4-15 to 11-10-15Dr. Lee E Faulkner, Cardiology
8-7-15 to 8-26-15Dr. Mohammed Qureshi, PCP

Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.

Analysis/Rationale: Mr. Carter is a 48 y/o male Delivery Driver (medium) w ith a DOD of 8-7-15 and a diagnosis of Osteoarthritis left hip. APS completed on 10-14-15 by Dr. Gregory D. Dabov w ith a diagnosis of Osteoarthritis left hip and R & Ls' of no prolonged w alking, standing or sitting, to be scheduled for surgery pending cardiac clearance w ith undetermined return to w ork w ith date of initial visit on 8-21-15.
APS completed on 10-21-15 by Dr. Lan w ith a diagnosis of Cardiomyopathy S/P ICD implant on 9-18-15, w ith R & L's of unable to lift/carry greater than 20 lbs. for 6 w eeks and unable to push or pull or raise left arm for 6 w eeks.
APS completed by Dr. Faulkner on 11-24-15 w ith Clmt totally disabled from all occupations secondary to EF of 20%.
Abilities form received on 11-27-15 w ith the ability to sit and lift 10 lbs. occasionally completed by Dr. Faulkner.

Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.

Dr. Faulkner
11-10-15 OVN
Diagnosis: S/P ACID, Cardiomyopathy
Clmt presents for cardiac evaluation and clearance for left total hip replacement. Clmt is to follow up in 3 months.
PE reveals BP 130/90 and he is to f/u in 3 months.
10-30-15 OVN
Diagnosis: S/P AICD, HTN controlled, Severe Dilated cardiomyopathy
Subjective: Clmt presents for cardiac evaluation and clearance for hip surgery, C/O chest pain but improving. Dr. Lan had prescribed medication post ablation and ICD implant
PE reveals Clmt is to f/u in 2 w eeks for BP re check on 11-10-15 and w ill be re-evaluated for clearance.
9-4-15 OVN
Diagnosis: Severe Cardiomyopathy w orse since last visit.
PE reveals C/O chest pain on the left side of his chest w hile laying dow n, elevated BP. Referred for ACID.

**Chronological Activity List**

Dr. Qureshi
8-26-15 OVN
Diagnosis: Increased Bilirubin, Hyperlipidemia, Leukopenic, Low back pain, HTN, DJD, Hip Surgery, Abnormal EKG referred.
8-7-15 OVN
Diagnosis: Low Back Pain, Myalgia, Leg pain w ith claudication
Physical exam reveals Clmt is c/o back pain, cramps and spasms, BP 140/96, Work status note dated 8-7-15 w ith out of w ork until 8-13-15.

Dr. Lan
9-18-15 OVN
Clmt had a cardioversion w ith PVC ablation and ICD placement and discharge on 9-19-15.

12-24-15 Call to Dr. Qureshi, PCP @ 901 266-1080, the office is closed today.

Specific clinical recommendations: Contact Clmt for w ell checks.

Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

Nancy Nagle RN
Nurse Disability Consultant
Registered Nurse (GA) - NATNA3 - Dec 24, 2015 10:04:52 am

12/24/2015 11:31:12 AM Referrals 4 Management Review Initial KEAST0

please review this initial for approval - due to release 2 months as BSD is 11/5/2015- thanks!

Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible.
FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015.
Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - Dr Qureshi PCP.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia, leg pain, claudication. 8/26/15 visit is for lab results ordered on 8/7/2015.
Clinical Review : Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.
Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.
Specific clinical recommendations: Contact Clmt for w ell checks.
Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE has received med recs show ing FOV w ith PCP on 8/7/2015 along w ith w ork note - seen for back pain, cramps, spasms, dx of low back pain, leg pain. Reasonable to set DOD at 8/7/2015, clmt w as actively at w ork. Then clmt F/up w ith ortho.

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

PATH: Clmt is TDOO, unable to RTW due to EF of 20%. SHORT TERM: F/up w ith clmt to get update on condition (end of January). LONG TERM: pending short term.
- Management Review - KEAST0 - Dec 24, 2015 11:33:40 am

I agree w ith your decision.

Thanks! - Management Review - NXOKETC - Dec 24, 2015 02:17:35 pm

| | | | | | |
|---|---|---|---|---|---|
| 12/24/2015 8:28:43 PM | Referrals | 5 | Vendor Results | Initial | SXLIMPA |

SS VENDOR - REFERRAL T-2
Social Security Vendor IBI has review ed this claim and indicated the claimant should be aw arded at the appeal Level. Follow -up in 30 days for receipt of DPO, SS Auth, and POF or Vendor Acceptance and to complete intro call to clmt.
- MXKNECH - Dec 28, 2015 10:11:33 am

1/22/16 - IBI has spoken to clmt on 1/15 and 1/19. clmt is mailing forms to ibi on 1/19
I am setting flup for rcpt of our forms and for IC file date from vendor - 15 days.
- SXLIMPA - Jan 22, 2016 11:19:29 am

ibi filed ic 1/28/16 - SXLIMPA - Feb 01, 2016 09:37:22 am

Rcvd DPO #2 and SS AUTH from ibi Set 6mo vendor IC flup - SXLIMPA - Feb 03, 2016 10:35:39 am

3/2/16 - gave clmt IBI ph# - SXLIMPA - Mar 02, 2016 11:19:16 am

ibi filed RECON Appeal 3/30/16 6mo vendor flup - SXLIMPA - Apr 11, 2016 05:41:39 pm

6/9/16 - Rcvd vm from clmt -he provided new /updated ph#
I updated LTD Claim file. Forw arded info to SS Vendor/IBI. Notified CE.
Per ibi, SSA closed claim file on 6/3. (clmt might be aw arded???)
w ill monitor vendor notes in a w eek. - SXLIMPA - Jun 09, 2016 01:33:15 pm

6/16/16 - per ibi notes SSDI Recon appeal is stil pending
- SXLIMPA - Jun 16, 2016 04:29:02 pm

IBI filed RQST for HEARING 6/28/16 Set 12mo vendor flup
- SXLIMPA - Jul 06, 2016 09:22:19 am

Sending rqst to ibi to verify claim status --clmt might be aw arded ???
- SXLIMPA - Jun 28, 2017 03:04:55 pm

per amanda:...
Yes..met medical is a fav med decision..I am not in the office so I w ill look at the file for status of NOA w hen I get home and can log in
- SXLIMPA - Jun 28, 2017 03:58:39 pm

Per ibi notes, Hearing is dismissed due to pre-hearing Fully Favorable Decision
REset flup for rcpt of NOA from ibi - SXLIMPA - Jul 06, 2017 03:27:51 pm

ibi still w aiting for NOA Reset 15 days - SXLIMPA - Jul 17, 2017 03:08:29 pm

ibi still w aiting for NOA Reset 15 days - SXLIMPA - Aug 01, 2017 10:46:58 am

per ibi notes:....08/01/2017 Called Payment Center 7 for Aw ard and Retro, Bonnie said this is not set up to be w orked yet, still pending at the field office. CA
- SXLIMPA - Aug 16, 2017 01:57:18 pm

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

IBI has NOA now and will be sending to LFG soon.
IBI discussed how to apply for Dept bnfts for 18 y/o child.
reset flup for rcpt of NOA from vendor - SXLIMPA - Aug 30, 2017 01:20:47 pm

AWARD SHERMAN CARTER 1150128075 VA EFT
09/6/17 - SSDI AWARD Rcvd from IBI
SSDI award dated = 08/22/2017
Entitlement Date = 02/01/2016
SSDI Award = $1,369.00
EST DEPT AWARD = $684.00
Past Due Benefits = $24,674.00
Vendor/atty fees to credit = $0.00**
**LFG pays Attny fee for IBI.
-- Please note:….. -
STD claim - NOT AFFECTED
CE will need to advise clmt of reduction to bnfts going forward.
Risk Recovery Specialist will calculate Overpayment
Vendor (IBI) will recover ovp amount thru CORS/EFT
Also, in any discussion with the clmt, please remind clmt to repay Overpayment via IBI EFT service, thank you
- GXJONAH - Sep 06, 2017 10:27:29 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/28/2015 | Telephone (IN) | 12 | SHARRONDA M. CARTER | Completed | KEAST0 |

ibc from TPA after OBC regarding approval - TPA advised that she was not able to get the figures referred to for GMB and first payment during first TC> CE provided the amounts for TPA and TPA asked how long the benefits would last. CE advised that as long as the policy provisions are met, then will receive benefits. After 24 months, AO review and then potentially could go to retirement age. TPA thanked CE, call ended. - KEAST0 - Dec 28, 2015 12:03:59 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/28/2015 | Claim Tasks | 8 | Update Claim Information | Completed | KEAST0 |

review med recs on file and send for mgmt review - KEAST0 - Dec 10, 2015 10:57:01 am

has gone for full med review. f/up set. - KEAST0 - Dec 17, 2015 11:22:26 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/28/2015 | Documents/Mail | 8 | Approval Letter LTD | Completed | KEAST0 |

Approval Letter LTDAttachments:Rehab Survey

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/28/2015 | Documents/Mail | 9 | Approval Letter LTD | Completed | KEAST0 |

Approval Letter LTDAttachments:Rehab Survey

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/28/2015 | Summary/Assessment/Pa | 1h | INITIAL........................................................ | Completed | KEAST0 |

Summary Notes
INITIAL................................................................................ - KEAST0 - Dec 07, 2015 10:18:12 am
Assessment Notes
SEE PATH TAB - KEAST0 - Dec 07, 2015 10:18:12 am
Path Notes
Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 with DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; however, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: LINKS Clinical Response - 48 y.o. male, employed as a truck driver with a DOD as 8/21/2015 due to an original diagnosis of OA of the hip with secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underwent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB with inability to prolonged walk, lift or stand. His latest cardiology notes his is still with changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his own occupational duties. Medical provided is supportive following this, as he remains with a 20% ejection fraction.
R&Ls per Ortho on APS of 10/14/2015 are no prolonged walking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.
Job desc provided by ER - Off Premise Delivery Driver - OA exists in AWD under Group Specific Occs- matches eDOT for Truck Driver, Heavy (medium occ) 905.663-014. Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE w ill need details of w hether clmt w as seen by any other providers prior to 8/21/2015 to determine if he w as actively at w ork. ER form indicates that EE received sick pay from 8/7/2015 to 8/17/2015.

Path: CE w ill need to determine w hether clmt w as considered actively at w ork as DLW w as 8/6/2015 and DOD is 8/21/2015 per APS signed by Ortho.
Initial call w ith EE attempted.
Initial call w ith ER completed - ER advised they w ould look for FMLA paperw ork and forw ard to CE if found. - KEAST0 - Dec 07, 2015 10:18:12 am
..............................
Medical Assessment: FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015.
Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - multiple dr's listed on letterhead.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia,leg pain, cladication. 8/26/15 visit is for lab resullts ordered on 8/7/2015.

PATH: CE w ill review medical and determine path.
- KEAST0 - Dec 09, 2015 03:49:42 pm
Dr Qureshi is PCP. - KEAST0 - Dec 10, 2015 11:33:42 am
Flie is currently at Clinical Review . - KEAST0 - Dec 21, 2015 08:17:58 am
................................
Medical Review : Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.

Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.

Specific clinical recommendations: Contact Clmt for w ell checks.
Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

PATH: Clmt is TDOO, unable to RTW due to EF of 20%. SHORT TERM: F/up w ith clmt to get update on condition. LONG TERM: pending short term.
(f/up end of January) - KEAST0 - Dec 24, 2015 11:33:16 am

| 12/28/2015 | Referrals | 4 | Management Review | Completed | KEAST0 |
|---|---|---|---|---|---|

please review this initial for approval - due to release 2 months as BSD is 11/5/2015- thanks!

Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

possible.
FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015.
Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - Dr Qureshi PCP.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia, leg pain, claudication. 8/26/15 visit is for lab results ordered on 8/7/2015.
Clinical Review : Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.
Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.
Specific clinical recommendations: Contact Clmt for w ell checks.
Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE has received med recs show ing FOV w ith PCP on 8/7/2015 along w ith w ork note - seen for back pain, cramps, spasms, dx of low back pain, leg pain. Reasonable to set DOD at 8/7/2015, clmt w as actively at w ork. Then clmt F/up w ith ortho.

PATH: Clmt is TDOO, unable to RTW due to EF of 20%. SHORT TERM: F/up w ith clmt to get update on condition (end of January). LONG TERM: pending short term.
- Management Review - KEAST0 - Dec 24, 2015 11:33:40 am

I agree w ith your decision.

Thanks! - Management Review - NXOKETC - Dec 24, 2015 02:17:35 pm

| 12/28/2015 11:23:26 AM | Summary/Assessment/Pa | 2h | ONGOING......................................................... | Requested | KAGFA8 |
|---|---|---|---|---|---|

Summary Notes
ONGOING........................................................................ - KEAST0 - Dec 28, 2015 11:25:59 am
Assessment Notes
see path tab - KEAST0 - Dec 28, 2015 11:25:59 am
Path Notes
Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: LINKS Clinical Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.
Job desc provided by ER - Off Premise Delivery Driver - OA exists in AWD under Group Specific Occs- matches eDOT for Truck Driver, Heavy (medium occ) 905.663-014. Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE w ill need details of w hether clmt w as seen by any other providers prior to 8/21/2015 to determine if he w as actively at w ork. ER form indicates that EE received sick pay from 8/7/2015 to 8/17/2015.
..............................
Medical Assessment: FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015.
Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - multiple dr's listed on letterhead.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia, leg pain, claudication. 8/26/15 visit is for lab results ordered on 8/7/2015.

...............................
Medical Review : Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.

Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.

Specific clinical recommendations: Contact Clmt for w ell checks.
Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

PATH: Clmt is TDOO, unable to RTW due to EF of 20%. SHORT TERM: F/up w ith clmt to get update on condition. LONG TERM: pending short term.
- KEAST0 - Dec 28, 2015 11:25:59 am
(NOV is 3 months from 11/10/2015) - KEAST0 - Feb 02, 2016 02:37:29 pm
...................
Requesting med recs

PATH: Clmt is TDOO, requesting updated med recs. SHORT TERM: review med recs once received. LONG TERM: pending short term. - KEAST0 - Mar 11, 2016 10:28:21 am

MEDICAL RECORDS
OVN 2/11/16 from Dr. Faulker . EE seen for cardiac eval, ee complains of chest pain on the L side of his chest and SOB w ith over exertion. PE w as unremarkable. Impression. S/P AICD, non ischemic Cardiomyopathy hypertension. Plan: Current cardiac care, follow up in 4 months.

P……. Remaining OVN needed from Dr. Faulker to verify ee's current status. Latest OVN dated 2/11/16 noted physical exam to be unremarkable. Long Term Path: TBD
- KI7TH3 - Apr 27, 2016 12:32:52 pm

APS completed by Dr Faulkner w ith no date - advised LOV is 2/11/2016 - has severely depressed EF of 20% by ECG. seen every 3 months. BP LOV w as 124/88. Unknow n w hen he can RTW. R&Ls listed as medical therapy for now .

PATH: remaining OV neede from Dr. Faulkner to verify status. - KEAST0 - Apr 28, 2016 02:57:27 pm

NOV is not until June - APS completed advises that LOV is 2/11/2016 and severely depressed EF of 20%.

PATH: get update w ith clmt on LOV in June. Request records to determine support. LONG TERM: pending short

term. - KEAST0 - May 11, 2016 12:15:27 pm

PATH: Get update w ith clmt on LOV in early July. Request records to determine support. LONG TERM: pending short term. - KEAST0 - Jul 06, 2016 01:52:23 pm

PATH: Requesting med recs from Dr Faulkner. SHORT TERM: review med recs once received to determine path. Also requesting APS. - KEAST0 - Jul 14, 2016 11:04:06 am

Med recs and APS received from Dr Faulkner - cardio - 7/5/2016 - f/up visit. Chest pain in middle of chest w ith activity w hich lasts for 10 minutes. PE results appear normal. HTN and cardiomyopathy - continue cardiac care. APS signed by Dr Faulkner, but not dated advises that clmt continues w ith severely depressed EF fo 20% by ECG LOV 7/6/16 and seen every 2-3 months. BP listed as 120/80 and clmt is unchanged, class 4 cardiac functional capacity and physical capacity (incapable of sedentary). Unknow n RTW and continue medical therapy.

PATH: Clmt is TDOO based on med recs. CE is seeking input from NDC regarding reasonable f/up based on most recent medical. - KEAST0 - Jul 20, 2016 07:40:00 am

Walk up w ith NDC found that it w as reasonable due to conditions to follow up at COD .

PATH: Clmt is TDOO based on med recs. SHORT TERM: Review file at COD. LONG TERM: TDOO, possibly AO. - KEAST0 - Aug 01, 2016 07:14:00 am
MEDICAL ASSESSMENT: AWD 10/13/2016 - Med recs from Dr Faulker - 9/29/2016 - f/up visit - no chest pain or symptoms noted - BP: 130/90. Impression is HTN, Alcoholism, DJD of hip. Plan: ETOH cessation, f/up 6 months.

PATH: updated R&Ls are needed from Dr Faulkner as records are not clear about R&Ls.
F/up for auth. - KEAST0 - Oct 14, 2016 03:13:36 pm

MEDICAL ASSESSMENT: AWD 11/21/16 - Med recs from Dr Faulkner - 9/29/16. OV note - f/up - chest pain free, no complaints of vomiting, dizziness, palpation, dyspnea, orthopnea, paraoxysmal nocturnal dyspnea. BP: 130/90. Physical exam show s normal - cardio show s normal 1st and 2nd heart sounds. No S-3 or S-4 gallop, Impression: HTN, alcoholism, DJD of hip. F/up 6 months.
AWD 11/21/16 - GCOD completed by Dr Faulkner on 11/21/116. Advised dx of Cardiomyopathy, HTN. Unknow n RTW. Medical therapy for now , severe limitation. Class 5 - incapable of sedentary.

PATH: CE is presenting for review to determine continued support. - KEAST0 - Nov 23, 2016 12:02:29 pm

UPDATED PATH: Review of prior CT/ CRs on file support ongoing TDOO due to EF. COD is due to start on 2/17/2017. CE w ill request forms and updated med recs at that point for COD consideration. LONG TERM: pending COD review .
- KEAST0 - Nov 23, 2016 12:05:03 pm

UPDATED: Begin AO letter mailed to clmnt upon receipt of updated mr requested on 4/10/2017 clmnt LOV 4/3/2017, AF and AO forms w ill submit for full medical review and update PATH - VKIMBLE - Apr 10, 2017 04:11:43 pm

UPDATE: OVN dated 4/3/2017 w ith Physician Hearts Clmnt has no SOB. Or c/o chest pain
EKG - Sinus Bradycardia rate 59, nonspecific abnormality Clmnt to continue meds and f/u in 3 months per Dr. Lee Faulkner STP: w ill continually f/u for AO forms pending receipt w ill update COD determination ., EF still poor PATH TDOO potnetially TDAO at this time
- VKIMBLE - Apr 24, 2017 08:59:47 am

Update: AO Begin letter mailed out on 4/10/2017 at present most recent OVN Dr. Lee Faulkner on file dated 4/3/2017 EBF/ AUTH also on file., still w aiting on AF/ APS mailed out 30day AO f/u letter pending receipt of medical information claim w ill need medical review and update to STP/claim Direction - VKIMBLE - May 12, 2017 10:24:16 am

06/02/2017(AWD) Received Abilities form and APS from Dr. Faulkner MD
05/24/2017- Abilities form. Clmt can occasionally lift up to 10 pounds. And never lift any more than 10 pounds. Provider Wrote N/A for all other restrictions/limitations. No lifting or ?? w hatsoever as his condition is w orsening over time.

05/24/2017-APS. DX: Cardiomyopathy. Subjective findings: w orsening dyspnea. LOV: 04/03/2017. Patient is seen quarterly or every 6 months or more. PHYSICAL IMPAIRMENET: class 4- not capable of sedentary w ork. Patient has

retrogressed. Patient is disabled from ow n and any occ. A fundamental change is never expected.
- KAGFA8 - Jun 05, 2017 07:57:00 am

PATH:
Pending a clinical review for A/O decision. - KAGFA8 - Jun 05, 2017 09:06:20 am

CLINICAL RESPONSE 06/09/2017:
Round table w ith DWKEE, DASBA3, TAKGO7, and DOBTH2

Because his cardio condition prevents him from having the hip surgery, the R&L's are reasonable.
- KAGFA8 - Jun 09, 2017 02:07:58 pm

PATH:
A/O to be approved as the clinical review indicates restrictiosn/limitations are supported. Per most recent APS Clmt is not capable of sedentary w ork. CE w ill continue to moonitor this claim. If clmt does have hip sx claim to be review ed follow ing recovery to determine updated R&L's. - KAGFA8 - Jun 12, 2017 07:34:41 am

07/27/2017- phone call to clmt. Per Clmt report- hip sx is scheduled for 10/20/2017

PATH:
CE to call clmt after 10/20/2017 to confirm he had hip sx. Confirm sx date w ith provider. CE to allow time for recovery prior to updating medical records if clmt does have the sx. Clmt is currenlty TDAO. Clmt may gain some capacity after having sx and may be able to do another occupation. - KAGFA8 - Jul 27, 2017 02:36:36 pm

10/31/2017- phone message left from the clmt: Clmt reports hip replacement sx is scheduled for February. Had to reschedule sx because he does not have finances to pay for it. Will have state insurance starting 02/2018.

- KAGFA8 - Oct 31, 2017 02:35:35 pm

PATH:
CE w ill f/u w ith the clmt in 02/2018 after clmt has sx. Clmt is currently TDAO, but may improve after he has sx. Will determine long term goal follow ing recovery from hip sx. - KAGFA8 - Oct 31, 2017 02:36:03 pm

PATH:
CE w as unable to reach the clmt in Februayr via phone. AS such a no contact letter w as sent to the clmt. Pending call from clmt. Clmt remains TDOO pending verification of sx. Long term goal is TBD. - KAGFA8 - Feb 28, 2018 09:10:08 am

PATH:
Per clmt report on call on 03/01/2018 clmt to have hip sx on 03/07/2018. Clmt to provide discharge summary. CE w ill allow time for recovery . CE w ill complete w ellness check 6 months post hip sx for update to determine if records are needed at that time. Clmt is currently TDOO. Long term goal is TBD. - KAGFA8 - Mar 01, 2018 12:41:18 pm

03/23/2018(AWD) received RTW note from Cambell Clinic dated 03/22/2018 advising that the clmt had total hip replacement sx on 03/07/2018 - KAGFA8 - Mar 23, 2018 02:01:46 pm

PATH:
CE allow ing time for recovery form hip replacement sx. Will f/u w ith the clmt in 4 months. Clmt may improve and have some functionality follow ing recovery from sx. Currently TDAO. - KAGFA8 - Mar 23, 2018 02:06:16 pm

PATH:
Medical records requested from Campbell clinic (hip surgeon and PT provider) and Dr. Faulker (cardiologist). When info is received claim to be sent to clinical to determine if clmt has functionality for another occupation. Clmt is currently TDAO. Long term goal is unclear at this time. CE w ill f/u on medical record requested accordingly. - KAGFA8 - Jul 31, 2018 07:40:15 am

PATH;
Updated auth needed to request records. Sending auth form to clmt to complete andreturn. Once received w il lsubmit request for records. Will f/u on auth form accordingly. - KAGFA8 - Aug 06, 2018 12:33:15 pm

PATH:
Medical records requested from Dr. Lee Faulkner (cardiologist) and Campbell Clinic Orthopedics. An APS w as sent

to both providers to complete and return. CE w ill f/u on the medical records and forms accordingly. Once info is received claim to be referred to clinical to determine if the clmt remains TDAO and is likely to remain TDAO. Long term goal is PTD.
- KAGFA8 - Aug 15, 2018 07:38:26 am

09/04/2018(AWD) received Group Continuance of Disability signed by Dr. Lee Faulkner dated 09/04/2018. DX: cardiomyopathy, HTN. LOV: 07/30/2018. Patient is seen every 6 months or more. TXT: medical-cardiology. RTW is unknow n. R&L's medical therapy for now - severe limitation. PHYSICAL IMPAIRMENT: class 5- not capable of sedentary. - KAGFA8 - Sep 05, 2018 09:04:38 am

09/04/2018 (AWD) received medical records from Dr. Lee Faulkner(cardiologist)
07/30/2018- present for f/u - reports pain w hen stressed out or w hen over exerting himself. Has been under recent stress due to a random shooting to his house- shooter still at large. AICD interrogation- normal AICD function, nonsustained ventricular tachycardia. EKG -sinus rhythm rate of 60, nonspecific tw ave abnormality. PLAN: continue current meds. f/u in 6 months.
- KAGFA8 - Sep 05, 2018 03:15:25 pm

PATH:
Pending receipt of recordsfrom Campbell Clinic Orthopaedics. once received claim to be referred to clinical for review . Will f/u on outstanding records accordingly. - KAGFA8 - Sep 05, 2018 03:16:58 pm

10/01/2018(AWD) received medical records from Campbell Clinic- Dr. Dabov- ortho from 03/19/2018-04/23/2018
04/23/2018-6 w eeks s/p left total hip replacement sx. Doing w ell- has some startup pain. Patient is permanently disabled from medium-or heavy type of w ork. Should get involved in a good w alking program and fitness. f/u in 10 months w ith AP pelvis and lateral of the left hip.
- KAGFA8 - Oct 02, 2018 08:16:08 am

PATH:
Pending a clinical review . Next steps w ill be updated follow ing the conclusion of the review . - KAGFA8 - Oct 02, 2018 08:20:59 am

10/03/2018(AWD) received APS signed by Dr. Lee Faulker form is not dated. DX: Cardiomyopathy and hypertension. R&L's: occasionally lift up to 5 pounds, never lift greater than 5 pounds, stand, w alk, sit, balance, stoop, kneel, finger, crouch, craw l, grasp, climb, push, pull, bend, reach overhead-desk level-or below w aist. TXT: medical therapy. Prognosis- lifelong. - KAGFA8 - Oct 04, 2018 07:30:02 am

PATH:
Claim is pending a clinical review . Next steps w ill be updated once conclusion of review is received.
10/24/2018- Case submitted t for a peer review Board-Certified Cardiology
- KAGFA8 - Oct 24, 2018 02:50:08 pm

10/26/2018(AWD) PEER REVIEW
There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II).

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

PATH:

**Chronological Activity List**

Claim has been referred to voc for a TSA. Once results are received next steps w ill be updated. Will f/u on TSA accordingly. - KAGFA8 - Oct 29, 2018 09:46:30 am

TSA RESULTS:
Vocational Response:
This VRC w as requested to perform a TSA on this claimant to determine if there w ere transferable occupations based upon the individual's w ork history, skills, education, & restrictions & limitations. Occupations w ere identified that meet all of the noted criteria. A complete TSA report has been uploaded into AWD.

Tracie Grumet, MA, CRC
Vocational Rehabilitation Consultant
- TROGR7 - Oct 30, 2018 08:19:00 am

PATH:
Claim to be denied for NOT TDAO. - KAGFA8 - Oct 30, 2018 09:50:33 am

12/05/2018(AWD) Received addendum to initial clinical review . Addendum is dated 12/05/2018.
CONCLUSION; New date altered option. Data supports ONLY sedentary w ork w ith no w alking, occasional standing, no professional driving, no lifting/carrying greater than 10 pounds ever and greater than 10 pounds occasionally in full time capacity, w ith respect to the claimant's cardiac condition.
- KAGFA8 - Dec 06, 2018 02:38:02 pm

PATH;
based on the results of the initial TSA- tw o sedentary occupations w ere identifed. As such, the original denial remains in effect. CE sent the clmt a letter to advise of addendum to peer review and the decision to uphold initial denial. Appeal rights w ere included in the letter. - KAGFA8 - Dec 06, 2018 03:03:05 pm

| | | | | | |
|---|---|---|---|---|---|
| 12/28/2015 9:51:05 PM | Payments | | DEPOSIT 11/5/2015 - 1/5/2016 | INITIAL | NXOKETC |
| 12/29/2015 11:14:36 AM | Documents/Mail | 10 | Social Security Forms | Received | SSA |
| | 2015-12-28-17.09.27.275080O01 | | | | |
| 12/29/2015 11:14:36 AM | Documents/Mail | 11 | Social Security Forms | Received | SSA |
| | 2015-12-28-17.09.27.310080O01 | | | | |
| 12/30/2015 | Documents/Mail | 10 | Social Security Forms | Completed | SSA |
| | 2015-12-28-17.09.27.275080O01 | | | | |
| 12/30/2015 | Documents/Mail | 11 | Social Security Forms | Completed | SSA |
| | 2015-12-28-17.09.27.310080O01 | | | | |
| 1/6/2016 | Telephone (OUT) | 13 | SHARRONDA M. CARTER | Completed | KEAST0 |
| | obc to TPA returning call - CE advised that 2 months benefits had been released - paid 1 month in arrears - first payment w ould be due on 12/5/2015 and w as paid to 1/5/2016. 1 month payments. TPA voiced understanding. Call ended. - KEAST0 - Jan 06, 2016 02:53:26 pm | | | | |
| 2/2/2016 6:18:45 AM | Documents/Mail | 13 | Social Security Forms | Received | SS-ATL |
| | 2016-02-01-08.24.09.006260O01 | | | | |
| 2/2/2016 6:18:45 AM | Documents/Mail | 12 | Social Security Forms | Received | SS-ATL |
| | 2016-02-01-08.24.08.963260O01 | | | | |
| 2/2/2016 6:18:46 AM | Documents/Mail | 14 | Social Security Forms | Received | SS-ATL |
| | 2016-02-02-07.17.49.490220O01 | | | | |
| 2/3/2016 | Documents/Mail | 13 | Social Security Forms | Completed | SS-ATL |
| | 2016-02-01-08.24.09.006260O01 | | | | |
| 2/3/2016 | Documents/Mail | 12 | Social Security Forms | Completed | SS-ATL |
| | 2016-02-01-08.24.08.963260O01 | | | | |
| 2/3/2016 | Documents/Mail | 14 | Social Security Forms | Completed | SS-ATL |
| | 2016-02-02-07.17.49.490220O01 | | | | |
| 2/29/2016 | Telephone (OUT) | 14 | SHERMAN CARTER | Completed | KEAST0 |
| | Obc to clmt returning VM from earlier - unavailable and mailbox is full - CE unable to leave a message. - KEAST0 - Feb 29, 2016 02:45:49 pm | | | | |
| 3/2/2016 | Telephone (IN) | 15 | Sherman Carter | Completed | SAQRE8 |
| | gave CE contact info | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/11/2016 | Documents/Mail | 15 | Authorization | Completed | KEAST0 |

On STD dated 10/5/2015 - KEAST0 - Mar 11, 2016 10:42:17 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/11/2016 10:42:41 AM | Medical | 1 | | Initial | KEAST0 |

mailed med recs request letter w ith auth and aps form to dr lee faulkner md. unable to get a fax thru (phone line problem). - PJMERGE - Mar 15, 2016 11:53:09 am

advised received and being processed. - KEAST0 - Mar 24, 2016 02:12:29 pm

advised that the request that w as received w as only from march -CE advised that w as not the request that she sent - CE to refax - fax number confirmed - refaxing.
CE is refaxing w ith correct auth as auth that w as sent w as TPA for w ife.
f/up to check on status. - KEAST0 - Apr 12, 2016 01:55:57 pm

Contacted office, left message requesting callback from person w ho handles medical records.

Next Task: Contact office regarding records
- KI7TH3 - Apr 26, 2016 10:52:59 am

RTC to Dr. Faulkners office, spoke w ith Sharlena w ho advised OVN not faxed over on 4/12/16, CE checked aw d OVN from 2/11/16 is in AWD , She also advised there is another OVN that she w ill fax over. She also advised Dr. Faulkner does not fill out APS statement.

OVN 2/11/16 . EE seen for cardiac eval, ee complains of chest pain on the L side of his chest and SOB w ith over exertion. PE w as unremarkable. Impression. S/P AICD, non ischemic Cardiomyopathy hypertension. Plan: Current cardiac care, follow up in 4 months.

Next Task: Follow up w ith Drs office if second OVN is not received. - KI7TH3 - Apr 27, 2016 12:30:38 pm

request does not cover the 4/12 ov - CE w ill request separately. - KEAST0 - May 06, 2016 02:19:08 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/11/2016 10:43:33 AM | Medical | 2 | | Initial | KEAST0 |

CE left VM asking for status. f/up set. - KEAST0 - Mar 24, 2016 02:14:36 pm

ibc from Dr's office - Alice - advised that med recs fax is 901 759 3193 and number is 901 759 3139. f/up to refax. -
KEAST0 - Mar 28, 2016 08:18:02 am
w rong auth w as attached - TPA w as attached - CE added auth and refaxed to med recs.

f/up to check on status. - KEAST0 - Mar 31, 2016 12:00:52 pm

CE left VM asking for status. f/up set. - KEAST0 - Apr 04, 2016 03:00:03 pm

rec'd note back from Dr Dabov- no records for dos requested. - MCHOWE - Apr 05, 2016 03:10:11 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/15/2016 | Documents/Mail | 17 | Med Rec Request | Completed | PJMERGE |

Attachments:LTD APSMed Rec RequestCARTER AUTH.pdf

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/15/2016 | Documents/Mail | 16 | Med Rec Request | Completed | PJMERGE |

Attachments:LTD APSMed Rec RequestCARTER AUTH.pdf

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 4/5/2016 11:50:22 AM | Documents/Mail | 18 | Medical Records | Received | KEAST0 |

2016-04-05-12.42.17.972080O01
refusal from Dr Dabov as no DOS for the period requested. - KEAST0 - Apr 07, 2016 01:17:28 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 4/7/2016 | Medical | 2 | | Closed | KEAST0 |

CE left VM asking for status. f/up set. - KEAST0 - Mar 24, 2016 02:14:36 pm

ibc from Dr's office - Alice - advised that med recs fax is 901 759 3193 and number is 901 759 3139. f/up to refax. -
KEAST0 - Mar 28, 2016 08:18:02 am
w rong auth w as attached - TPA w as attached - CE added auth and refaxed to med recs.

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | f/up to check on status. - KEAST0 - Mar 31, 2016 12:00:52 pm | | | | |
| | CE left VM asking for status. f/up set. - KEAST0 - Apr 04, 2016 03:00:03 pm | | | | |
| | rec'd note back from Dr Dabov- no records for dos requested. - MCHOWE - Apr 05, 2016 03:10:11 pm | | | | |
| 4/7/2016 | Documents/Mail | 18 | Medical Records | Completed | KEAST0 |
| | 2016-04-05-12.42.17.972080O01<br>refusal from Dr Dabov as no DOS for the period requested. - KEAST0 - Apr 07, 2016 01:17:28 pm | | | | |
| 4/13/2016 8:40:15 AM | Documents/Mail | 19 | Fax | Received | KEAST0 |
| | 2016-04-12-16.30.47.350040O01 | | | | |
| 4/13/2016 8:40:16 AM | Documents/Mail | 20 | Medical Records | Received | KEAST0 |
| | 2016-04-13-09.39.39.209020O01 | | | | |
| 4/13/2016 8:40:17 AM | Documents/Mail | 21 | Claim Form - EE, ER, APS | Received | KEAST0 |
| | 2016-04-13-09.39.56.307020O01 | | | | |
| 4/14/2016 | Documents/Mail | 20 | Medical Records | Completed | KEAST0 |
| | 2016-04-13-09.39.39.209020O01 | | | | |
| 4/14/2016 | Documents/Mail | 19 | Fax | Completed | KEAST0 |
| | 2016-04-12-16.30.47.350040O01 | | | | |
| 4/14/2016 | Documents/Mail | 21 | Claim Form - EE, ER, APS | Completed | KEAST0 |
| | 2016-04-13-09.39.56.307020O01 | | | | |
| 4/27/2016 1:55:32 PM | Documents/Mail | 22 | Fax | Received | KEAST0 |
| | 2016-04-27-13.30.27.114340O01 | | | | |
| 4/27/2016 1:55:33 PM | Documents/Mail | 23 | Claim Form - EE, ER, APS | Received | KEAST0 |
| | 2016-04-27-14.54.23.133400O01<br>APS completed by Dr Faulkner w ith no date - advised LOV is 2/11/2016 - has severely depressed EF of 20% by ECG. seen every 3 months. BP LOV w as 124/88. Unknow n w hen he can RTW. R&Ls listed as medical therapy for now . - KEAST0 - Apr 28, 2016 02:56:45 pm | | | | |
| 4/27/2016 1:55:34 PM | Documents/Mail | 24 | Medical Records | Received | KEAST0 |
| | 2016-04-27-14.54.40.918400O01<br>Med recs received from Dr Faulkner - 2/11/16 - presents for cardiac evaluation. SOB w ith exertion, chest pain on left sids. Physical exam: 124/88, all physicial exam findings are essentially normal. Advises f/up in 4 months. - KEAST0 - Apr 28, 2016 02:36:53 pm | | | | |
| 4/28/2016 | Documents/Mail | 24 | Medical Records | Completed | KEAST0 |
| | 2016-04-27-14.54.40.918400O01<br>Med recs received from Dr Faulkner - 2/11/16 - presents for cardiac evaluation. SOB w ith exertion, chest pain on left sids. Physical exam: 124/88, all physicial exam findings are essentially normal. Advises f/up in 4 months. - KEAST0 - Apr 28, 2016 02:36:53 pm | | | | |
| 4/28/2016 | Documents/Mail | 22 | Fax | Completed | KEAST0 |
| | 2016-04-27-13.30.27.114340O01 | | | | |
| 4/28/2016 | Documents/Mail | 23 | Claim Form - EE, ER, APS | Completed | KEAST0 |
| | 2016-04-27-14.54.23.133400O01<br>APS completed by Dr Faulkner w ith no date - advised LOV is 2/11/2016 - has severely depressed EF of 20% by ECG. seen every 3 months. BP LOV w as 124/88. Unknow n w hen he can RTW. R&Ls listed as medical therapy for now . - KEAST0 - Apr 28, 2016 02:56:45 pm | | | | |
| 5/6/2016 | Medical | 1 | | Closed | KEAST0 |
| | mailed med recs request letter w ith auth and aps form to dr lee faulkner md. unable to get a fax thru (phone line problem). - PJMERGE - Mar 15, 2016 11:53:09 am | | | | |
| | advised received and being processed. - KEAST0 - Mar 24, 2016 02:12:29 pm | | | | |
| | advised that the request that w as received w as only from march -CE advised that w as not the request that she sent - CE to refax - fax number confirmed - refaxing. | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

CE is refaxing w ith correct auth as auth that w as sent w as TPA for w ife.
f/up to check on status. - KEAST0 - Apr 12, 2016 01:55:57 pm

Contacted office, left message requesting callback from person w ho handles medical records.

Next Task: Contact office regarding records
- KI7TH3 - Apr 26, 2016 10:52:59 am

RTC to Dr. Faulkners office, spoke w ith Sharlena w ho advised OVN not faxed over on 4/12/16, CE checked aw d OVN from 2/11/16 is in AWD , She also advised there is another OVN that she w ill fax over. She also advised Dr. Faulkner does not fill out APS statement.

OVN 2/11/16 . EE seen for cardiac eval, ee complains of chest pain on the L side of his chest and SOB w ith over exertion. PE w as unremarkable. Impression. S/P AICD, non ischemic Cardiomyopathy hypertension. Plan: Current cardiac care, follow up in 4 months.

Next Task: Follow up w ith Drs office if second OVN is not received. - KI7TH3 - Apr 27, 2016 12:30:38 pm

request does not cover the 4/12 ov - CE w ill request separately. - KEAST0 - May 06, 2016 02:19:08 pm

| 5/6/2016 2:19:20 PM | Medical | 3 | | Initial | KEAST0 |
|---|---|---|---|---|---|

CE is sending amended request w ith 2/1/16 as this w as the last date that he w as seen according to Dr's office staff. - KEAST0 - May 10, 2016 02:39:48 pm

obc to dr's office - they advised LOV w as from February and advised that next appt is not until June 13th. closing tab. - KEAST0 - May 20, 2016 01:48:09 pm

| 5/10/2016 | Documents/Mail | 25 | Med Rec Request | Completed | VLHOFFM |
|---|---|---|---|---|---|

Med Rec RequestAttachments:sherman carter.pdf

| 5/11/2016 | Documents/Mail | 26 | Medical Records | Completed | KEAST0 |
|---|---|---|---|---|---|

2016-05-10-15.45.27.083540O01
Med recs received from Dr Faulkner (cardio) LOV notes from 2/11/2016. Advises rom Dr Faulkner (cardio) - complains of chest pain on left side of chest and SOB w ith over exertion. On Carvedilol x 2 a day and Lisinopril daily. BP: 128/88 - phys exam show s normal results. Impression: S/p AICD, non ischemic cardiomyopathy, HTN. Plan: current cardiac care - f/up in 4 months. - KEAST0 - May 11, 2016 11:38:19 am

| 5/20/2016 | Medical | 3 | | Closed | KEAST0 |
|---|---|---|---|---|---|

CE is sending amended request w ith 2/1/16 as this w as the last date that he w as seen according to Dr's office staff. - KEAST0 - May 10, 2016 02:39:48 pm

obc to dr's office - they advised LOV w as from February and advised that next appt is not until June 13th. closing tab. - KEAST0 - May 20, 2016 01:48:09 pm

| 6/9/2016 | Claim Tasks | 9 | Update Claim Direction | Completed | KEAST0 |
|---|---|---|---|---|---|

fyi....

6/9/16 - Rcvd vm from clmt -he provided new /updated ph#
I updated LTD Claim file. Forw arded info to SS Vendor/IBI. Notified CE.
Per ibi, SSA closed claim file on 6/3. (clmt might be aw arded???)
w ill monitor vendor notes in a w eek. - SXLIMPA - Jun 09, 2016 01:34:13 pm

| 6/16/2016 | Telephone (OUT) | 16 | SHERMAN CARTER | Completed | KEAST0 |
|---|---|---|---|---|---|

Obc to clmt regarding update - Dr Faulkner - NOV - still monitoring his heart - once he sees them then they w ill go from there. Not cleared for sx at this point. CE advised she w ould f/up w ith clmt after NOV and for clmt to call if he had any questions in the meantime. Clmt voiced understanding. - KEAST0 - Jun 16, 2016 12:14:01 pm

| 6/27/2016 | Telephone (OUT) | 17 | SHERMAN CARTER | Completed | KEAST0 |
|---|---|---|---|---|---|

obc to clmt regarding update w ith Dr Faulkner -didn't have the visit because Dr Faulkner asked him to reschedule. Clmt advised that he w ould contact CE to let her know w hen rescheduled. - KEAST0 - Jun 27, 2016 03:07:58 pm

| 7/1/2016 | Telephone (OUT) | 18 | SHERMAN CARTER | Completed | KEAST0 |
|---|---|---|---|---|---|

obc to clmt returning VM about Dr Faulker's NOV on 7/5/2016 - clmt asked CE to call back to ensure she received

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | message. CE advised received and w ould f/up w ith clmt after NOV and get anything needed from Dr Faulker. Call ended. - KEAST0 - Jul 01, 2016 09:50:15 am | | | | |
| 7/6/2016 | Telephone (OUT) | 19 | SHERMAN CARTER | Completed | KEAST0 |
| | Obc to clmt regarding LOV w ith Dr Faulkner - phone rang 2 x and advised that mailbox not set up. CE unable to leave message. - KEAST0 - Jul 06, 2016 01:50:22 pm | | | | |
| 7/6/2016 1:51:04 PM | Claim Tasks | 10 | Update Claim Information | Requested | KEAST0 |
| | Auth is on STD dated from 10/2015 - updated auth is needed. - KEAST0 - Jul 06, 2016 01:51:34 pm<br><br>CE w ill do status check w ith clmt in mid October to and send out updated auth at that time - f/up set. - KEAST0 - Sep 01, 2016 10:56:03 am<br><br>obc to clmt - left VM advising sending out auth and looking for update. f/up set. 15 days. - KEAST0 - Oct 12, 2016 02:44:22 pm | | | | |
| 7/14/2016 11:00:55 AM | Medical | 4 | | Initial | KEAST0 |
| | Fax correct, no special auth, auth on STD dated 10/5/2015, no charge for records per prior requests. - KEAST0 - Jul 14, 2016 11:02:46 am<br><br>letter sent - f/up for receipt check. - KEAST0 - Jul 18, 2016 02:41:51 pm<br><br>received. - KEAST0 - Jul 20, 2016 07:20:46 am | | | | |
| 7/15/2016 | Documents/Mail | 27 | Med Rec Request | Completed | ADYOUNG |
| | Attachments:carter.pdfMed Rec RequestLTD APS | | | | |
| 7/18/2016 | Documents/Mail | 28 | Med Rec Request Follow Up | Completed | KEAST0 |
| | Med Rec Request Follow Up | | | | |
| 7/19/2016 | Documents/Mail | 29 | Medical Records | Completed | KEAST0 |
| | 2016-07-18-16.45.43.363360O01 | | | | |
| 7/20/2016 | Medical | 4 | | Closed | KEAST0 |
| | Fax correct, no special auth, auth on STD dated 10/5/2015, no charge for records per prior requests. - KEAST0 - Jul 14, 2016 11:02:46 am<br><br>letter sent - f/up for receipt check. - KEAST0 - Jul 18, 2016 02:41:51 pm<br><br>received. - KEAST0 - Jul 20, 2016 07:20:46 am | | | | |
| 7/27/2016 | Telephone (IN) | 20 | SHERMAN CARTER | Completed | KEAST0 |
| | Ibc from clmt - regarding letter from lov from Dr Faulkner - clmt advised that Dr's office sent out med recs on 7/18 - CE said she w ould look out for it and let clmt know if she needed any further information. Clmt voiced understanding. Call ended. - KEAST0 - Jul 27, 2016 10:52:36 am | | | | |
| 10/12/2016 | Telephone (OUT) | 21 | SHERMAN CARTER | Completed | KEAST0 |
| | obc to clmt - left VM advising updated auth needed and looking for update - Ibc from clmt after VM w as left. - w ent to see Dr Faulkner - LOV a few w eeks ago. Not released to hip sx. Still w aiting to have clearance from heart dr - clmt advised that the BP is stabilizing but not released at this point. CE advisd that an updated auth is required on file and w ould send out. Clmt voiced understanding. Call ended. - KEAST0 - Oct 12, 2016 02:48:33 pm | | | | |
| 10/14/2016 | Claim Tasks | 10 | Update Claim Information | Completed | KEAST0 |
| | Auth is on STD dated from 10/2015 - updated auth is needed. - KEAST0 - Jul 06, 2016 01:51:34 pm<br><br>CE w ill do status check w ith clmt in mid October to and send out updated auth at that time - f/up set. - KEAST0 - Sep 01, 2016 10:56:03 am<br><br>obc to clmt - left VM advising sending out auth and looking for update. f/up set. 15 days. - KEAST0 - Oct 12, 2016 02:44:22 pm | | | | |
| 10/14/2016 | Documents/Mail | 30 | Medical Records | Completed | KEAST0 |
| | 2016-10-13-14.45.25.473080O01<br>MEDICAL ASSESSMENT: AWD 10/13/2016 - Med recs from Dr Faulker - 9/29/2016 - f/up visit - no chest pain or symptoms noted - BP: 130/90. Impression is HTN, Alcoholism, DJD of hip. Plan: ETOH cessation, f/up 6 months. - KEAST0 - Oct 14, 2016 03:11:43 pm | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 10/14/2016 | Documents/Mail | 31 | Request Sign Authorization | Completed | KEAST0 |
| | Attachments:Auth MedicalRequest Sign Authorization | | | | |
| 10/28/2016 | Telephone (OUT) | 22 | SHERMAN CARTER | Completed | KEAST0 |
| | obc to clmt 15 day for auth - clmt advised they mailed the form back last w eek, CE advised that the form w as not received yet- but CE w ould look out for it and give clmt a call if not received by 11/3/2016. Clmt voiced understanding., Call ended. - KEAST0 - Oct 28, 2016 02:41:08 pm | | | | |
| 11/1/2016 1:12:51 PM | Documents/Mail | 32 | Claim Form - Authorization | Received | KEAST0 |
| | 2016-10-31-17.35.54.527920O01<br>LFG auth 10/24/16 - KEAST0 - Nov 03, 2016 01:46:26 pm | | | | |
| 11/3/2016 | Telephone (OUT) | 23 | SHERMAN CARTER | Completed | KEAST0 |
| | obc to clmt regarding receipt of auth - CE left VM advised that auth w as received. - KEAST0 - Nov 03, 2016 01:44:24 pm | | | | |
| 11/3/2016 | Documents/Mail | 32 | Claim Form - Authorization | Completed | KEAST0 |
| | 2016-10-31-17.35.54.527920O01<br>LFG auth 10/24/16 - KEAST0 - Nov 03, 2016 01:46:26 pm | | | | |
| 11/3/2016 1:46:56 PM | Medical | 5 | | Initial | KEAST0 |
| | Fax correct, no special auth, updated auth AWD 10/31/16. , no charge for records per prior requests. thank you! - KEAST0 - Nov 03, 2016 01:47:47 pm<br><br>obc to Dr's office - request w as received. f/up 30 days. - KEAST0 - Nov 11, 2016 12:54:48 pm<br><br>received. - KEAST0 - Nov 23, 2016 12:01:16 pm | | | | |
| 11/7/2016 | Documents/Mail | 33 | Med Rec Request | Completed | NA7SU3 |
| | Med Rec RequestAttachments:Group Continuance of DisabilityCARTER SHERMAN.pdf | | | | |
| 11/8/2016 | Documents/Mail | 34 | Med Rec Request Follow Up | Completed | KEAST0 |
| | Med Rec Request Follow Up | | | | |
| 11/16/2016 | Telephone (OUT) | 24 | SHERMAN CARTER | Completed | KEAST0 |
| | obc to clmt returning VM regarding request for med recs - CE advised w e requested med recs and form from Dr F regarding current R&Ls. CE advised w e had confirmation from office that it w as received. Clmt voiced understanding. CE advised that she w ould be in touch w tih clmt mid-December if any issues. Call ended. - KEAST0 - Nov 16, 2016 11:39:38 am | | | | |
| 11/21/2016 10:15:55 AM | Documents/Mail | 35 | Fax | Received | KEAST0 |
| | 2016-11-21-11.01.33.565500O01 | | | | |
| 11/21/2016 10:15:56 AM | Documents/Mail | 36 | Medical Record Invoice | Received | PDPWA0 |
| | 2016-11-21-11.14.15.722500O01<br>REP WILL CALL ME BACK DO TO ISSUE WITH PHONE LINE TO MAKE PAYMENT - PDPWA0 - Nov 22, 2016 03:23:13 pm<br><br>inv w as w as pd w ith cc for 20.00 to ms green from dr lee faulkner md - PDPWA0 - Nov 22, 2016 03:51:18 pm | | | | |
| 11/21/2016 10:15:57 AM | Documents/Mail | 38 | Medical Records | Received | KEAST0 |
| | 2016-11-21-11.14.50.571500O01<br>AWD 11/21/16 - Med recs from Dr Faulkner - 9/29/16. OV note - f/up - chest pain free, no complaints of vomiting, dizziness, palpation, dyspnea, orthopnea, paraoxysmal nocturnal dyspnea. BP: 130/90. Physical exam show s normal - cardio show s normal 1st and 2nd heart sounds. No S-3 or S-4 gallop, Impression: HTN, alcoholism, DJD of hip. F/up 6 months. - KEAST0 - Nov 23, 2016 11:59:05 am | | | | |
| 11/21/2016 10:15:57 AM | Documents/Mail | 37 | Claim Form - EE, ER, APS | Received | KEAST0 |
| | 2016-11-21-11.14.37.627500O01<br>AWD 11/21/16 - GCOD completed by Dr Faulkner on 11/21/116. Advised dx of Cardiomyopathy, HTN. Unknow n RTW. Medical therapy for now , severe limitation. Class 5 - incapable of sedentary.<br>- KEAST0 - Nov 23, 2016 12:00:58 pm | | | | |
| 11/22/2016 | Documents/Mail | 35 | Fax | Completed | KEAST0 |
| | 2016-11-21-11.01.33.565500O01 | | | | |
| 11/22/2016 | Documents/Mail | 36 | Medical Record Invoice | Completed | PDPWA0 |
| | 2016-11-21-11.14.15.722500O01<br>REP WILL CALL ME BACK DO TO ISSUE WITH PHONE LINE TO MAKE PAYMENT - PDPWA0 - Nov 22, 2016 03:23:13 | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | pm<br><br>inv w as w as pd w ith cc for 20.00 to ms green from dr lee faulkner md - PDPWA0 - Nov 22, 2016 03:51:18 pm | | | | |
| 11/23/2016 | Medical | 5 | | Closed | KEAST0 |
| | Fax correct, no special auth, updated auth AWD 10/31/16. , no charge for records per prior requests. thank you! - KEAST0 - Nov 03, 2016 01:47:47 pm<br><br>obc to Dr's office - request w as received. f/up 30 days. - KEAST0 - Nov 11, 2016 12:54:48 pm<br><br>received. - KEAST0 - Nov 23, 2016 12:01:16 pm | | | | |
| 11/23/2016 | Documents/Mail | 38 | Medical Records | Completed | KEAST0 |
| | 2016-11-21-11.14.50.571500O01<br>AWD 11/21/16 - Med recs from Dr Faulkner - 9/29/16. OV note - f/up - chest pain free, no complaints of vomiting, dizziness, palpation, dyspnea, orthopnea, paraoxysmal nocturnal dyspnea. BP: 130/90. Physical exam show s normal - cardio show s normal 1st and 2nd heart sounds. No S-3 or S-4 gallop, Impression: HTN, alcoholism, DJD of hip. F/up 6 months. - KEAST0 - Nov 23, 2016 11:59:05 am | | | | |
| 11/23/2016 | Documents/Mail | 37 | Claim Form - EE, ER, APS | Completed | KEAST0 |
| | 2016-11-21-11.14.37.627500O01<br>AWD 11/21/16 - GCOD completed by Dr Faulkner on 11/21/116. Advised dx of Cardiomyopathy, HTN. Unknow n RTW. Medical therapy for now , severe limitation. Class 5 - incapable of sedentary.<br>- KEAST0 - Nov 23, 2016 12:00:58 pm | | | | |
| 2/22/2017 | Claim Tasks | 7 | Call Claimant | Completed | VKIMBLE |
| | call clmt w ith outcome of mgmt review once finished. - KEAST0 - Dec 10, 2015 10:56:32 am<br><br>file has gone for full med review - f/up set. - KEAST0 - Dec 17, 2015 11:22:55 am<br><br>approved - advised clmt - f/up set for end of Jan to get update. - KEAST0 - Dec 28, 2015 11:29:32 am<br><br>NOV for cardio is in 3 months from 11/15. F/up set to get update after NOV. - KEAST0 - Feb 02, 2016 02:36:48 pm<br><br>attempted - try again. - KEAST0 - Feb 29, 2016 02:46:08 pm<br><br>no change - still no sx - CE w ill request updated med recs. - KEAST0 - Mar 02, 2016 08:52:42 am<br><br>requested - f/up to review and contact clmt as required after review . - KEAST0 - Mar 11, 2016 10:28:45 am<br><br>clmt's NOV w ith Dr Faulkner is in June - get update w ith clmt on current status, w hether sx has been scheduled, how LOV w ith Dr Faulkner (cardio) w ent and w hether he has been cleared for hip sx at this point. - KEAST0 - May 11, 2016 11:48:39 am<br><br>NOV is next w eek - ce to f/up w ith clmt after NOV. - KEAST0 - Jun 16, 2016 12:15:29 pm<br><br>f/up to check if no response about reschedule. - KEAST0 - Jun 27, 2016 03:08:24 pm<br><br>attempted update after LOV on 7/5/2016 - f/up to try again and request med recs. - KEAST0 - Jul 06, 2016 01:53:01 pm<br><br>requesting med recs. - KEAST0 - Jul 14, 2016 10:59:47 am<br><br>received med recs and they show no change - CE has asked NDC for clarification on w hether the file w ill need a review based on the med recs received - w aiting for response. - KEAST0 - Jul 20, 2016 07:39:12 am<br><br>reasonable to f/up at COD due to comorbidities. _ f/up is set to request new auth. - KEAST0 - Aug 01, 2016 07:14:34 am<br><br>f/up 15 days. - KEAST0 - Oct 12, 2016 02:48:58 pm<br><br>advised mailed in - check for receipt- call clmt if not received. - KEAST0 - Oct 28, 2016 02:41:31 pm | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | received. requesting med recs and GCOD from Dr Faulkner. - KEAST0 - Nov 03, 2016 01:44:57 pm | | | | |
| | received - f/up at COD investigation start date in Feb 2017. - KEAST0 - Nov 23, 2016 12:05:34 pm | | | | |
| 4/10/2017 | Telephone (OUT) | 25 | SHERMAN CARTER | Completed | VKIMBLE |
| | OBC to clmnt to advise that Begin AO is underw ay clmnt advised lov w / LEE FAULKNER MD 4/3/2017 no other tx: physicians Clmnt is w aiting for release so he can get hip replaced - left advised of AO vs OO and that forms w ill mail out today 4/10/2017 clmnt w ill have 45days to rtn clmnt advised if I have ? to contact w ife no valid TPA on file clmnt may submit in w riting., no change in income or new dx: at this time., advised w ill f/u over the next 15-45 days w ith outstanding information no addtl ? or concerns and call ended - VKIMBLE - Apr 10, 2017 04:10:51 pm | | | | |
| 4/10/2017 | Documents/Mail | 39 | Begin Any Occ Investigation | Completed | VKIMBLE |
| | Begin Any Occ InvestigationAttachments:Auth MedicalAbilitiesEducational BackgroundAbilitiesLTD APS | | | | |
| 4/10/2017 4:07:21 PM | Medical | 6 | | Initial | VKIMBLE |
| | mr rcvd see SAP for review - VKIMBLE - Apr 24, 2017 08:58:13 am | | | | |
| 4/10/2017 4:11:52 PM | Claim Tasks | 11 | Call Claimant | Requested | KAGFA8 |
| | clmnt w ellness check and status update - VKIMBLE - Apr 10, 2017 04:12:13 pm | | | | |
| 4/10/2017 8:46:20 PM | Investigation | 1 | Any Occ | Requested | VKIMBLE |
| 4/12/2017 | Documents/Mail | 40 | Med Rec Request | Completed | SH6MI5 |
| | Med Rec RequestAttachments:S Carter.pdf | | | | |
| 4/13/2017 12:43:09 PM | Documents/Mail | 41 | Fax | Received | VKIMBLE |
| | 2017-04-13-09.45.46.468440O01 | | | | |
| 4/13/2017 12:43:10 PM | Documents/Mail | 42 | Medical Record Invoice | Received | MCHOWE |
| | 2017-04-13-13.42.23.868440O01 | | | | |
| | Duplicate invoice. Pd - MCHOWE - Apr 17, 2017 11:55:41 am | | | | |
| 4/13/2017 12:43:11 PM | Documents/Mail | 43 | Medical Records | Received | VKIMBLE |
| | 2017-04-13-13.42.33.790440O01 | | | | |
| 4/13/2017 12:47:29 PM | Documents/Mail | 44 | Fax | Received | VKIMBLE |
| | 2017-04-13-10.00.20.102380O01 | | | | |
| 4/13/2017 12:47:30 PM | Documents/Mail | 45 | Medical Records | Received | VKIMBLE |
| | 2017-04-13-13.46.42.012440O01 | | | | |
| 4/13/2017 12:47:30 PM | Documents/Mail | 46 | Medical Record Invoice | Received | MCHOWE |
| | 2017-04-13-13.46.52.981440O01 | | | | |
| | SPOKE W/ JACKIE- PD CC $20.00 FOR MEDICAL RECORDS FROM DR LEE FAULKNER- APPR# 023333- - MCHOWE - Apr 17, 2017 12:05:34 pm | | | | |
| 4/17/2017 | Documents/Mail | 42 | Medical Record Invoice | Completed | MCHOWE |
| | 2017-04-13-13.42.23.868440O01 | | | | |
| | Duplicate invoice. Pd - MCHOWE - Apr 17, 2017 11:55:41 am | | | | |
| 4/17/2017 | Documents/Mail | 46 | Medical Record Invoice | Completed | MCHOWE |
| | 2017-04-13-13.46.52.981440O01 | | | | |
| | SPOKE W/ JACKIE- PD CC $20.00 FOR MEDICAL RECORDS FROM DR LEE FAULKNER- APPR# 023333- - MCHOWE - Apr 17, 2017 12:05:34 pm | | | | |
| 4/24/2017 | Medical | 6 | | Closed | VKIMBLE |
| | mr rcvd see SAP for review - VKIMBLE - Apr 24, 2017 08:58:13 am | | | | |
| 4/24/2017 | Documents/Mail | 45 | Medical Records | Completed | VKIMBLE |
| | 2017-04-13-13.46.42.012440O01 | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 4/24/2017 | Documents/Mail | 41 | Fax | Completed | VKIMBLE |
| | 2017-04-13-09.45.46.468440O01 | | | | |
| 4/24/2017 | Documents/Mail | 43 | Medical Records | Completed | VKIMBLE |
| | 2017-04-13-13.42.33.790440O01 | | | | |
| 4/24/2017 | Documents/Mail | 44 | Fax | Completed | VKIMBLE |
| | 2017-04-13-10.00.20.102380O01 | | | | |
| 4/25/2017 | Documents/Mail | 47 | Envelope | Completed | VKIMBLE |
| | 2017-04-24-16.00.34.108560O01 | | | | |
| 4/25/2017 10:56:56 AM | Documents/Mail | 48 | Incoming Correspondence | Received | VKIMBLE |
| | 2017-04-25-11.56.18.648580O01<br>EBF form dated 4/19/2017<br>clmnt has HS diploma, some college exp and w ork exp as a fork lift driver and machinist - VKIMBLE - Apr 27, 2017 10:26:45 pm | | | | |
| 4/25/2017 10:56:57 AM | Documents/Mail | 49 | Claim Form - Authorization | Received | VKIMBLE |
| | 2017-04-25-11.56.35.360580O01<br>AUTH on file dated 4/19/2017 - VKIMBLE - Apr 27, 2017 10:27:21 pm | | | | |
| 4/27/2017 | Claim Tasks | 2 | Begin AO Investigation | Completed | VKIMBLE |
| | auth requested mid October 2016 and is not required for AO./ - KEAST0 - Sep 01, 2016 10:59:39 am<br><br>mailed out Begin AO letter and requested mr from Dr. Faulkner claim on 30/5 se tc for details<br>15day f/u in plae to f/u on forms and mr - VKIMBLE - Apr 10, 2017 04:10:36 pm<br><br>mr rcvd on file ...f/u for AO forms and submit for review - VKIMBLE - Apr 24, 2017 08:57:53 am<br><br>EBF / AUTH on file w ill submit for full medical review 4/28/17 and update SAP /PATH - VKIMBLE - Apr 27, 2017 10:28:17 pm | | | | |
| 4/27/2017 | Documents/Mail | 49 | Claim Form - Authorization | Completed | VKIMBLE |
| | 2017-04-25-11.56.35.360580O01<br>AUTH on file dated 4/19/2017 - VKIMBLE - Apr 27, 2017 10:27:21 pm | | | | |
| 4/27/2017 | Documents/Mail | 48 | Incoming Correspondence | Completed | VKIMBLE |
| | 2017-04-25-11.56.18.648580O01<br>EBF form dated 4/19/2017<br>clmnt has HS diploma, some college exp and w ork exp as a fork lift driver and machinist - VKIMBLE - Apr 27, 2017 10:26:45 pm | | | | |
| 5/3/2017 3:06:31 PM | Claim Tasks | 12 | Update Claim Information | Requested | KAGFA8 |
| | 30day f/u for AO forms<br>pending receipt refer for ealry COD review - VKIMBLE - May 03, 2017 03:07:00 pm<br><br>Abilities Form – To be completed by your medical provider<br>Attending Physician Statement of Disability form completed by your medical provider<br><br>EBF/ AUTH on file - VKIMBLE - May 03, 2017 03:08:55 pm<br><br>mailed out 30day AO FLUP letter to clmnt - VKIMBLE - May 12, 2017 10:24:42 am<br><br>FYI:<br>IBC rcvd from clmnt advised that he is having the cardiologist complete the forms and clmnt has an appt w / Dr. Gibode and w ill have him submit addtl information at that time<br>advised w ill note as FYI for new CE and provided contat information no addtl ? or concerns and call ended - VKIMBLE - May 22, 2017 10:53:54 am<br><br>05/24/2017- CE spoke w ith the clmt w ho reports he has dropped the forms off to his cardiologist to complete. CE advised she iw ll allow until next w eek for it to be received. If not received by next w eek claim to be suspended for FTP. - KAGFA8 - May 24, 2017 09:03:00 am<br><br>06/01/2017- CE spoke w ith Jackie at providers office. She notes that hte fomrs w ill be completed and faxed | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | tomorrow . | | | | |
| | f/u on forms from provider. - KAGFA8 - Jun 01, 2017 12:19:50 pm | | | | |
| | 06/05/2017- forms received - KAGFA8 - Jun 05, 2017 09:05:54 am | | | | |
| 5/10/2017 | Investigation | 1 | Any Occ | Received | VKIMBLE |
| 5/12/2017 | Documents/Mail | 50 | Any Occ Follow Up | Completed | VKIMBLE |
| | Any Occ Follow UpAttachments:AbilitiesLTD APS | | | | |
| 5/12/2017 8:49:19 PM | Investigation | 2 | Any Occ | Requested | KAGFA8 |
| 5/22/2017 | Telephone (IN) | 26 | Sherman Carter | Completed | MABCA2 |
| | LTD 1150128075<br><br>claimamtn adv he doenst have an appointment w ith his heart doctor on 06/01/2017<br><br>adv to get info in as soon as hecan | | | | |
| 5/22/2017 | Telephone (IN) | 27 | SHERMAN CARTER | Completed | VKIMBLE |
| | IBC rcvd from clmnt advised that he is having the cardiologist complete the forms and clmnt has an appt w / Dr. Gibode and w ill have him submit addtl information at that time<br>advised w ill note as FYI for new CE and provided contat information no addtl ? or concerns and call ended - VKIMBLE - May 22, 2017 10:53:33 am | | | | |
| 5/24/2017 | Telephone (IN) | 28 | SHERMAN CARTER | Completed | KAGFA8 |
| | Cardiologist has forms and w ill be submitting them. He notes he dropped them off on Monday. Been due for a hop surgery, but due to heart complications could not have the surgery. It has been put off for over a year now . CE asked the clmt to contact providers office and request that the forms be submitted ASAP. He advised that he has already done so. CE advised him that she w ill f/u w ith him next w eek if the forms have not been received by then. The clmt did not have any questions for CE. - KAGFA8 - May 24, 2017 09:00:45 am | | | | |
| 5/24/2017 | Investigation | 2 | Any Occ | Received | KAGFA8 |
| 6/1/2017 | Telephone (IN) | 29 | LEE FAULKNER MD | Completed | KAGFA8 |
| | CE spoke w ith Jackie w ho notes that the forms w ill be completed and faxed tomorrow . CE thanked her for her time. - KAGFA8 - Jun 01, 2017 12:16:33 pm | | | | |
| 6/1/2017 | Telephone (OUT) | 30 | SHERMAN CARTER | Completed | VKIMBLE |
| | OBC to clmnt per vm receipt rtc no answ r and advised of new CE - VKIMBLE - Jun 01, 2017 01:29:44 pm | | | | |
| 6/2/2017 | Documents/Mail | 52 | Medical Records | Completed | KAGFA8 |
| | 2017-06-02-14.16.53.805360O01 | | | | |
| 6/2/2017 | Documents/Mail | 53 | Claim Form - EE, ER, APS | Completed | KAGFA8 |
| | 2017-06-02-14.17.07.432360O01 | | | | |
| 6/2/2017 1:18:29 PM | Documents/Mail | 51 | Fax | Received | KAGFA8 |
| | 2017-06-02-13.09.16.426400O01 | | | | |
| 6/5/2017 | Telephone (IN) | 31 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE called the clmt back and comfrimed that APS and Abilities form w as received. He notes thatw e w ill also receive informatio nregarding his hip as he has w ent back and hopes to be released bo cardiologist to have the surgery. CE thanked him for the updatre. - KAGFA8 - Jun 05, 2017 02:02:36 pm | | | | |
| 6/5/2017 | Claim Tasks | 11 | Call Claimant | Completed | KAGFA8 |
| | clmnt w ellness check and status update - VKIMBLE - Apr 10, 2017 04:12:13 pm | | | | |
| 6/5/2017 | Claim Tasks | 12 | Update Claim Information | Completed | KAGFA8 |
| | 30day f/u for AO forms<br>pending receipt refer for ealry COD review - VKIMBLE - May 03, 2017 03:07:00 pm<br><br>Abilities Form – To be completed by your medical provider<br>Attending Physician Statement of Disability form completed by your medical provider<br><br>EBF/ AUTH on file - VKIMBLE - May 03, 2017 03:08:55 pm | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

mailed out 30day AO FLUP letter to clmnt - VKIMBLE - May 12, 2017 10:24:42 am

FYI:
IBC rcvd from clmnt advised that he is having the cardiologist complete the forms and clmnt has an appt w / Dr. Gibode and w ill have him submit addtl information at that time
advised w ill note as FYI for new CE and provided contat information no addtl ? or concerns and call ended - VKIMBLE - May 22, 2017 10:53:54 am

05/24/2017- CE spoke w ith the clmt w ho reports he has dropped the forms off to his cardiologist to complete. CE advised she iw ll allow until next w eek for it to be received. If not received by next w eek claim to be suspended for FTP. - KAGFA8 - May 24, 2017 09:03:00 am

06/01/2017- CE spoke w ith Jackie at providers office. She notes that hte fomrs w ill be completed and faxed tomorrow .

f/u on forms from provider. - KAGFA8 - Jun 01, 2017 12:19:50 pm

06/05/2017- forms received - KAGFA8 - Jun 05, 2017 09:05:54 am

| | | | | | |
|---|---|---|---|---|---|
| 6/5/2017 | Documents/Mail | 51 | Fax | Completed | KAGFA8 |

2017-06-02-13.09.16.426400O01

| | | | | | |
|---|---|---|---|---|---|
| 6/5/2017 9:03:57 AM | Referrals | 6 | Change of Definition | Initial | KAGFA8 |

Claimant Name: Sherman Carter
Claim Number: 11501208075
Occupation/level:Delivery Driver- med occ
Diagnosis:Cardiomyopathy, and oseoarthrtis of hip
DOD:08/07/2015
DLW:08/06/2015
SUMMARY:
48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034

MEDICAL ASSESSMENT:
UPDATE: OVN dated 4/3/2017 w ith Physician Hearts Clmnt has no SOB. Or c/o chest pain
EKG - Sinus Bradycardia rate 59, nonspecific abnormality Clmnt to continue meds and f/u in 3 months per Dr. Lee Faulkner STP: w ill continually f/u for AO forms pending receipt w ill update COD determination ., EF still poor PATH TDOO potnetially TDAO at this time
06/02/2017(AWD) Received Abilities form and APS from Dr. Faulkner MD
05/24/2017- Abilities form. Clmt can occasionally lift up to 10 pounds. And never lift any more than 10 pounds. Provider Wrote N/A for all other restrictions/limitations. No lifting or ?? w hatsoever as his condition is w orsening over time.
05/24/2017-APS. DX: Cardiomyopathy. Subjective findings: w orsening dyspnea. LOV: 04/03/2017. Patient is seen quarterly or every 6 months or more. PHYSICAL IMPAIRMENET: class 4- not capable of sedentary w ork. Patient has retrogressed. Patient is disabled from ow n and any occ. A fundamental change is never expected.
Specific Medical Question:
Based on the available medical records are ten restrictions/limitations noted on the APS and Abilities fomr completed by Dr. Faulkner supported?

If yes, w hat is a reasonable duration that the restrictions/limitations w ould be supported? - KAGFA8 - Jun 05, 2017 09:05:10 am
Round table w ith DWKEE, DASBA3, TAKGO7, and DOBTH2

Because his cardio condition prevents him from having the hip surgery, the R&L's are reasonable. - DOBTH2 - Jun 09, 2017 01:24:04 pm

| | | | | | |
|---|---|---|---|---|---|
| 6/12/2017 | Claim Tasks | 4 | Ow n Occ - See Contract Language | Completed | KAGFA8 |

06/12/2017- A/O being approved - KAGFA8 - Jun 12, 2017 07:47:06 am

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 6/12/2017 | Documents/Mail<br>Approv Any Occ | 54 | Approv Any Occ | Completed | KAGFA8 |
| 6/12/2017 | Documents/Mail<br>Approv Any Occ | 55 | Approv Any Occ | Completed | KAGFA8 |
| 6/12/2017 | Referrals | 6 | Change of Definition | Completed | KAGFA8 |

Claimant Name: Sherman Carter
Claim Number: 11501208075
Occupation/level:Delivery Driver- med occ
Diagnosis:Cardiomyopathy, and oseoarthrtis of hip
DOD:08/07/2015
DLW:08/06/2015
SUMMARY:
48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034

MEDICAL ASSESSMENT:
UPDATE: OVN dated 4/3/2017 w ith Physician Hearts Clmnt has no SOB. Or c/o chest pain
EKG - Sinus Bradycardia rate 59, nonspecific abnormality Clmnt to continue meds and f/u in 3 months per Dr. Lee Faulkner STP: w ill continually f/u for AO forms pending receipt w ill update COD determination ., EF still poor PATH TDOO potnetially TDAO at this time
06/02/2017(AWD) Received Abilities form and APS from Dr. Faulkner MD
05/24/2017- Abilities form. Clmt can occasionally lift up to 10 pounds. And never lift any more than 10 pounds. Provider Wrote N/A for all other restrictions/limitations. No lifting or ?? w hatsoever as his condition is w orsening over time.
05/24/2017-APS. DX: Cardiomyopathy. Subjective findings: w orsening dyspnea. LOV: 04/03/2017. Patient is seen quarterly or every 6 months or more. PHYSICAL IMPAIRMENET: class 4- not capable of sedentary w ork. Patient has retrogressed. Patient is disabled from ow n and any occ. A fundamental change is never expected.
Specific Medical Question:
Based on the available medical records are ten restrictions/limitations noted on the APS and Abilities fomr completed by Dr. Faulkner supported?

If yes, w hat is a reasonable duration that the restrictions/limitations w ould be supported? - KAGFA8 - Jun 05, 2017 09:05:10 am
Round table w ith DWKEE, DASBA3, TAKGO7, and DOBTH2

Because his cardio condition prevents him from having the hip surgery, the R&L's are reasonable. - DOBTH2 - Jun 09, 2017 01:24:04 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 6/12/2017 | Referrals | 7 | Management Review | Completed | KAGFA8 |

Please review claim for A/O approval

48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034

06/02/2017(AWD) Received Abilities form and APS from Dr. Faulkner MD DX: Cardiomyopathy. Subjective findings: w orsening dyspnea. LOV: 04/03/2017. Patient is seen quarterly or every 6 months or more. PHYSICAL IMPAIRMENET: class 4- not capable of sedentary w ork. Patient has retrogressed. Patient is disabled from ow n and any occ. A fundamental change is never expected.

CLINICAL RESPONSE 06/09/2017:
Round table w ith DWKEE, DASBA3, TAKGO7, and DOBTH2

Because his cardio condition prevents him from having the hip surgery, the R&L's are reasonable.

R&L's are supported. As such, clmt is not capable of performing a sedentary job. Requesting A/O approval. CE w ill

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | continue to monitor this claim. If clmt receives hip sx w ill allow recovery time and obtain updated R&L's.<br><br>A/O approval letter is in WIP status.<br>- Management Review - KAGFA8 - Jun 12, 2017 07:46:07 am<br><br>6/12/17 Early TDAO approval is appropriate; ok to proceed w ith approval process.<br>- Management Review - DDWATTS - Jun 12, 2017 02:49:09 pm | | | | |
| 6/12/2017 7:47:11 AM | Claim Tasks | 13 | Update Claim Information | Requested | KAGFA8 |
| | Complete a w ellness check. Has the clmt had hip sx? - KAGFA8 - Jun 12, 2017 07:47:53 am<br><br>09/27/2017- per clmt report- hip sx is scheduled for 10/20/2017<br><br>Call clmt to confimr he had sx. - KAGFA8 - Sep 27, 2017 11:28:32 am<br><br>10/30/2017- alled clmt no answ er. VM message left.<br><br>Make 2nd attempt to reach the clmt. - KAGFA8 - Oct 30, 2017 09:26:29 am<br><br>10/31/2017- called clmt no answ er. VM message left. Sent clmt a no contact letter.<br><br>This is the 15 day f/u on no contact letter. Call clmt. - KAGFA8 - Oct 31, 2017 09:21:43 am<br><br>10/30/2017- clmt left a VM message advising that he has to w ait on insurance to becme effective prior to having sx. Will have sx in 02/2018.<br><br>Contact the clmt for an update. Did the clmt have hip sx? If yes w hen? What surgeon? Current txt planK? - KAGFA8 - Oct 31, 2017 02:39:08 pm<br><br>02/20/2018- called clmt. No answ er. VM message left requesting a return call.<br><br>Make 2nd attempt to reach the clmt. - KAGFA8 - Feb 20, 2018 09:25:14 am<br><br>02/22/2018-Called clmt. No answ er. No contact letter and ISS form sent to the clmt.<br><br>This is the 15 day f/u. Call the clmt. - KAGFA8 - Feb 22, 2018 08:46:09 am<br><br>03/01/2018- CE received a call from the clmt. He w ill have hop sx on 03/07/2018. He w ill send in discharge summary.<br><br>Call clmt to inquire about discharge sumary. - KAGFA8 - Mar 01, 2018 12:40:03 pm<br><br>03/21/2018- Clmt reports he w il lsend over confirmation of sx tomrrow .<br><br>f/u w ith clmt re: sx discharge paperw ork. - KAGFA8 - Mar 21, 2018 01:15:41 pm<br><br>03/23/2018- received note confirming clmt had sx on 03/07/2018 - KAGFA8 - Mar 23, 2018 02:06:42 pm | | | | |
| 7/27/2017 | Telephone (IN) | 32 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE called the clmt to discuss hip sx. Hip replacement sx scheduled for 10/20/2017. Will see cardiologist for pre op<br>CE advised she w ill call clmt after sx date for an update. - KAGFA8 - Jul 27, 2017 02:34:55 pm | | | | |
| 8/25/2017 | Telephone (IN) | 33 | Sherman Carter | Completed | KAGFA8 |
| | ssn<br>Sherman Carter<br>er ASBARB<br><br><br>ee called to find the name of the Attorney w ho is on his claim<br>xfer to ce reach vm.<br>Farrell Lott ext 3080 | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

check w ith claim assist, adv no attorney on file and ask to leave a follow up note to ce to call ee back.
caller w ants to speak to a supervisor and ask for sup name
provide nikky Beasley 7377
xfer to ce, reach vm

08/25/2017- called clmt- advised IBI phone number is :
800-535-6575
- KAGFA8 - Aug 25, 2017 03:32:54 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 8/25/2017 | Telephone (IN) | 34 | Sherman Carter | Completed | SJGARDN |

Name: Sherman Carter
Claim # or SSN:
ER Name: BarDett, LLC
Phone #:

trying to get atty SSI phone #
3080
7784

Integrated Benefits, Inc.800-535-6575

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 9/6/2017 | Referrals | 5 | Vendor Results | Completed | SXLIMPA |

SS VENDOR - REFERRAL T-2
Social Security Vendor IBI has review ed this claim and indicated the claimant should be aw arded at the appeal Level. Follow -up in 30 days for receipt of DPO, SS Auth, and POF or Vendor Acceptance and to complete intro call to clmt.
- MXKNECH - Dec 28, 2015 10:11:33 am

1/22/16 - IBI has spoken to clmt on 1/15 and 1/19. clmt is mailing forms to ibi on 1/19
I am setting flup for rcpt of our forms and for IC file date from vendor - 15 days.
- SXLIMPA - Jan 22, 2016 11:19:29 am

ibi filed ic 1/28/16 - SXLIMPA - Feb 01, 2016 09:37:22 am

Rcvd DPO #2 and SS AUTH from ibi Set 6mo vendor IC flup - SXLIMPA - Feb 03, 2016 10:35:39 am

3/2/16 - gave clmt IBI ph# - SXLIMPA - Mar 02, 2016 11:19:16 am

ibi filed RECON Appeal 3/30/16 6mo vendor flup - SXLIMPA - Apr 11, 2016 05:41:39 pm

6/9/16 - Rcvd vm from clmt -he provided new /updated ph#
I updated LTD Claim file. Forw arded info to SS Vendor/IBI. Notified CE.
Per ibi, SSA closed claim file on 6/3. (clmt might be aw arded???)

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

w ill monitor vendor notes in a w eek. - SXLIMPA - Jun 09, 2016 01:33:15 pm

6/16/16 - per ibi notes SSDI Recon appeal is stil pending
- SXLIMPA - Jun 16, 2016 04:29:02 pm

IBI filed RQST for HEARING 6/28/16 Set 12mo vendor flup
- SXLIMPA - Jul 06, 2016 09:22:19 am

Sending rqst to ibi to verify claim status --clmt might be aw arded ???
- SXLIMPA - Jun 28, 2017 03:04:55 pm

per amanda:...
Yes..met medical is a fav med decision..I am not in the office so I w ill look at the file for status of NOA w hen I get home and can log in
- SXLIMPA - Jun 28, 2017 03:58:39 pm

Per ibi notes, Hearing is dismissed due to pre-hearing Fully Favorable Decision
REset flup for rcpt of NOA from ibi - SXLIMPA - Jul 06, 2017 03:27:51 pm

ibi still w aiting for NOA Reset 15 days - SXLIMPA - Jul 17, 2017 03:08:29 pm

ibi still w aiting for NOA Reset 15 days - SXLIMPA - Aug 01, 2017 10:46:58 am

per ibi notes:....08/01/2017 Called Payment Center 7 for Aw ard and Retro, Bonnie said this is not set up to be w orked yet, still pending at the field office. CA
- SXLIMPA - Aug 16, 2017 01:57:18 pm

IBI has NOA now and w ill be sending to LFG soon.
IBI discussed how to apply for Dept bnfts for 18 y/o child.
reset flup for rcpt of NOA from vendor - SXLIMPA - Aug 30, 2017 01:20:47 pm

AWARD SHERMAN CARTER 1150128075 VA EFT
09/6/17 - SSDI AWARD Rcvd from IBI
SSDI aw ard dated = 08/22/2017
Entitlement Date = 02/01/2016
SSDI Aw ard = $1,369.00
EST DEPT AWARD = $684.00
Past Due Benefits = $24,674.00
Vendor/atty fees to credit = $0.00**
**LFG pays Attny fee for IBI.
-- Please note:..... -
STD claim - NOT AFFECTED
CE w ill need to advise clmt of reduction to bnfts going forw ard.
Risk Recovery Specialist w ill calculate Overpayment
Vendor (IBI) w ill recover ovp amount thru CORS/EFT
Also, in any discussion w ith the clmt, please remind clmt to repay Overpayment via IBI EFT service, thank you
- GXJONAH - Sep 06, 2017 10:27:29 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 9/6/2017 9:46:10 AM | Documents/Mail | 56 | Vendor Overpayment Letter | Work In Progress | GXJONAH |

Vendor Overpayment LetterAttachments:SHERMAN CARTER OVP CALC.pdf

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 9/6/2017 10:16:24 AM | Referrals | 8 | SSDI Aw ard | Initial | BXMOHR |

AWARD SHERMAN CARTER 1150128075 VA EFT
09/6/17 - SSDI AWARD Rcvd from IBI
SSDI aw ard dated = 08/22/2017
Entitlement Date = 02/01/2016
SSDI Aw ard = $1,369.00
EST DEPT AWARD = $684.00
Past Due Benefits = $24,674.00

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Vendor/atty fees to credit = $0.00**
**LFG pays Attny fee for IBI.
-- Please note:..... -
STD claim - NOT AFFECTED
CE w ill need to advise clmt of reduction to bnfts going forw ard.
Risk Recovery Specialist w ill calculate Overpayment
Vendor (IBI) w ill recover ovp amount thru CORS/EFT
Also, in any discussion w ith the clmt, please remind clmt to repay Overpayment via IBI EFT service, thank you

LTD Claim #1150128075 Overpayment $33,579.00
OVP Letter sent to clmt and a copy to IBI for recovery
30 days F/U for update>>
- GXJONAH - Sep 06, 2017 10:26:19 am

RECVD DEPENDENT AWARD DATED 9/15/17
Entitlement date 02/1/16 to 7/1/17 (Dept is no more eligible)
Amount = $684.00
Past Due benefits = $11,642.00

OP RECALC DONE:

LTD Claim #1150128075 Overpayment $32,755.53
OVP letter sent to clmt and IBI
F/U for update (PDB is pending SSI investigation - GXJONAH - Sep 19, 2017 01:43:52 pm

Clmt called: PDB is still pending. Clmt w ants to discuss settlement. I advised the CE needs to certify that he w ill be on the claim past COD and then refer to STL for review before a settlement can be made. Clmt w ill call CE. - GXJONAH - Sep 27, 2017 11:07:20 am

2nd OVP letter sent to clmt
F/U for uopdate> - GXJONAH - Oct 19, 2017 02:47:49 pm

Clmt called> He has not rcvd PDB. I advise him to continue f/u w ith SS for the PDB. He has to be calling SSA for the money. If no f/u lfg w ill be forced to ROR his benefits. Clmt w ould also like to discuss STL w ith CE. Thank you - GXJONAH - Oct 31, 2017 10:36:37 am

PER CE > ci to advise has not received his ssdi back pay yet - GXJONAH - Nov 20, 2017 03:16:47 pm

(info that PDB is not been released by SS) F/U in JANUARY for PDB - GXJONAH - Dec 07, 2017 11:59:42 am

IBI is still w aiting for PDB. We w ill continue to monitor PDB release> - GXJONAH - Jan 09, 2018 09:48:59 am

NO PDB from IBI yet> - GXJONAH - Jan 24, 2018 01:00:22 pm

PER IBI> I cannot get Sherman or Sherronda to return any of my calls regarding the Overpayment. I have been calling and leaving messages every couple of days, since the end of December. They are clearly not communicating w ith me any longer.

I am sorry, but I have exhausted all of my efforts. I am closing his file today.

Sent 2nd OP letter
> If w e do not hear from you by 02/10/2018, it w ill be necessary to w ithhold your remaining benefits tow ards the overpayment and refer this matter for collection.

- GXJONAH - Jan 26, 2018 02:47:22 pm

fee w ithheld from IBI $2500.00 - MBGRAY - Feb 05, 2018 08:04:00 am

ROR Set in claim. IBI already closed claim

PLEASE REVIEW CLAIM FOR COLLECTIONS
-------------------------------------------------------
-OVP letters were sent on 9/19/17, 10/19/17, and 1/26/18
- Calls on 10/19/17 and 10/31/17
- IBI closed for non-response
- Withholding remaining benefits
----------------------------------------------------------- - GXJONAH - Feb 26, 2018 02:55:45 pm

************************************************************
***SENT TO JMC - 03/02/18******
*****WITHHOLDING $581.00 MONTHLY*****
***RETURN TO OVP-RISK IF BENEFIT REDUCTIONS STOP***
*****$32174.53

****RETURNING TO CE TO MONITOR BENEFIT REDUCTIONS FOR ACK LETTER
- BXMOHR - Mar 02, 2018 02:27:06 pm

ACKREFUND SENT> After crediting $581.00 to the overpayment, the remaining balance is now $31,593.53. - GXJONAH - May 02, 2018 01:13:18 pm

ACKREFUND SENT> After crediting $581.00 to the overpayment, the remaining balance is now $29,269.53.
- GXJONAH - Aug 03, 2018 07:25:39 am

ACKREFUND SENT> After crediting $484.17 to the overpayment, the remaining balance is now $27,623.36.

Claim has been closed. NO RESERVE - No benefits to withhold> Sending back to OVP-RISK - GXJONAH - Nov 02, 2018 02:16:32 pm

Email to JMC that we are no longer reducing benefits. - BXMOHR - Nov 05, 2018 07:58:33 am

CONDITIONAL WRITE OFF OF OVP RATIONALE
Overpayment continues to exist on claim. No Refund activity for greater than 6 months. Writing off overpayment amount "Conditionally" as uncollectable. Conditional Write Off means if claim is reopened or new claim for same ee is opened, we will resume recovery efforts.
- BXMOHR - Oct 31, 2019 11:10:26 am

9/6/2017 10:26:32 AM Claim Tasks 14 Review SS Offset Amount Requested KAGFA8

AWARD SHERMAN CARTER 1150128075 VA EFT
09/6/17 - SSDI AWARD Rcvd from IBI
SSDI award dated = 08/22/2017
Entitlement Date = 02/01/2016
SSDI Award = $1,369.00
EST DEPT AWARD = $684.00
Past Due Benefits = $24,674.00
Vendor/atty fees to credit = $0.00**
**LFG pays Attny fee for IBI.
-- Please note:..... -
STD claim - NOT AFFECTED
CE will need to advise clmt of reduction to bnfts going forward.
Risk Recovery Specialist will calculate Overpayment
Vendor (IBI) will recover ovp amount thru CORS/EFT
Also, in any discussion with the clmt, please remind clmt to repay Overpayment via IBI EFT service, thank you
- GXJONAH - Sep 06, 2017 10:26:44 am

10/07/2017- mailed clmt a letter to advise of new benefit amount. - KAGFA8 - Sep 07, 2017 07:20:33 am

9/7/2017 Claim Tasks 14 Review SS Offset Amount Completed KAGFA8

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

AWARD SHERMAN CARTER 1150128075 VA EFT
09/6/17 - SSDI AWARD Rcvd from IBI
SSDI aw ard dated = 08/22/2017
Entitlement Date = 02/01/2016
SSDI Aw ard = $1,369.00
EST DEPT AWARD = $684.00
Past Due Benefits = $24,674.00
Vendor/atty fees to credit = $0.00**
**LFG pays Attny fee for IBI.
-- Please note:..... -
STD claim - NOT AFFECTED
CE w ill need to advise clmt of reduction to bnfts going forw ard.
Risk Recovery Specialist w ill calculate Overpayment
Vendor (IBI) w ill recover ovp amount thru CORS/EFT
Also, in any discussion w ith the clmt, please remind clmt to repay Overpayment via IBI EFT service, thank you
- GXJONAH - Sep 06, 2017 10:26:44 am

10/07/2017- mailed clmt a letter to advise of new benefit amount. - KAGFA8 - Sep 07, 2017 07:20:33 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 9/7/2017 | Documents/Mail | 56 | Vendor Overpayment Letter | Completed | GXJONAH |
| | Vendor Overpayment LetterAttachments:SHERMAN CARTER OVP CALC.pdf | | | | |
| 9/7/2017 | Documents/Mail | 57 | SS New Benefit w ith No OVP | Completed | KAGFA8 |
| | SS New Benefit w ith No OVP | | | | |
| 9/7/2017 | Documents/Mail | 58 | SS New Benefit w ith No OVP | Completed | KAGFA8 |
| | SS New Benefit w ith No OVP | | | | |
| 9/12/2017 | Telephone (IN) | 35 | Sherman Carter | Completed | ICEBU7 |
| | Recvd cll frm Sherman Carter, Grp Id ASBARB re clm#1150128075 cllng abt SSDI benefits and over pymt. I advsd him w e recvd the SSDI aw ard letter and advsd his ce w ill determine how much the over pymt w ill be. I advsd him a letter w as mailed to him on 9/6/17 and he shd be getting it any day now . | | | | |
| 9/19/2017 | Documents/Mail | 59 | Vendor Overpayment Letter | Completed | GXJONAH |
| | Vendor Overpayment LetterAttachments:SHERMAN CARTER OVP CALC update.pdf | | | | |
| 9/27/2017 | Telephone (IN) | 36 | SHERMAN CARTER | Completed | GXJONAH |
| | Clmt called: PDB is still pending. Clmt w ants to discuss settlement. I advised the CE needs to certify that he w ill be on the claim past COD and then refer to STL for review before a settlement can be made. Clmt w ill call CE. - GXJONAH - Sep 27, 2017 11:07:13 am | | | | |
| 9/27/2017 | Telephone (IN) | 37 | SHERMAN CARTER | Completed | KAGFA8 |
| | Clmt called and asked if it w ould be possible for a settlement on his claim. CE looked over his claim and asked the clmt if he w as going to have hip surgery. He notes that it is currently scheduled for 10/20/2017. CE advised that based on the last clinical review the clmt may gain some capacity to w ork after having hip surgery. AS such, CE is unable to refer to settlement. CE advised that after his hop recovery w e can revisit a settlement option. He expressed understanding. - KAGFA8 - Sep 27, 2017 11:27:43 am | | | | |
| 10/19/2017 | Documents/Mail | 60 | Overpayment 2nd Request | Completed | GXJONAH |
| | Overpayment 2nd Request | | | | |
| 10/30/2017 | Telephone (IN) | 38 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE called clmt to confirm he had hip sx. there w as no answ er. CE left a VM message requesting a return call. - KAGFA8 - Oct 30, 2017 09:24:20 am | | | | |
| 10/31/2017 | Telephone (IN) | 39 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE called clmt- there w as no answ er. CE left a VM message requesting a return call. - KAGFA8 - Oct 31, 2017 09:17:24 am | | | | |
| 10/31/2017 | Telephone (IN) | 40 | Sherman Carter | Completed | KAGFA8 |
| | SHERMAN CARTER | | | | |

CI TO ADV RECEIVED LETTER RE: OVP...WANTS US TO KNOW HE HAS NOT BEEN PAID BY SSDI YET IN ORDER TO REPAY US.

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | *****HIP REPLACEMENT SX RESCHEDULED FOR FEBRUARY DUE TO FIBRULATOR PUT IN CHEST AND NOW HE DOES NOT HAVE $3000 TO PAY FOR THE SX OUT OF HIS POCKET. ONCE STATE INSURANCE STARTS 2-1-18 HE CAN SCHEDULE THE SX FOR HIP REPLACEMENT****<br><br>10/31/2017- called clmt back. No answ er. VM message left w ith direct phone number left for clmt to return call. - KAGFA8 - Oct 31, 2017 02:33:31 pm | | | | |
| 10/31/2017 | Telephone (IN) | 41 | SHERMAN CARTER | Completed | GXJONAH |
| | Clmt called> He has not rcvd PDB. I advise him to continue f/u w ith SS for the PDB. He has to be calling SSA for the money. If no f/u lfg w ill be forced to ROR his benefits. Clmt w ould also like to discuss STL w ith CE. Thank you - GXJONAH - Oct 31, 2017 10:36:28 am | | | | |
| 10/31/2017 | Documents/Mail | 61 | Free Form Letter | Completed | KAGFA8 |
| | Record w as canceled. Completed to remove from case diary. Date: 01-NOV-17<br>Free Form Letter | | | | |
| 11/10/2017 8:11:18 PM | Claim Tasks | 15 | Review for Vendor Collection | Requested | KAGFA8 |
| 11/13/2017 | Claim Tasks | 15 | Review for Vendor Collection | Completed | KAGFA8 |
| 11/20/2017 | Telephone (IN) | 42 | Sherman Carter | Completed | GXJONAH |
| | SHERMAN CARTER<br><br>ci to advise has not received his ssdi back pay yet<br><br>noted - GXJONAH - Nov 20, 2017 03:16:23 pm | | | | |
| 11/30/2017 | Telephone (IN) | 43 | Sherman Carter | Completed | CHRDA4 |
| | Sherman Carter<br>BarDett, LLC<br><br>claimant is calling to inform that he has not received the back pay from ss and claim is open and next pymt w ill be issued on 11-30-17 | | | | |
| 1/26/2018 | Documents/Mail | 62 | Overpayment 2nd Request | Completed | GXJONAH |
| | Overpayment 2nd Request | | | | |
| 2/20/2018 | Telephone (IN) | 44 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE caleld the clmt. There w as no answ er. VM message left requesting a return call. - KAGFA8 - Feb 20, 2018 09:24:38 am | | | | |
| 2/22/2018 | Telephone (IN) | 45 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE caleld clmt. The phone w ent directly to VM. A message w as left requesting a return call. - KAGFA8 - Feb 22, 2018 08:41:48 am | | | | |
| 2/22/2018 | Documents/Mail | 63 | Free Form Letter | Completed | KAGFA8 |
| | Free Form LetterAttachments:ISS | | | | |
| 3/1/2018 | Telephone (IN) | 46 | Sherman Carter | Completed | KAGFA8 |
| | c/b# 9013568012<br>Employer?s Name/Group ID: ASBARB<br>Name of caller: Sherman Carter<br><br>ee calling to report upcoming sx 3/7/2018 // ee w ould like a call back from ce to discuss settlement and how he w ould like to repayback.<br><br>03/01/2018- CE called clmt back. He advised that he w ill have his hip sx. He notes that w e need to udnerstand that | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | he is disabled due to his heart condition. He notes he cant be in stressful positions as it w ill cause blood preasure to increase. He als odisucssed OVP. He indicates that he never received a back pay check because it w ent to child support. CE explained to him that he w as still due the money but due to prior obligations he had to pay other debts w ith the money. How ever, that does not negate the fact tht he ow es us the mone ytoo. He then started talking about him never agreening to use the vendor for SSDI. and that the attorney never spoke w ith him until he called to talk about the amount that he ow ed. CE advised the clmt he should call the OVP person back to discuss options. He is intersted in a settlement. CE explained to him that he may gain suome functionality after havying hip sx so w e cant explore settlement as an option right now . He expressed understanding. CE asked the clmt to send in discharge summary from his hip sx. He agreed to do so. CE advised once received she w ill allow time for recovery prior to requesting updated medical records. - KAGFA8 - Mar 01, 2018 12:38:48 pm | | | | |
| 3/21/2018 | Telephone (IN) | 47 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE spoke w ith the clmt. He reports he had his sx tw o w eeks ago and is doing therapy 2 days per w eek. His f/u w ith surgeon is tomorrow and he w il lsee his cardioligist. He w il lforw ard confirmation of sx after appt's tomorrow along w ith updated info from doctors. He asked CE to cal lhsi w ife and give her CE's fax number. CE did. - KAGFA8 - Mar 21, 2018 01:14:48 pm | | | | |
| 3/23/2018 | Claim Tasks | 13 | Update Claim Information | Completed | KAGFA8 |

Complete a w ellness check. Has the clmt had hip sx? - KAGFA8 - Jun 12, 2017 07:47:53 am

09/27/2017- per clmt report- hip sx is scheduled for 10/20/2017

Call clmt to confimr he had sx. - KAGFA8 - Sep 27, 2017 11:28:32 am

10/30/2017- alled clmt no answ er. VM message left.

Make 2nd attempt to reach the clmt. - KAGFA8 - Oct 30, 2017 09:26:29 am

10/31/2017- called clmt no answ er. VM message left. Sent clmt a no contact letter.

This is the 15 day f/u on no contact letter. Call clmt. - KAGFA8 - Oct 31, 2017 09:21:43 am

10/30/2017- clmt left a VM message advising that he has to w ait on insurance to becme effective prior to having sx. Will have sx in 02/2018.

Contact the clmt for an update. Did the clmt have hip sx? If yes w hen? What surgeon? Current txt planK? - KAGFA8 - Oct 31, 2017 02:39:08 pm

02/20/2018- called clmt. No answ er. VM message left requesting a return call.

Make 2nd attempt to reach the clmt. - KAGFA8 - Feb 20, 2018 09:25:14 am

02/22/2018-Called clmt. No answ er. No contact letter and ISS form sent to the clmt.

This is the 15 day f/u. Call the clmt. - KAGFA8 - Feb 22, 2018 08:46:09 am

03/01/2018- CE received a call from the clmt. He w ill have hop sx on 03/07/2018. He w ill send in discharge summary.

Call clmt to inquire about discharge sumary. - KAGFA8 - Mar 01, 2018 12:40:03 pm

03/21/2018- Clmt reports he w il lsend over confirmation of sx tomrrow .

f/u w ith clmt re: sx discharge paperw ork. - KAGFA8 - Mar 21, 2018 01:15:41 pm

03/23/2018- received note confirming clmt had sx on 03/07/2018 - KAGFA8 - Mar 23, 2018 02:06:42 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/23/2018 2:06:48 PM | Claim Tasks | 16 | Update Claim Information | Requested | KAGFA8 |
| | Call clmt for a w ellness check. How is recovery form hip replacement sx that he had on 03/07/2018? Current txt plan? Update regarding cardiac dx? - KAGFA8 - Mar 23, 2018 02:07:50 pm | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | File is under review for potential settlement how ever w ould need update on clmt's treatment for his alcoholism. If the clinical records and update support continued support for R/Ls please disccuss w ith clmt his current treatment for his alcoholism. - JLDOWSE - Apr 24, 2018 08:59:53 am<br><br>07/24/2018- Completed w ellness call. Clmt to call back tomorrow w ith NOV w ith cardioligst so records can be requested.<br><br>f/u w ith clmt re: NOV date for cardiologist. - KAGFA8 - Jul 24, 2018 03:18:31 pm<br><br>07/25/2018- clmt reports appt w ith cardioligst w ill be on 07/30/2018<br><br>Request records from cardiologist and ortho surgeon. Also request APS from both providers . - KAGFA8 - Jul 25, 2018 11:16:08 am<br><br>07/31/2018- Medical records requested from hip surgeon and caordiologist along w ith APS.<br><br>This is the 15 day f/u. Call the clmt and the provider. - KAGFA8 - Jul 31, 2018 07:43:45 am<br><br>08/06/2018- updated auth form required as one on file is expired. Sening auth to clmt via postal mail to complete and return.<br><br>This is the 15 day f/u. Call the clmt. - KAGFA8 - Aug 06, 2018 12:34:49 pm<br><br>08/15/2018- auth form received. - KAGFA8 - Aug 15, 2018 07:39:06 am | | | | |
| 3/26/2018 | Documents/Mail | 64 | Medical Records | Completed | KAGFA8 |
| | 2018-03-25-07.49.44.044780O01 | | | | |
| 3/26/2018 | Documents/Mail | 65 | Medical Records | Completed | KAGFA8 |
| | 2018-03-25-07.49.47.662780O01 | | | | |
| 4/4/2018 | Telephone (IN) | 48 | Sherman Carter | Completed | AMQDA3 |
| | 9013568012<br><br>xfer to ce per request | | | | |
| 4/23/2018 3:15:56 PM | Referrals | 9 | Data Mining | Initial | KLUSA0 |
| | Review ed for DM. Will discuss in RT to see w hat additional informaiton w ould be needed in order to engage in settlement discussions. - KLUSA0 - Apr 23, 2018 03:16:49 pm<br><br>Discussed in RT. Will review after next update. Cardiac status is unclear from medical reports received. Clmt may not be a suitable settlement candidate, but w e w ill take another look. - KLUSA0 - Apr 24, 2018 09:07:03 am<br><br>CE still in the process of updating the claim file. Will close referral and set follow up task. - KLUSA0 - Aug 21, 2018 11:23:44 am | | | | |
| 5/2/2018 | Documents/Mail | 66 | Acknow ledge Full or Partial Refund | Completed | GXJONAH |
| | Acknow ledge Full or Partial Refund | | | | |
| 7/24/2018 | Telephone (IN) | 49 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE called the clmt to discuss recovery of hip sx. Notes he w as released from therapy about 3-4 months ago.<br><br>Able to w alk better- pain is not a severe as it w as. Notes he w ill be ok for the rest of his life. Only limitation is limited extension of leg backw ards.<br><br>Still treating w ith heart doctor. Has a fibrilator in chest. Sees him 1x every 6 months.<br><br>Hip sx w as Campbell - Dr. Debo<br><br>Notes he is unable to w ork- because he is permanently disabled due to fibrillatory and blood pressure as per SSDI.<br><br>Lee Faulkner is Cardiologist. Hopes to have an appt soon.<br>Dr. Debo- hip surgeon. Also did therapy at some office. | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | | | Typical day- nothing more than w atching son play basketball. Can't sit for a long time. Watches over the house and going to the mailbox. Unable to bend to get pots and pans and place in the oven does not do any cooking May sw eep up- notes he starts a little and then takes a break, can do a little laundry can w ash dishes. Standing for long periods of time he is in pain. Due to heart get SOB if he gets upset- chest also starts hurting. Notes he is taking medication- Entresto 24mg takes this 2x per day. This is the only medication he is taking.<br><br>CE asked the clmt if he felt that he can do any w ork- he said no- the only thing he can do is breath. The most debilitating condition is heart condition.<br><br>Only receiving SSDI- because w e cut the check off.<br><br>Clmt to call CE back tomorrow w ith NOV w ith cardiologist. CE explained w e need updated records to assess his functionality now that he has had his hip sx. The clmt advised if w e determine he is unable to w ork can w e settle his claim. CE advised w e can explore that option after the clinical review . Clmt did not have question for CE><br>- KAGFA8 - Jul 24, 2018 03:16:55 pm | | |
| 7/25/2018 | Telephone (IN) | 50 | SHERMAN CARTER | Completed | KAGFA8 |
| | | | Clmt caleld in and notes that his appt w ith cardioligst is on Monday 07/30/2018. CE advised she w ill request records on Monday. CE advised it is his responsbility to ensrue records are recevied w ithin 30 days. He advised that w ill not be a problem. CE thanked him for hte update. - KAGFA8 - Jul 25, 2018 11:15:06 am | | |
| 7/30/2018 | Telephone (IN) | 51 | SHERMAN CARTER | Completed | KAGFA8 |
| | | | Clmt called in follow ing appt he had today. He advised: Had appt today w ith cardiologist. Nothing has changed. Will continue w ith same meds. Will f/u in 6 months- NOV is set for 01/2019. CE advsied records w ill be requested from cardiologist and surgeon and it is his responsbility to ensure requested info is received. He did not have any questions for CE. - KAGFA8 - Jul 30, 2018 03:20:49 pm | | |
| 7/31/2018 7:19:55 AM | Medical | 7 | | Initial | KAGFA8 |
| | | | Good afternoon,<br><br>Below is the rejection information for the referral referenced:<br><br>Claim #: 1150128075<br>Claimant Name: Sherman Carter<br>Request Date: 7/31/2018<br>Provider Name: LEE FAULKNER MD<br>Invalid Authorization Reason:<br>oInvalid date (expired)<br><br>Comments: The date on the authorization is 4/19/2017 and is more than 12 months old. The authorization is expired.<br><br>*Since the authorization is invalid, w e have closed this request. Please create a new referral w hen the updated authorization is on file.<br><br>Thank you.<br>- BPFRO0 - Aug 02, 2018 01:00:00 pm | | |
| 7/31/2018 7:37:12 AM | Medical | 8 | | Initial | KAGFA8 |
| | | | PLEASE SEND APS TO DR. GREGORY DABOV - KAGFA8 - Jul 31, 2018 07:37:44 am<br><br>Good afternoon,<br><br>Below is the rejection information for the referral referenced:<br><br>Claim #: 1150128075<br>Claimant Name: Sherman Carter<br>Request Date: 7/31/2018<br>Provider Name: Campbell Clinic Orthopaedics<br>Invalid Authorization Reason: | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | oInvalid date (expired)<br><br>Comments: The date on the authorization is 4/19/2017 and is more than 12 months old. The authorization is expired.<br><br>*Since the authorization is invalid, w e have closed this request. Please create a new referral w hen the updated authorization is on file.<br><br>Thank you.<br>- BPFRO0 - Aug 02, 2018 01:01:30 pm | | | | |
| 8/2/2018 | Medical | 7 | | Closed | KAGFA8 |
| | Good afternoon,<br><br>Below is the rejection information for the referral referenced:<br><br>Claim #: 1150128075<br>Claimant Name: Sherman Carter<br>Request Date: 7/31/2018<br>Provider Name: LEE FAULKNER MD<br>Invalid Authorization Reason:<br>oInvalid date (expired)<br><br>Comments: The date on the authorization is 4/19/2017 and is more than 12 months old. The authorization is expired.<br><br>*Since the authorization is invalid, w e have closed this request. Please create a new referral w hen the updated authorization is on file.<br><br>Thank you.<br>- BPFRO0 - Aug 02, 2018 01:00:00 pm | | | | |
| 8/2/2018 | Medical | 8 | | Closed | KAGFA8 |
| | PLEASE SEND APS TO DR. GREGORY DABOV - KAGFA8 - Jul 31, 2018 07:37:44 am<br><br>Good afternoon,<br><br>Below is the rejection information for the referral referenced:<br><br>Claim #: 1150128075<br>Claimant Name: Sherman Carter<br>Request Date: 7/31/2018<br>Provider Name: Campbell Clinic Orthopaedics<br>Invalid Authorization Reason:<br>oInvalid date (expired)<br><br>Comments: The date on the authorization is 4/19/2017 and is more than 12 months old. The authorization is expired.<br><br>*Since the authorization is invalid, w e have closed this request. Please create a new referral w hen the updated authorization is on file.<br><br>Thank you.<br>- BPFRO0 - Aug 02, 2018 01:01:30 pm | | | | |
| 8/3/2018 | Documents/Mail | 67 | Acknow ledge Full or Partial Refund | Completed | GXJONAH |
| | Acknow ledge Full or Partial Refund | | | | |
| 8/6/2018 | Documents/Mail | 68 | Request Sign Authorization | Completed | KAGFA8 |
| | Request Sign AuthorizationAttachments:Disability Med Authorization Form Generic GLC 11609.pdf | | | | |
| 8/14/2018 5:55:58 PM | Documents/Mail | 69 | Claim Form - Authorization | Received | KAGFA8 |
| | 2018-08-14-18.54.09.452240O01 | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 8/15/2018 | Claim Tasks | 16 | Update Claim Information | Completed | KAGFA8 |

Call clmt for a w ellness check. How is recovery form hip replacement sx that he had on 03/07/2018? Current txt plan? Update regarding cardiac dx? - KAGFA8 - Mar 23, 2018 02:07:50 pm

File is under review for potential settlement how ever w ould need update on clmt's treatment for his alcoholism. If the clinical records and update support continued support for R/Ls please disccuss w ith clmt his current treatment for his alcoholism. - JLDOWSE - Apr 24, 2018 08:59:53 am

07/24/2018- Completed w ellness call. Clmt to call back tomorrow w ith NOV w ith cardioligst so records can be requested.

f/u w ith clmt re: NOV date for cardiologist. - KAGFA8 - Jul 24, 2018 03:18:31 pm

07/25/2018- clmt reports appt w ith cardioligst w ill be on 07/30/2018

Request records from cardiologist and ortho surgeon. Also request APS from both providers . - KAGFA8 - Jul 25, 2018 11:16:08 am

07/31/2018- Medical records requested from hip surgeon and caordiologist along w ith APS.

This is the 15 day f/u. Call the clmt and the provider. - KAGFA8 - Jul 31, 2018 07:43:45 am

08/06/2018- updated auth form required as one on file is expired. Sening auth to clmt via postal mail to complete and return.

This is the 15 day f/u. Call the clmt. - KAGFA8 - Aug 06, 2018 12:34:49 pm

08/15/2018- auth form received. - KAGFA8 - Aug 15, 2018 07:39:06 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 8/15/2018 | Documents/Mail | 69 | Claim Form - Authorization | Completed | KAGFA8 |

2018-08-14-18.54.09.452240O01

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 8/15/2018 7:34:12 AM | Medical | 9 | | Initial | KAGFA8 |

PLEASE SEND APS TO DR. GREGORY DABOV - KAGFA8 - Aug 15, 2018 07:37:08 am

09/04/2018- Shundrell w iht Sharepoint advised request w as not received. CE confirmed that fax number is correct. CE re-sent the request . - KAGFA8 - Sep 04, 2018 10:39:14 am

09/20/2018- CE caled to f/u. CE w as on the call for about 6 min then transfered to a different line w here there w as no answ er. - KAGFA8 - Sep 20, 2018 08:46:49 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 8/15/2018 7:34:47 AM | Medical | 10 | | Initial | KAGFA8 |

09/04/2018- CE spoke w ith Keisha. She advised records should be faxed today. - KAGFA8 - Sep 04, 2018 10:44:07 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 8/15/2018 7:39:08 AM | Claim Tasks | 17 | Update Claim Information | Requested | KAGFA8 |

Medical records requested from Dr. Lee Faulkner (cardiologist) and Campbell Clinic Orthopedics. An APS w as sent to both providers to complete and return.

This is the 15 day f/u on records and APS- call clmt and the providers.
- KAGFA8 - Aug 15, 2018 07:39:59 am

09/04/2018- called clmt and providers.

This is teh 30 day f/u. Call the clmt and providers. Send the clmt the 2nd request letter. - KAGFA8 - Sep 04, 2018 11:02:56 am

09/20/2018- called clmt aand provider. Sent the 2nd request letter to the clmt.

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | This is the 45 day f/u. Request suspension of bneefits for FTP. - KAGFA8 - Sep 20, 2018 09:03:48 am<br><br>10/02/2018- medical records received. Claim is pending a clinical review .<br><br>Check on status of clinical revew . - KAGFA8 - Oct 02, 2018 08:21:43 am<br><br>10/24/2018-Case submitted to PDA conf #17064 for a peer review<br>Board-Certified Cardiology<br><br>Check on status of peer review - KAGFA8 - Oct 24, 2018 02:55:33 pm<br><br>10/29/2018- Peer review received. Claim sent for TSA<br><br>Check on status of TSA - KAGFA8 - Oct 29, 2018 09:47:02 am<br><br>Risk Consultant Review : If TSA indicates no gainful, re-refer to settlement w ith updated information. May have mortality risk, but w ould like settlement to review prior to any PTD referral. - SREVANS - Oct 29, 2018 05:10:41 pm | | | | |
| 8/20/2018 | Documents/Mail | 71 | Med Rec Request | Completed | BRORE7 |
| | Attachments:carter.pdfMed Rec RequestGroup Continuance of Disability | | | | |
| 8/20/2018 | Documents/Mail | 70 | Med Rec Request | Completed | BRORE7 |
| | Attachments:carter.pdfMed Rec RequestNEW LTD APS.pdf | | | | |
| 8/21/2018 | Documents/Mail | 72 | Med Rec Request Follow Up | Completed | KAGFA8 |
| | Med Rec Request Follow UpAttachments:Group Continuance of Disability | | | | |
| 8/21/2018 | Referrals | 9 | Data Mining | Completed | KLUSA0 |
| | Review ed for DM. Will discuss in RT to see w hat additional informaiton w ould be needed in order to engage in settlement discussions. - KLUSA0 - Apr 23, 2018 03:16:49 pm<br><br>Discussed in RT. Will review after next update. Cardiac status is unclear from medical reports received. Clmt may not be a suitable settlement candidate, but w e w ill take another look. - KLUSA0 - Apr 24, 2018 09:07:03 am<br><br>CE still in the process of updating the claim file. Will close referral and set follow up task. - KLUSA0 - Aug 21, 2018 11:23:44 am | | | | |
| 8/21/2018 11:23:47 AM | Claim Tasks | 18 | Settlement Follow Up | Requested | KLUSA0 |
| | Review in light of updated records. - KLUSA0 - Aug 21, 2018 11:24:20 am<br><br>Claim is in no reserve status. - KLUSA0 - Nov 19, 2018 07:56:38 am | | | | |
| 9/4/2018 | Telephone (IN) | 52 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE spoke w ith clmt re: outstanding records. He advised he w il lf/u w ith providers and ensure records are sent. - KAGFA8 - Sep 04, 2018 11:01:47 am | | | | |
| 9/4/2018 2:28:01 PM | Documents/Mail | 73 | Attending Physicians Statement | Received | KAGFA8 |
| | 2018-09-04-12.54.12.915440O01 | | | | |
| 9/5/2018 | Medical | 10 | | Closed | KAGFA8 |
| | 09/04/2018- CE spoke w ith Keisha. She advised records should be faxed today. - KAGFA8 - Sep 04, 2018 10:44:07 am | | | | |
| 9/5/2018 | Documents/Mail | 74 | Medical Records | Completed | KAGFA8 |
| | 2018-09-04-14.16.24.004460O01 | | | | |
| 9/5/2018 | Documents/Mail | 73 | Attending Physicians Statement | Completed | KAGFA8 |
| | 2018-09-04-12.54.12.915440O01 | | | | |
| 9/11/2018 | Telephone (IN) | 53 | Sherman Carter | Completed | RACWA7 |
| | ASBARB<br>LTD 1150128075 | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | transfer to ce. | | | | |
| 9/11/2018 | Telephone (IN) | 54 | SHERMAN CARTER | Completed | KAGFA8 |
| | clmt called and asked that APS be sent to him. CE sent APS via postal mail - KAGFA8 - Sep 11, 2018 03:19:01 pm | | | | |
| 9/11/2018 | Documents/Mail | 75 | Free Form Letter | Completed | KAGFA8 |
| | Free Form LetterAttachments:Attending Physician Statement -new .pdf | | | | |
| 9/20/2018 | Telephone (IN) | 55 | SHERMAN CARTER | Completed | KAGFA8 |
| | CE spoke w ith clmt- he advised he has given the form to his doctor and requested records. Advised it w ill take 15 days. CE thanekd him for his assistance w ith getting the information. - KAGFA8 - Sep 20, 2018 08:47:41 am | | | | |
| 9/20/2018 | Documents/Mail | 76 | 2nd Request Letter | Completed | KAGFA8 |
| | 2nd Request Letter | | | | |
| 9/20/2018 8:24:20 PM | Investigation | 3 | Determine Disability | Requested | KAGFA8 |
| 9/28/2018 | Investigation | 3 | Determine Disability | Received | KAGFA8 |
| 10/1/2018 3:11:43 PM | Documents/Mail | 77 | Medical Records | Received | KAGFA8 |
| | 2018-10-01-09.45.18.199100O01 | | | | |
| 10/2/2018 | Medical | 9 | | Closed | KAGFA8 |
| | PLEASE SEND APS TO DR. GREGORY DABOV - KAGFA8 - Aug 15, 2018 07:37:08 am<br><br>09/04/2018- Shundrell w iht Sharepoint advised request w as not received. CE confirmed that fax number is correct. CE re-sent the request . - KAGFA8 - Sep 04, 2018 10:39:14 am<br><br>09/20/2018- CE caled to f/u. CE w as on the call for about 6 min then transfered to a different line w here there w as no answ er. - KAGFA8 - Sep 20, 2018 08:46:49 am | | | | |
| 10/2/2018 | Documents/Mail | 77 | Medical Records | Completed | KAGFA8 |
| | 2018-10-01-09.45.18.199100O01 | | | | |
| 10/2/2018 8:20:03 AM | Referrals | 10 | Ongoing Claim Review | Initial | KAGFA8 |

The final report from PDA w as received and sent to Disability Claims for attachment to AWD.
- PDPWA0 - Oct 26, 2018 03:48:19 pm
Claimant Name: Sherman Carter
Claim Number: 11501208075
Occupation/level:Delivery Driver- med occ
Diagnosis:Cardiomyopathy, and oseoarthrtis of hip
DOD:08/07/2015
DLW:08/06/2015
SUMMARY:
48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034

MEDICAL ASSESSMENT:
09/04/2018(AWD) received Group Continuance of Disability signed by Dr. Lee Faulkner dated 09/04/2018. DX: cardiomyopathy, HTN. LOV: 07/30/2018. Patient is seen every 6 months or more. TXT: medical-cardiology. RTW is unknow n. R&L's medical therapy for now - severe limitation. PHYSICAL IMPAIRMENT: class 5- not capable of sedentary.
09/04/2018 (AWD) received medical records from Dr. Lee Faulkner(cardiologist)
07/30/2018- present for f/u - reports pain w hen stressed out or w hen over exerting himself. Has been under recent stress due to a random shooting to his house- shooter still at large. AICD interrogation- normal AICD function, nonsustained ventricular tachycardia. EKG -sinus rhythm rate of 60, nonspecific tw ave abnormality. PLAN: continue current meds. f/u in 6 months.
10/01/2018(AWD) received medical records from Campbell Clinic- Dr. Dabov- ortho from 03/19/2018-04/23/2018
04/23/2018-6 w eeks s/p left total hip replacement sx. Doing w ell- has some startup pain. Patient is permanently disabled from medium-or heavy type of w ork. Should get involved in a good w alking program and fitness. f/u in 10 months w ith AP pelvis and lateral of the left hip.

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Specific Medical Question:
Based on the available medical records are the R&L's offered by Dr. Lee Faulkner on the Group Continuance of Disability form dated 09/04/2018 supported?
If the R&L's are supported, it is reasonable that the R&L's w ould be permenant in nature? If not, w hat is a reasonable duration that the R&L's w ould be supported? - KAGFA8 - Oct 02, 2018 08:20:30 am
Clinical Response Review Template

Claimant name: Sherman Carter
Claim number: 1150128075
DOB:
DOD: 8/7/2015
COD: 11/19/2017

Date of review : 10/11/18
Review ed by Anne Wuertz RN for Kameetrice Farrell
Previous Medical Review : 11/24/15 CT, 11/25/15, 12/24/15, 6/9/17 Round table.

MDA Guidelines: Cardiomyopathy
Duration: Medium 21-42-indefinite
Total Hip Replacement
Duration: Medium 60-84-182

Documents review ed:
Dr Faulkner (Cardio): 7/30/18 (also review ed records from 2016 to present)
Dr Dabov: 3/19/18 - 4/23/18

Conclusion: Medical records do not support ongoing symptoms of severe cardiomyopathy except subjective reports of chest pain w ith exertion or w hile stressed. There are no recent echo results to evaluate the clmt functional capacity at this time & R&LS from Dr Faulkner of never sit, stand or w alk are overly restrictive and not supported at this time.

Clinical Summary: The clmt is a 51 yr old Truck Driver (Medium Occ per OA) w ith DOD 8/7/2015 and diagnosis of Cardiomyopathy and left total hip replacement for osteoarthritis. SSDI aw arded. Ongoing claim w ith COD 11/19/17 - past any occ. The clmt had left hip pain and osteoarthritis and w as scheduled for left total hip arthroplasty in 2015. Pre op medical clearance found evidence of cardiomyopathy w ith EF 20% and clmt had an AICD placed 9/18/15. There are few notes since 2016 w hich reported improvement in SOB and chest pain but as of 7/30/18 the clmt still reports chest pain w hen he is stressed or over exerts himself. AICD interrogation show ed normal function and EKG show ed sinus rhythm w ith nonsustained ventricular tachycardia by history. The clmt is being treated w ith Entresto. Dr Faulkner his cardiologist on APS 10/3/18 gives Physical impairment class 5 w ith R&Ls of no activities and occasional lift 1-5#. The clmt had his left total hip replacement surgery in 3/2018 and has done w ell post op. Last ortho note w as 6 w eeks post op left hip replacement and states he cannot go back to previous level w ork but APS 10/1/18 gives no R&Ls and form is crossed out. There are no cardiac symptoms noted in last notes except chest pain on exertion or w ith stress. No edema or SOB and no follow up Echo to determine recent EF.

APS/R&Ls:
10/3/18 faxed but not dated APS by Dr Faulkner: Dx - Cardiomyopathy and Hypertension. Clmt can occasionally lift/carry 1-5# and all other activities marked never. Treatment is medical therapy for now . Prognosis - Lifelong.

10/1/18 APS by Dr Dabov (Ortho): Dx - history left total hip arthroplasty. See notes. R&Ls crossed out on form. See notes.

9/4/18 GCOD by Dr Faulkner (Cardio): Dx - Cardiomyopathy & HTN. Totally disabled Aug 2015 to present. Return to w ork - unknow n. R&Ls - Medical therapy for now - severe limitation. Physical Impairment - Class 5 - incapable of minimum activity. APS

3/22/18 Work Note by Dr Dabov: Pt had total hip arthroplasty 3/7/18.

Rational: There are no cardiac symptoms noted in last notes except chest pain on exertion or w ith stress. No edema or SOB and no follow up Echo to determine recent EF. Needs Cardiology Peer to address w ith cardiologist if clmt has at least sedentary capacity of not.

Medical Documentation:
7/30/18 Dr Faulkner: Pt denies chest pain at rest but experiences pain w hen stressed out or over exerting himself. Denies syncope & no dizziness. He has been under recent stress due to random shooting to his house by lone shooter w ho is still at large. Here for interrogation of AICD single chamber. He is on Entresto 24/26 BID. Physical exam w ithin normal limits. AICD interrogation show ed normal function and nonsustained ventricular tachycardia. EKG show ed sinus rhythm of 60. Nonspecific T w ave abnormality. Impression: Cardiomyopathy, arterial HTN, ventricular tachycardia. Plan - continue current meds. F/U 6 months.

4/23/18 Dr Dabov: 6 w eeks post op left total hip. No major issues. Previously w orked as a w arehouse man and certainly not the type of w ork I like my total hip patients back at. In w ork up for total hip w e found he had severe cardiac issues and he has a low ejection fraction. Cardiologist does not w ant him doing heavy type w ork. Will get him involved in good w alking program & fitness and review ed dental procedures. Return 10 months w ith x-rays.

3/19/18 Motiw ala PA-C: Here for left hip after left total hip arthroplasty by Dr Dabov 3/7/18 - now 12 days postop. Pain controlled & using w alker to ambulate. Participating in physical therapy. On exam no acute distress. Ambulates w ith w alker. No signs of infection w ith incision healing appropriately. Neurovascular intact. X-rays left hip 3/19/18 revealed good position w ith no fracture, loosening or dislocation. Assessment: S/P Left total hip arthroplasty. Plan - Review ed dental & hip precautions. Continue w ith therapy. F/U 4 w eeks. Pain med offered but pt has enough.

Clinical Recommendations: Recommend Peer review by cardiology to conduct peer review and TPC w ith Dr Faulkner to clarify functional capacity and R&Ls.

Return to Work: Per Peer review .

Anne Wuertz RN
Nurse Disability Consultant. - ADKWU5 - Oct 11, 2018 04:03:23 pm
Request for Peer Review

Clinician/Appeals Examiner: Anne Wuertz RN
Phone Number: 678-295-3205

Claimant Name: Sherman Carter
Claim Number: 1150128075
Date of Birth:
Date of Disability: 8/7/2015

LTD Ongoing claim. COD w as 11/19/17
Service Request: Cardiology Peer review
Diagnosis: Cardiomyopathy & HTN. Left total hip replacement.

Treating Provider(s) Name, Specialty and Contact Number:
Dr Lee Faulkner (Cardio), Memphis TN 901-682-7241

Claim Summary:
The clmt is a 51 yr old Truck Driver (Medium Occ per OA) w ith DOD 8/7/2015 and diagnosis of Cardiomyopathy and left total hip replacement for osteoarthritis. SSDI aw arded. Ongoing claim w ith COD 11/19/17 - past any occ. The clmt had left hip pain and osteoarthritis and w as scheduled for left total hip arthroplasty in 2015. Pre op medical clearance found evidence of cardiomyopathy w ith EF 20% and clmt had an AICD placed 9/18/15. There are few notes since 2016 w hich reported improvement in SOB and chest pain but as of 7/30/18 the clmt still reports chest pain w hen he is stressed or over exerts himself. AICD interrogation show ed normal function and EKG show ed sinus rhythm w ith nonsustained ventricular tachycardia by history. The clmt is being treated w ith Entresto. Dr Faulkner his cardiologist on APS 10/3/18 gives Physical impairment class 5 w ith R&Ls of no activities and occasional lift 1-5#. The clmt had his left total hip replacement surgery in 3/2018 and has done w ell post op. Last ortho note w as 6 w eeks post op left hip replacement and states he cannot go back to previous level w ork but APS 10/1/18 gives no R&Ls and form is crossed out. There are no cardiac symptoms noted in last notes except chest pain on exertion or w ith stress. No edema or SOB and no follow up Echo to determine recent EF.

Questions for Review er:

1.Are there any physical conditions supported by the clinical evidence that are functionally impairing? If yes, please provide primary and secondary DX and clinical rationale to support.
2.If functional impairment is supported, does this translate into restrictions and limitations? If yes, please provide restrictions and limitations and duration. Please do not provide functional level (sedentary / light / etc.) but report restrictions / limitations and timetable for these.
3.Please advise on w hen w ould be appropriate time frame for clinical follow up and is future improvement expected. - ADKWU5 - Oct 11, 2018 04:03:23 pm
RN Audit for Cardiology Peer Report dated 10/26/18 by Dr Borzak for PDA.

Questions:

1) Physical Conditions?

There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II). How ever, Dr Faulkner's disability forms consistently state that the clmt is permanently and totally disabled due to cardiomyopathy, w hich is inconsistent w ith the office notes.

2) R&Ls:

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Theefore he w ould be rstricted from lift/carry more than 25# ever, no more than 10-25# occasionally and < 10# no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly nonsustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

3) Appropriate clinical follow up & future improvement?

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

4) Peer to Peer contact. Cardiology Peer sucessfully spoke to Dr Faulkner w ho said he w ould get back in touch w ith Peer but has not done so.

Anne Wuertz RN
Nurse Disability Consultant - ADKWU5 - Oct 26, 2018 05:47:45 pm
Case submitted to PDA conf #17064 for a peer review
Board-Certified Cardiology - PDPWA0 - Oct 12, 2018 12:00:30 pm
The final report from PDA w as received and sent to Disability Claims for attachment to AWD. - PDPWA0 - Oct 26, 2018 03:48:20 pm

| | | | | | |
|---|---|---|---|---|---|
| 10/3/2018 6:31:29 PM | Documents/Mail<br>2018-10-03-16.24.10.530260O01 | 78 | Attending Physicians Statement | Received | KAGFA8 |
| 10/4/2018 | Documents/Mail<br>2018-10-03-16.24.10.530260O01 | 78 | Attending Physicians Statement | Completed | KAGFA8 |
| 10/29/2018 | Telephone (IN) | 56 | SHERMAN CARTER | Completed | KAGFA8 |

CE called the clmtto advise of results of peer review . CE explained that the peer review r has provided restrictions and liitatiosn that w ould allow the clmt to w ork. CE advised that the next step os to refer to our voc department for a TSA. CE explained if the yfind jobs the benefit w ill end, if they dont find jobs then w e w ill continue to pay the claim. The clmt asked if there w as an appeal option at this point. CE advised if the claim is denied then he can appeal. He thanked CE for keeping him informed. - KAGFA8 - Oct 29, 2018 09:29:13 am

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 10/29/2018 | Documents/Mail | 80 | Medical Records | Completed | KAGFA8 |
| | 2018-10-26-16.48.06.566420O01 | | | | |
| 10/29/2018 | Documents/Mail | 79 | Email | Completed | KAGFA8 |
| | 2018-10-26-16.48.06.546420O01 | | | | |
| 10/29/2018 | Referrals | 10 | Ongoing Claim Review | Completed | KAGFA8 |

The final report from PDA w as received and sent to Disability Claims for attachment to AWD.
- PDPWA0 - Oct 26, 2018 03:48:19 pm
Claimant Name: Sherman Carter
Claim Number: 11501208075
Occupation/level:Delivery Driver- med occ
Diagnosis:Cardiomyopathy, and oseoarthrtis of hip
DOD:08/07/2015
DLW:08/06/2015
SUMMARY:
48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034

MEDICAL ASSESSMENT:
09/04/2018(AWD) received Group Continuance of Disability signed by Dr. Lee Faulkner dated 09/04/2018. DX: cardiomyopathy, HTN. LOV: 07/30/2018. Patient is seen every 6 months or more. TXT: medical-cardiology. RTW is unknow n. R&L's medical therapy for now - severe limitation. PHYSICAL IMPAIRMENT: class 5- not capable of sedentary.
09/04/2018 (AWD) received medical records from Dr. Lee Faulkner(cardiologist)
07/30/2018- present for f/u - reports pain w hen stressed out or w hen over exerting himself. Has been under recent stress due to a random shooting to his house- shooter still at large. AICD interrogation- normal AICD function, nonsustained ventricular tachycardia. EKG -sinus rhythm rate of 60, nonspecific tw ave abnormality. PLAN: continue current meds. f/u in 6 months.
10/01/2018(AWD) received medical records from Campbell Clinic- Dr. Dabov- ortho from 03/19/2018-04/23/2018
04/23/2018-6 w eeks s/p left total hip replacement sx. Doing w ell- has some startup pain. Patient is permanently disabled from medium-or heavy type of w ork. Should get involved in a good w alking program and fitness. f/u in 10 months w ith AP pelvis and lateral of the left hip.
Specific Medical Question:
Based on the available medical records are the R&L's offered by Dr. Lee Faulkner on the Group Continuance of Disability form dated 09/04/2018 supported?
If the R&L's are supported, it is reasonable that the R&L's w ould be permenant in nature? If not, w hat is a reasonable duration that the R&L's w ould be supported? - KAGFA8 - Oct 02, 2018 08:20:30 am
Clinical Response Review Template

Claimant name: Sherman Carter
Claim number: 1150128075
DOB:
DOD: 8/7/2015
COD: 11/19/2017

Date of review : 10/11/18
Review ed by Anne Wuertz RN for Kameetrice Farrell
Previous Medical Review : 11/24/15 CT, 11/25/15, 12/24/15, 6/9/17 Round table.

MDA Guidelines: Cardiomyopathy
Duration: Medium 21-42-indefinite
Total Hip Replacement
Duration: Medium 60-84-182

Documents review ed:
Dr Faulkner (Cardio): 7/30/18 (also review ed records from 2016 to present)
Dr Dabov: 3/19/18 - 4/23/18

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Conclusion: Medical records do not support ongoing symptoms of severe cardiomyopathy except subjective reports of chest pain w ith exertion or w hile stressed. There are no recent echo results to evaluate the clmt functional capacity at this time & R&LS from Dr Faulkner of never sit, stand or w alk are overly restrictive and not supported at this time.

Clinical Summary: The clmt is a 51 yr old Truck Driver (Medium Occ per OA) w ith DOD 8/7/2015 and diagnosis of Cardiomyopathy and left total hip replacement for osteoarthritis. SSDI aw arded. Ongoing claim w ith COD 11/19/17 - past any occ. The clmt had left hip pain and osteoarthritis and w as scheduled for left total hip arthroplasty in 2015. Pre op medical clearance found evidence of cardiomyopathy w ith EF 20% and clmt had an AICD placed 9/18/15. There are few notes since 2016 w hich reported improvement in SOB and chest pain but as of 7/30/18 the clmt still reports chest pain w hen he is stressed or over exerts himself. AICD interrogation show ed normal function and EKG show ed sinus rhythm w ith nonsustained ventricular tachycardia by history. The clmt is being treated w ith Entresto. Dr Faulkner his cardiologist on APS 10/3/18 gives Physical impairment class 5 w ith R&Ls of no activities and occasional lift 1-5#. The clmt had his left total hip replacement surgery in 3/2018 and has done w ell post op. Last ortho note w as 6 w eeks post op left hip replacement and states he cannot go back to previous level w ork but APS 10/1/18 gives no R&Ls and form is crossed out. There are no cardiac symptoms noted in last notes except chest pain on exertion or w ith stress. No edema or SOB and no follow up Echo to determine recent EF.

APS/R&Ls:
10/3/18 faxed but not dated APS by Dr Faulkner: Dx - Cardiomyopathy and Hypertension. Clmt can occasionally lift/carry 1-5# and all other activities marked never. Treatment is medical therapy for now . Prognosis - Lifelong.

10/1/18 APS by Dr Dabov (Ortho): Dx - history left total hip arthroplasty. See notes. R&Ls crossed out on form. See notes.

9/4/18 GCOD by Dr Faulkner (Cardio): Dx - Cardiomyopathy & HTN. Totally disabled Aug 2015 to present. Return to w ork - unknow n. R&Ls - Medical therapy for now - severe limitation. Physical Impairment - Class 5 - incapable of minimum activity. APS

3/22/18 Work Note by Dr Dabov: Pt had total hip arthroplasty 3/7/18.

Rational: There are no cardiac symptoms noted in last notes except chest pain on exertion or w ith stress. No edema or SOB and no follow up Echo to determine recent EF. Needs Cardiology Peer to address w ith cardiologist if clmt has at least sedentary capacity of not.

Medical Documentation:
7/30/18 Dr Faulkner: Pt denies chest pain at rest but experiences pain w hen stressed out or over exerting himself. Denies syncope & no dizziness. He has been under recent stress due to random shooting to his house by lone shooter w ho is still at large. Here for interrogation of AICD single chamber. He is on Entresto 24/26 BID. Physical exam w ithin normal limits. AICD interrogation show ed normal function and nonsustained ventricular tachycardia. EKG show ed sinus rhythm of 60. Nonspecific T w ave abnormality. Impression: Cardiomyopathy, arterial HTN, ventricular tachycardia. Plan - continue current meds. F/U 6 months.

4/23/18 Dr Dabov: 6 w eeks post op left total hip. No major issues. Previously w orked as a w arehouse man and certainly not the type of w ork I like my total hip patients back at. In w ork up for total hip w e found he had severe cardiac issues and he has a low ejection fraction. Cardiologist does not w ant him doing heavy type w ork. Will get him involved in good w alking program & fitness and review ed dental procedures. Return 10 months w ith x-rays.

3/19/18 Motiw ala PA-C: Here for left hip after left total hip arthroplasty by Dr Dabov 3/7/18 - now 12 days postop. Pain controlled & using w alker to ambulate. Participating in physical therapy. On exam no acute distress. Ambulates w ith w alker. No signs of infection w ith incision healing appropriately. Neurovascular intact. X-rays left hip 3/19/18 revealed good position w ith no fracture, loosening or dislocation. Assessment: S/P Left total hip arthroplasty. Plan - Review ed dental & hip precautions. Continue w ith therapy. F/U 4 w eeks. Pain med offered but pt has enough.

Clinical Recommendations: Recommend Peer review by cardiology to conduct peer review and TPC w ith Dr Faulkner to clarify functional capacity and R&Ls.

Return to Work: Per Peer review .

Anne Wuertz RN

Nurse Disability Consultant. - ADKWU5 - Oct 11, 2018 04:03:23 pm
Request for Peer Review

Clinician/Appeals Examiner: Anne Wuertz RN
Phone Number: 678-295-3205

Claimant Name: Sherman Carter
Claim Number: 1150128075
Date of Birth:
Date of Disability: 8/7/2015

LTD Ongoing claim. COD w as 11/19/17
Service Request: Cardiology Peer review
Diagnosis: Cardiomyopathy & HTN. Left total hip replacement.

Treating Provider(s) Name, Specialty and Contact Number:
Dr Lee Faulkner (Cardio), Memphis TN 901-682-7241

Claim Summary:
The clmt is a 51 yr old Truck Driver (Medium Occ per OA) w ith DOD 8/7/2015 and diagnosis of Cardiomyopathy and left total hip replacement for osteoarthritis. SSDI aw arded. Ongoing claim w ith COD 11/19/17 - past any occ. The clmt had left hip pain and osteoarthritis and w as scheduled for left total hip arthroplasty in 2015. Pre op medical clearance found evidence of cardiomyopathy w ith EF 20% and clmt had an AICD placed 9/18/15. There are few notes since 2016 w hich reported improvement in SOB and chest pain but as of 7/30/18 the clmt still reports chest pain w hen he is stressed or over exerts himself. AICD interrogation show ed normal function and EKG show ed sinus rhythm w ith nonsustained ventricular tachycardia by history. The clmt is being treated w ith Entresto. Dr Faulkner his cardiologist on APS 10/3/18 gives Physical impairment class 5 w ith R&Ls of no activities and occasional lift 1-5#. The clmt had his left total hip replacement surgery in 3/2018 and has done w ell post op. Last ortho note w as 6 w eeks post op left hip replacement and states he cannot go back to previous level w ork but APS 10/1/18 gives no R&Ls and form is crossed out. There are no cardiac symptoms noted in last notes except chest pain on exertion or w ith stress. No edema or SOB and no follow up Echo to determine recent EF.

Questions for Review er:

1.Are there any physical conditions supported by the clinical evidence that are functionally impairing? If yes, please provide primary and secondary DX and clinical rationale to support.
2.If functional impairment is supported, does this translate into restrictions and limitations? If yes, please provide restrictions and limitations and duration. Please do not provide functional level (sedentary / light / etc.) but report restrictions / limitations and timetable for these.
3.Please advise on w hen w ould be appropriate time frame for clinical follow up and is future improvement expected. - ADKWU5 - Oct 11, 2018 04:03:23 pm
Case submitted to PDA conf #17064 for a peer review
Board-Certified Cardiology - PDPWA0 - Oct 12, 2018 12:00:30 pm
The final report from PDA w as received and sent to Disability Claims for attachment to AWD. - PDPWA0 - Oct 26, 2018 03:48:20 pm
RN Audit for Cardiology Peer Report dated 10/26/18 by Dr Borzak for PDA.

Questions:

1) Physical Conditions?

There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II). How ever, Dr Faulkner's disability forms consistently state that the clmt is permanently and totally disabled due to cardiomyopathy, w hich is inconsistent w ith the office notes.

2) R&Ls:

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Theefore he w ould be rstricted from lift/carry more than 25# ever, no more than 10-25# occasionally and < 10# no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly nonsustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

3) Appropriate clinical follow up & future improvement?

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

4) Peer to Peer contact. Cardiology Peer sucessfully spoke to Dr Faulkner w ho said he w ould get back in touch w ith Peer but has not done so.

Anne Wuertz RN
Nurse Disability Consultant - ADKWU5 - Oct 26, 2018 05:47:45 pm

| | | | | | |
|---|---|---|---|---|---|
| 10/29/2018 9:37:52 AM | Referrals | 11 | TSA | Initial | KAGFA8 |

Claimant Name: Sherman Carter
Claim Number: 1150128075
Gainful Amount (w here applicable, e.g. LTD):2275
Medical Information
Current Functional Capacity and R&Ls: Peer review located in AWD dated 10/26/2018
Vocational Information:
Job Title from ER: Off Premise Delivery Driver
Previous OA/TSA/TSR/Voc Rehab review completed? AWD 12/07/2015
Job Description on file? (if yes date and location):AWD dated 10/21/2015
Job Analysis on file? (if yes date and location): No
Work History and Educational Information: Educational background form located in AWD dated 04/25/2017
Specific Question(s) for Review er
Please complete a TSA.
- KAGFA8 - Oct 29, 2018 09:38:12 am

Vocational Response:
This VRC w as requested to perform a TSA on this claimant to determine if there w ere transferable occupations based upon the individual's w ork history, skills, education, & restrictions & limitations. Occupations w ere identified that meet all of the noted criteria. A complete TSA report has been uploaded into AWD.

Tracie Grumet, MA, CRC
Vocational Rehabilitation Consultant
- TROGR7 - Oct 30, 2018 08:19:00 am

| | | | | | |
|---|---|---|---|---|---|
| 10/30/2018 | Telephone (IN) | 57 | SHERMAN CARTER | Completed | KAGFA8 |

CE spoke w ith the clmt and advised that the TSA w as completed. CE advised that 5 jobs w ere identified that he could perform w ithin the R&L's offered. CE explained that based on this information the claim w ill be denied as he is capable of performing in another occupation despite the fact that he is disabled from performing his ow n occupation. CE advised the clmt of his right to appeal and advised he w ill find steps to do so at the end of the denial letter that he w ill receive. CE advised that he w ill likely be contacted regarding the outstanding OVP on his claim. He notes that he w ill appeal and did not have any questions and/or concerns for CE. - KAGFA8 - Oct 30, 2018 11:29:09 am

| | | | | | |
|---|---|---|---|---|---|
| 10/30/2018 | Claim Tasks | 3 | Max Duration Notice | Completed | KAGFA8 |
| 10/30/2018 | Claim Tasks | 17 | Update Claim Information | Completed | KAGFA8 |

Medical records requested from Dr. Lee Faulkner (cardiologist) and Campbell Clinic Orthopedics. An APS w as sent

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

to both providers to complete and return.

This is the 15 day f/u on records and APS- call clmt and the providers.
- KAGFA8 - Aug 15, 2018 07:39:59 am

09/04/2018- called clmt and providers.

This is teh 30 day f/u. Call the clmt and providers. Send the clmt the 2nd request letter. - KAGFA8 - Sep 04, 2018 11:02:56 am

09/20/2018- called clmt aand provider. Sent the 2nd request letter to the clmt.

This is the 45 day f/u. Request suspension of bneefits for FTP. - KAGFA8 - Sep 20, 2018 09:03:48 am

10/02/2018- medical records received. Claim is pending a clinical review .

Check on status of clinical revew . - KAGFA8 - Oct 02, 2018 08:21:43 am

10/24/2018-Case submitted to PDA conf #17064 for a peer review
Board-Certified Cardiology

Check on status of peer review - KAGFA8 - Oct 24, 2018 02:55:33 pm

10/29/2018- Peer review received. Claim sent for TSA

Check on status of TSA - KAGFA8 - Oct 29, 2018 09:47:02 am

Risk Consultant Review : If TSA indicates no gainful, re-refer to settlement w ith updated information. May have mortality risk, but w ould like settlement to review prior to any PTD referral. - SREVANS - Oct 29, 2018 05:10:41 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 10/30/2018 | Documents/Mail | 83 | Incoming Correspondence | Completed | KAGFA8 |
| | 2018-10-30-09.19.54.404980O01 | | | | |
| 10/30/2018 | Documents/Mail | 82 | Email | Completed | KAGFA8 |
| | 2018-10-30-09.19.54.367980O01 | | | | |
| 10/30/2018 | Documents/Mail | 81 | Denial Any Occupation | Completed | KAGFA8 |
| | Denial Any OccupationAttachments:Translation services | | | | |
| 10/30/2018 | Referrals | 12 | Management Review | Completed | KAGFA8 |
| | Please review this claim for NOT TDAO | | | | |

Clmt is 51 year old male Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

10/26/2018(AWD) PEER REVIEW
There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II).

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

TSA RESULTS:
Vocational Response:
This VRC w as requested to perform a TSA on this claimant to determine if there w ere transferable occupations based upon the individual's w ork history, skills, education, & restrictions & limitations. Occupations w ere identified that meet all of the noted criteria. A complete TSA report has been uploaded into AWD.

Tracie Grumet, MA, CRC
Vocational Rehabilitation Consultant
CE is suggesting denial for NOT TDAO

Letter is in WIP status

10/30/2018- call w ith clmt to advise of denial completed.
- Management Review - KAGFA8 - Oct 30, 2018 11:29:45 am

10/30/18 No longer TDAO denial is appropriate as there is a lack of medical evidence that supports or certifies a functional impairment for ongoing out of w ork status based upon the medical documentation w ith current Peer Review findings. ; appropriate to proceed w ith denial process as the identified R/Ls w ere used and gainful has been identified; therefore ok to proceed w ith not TDAO denial.
- Management Review - DDWATTS - Oct 30, 2018 02:31:02 pm

| | | | | | |
|---|---|---|---|---|---|
| 10/30/2018 | Referrals | 11 | TSA | Completed | KAGFA8 |

Claimant Name: Sherman Carter
Claim Number: 1150128075
Gainful Amount (w here applicable, e.g. LTD):2275
Medical Information
Current Functional Capacity and R&Ls: Peer review located in AWD dated 10/26/2018
Vocational Information:
Job Title from ER: Off Premise Delivery Driver
Previous OA/TSA/TSR/Voc Rehab review completed? AWD 12/07/2015
Job Description on file? (if yes date and location):AWD dated 10/21/2015
Job Analysis on file? (if yes date and location): No
Work History and Educational Information: Educational background form located in AWD dated 04/25/2017
Specific Question(s) for Review er
Please complete a TSA.
- KAGFA8 - Oct 29, 2018 09:38:12 am

Vocational Response:
This VRC w as requested to perform a TSA on this claimant to determine if there w ere transferable occupations based upon the individual's w ork history, skills, education, & restrictions & limitations. Occupations w ere identified that meet all of the noted criteria. A complete TSA report has been uploaded into AWD.

Tracie Grumet, MA, CRC
Vocational Rehabilitation Consultant
- TROGR7 - Oct 30, 2018 08:19:00 am

| | | | | | |
|---|---|---|---|---|---|
| 11/2/2018 | Documents/Mail | 84 | Acknow ledge Full or Partial Refund | Completed | GXJONAH |

Acknow ledge Full or Partial Refund

| | | | | | |
|---|---|---|---|---|---|
| 11/6/2018 | Telephone (IN) | 58 | SHERMAN CARTER | Completed | KAGFA8 |

CE received a VM message from the clmt requesting a return call. CE called the clmt back. There w as no answ er. A VM message w as left. - KAGFA8 - Nov 06, 2018 08:51:17 am

| | | | | | |
|---|---|---|---|---|---|
| 11/19/2018 | Claim Tasks | 18 | Settlement Follow Up | Completed | KLUSA0 |

Review in light of updated records. - KLUSA0 - Aug 21, 2018 11:24:20 am

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | Claim is in no reserve status. - KLUSA0 - Nov 19, 2018 07:56:38 am | | | | |
| 11/21/2018 7:15:09 AM | Appeal | 1 | Level 1 | New | SMMCSHA |
| | Plese back out this appeal. see phone note below , the clmnt w ants the CE to send the ansered Peer quston to the peer as addendum.<br><br>CP to Sherman - His PCP (Dr Faulkner) w as out of the office and did not see the Peer review er's ques;tions 10/23/18 until ealry November, He ansred thm and gave his answ ers to the clmnt at his 11/01/18 OV. The clmt submitted them as the appeal. Per call to EE he w ould like the appeal backed out and have the clms rep send the PCP response to th peer questions in hopes that answ ers the peer and completes the peer review . He does understand that if the peer still opines "not disabled for AO", he can then appeal again. - Consultant Review - SMMCSHA - Nov 29, 2018 03:05:38 pm<br><br>Closed appeal as "marked up in error" as EE is requesting to w ithdraw appeal at this time and have claims proceed w ith addendum review based on phsycian response to peer review questionaire. - CXGEARY - Nov 30, 2018 11:14:50 am | | | | |
| 11/28/2018 8:01:12 PM | Claim Tasks | 19 | Appeal - 4 day notice | Requested | SMMCSHA |
| 11/29/2018 | Telephone (IN) | 59 | SHERMAN CARTER | Completed | SMMCSHA |
| | CP to Sherman - His PCP (Dr Faulkner) w as out of the office and did not see the Peer review er's ques;tions 10/23/18 until ealry November, He ansred thm and gave his answ ers to the clmnt at his 11/01/18 OV. The clmt submitted them as the appeal. Per call to EE he w ould like the appeal backed out and have the clms rep send the PCP response to th peer questions in hopes that answ ers the peer and completes the peer review . He does understand that if the peer still opines "not disabled for AO", he can then appeal again. - SMMCSHA - Nov 29, 2018 03:04:07 pm | | | | |
| 11/29/2018 | Claim Tasks | 19 | Appeal - 4 day notice | Completed | SMMCSHA |
| 11/29/2018 3:04:14 PM | Referrals | 13 | Consultant Review | Initial | SMMCSHA |
| | Plese back out this appeal. see phone note below , the clmnt w ants the CE to send the ansered Peer quston to the peer as addendum.<br><br>CP to Sherman - His PCP (Dr Faulkner) w as out of the office and did not see the Peer review er's ques;tions 10/23/18 until ealry November, He ansred thm and gave his answ ers to the clmnt at his 11/01/18 OV. The clmt submitted them as the appeal. Per call to EE he w ould like the appeal backed out and have the clms rep send the PCP response to th peer questions in hopes that answ ers the peer and completes the peer review . He does understand that if the peer still opines "not disabled for AO", he can then appeal again. - Consultant Review - SMMCSHA - Nov 29, 2018 03:05:38 pm<br><br>Closed appeal as "marked up in error" as EE is requesting to w ithdraw appeal at this time and have claims proceed w ith addendum review based on phsycian response to peer review questionaire.<br><br>AE to return claim to "closed" status on the claims screen. - Consultant Review - CXGEARY - Nov 30, 2018 11:15:25 am | | | | |
| 11/30/2018 | Claim Tasks | 20 | Update Claim Direction | Completed | KAGFA8 |
| | Hello, this claimant submitted an appeal and sent in the treating physicians response to the 10/26/18 Cardiology Peer w ith Steven Borzak. The peer sent the questions to the treating provider but had not reicved a response in the appropriate timeframe. How ever the treating phsycian did finally complete the questions and now the clmnt w ould like the response addressed w ith the Peer as an addendum review , in lieu of filing an appeal. We w ill be backing out of the appeal.<br><br>Please proceed w ith sending the response (AWD 11/21/18) as an addendum review and address the then claim decison.<br><br>Thank you. - SMMCSHA - Nov 30, 2018 08:24:46 am<br><br>11/30/2018- claim referred to clinical for an addendum. - KAGFA8 - Nov 30, 2018 08:31:37 am | | | | |
| 11/30/2018 | Appeal | 1 | Level 1 | Closed | SMMCSHA |
| | Plese back out this appeal. see phone note below , the clmnt w ants the CE to send the ansered Peer quston to the | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

peer as addendum.

CP to Sherman - His PCP (Dr Faulkner) w as out of the office and did not see the Peer review er's ques;tions 10/23/18 until ealry November, He ansred thm and gave his answ ers to the clmnt at his 11/01/18 OV. The clmt submitted them as the appeal. Per call to EE he w ould like the appeal backed out and have the clms rep send the PCP response to th peer questions in hopes that answ ers the peer and completes the peer review . He does understand that if the peer still opines "not disabled for AO", he can then appeal again. - Consultant Review - SMMCSHA - Nov 29, 2018 03:05:38 pm

Closed appeal as "marked up in error" as EE is requesting to w ithdraw appeal at this time and have claims proceed w ith addendum review based on phsycian response to peer review questionaire. - CXGEARY - Nov 30, 2018 11:14:50 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 11/30/2018 | Referrals | 13 | Consultant Review | Completed | SMMCSHA |

Plese back out this appeal. see phone note below , the clmnt w ants the CE to send the ansered Peer quston to the peer as addendum.

CP to Sherman - His PCP (Dr Faulkner) w as out of the office and did not see the Peer review er's ques;tions 10/23/18 until ealry November, He ansred thm and gave his answ ers to the clmnt at his 11/01/18 OV. The clmt submitted them as the appeal. Per call to EE he w ould like the appeal backed out and have the clms rep send the PCP response to th peer questions in hopes that answ ers the peer and completes the peer review . He does understand that if the peer still opines "not disabled for AO", he can then appeal again. - Consultant Review - SMMCSHA - Nov 29, 2018 03:05:38 pm

Closed appeal as "marked up in error" as EE is requesting to w ithdraw appeal at this time and have claims proceed w ith addendum review based on phsycian response to peer review questionaire.

AE to return claim to "closed" status on the claims screen. - Consultant Review - CXGEARY - Nov 30, 2018 11:15:25 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 11/30/2018 8:29:13 AM | Referrals | 14 | Change of Definition | Initial | KAGFA8 |

UPDATED INFO:
The peer review contacted the clmt's provider for a response. The provider failed to respond in a timely manner, how ever the clmt has provided the providers response and w ould like an addendum to the peer review .
The providers response is located in AWD dated 11/29/2018.

Claimant Name: Sherman Carter
Claim Number: 11501208075
Occupation/level:Delivery Driver- med occ
Diagnosis:Cardiomyopathy, and oseoarthrtis of hip
DOD:08/07/2015
DLW:08/06/2015
SUMMARY:
48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034 - KAGFA8 - Nov 30, 2018 08:31:03 am
Request for Peer Addendum

Clinician/Appeals Examiner: Anne Wuertz RN
Phone Number: 678-295-3205

Claimant Name: Sherman Carter
Claim Number: 1150128075
Date of Birth:

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Date of Disability: 8/7/2015
COD: 11/5/2017

PREVIOUS VENDOR NAME & CASE NUMBER: PDA Claim # 1150128075
PREVIOUS REVIEWER & SPECIALTY: Dr Steven Borzak, cardiology

Thank you for your report regarding the LTD COD claim for Sherman Carter. After review ing your report, w e are requesting an addendum to the 10/26/18 Peer Review due to receipt of response from Provider, Dr Faulkner to your previous correspondence.

Thank you for your addendum

Anne Wuertz RN
Nurse Disability Consultant - ADKWU5 - Nov 30, 2018 01:04:07 pm
Request for Peer Addendum

Clinician/Appeals Examiner: Anne Wuertz RN
Phone Number: 678-295-3205

Claimant Name: Sherman Carter
Claim Number: 1150128075
Date of Birth:
Date of Disability: 8/7/2015
COD: 11/5/2017

PREVIOUS VENDOR NAME & CASE NUMBER: PDA Claim # 1150128075
PREVIOUS REVIEWER & SPECIALTY: Dr Steven Borzak, cardiology

Thank you for your report regarding the LTD COD claim for Sherman Carter. After review ing your report, w e are requesting an addendum to the 10/26/18 Peer Review due to receipt of response from Provider, Dr Faulkner to your previous correspondence.

Thank you for your addendum

Anne Wuertz RN
Nurse Disability Consultant - ADKWU5 - Nov 30, 2018 01:04:07 pm
RN Audit of Peer Addendum by Dr Steven Borzak (Cardiology) dated 12/5/18 for PDA.

Conclusion: The new data caused me to alter my opinion. Rather than the data supporting light or sedentary w ork, the data now supports only sedentary w ork w ith no w alking, occasional standing, no professional driving, no lift/carry greater than 10# ever and < 10# occasionally, but in full time capacity w ith respect to the clmt's cardiac condition.

Anne Wuertz RN
urse Disability Consultant - ADKWU5 - Dec 05, 2018 06:55:56 pm
Case submitted to PDA # 18015 for a /Addendum report - PDPWA0 - Dec 03, 2018 09:33:52 am
The final report from PDA w as received and sent to Disability Claims for attachment to AWD. - PDPWA0 - Dec 05, 2018 10:35:58 am

| 12/5/2018 | Telephone (IN) | 60 | SHERMAN CARTER | Completed | KAGFA8 |
|---|---|---|---|---|---|

CE spoke w ith the clmt. CE advised that the doctor w ho originally review d his claim did complete an addendum to his original peer review . CE advised the informatio ndid change his opinion. CE advised he now feels that the clmt is only able to do sedentary level w ork, how ever, CE further advised that the TSA that w as completed did find tw o sedentary jobs that he can do. As such, the claim w ill remain closed. CE advised she w ill send him a letter w ith appeal langauge to him. He notes he w ill file an appeal. - KAGFA8 - Dec 05, 2018 03:42:14 pm

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/5/2018 | Documents/Mail<br>2018-12-05-11.36.39.051540O01 | 85 | Email | Completed | KAGFA8 |
| 12/5/2018 3:14:31 PM | Documents/Mail<br>2018-12-05-11.36.39.074540O01 | 86 | Medical Records | Received | KAGFA8 |
| 12/6/2018 | Documents/Mail<br>2018-12-05-11.36.39.074540O01 | 86 | Medical Records | Completed | KAGFA8 |
| 12/6/2018 | Documents/Mail<br>Free Form Letter | 87 | Free Form Letter | Completed | KAGFA8 |
| 12/6/2018 | Summary/Assessment/Pa | 2h | ONGOING........................................................ | Completed | KAGFA8 |

Summary Notes
ONGOING..................................................................... - KEAST0 - Dec 28, 2015 11:25:59 am
Assessment Notes
see path tab - KEAST0 - Dec 28, 2015 11:25:59 am
Path Notes
Summary: Clmt is 48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Assessment:
Medical Assessment: LINKS Clinical Response - 48 y.o. male, employed as a truck driver w ith a DOD as 8/21/2015 due to an original diagnosis of OA of the hip w ith secondary issue of failure to achieve cardiac clearance of THR. Clmt has poor EF and underw ent ICDF placement for an ejection fraction of approximately 20%. He has noted cardiomyopathy and often report SOB w ith inability to prolonged w alk, lift or stand. His latest cardiology notes his is still w ith changing blood pressures and not cleared for his surgery and an abilities form indicates he is unable to return to his ow n occupational duties. Medical provided is supportive follow ing this, as he remains w ith a 20% ejection fraction.
R&Ls per Ortho on APS of 10/14/2015 are no prolonged w alking, standing, sitting. Most recent APS signed by Dr Faulkner on 11/24/15 (cardio) advising DOD of 10/30/2015 - no dx provided, objective findings include severely depressed EF of 20% (ECG). FOV 9/24/2015 LOV 11/10/2015. Unknow n w hen RTW w ill be possible.

Claim Assessment: List, pd to 12/1/2015, Delivery Driver, DOH: 8/13/2012 50 hrs, (terminated 11/30/2015). Annual salary per Ardis: 39000.00 / 12 = 3250.00 p/m. x 60% = 1950.00 GMB. PolEffd: 5/1/2004, EE Effd: 7/1/2013. Class 4, min hrs: 30, WP: 120, prex: 3/12. OO: 24, ER 0%, 60% GMB, max $6k, min $100/ 10%. PIB: 10%/ max $5k. RBDSS. Elim: 90.
Job desc provided by ER - Off Premise Delivery Driver - OA exists in AWD under Group Specific Occs- matches eDOT for Truck Driver, Heavy (medium occ) 905.663-014. Drive truck and deliver beer to retail stores. Physical requirements include driving, climbing into truck, lifting, bending, and pushing carts or dolly.

Eligibility: Clmt DLW w as 8/6/2015 and DOD is not until 8/21/2015 per APS signed by Ortho. CE w ill need details of w hether clmt w as seen by any other providers prior to 8/21/2015 to determine if he w as actively at w ork. ER form indicates that EE received sick pay from 8/7/2015 to 8/17/2015.
..............................
Medical Assessment: FMLA docs received from ER - first visit listed for Dr Dabov as 8/21/15. Possible duration approx. 4 months. Work note show s certificate for no w ork until released from 8/21/15 to present. Signed on 8/21/2015.
Work note from Memphis Primary Care Specialists. - advises clmt is under care from 8/7/15 and is able to return to w ork on 8/13/2015. Not clear w hich physician signed the note - signed on 8/7/2015 - multiple dr's listed on letterhead.
Medical records received from clmt show ing OV from 8/7/15 and 8/26/15 - seen for back pain, cramps, spasms. Dx of Low back pain, myalgia, leg pain, claudication. 8/26/15 visit is for lab results ordered on 8/7/2015.

...............................
Medical Review : Conclusion: Review of available medicals supports R & L's as noted by Dr. Faulkner on 11-27-15 w ith inability to RTW now or in the foreseeable future in his OO or AO secondary to EF of 20%.

Surgery w as scheduled for a Left Total Hip Replacement on 9-21-15; how ever, the surgery w as cancelled secondary to the need for cardiac clearance. Clmt had an ECHO on 9-3-15 w hich revealed an EF of 20%; he

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

follow ed up w ith Dr. Lan, Cardiology and w as subsequently admitted for a PVC ablation w ith ICD implant on 9-18-15 for his cardiomyopathy by and discharged on 9-19-15.

Specific clinical recommendations: Contact Clmt for w ell checks.
Return to w ork: Clmt is not able to return to w ork in his OO or AO as stated by Dr. Faulkner on 11-27-15.

PATH: Clmt is TDOO, unable to RTW due to EF of 20%. SHORT TERM: F/up w ith clmt to get update on condition.
LONG TERM: pending short term.
- KEAST0 - Dec 28, 2015 11:25:59 am
(NOV is 3 months from 11/10/2015) - KEAST0 - Feb 02, 2016 02:37:29 pm
..................
Requesting med recs

PATH: Clmt is TDOO, requesting updated med recs. SHORT TERM: review med recs once received. LONG TERM: pending short term. - KEAST0 - Mar 11, 2016 10:28:21 am

MEDICAL RECORDS
OVN 2/11/16 from Dr. Faulker . EE seen for cardiac eval, ee complains of chest pain on the L side of his chest and SOB w ith over exertion. PE w as unremarkable. Impression. S/P AICD, non ischemic Cardiomyopathy hypertension.
Plan: Current cardiac care, follow up in 4 months.

P....... Remaining OVN needed from Dr. Faulker to verify ee's current status. Latest OVN dated 2/11/16 noted physical exam to be unremarkable. Long Term Path: TBD
- KI7TH3 - Apr 27, 2016 12:32:52 pm

APS completed by Dr Faulkner w ith no date - advised LOV is 2/11/2016 - has severely depressed EF of 20% by ECG. seen every 3 months. BP LOV w as 124/88. Unknow n w hen he can RTW. R&Ls listed as medical therapy for now .

PATH: remaining OV neede from Dr. Faulkner to verify status. - KEAST0 - Apr 28, 2016 02:57:27 pm

NOV is not until June - APS completed advises that LOV is 2/11/2016 and severely depressed EF of 20%.

PATH: get update w ith clmt on LOV in June. Request records to determine support. LONG TERM: pending short term. - KEAST0 - May 11, 2016 12:15:27 pm

PATH: Get update w ith clmt on LOV in early July. Request records to determine support. LONG TERM: pending short term. - KEAST0 - Jul 06, 2016 01:52:23 pm

PATH: Requesting med recs from Dr Faulkner. SHORT TERM: review med recs once received to determine path.
Also requesting APS. - KEAST0 - Jul 14, 2016 11:04:06 am

Med recs and APS received from Dr Faulkner - cardio - 7/5/2016 - f/up visit. Chest pain in middle of chest w ith activity w hich lasts for 10 minutes. PE results appear normal. HTN and cardiomyopathy - continue cardiac care.
APS signed by Dr Faulkner, but not dated advises that clmt continues w ith severely depressed EF fo 20% by ECG LOV 7/6/16 and seen every 2-3 months. BP listed as 120/80 and clmt is unchanged, class 4 cardiac functional capacity and physical capacity (incapable of sedentary). Unknow n RTW and continue medical therapy.

PATH: Clmt is TDOO based on med recs. CE is seeking input from NDC regarding reasonable f/up based on most recent medical. - KEAST0 - Jul 20, 2016 07:40:00 am

Walk up w ith NDC found that it w as reasonable due to conditions to follow up at COD .

PATH: Clmt is TDOO based on med recs. SHORT TERM: Review file at COD. LONG TERM: TDOO, possibly AO. - KEAST0 - Aug 01, 2016 07:14:00 am
MEDICAL ASSESSMENT: AWD 10/13/2016 - Med recs from Dr Faulker - 9/29/2016 - f/up visit - no chest pain or symptoms noted - BP: 130/90. Impression is HTN, Alcoholism, DJD of hip. Plan: ETOH cessation, f/up 6 months.

PATH: updated R&Ls are needed from Dr Faulkner as records are not clear about R&Ls.
F/up for auth. - KEAST0 - Oct 14, 2016 03:13:36 pm

**Chronological Activity List**

MEDICAL ASSESSMENT: AWD 11/21/16 - Med recs from Dr Faulkner - 9/29/16. OV note - f/up - chest pain free, no complaints of vomiting, dizziness, palpation, dyspnea, orthopnea, paraoxysmal nocturnal dyspnea. BP: 130/90. Physical exam show s normal - cardio show s normal 1st and 2nd heart sounds. No S-3 or S-4 gallop, Impression: HTN, alcoholism, DJD of hip. F/up 6 months.
AWD 11/21/16 - GCOD completed by Dr Faulkner on 11/21/116. Advised dx of Cardiomyopathy, HTN. Unknow n RTW. Medical therapy for now , severe limitation. Class 5 - incapable of sedentary.

PATH: CE is presenting for review to determine continued support. - KEAST0 - Nov 23, 2016 12:02:29 pm

UPDATED PATH: Review of prior CT/ CRs on file support ongoing TDOO due to EF. COD is due to start on 2/17/2017. CE w ill request forms and updated med recs at that point for COD consideration. LONG TERM: pending COD review .
- KEAST0 - Nov 23, 2016 12:05:03 pm

UPDATED: Begin AO letter mailed to clmnt upon receipt of updated mr requested on 4/10/2017 clmnt LOV 4/3/2017, AF and AO forms w ill submit for full medical review and update PATH - VKIMBLE - Apr 10, 2017 04:11:43 pm

UPDATE: OVN dated 4/3/2017 w ith Physician Hearts Clmnt has no SOB. Or c/o chest pain
EKG - Sinus Bradycardia rate 59, nonspecific abnormality Clmnt to continue meds and f/u in 3 months per Dr. Lee Faulkner STP: w ill continually f/u for AO forms pending receipt w ill update COD determination ., EF still poor PATH TDOO potnetially TDAO at this time
- VKIMBLE - Apr 24, 2017 08:59:47 am

Update: AO Begin letter mailed out on 4/10/2017 at present most recent OVN Dr. Lee Faulkner on file dated 4/3/2017 EBF/ AUTH also on file., still w aiting on AF/ APS mailed out 30day AO f/u letter pending receipt of medical information claim w ill need medical review and update to STP/claim Direction - VKIMBLE - May 12, 2017 10:24:16 am

06/02/2017(AWD) Received Abilities form and APS from Dr. Faulkner MD
05/24/2017- Abilities form. Clmt can occasionally lift up to 10 pounds. And never lift any more than 10 pounds. Provider Wrote N/A for all other restrictions/limitations. No lifting or ?? w hatsoever as his condition is w orsening over time.

05/24/2017-APS. DX: Cardiomyopathy. Subjective findings: w orsening dyspnea. LOV: 04/03/2017. Patient is seen quarterly or every 6 months or more. PHYSICAL IMPAIRMENET: class 4- not capable of sedentary w ork. Patient has retrogressed. Patient is disabled from ow n and any occ. A fundamental change is never expected.
- KAGFA8 - Jun 05, 2017 07:57:00 am

PATH:
Pending a clinical review for A/O decision. - KAGFA8 - Jun 05, 2017 09:06:20 am

CLINICAL RESPONSE 06/09/2017:
Round table w ith DWKEE, DASBA3, TAKGO7, and DOBTH2

Because his cardio condition prevents him from having the hip surgery, the R&L's are reasonable.
- KAGFA8 - Jun 09, 2017 02:07:58 pm

PATH:
A/O to be approved as the clinical review indicates restrictiosn/limitations are supported. Per most recent APS Clmt is not capable of sedentary w ork. CE w ill continue to moonitor this claim. If clmt does have hip sx claim to be review ed follow ing recovery to determine updated R&L's. - KAGFA8 - Jun 12, 2017 07:34:41 am

07/27/2017- phone call to clmt. Per Clmt report- hip sx is scheduled for 10/20/2017

PATH:
CE to call clmt after 10/20/2017 to confirm he had hip sx. Confirm sx date w ith provider. CE to allow time for recovery prior to updating medical records if clmt does have the sx. Clmt is currenlty TDAO. Clmt may gain some capacity after having sx and may be able to do another occupation. - KAGFA8 - Jul 27, 2017 02:36:36 pm

10/31/2017- phone message left from the clmt: Clmt reports hip replacement sx is scheduled for February. Had to reschedule sx because he does not have finances to pay for it. Will have state insurance starting 02/2018.

- KAGFA8 - Oct 31, 2017 02:35:35 pm

PATH:
CE w ill f/u w ith the clmt in 02/2018 after clmt has sx. Clmt is currently TDAO, but may improve after he has sx. Will determine long term goal follow ing recovery from hip sx. - KAGFA8 - Oct 31, 2017 02:36:03 pm

PATH:
CE w as unable to reach the clmt in Februayr via phone. AS such a no contact letter w as sent to the clmt. Pending call from clmt. Clmt remains TDOO pending verification of sx. Long term goal is TBD. - KAGFA8 - Feb 28, 2018 09:10:08 am

PATH:
Per clmt report on call on 03/01/2018 clmt to have hip sx on 03/07/2018. Clmt to provide discharge summary. CE w ill allow time for recovery . CE w ill complete w ellness check 6 months post hip sx for update to determine if records are needed at that time. Clmt is currently TDOO. Long term goal is TBD. - KAGFA8 - Mar 01, 2018 12:41:18 pm

03/23/2018(AWD) received RTW note from Cambell Clinic dated 03/22/2018 advising that the clmt had total hip replacement sx on 03/07/2018 - KAGFA8 - Mar 23, 2018 02:01:46 pm

PATH:
CE allow ing time for recovery form hip replacement sx. Will f/u w ith the clmt in 4 months. Clmt may improve and have some functionality follow ing recovery from sx. Currently TDAO. - KAGFA8 - Mar 23, 2018 02:06:16 pm

PATH:
Medical records requested from Campbell clinic (hip surgeon and PT provider) and Dr. Faulker (cardiologist). When info is received claim to be sent to clinical to determine if clmt has functionality for another occupation. Clmt is currently TDAO. Long term goal is unclear at this time. CE w ill f/u on medical record requested accordingly. - KAGFA8 - Jul 31, 2018 07:40:15 am

PATH;
Updated auth needed to request records. Sending auth form to clmt to complete andreturn. Once received w il lsubmit request for records. Will f/u on auth form accordingly. - KAGFA8 - Aug 06, 2018 12:33:15 pm

PATH:
Medical records requested from Dr. Lee Faulkner (cardiologist) and Campbell Clinic Orthopedics. An APS w as sent to both providers to complete and return. CE w ill f/u on the medical records and forms accordingly. Once info is received claim to be referred to clinical to determine if the clmt remains TDAO and is likely to remain TDAO. Long term goal is PTD.
- KAGFA8 - Aug 15, 2018 07:38:26 am

09/04/2018(AWD) received Group Continuance of Disability signed by Dr. Lee Faulkner dated 09/04/2018. DX: cardiomyopathy, HTN. LOV: 07/30/2018. Patient is seen every 6 months or more. TXT: medical-cardiology. RTW is unknow n. R&L's medical therapy for now - severe limitation. PHYSICAL IMPAIRMENT: class 5- not capable of sedentary. - KAGFA8 - Sep 05, 2018 09:04:38 am

09/04/2018 (AWD) received medical records from Dr. Lee Faulkner(cardiologist)
07/30/2018- present for f/u - reports pain w hen stressed out or w hen over exerting himself. Has been under recent stress due to a random shooting to his house- shooter still at large. AICD interrogation- normal AICD function, nonsustained ventricular tachycardia. EKG -sinus rhythm rate of 60, nonspecific tw ave abnormality. PLAN: continue current meds. f/u in 6 months.
- KAGFA8 - Sep 05, 2018 03:15:25 pm

PATH:
Pending receipt of recordsfrom Campbell Clinic Orthopaedics. once received claim to be referred to clinical for review . Will f/u on outstanding records accordingly. - KAGFA8 - Sep 05, 2018 03:16:58 pm

10/01/2018(AWD) received medical records from Campbell Clinic- Dr. Dabov- ortho from 03/19/2018-04/23/2018
04/23/2018-6 w eeks s/p left total hip replacement sx. Doing w ell- has some startup pain. Patient is permanently disabled from medium-or heavy type of w ork. Should get involved in a good w alking program and fitness. f/u in 10 months w ith AP pelvis and lateral of the left hip.
- KAGFA8 - Oct 02, 2018 08:16:08 am

**Chronological Activity List**

PATH:
Pending a clinical review . Next steps w ill be updated follow ing the conclusion of the review . - KAGFA8 - Oct 02, 2018 08:20:59 am

10/03/2018(AWD) received APS signed by Dr. Lee Faulker form is not dated. DX: Cardiomyopathy and hypertension. R&L's: occasionally lift up to 5 pounds, never lift greater than 5 pounds, stand, w alk, sit, balance, stoop, kneel, finger, crouch, craw l, grasp, climb, push, pull, bend, reach overhead-desk level-or below w aist. TXT: medical therapy. Prognosis- lifelong. - KAGFA8 - Oct 04, 2018 07:30:02 am

PATH:
Claim is pending a clinical review . Next steps w ill be updated once conclusion of review is received.
10/24/2018- Case submitted t for a peer review Board-Certified Cardiology
- KAGFA8 - Oct 24, 2018 02:50:08 pm

10/26/2018(AWD) PEER REVIEW
There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II).

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

PATH:
Claim has been referred to voc for a TSA. Once results are received next steps w ill be updated. Will f/u on TSA accordingly. - KAGFA8 - Oct 29, 2018 09:46:30 am

TSA RESULTS:
Vocational Response:
This VRC w as requested to perform a TSA on this claimant to determine if there w ere transferable occupations based upon the individual's w ork history, skills, education, & restrictions & limitations. Occupations w ere identified that meet all of the noted criteria. A complete TSA report has been uploaded into AWD.

Tracie Grumet, MA, CRC
Vocational Rehabilitation Consultant
- TROGR7 - Oct 30, 2018 08:19:00 am

PATH:
Claim to be denied for NOT TDAO. - KAGFA8 - Oct 30, 2018 09:50:33 am

12/05/2018(AWD) Received addendum to initial clinical review . Addendum is dated 12/05/2018.
CONCLUSION; New date altered option. Data supports ONLY sedentary w ork w ith no w alking, occasional standing, no professional driving, no lifting/carrying greater than 10 pounds ever and greater than 10 pounds occasionally in full time capacity, w ith respect to the claimant's cardiac condition.
- KAGFA8 - Dec 06, 2018 02:38:02 pm

PATH;
based on the results of the initial TSA- tw o sedentary occupations w ere identifed. As such, the original denial remains in effect. CE sent the clmt a letter to advise of addendum to peer review and the decision to uphold initial denial. Appeal rights w ere included in the letter. - KAGFA8 - Dec 06, 2018 03:03:05 pm

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 12/6/2018 | Referrals | 14 | Change of Definition | Completed | KAGFA8 |

UPDATED INFO:
The peer review contacted the clmt's provider for a response. The provider failed to respond in a timely manner, how ever the clmt has provided the providers response and w ould like an addendum to the peer review .
The providers response is located in AWD dated 11/29/2018.

Claimant Name: Sherman Carter
Claim Number: 11501208075
Occupation/level:Delivery Driver- med occ
Diagnosis:Cardiomyopathy, and oseoarthrtis of hip
DOD:08/07/2015
DLW:08/06/2015
SUMMARY:
48 yom Delivery Driver (medium). DLW 8/6/2015 w ith DOD 8/21/2015. APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015. Prmary DX: cardiomyopathy secondary dx oseoarthrits of hip. BSD: 11/05/2015 COD: 11/05/2015 MBD: 11/05/2034 - KAGFA8 - Nov 30, 2018 08:31:03 am
Request for Peer Addendum

Clinician/Appeals Examiner: Anne Wuertz RN
Phone Number: 678-295-3205

Claimant Name: Sherman Carter
Claim Number: 1150128075
Date of Birth:
Date of Disability: 8/7/2015
COD: 11/5/2017

PREVIOUS VENDOR NAME & CASE NUMBER: PDA Claim # 1150128075
PREVIOUS REVIEWER & SPECIALTY: Dr Steven Borzak, cardiology

Thank you for your report regarding the LTD COD claim for Sherman Carter. After review ing your report, w e are requesting an addendum to the 10/26/18 Peer Review due to receipt of response from Provider, Dr Faulkner to your previous correspondence.

Thank you for your addendum

Anne Wuertz RN
Nurse Disability Consultant - ADKWU5 - Nov 30, 2018 01:04:07 pm
Request for Peer Addendum

Clinician/Appeals Examiner: Anne Wuertz RN
Phone Number: 678-295-3205

Claimant Name: Sherman Carter
Claim Number: 1150128075
Date of Birth:
Date of Disability: 8/7/2015
COD: 11/5/2017

PREVIOUS VENDOR NAME & CASE NUMBER: PDA Claim # 1150128075
PREVIOUS REVIEWER & SPECIALTY: Dr Steven Borzak, cardiology

Thank you for your report regarding the LTD COD claim for Sherman Carter. After review ing your report, w e are requesting an addendum to the 10/26/18 Peer Review due to receipt of response from Provider, Dr Faulkner to your previous correspondence.

Thank you for your addendum

Anne Wuertz RN
Nurse Disability Consultant - ADKWU5 - Nov 30, 2018 01:04:07 pm
Case submitted to PDA # 18015 for a /Addendum report - PDPWA0 - Dec 03, 2018 09:33:52 am
The final report from PDA w as received and sent to Disability Claims for attachment to AWD. - PDPWA0 - Dec 05, 2018 10:35:58 am
RN Audit of Peer Addendum by Dr Steven Borzak (Cardiology) dated 12/5/18 for PDA.

Conclusion: The new data caused me to alter my opinion. Rather than the data supporting light or sedentary w ork, the data now supports only sedentary w ork w ith no w alking, occasional standing, no professional driving, no lift/carry greater than 10# ever and < 10# occasionally, but in full time capacity w ith respect to the clmt's cardiac condition.

Anne Wuertz RN
urse Disability Consultant - ADKWU5 - Dec 05, 2018 06:55:56 pm

1/23/2019 Telephone (IN) 61 SHERMAN CARTER Completed KAGFA8
clmt left a VM message asking for a copy of law yer info. Ce called the clmt back. He notes that his attorney asked him to get a file copy. CE explaiend he needs to put his reqeust in w ritting and w e can send him a copy of his file He notes he w il lsend over the request. - KAGFA8 - Jan 23, 2019 02:31:24 pm

1/23/2019 Telephone (IN) 62 SHERMAN CARTER Completed KAGFA8
clmt called back and notes he submitted a request in 11/2018 for a coy of his claim file. CE found request and advised she w ill make a reqeust for a file copy to be completed for him. - KAGFA8 - Jan 23, 2019 02:43:05 pm

1/23/2019 2:41:46 PM Claim Tasks 21 File scan request Requested PDPWA0
Please complete a file copy request for the clmt per request located in AWD dated 11/21/2018.
Claim number: 1150128075- LTD
Claim number: 1150112339- STD
No additional letter is needed for this file copy request.
- KAGFA8 - Jan 23, 2019 02:42:13 pm

Copy has been prepared, it is in the U:\Claims Support\File Copies 2017

SHERMAN CARTER 1150128075 1150112339 1-25-2019

Please review and flip the task back to my initials. I w ill burn the copy to a disk and mail to the attorney/claimant.

- PDPWA0 - Jan 25, 2019 04:57:16 pm

1/28/19: Ok to proceed w ith mailing a copy of the file to the claimant. - JA0SC6 - Jan 28, 2019 10:25:12 am
cdburn secure and mailed - PDPWA0 - Jan 29, 2019 03:14:13 pm

1/25/2019 Documents/Mail 88 Atty Ltr w ith Copy of Claim File Completed PDPWA0
Atty Ltr w ith Copy of Claim File

1/29/2019 Claim Tasks 21 File scan request Completed PDPWA0
Please complete a file copy request for the clmt per request located in AWD dated 11/21/2018.
Claim number: 1150128075- LTD
Claim number: 1150112339- STD
No additional letter is needed for this file copy request.
- KAGFA8 - Jan 23, 2019 02:42:13 pm

Copy has been prepared, it is in the U:\Claims Support\File Copies 2017

SHERMAN CARTER 1150128075 1150112339 1-25-2019

Please review and flip the task back to my initials. I w ill burn the copy to a disk and mail to the attorney/claimant.

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | - PDPWA0 - Jan 25, 2019 04:57:16 pm<br><br>1/28/19: Ok to proceed w ith mailing a copy of the file to the claimant. - JA0SC6 - Jan 28, 2019 10:25:12 am<br>cdburn secure and mailed - PDPWA0 - Jan 29, 2019 03:14:13 pm | | | | |
| 4/2/2019 7:59:51 AM | Appeal | 2 | Level 1 | New | LAKURTZ |
| 4/5/2019 | Telephone (OUT) | 63 | SHERMAN CARTER | Completed | LAKURTZ |
| | Call to the claimant and had to leave a voice message. the appeal letter appears to be more of a request for records than an appeal. Would like to discuss w ith the claimant prior to completing the appeal w ork up. - LAKURTZ - Apr 05, 2019 08:28:07 am | | | | |
| 4/5/2019 | Telephone (IN) | 64 | SHERMAN CARTER | Completed | LAKURTZ |
| | Return call from the claimant. Advised rec'd a letter dated 03/25/2019 and the letter requested information. He stated that he received the information. He asked if anything else w as recevied w ith the letter so w ent over items received. Asked if he plans on submitting any additional information and he says he w ants "to keep the claim open" so that he can add information. Advised that w e w ould provide a 30 days extension for him to supplement the file and once he is complete to advise and w e w ill start the review . He asked how long it w ill take. Advised approximately 6 to 9 w eeks but that could be less or more depending on the progression of the appeal.<br><br>he then asked if he can settle the claim. Informed at this point, no. We have determined that he is not TD therefore there is no STL option. If the denial is OVT and goes back to claims then he can discuss w ith the CE.<br><br>He stated he w anted the extension. Advised I w ould get a letter out today. - LAKURTZ - Apr 05, 2019 08:56:53 am | | | | |
| 4/5/2019 | Documents/Mail | 89 | Appeal Dis EE Ackappeal | Completed | LAKURTZ |
| | Appeal Dis EE Ackappeal | | | | |
| 4/5/2019 9:31:25 AM | Referrals | 15 | Tolling Review | In Active Review | LAKURTZ |
| | Appeal Rcvd DateToday's DateDays Since Received<br>4/1/20194/5/20194<br>1st 45 days<br>Tolling Start DateTolling end DateTolling Days<br>4/5/2019 5/5/2019 30<br>0<br>0<br>0<br>Tolling Days 30<br>45th Day of Active Review 6/15/2019<br>Active Review Days Remaining to 45th Day71<br>30th Day of Active Review 5/31/2019<br><br>After 45 day Extension<br>Tolling Start DateTolling end DateTolling Days<br>0<br>0<br>0<br>Tolling Days0<br>90th Day of Active Review 7/30/2019<br>Active Review Days Remaining to 90th Day116<br>******************************************************************************************** - LAKURTZ - Apr 05, 2019 09:32:16 am | | | | |
| 4/5/2019 9:34:31 AM | Claim Tasks | 22 | Appeal - Ack Ltr Follow up | Requested | LAKURTZ |
| | 45 day letter is due on 30 day of active review ; how ever the 45 day language is in the ack appeal letter. Also included SSA paragraph.<br><br>follow up in 30th day - 05/05/2019<br>Will need to establish 90th day. - LAKURTZ - Apr 05, 2019 09:36:16 am | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 4/5/2019 9:36:56 AM | Summary/Assessment/Pa | 3h | First Level LTD Appeal Pending Rationale: - LAK | Requested | LAKURTZ |

Summary Notes
First Level LTD Appeal Pending Rationale: - LAKURTZ - Apr 05, 2019 09:42:18 am
Assessment Notes

Path Notes

Attorney Information:NA

Appeal level:First
Date Appeal Received:04/01/2019
45th day due on 30th day - yes
45th Day:05/16/2019
90th Day:06/30/2019

Claimant Name: Sherman Carter
Claim Number: LTD 1150128075
Group ID & Policy Number: ASBARB / 00001004922000000 / CL 4 (ATL)
Group Name:BarDett LLC
Group Status:Active

Claim Demographics
Current Age: 52( )
Situs Sate:TNState Language applicable: N
State of Residence: TNState Language applicable: N
Effective Date:07/01/2013
Estimated Net benefit: (Monthly):$1950 - $1369 = $581 (Existing OVP $27,623.36)
SS Aw ard information:02/01/2016
Date of Disability: 08/07/2015
EP: 90
Benefit Commencement Date: 11/05/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 24 months
Rehab Survey or EBF?
Max Duration Date: 01/15/2034
Pre-ex apply:NA
OO or AO:AO
Job Description / Location in AWD: Off Premise Delivery Driver
OA / Location in AWD:Truck Driver
Physical Demand Level of Occ:medium
Primary Diagnosis: Cardiomyopathy
Co-Morbid Diagnoses: OA of the hip
ERISA or NON-ERISA (verified)ERISA (LLC)
Riders:PIB
STD claim status:1150112339
LW claim status:1160012638 & 1160009294 Closed

Contractual limits
Legal action5 years (60 days) = 10/30/2023
Proof of claimelimination period
Date of Authorization08/13/2018 - valid 24 months
3rd party auth dateyes

Claim Synopsis
APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Initial Claim Decision: 10/30/2018 & 12/06/2018
Reason/Date of denial: Not TDAO

Type of Medical Review , Name, & Specialty:
PDA / Cardiology Dr. Steven Borzak (AWD 10/26/2018) & Addendum (12/05/2018)

There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II).

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

Current Providers - last 18 to 24 months
Dr. Lee Faulkner / Cardiology / 901-682-7241
Dr. Gregory Davob / Ortho / 901-759-3100

Date and Type of Recent Surgeries:
09/18/2015 - ICD
02/2019 L total hip replacement

Appeal being discussed
Reasons for disagreement as explained in appeal:
Letter from the claimant to appeal the determination.
He stated he w as approved AO 06/12/2017
He stated he w as found TD by SSA declaring he cannot do the w ork he used to do, cannot adjust to other forms of w ork b/c of the medical condition and the disability can result in death.
He complains that Lincoln never had him examined.
He states that he is unable to w alk for short or long periods of time and as a result experience SOB and dizziness, all elated to hear problems.

The claimants request for information has already been completed by the CE therefore w ill not bet sending again.

Information Submitted w ith appeal and not previously review ed:
Response from Dr. Lee Faulkner to Dr. Steven Borzak's peer review (claim level)
11/01/2018 - progress not from Physicians of Hearts. / dr. Lee E Faulkner
02/25/2019 - Campbell Clinic / Dr. Gregory D Dabov - 1 year out from THA-L. "I do believe that Mr. Sherman is permanently disabled from heavy w ork." He is advised to ride a bike and w alk as much as allow ed by his cardiologist. He is to RTN aprn.
Off w ork note by Dr. Dabov for the period of 03/07/2018 - forw ard.

PATH:
Sending ack appeal letter to the claimant and providing a 30 day extension. Including 45 day language and SS paragraph.
Call completed
No letter to the ER since the DOD is more than 2 years ago
Setting up tolling

NOTES:

SS file mentioned in initial call? - yes
SS language added to ack appeal letter? - yes

**Chronological Activity List**

- LAKURTZ - Apr 05, 2019 09:42:18 am

MAIL
4/24/2019 letter from the claimant.
The claimant states he is unsure w hy his claim w as denied as the letter w as unclear.
The claimant states that the TSA revealed occupations that he feels he is not able to perform.
Was not physically examined by the Lincoln review er.

The claimant is submitting the follow ing items (duplicates of items on file)
06/17/2017 SS decision letter
02/25/2018 Dr. Dabov progress note
03/07/2018 Dr. Dabov RTW
04/23/2018 Dr. Dabov progress note
11/01/2018 Dr. Fulkner progress note - heart
Peer questions and response
Peer review
Denial letter 12/06/2018
Denial letter 10/30/2018
06/12/2017 approval letter
09/19/2017 OVP letter
- LAKURTZ - May 06, 2019 03:40:05 pm

sending begin review letter and setting up AD. - LAKURTZ - May 10, 2019 07:40:29 am

Call Dr. Faulkner's office and spoke w ith Ms. Grier. She advised that the ECHO w as done on 11/01/2018. Asked if they could send a copy of the report and she stated that med records w ould not be in until Monday (05/13/2019) and she w ill have it faxed to 402-361-1460. Thanked her for the call. - LAKURTZ - May 10, 2019 09:25:14 am

Echo from 11/1/18 recd. NDC review pending, not yet started. - CXGEARY - May 15, 2019 11:54:34 am

sending NDC review to the claimant and providing 21 days to respond = 06/19/2019. - LAKURTZ - May 29, 2019 03:24:28 pm

no response to peer report. - LAKURTZ - Jun 21, 2019 12:03:21 pm

5/2/2019 7:51:58 AM | Documents/Mail | 90 | Incoming Correspondence | Received | LAKURTZ

2019-05-01-09.20.04.601940O01
4/24/2019 letter from the claimant.
The claimant states he is unsure w hy his claim w as denied as the letter w as unclear.
The claimant states that the TSA revealed occupations that he feels he is not able to perform.
Was not physically examined by the Lincoln review er.

The claimant is submitting the follow ing items (duplicates of items on file)
06/17/2017 SS decision letter
02/25/2018 Dr. Dabov progress note
03/07/2018 Dr. Dabov RTW
04/23/2018 Dr. Dabov progress note
11/01/2018 Dr. Fulkner progress note - heart
Peer questions and response
Peer review
Denial letter 12/06/2018
Denial letter 10/30/2018
06/12/2017 approval letter
09/19/2017 OVP letter
- LAKURTZ - May 06, 2019 03:25:12 pm

5/6/2019 | Telephone (OUT) | 65 | SHERMAN CARTER | Completed | LAKURTZ

Call to the claimant to discuss his letter as it is unclear if he is complete w ith the appeal or not. He stated the appeal is complete and he is ready for a fair review . Explained a full and fair review w ill be conducted as required by ERISA. - LAKURTZ - May 06, 2019 03:39:37 pm

5/6/2019 | Documents/Mail | 90 | Incoming Correspondence | Completed | LAKURTZ

2019-05-01-09.20.04.601940O01

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

4/24/2019 letter from the claimant.
The claimant states he is unsure w hy his claim w as denied as the letter w as unclear.
The claimant states that the TSA revealed occupations that he feels he is not able to perform.
Was not physically examined by the Lincoln review er.

The claimant is submitting the follow ing items (duplicates of items on file)
06/17/2017 SS decision letter
02/25/2018 Dr. Dabov progress note
03/07/2018 Dr. Dabov RTW
04/23/2018 Dr. Dabov progress note
11/01/2018 Dr. Fulkner progress note - heart
Peer questions and response
Peer review
Denial letter 12/06/2018
Denial letter 10/30/2018
06/12/2017 approval letter
09/19/2017 OVP letter
- LAKURTZ - May 06, 2019 03:25:12 pm

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 5/10/2019 | Telephone (OUT) | 66 | LEE FAULKNER MD | Completed | LAKURTZ |

Call to Dr. Faulkner's office to verify w hen the ECHO w as completed. The answ ering party w as stated Dr. Faulkner. Asked if this w as an answ ering service or the office and he stated it w as a little of both. Informed not sure if he w ould be able to assist but introduced myself and adivse that I w as w anting to confirm the date that Mr. Carter had his ECHO that show ed an EF of 20-25%. he stated to call the office in an hour and a half. Asked if this w as an answ ering service again and he stated to call the office in 1.5 hours. Asked if it w as centeral time zone and he stated "I told you w hat to do now just do and call the office in 1.5 hours". Asked for his name and this w as a very strange conversation for an answ ering service. He said he w as Dr. Faulkner and to just do w hat I w as told to do and he hung up. - LAKURTZ - May 10, 2019 07:36:36 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 5/10/2019 | Telephone (OUT) | 67 | LEE FAULKNER MD | Completed | LAKURTZ |

Call Dr. Faulkner's office and spoke w ith Ms. Grier. She advised that the ECHO w as done on 11/01/2018. Asked if they could send a copy of the report and she stated that med records w ould not be in until Monday (05/13/2019) and she w ill have it faxed to 402-361-1460. Thanked her for the call. - LAKURTZ - May 10, 2019 09:25:45 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 5/10/2019 | Claim Tasks | 22 | Appeal - Ack Ltr Follow up | Completed | LAKURTZ |

45 day letter is due on 30 day of active review ; how ever the 45 day language is in the ack appeal letter. Also included SSA paragraph.

follow up in 30th day - 05/05/2019
Will need to establish 90th day. - LAKURTZ - Apr 05, 2019 09:36:16 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 5/10/2019 | Documents/Mail | 91 | Appeal Info Rcvd Start Review | Completed | LAKURTZ |

Appeal Info Rcvd Start Review

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 5/10/2019 | Referrals | 16 | Appeal Review | Completed | LAKURTZ |

Appeal Direction Tool - LTD
Appeals Examiners answ er here:Recommendations/Comments
Was the claim denied because the claimant: w as not disabled, had a pre-existing condition, reached the specified conditions limit, &/or w here medical judgement w as involved?YesERISA requires a review by a different healthcare professional at each level of review /appeal.

If claim denied as not disabled ow n occupation, are w e now w ithin 6 months of the change in the definition of disability (COD)?N/A

Did claimant undergo an IME as part of decision to deny benefits at claim level (or 1st level of appeal)?No

Indicate w hether ERISA or non-ERISA?ERISA

Is the claimant a resident of California? No

Is the claimant represented by an attorney?No

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

What type of medical review w as undertaken previously?Peer Review

Indicate the length of time (in months) from previous medical review to present?4 up to 6 months

If there w as agreement previously, is there now a medical disagreement betw een NDC and treating provider?No

Does the claimant have both a physical and a behavioral health condition?No

Did the CE fail to address all limiting medical conditions in the previous denial?No

Did the claimant request that w e undertake our appeal review w ithout providing any new medical, vocational, or other documentation?No

Was the new medical information submitted on appeal significant? E.g. does it include relevant laboratory or diagnostic testing; recent evidence of functional ability; for a potentially limiting condition w e w ere unaw are of.No

Are the claimants complaints primarily pain related?No

Did the claimant submit a FCE or IME to us as part of their appeal?No

Are there possible side effects from the claimant's medication that needs to be addressed?No

Is the claimant being seen by specialists for multiple medical conditions affecting different body parts?YesConsider NDC review to determine appropriate specialty if considering physician review or exam.

Are there financial considerations (e.g. offset dispute), findings from a SIU investigation, or contractual issues other than disability that need to be addressed? No

Consider taking the follow ing action(s):NDC

- Appeal Review - LAKURTZ - May 10, 2019 08:10:03 am

| | | | | | |
|---|---|---|---|---|---|
| 5/10/2019 7:59:53 AM | Claim Tasks | 23 | Appeal 90 Day Extension | Requested | LAKURTZ |
| | 90 day ERISA 07/30/2019 | | - LAKURTZ - May 10, 2019 08:00:31 am | | |
| 5/10/2019 8:14:48 AM | Referrals | 17 | Ongoing Claim Review | Initial | LAKURTZ |
| | Clinical Review Request | | | | |

At this time, w e are review ing w hether or not the evidence w ithin the file supports findings of w arranted restrictions and/or limitations that w ould preclude the claimant's ability to perform XXX occupation from xxx.

Claim Summary:

Sherman Carter is a 52 year old w ho ceased w orking as a Truck Driver on 08/07/2015 due to cardiomyopathy and OA of the hip. It w as previously determined that the claimant met the policy definition of disability to 10/30/2018.

At this time w e are review ing w hether or not the evidence w ithin the file supports findings of w arranted restrictions and/or limitations that w ould preclude his ability to carry out any occupation beyond 10/30/2018.

Based on review of the medical information, are there any impairments that w ould w arrant restrictions and/or limitations to preclude occupational functioning? If yes, please outline and provide your clinical rationale.

Demographics:
Current Age: 52( )
Situs Sate:TNState Language applicable: N
State of Residence: TNState Language applicable: N
Effective Date:07/01/2013

**Posted Date** **Category** **Seq** **Item** **Status** **User**

Estimated Net benefit: (Monthly):$1950 - $1369 = $581 (Existing OVP $27,623.36)
SS Aw ard information:02/01/2016
Date of Disability: 08/07/2015
EP: 90
Benefit Commencement Date: 11/05/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 24 months = 11/05/2017
Rehab Survey or EBF?
Max Duration Date: 01/15/2034
Pre-ex apply:NA
OO or AO:AO
Job Description / Location in AWD: Off Premise Delivery Driver
OA / Location in AWD:Truck Driver
Physical Demand Level of Occ:medium
Primary Diagnosis: Cardiomyopathy
Co-Morbid Diagnoses: OA of the hip
ERISA or NON-ERISA (verified)ERISA (LLC)
Riders:PIB
STD claim status:1150112339
LW claim status:1160012638 & 1160009294 Closed

Date and Type of Recent Surgeries:
09/18/2015 - ICD
02/2018 L total hip replacement

Additional Medical:
Information Submitted w ith appeal and not previously review ed:
Response from Dr. Lee Faulkner to Dr. Steven Borzak's peer review (claim level)
11/01/2018 - progress not from Physicians of Hearts. / dr. Lee E Faulkner
02/25/2019 - Campbell Clinic / Dr. Gregory D Dabov - 1 year out from THA-L. "I do believe that Mr. Sherman is permanently disabled from heavy w ork." He is advised to ride a bike and w alk as much as allow ed by his cardiologist. He is to RTN aprn.
Off w ork note by Dr. Dabov for the period of 03/07/2018 - forw ard.

The claimant is submitting the follow ing items (duplicates of items on file)
06/17/2017 SS decision letter
02/25/2018 Dr. Dabov progress note
03/07/2018 Dr. Dabov RTW
04/23/2018 Dr. Dabov progress note
11/01/2018 Dr. Fulkner progress note - heart (call placed to doctor to see w hen ECHO noted in the OV w as done)
Peer questions and response
Peer review
Denial letter 12/06/2018
Denial letter 10/30/2018
06/12/2017 approval letter
09/19/2017 OVP letter

Questions

Based on review of the medical information, are there any impairments that w ould w arrant restrictions and/or limitations to preclude occupational functioning? If yes, please outline and provide your clinical rationale. - LAKURTZ - May 10, 2019 08:15:33 am
1st level appeal assigned to A. Malskeit on 5/21/19 - MEHLO8 - May 21, 2019 06:38:06 am
Date:May 28, 2019

Subject:Nursing Memorandum

Claim#: 1150128075
Claimant: Sherman Carter
DOD: 8/7/15

COD: 11/5/17

Conclusion:
Essentially unchanged since the previous 12/5/18 peer review which stated the claimant can do "sedentary work with no walking, occasional standing, lifting <10 lbs occasionally.

Rationale:
Since the peer review, there has been no new significant illness or injury reported that would otherwise contribute to new medically reasonable work restrictions or limitations. No new physical examinations or diagnostic tests was provided. New hospitalizations or surgeries either for musculoskeletal diagnoses or cardiopulmonary diagnoses were not noted.
File does not indicate an instance of ongoing 100% nonweightbearing status, bedridden status or wheelchair dependency. File does not indicate an instance of constant, daily ADL assistance or that the claimant needs active hands on help from a secondary individual. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) with no significant radiographic abnormalities to the left hip and the claimant to be navigating the room reasonably well.

There is insufficient documented evidence of significant or severe high grade joint weakness and instability, significant gait instability resulting in frequently witnessed falls, significant distal extremity circulatory, sensory and motor deficits, muscular atrophy, dexterity or coordination problems that would otherwise translate into a wholly diminished sitting, standing, walking, lifting and fingering functional capacity. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) with intact motor, sensation, etc. and no deformities and indicated again, no significant radiographic abnormalities on the left hip xrays.

Although the 11/1/18 and 11/11/18 medical records from Dr Faulkner noted the claimant continues to have a severely depressed left ventricular function (LV) and nonsustained ventricular tachycardia (VT) along with having shortness of breath (SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

Although the records indicate that the claimant has chronic musculoskeletal pain and paresthesias, it would be reasonable to periodically adjust positions throughout the workday per position of comfort. i.e. taking reasonable breaks, stretching, alternating sitting, standing and walking throughout the day to minimize or mitigate the aforementioned symptomatology.

Background history:

The medical records indicate that the claimant is a 52 yr old truck driver (med occ) with an extensive cardiac history entailing hypertension, cardiomyopathy, depressed left ventricular function, nonsustained VT whom underwent AICD placement on Sept 2015. The claimant has ongoing reported symptoms of dizziness, shortness of breath, chest pain with stress and activity, etc.
File also noted the claimant had a dx of OA of the left hip and underwent uncomplicated total left hip replacement on March 2018. The claimant has ongoing reported symptoms of leg pain and paresthesias.

Recent R+L's as so stated by the treating medical providers:
3/22/18 Dr Dabov (ortho) off work
4/23/18 Dr Dabov: permanently disabled from medium or heavy work…….I do want him getting involved in a good walking program and fitness…..
10/1/18 Dr Dabov "see notes."
2/25/19 Dr Dabov Permanently disabled from heavy work…..i do want him exercising as far as what his heart doctor wants, mainly walking and maybe riding a bike. No running, heavy lifting, bending, squatting, climbing, etc.

Medical office notes or hospital reports as so stated in the records:
3/19/18 Dr Dabov: using walker to ambulate
4/23/18 Dr Dabov: has done well no major issues.
7/30/18 Dr Faulkner cardio: denies CP, however pain when stressed or overexerting himself. Denies syncope or dizziness. ICD interrogation noted nonsustained VT. EKG in office noted normal sinus rhythm rate of 60. Exam noted intact lung and heart sounds, hr and rhythm, no deformities, clubbing, cyanosis or edema. neuro intact.
11/1/18 Dr Faulkner: continues having SOB. having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia and difficulty walking. He continues to have numbness

of his leg and expresses DOE and orthopnea. Exam: 130/80 intact lung and heart sounds, hr and rhythm, neurological functions. no deformities, sw elling, clubbing or cyanosis.
11/1/18 echocardiogram severely depressed LV function w ith EF 25%. Posterior w all akinesis
11/11/18 Dr Borzak IM/cardio: clmt has severely depressed LV function w ith an EF of 20-25%. EKG w ith frequent ventricular ectopy. s/p AICD. Nonsustained VT. Unable to w alk 6 minutes w ithout stopping due to dizziness and numbness since hip replacement. Has DOE. He has 3 pillow orthopnea. NYHA class III.
2/25/19 Dr Dabov exam: NAD. intact orientation, sensation, motor. Limited ROM in right hip vs left. Xrays noted arthroplasty in good position. Intact lengths. No loosening or failure. navigates the room reasonably w ell. Permanently disabled from heavy w ork.....i do w ant him exercising as far as w hat his heart doctor w ants, mainly w alking and maybe riding a bike. No running, heavy lifting, bending, squatting, climbing, etc.

NDC Fil C, RN
Nurse Disability Consultant, Lincoln Financial Group - FXCASTI - May 28, 2019 02:51:11 pm
Transferred to F. Castillo on 5/28/19 - MEHLO8 - May 28, 2019 07:28:17 am

| | | | | | |
|---|---|---|---|---|---|
| 5/15/2019 | Documents/Mail | 92 | Medical Records | Completed | LAKURTZ |

2019-05-14-13.00.13.327260O01
Echo results - CXGEARY - May 15, 2019 11:54:51 am

| | | | | | |
|---|---|---|---|---|---|
| 5/29/2019 | Telephone (OUT) | 68 | SHERMAN CARTER | Completed | LAKURTZ |

Call to the claimant to advise of the status of the appeal and the review . No answ er so left vm w ith my dirct contact info. 21 day letter. - LAKURTZ - May 29, 2019 03:36:48 pm

| | | | | | |
|---|---|---|---|---|---|
| 5/29/2019 | Documents/Mail | 93 | Appeal Dis EE 21 Day Letter | Completed | LAKURTZ |

Appeal Dis EE 21 Day LetterAttachments:S Carter Review .pdf

| | | | | | |
|---|---|---|---|---|---|
| 5/29/2019 | Referrals | 17 | Ongoing Claim Review | Completed | LAKURTZ |

Clinical Review Request

At this time, w e are review ing w hether or not the evidence w ithin the file supports findings of w arranted restrictions and/or limitations that w ould preclude the claimant's ability to perform XXX occupation from xxx.

Claim Summary:

Sherman Carter is a 52 year old w ho ceased w orking as a Truck Driver on 08/07/2015 due to cardiomyopathy and OA of the hip. It w as previously determined that the claimant met the policy definition of disability to 10/30/2018.

At this time w e are review ing w hether or not the evidence w ithin the file supports findings of w arranted restrictions and/or limitations that w ould preclude his ability to carry out any occupation beyond 10/30/2018.

Based on review of the medical information, are there any impairments that w ould w arrant restrictions and/or limitations to preclude occupational functioning? If yes, please outline and provide your clinical rationale.

Demographics:
Current Age: 52( )
Situs Sate:TNState Language applicable: N
State of Residence: TNState Language applicable: N
Effective Date:07/01/2013
Estimated Net benefit: (Monthly):$1950 - $1369 = $581 (Existing OVP $27,623.36)
SS Aw ard information:02/01/2016
Date of Disability: 08/07/2015
EP: 90
Benefit Commencement Date: 11/05/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 24 months = 11/05/2017
Rehab Survey or EBF?
Max Duration Date: 01/15/2034
Pre-ex apply:NA
OO or AO:AO
Job Description / Location in AWD: Off Premise Delivery Driver
OA / Location in AWD:Truck Driver
Physical Demand Level of Occ:medium

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Primary Diagnosis: Cardiomyopathy
Co-Morbid Diagnoses: OA of the hip
ERISA or NON-ERISA (verified)ERISA (LLC)
Riders:PIB
STD claim status:1150112339
LW claim status:1160012638 & 1160009294 Closed

Date and Type of Recent Surgeries:
09/18/2015 - ICD
02/2018 L total hip replacement

Additional Medical:
Information Submitted w ith appeal and not previously review ed:
Response from Dr. Lee Faulkner to Dr. Steven Borzak's peer review (claim level)
11/01/2018 - progress not from Physicians of Hearts. / dr. Lee E Faulkner
02/25/2019 - Campbell Clinic / Dr. Gregory D Dabov - 1 year out from THA-L. "I do believe that Mr. Sherman is permanently disabled from heavy w ork." He is advised to ride a bike and w alk as much as allow ed by his cardiologist. He is to RTN aprn.
Off w ork note by Dr. Dabov for the period of 03/07/2018 - forw ard.

The claimant is submitting the follow ing items (duplicates of items on file)
06/17/2017 SS decision letter
02/25/2018 Dr. Dabov progress note
03/07/2018 Dr. Dabov RTW
04/23/2018 Dr. Dabov progress note
11/01/2018 Dr. Fulkner progress note - heart (call placed to doctor to see w hen ECHO noted in the OV w as done)
Peer questions and response
Peer review
Denial letter 12/06/2018
Denial letter 10/30/2018
06/12/2017 approval letter
09/19/2017 OVP letter

Questions

Based on review of the medical information, are there any impairments that w ould w arrant restrictions and/or limitations to preclude occupational functioning? If yes, please outline and provide your clinical rationale. - LAKURTZ - May 10, 2019 08:15:33 am
1st level appeal assigned to A. Malskeit on 5/21/19 - MEHLO8 - May 21, 2019 06:38:06 am
Transferred to F. Castillo on 5/28/19 - MEHLO8 - May 28, 2019 07:28:17 am
Date:May 28, 2019

Subject:Nursing Memorandum

Claim#: 1150128075
Claimant: Sherman Carter
DOD: 8/7/15
COD: 11/5/17

Conclusion:
Essentially unchanged since the previous 12/5/18 peer review w hich stated the claimant can do "sedentary w ork w ith no w alking, occasional standing, lifting <10 lbs occasionally.

Rationale:
Since the peer review , there has been no new significant illness or injury reported that w ould otherw ise contribute to new medically reasonable w ork restrictions or limitations. No new physical examinations or diagnostic tests w as provided. New hospitalizations or surgeries either for musculoskeletal diagnoses or cardiopulmonary diagnoses w ere not noted.
File does not indicate an instance of ongoing 100% nonw eightbearing status, bedridden status or w heelchair dependency. File does not indicate an instance of constant, daily ADL assistance or that the claimant needs active

hands on help from a secondary individual. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) w ith no significant radiographic abnormalities to the left hip and the claimant to be navigating the room reasonably w ell.

There is insufficient documented evidence of significant or severe high grade joint w eakness and instability, significant gait instability resulting in frequently w itnessed falls, significant distal extremity circulatory, sensory and motor deficits, muscular atrophy, dexterity or coordination problems that w ould otherw ise translate into a w holly diminished sitting, standing, w alking, lifting and fingering functional capacity. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) w ith intact motor, sensation, etc. and no deformities and indicated again, no significant radiographic abnormalities on the left hip xrays.

Although the 11/1/18 and 11/11/18 medical records from Dr Faulkner noted the claimant continues to have a severely depressed left ventricular function (LV) and nonsustained ventricular tachycardia (VT) along w ith having shortness of breath (SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, w ith no syncope, sw elling, clubbing or cyanosis.

Although the records indicate that the claimant has chronic musculoskeletal pain and paresthesias, it w ould be reasonable to periodically adjust positions throughout the w orkday per position of comfort. i.e. taking reasonable breaks, stretching, alternating sitting, standing and w alking throughout the day to minimize or mitigate the aforementioned symptomatology.

Background history:

The medical records indicate that the claimant is a 52 yr old truck driver (med occ) w ith an extensive cardiac history entailing hypertension, cardiomyopathy, depressed left ventricular function, nonsustained VT w hom underw ent AICD placement on Sept 2015. The claimant has ongoing reported symptoms of dizziness, shortness of breath, chest pain w ith stress and activity, etc.
File also noted the claimant had a dx of OA of the left hip and underw ent uncomplicated total left hip replacement on March 2018. The claimant has ongoing reported symptoms of leg pain and paresthesias.

Recent R+L's as so stated by the treating medical providers:
3/22/18 Dr Dabov (ortho) off w ork
4/23/18 Dr Dabov: permanently disabled from medium or heavy w ork…….I do w ant him getting involved in a good w alking program and fitness…..
10/1/18 Dr Dabov "see notes."
2/25/19 Dr Dabov Permanently disabled from heavy w ork…..i do w ant him exercising as far as w hat his heart doctor w ants, mainly w alking and maybe riding a bike. No running, heavy lifting, bending, squatting, climbing, etc.

Medical office notes or hospital reports as so stated in the records:
3/19/18 Dr Dabov: using w alker to ambulate
4/23/18 Dr Dabov: has done w ell no major issues.
7/30/18 Dr Faulkner cardio: denies CP, how ever pain w hen stressed or overexerting himself. Denies syncope or dizziness. ICD interrogation noted nonsustained VT. EKG in office noted normal sinus rhythm rate of 60. Exam noted intact lung and heart sounds, hr and rhythm, no deformities, clubbing, cyanosis or edema. neuro intact.
11/1/18 Dr Faulkner: continues having SOB. having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia and difficulty w alking. He continues to have numbness of his leg and expresses DOE and orthopnea. Exam: 130/80 intact lung and heart sounds, hr and rhythm, neurological functions. no deformities, sw elling, clubbing or cyanosis.
11/1/18 echocardiogram severely depressed LV function w ith EF 25%. Posterior w all akinesis
11/11/18 Dr Borzak IM/cardio: clmt has severely depressed LV function w ith an EF of 20-25%. EKG w ith frequent ventricular ectopy. s/p AICD. Nonsustained VT. Unable to w alk 6 minutes w ithout stopping due to dizziness and numbness since hip replacement. Has DOE. He has 3 pillow orthopnea. NYHA class III.
2/25/19 Dr Dabov exam: NAD. intact orientation, sensation, motor. Limited ROM in right hip vs left. Xrays noted arthroplasty in good position. Intact lengths. No loosening or failure. navigates the room reasonably w ell.
Permanently disabled from heavy w ork…..i do w ant him exercising as far as w hat his heart doctor w ants, mainly w alking and maybe riding a bike. No running, heavy lifting, bending, squatting, climbing, etc.

**Chronological Activity List**

NDC Fil C, RN
Nurse Disability Consultant, Lincoln Financial Group - FXCASTI - May 28, 2019 02:51:11 pm

| | | | | | |
|---|---|---|---|---|---|
| 5/29/2019 3:29:45 PM | Claim Tasks | 24 | Appeal - 21 Day Letter | Requested | LAKURTZ |

sending ndc review . claimant has 21 days to respond 06/19/2019.
- LAKURTZ - May 29, 2019 03:30:29 pm

| | | | | | |
|---|---|---|---|---|---|
| 6/10/2019 8:01:00 PM | Claim Tasks | 25 | Appeal - 45 Day Reminder | Requested | LAKURTZ |
| 6/11/2019 | Claim Tasks | 25 | Appeal - 45 Day Reminder | Completed | LAKURTZ |
| 7/12/2019 | Telephone (OUT) | 69 | SHERMAN CARTER | Completed | LAKURTZ |

Call to the claimant to go over uphold letter and explain appeal rights. He stated he did not have any questions and our call ended. - LAKURTZ - Jul 12, 2019 10:41:43 am

| | | | | | |
|---|---|---|---|---|---|
| 7/12/2019 | Claim Tasks | 23 | Appeal 90 Day Extension | Completed | LAKURTZ |

90 day ERISA 07/30/2019 - LAKURTZ - May 10, 2019 08:00:31 am

| | | | | | |
|---|---|---|---|---|---|
| 7/12/2019 | Claim Tasks | 24 | Appeal - 21 Day Letter | Completed | LAKURTZ |

sending ndc review . claimant has 21 days to respond 06/19/2019.
- LAKURTZ - May 29, 2019 03:30:29 pm

| | | | | | |
|---|---|---|---|---|---|
| 7/12/2019 | Documents/Mail | 94 | Appeal Any Occ Level 1 Uphold EE | Completed | LAKURTZ |

Appeal Any Occ Level 1 Uphold EEAttachments:Translation services

| | | | | | |
|---|---|---|---|---|---|
| 7/12/2019 | Appeal | 2 | Level 1 | Closed | LAKURTZ |
| 7/12/2019 | Summary/Assessment/Pa | 3h | First Level LTD Appeal Pending Rationale: - LAK | Completed | LAKURTZ |

Summary Notes
First Level LTD Appeal Pending Rationale: - LAKURTZ - Apr 05, 2019 09:42:18 am
Assessment Notes

Path Notes

Attorney Information:NA

Appeal level:First
Date Appeal Received:04/01/2019
45th day due on 30th day - yes
45th Day:05/16/2019
90th Day:06/30/2019

Claimant Name: Sherman Carter
Claim Number: LTD 1150128075
Group ID & Policy Number: ASBARB / 00001004922000000 / CL 4 (ATL)
Group Name:BarDett LLC
Group Status:Active

Claim Demographics
Current Age: 52( )
Situs Sate:TNState Language applicable: N
State of Residence: TNState Language applicable: N
Effective Date:07/01/2013
Estimated Net benefit: (Monthly):$1950 - $1369 = $581 (Existing OVP $27,623.36)
SS Aw ard information:02/01/2016
Date of Disability: 08/07/2015
EP: 90
Benefit Commencement Date: 11/05/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 24 months
Rehab Survey or EBF?
Max Duration Date: 01/15/2034
Pre-ex apply:NA
OO or AO:AO
Job Description / Location in AWD: Off Premise Delivery Driver
OA / Location in AWD:Truck Driver
Physical Demand Level of Occ:medium

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Primary Diagnosis: Cardiomyopathy
Co-Morbid Diagnoses: OA of the hip
ERISA or NON-ERISA (verified)ERISA (LLC)
Riders:PIB
STD claim status:1150112339
LW claim status:1160012638 & 1160009294 Closed

Contractual limits
Legal action5 years (60 days) = 10/30/2023
Proof of claimelimination period
Date of Authorization08/13/2018 - valid 24 months
3rd party auth dateyes

Claim Synopsis
APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Initial Claim Decision: 10/30/2018 & 12/06/2018
Reason/Date of denial: Not TDAO
Type of Medical Review , Name, & Specialty:
PDA / Cardiology Dr. Steven Borzak (AWD 10/26/2018) & Addendum (12/05/2018)

There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II).

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

Current Providers - last 18 to 24 months
Dr. Lee Faulkner / Cardiology / 901-682-7241
Dr. Gregory Davob / Ortho / 901-759-3100

Date and Type of Recent Surgeries:
09/18/2015 - ICD
02/2019 L total hip replacement

Appeal being discussed
Reasons for disagreement as explained in appeal:
Letter from the claimant to appeal the determination.
He stated he w as approved AO 06/12/2017
He stated he w as found TD by SSA declaring he cannot do the w ork he used to do, cannot adjust to other forms of w ork b/c of the medical condition and the disability can result in death.
He complains that Lincoln never had him examined.
He states that he is unable to w alk for short or long periods of time and as a result experience SOB and dizziness, all elated to hear problems.

The claimants request for information has already been completed by the CE therefore w ill not bet sending again.

Information Submitted w ith appeal and not previously review ed:
Response from Dr. Lee Faulkner to Dr. Steven Borzak's peer review (claim level)
11/01/2018 - progress not from Physicians of Hearts. / dr. Lee E Faulkner
02/25/2019 - Campbell Clinic / Dr. Gregory D Dabov - 1 year out from THA-L. "I do believe that Mr. Sherman is permanently disabled from heavy w ork." He is advised to ride a bike and w alk as much as allow ed by his cardiologist. He is to RTN aprn.
Off w ork note by Dr. Dabov for the period of 03/07/2018 - forw ard.

PATH:
Sending ack appeal letter to the claimant and providing a 30 day extension. Including 45 day language and SS paragraph.
Call completed
No letter to the ER since the DOD is more than 2 years ago
Setting up tolling

NOTES:

SS file mentioned in initial call? - yes
SS language added to ack appeal letter? - yes

- LAKURTZ - Apr 05, 2019 09:42:18 am

MAIL
4/24/2019 letter from the claimant.
The claimant states he is unsure w hy his claim w as denied as the letter w as unclear.
The claimant states that the TSA revealed occupations that he feels he is not able to perform.
Was not physically examined by the Lincoln review er.

The claimant is submitting the follow ing items (duplicates of items on file)
06/17/2017 SS decision letter
02/25/2018 Dr. Dabov progress note
03/07/2018 Dr. Dabov RTW
04/23/2018 Dr. Dabov progress note
11/01/2018 Dr. Fulkner progress note - heart
Peer questions and response
Peer review
Denial letter 12/06/2018
Denial letter 10/30/2018
06/12/2017 approval letter
09/19/2017 OVP letter
- LAKURTZ - May 06, 2019 03:40:05 pm

sending begin review letter and setting up AD. - LAKURTZ - May 10, 2019 07:40:29 am

Call Dr. Faulkner's office and spoke w ith Ms. Grier. She advised that the ECHO w as done on 11/01/2018. Asked if they could send a copy of the report and she stated that med records w ould not be in until Monday (05/13/2019) and she w ill have it faxed to 402-361-1460. Thanked her for the call. - LAKURTZ - May 10, 2019 09:25:14 am

Echo from 11/1/18 recd. NDC review pending, not yet started. - CXGEARY - May 15, 2019 11:54:34 am

sending NDC review to the claimant and providing 21 days to respond = 06/19/2019. - LAKURTZ - May 29, 2019 03:24:28 pm

no response to peer report. - LAKURTZ - Jun 21, 2019 12:03:21 pm

| | | | | | |
|---|---|---|---|---|---|
| 7/12/2019 | Summary/Assessment/P:4h | First Level LTD Appeal Determinatoin | - | Completed | LAKURTZ |

Summary Notes
First Level LTD Appeal Determinatoin - LAKURTZ - Jul 12, 2019 10:35:39 am
Assessment Notes

Path Notes
Appeal level:First

Claimant Name: Sherman Carter
Claim Number: LTD 1150128075

Claim Synopsis
APS signed by Dr. Gregory Dabov (ortho) on 10/14/2015 advises DOD of 8/21/2015 due to Dx of Osteoarthritis of Left Hip. FOV 8/21/2015. Will require sx; how ever, clmt needs to be cleared by cardio. Cardio sx of PVC Ablation and ICD Implant on 9/18/2015 per APS signed by cardio Dr. Lan on 10/21/2015.

Initial Claim Decision: 10/30/2018 & 12/06/2018
Reason/Date of denial: Not TDAO
Type of Medical Review , Name, & Specialty:
PDA / Cardiology Dr. Steven Borzak (AWD 10/26/2018) & Addendum (12/05/2018)

There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II).

The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

The data do not support severe impairment due to heart failure. it is surprising that Dr Faulkner recommended 6 month f/u on 7/30/18 in an individual w ho has severe impairment due to heart failure. A clmt w ith heart failure & functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the clmt could improve w ith adjustment and revision of evidence-based therapy for heart failure.

Appeal being discussed
Reasons for disagreement as explained in appeal:
Letter from the claimant to appeal the determination.
He stated he w as approved AO 06/12/2017
He stated he w as found TD by SSA declaring he cannot do the w ork he used to do, cannot adjust to other forms of w ork b/c of the medical condition and the disability can result in death.

NDC review

sending NDC review to the claimant and providing 21 days to respond = 06/19/2019. - LAKURTZ - May 29, 2019 03:24:28 pm

no response to peer report. - LAKURTZ - Jun 21, 2019 12:03:21 pm

The review noted in part, the follow ing:

File does not indicate an instance of ongoing 100% nonw eightbearing status, bedridden status or w heelchair dependency. File does not indicate an instance of constant, daily ADL assistance or that the claimant needs active hands on help from a secondary individual. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) w ith no significant radiographic abnormalities to the left hip and the claimant to be navigating the room reasonably w ell.

There is insufficient documented evidence of significant or severe high grade joint w eakness and instability,

significant gait instability resulting in frequently w itnessed falls, significant distal extremity circulatory, sensory and motor deficits, muscular atrophy, dexterity or coordination problems that w ould otherw ise translate into a w holly diminished sitting, standing, w alking, lifting and fingering functional capacity. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) w ith intact motor, sensation, etc. and no deformities and indicated again, no significant radiographic abnormalities on the left hip xrays.

Although the 11/1/18 and 11/11/18 medical records from Dr Faulkner noted the claimant continues to have a severely depressed left ventricular function (LV) and nonsustained ventricular tachycardia (VT) along w ith having shortness of breath (SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, w ith no syncope, sw elling, clubbing or cyanosis.

You have an extensive cardiac history entailing hypertension, cardiomyopathy, depresses left ventricular function, nonsustained VT for w hich you underw ent AICD placement 09/2015. You have also been diagnosed w ith osteoarthritis of the left hip and underw ent an uncomplicated total left hip replacement n 03/2018.

Medical records dated 07/30/2018 w ith Dr. Faulkner (cardiology) indicate you denied chest pain; how ever, did indicate pain w hen you w ere stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath w ith problems standing and being dizzy. How ever, your examination show ed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

Dr. Dabov (orthopedics) noted on 02/25/2019 that your exam revealed you to be in no acute distress and that you w ere intact to orientation, sensation and motor. You had limited range of motion in the right hip vs left. Your arthroplasty w as in good position w ith no loosening or failure. You w ere able to navigate reasonably w ell and he advised you w ere permanently disabled from heavy w ork.

Although the records indicate that the claimant has chronic musculoskeletal pain and paresthesias, it w ould be reasonable to periodically adjust positions throughout the w orkday per position of comfort. i.e. taking reasonable breaks, stretching, alternating sitting, standing and w alking throughout the day to minimize or mitigate the aforementioned symptomatology.

PATH:
uphold letter to the claimant but not ER sinc the DOD is more than 2 years ago
Call to the claimant
closing the appeal
placing clain in OVP_RISK due to existing overpayment

- LAKURTZ - Jul 12, 2019 10:35:39 am

| | | | | | |
|---|---|---|---|---|---|
| 7/12/2019 | Referrals | 15 | Tolling Review | Completed | LAKURTZ |

Appeal Rcvd DateToday's DateDays Since Received
4/1/20194/5/20194
1st 45 days
Tolling Start DateTolling end DateTolling Days
4/5/2019 5/5/2019 30
0
0
0
Tolling Days 30
45th Day of Active Review 6/15/2019
Active Review Days Remaining to 45th Day71
30th Day of Active Review 5/31/2019

After 45 day Extension
Tolling Start DateTolling end DateTolling Days
0

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | 0<br>0<br>Tolling Days0<br>90th Day of Active Review 7/30/2019<br>Active Review Days Remaining to 90th Day116<br>*************************************************************************************** - LAKURTZ - Apr 05, 2019 09:32:16 am | | | | |
| 9/27/2019 | Documents/Mail<br>2019-09-26-15.22.09.509560O01 | 95 | Email | Completed | LAKURTZ |
| 9/27/2019 | Documents/Mail<br>2019-09-26-15.22.09.530560O01 | 96 | Incoming Correspondence | Completed | LAKURTZ |
| 10/2/2019 | Documents/Mail<br>2019-10-01-11.02.13.460560O01 | 97 | Incoming Correspondence | Completed | LAKURTZ |
| 10/28/2019 | Telephone (IN)<br>Call from the claimant's attorney to see if w e had him in our system as the attorney. Confirmed that w e do. - LAKURTZ - Oct 28, 2019 12:36:34 pm | 70 | GLANKLER BROWN | Completed | LAKURTZ |
| 10/29/2019 8:26:49 AM | Documents/Mail<br>2019-10-28-12.44.53.424780O01 | 98 | Email | Received | LAKURTZ |
| 10/29/2019 8:26:50 AM | Documents/Mail<br>2019-10-28-12.44.53.453780O01 | 99 | Incoming Correspondence | Received | LAKURTZ |
| 10/29/2019 8:54:28 AM | Documents/Mail<br>2019-10-28-14.30.12.886780O01 | 100 | Incoming Correspondence | Received | LAKURTZ |
| 10/30/2019 | Documents/Mail<br>2019-10-28-14.30.12.886780O01 | 100 | Incoming Correspondence | Completed | LAKURTZ |
| 10/30/2019 | Documents/Mail<br>2019-10-28-12.44.53.424780O01 | 98 | Email | Completed | LAKURTZ |
| 10/30/2019 | Documents/Mail<br>2019-10-28-12.44.53.453780O01 | 99 | Incoming Correspondence | Completed | LAKURTZ |
| 10/30/2019 1:34:23 PM | Claim Tasks | 26 | File scan request | Requested | SARCH6 |

Please prepare a file copy for the claimant's attorney.,..,

LTD 1150128075
STD 1150112339
WOP 1160012638 & 1160009294

email - dhearn@glankler.com

Thank you. - LAKURTZ - Oct 30, 2019 01:36:30 pm

Need to add policies before submitting for approval to send out. - KAQPO7 - Nov 06, 2019 08:14:19 am

Copy has been prepared, it is in the CSS Folder/Claim_File_ Scans/Sam Folder as:

S CARTER 1150128075 - 1150112339 - 1160012638 - 1160009294 11-13-19

Please review , advise if any pages need to be removed due to PHI and flip the task back into my initials w ith the requestor's email address. I w ill then send the file copy securely via email to them w ith you CC'ed.

** Please note to notify the requestor that they w ill only have 24 hours to access the item once it is sent to them**

- SARCH6 - Nov 13, 2019 05:59:21 pm

file scan completed. ok to send. - LAKURTZ - Nov 14, 2019 10:35:52 am

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Sent secured email to attorney. - SARCH6 - Nov 19, 2019 10:27:23 am

| 10/31/2019 | Referrals | 8 | SSDI Aw ard | Completed | BXMOHR |
|---|---|---|---|---|---|

AWARD SHERMAN CARTER 1150128075 VA EFT
09/6/17 - SSDI AWARD Rcvd from IBI
SSDI aw ard dated = 08/22/2017
Entitlement Date = 02/01/2016
SSDI Aw ard = $1,369.00
EST DEPT AWARD = $684.00
Past Due Benefits = $24,674.00
Vendor/atty fees to credit = $0.00**
**LFG pays Attny fee for IBI.
-- Please note:….. -
STD claim - NOT AFFECTED
CE w ill need to advise clmt of reduction to bnfts going forw ard.
Risk Recovery Specialist w ill calculate Overpayment
Vendor (IBI) w ill recover ovp amount thru CORS/EFT
Also, in any discussion w ith the clmt, please remind clmt to repay Overpayment via IBI EFT service, thank you

LTD Claim #1150128075 Overpayment $33,579.00
OVP Letter sent to clmt and a copy to IBI for recovery
30 days F/U for update>>
- GXJONAH - Sep 06, 2017 10:26:19 am

RECVD DEPENDENT AWARD DATED 9/15/17
Entitlement date 02/1/16 to 7/1/17 (Dept is no more eligible)
Amount = $684.00
Past Due benefits = $11,642.00

OP RECALC DONE:

LTD Claim #1150128075 Overpayment $32,755.53
OVP letter sent to clmt and IBI
F/U for update (PDB is pending SSI investigation - GXJONAH - Sep 19, 2017 01:43:52 pm

Clmt called: PDB is still pending. Clmt w ants to discuss settlement. I advised the CE needs to certify that he w ill be on the claim past COD and then refer to STL for review before a settlement can be made. Clmt w ill call CE. - GXJONAH - Sep 27, 2017 11:07:20 am

2nd OVP letter sent to clmt
F/U for uopdate> - GXJONAH - Oct 19, 2017 02:47:49 pm

Clmt called> He has not rcvd PDB. I advise him to continue f/u w ith SS for the PDB. He has to be calling SSA for the money. If no f/u lfg w ill be forced to ROR his benefits. Clmt w ould also like to discuss STL w ith CE. Thank you - GXJONAH - Oct 31, 2017 10:36:37 am

PER CE > ci to advise has not received his ssdi back pay yet - GXJONAH - Nov 20, 2017 03:16:47 pm

(info that PDB is not been released by SS) F/U in JANUARY for PDB - GXJONAH - Dec 07, 2017 11:59:42 am

IBI is still w aiting for PDB. We w ill continue to monitor PDB release> - GXJONAH - Jan 09, 2018 09:48:59 am

NO PDB from IBI yet> - GXJONAH - Jan 24, 2018 01:00:22 pm

PER IBI> I cannot get Sherman or Sherronda to return any of my calls regarding the Overpayment. I have been calling and leaving messages every couple of days, since the end of December. They are clearly not communicating w ith me any longer.

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | I am sorry, but I have exhausted all of my efforts. I am closing his file today.<br><br>Sent 2nd OP letter<br>> If we do not hear from you by 02/10/2018, it will be necessary to withhold your remaining benefits towards the overpayment and refer this matter for collection.<br><br>- GXJONAH - Jan 26, 2018 02:47:22 pm<br><br>fee withheld from IBI $2500.00 - MBGRAY - Feb 05, 2018 08:04:00 am<br><br>ROR Set in claim. IBI already closed claim<br><br>PLEASE REVIEW CLAIM FOR COLLECTIONS<br>-------------------------------------------------------<br>-OVP letters were sent on 9/19/17, 10/19/17, and 1/26/18<br>- Calls on 10/19/17 and 10/31/17<br>- IBI closed for non-response<br>- Withholding remaining benefits<br>----------------------------------------------------------- - GXJONAH - Feb 26, 2018 02:55:45 pm<br><br>************************************************************<br>***SENT TO JMC - 03/02/18******<br>*****WITHHOLDING $581.00 MONTHLY*****<br>***RETURN TO OVP-RISK IF BENEFIT REDUCTIONS STOP***<br>*****$32174.53<br><br>****RETURNING TO CE TO MONITOR BENEFIT REDUCTIONS FOR ACK LETTER<br>- BXMOHR - Mar 02, 2018 02:27:06 pm<br><br>ACKREFUND SENT> After crediting $581.00 to the overpayment, the remaining balance is now $31,593.53. - GXJONAH - May 02, 2018 01:13:18 pm<br><br>ACKREFUND SENT> After crediting $581.00 to the overpayment, the remaining balance is now $29,269.53.<br>- GXJONAH - Aug 03, 2018 07:25:39 am<br><br>ACKREFUND SENT> After crediting $484.17 to the overpayment, the remaining balance is now $27,623.36.<br><br>Claim has been closed. NO RESERVE - No benefits to withhold> Sending back to OVP-RISK - GXJONAH - Nov 02, 2018 02:16:32 pm<br><br>Email to JMC that we are no longer reducing benefits. - BXMOHR - Nov 05, 2018 07:58:33 am<br><br>CONDITIONAL WRITE OFF OF OVP RATIONALE<br>Overpayment continues to exist on claim. No Refund activity for greater than 6 months. Writing off overpayment amount "Conditionally" as uncollectable. Conditional Write Off means if claim is reopened or new claim for same ee is opened, we will resume recovery efforts.<br>- BXMOHR - Oct 31, 2019 11:10:26 am | | | | |
| 10/31/2019 11:09:09 AM | Payments | | SETOP - | CURRENT | BXMOHR |
| 10/31/2019 11:09:50 AM | Status | | Not TD Any Occ | CLOSED | BXMOHR |
| 11/8/2019 11:40:37 AM | Documents/Mail | 101 | Atty Ltr with Copy of Claim File | Work In Progress | KAQPO7 |
| | Atty Ltr with Copy of Claim File | | | | |
| 11/13/2019 8:20:55 AM | Documents/Mail | 102 | Incoming Correspondence | Received | DDWATTS |
| | 2019-11-12-15.15.11.284820O01 | | | | |
| 11/13/2019 8:26:17 AM | Documents/Mail | 103 | Email | Received | DDWATTS |
| | 2019-11-12-15.52.24.146740O01 | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 11/13/2019 8:26:19 AM | Documents/Mail<br>2019-11-12-15.52.24.183740O01 | 104 | Incoming Correspondence | Received | DDWATTS |
| 11/18/2019 8:31:38 AM | Documents/Mail<br>2019-11-15-10.36.32.769740O01 | 105 | Incoming Correspondence | Received | DDWATTS |
| 11/19/2019 | Claim Tasks | 26 | File scan request | Completed | SARCH6 |

Please prepare a file copy for the claimant's attorney.,..,

LTD 1150128075
STD 1150112339
WOP 1160012638 & 1160009294

email - dhearn@glankler.com

Thank you. - LAKURTZ - Oct 30, 2019 01:36:30 pm

Need to add policies before submitting for approval to send out. - KAQPO7 - Nov 06, 2019 08:14:19 am

Copy has been prepared, it is in the CSS Folder/Claim_File_ Scans/Sam Folder as:

S CARTER 1150128075 - 1150112339 - 1160012638 - 1160009294 11-13-19

Please review , advise if any pages need to be removed due to PHI and flip the task back into my initials w ith the requestor's email address. I w ill then send the file copy securely via email to them w ith you CC'ed.

** Please note to notify the requestor that they w ill only have 24 hours to access the item once it is sent to them**

- SARCH6 - Nov 13, 2019 05:59:21 pm

file scan completed. ok to send. - LAKURTZ - Nov 14, 2019 10:35:52 am

Sent secured email to attorney. - SARCH6 - Nov 19, 2019 10:27:23 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 11/21/2019 8:40:18 AM | Documents/Mail<br>2019-11-21-07.26.13.111900O01 | 106 | Email | Received | DDWATTS |
| 12/17/2019 | Documents/Mail<br>Atty Ltr w ith Copy of Claim File | 101 | Atty Ltr w ith Copy of Claim File | Completed | KAQPO7 |
| 1/8/2020 1:50:53 PM | Appeal | 3 | Level 2 | New | TKHENDE |
| 1/8/2020 1:51:29 PM | Status | | | REOPENED | AMCPA5 |
| 1/8/2020 2:29:10 PM | Documents/Mail<br>2020-01-08-13.49.23.764020O01 | 107 | Email | Received | DDWATTS |
| 1/8/2020 2:29:12 PM | Documents/Mail<br>2020-01-08-13.49.23.787020O01 | 108 | Incoming Correspondence | Received | DDWATTS |
| 1/10/2020 9:39:28 AM | Documents/Mail<br>2020-01-09-09.49.27.959060O01 | 109 | Email | Received | DDWATTS |
| 1/10/2020 9:39:30 AM | Documents/Mail<br>2020-01-09-09.49.27.996060O01 | 110 | Medical Records | Received | DDWATTS |
| 1/10/2020 9:39:32 AM | Documents/Mail<br>2020-01-09-09.49.28.046060O01 | 111 | Medical Records | Received | DDWATTS |
| 1/13/2020 | Documents/Mail<br>2020-01-13-11.12.51.871180O01 | 112 | Envelope | Completed | DDWATTS |
| 1/13/2020 1:53:00 PM | Documents/Mail<br>2020-01-13-14.49.13.701180O01 | 113 | Medical Records | Received | DDWATTS |
| 1/13/2020 1:53:01 PM | Documents/Mail<br>2020-01-13-14.49.59.497180O01 | 114 | Incoming Correspondence | Received | DDWATTS |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 1/13/2020 1:53:02 PM | Documents/Mail | 115 | Incoming Correspondence<br>2020-01-13-14.50.19.818180O01<br>The SS Team has processed this mail:...<br>SSDI Favorable Decision letter. SSA found clmt to be disabled as of 8/6/2015.<br>Our SSDI offset beginning 2/1/16 remains unchanged. - SXLIMPA - Jan 14, 2020 08:21:44 am | Received | DDWATTS |
| 1/13/2020 1:59:05 PM | Documents/Mail | 116 | Email<br>2020-01-13-14.23.49.241100O01 | Received | DDWATTS |
| 1/13/2020 1:59:06 PM | Documents/Mail | 117 | Email<br>2020-01-13-14.23.49.265100O01 | Received | DDWATTS |
| 1/13/2020 1:59:06 PM | Documents/Mail | 118 | Incoming Correspondence<br>2020-01-13-14.57.52.321180O01 | Received | DDWATTS |
| 1/13/2020 1:59:07 PM | Documents/Mail | 119 | Incoming Correspondence<br>2020-01-13-14.58.11.271180O01 | Received | DDWATTS |
| 1/14/2020 | Telephone (OUT) | 71 | GLANKLER BROWN<br>Call to atty advising receipt of appeal and documents. Advised w ill pend the appeal allow ing time for additional documentation to be submitted per the appeal letter. Also stated a copy of the SSA file can be provided for review . - TKHENDE - Jan 14, 2020 02:58:54 pm | Completed | TKHENDE |
| 1/14/2020 | Documents/Mail | 104 | Incoming Correspondence<br>2019-11-12-15.52.24.183740O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 103 | Email<br>2019-11-12-15.52.24.146740O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 102 | Incoming Correspondence<br>2019-11-12-15.15.11.284820O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 106 | Email<br>2019-11-21-07.26.13.111900O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 105 | Incoming Correspondence<br>2019-11-15-10.36.32.769740O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 119 | Incoming Correspondence<br>2020-01-13-14.58.11.271180O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 113 | Medical Records<br>2020-01-13-14.49.13.701180O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 114 | Incoming Correspondence<br>2020-01-13-14.49.59.497180O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 117 | Email<br>2020-01-13-14.23.49.265100O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 107 | Email<br>2020-01-08-13.49.23.764020O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 111 | Medical Records<br>2020-01-09-09.49.28.046060O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 108 | Incoming Correspondence<br>2020-01-08-13.49.23.787020O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 115 | Incoming Correspondence<br>2020-01-13-14.50.19.818180O01<br>The SS Team has processed this mail:...<br>SSDI Favorable Decision letter. SSA found clmt to be disabled as of 8/6/2015.<br>Our SSDI offset beginning 2/1/16 remains unchanged. - SXLIMPA - Jan 14, 2020 08:21:44 am | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 110 | Medical Records<br>2020-01-09-09.49.27.996060O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 116 | Email<br>2020-01-13-14.23.49.241100O01 | Completed | DDWATTS |
| 1/14/2020 | Documents/Mail | 109 | Email<br>2020-01-09-09.49.27.959060O01 | Completed | DDWATTS |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 1/14/2020 | Documents/Mail | 118 | Incoming Correspondence | Completed | DDWATTS |

2020-01-13-14.57.52.321180O01

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 1/14/2020 | Documents/Mail | 120 | Appeal Dis Atty Ackappeal | Completed | TKHENDE |

Appeal Dis Atty Ackappeal

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 1/14/2020 2:46:30 PM | Referrals | 18 | Tolling Review | In Active Review | TKHENDE |

Appeal Rcvd DateToday's DateDays Since Received
1/8/20201/14/20206
1st 45 days
Tolling Start DateTolling end DateTolling Days
1/8/2020N/A
0
0
0
Tolling Days0
45th Day of Active Review 2/22/2020
Active Review Days Remaining to 45th Day39
30th Day of Active Review 2/7/2020

- TKHENDE - Jan 14, 2020 02:46:57 pm

Appeal Rcvd DateToday's DateDays Since Received
1/8/20203/2/202054
1st 45 days
Tolling Start DateTolling end DateTolling Days
1/8/20202/27/202050
0
0
0
Tolling Days50
45th Day of Active Review 4/12/2020
Active Review Days Remaining to 45th Day41
30th Day of Active Review 3/28/2020

After 45 day Extension
Tolling Start DateTolling end DateTolling Days
0
0
0
Tolling Days0
90th Day of Active Review 5/27/2020
Active Review Days Remaining to 90th Day86

- TKHENDE - Mar 02, 2020 10:09:19 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 1/14/2020 2:53:53 PM | Claim Tasks | 27 | Appeal - 45 Day Reminder | Requested | TKHENDE |

30TH DAY = 2/7/2020
45TH DAY = 2/22/2020

*Tolling---atty requested to 2/15/2020 to supplement appeal - TKHENDE - Jan 14, 2020 02:55:14 pm

Extension to 2/27/2020 - TKHENDE - Feb 18, 2020 09:25:41 am

Tolling ends 2/27/2020

30th day = 3/28/2020
45th day = 4/12/2020
90th day = 5/27/2020 - TKHENDE - Mar 02, 2020 10:10:01 am

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | * 21 day response by 3/27/2020 - TKHENDE - Mar 06, 2020 02:38:36 pm | | | | |
| 1/14/2020 3:23:16 PM | Summary/Assessment/Pa | 5h | 2ND LEVEL APPEAL PENDING RATIONALE - TKHENDE - Jan | Requested | TKHENDE |

Summary Notes
2ND LEVEL APPEAL PENDING RATIONALE - TKHENDE - Jan 14, 2020 03:25:41 pm
Assessment Notes

Path Notes

1st or 2nd Level Appeal: 2ND LEVEL
Date Appeal Received:1/8/2020
30th day:2/7/2020
45th Day:2/22/2020
90th Day:4/7/2020
Authorization/expiration: 8/13/2020
Pre Ex investigation required n
AO investigation required n
SSDI Aw ard information needed/requested - Rec'd

Claimant Name: Sherman Carter
Claim Number: 1150128075
Group ID & active/termed:asbarb/active

Attorney: Yes > Don L. Hearn Jr. / Glanker Brow n Attorneys

Claim Demographics
Current Age: 53
Situs State:TNState Language applicable n
State of Residence:TNState Language applicable n
LTD Mo. Bnft amt:$581.00 (after ssd offset)
Date of Disability: 8/7/2015
EP: 90 days
Benefit Commencement Date: 11/5/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 11/5/2017
Max Duration Date: 1/15/2034
Occupation / Location in AWD: Trucker Driver, Heavy
Physical Demand Level of Occ:Medium
Primary Diagnosis: Cardiomyopathy, hypertension, ventricular tachycardia
Co-Morbid Diagnoses:
ERISA
Riders: n/a
STD claim status:Closed
LW claim status:Closed
LTD claim status:Pending appeal rvw

Notes: Contractual Limits
Legal Action 3 yrs
Proof of claim Elim period

Initial Claim Decision:
Reason/Date of denial: Not TD Any Occ - See denial letter 10/30/2018
Type of Medical Review , Name, & Specialty: PDA Peer rvw - Internal Medicine/Cardiovascular Disease

"There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II)."

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

"The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25 lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met."

1ST Level Appeal Decision (if applicable)
Reason/Date of 1st level appeal determination: Not TD Any Occ - See denial letter 7/12/2019
Type of Medical Review , Name, & Specialty: NDC review - Fxcasti

Current Providers - last 18 to 24 months
AP Name/Specialty/Phone Number:Dr. Lee Faulkner - Cardiology
Last Date of Service: 2/6/2019
Restrictions and Limitations/Duration: Cannot w ork or perform sedentary w ork due to severe, chronic and w orsening cardiomyopathy. No lifting

Date and Type of Recent Surgeries:

9/18/2015 - ICD
2/2019- Left Total hip replacement

Appeal being discussed
Reasons for disagreement as explained in appeal: The atty states on appeal LFG cites tw o reports prepared by medical review ers as the basis of determination how ever these reports fail to address significant portions of the clmnt's medical records and misstate the findings of his treating physician in material respects. The appeal notes additional and more recent medical records provide further confirmation of his documented inability to perform sedentary w ork. The atty notes the clmnt's severely depressed left ventricular systolic function w ith an ejection fraction of 20-25% and non-sustained ventricular tachycardia, all of w hich is w orsening and w ill not improve. Records note the clmnt has problems standing and frequently has dizzy spells. The appeal states the clmnt suffers from severely depressed left ventricular systolic function w ith an ejection fraction of 20-25%. The clmnt suffers from dyspnea on exertion and has a New York Heart Association Functional Class III. The atty requests until 2/15/2020 to submit all documentation in support of appeal.

Information Submitted w ith appeal and not previously review ed: Medical records from cardiology, DOT information, New York Heart Association Functional Classification info,

Appeal Analysis: LTD bnfts w ere paid 11/5/2015 to 10/30/2018. The COD w as 11/5/2017. The appeal points the clmnt cannot rtw in any occupation due to cardiac condition.

SSDI file mentioned in initial call Yes
SSDI language added to ack appeal letter Yes

PATH:
Ack letter to atty
Call to atty
Per letter from atty requests to 2/15/2020 to supplement appeal claim. Tolling begins 1/8/2020.
Appeal pending medical records.
- TKHENDE - Jan 14, 2020 03:25:41 pm
Emailed the curriculum vitae's of the medical review s on claim to the atty. - TKHENDE - Jan 16, 2020 10:18:20 am

Status letter sent to atty advising appeal pending allow ing time to supplement the claim. - TKHENDE - Feb 11, 2020 02:43:47 pm

Rec'd letter from atty dated 2/13/2020 requesting a 2 w eek extension to provide medical records for review . Also rec'd supplemental information from Dr. Faulkner (Cardiologist).
Call w as placed to the atty's office and extension letter sent granting the 2 w eek extension. Appeal pending medical records. Will f/up in 2 w eeks. - TKHENDE - Feb 18, 2020 09:53:10 am
Rec'd duplicate mail. - TKHENDE - Feb 20, 2020 10:23:56 am

**Chronological Activity List**

APPEAL UPDATE / PATH:
> Allow ed 2 w eek extension. Tolling ends 2/27/2020, 45th day = 4/12/2020
> VM to atty advising w ill move forw ard. Letter to atty advising w ill move forw ard.
> Appeal pending appeal consult. - TKHENDE - Mar 02, 2020 10:11:16 am
> Moving forw ard w ith medical review w ith health care consultant. - TKHENDE - Mar 03, 2020 09:32:05 am

APPEAL UPDATE / STEPS:
> Medical review w ith health consultant has been completed. Letter w /copy of review sent to atty.
> VM to atty advising copy of review has been sent.
> F/up in 21 days.

- TKHENDE - Mar 06, 2020 02:40:30 pm

No response to medical review completed on appeal from atty. Moving forw ard w ith appeal decision. - TKHENDE - Mar 31, 2020 09:02:13 am

| | | | | | |
|---|---|---|---|---|---|
| 1/16/2020 | Documents/Mail | 122 | Incoming Correspondence | Completed | TKHENDE |
| | 2020-01-15-14.56.54.573100O01 | | | | |
| 1/16/2020 | Documents/Mail | 121 | Email | Completed | TKHENDE |
| | 2020-01-15-14.56.54.553100O01 | | | | |
| 1/16/2020 | Documents/Mail | 123 | Incoming Correspondence | Completed | TKHENDE |
| | 2020-01-15-14.56.54.593100O01 | | | | |
| 2/11/2020 | Documents/Mail | 124 | Appeal Dis Atty Extension Letter | Completed | TKHENDE |
| | Appeal Dis Atty Extension Letter | | | | |
| 2/14/2020 9:47:34 AM | Documents/Mail | 125 | Email | Received | TKHENDE |
| | 2020-02-13-13.28.12.398500O01 | | | | |
| 2/14/2020 9:47:35 AM | Documents/Mail | 126 | Incoming Correspondence | Received | TKHENDE |
| | 2020-02-13-13.28.12.440500O01 | | | | |
| 2/14/2020 9:48:13 AM | Documents/Mail | 127 | Incoming Correspondence | Received | TKHENDE |
| | 2020-02-13-13.32.12.451580O01 | | | | |
| 2/17/2020 4:29:48 AM | Documents/Mail | 128 | Incoming Correspondence | Received | TKHENDE |
| | 2020-02-14-16.45.16.548500O01 | | | | |
| 2/17/2020 5:02:47 AM | Documents/Mail | 129 | Email | Received | TKHENDE |
| | 2020-02-14-16.39.14.700540O01 | | | | |
| 2/17/2020 5:02:49 AM | Documents/Mail | 130 | Incoming Correspondence | Received | TKHENDE |
| | 2020-02-14-16.39.14.744540O01 | | | | |
| 2/17/2020 5:04:43 AM | Documents/Mail | 131 | Email | Received | TKHENDE |
| | 2020-02-14-16.37.43.939560O01 | | | | |
| 2/17/2020 5:04:45 AM | Documents/Mail | 132 | Incoming Correspondence | Received | TKHENDE |
| | 2020-02-14-16.37.43.958560O01 | | | | |
| 2/17/2020 9:09:12 AM | Documents/Mail | 133 | Email | Received | TKHENDE |
| | 2020-02-14-08.25.09.559540O01 | | | | |
| 2/17/2020 9:09:13 AM | Documents/Mail | 134 | Incoming Correspondence | Received | TKHENDE |
| | 2020-02-14-08.25.09.592540O01 | | | | |
| 2/18/2020 | Telephone (OUT) | 72 | GLANKLER BROWN | Completed | TKHENDE |
| | Placed call to the atty's office and spoke to Brenda. I stated I w as calling in reference to the atty's letter dated 2/13/2020 requesting a 2 w eek extension to supplement his client's appeal. I advised w e w e w ill grant the 2 w eek extension and allow to 2/27/2020 for the atty to submit documentation. I further discussed the atty in his letter asked w hat information does Lincoln need in response to the denial letter. I advised the atty can send in office treatment notes, any testing results & medical correspondence he w ants review ed on appeal. Brenda stated she w ill let the atty know . I further said a letter w ill be sent to the atty today as w ell. I thanked her for her time today. - TKHENDE - Feb 18, 2020 09:24:53 am | | | | |
| 2/18/2020 | Documents/Mail | 133 | Email | Completed | TKHENDE |
| | 2020-02-14-08.25.09.559540O01 | | | | |

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 2/18/2020 | Documents/Mail<br>2020-02-14-16.37.43.939560O01 | 131 | Email | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-13-13.28.12.440500O01 | 126 | Incoming Correspondence | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-14-16.45.16.548500O01 | 128 | Incoming Correspondence | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-14-16.39.14.700540O01 | 129 | Email | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-14-08.25.09.592540O01 | 134 | Incoming Correspondence | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-14-16.37.43.958560O01 | 132 | Incoming Correspondence | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-18-12.50.20.798660O01 | 136 | Envelope | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-14-16.39.14.744540O01 | 130 | Incoming Correspondence | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-13-13.28.12.398500O01 | 125 | Email | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>2020-02-13-13.32.12.451580O01 | 127 | Incoming Correspondence | Completed | TKHENDE |
| 2/18/2020 | Documents/Mail<br>Appeal Dis Atty Extension Letter | 135 | Appeal Dis Atty Extension Letter | Completed | TKHENDE |
| 2/18/2020 1:00:07 PM | Documents/Mail<br>2020-02-18-13.59.11.253700O01 | 137 | Incoming Correspondence | Received | TKHENDE |
| 2/18/2020 1:00:08 PM | Documents/Mail<br>2020-02-18-13.59.25.902700O01 | 138 | Medical Records | Received | TKHENDE |
| 2/19/2020 | Documents/Mail<br>2020-02-18-12.50.59.453660O01 | 139 | Envelope | Completed | TKHENDE |
| 2/19/2020 9:55:57 AM | Documents/Mail<br>2020-02-19-10.52.30.249700O01<br><br>2/20/2020 - request from Atty office for copy of clmt's LTD file w hich is needed for appeal of ltd claim. flipped to CE to handle. - APTHRAE - Feb 20, 2020 07:15:22 am | 140 | Incoming Correspondence | Received | TKHENDE |
| 2/19/2020 9:55:58 AM | Documents/Mail<br>2020-02-19-10.52.49.657700O01 | 141 | Claim Form - Authorization | Received | TKHENDE |
| 2/19/2020 9:55:59 AM | Documents/Mail<br>2020-02-19-10.53.11.242700O01 | 142 | Incoming Correspondence | Received | TKHENDE |
| 2/20/2020 | Documents/Mail<br>2020-02-18-13.59.11.253700O01 | 137 | Incoming Correspondence | Completed | TKHENDE |
| 2/20/2020 | Documents/Mail<br>2020-02-18-13.59.25.902700O01 | 138 | Medical Records | Completed | TKHENDE |
| 2/21/2020 | Documents/Mail<br>2020-02-19-10.52.30.249700O01<br><br>2/20/2020 - request from Atty office for copy of clmt's LTD file w hich is needed for appeal of ltd claim. flipped to CE to handle. - APTHRAE - Feb 20, 2020 07:15:22 am | 140 | Incoming Correspondence | Completed | TKHENDE |
| 2/21/2020 | Documents/Mail<br>2020-02-19-10.53.11.242700O01 | 142 | Incoming Correspondence | Completed | TKHENDE |
| 2/21/2020 | Documents/Mail<br>2020-02-19-10.52.49.657700O01 | 141 | Claim Form - Authorization | Completed | TKHENDE |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/2/2020 | Telephone (IN) | 73 | GLANKLER BROWN | Completed | TKHENDE |

Called atty Don Hearn and left VM advising per his letter dated 2/13/2020 he requested a 2 w eek extension to supplement his client's appeal claim. I advised w e have allow ed the extension request and at this time w ill move forw ard w ith review . I gave my contact information should he have any questions or concerns. - TKHENDE - Mar 02, 2020 09:58:30 am

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/2/2020 | Documents/Mail | 143 | Appeal Dis Atty Extension Letter | Completed | TKHENDE |

Appeal Dis Atty Extension Letter

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 3/3/2020 | Referrals | 19 | Management Review | Completed | TKHENDE |

Appeal Direction Tool - LTD
Appeals Examiners answ er here:Recommendations/Comments
Was the claim denied because the claimant: w as not disabled, had a pre-existing condition, reached the specified conditions limit, &/or w here medical judgement w as involved?YesERISA requires a review by a different healthcare professional at each level of review /appeal.

If claim denied as not disabled ow n occupation, are w e now w ithin 6 months of the change in the definition of disability (COD)?No

Did claimant undergo an IME as part of decision to deny benefits at claim level (or 1st level of appeal)?No

Indicate w hether ERISA or non-ERISA?ERISA

Is the claimant a resident of California? No

Is the claimant represented by an attorney?YesRemember to communicate w ith the attorney. Ask permission if you need to speak w ith the claimant.

What type of medical review w as undertaken previously?NDC review

Indicate the length of time (in months) from previous medical review to present?> 6 months

If there w as agreement previously, is there now a medical disagreement betw een NDC and treating provider?No

Does the claimant have both a physical and a behavioral health condition?No

Did the CE fail to address all limiting medical conditions in the previous denial?No

Did the claimant request that w e undertake our appeal review w ithout providing any new medical, vocational, or other documentation?No

Was the new medical information submitted on appeal significant? E.g. does it include relevant laboratory or diagnostic testing; recent evidence of functional ability; for a potentially limiting condition w e w ere unaw are of.No

Are the claimants complaints primarily pain related?No

Did the claimant submit a FCE or IME to us as part of their appeal?No

Are there possible side effects from the claimant's medication that needs to be addressed?No

Is the claimant being seen by specialists for multiple medical conditions affecting different body parts?No

Are there financial considerations (e.g. offset dispute), findings from a SIU investigation, or contractual issues other than disability that need to be addressed? No

Consider taking the follow ing action(s):NDC

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

1st or 2nd Level Appeal: 2ND LEVEL
Date Appeal Received:1/8/2020
30th day:2/7/2020
45th Day:2/22/2020
90th Day:4/7/2020
Authorization/expiration: 8/13/2020
Pre Ex investigation required n
AO investigation required n
SSDI Aw ard information needed/requested - Rec'd

Claimant Name: Sherman Carter
Claim Number: 1150128075
Group ID & active/termed:asbarb/active

Attorney: Yes > Don L. Hearn Jr. / Glanker Brow n Attorneys

Claim Demographics
Current Age: 53
Situs State:TNState Language applicable n
State of Residence:TNState Language applicable n
LTD Mo. Bnft amt:$581.00 (after ssd offset)
Date of Disability: 8/7/2015
EP: 90 days
Benefit Commencement Date: 11/5/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 11/5/2017
Max Duration Date: 1/15/2034
Occupation / Location in AWD: Trucker Driver, Heavy
Physical Demand Level of Occ:Medium
Primary Diagnosis: Cardiomyopathy, hypertension, ventricular tachycardia
Co-Morbid Diagnoses:
ERISA
Riders: n/a
STD claim status:Closed
LW claim status:Closed
LTD claim status:Pending appeal rvw

Notes: Contractual Limits
Legal Action 3 yrs
Proof of claim Elim period

Initial Claim Decision:
Reason/Date of denial: Not TD Any Occ - See denial letter 10/30/2018
Type of Medical Review , Name, & Specialty: PDA Peer rvw - Internal Medicine/Cardiovascular Disease

"There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II)."

"The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25 lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met."

1ST Level Appeal Decision (if applicable)

Reason/Date of 1st level appeal determination: Not TD Any Occ - See denial letter 7/12/2019
Type of Medical Review , Name, & Specialty: NDC review - Fxcasti

Current Providers - last 18 to 24 months
AP Name/Specialty/Phone Number:Dr. Lee Faulkner - Cardiology
Last Date of Service: 2/6/2019
Restrictions and Limitations/Duration: Cannot w ork or perform sedentary w ork due to severe, chronic and w orsening cardiomyopathy. No lifting

Date and Type of Recent Surgeries:

9/18/2015 - ICD
2/2019- Left Total hip replacement

Appeal being discussed
Reasons for disagreement as explained in appeal: The atty states on appeal LFG cites tw o reports prepared by medical review ers as the basis of determination how ever these reports fail to address significant portions of the clmnt's medical records and misstate the findings of his treating physician in material respects. The appeal notes additional and more recent medical records provide further confirmation of his documented inability to perform sedentary w ork. The atty notes the clmnt's severely depressed left ventricular systolic function w ith an ejection fraction of 20-25% and non-sustained ventricular tachycardia, all of w hich is w orsening and w ill not improve. Records note the clmnt has problems standing and frequently has dizzy spells. The appeal states the clmnt suffers from severely depressed left ventricular systolic function w ith an ejection fraction of 20-25%. The clmnt suffers from dyspnea on exertion and has a New York Heart Association Functional Class III. The atty requests until 2/15/2020 to submit all documentation in support of appeal.

Information Submitted w ith appeal and not previously review ed: Medical records from cardiology, DOT information, New York Heart Association Functional Classification info,

Appeal Analysis: LTD bnfts w ere paid 11/5/2015 to 10/30/2018. The COD w as 11/5/2017. The appeal points the clmnt cannot rtw in any occupation due to cardiac condition.

SSDI file mentioned in initial call Yes
SSDI language added to ack appeal letter Yes

PATH:
Ack letter to atty
Call to atty
Per letter from atty requests to 2/15/2020 to supplement appeal claim. Tolling begins 1/8/2020.
Appeal pending medical records.
- TKHENDE - Jan 14, 2020 03:25:41 pm
Emailed the curriculum vitae's of the medical review s on claim to the atty. - TKHENDE - Jan 16, 2020 10:18:20 am

Status letter sent to atty advising appeal pending allow ing time to supplement the claim. - TKHENDE - Feb 11, 2020 02:43:47 pm

Rec'd letter from atty dated 2/13/2020 requesting a 2 w eek extension to provide medical records for review . Also rec'd supplemental information from Dr. Faulkner (Cardiologist).
Call w as placed to the atty's office and extension letter sent granting the 2 w eek extension. Appeal pending medical records. Will f/up in 2 w eeks. - TKHENDE - Feb 18, 2020 09:53:10 am
Rec'd duplicate mail. - TKHENDE - Feb 20, 2020 10:23:56 am

APPEAL UPDATE / PATH:
> Allow ed 2 w eek extension. Tolling ends 2/27/2020, 45th day = 4/12/2020
> VM to atty advising w ill move forw ard. Letter to atty advising w ill move forw ard.
> Appeal pending appeal consult. - TKHENDE - Mar 02, 2020 10:11:16 am

Recommendation: NDC rvw
- Management Review - TKHENDE - Mar 03, 2020 09:28:29 am

| | | | | | |
|---|---|---|---|---|---|
| 3/3/2020 9:31:02 AM | Referrals | 20 | Ongoing Claim Review | Initial | TKHENDE |
| | NDC LTD APPEAL REVIEW | | | | |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

SEE QUESTIONS BELOW

1st or 2nd Level Appeal: 2ND LEVEL
Date Appeal Received:1/8/2020
30th day:2/7/2020
45th Day:2/22/2020
90th Day:4/7/2020
Authorization/expiration: 8/13/2020
Pre Ex investigation required n
AO investigation required n
SSDI Aw ard information needed/requested - Rec'd

Claimant Name: Sherman Carter
Claim Number: 1150128075
Group ID & active/termed:asbarb/active

Attorney: Yes > Don L. Hearn Jr. / Glanker Brow n Attorneys

Claim Demographics
Current Age: 53
Situs State:TNState Language applicable n
State of Residence:TNState Language applicable n
LTD Mo. Bnft amt:$581.00 (after ssd offset)
Date of Disability: 8/7/2015
EP: 90 days
Benefit Commencement Date: 11/5/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 11/5/2017
Max Duration Date: 1/15/2034
Occupation / Location in AWD: Trucker Driver, Heavy
Physical Demand Level of Occ:Medium
Primary Diagnosis: Cardiomyopathy, hypertension, ventricular tachycardia
Co-Morbid Diagnoses:
ERISA
Riders: n/a
STD claim status:Closed
LW claim status:Closed
LTD claim status:Pending appeal rvw

Notes: Contractual Limits
Legal Action 3 yrs
Proof of claim Elim period

Initial Claim Decision:
Reason/Date of denial: Not TD Any Occ - See denial letter 10/30/2018
Type of Medical Review , Name, & Specialty: PDA Peer rvw - Internal Medicine/Cardiovascular Disease

"There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II)."

"The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25 lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications

are met."

1ST Level Appeal Decision (if applicable)
Reason/Date of 1st level appeal determination: Not TD Any Occ - See denial letter 7/12/2019
Type of Medical Review , Name, & Specialty: NDC review - FXCASTI

Current Providers - last 18 to 24 months
AP Name/Specialty/Phone Number:Dr. Lee Faulkner - Cardiology
Last Date of Service: 2/6/2019
Restrictions and Limitations/Duration: Cannot w ork or perform sedentary w ork due to severe, chronic and w orsening cardiomyopathy. No lifting

Date and Type of Recent Surgeries:

9/18/2015 - ICD
2/2019- Left Total hip replacement

Appeal being discussed
Reasons for disagreement as explained in appeal: The atty states on appeal LFG cites tw o reports prepared by medical review ers as the basis of determination how ever these reports fail to address significant portions of the clmnt's medical records and misstate the findings of his treating physician in material respects. The appeal notes additional and more recent medical records provide further confirmation of his documented inability to perform sedentary w ork. The atty notes the clmnt's severely depressed left ventricular systolic function w ith an ejection fraction of 20-25% and non-sustained ventricular tachycardia, all of w hich is w orsening and w ill not improve. Records note the clmnt has problems standing and frequently has dizzy spells. The appeal states the clmnt suffers from severely depressed left ventricular systolic function w ith an ejection fraction of 20-25%. The clmnt suffers from dyspnea on exertion and has a New York Heart Association Functional Class III. The atty requests until 2/15/2020 to submit all documentation in support of appeal.

Information Submitted w ith appeal and not previously review ed: Medical records from cardiology, DOT information, New York Heart Association Functional Classification info,

Appeal Analysis: LTD bnfts w ere paid 11/5/2015 to 10/30/2018. The COD w as 11/5/2017. The appeal points the clmnt cannot rtw in any occupation due to cardiac condition.

SSDI file mentioned in initial call Yes
SSDI language added to ack appeal letter Yes

PATH:
Ack letter to atty
Call to atty
Per letter from atty requests to 2/15/2020 to supplement appeal claim. Tolling begins 1/8/2020.
Appeal pending medical records.
- TKHENDE - Jan 14, 2020 03:25:41 pm
Emailed the curriculum vitae's of the medical review s on claim to the atty. - TKHENDE - Jan 16, 2020 10:18:20 am

Status letter sent to atty advising appeal pending allow ing time to supplement the claim. - TKHENDE - Feb 11, 2020 02:43:47 pm

Rec'd letter from atty dated 2/13/2020 requesting a 2 w eek extension to provide medical records for review . Also rec'd supplemental information from Dr. Faulkner (Cardiologist).
Call w as placed to the atty's office and extension letter sent granting the 2 w eek extension. Appeal pending medical records. Will f/up in 2 w eeks. - TKHENDE - Feb 18, 2020 09:53:10 am
Rec'd duplicate mail. - TKHENDE - Feb 20, 2020 10:23:56 am

APPEAL UPDATE / PATH:
> Allow ed 2 w eek extension. Tolling ends 2/27/2020, 45th day = 4/12/2020
> VM to atty advising w ill move forw ard. Letter to atty advising w ill move forw ard.
> Appeal pending appeal consult. - TKHENDE - Mar 02, 2020 10:11:16 am

Recommendation: NDC rvw

Questions:

It w as previously determined that the claimant met the policy definition of disability to 10/30/2018.

At this time w e are review ing w hether or not the medical findings w ithin the file support the restrictions and/ or limitations of the treating provider(s).

Please respond to the specific questions below and provide the medical findings supporting your rationale.

1.Please provide a review of the medical findings. Please state your findings upon review of the medical information.

2.Based on the medical findings, please provide a description of the claimant's impairments, and how these w ould translate into functional limitations or medically appropriate restrictions from 10/30/2018 and forw ard.
a.For any outlined functional limitations and/or medically appropriate restrictions, please specify from and to dates to w hich the limitations and/or restrictions apply.
b.Please provide the maximal physical capacities the claimant retains and can safely perform at w ith specific from and to dates.

3.Are the restrictions or limitations placed upon the claimant's physical activities by the attending physician(s) reasonable and consistent w ith the medical findings? Please explain. - TKHENDE - Mar 03, 2020 09:31:38 am
Assigned to A. Malskeit on 3/5/20 - MEHLO8 - Mar 05, 2020 07:06:47 am
Date: 3/5/2020
Nursing Memorandum

Claim: 1150128075
Claimant: Sherman Carter
Date of Disability: 8/7/15

Clinical Assessment: All available medical records have been review ed through date and time of this review including all documentation submitted for appeal to date. Information summarized below includes those portions of the records received that have relevance to the questions and time frame identified for this review . For background details refer to the latest peer review w hich comprehensively outlines the EE's medical history and functional capacity in relation to the EE's medical history.

The EE stopped w orking on 8/7/15 for cardiomyopathy (heart muscle disease making it harder for the heart to pump blood to the rest of the body), high blood pressure, ventricular tachycardia (fast abnormal heart rate). He underw ent an automatic implantable cardioverter defibrillator (AICD) Sept. 2015 due to depressed left ventricular function. He underw ent a left total hip replacement March 2018 due to osteoarthritis (age related joint disease). He remains out of w ork for ongoing complaints of shortness of breath, frequent dizzy spells, abnormal sensation in his leg, and difficulty w alking

The EE saw Dr. Dabov (Orthopedics) on 4/23/18 6 w eeks post-surgery for left total hip replacement. He is noted to be doing w ell w ith no major concerned and he is overall is pleased. Dr. Dabov opines the EE is disabled from medium or heavy type w ork and w ants him to get involved in a good w alking program and fitness, maybe w ith elliptical machine or stationary bike. There are no documents exam findings. Plan is to follow up in 10 months.

An independent medical peer review w as completed on 10/26/18 by Dr. Borzak (Cardiology) w ho opines the data supports NYHA FC II and therefore w ould be restricted from lift/carry more than 25 lbs. ever, no more than 10-25 lbs. occasionally and less than 10 lbs. unrestricted; no limit on standing; w alking no more than 4 of 8 hours, and no limit on reaching or stooping therefore he is restricted from professional driving unless DOT specifications are met.

The EE saw Dr. Faulkner (Cardiology) on 11/1/18 for follow and reports shortness of breath w ith exertion and lying dow n, continued problems w ith standing and frequent dizzy spells. He had a hip replacement a few months ago and reports abnormal sensation (numbness) of his leg and difficulty w alking. Exam documents normal heart and lungs; chest w all w ith no sw elling, bruising, redness or sw elling. Extremities w ithout deformities, clubbing, cyanosis or edema and no neurological deficits. Echocardiogram (ECHO) (evaluate the structures of the heart) on this date show ed severely depressed left ventricular systolic function w ith an ejection fraction (hearts ability to pump blood out of the heart) of 25%. Plan is to continue current medications w ith a follow up in 3 months.

An addendum from Dr. Borzak dated 12/5/18 opines the EE has sedentary capacity w ith no w alking or professional driving; occasional standing and lifting or carrying less than 10 lbs.; never lift or carry more than 10 lbs. Please see report in AWD for details.

The EE saw Dr. Faulkner on 2/6/19 and denies chest pain or shortness of breath. He does report an episode of chest tightness after lifting items. AICD interrogation w hich show ed non-sustained ventricular tachycardia. Exam is unremarkable and unchanged from prior visit. Plan is to follow up in 6 months.

The EE saw Dr. Dabov on 2/25/19 for one year post left hip surgery. He reports trouble w ith his right hip. Exam documents the EE to be pleasant, in no acute distress. He navigates the exam room reasonably w ell; somew hat uncomfortable w ith Stinchfeld's (resistance test) on the right, non-tender w ith maneuver of the left hip and some decreased sensation lateral femoral cutaneous nerve on the left. Motor and sensory exam is intact. He has limited ROM of the right hip compared to the left, especially w ith internal rotation. Left hip x-ray show ed total hip arthroplasty in good position and no signs of loosening or failure. Dr. Dabov opines the EE is permanently disabled for heavy w ork. He is advised to exercise per cardiology, mainly w alking or riding a bike. He should not run, jog, or do heavy lifting and no squatting, bending, ladder climbing, etc. Plan for follow up as needed.

There are no further office visits or exams findings received on appeal.

The medical records document a history of cardiomyopathy and severely depressed left ventricular function that is stable w ith medication management. AICD function is noted to be normal w ith non-sustained ventricular tachycardia. While it is noted the EE has a reduced ejection fraction, the medical exam documentation does not reflect significant abnormal findings or functioning that w ould preclude all w ork activities. The EE is asymptomatic w ithout ongoing complaints of chest pain/tightness, shortness of breath, or dizziness. There is no documentation of frequent office visits, ER visits or any hospitalizations due to his heart condition. The R/L's outlined above by Dr. Borzak are supported. There is no new compelling evidence that supports progression of heart disease.
From an orthopedic standpoint, the medical evidence fails to demonstrate significant pain, decreased strength, altered sensation, or impaired gait to support R/L's that w ould preclude all w ork activities. There is no indication the EE requires an assistive device for ambulation or any other activities. Left hip x-ray 2/25/19 show ed no significant abnormalities. The EE has been encouraged to exercise by w alking or riding a bike.

Amy M., RN
Nurse Disability Consultant, Lincoln Financial Consultant - AMAMA3 - Mar 05, 2020 12:39:18 pm

3/6/2020 Telephone (OUT) 74 GLANKLER BROWN Completed TKHENDE

Called the atty and left VM stating I am sending a letter w ith copy of the medical review completed on appeal for his review . I stated w e w ill give him 21 days for review /reply. Left my direct contact number should he have any questions. - TKHENDE - Mar 06, 2020 02:35:46 pm

3/6/2020 Documents/Mail 144 Appeal Dis Atty 21 Day Letter Completed TKHENDE

Attachments:S Carter.pdf Appeal Dis Atty 21 Day Letter

3/6/2020 Referrals 20 Ongoing Claim Review Completed TKHENDE

NDC LTD APPEAL REVIEW
SEE QUESTIONS BELOW

1st or 2nd Level Appeal: 2ND LEVEL
Date Appeal Received:1/8/2020
30th day:2/7/2020
45th Day:2/22/2020
90th Day:4/7/2020
Authorization/expiration: 8/13/2020
Pre Ex investigation required n
AO investigation required n
SSDI Aw ard information needed/requested - Rec'd

Claimant Name: Sherman Carter
Claim Number: 1150128075
Group ID & active/termed:asbarb/active

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

Attorney: Yes > Don L. Hearn Jr. / Glanker Brow n Attorneys

Claim Demographics
Current Age: 53
Situs State:TNState Language applicable n
State of Residence:TNState Language applicable n
LTD Mo. Bnft amt:$581.00 (after ssd offset)
Date of Disability: 8/7/2015
EP: 90 days
Benefit Commencement Date: 11/5/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 11/5/2017
Max Duration Date: 1/15/2034
Occupation / Location in AWD: Trucker Driver, Heavy
Physical Demand Level of Occ:Medium
Primary Diagnosis: Cardiomyopathy, hypertension, ventricular tachycardia
Co-Morbid Diagnoses:
ERISA
Riders: n/a
STD claim status:Closed
LW claim status:Closed
LTD claim status:Pending appeal rvw

Notes: Contractual Limits
Legal Action 3 yrs
Proof of claim Elim period

Initial Claim Decision:
Reason/Date of denial: Not TD Any Occ - See denial letter 10/30/2018
Type of Medical Review , Name, & Specialty: PDA Peer rvw - Internal Medicine/Cardiovascular Disease

"There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath w ith heavy exertion, but otherw ise no symptoms to support a diagnosis of heart failure w ith more than a mild functional impairment (NYHA Class II)."

"The available data support heart failure w ith NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but w ithout the source documentation. Therefore he w ould be restricted from lift/carry more than 25lbs ever, no more than 10-25 lbs occasionally and < 10lbs no restrictions; no limit on standing; w alking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met."

1ST Level Appeal Decision (if applicable)
Reason/Date of 1st level appeal determination: Not TD Any Occ - See denial letter 7/12/2019
Type of Medical Review , Name, & Specialty: NDC review - FXCASTI

Current Providers - last 18 to 24 months
AP Name/Specialty/Phone Number:Dr. Lee Faulkner - Cardiology
Last Date of Service: 2/6/2019
Restrictions and Limitations/Duration: Cannot w ork or perform sedentary w ork due to severe, chronic and w orsening cardiomyopathy. No lifting

Date and Type of Recent Surgeries:

9/18/2015 - ICD
2/2019- Left Total hip replacement

Appeal being discussed

**Chronological Activity List**

Reasons for disagreement as explained in appeal: The atty states on appeal LFG cites two reports prepared by medical reviewers as the basis of determination however these reports fail to address significant portions of the clmnt's medical records and misstate the findings of his treating physician in material respects. The appeal notes additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work. The atty notes the clmnt's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and non-sustained ventricular tachycardia, all of which is worsening and will not improve. Records note the clmnt has problems standing and frequently has dizzy spells. The appeal states the clmnt suffers from severely depressed left ventricular systolic function with an ejection fraction of 20-25%. The clmnt suffers from dyspnea on exertion and has a New York Heart Association Functional Class III. The atty requests until 2/15/2020 to submit all documentation in support of appeal.

Information Submitted with appeal and not previously reviewed: Medical records from cardiology, DOT information, New York Heart Association Functional Classification info,

Appeal Analysis: LTD bnfts were paid 11/5/2015 to 10/30/2018. The COD was 11/5/2017. The appeal points the clmnt cannot rtw in any occupation due to cardiac condition.

SSDI file mentioned in initial call Yes
SSDI language added to ack appeal letter Yes

PATH:
Ack letter to atty
Call to atty
Per letter from atty requests to 2/15/2020 to supplement appeal claim. Tolling begins 1/8/2020.
Appeal pending medical records.
- TKHENDE - Jan 14, 2020 03:25:41 pm
Emailed the curriculum vitae's of the medical reviews on claim to the atty. - TKHENDE - Jan 16, 2020 10:18:20 am

Status letter sent to atty advising appeal pending allowing time to supplement the claim. - TKHENDE - Feb 11, 2020 02:43:47 pm

Rec'd letter from atty dated 2/13/2020 requesting a 2 week extension to provide medical records for review. Also rec'd supplemental information from Dr. Faulkner (Cardiologist).
Call was placed to the atty's office and extension letter sent granting the 2 week extension. Appeal pending medical records. Will f/up in 2 weeks. - TKHENDE - Feb 18, 2020 09:53:10 am
Rec'd duplicate mail. - TKHENDE - Feb 20, 2020 10:23:56 am

APPEAL UPDATE / PATH:
> Allowed 2 week extension. Tolling ends 2/27/2020, 45th day = 4/12/2020
> VM to atty advising will move forward. Letter to atty advising will move forward.
> Appeal pending appeal consult. - TKHENDE - Mar 02, 2020 10:11:16 am

Recommendation: NDC rvw

Questions:

It was previously determined that the claimant met the policy definition of disability to 10/30/2018.

At this time we are reviewing whether or not the medical findings within the file support the restrictions and/ or limitations of the treating provider(s).

Please respond to the specific questions below and provide the medical findings supporting your rationale.

1.Please provide a review of the medical findings. Please state your findings upon review of the medical information.

2.Based on the medical findings, please provide a description of the claimant's impairments, and how these would translate into functional limitations or medically appropriate restrictions from 10/30/2018 and forward.
a.For any outlined functional limitations and/or medically appropriate restrictions, please specify from and to dates

to w hich the limitations and/or restrictions apply.
b.Please provide the maximal physical capacities the claimant retains and can safely perform at w ith specific from and to dates.

3.Are the restrictions or limitations placed upon the claimant's physical activities by the attending physician(s) reasonable and consistent w ith the medical findings? Please explain. - TKHENDE - Mar 03, 2020 09:31:38 am
Assigned to A. Malskeit on 3/5/20 - MEHLO8 - Mar 05, 2020 07:06:47 am
Date: 3/5/2020
Nursing Memorandum

Claim: 1150128075
Claimant: Sherman Carter
Date of Disability: 8/7/15

Clinical Assessment: All available medical records have been review ed through date and time of this review including all documentation submitted for appeal to date. Information summarized below includes those portions of the records received that have relevance to the questions and time frame identified for this review . For background details refer to the latest peer review w hich comprehensively outlines the EE's medical history and functional capacity in relation to the EE's medical history.

The EE stopped w orking on 8/7/15 for cardiomyopathy (heart muscle disease making it harder for the heart to pump blood to the rest of the body), high blood pressure, ventricular tachycardia (fast abnormal heart rate). He underw ent an automatic implantable cardioverter defibrillator (AICD) Sept. 2015 due to depressed left ventricular function. He underw ent a left total hip replacement March 2018 due to osteoarthritis (age related joint disease). He remains out of w ork for ongoing complaints of shortness of breath, frequent dizzy spells, abnormal sensation in his leg, and difficulty w alking

The EE saw Dr. Dabov (Orthopedics) on 4/23/18 6 w eeks post-surgery for left total hip replacement. He is noted to be doing w ell w ith no major concerned and he is overall is pleased. Dr. Dabov opines the EE is disabled from medium or heavy type w ork and w ants him to get involved in a good w alking program and fitness, maybe w ith elliptical machine or stationary bike. There are no documents exam findings. Plan is to follow up in 10 months.

An independent medical peer review w as completed on 10/26/18 by Dr. Borzak (Cardiology) w ho opines the data supports NYHA FC II and therefore w ould be restricted from lift/carry more than 25 lbs. ever, no more than 10-25 lbs. occasionally and less than 10 lbs. unrestricted; no limit on standing; w alking no more than 4 of 8 hours, and no limit on reaching or stooping therefore he is restricted from professional driving unless DOT specifications are met.

The EE saw Dr. Faulkner (Cardiology) on 11/1/18 for follow and reports shortness of breath w ith exertion and lying dow n, continued problems w ith standing and frequent dizzy spells. He had a hip replacement a few months ago and reports abnormal sensation (numbness) of his leg and difficulty w alking. Exam documents normal heart and lungs; chest w all w ith no sw elling, bruising, redness or sw elling. Extremities w ithout deformities, clubbing, cyanosis or edema and no neurological deficits. Echocardiogram (ECHO) (evaluate the structures of the heart) on this date show ed severely depressed left ventricular systolic function w ith an ejection fraction (hearts ability to pump blood out of the heart) of 25%. Plan is to continue current medications w ith a follow up in 3 months.

An addendum from Dr. Borzak dated 12/5/18 opines the EE has sedentary capacity w ith no w alking or professional driving; occasional standing and lifting or carrying less than 10 lbs.; never lift or carry more than 10 lbs. Please see report in AWD for details.

The EE saw Dr. Faulkner on 2/6/19 and denies chest pain or shortness of breath. He does report an episode of chest tightness after lifting items. AICD interrogation w hich show ed non-sustained ventricular tachycardia. Exam is unremarkable and unchanged from prior visit. Plan is to follow up in 6 months.

The EE saw Dr. Dabov on 2/25/19 for one year post left hip surgery. He reports trouble w ith his right hip. Exam documents the EE to be pleasant, in no acute distress. He navigates the exam room reasonably w ell; somew hat uncomfortable w ith Stinchfeld's (resistance test) on the right, non-tender w ith maneuver of the left hip and some decreased sensation lateral femoral cutaneous nerve on the left. Motor and sensory exam is intact. He has limited ROM of the right hip compared to the left, especially w ith internal rotation. Left hip x-ray show ed total hip arthroplasty in good position and no signs of loosening or failure. Dr. Dabov opines the EE is permanently disabled for heavy w ork. He is advised to exercise per cardiology, mainly w alking or riding a bike. He should not run, jog, or do heavy lifting and no squatting, bending, ladder climbing, etc. Plan for follow up as needed.

**Chronological Activity List**

There are no further office visits or exams findings received on appeal.

The medical records document a history of cardiomyopathy and severely depressed left ventricular function that is stable w ith medication management. AICD function is noted to be normal w ith non-sustained ventricular tachycardia. While it is noted the EE has a reduced ejection fraction, the medical exam documentation does not reflect significant abnormal findings or functioning that w ould preclude all w ork activities. The EE is asymptomatic w ithout ongoing complaints of chest pain/tightness, shortness of breath, or dizziness. There is no documentation of frequent office visits, ER visits or any hospitalizations due to his heart condition. The R/L's outlined above by Dr. Borzak are supported. There is no new compelling evidence that supports progression of heart disease.
From an orthopedic standpoint, the medical evidence fails to demonstrate significant pain, decreased strength, altered sensation, or impaired gait to support R/L's that w ould preclude all w ork activities. There is no indication the EE requires an assistive device for ambulation or any other activities. Left hip x-ray 2/25/19 show ed no significant abnormalities. The EE has been encouraged to exercise by w alking or riding a bike.

Amy M., RN
Nurse Disability Consultant, Lincoln Financial Consultant - AMAMA3 - Mar 05, 2020 12:39:18 pm

3/6/2020 2:38:42 PM | Claim Tasks | 28 | Appeal - 21 Day Letter | Requested | TKHENDE
NDC rvw sent to atty. Response? - TKHENDE - Mar 06, 2020 02:39:06 pm

3/30/2020 3:16:27 PM | Documents/Mail | 145 | Appeal Any Occ Level 2 Uphold Atty | Work In Progress | TKHENDE
Appeal Any Occ Level 2 Uphold AttyAttachments:Translation services

3/31/2020 | Telephone (OUT) | 75 | GLANKLER BROWN | Completed | TKHENDE
Spoke to the atty and advised of the appeal uphold decision. He thanked me for calling to advise. - TKHENDE - Mar 31, 2020 04:44:32 pm

3/31/2020 | Claim Tasks | 27 | Appeal - 45 Day Reminder | Completed | TKHENDE
30TH DAY = 2/7/2020
45TH DAY = 2/22/2020

*Tolling---atty requested to 2/15/2020 to supplement appeal - TKHENDE - Jan 14, 2020 02:55:14 pm

Extension to 2/27/2020 - TKHENDE - Feb 18, 2020 09:25:41 am

Tolling ends 2/27/2020

30th day = 3/28/2020
45th day = 4/12/2020
90th day = 5/27/2020 - TKHENDE - Mar 02, 2020 10:10:01 am

* 21 day response by 3/27/2020 - TKHENDE - Mar 06, 2020 02:38:36 pm

3/31/2020 | Claim Tasks | 28 | Appeal - 21 Day Letter | Completed | TKHENDE
NDC rvw sent to atty. Response? - TKHENDE - Mar 06, 2020 02:39:06 pm

3/31/2020 | Documents/Mail | 145 | Appeal Any Occ Level 2 Uphold Atty | Completed | TKHENDE
Appeal Any Occ Level 2 Uphold AttyAttachments:Translation services

3/31/2020 | Appeal | 3 | Level 2 | Closed | TKHENDE

3/31/2020 | Summary/Assessment/Path | 5 | 2ND LEVEL APPEAL PENDING RATIONALE - TKHENDE - Jan | Completed | TKHENDE

Summary Notes
2ND LEVEL APPEAL PENDING RATIONALE - TKHENDE - Jan 14, 2020 03:25:41 pm
Assessment Notes

Path Notes

1st or 2nd Level Appeal: 2ND LEVEL
Date Appeal Received:1/8/2020
30th day:2/7/2020
45th Day:2/22/2020
90th Day:4/7/2020
Authorization/expiration: 8/13/2020
Pre Ex investigation required n
AO investigation required n

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

SSDI Award information needed/requested - Rec'd

Claimant Name: Sherman Carter
Claim Number: 1150128075
Group ID & active/termed:asbarb/active

Attorney: Yes > Don L. Hearn Jr. / Glanker Brown Attorneys

Claim Demographics
Current Age: 53
Situs State:TNState Language applicable n
State of Residence:TNState Language applicable n
LTD Mo. Bnft amt:$581.00 (after ssd offset)
Date of Disability: 8/7/2015
EP: 90 days
Benefit Commencement Date: 11/5/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 11/5/2017
Max Duration Date: 1/15/2034
Occupation / Location in AWD: Trucker Driver, Heavy
Physical Demand Level of Occ:Medium
Primary Diagnosis: Cardiomyopathy, hypertension, ventricular tachycardia
Co-Morbid Diagnoses:
ERISA
Riders: n/a
STD claim status:Closed
LW claim status:Closed
LTD claim status:Pending appeal rvw

Notes: Contractual Limits
Legal Action 3 yrs
Proof of claim Elim period

Initial Claim Decision:
Reason/Date of denial: Not TD Any Occ - See denial letter 10/30/2018
Type of Medical Review, Name, & Specialty: PDA Peer rvw - Internal Medicine/Cardiovascular Disease

"There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr Faulkner's notes. Further, Dr Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath with heavy exertion, but otherwise no symptoms to support a diagnosis of heart failure with more than a mild functional impairment (NYHA Class II)."

"The available data support heart failure with NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but without the source documentation. Therefore he would be restricted from lift/carry more than 25lbs ever, no more than 10-25 lbs occasionally and < 10lbs no restrictions; no limit on standing; walking no more than 4 of 8 hrs, and no limit on reaching or stooping. The clmt has an ICD & reportedly non-sustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met."

1ST Level Appeal Decision (if applicable)
Reason/Date of 1st level appeal determination: Not TD Any Occ - See denial letter 7/12/2019
Type of Medical Review, Name, & Specialty: NDC review - Fxcasti

Current Providers - last 18 to 24 months
AP Name/Specialty/Phone Number:Dr. Lee Faulkner - Cardiology
Last Date of Service: 2/6/2019
Restrictions and Limitations/Duration: Cannot work or perform sedentary work due to severe, chronic and worsening cardiomyopathy. No lifting

Date and Type of Recent Surgeries:

9/18/2015 - ICD
2/2019- Left Total hip replacement

Appeal being discussed
Reasons for disagreement as explained in appeal: The atty states on appeal LFG cites tw o reports prepared by medical review ers as the basis of determination how ever these reports fail to address significant portions of the clmnt's medical records and misstate the findings of his treating physician in material respects. The appeal notes additional and more recent medical records provide further confirmation of his documented inability to perform sedentary w ork. The atty notes the clmnt's severely depressed left ventricular systolic function w ith an ejection fraction of 20-25% and non-sustained ventricular tachycardia, all of w hich is w orsening and w ill not improve. Records note the clmnt has problems standing and frequently has dizzy spells. The appeal states the clmnt suffers from severely depressed left ventricular systolic function w ith an ejection fraction of 20-25%. The clmnt suffers from dyspnea on exertion and has a New York Heart Association Functional Class III. The atty requests until 2/15/2020 to submit all documentation in support of appeal.

Information Submitted w ith appeal and not previously review ed: Medical records from cardiology, DOT information, New York Heart Association Functional Classification info,

Appeal Analysis: LTD bnfts w ere paid 11/5/2015 to 10/30/2018. The COD w as 11/5/2017. The appeal points the clmnt cannot rtw in any occupation due to cardiac condition.

SSDI file mentioned in initial call Yes
SSDI language added to ack appeal letter Yes

PATH:
Ack letter to atty
Call to atty
Per letter from atty requests to 2/15/2020 to supplement appeal claim. Tolling begins 1/8/2020.
Appeal pending medical records.
- TKHENDE - Jan 14, 2020 03:25:41 pm
Emailed the curriculum vitae's of the medical review s on claim to the atty. - TKHENDE - Jan 16, 2020 10:18:20 am

Status letter sent to atty advising appeal pending allow ing time to supplement the claim. - TKHENDE - Feb 11, 2020 02:43:47 pm

Rec'd letter from atty dated 2/13/2020 requesting a 2 w eek extension to provide medical records for review . Also rec'd supplemental information from Dr. Faulkner (Cardiologist).
Call w as placed to the atty's office and extension letter sent granting the 2 w eek extension. Appeal pending medical records. Will f/up in 2 w eeks. - TKHENDE - Feb 18, 2020 09:53:10 am
Rec'd duplicate mail. - TKHENDE - Feb 20, 2020 10:23:56 am

APPEAL UPDATE / PATH:
> Allow ed 2 w eek extension. Tolling ends 2/27/2020, 45th day = 4/12/2020
> VM to atty advising w ill move forw ard. Letter to atty advising w ill move forw ard.
> Appeal pending appeal consult. - TKHENDE - Mar 02, 2020 10:11:16 am
> Moving forw ard w ith medical review w ith health care consultant. - TKHENDE - Mar 03, 2020 09:32:05 am

APPEAL UPDATE / STEPS:
> Medical review w ith health consultant has been completed. Letter w /copy of review sent to atty.
> VM to atty advising copy of review has been sent.
> F/up in 21 days.

- TKHENDE - Mar 06, 2020 02:40:30 pm

No response to medical review completed on appeal from atty. Moving forw ard w ith appeal decision. - TKHENDE - Mar 31, 2020 09:02:13 am

| | | | | |
|---|---|---|---|---|
| 3/31/2020 | Summary/Assessment/Path | 2ND LEVEL APPEAL UPHOLD RATIONALE - TKHENDE - Mar 31, | Completed | TKHENDE |

Summary Notes

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|

2ND LEVEL APPEAL UPHOLD RATIONALE - TKHENDE - Mar 31, 2020 09:20:03 am
Assessment Notes

Path Notes
2ND LEVEL APPEAL UPHOLD RATIONALE: Appeal review complete to include a medical review with a health care consultant (NDC rvw) does not support r/l's from the clmnt performing in any occupation beyond 10/30/2018. See uphold letter for complete details.

Claimant Name: Sherman Carter
Claim Number: 1150128075
Group ID & active/termed:asbarb/active

Attorney: Yes > Don L. Hearn Jr. / Glanker Brown Attorneys

Claim Demographics
Current Age: 53
Situs State:TNState Language applicable n
State of Residence:TNState Language applicable n
LTD Mo. Bnft amt:$581.00 (after ssd offset)
Date of Disability: 8/7/2015
EP: 90 days
Benefit Commencement Date: 11/5/2015
Benefit Paid/Approved To Date:10/30/2018
Change in Definition (COD) Date: 11/5/2017
Max Duration Date: 1/15/2034
Occupation / Location in AWD: Trucker Driver, Heavy
Physical Demand Level of Occ:Medium
Primary Diagnosis: Cardiomyopathy, hypertension, ventricular tachycardia

NDC REVIEW STATES IN PART: The EE stopped working on 8/7/15 for cardiomyopathy (heart muscle disease making it harder for the heart to pump blood to the rest of the body), high blood pressure, ventricular tachycardia (fast abnormal heart rate). He underwent an automatic implantable cardioverter defibrillator (AICD) Sept. 2015 due to depressed left ventricular function. He underwent a left total hip replacement March 2018 due to osteoarthritis (age related joint disease). He remains out of work for ongoing complaints of shortness of breath, frequent dizzy spells, abnormal sensation in his leg, and difficulty walking

The EE saw Dr. Dabov (Orthopedics) on 4/23/18 6 weeks post-surgery for left total hip replacement. He is noted to be doing well with no major concerned and he is overall is pleased. Dr. Dabov opines the EE is disabled from medium or heavy type work and wants him to get involved in a good walking program and fitness, maybe with elliptical machine or stationary bike. There are no documents exam findings. Plan is to follow up in 10 months.

The EE saw Dr. Dabov on 2/25/19 for one year post left hip surgery. He reports trouble with his right hip. Exam documents the EE to be pleasant, in no acute distress. He navigates the exam room reasonably well; somewhat uncomfortable with Stinchfeld's (resistance test) on the right, non-tender with maneuver of the left hip and some decreased sensation lateral femoral cutaneous nerve on the left. Motor and sensory exam is intact. He has limited ROM of the right hip compared to the left, especially with internal rotation. Left hip x-ray showed total hip arthroplasty in good position and no signs of loosening or failure. Dr. Dabov opines the EE is permanently disabled for heavy work. He is advised to exercise per cardiology, mainly walking or riding a bike. He should not run, jog, or do heavy lifting and no squatting, bending, ladder climbing, etc. Plan for follow up as needed.

There are no further office visits or exams findings received on appeal.

The medical records document a history of cardiomyopathy and severely depressed left ventricular function that is stable with medication management. AICD function is noted to be normal with non-sustained ventricular tachycardia. While it is noted the EE has a reduced ejection fraction, the medical exam documentation does not reflect significant abnormal findings or functioning that would preclude all work activities. The EE is asymptomatic without ongoing complaints of chest pain/tightness, shortness of breath, or dizziness. There is no documentation of frequent office visits, ER visits or any hospitalizations due to his heart condition. The R/L's outlined above by Dr. Borzak are supported. There is no new compelling evidence that supports progression of heart disease.
From an orthopedic standpoint, the medical evidence fails to demonstrate significant pain, decreased strength,

altered sensation, or impaired gait to support R/L's that w ould preclude all w ork activities. There is no indication the EE requires an assistive device for ambulation or any other activities. Left hip x-ray 2/25/19 show ed no significant abnormalities. The EE has been encouraged to exercise by w alking or riding a bike.

APPEAL PATH/STEPS:
Uphold letter to atty
Call to atty
- TKHENDE - Mar 31, 2020 09:20:03 am

3/31/2020 Referrals 18 Tolling Review Completed TKHENDE

Appeal Rcvd DateToday's DateDays Since Received
1/8/20201/14/20206
1st 45 days
Tolling Start DateTolling end DateTolling Days
1/8/2020N/A
0
0
0
Tolling Days0
45th Day of Active Review 2/22/2020
Active Review Days Remaining to 45th Day39
30th Day of Active Review 2/7/2020

- TKHENDE - Jan 14, 2020 02:46:57 pm

Appeal Rcvd DateToday's DateDays Since Received
1/8/20203/2/202054
1st 45 days
Tolling Start DateTolling end DateTolling Days
1/8/20202/27/202050
0
0
0
Tolling Days50
45th Day of Active Review 4/12/2020
Active Review Days Remaining to 45th Day41
30th Day of Active Review 3/28/2020

After 45 day Extension
Tolling Start DateTolling end DateTolling Days
0
0
0
Tolling Days0
90th Day of Active Review 5/27/2020
Active Review Days Remaining to 90th Day86

- TKHENDE - Mar 02, 2020 10:09:19 am

3/31/2020 9:20:22 AM Status Not TD Any Occ CLOSED TKHENDE
3/31/2020 4:35:40 PM Claim Tasks 29 File scan request Requested JICFE4

***FILE COPY TO ATTY***

Please prepare a full file copy. As a reminder, the file copy should include all documents w ithin the administrative claim file to include the contract, all AWD/Paper documents, activity lists, phone notes, etc.

Please also include STD # 1150112339 & Life Wvr #1160012638 & 1160009294

ATTY EMAIL: DHearn@Glankler.com - TKHENDE - Mar 31, 2020 04:37:33 pm

## Chronological Activity List

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| | Copy has been prepared, it is in the CSS Folder/Claim_File_ Scans/Jill Folder as:<br><br>S CARTER 11500128075 - 1150112339 - 1160012638 - 1160009294 4-6-2020<br><br>Please review , advise if any pages need to be removed due to PHI and flip the task back into my initials.<br>**NOTE** Due to system constraints, w e are currently only able to provide file copies via OneDrive links at this time. Please provide a valid email address to send the link to for your request. Thank you for your understanding.<br>- JICFE4 - Apr 06, 2020 04:27:15 pm<br>file copy review ed OK to send. please be sure correct LTD claim # (1150128075) is in email to atty and on file copy see atty email address above thanks- - SXNOLAN - Apr 14, 2020 03:36:29 pm<br><br>Email of file copy has been sent securely to requestor and CE<br><br>- JICFE4 - Apr 16, 2020 03:48:16 pm | | | | |
| 4/2/2020 | Documents/Mail<br>2020-03-26-14.04.36.555060O01 | 146 | Email | Completed | TKHENDE |
| 4/16/2020 | Claim Tasks<br>***FILE COPY TO ATTY***<br><br>Please prepare a full file copy. As a reminder, the file copy should include all documents w ithin the administrative claim file to include the contract, all AWD/Paper documents, activity lists, phone notes, etc.<br><br>Please also include STD # 1150112339 & Life Wvr #1160012638 & 1160009294<br><br>ATTY EMAIL: DHearn@Glankler.com - TKHENDE - Mar 31, 2020 04:37:33 pm<br><br>Copy has been prepared, it is in the CSS Folder/Claim_File_ Scans/Jill Folder as:<br><br>S CARTER 11500128075 - 1150112339 - 1160012638 - 1160009294 4-6-2020<br><br>Please review , advise if any pages need to be removed due to PHI and flip the task back into my initials.<br>**NOTE** Due to system constraints, w e are currently only able to provide file copies via OneDrive links at this time. Please provide a valid email address to send the link to for your request. Thank you for your understanding.<br>- JICFE4 - Apr 06, 2020 04:27:15 pm<br>file copy review ed OK to send. please be sure correct LTD claim # (1150128075) is in email to atty and on file copy see atty email address above thanks- - SXNOLAN - Apr 14, 2020 03:36:29 pm<br><br>Email of file copy has been sent securely to requestor and CE<br><br>- JICFE4 - Apr 16, 2020 03:48:16 pm | 29 | File scan request | Completed | JICFE4 |
| 4/17/2020 4:08:32 AM | Documents/Mail<br>2020-04-16-16.57.14.187040O01 | 147 | Email | Received | TKHENDE |
| 4/17/2020 4:10:10 AM | Documents/Mail<br>2020-04-16-16.56.14.414020O01 | 148 | Email | Received | TKHENDE |
| 4/20/2020 | Documents/Mail<br>2020-04-16-16.57.14.187040O01 | 147 | Email | Completed | TKHENDE |
| 4/20/2020 | Documents/Mail<br>2020-04-16-16.56.14.414020O01 | 148 | Email | Completed | TKHENDE |
| 4/21/2020 11:00:32 AM | Documents/Mail<br>2020-04-20-11.09.17.009600O01 | 149 | Email | Received | TKHENDE |
| 4/22/2020 | Documents/Mail<br>2020-04-20-11.09.17.009600O01 | 149 | Email | Completed | TKHENDE |
| 5/1/2020 9:11:36 AM | Documents/Mail<br>2020-04-30-15.08.15.844600O01 | 150 | Email | Received | TKHENDE |
| 5/1/2020 9:17:45 AM | Documents/Mail<br>2020-04-30-15.09.31.943620O01 | 151 | Email | Received | TKHENDE |

**Chronological Activity List**

| Posted Date | Category | Seq | Item | Status | User |
|---|---|---|---|---|---|
| 5/1/2020 9:19:04 AM | Documents/Mail<br>2020-04-30-15.10.17.417600O01 | 152 | Email | Received | TKHENDE |
| 5/4/2020 | Documents/Mail<br>2020-04-30-15.08.15.844600O01 | 150 | Email | Completed | TKHENDE |
| 5/4/2020 | Documents/Mail<br>2020-04-30-15.09.31.943620O01 | 151 | Email | Completed | TKHENDE |
| 5/4/2020 | Documents/Mail<br>2020-04-30-15.10.17.417600O01 | 152 | Email | Completed | TKHENDE |
| 12/28/2020 3:05:03 PM | Claim Tasks | 30 | Paper File | Follow Up | FALHO2 |

Please prepare a full file copy. As a reminder the file copy should include the follow ing information, in this order.

1. Claim Profile
2. Chronological Activity List
3. Policy at time of DOD
4. Certificate at time of DOD
5. All AWD/Paper documents.

Please save the follow ing file(s) in the Legal Requests Folder:

LTD 1150128075
STD 1150112339
LW 1160012638
LW 1160009294

- DMQMA5 - Dec 28, 2020 03:07:12 pm

| | | | | | |
|---|---|---|---|---|---|
| 12/28/2020 3:26:01 PM | Status | | | REOPENED | CXGEARY |

Date: Fri Mar 06 14:40:34 CST 2020
From: Theresa Henderson <Theresa.Henderson@lfg.com>
To: DHEARN@GLANKLER.COM
Message-ID: <1395533739.3.1583527234826.JavaMail.gman@ne1pldb101c>
Subject:Lincoln Financial Group Information for Claim 1150128075 (SECURE)

E-communication from Lincoln Financial Group

Lincoln Financial Group

LINCOLN FOR GROUP BENEFITS

# Important Information for Claim #1150128075

Please review the attached letter and/or document(s) regarding the Claim #1150128075 for Sherman Carter. You may submit claim forms and additional documentation via email to DisabilityClaims@LFG.com. If you have any questions regarding this information, please contact us at claims@lfg.com or 1-800-423-2765.

**Theresa Henderson**
**Specialist, Claims**
LN10-Lincoln National Life Insurance Co
8801 Indian Hills Drive
Omaha, NE 68114
Toll Free Phone: 1-800-423-2765 ext 7277
Phone: 800-423-2765 *7277
Fax: 402-361-1280
Email: Theresa.Henderson@lfg.com

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

©2013 Lincoln National Corporation

LincolnFinancial.com

You're In Charge℠

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

March 6, 2020

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

This letter is in regard to your client's appeal for Long Term Disability benefits.

As part of your client's appeal review, your client's medical information was reviewed by a health care consultant. We are enclosing a copy of the report with this letter for you/your client to review prior to completion of our appeal decision.

You/your client may wish to provide this assessment to her treating physician(s) for further review. Any additional written information or comments must be provided within 21 days.

The 21-day period will expire on 03/27/2020. Please submit any written comments or documentation to us at the address in the upper right hand corner of this letter or fax it to 402-361-1460. If you will not be responding to the review, please advise us in writing immediately.

We are not making a final determination on your client's disability claim at this time as we want to provide your client every opportunity to review our assessment and provide a response.

If we do not receive a response by 03/27/2020 then we will render a decision based on the information currently in the file.

©2020 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Please contact me directly at 402-361-7277 with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Theresa Henderson
800-423-2765 *7277
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

Date: 3/5/2020
Nursing Memorandum

Claim: 1150128075
Claimant: Sherman Carter
Date of Disability: 8/7/15

Clinical Assessment: All available medical records have been reviewed through date and time of this review including all documentation submitted for appeal to date. Information summarized below includes those portions of the records received that have relevance to the questions and time frame identified for this review. For background details refer to the latest peer review which comprehensively outlines the EE's medical history and functional capacity in relation to the EE's medical history.

The EE stopped working on 8/7/15 for cardiomyopathy (heart muscle disease making it harder for the heart to pump blood to the rest of the body), high blood pressure, ventricular tachycardia (fast abnormal heart rate). He underwent an automatic implantable cardioverter defibrillator (AICD) Sept. 2015 due to depressed left ventricular function. He underwent a left total hip replacement March 2018 due to osteoarthritis (age related joint disease). He remains out of work for ongoing complaints of shortness of breath, frequent dizzy spells, abnormal sensation in his leg, and difficulty walking

The EE saw Dr. Dabov (Orthopedics) on 4/23/18 6 weeks post-surgery for left total hip replacement. He is noted to be doing well with no major concerned and he is overall is pleased. Dr. Dabov opines the EE is disabled from medium or heavy type work and wants him to get involved in a good walking program and fitness, maybe with elliptical machine or stationary bike. There are no documents exam findings. Plan is to follow up in 10 months.

An independent medical peer review was completed on 10/26/18 by Dr. Borzak (Cardiology) who opines the data supports NYHA FC II and therefore would be restricted from lift/carry more than 25 lbs. ever, no more than 10-25 lbs. occasionally and less than 10 lbs. unrestricted; no limit on standing; walking no more than 4 of 8 hours, and no limit on reaching or stooping therefore he is restricted from professional driving unless DOT specifications are met.

The EE saw Dr. Faulkner (Cardiology) on 11/1/18 for follow and reports shortness of breath with exertion and lying down, continued problems with standing and frequent dizzy spells. He had a hip replacement a few months ago and reports abnormal sensation (numbness) of his leg and difficulty walking. Exam documents normal heart and lungs; chest wall with no swelling, bruising, redness or swelling. Extremities without deformities, clubbing, cyanosis or edema and no neurological deficits. Echocardiogram (ECHO) (evaluate the structures of the heart) on this date showed severely depressed left ventricular systolic function with an ejection fraction (hearts ability to pump blood out of the heart) of 25%. Plan is to continue current medications with a follow up in 3 months.

An addendum from Dr. Borzak dated 12/5/18 opines the EE has sedentary capacity with no walking or professional driving; occasional standing and lifting or carrying less than 10 lbs.; never lift or carry more than 10 lbs. Please see report in AWD for details.

The EE saw Dr. Faulkner on 2/6/19 and denies chest pain or shortness of breath. He does report an episode of chest tightness after lifting items. AICD interrogation which showed non-sustained ventricular tachycardia. Exam is unremarkable and unchanged from prior visit. Plan is to follow up in 6 months.

The EE saw Dr. Dabov on 2/25/19 for one year post left hip surgery. He reports trouble with his right hip. Exam documents the EE to be pleasant, in no acute distress. He navigates the exam room reasonably well; somewhat uncomfortable with Stinchfeld's (resistance test) on the right,

non-tender with maneuver of the left hip and some decreased sensation lateral femoral cutaneous nerve on the left. Motor and sensory exam is intact. He has limited ROM of the right hip compared to the left, especially with internal rotation. Left hip x-ray showed total hip arthroplasty in good position and no signs of loosening or failure. Dr. Dabov opines the EE is permanently disabled for heavy work. He is advised to exercise per cardiology, mainly walking or riding a bike. He should not run, jog, or do heavy lifting and no squatting, bending, ladder climbing, etc. Plan for follow up as needed.

There are no further office visits or exams findings received on appeal.

The medical records document a history of cardiomyopathy and severely depressed left ventricular function that is stable with medication management. AICD function is noted to be normal with non-sustained ventricular tachycardia. While it is noted the EE has a reduced ejection fraction, the medical exam documentation does not reflect significant abnormal findings or functioning that would preclude all work activities. The EE is asymptomatic without ongoing complaints of chest pain/tightness, shortness of breath, or dizziness. There is no documentation of frequent office visits, ER visits or any hospitalizations due to his heart condition. The R/L's outlined above by Dr. Borzak are supported. There is no new compelling evidence that supports progression of heart disease.
From an orthopedic standpoint, the medical evidence fails to demonstrate significant pain, decreased strength, altered sensation, or impaired gait to support R/L's that would preclude all work activities. There is no indication the EE requires an assistive device for ambulation or any other activities. Left hip x-ray 2/25/19 showed no significant abnormalities. The EE has been encouraged to exercise by walking or riding a bike.

Amy M., RN
Nurse Disability Consultant, Lincoln Financial Consultant

Date: Mon Mar 02 10:10:44 CST 2020
From: Theresa Henderson <Theresa.Henderson@lfg.com>
To: DHEARN@GLANKLER.COM
Message-ID: <624475142.3.1583165444264.JavaMail.gman@ne1pldb101c>
Subject:Lincoln Financial Group Information for Claim 1150128075 (SECURE)

E-communication from Lincoln Financial Group

Lincoln Financial Group

LINCOLN FOR GROUP BENEFITS

# Important Information for Claim #1150128075

Please review the attached letter and/or document(s) regarding the Claim #1150128075 for Sherman Carter. You may submit claim forms and additional documentation via email to DisabilityClaims@LFG.com. If you have any questions regarding this information, please contact us at claims@lfg.com or 1-800-423-2765.

**Theresa Henderson**
**Specialist, Claims**
LN10-Lincoln National Life Insurance Co
8801 Indian Hills Drive
Omaha, NE 68114
Toll Free Phone: 1-800-423-2765 ext 7277
Phone: 800-423-2765 *7277
Fax: 402-361-1280
Email: Theresa.Henderson@lfg.com

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

©2013 Lincoln National Corporation

LincolnFinancial.com

You're In Charge℠

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

March 2, 2020

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

This letter is in regard to your client's appeal claim for Long Term Disability benefits.

As you aware we granted a 2-week extension requesting allowing time to supplement your client's appeal claim. Please refer to our letter dated 2/18/2020.

We are in receipt of your letter dated 02/14/2020 with correspondence from Dr. Faulkner.

At this time we will move forward with our review. Your client's appeal claim is pending a complete medical review.

Please contact me directly at 402-361-7277 with any questions you may have or email us at LFGAppeals@lfg.com. The appeals fax number is 402-361-1460.

Sincerely,

Theresa Henderson
800-423-2765 *7277
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

©2020 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Don L. Hearn, Jr.
GLANKLER BROWN
ATTORNEYS
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

NEOPOST FIRST-CLASS MAIL
02/13/2020
US POSTAGE $000.65⁰
ZIP 38119
041M11273286

FEB 1 8 2020

Claims Shared Services
c/o Theresa Henderson, Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
*ATTN: Document Request*

68103082337 B050

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

FEB 18 2020

February 13, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
c/o Theresa Henderson
Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
*ATTN: Document Request*

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Ms. Henderson:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

I received your January 14, 2020, correspondence regarding this matter granting my first request for additional time to submit information relevant to and in support of Mr. Carter's claim and second level appeal. We greatly appreciate Lincoln's grant of additional time to provide information relevant to the appeal.

In our January 8, 2020, submission, we provided additional medical records obtained from Mr. Carter's treating cardiologist, Dr. Faulkner. In addition, I requested additional information from Lincoln as follows:

> As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

I have not received a response to my inquiry regarding to which medical records Lincoln is referring above. I have assumed that Lincoln was referring to electronic radiology records, which I requested from Dr. Faulkner's office on December 13, 2020. I have yet to receive those records but have been in constant communication with Dr. Faulkner's office. My client has an appointment today at 3:45 pm with Dr. Faulkner and I believe he will be receiving these records. Are these the records Lincoln needs?

We respectfully request another 2 weeks to ensure we have all the records available in support of Mr. Carter's claim. Understand please that we have worked diligently to obtain these records and others so that we and Lincoln can ensure Mr. Carter's appeal is given a full and fair review. We also have requested the Social Security Administration file (requested November 19, 2019) which Lincoln noted was not provided or included on the claim file. We would like to provide this information but need more time as the activity of the Social Security Administration is beyond our control. Please advise of this extension request and thank you in advance for your assistance.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P901.525.1322 F901.525.2389
www.glankler.com

Paula Bethge
901.576.1780
pbethge@glankler.com

December 13, 2019

**HAND DELIVERY**
Physicians of Heart
Attn: Radiology Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 381119

Re: **For Immediate Attention - Medical Records Request**
Patient: Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Pursuant to your telephone conversation with Don Hearn yesterday regarding our client, Sherman Carter who is a patient of Dr. Faulkner, enclosed is a blank DVD. Please produce copies of all radiology and studies performed on Mr. Carter, including but not limited to the study that was done on November 1, 2018. A copy of that report is also enclosed. Additionally, I have enclosed a copy of our written request for records and medical authorization and release that was sent to your office on November 19, 2019.

Please provide us with these requested records immediately as we are under a strict deadline pertaining to Mr. Carter's disability benefits. Additionally, please call me at (901) 576-1780 when this request is complete and I will have someone from our office pick the records up from your clinic. Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**

Paula Bethge

Paula Bethge, Litigation Paralegal

PCB:

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Paula Bethge**
**901.576.1760**
**pbethge@glankler.com**

November 19, 2019

Social Security Administration
1330 Monroe Avenue
Memphis, Tennessee 38104-9918

Re: Request for SSA File
Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Enclosed is a Consent for Release of Information executed by our client, Sherman Carter. We are requesting any and all information requested on this form for the time period of 11/05/2005 to 11/12/2019.

Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**

Paula Bethge

Paula Bethge, Litigation Paralegal

PCB:

**GENERAL MEDICAL RELEASE AND AUTHORIZATION
IN COMPLIANCE WITH FEDERAL GUIDELINES INCLUDING HIPAA**

TO: Physicians of Hearts
Attn: Medical Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 38119

I, **SHERMAN CARTER**, hereby authorize you to disclose and release the following protected health information to any Partner, Associate or Paralegal of Glankler Brown, PLLC, 6000 Poplar Avenue, Suite 400, Memphis, Tennessee 38119: **WRITTEN MEDICAL RECORDS:** any and all medical records, all inpatient and outpatient charts and records, hospital charts and records, doctor and nurse notes, emergency room records, correspondence, memoranda, physical therapy and rehabilitation records, patient questionnaire forms, patient history forms, social service records, laboratory reports, diagnostic reports. **RADIOLOGY:** written reports of any and all x-rays, MRI films, CAT scans, brain scans, and EKG tracings in all forms. **PRESCRIPTION RECORDS:** any and all prescription records, the issuance of sale of prescription drugs, original doctor's prescription forms, refill records and pharmacy records. **PROTOCOL:** any and all documents describing the protocol and criteria for administration and interpretation of diagnostic tests or imaging. **BILLING:** any and all billing records, including itemized statements of charges, payments, all insurance records, including all claims, claim forms, correspondence, payments and reports. I agree that a copy of the original of this General Medical Release (the "Medical Release") shall be as effective and valid as the original. I further understand and agree that this Medical Release is in full compliance with all HIPAA regulations and complies fully with the requirements of 45 CFR § 164.508, as detailed below:

I understand that any disclosure of records concerning diagnosis and/or treatment related to alcohol and/or drug abuse is covered by Title 42 of the Code of Federal Regulations. If any records contain information governed by Title 42 CFR Part 2, I authorize the release of such information as indicated above.

I understand that the above named party to whom I authorize the release of these records is not a health care provider or a health care plan, and that the said party may re-disclose the information it receives without violation any federal or state privacy laws.

I understand that I have the right to revoke this Medical Release at any time by submitting a written revocation to any entity that provides information pursuant to this Medical Release, except for when the entity has already relied on my authorization to make a use or disclose. My written revocation will become effective once the specified entity receives and processes it.

This Medical Release is executed by me at this time for purposes of litigation.

I understand that the information to be released includes any and/or all information and records as stated in the opening paragraph of this Medical Release.

I understand that I have the right to inspect, copy, and/or amend information to be used or disclosed.

I understand that I am entitled to retain a copy of this Medical Release for my own records.

I direct that this Medical Release shall expire at the conclusion of the current litigation. Once this Medical Release expires, my health information is not to be used and/or disclosed for the described purposes, unless I sign a new Medical Release.

I understand that treatment and payment may not be conditioned on my authorization and/or execution of this Medical Release.

Execution of this document does not authorize communication with the healthcare provider other than for the provision of medical records.

Sherman Carter

SHERMAN CARTER

Date: 11-19-19

Date of Birth:

SSN:

STATE OF TENNESSEE
COUNTY OF SHELBY

Sworn to and subscribed before me this 19th day of November, 2019.

Brenda K. Parnell

Notary Public

BRENDA K PARNELL STATE OF TENNESSEE NOTARY PUBLIC SHELBY COUNTY My Commission Expires 04-01-2023

My Commission Expires:

April 1, 2023

Social Security Administration

**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

You must complete all required fields. We will not honor your request unless all required fields are completed. (*Signifies a required field. **Please complete these fields in case we need to contact you about the consent form).

**TO: Social Security Administration**

| Sherman Carter | | |
|---|---|---|
| *My Full Name | *My Date of Birth (MM/DD/YYYY) | *My Social Security Number |

I authorize the Social Security Administration to release information or records about me to:

| *NAME OF PERSON OR ORGANIZATION: | *ADDRESS OF PERSON OR ORGANIZATION: |
|---|---|
| Don L. Hearn, Esq. | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |
| Glankler Brown, PLLC | 6000 Poplar Ave., Ste. 400,Memphis, TN 38119 |
| | |

***I want this information released because:** Appeal of long term disability claim

We may charge a fee to release information for non-program purposes.

***Please release the following information selected from the list below:**
**Check at least one box. We will not disclose records unless you include date ranges where applicable.**

1. ☐ Verification of Social Security Number
2. ☒ Current monthly Social Security benefit amount
3. ☒ Current monthly Supplemental Security Income payment amount
4. ☒ My benefit or payment amounts from date 11/05/2005 to date 11/12/2019
5. ☒ My Medicare entitlement from date 11/05/2005 to date 11/12/2019
6. ☒ Medical records from my claims folder(s) from date 11/05/2005 to date 11/12/2019

   If you want us to release a minor child's medical records, do not use this form. Instead, contact your local Social Security office.
7. ☒ Complete medical records from my claims folder(s)
8. ☒ Other record(s) from my file (We will not honor a request for "any and all records" or "the entire file." You must specify other records; e.g., consultative exams, award/denial notices, benefit applications, appeals, questionnaires, doctor reports, determinations.)

   benefit applications, questionnaires, consultative exams, correspondence, doctor reports

   medical records, determinations, award and denial notices

**I am the individual, to whom the requested information or record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult. I declare under penalty of perjury (28 CFR § 16.41(d)(2004) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000. I also understand that I must pay all applicable fees for requesting information for a non-program-related purpose.**

***Signature:** Sherman Carter ***Date:** 11-19-19

****Address:** ****Daytime Phone:**

**Relationship (If not the subject of the record):** ****Daytime Phone:**

Witnesses must sign this form ONLY if the above signature is by mark (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1. Signature of witness | 2. Signature of witness |
|---|---|
| Brenda Pannell | Pamela Bittiga |
| Address(Number and street,City,State, and Zip Code) | Address(Number and street,City,State, and Zip Code) |
| 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |

**Form SSA-3288** (11-2016) uf

Social Security Administration

## Consent for Release of Information

Form Approved
OMB No. 0960-0566

**Instructions for Using this Form**

Complete this form only if you want us to give information or records about you, a minor, or a legally incompetent adult, to an individual or group (for example, a doctor or an insurance company). If you are the natural or adoptive parent or legal guardian, acting on behalf of a minor child, you may complete this form to release only the minor's non-medical records. We may charge a fee for providing information unrelated to the administration of a program under the Social Security Act.

**NOTE:** Do not use this form to:

- Request the release of medical records on behalf of a minor child. Instead, visit your local Social Security office or call our toll-free number, 1-800-772-1213 (TTY-1-800-325-0778), or
- Request detailed information about your earnings or employment history. Instead, complete and mail form SSA-7050-F4. You can obtain form SSA-7050-F4 from your local Social Security office or online at www.ssa.gov/online/ssa-7050.pdf.

**How to Complete this Form**

We will not honor this form unless all required fields are completed. An asterisk (*) indicates a required field. Also, we will not honor blanket requests for "any and all records" or the "entire file." You must specify the information you are requesting and you must sign and date this form. We may charge a fee to release information for non-program purposes.

- Fill in your name, date of birth, and social security number or the name, date of birth, and social security number of the person to whom the requested information pertains.
- Fill in the name and address of the person or organization where you want us to send the requested information.
- Specify the reason you want us to release the information.
- Check the box next to the type(s) of information you want us to release including the date ranges, where applicable.
- For non-medical information, you, the parent or the legal guardian acting on behalf of a minor child or legally incompetent adult, must sign and date this form and provide a daytime phone number.
- If you are not the individual to whom the requested information pertains, state your relationship to that person. We may require proof of relationship.

### PRIVACY ACT STATEMENT

Section 205(a) of the Social Security Act, as amended, authorizes us to collect the information requested on this form. We will use the information you provide to respond to your request for access to the records we maintain about you or to process your request to release your records to a third party. You do not have to provide the requested information. Your response is voluntary; however, we cannot honor your request to release information or records about you to another person or organization without your consent. We rarely use the information provided on this form for any purpose other than to respond to requests for SSA records information. However, the Privacy Act (5 U.S.C. § 552a(b)) permits us to disclose the information you provide on this form in accordance with approved routine uses, which include but are not limited to the following:

1. To enable an agency or third party to assist Social Security in establishing rights to Social Security benefits and or coverage;
2. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level;
3. To comply with Federal laws requiring the disclosure of the information from our records; and,
4. To facilitate statistical research, audit, or investigative activities necessary to assure the integrity of SSA programs.

We may also use the information you provide when we match records by computer. Computer matching programs compare our records with those of other Federal, State, or local government agencies. We use information from these matching programs to establish or verify a person's eligibility for Federally-funded or administered benefit programs and for repayment of incorrect payments or overpayments under these programs. Additional information regarding this form, routine uses of information, and other Social Security programs is available on our Internet website, www.socialsecurity.gov, or at your local Social Security office.

### PAPERWORK REDUCTION ACT STATEMENT

This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 3 minutes to read the instructions, gather the facts, and answer the questions. **SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. You can find your local Social Security office through SSA's website at www.socialsecurity.gov. Offices are also listed under U.S. Government agencies in your telephone directory or you may call 1-800-772-1213 (TYY 1-800-325-0778).** You may send comments on our time estimate above to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. ***Send only comments relating to our time estimate to this address, not the completed form.***

---

(SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

* * *

Medical records dated 07/30/2018 with Dr. Faulkner (cardiology) indicate you denied chest pain; however, did indicate pain when you were stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath with problems standing and being dizzy. However, your examination showed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

As you can see, Lincoln has determined there is no supporting documentation to support an ongoing functional impairment despite your concluding that Mr. Carter is unable to work whatsoever due to his disabling condition of severely depressed left ventricular systolic function with an EF of 20-25%, akinesis of inferior wall, and mild tricuspid insufficiency, among other diagnoses and resulting symptoms.

Thus, we kindly request your response to the following questions:

1. Is it your medical opinion that from November 1, 2017, to the present date, Mr. Carter has been and is totally disabled and unable to perform sedentary work? If so, what medical conditions prevent him from performing sedentary work? Patient is short of breath
2. Do objective findings exist to support your medical diagnoses? If so, please identify them. Cardiomyopathy
3. Will Mr. Carter's medical condition improve? Is it worsening? Slightly – No
4. Is Mr. Carter able to perform a job that requires walking or standing occasionally (1%-33% of the time), which is what sedentary work would require? What physical limitations and restrictions do you place on Mr. Carter? Difficulty talking ✓
Not able to do prolonged walking OR Standing
5. Does Mr. Carter's physical condition upon examination (your review of systems) have any bearing on your opinion that Mr. Carter cannot work or would the review of symptoms depend on the presence of his symptoms at the time? Lincoln takes the position that a normal review of systems indicates Mr. Carter has no physical limitations. Exertional events throw MR Carter into further heart failure

resolved.period.

6. Lincoln opines that Mr. Carter's symptoms and your physical findings regarding his condition are not consistent with your opinion that he cannot perform sedentary work. For example, Lincoln's July 12, 2019, letter relies upon notes from your file noting "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Can you reconcile your opinion and these notes? He is stabalized by medications but has exacerbation requiring hospitalization.

7. Finally, I have attached the opinion of Steven Borzak, M.D., who reviewed the claim on behalf of Lincoln. Dr. Borzak accepted that Mr. Carter has NYHA FC III, but opines that Mr. Carter's condition would still permit full time employment in a sedentary capacity. He disagrees with your opinion that Mr. Carter is permanently and totally disabled. Can you address Dr. Borzak's opinion? ~~He has~~ He is totally disabled and spends most of his time in bed

Again, we greatly appreciate your continued treatment of Mr. Carter as well as your assistance gathering information for Mr. Carter's appeal with Lincoln. If you have any questions for me or would like to discuss anything contained herein, please do not hesitate to call.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp

4852-7826-5776, v. 1

Don L. Hearn, Jr.
GLANKLER BROWN
ATTORNEYS
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

FEB 1 8 2020

NEOPOST
FIRST-CLASS MAIL
02/14/2020
US POSTAGE $000.65⁰
ZIP 38119
041M11273286

Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

FA103-233737

GLANKLER BROWN. ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

FEB 1 8 2020

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 14, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Sir/Madam:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter and the attached supplemental information from Mr. Carter's treating cardiologist as additional confirmation of his documented inability to perform sedentary work. Dr. Faulkner has opined, again, that Mr. Carter suffers from cardiomyopathy, suffers from shortness of breath, his condition will not improve, he condition is worsening, he has difficulty talking, he is not able to do prolonged walking or standing, exertional events throw Mr. Carter into further heart failure, and he has exacerbations requiring hospitalizations despite sometimes being stabilized by medications.

Finally, Dr. Faulkner opined that Mr. Carter "is totally disabled and spends most of his time in bed." All of Dr. Faulkner's opinions are consistent with his previous opinions and those outlined in my January 8, 2020 letter that Mr. Carter is totally disabled and cannot perform even sedentary work.

For these reasons and those previously presented, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4835-5376-8628, v. 1

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

**Physicians of Hearts**

# Fax:

| | |
|---|---|
| To: Don Hearn | From: Dr. Lee Faulkner/ |
| Fax: 525-2389 | Pages: 3 |
| Phone: | Date: 2/14/2020 |
| Re: | CC: |

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

Don L. Hearn, Jr.
GLANKLER BROWN
ATTORNEYS
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

FEB 1 8 2020

NEOPOST
FIRST-CLASS MAIL
02/13/2020
US POSTAGE $000.65⁰
ZIP 38119
041M11273286

Claims Shared Services
c/o Theresa Henderson, Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: *Document Request*

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

Don L. Hearn, Jr.
Direct 901.576.1767
dhearn@glankler.com

FEB 1 8 2020

February 13, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
c/o Theresa Henderson
Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
*ATTN: Document Request*

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Ms. Henderson:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

I received your January 14, 2020, correspondence regarding this matter granting my first request for additional time to submit information relevant to and in support of Mr. Carter's claim and second level appeal. We greatly appreciate Lincoln's grant of additional time to provide information relevant to the appeal.

In our January 8, 2020, submission, we provided additional medical records obtained from Mr. Carter's treating cardiologist, Dr. Faulkner. In addition, I requested additional information from Lincoln as follows:

> As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

I have not received a response to my inquiry regarding to which medical records Lincoln is referring above. I have assumed that Lincoln was referring to electronic radiology records, which I requested from Dr. Faulkner's office on December 13, 2020. I have yet to receive those records but have been in constant communication with Dr. Faulkner's office. My client has an appointment today at 3:45 pm with Dr. Faulkner and I believe he will be receiving these records. Are these the records Lincoln needs?

We respectfully request another 2 weeks to ensure we have all the records available in support of Mr. Carter's claim. Understand please that we have worked diligently to obtain these records and others so that we and Lincoln can ensure Mr. Carter's appeal is given a full and fair review. We also have requested the Social Security Administration file (requested November 19, 2019) which Lincoln noted was not provided or included on the claim file. We would like to provide this information but need more time as the activity of the Social Security Administration is beyond our control. Please advise of this extension request and thank you in advance for your assistance.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P901.525.1322 F901.525.2389
www.glankler.com

Paula Bethge
901.576.1780
pbethge@glankler.com

December 13, 2019

**HAND DELIVERY**
Physicians of Heart
Attn: Radiology Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 381119

Re: **For Immediate Attention - Medical Records Request**
Patient: Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Pursuant to your telephone conversation with Don Hearn yesterday regarding our client, Sherman Carter who is a patient of Dr. Faulkner, enclosed is a blank DVD. Please produce copies of all radiology and studies performed on Mr. Carter, including but not limited to the study that was done on November 1, 2018. A copy of that report is also enclosed. Additionally, I have enclosed a copy of our written request for records and medical authorization and release that was sent to your office on November 19, 2019.

Please provide us with these requested records immediately as we are under a strict deadline pertaining to Mr. Carter's disability benefits. Additionally, please call me at (901) 576-1780 when this request is complete and I will have someone from our office pick the records up from your clinic. Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**
Paula Bethge
Paula Bethge, Litigation Paralegal

PCB:

**GENERAL MEDICAL RELEASE AND AUTHORIZATION IN COMPLIANCE WITH FEDERAL GUIDELINES INCLUDING HIPAA**

TO: Physicians of Hearts
Attn: Medical Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 38119

I, **SHERMAN CARTER**, hereby authorize you to disclose and release the following protected health information to any Partner, Associate or Paralegal of Glankler Brown, PLLC, 6000 Poplar Avenue, Suite 400, Memphis, Tennessee 38119: **WRITTEN MEDICAL RECORDS:** any and all medical records, all inpatient and outpatient charts and records, hospital charts and records, doctor and nurse notes, emergency room records, correspondence, memoranda, physical therapy and rehabilitation records, patient questionnaire forms, patient history forms, social service records, laboratory reports, diagnostic reports. **RADIOLOGY:** written reports of any and all x-rays, MRI films, CAT scans, brain scans, and EKG tracings in all forms. **PRESCRIPTION RECORDS:** any and all prescription records, the issuance of sale of prescription drugs, original doctor's prescription forms, refill records and pharmacy records. **PROTOCOL:** any and all documents describing the protocol and criteria for administration and interpretation of diagnostic tests or imaging. **BILLING:** any and all billing records, including itemized statements of charges, payments, all insurance records, including all claims, claim forms, correspondence, payments and reports. I agree that a copy of the original of this General Medical Release (the "Medical Release") shall be as effective and valid as the original. I further understand and agree that this Medical Release is in full compliance with all HIPAA regulations and complies fully with the requirements of 45 CFR § 164.508, as detailed below:

I understand that any disclosure of records concerning diagnosis and/or treatment related to alcohol and/or drug abuse is covered by Title 42 of the Code of Federal Regulations. If any records contain information governed by Title 42 CFR Part 2, I authorize the release of such information as indicated above.

I understand that the above named party to whom I authorize the release of these records is not a health care provider or a health care plan, and that the said party may re-disclose the information it receives without violation any federal or state privacy laws.

I understand that I have the right to revoke this Medical Release at any time by submitting a written revocation to any entity that provides information pursuant to this Medical Release, except for when the entity has already relied on my authorization to make a use or disclose. My written revocation will become effective once the specified entity receives and processes it.

This Medical Release is executed by me at this time for purposes of litigation.

I understand that the information to be released includes any and/or all information and records as stated in the opening paragraph of this Medical Release.

I understand that I have the right to inspect, copy, and/or amend information to be used or disclosed.

I understand that I am entitled to retain a copy of this Medical Release for my own records.

I direct that this Medical Release shall expire at the conclusion of the current litigation. Once this Medical Release expires, my health information is not to be used and/or disclosed for the described purposes, unless I sign a new Medical Release.

I understand that treatment and payment may not be conditioned on my authorization and/or execution of this Medical Release.

Execution of this document does not authorize communication with the healthcare provider other than for the provision of medical records.

Sherman Carter

SHERMAN CARTER

Date: 11-19-19

Date of Birth:

SSN:

STATE OF TENNESSEE
COUNTY OF SHELBY

Sworn to and subscribed before me this 19th day of November, 2019.

Brenda K. Parnell
Notary Public

BRENDA K PARNELL STATE OF TENNESSEE NOTARY PUBLIC SHELBY COUNTY My Commission Expires 04-01-2023

My Commission Expires:

April 1, 2023

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P901.525.1322 F901.525.2389
www.glankler.com

**Paula Bethge**
**901.576.1760**
**pbethge@glankler.com**

November 19, 2019

Social Security Administration
1330 Monroe Avenue
Memphis, Tennessee 38104-9918

Re: Request for SSA File
Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Enclosed is a Consent for Release of Information executed by our client, Sherman Carter. We are requesting any and all information requested on this form for the time period of 11/05/2005 to 11/12/2019.

Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**

Paula Bethge

Paula Bethge, Litigation Paralegal

PCB:

Social Security Administration

**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

You must complete all required fields. We will not honor your request unless all required fields are completed. (**Signifies a required field. **Please complete these fields in case we need to contact you about the consent form*).

**TO: Social Security Administration**

| Sherman Carter | | |
|---|---|---|
| ***My Full Name** | ***My Date of Birth (MM/DD/YYYY)** | ***My Social Security Number** |

I authorize the Social Security Administration to release information or records about me to:

| ***NAME OF PERSON OR ORGANIZATION:** | ***ADDRESS OF PERSON OR ORGANIZATION:** |
|---|---|
| Don L. Hearn, Esq. | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |
| Glankler Brown, PLLC | 6000 Poplar Ave., Ste. 400,Memphis, TN 38119 |

***I want this information released because:** Appeal of long term disability claim

We may charge a fee to release information for non-program purposes.

***Please release the following information selected from the list below:**
**Check at least one box. We will not disclose records unless you include date ranges where applicable.**

1. ☐ Verification of Social Security Number
2. ☒ Current monthly Social Security benefit amount
3. ☒ Current monthly Supplemental Security Income payment amount
4. ☒ My benefit or payment amounts from date 11/05/2005 to date 11/12/2019
5. ☒ My Medicare entitlement from date 11/05/2005 to date 11/12/2019
6. ☒ Medical records from my claims folder(s) from date 11/05/2005 to date 11/12/2019

   If you want us to release a minor child's medical records, do not use this form. Instead, contact your local Social Security office.
7. ☒ Complete medical records from my claims folder(s)
8. ☒ Other record(s) from my file (We will not honor a request for "any and all records" or "the entire file." You must specify other records; e.g., consultative exams, award/denial notices, benefit applications, appeals, questionnaires, doctor reports, determinations.)

   benefit applications, questionnaires, consultative exams, correspondence, doctor reports

   medical records, determinations, award and denial notices

**I am the individual, to whom the requested information or record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult. I declare under penalty of perjury (28 CFR § 16.41(d)(2004) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000. I also understand that I must pay all applicable fees for requesting information for a non-program-related purpose.**

***Signature:** Sherman Carter ***Date:** 11-19-19

****Address:** ****Daytime Phone:**

**Relationship (if not the subject of the record):** ****Daytime Phone:**

Witnesses must sign this form ONLY if the above signature is by mark (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1.Signature of witness | 2.Signature of witness |
|---|---|
| Brenda Pannell | [signature] |
| Address(Number and street,City,State, and Zip Code) | Address(Number and street,City,State, and Zip Code) |
| 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |

**Form SSA-3288** (11-2016) uf

Social Security Administration

**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

**Instructions for Using this Form**

Complete this form only if you want us to give information or records about you, a minor, or a legally incompetent adult, to an individual or group (for example, a doctor or an insurance company). If you are the natural or adoptive parent or legal guardian, acting on behalf of a minor child, you may complete this form to release only the minor's non-medical records. We may charge a fee for providing information unrelated to the administration of a program under the Social Security Act.

**NOTE:** Do not use this form to:

- Request the release of medical records on behalf of a minor child. Instead, visit your local Social Security office or call our toll-free number, 1-800-772-1213 (TTY-1-800-325-0778), or
- Request detailed information about your earnings or employment history. Instead, complete and mail form SSA-7050-F4. You can obtain form SSA-7050-F4 from your local Social Security office or online at www.ssa.gov/online/ssa-7050.pdf.

**How to Complete this Form**

We will not honor this form unless all required fields are completed. An asterisk (*) indicates a required field. Also, we will not honor blanket requests for "any and all records" or the "entire file." You must specify the information you are requesting and you must sign and date this form. We may charge a fee to release information for non-program purposes.

- Fill in your name, date of birth, and social security number or the name, date of birth, and social security number of the person to whom the requested information pertains.
- Fill in the name and address of the person or organization where you want us to send the requested information.
- Specify the reason you want us to release the information.
- Check the box next to the type(s) of information you want us to release including the date ranges, where applicable.
- For non-medical information, you, the parent or the legal guardian acting on behalf of a minor child or legally incompetent adult, must sign and date this form and provide a daytime phone number.
- If you are not the individual to whom the requested information pertains, state your relationship to that person. We may require proof of relationship.

**PRIVACY ACT STATEMENT**

Section 205(a) of the Social Security Act, as amended, authorizes us to collect the information requested on this form. We will use the information you provide to respond to your request for access to the records we maintain about you or to process your request to release your records to a third party. You do not have to provide the requested information. Your response is voluntary; however, we cannot honor your request to release information or records about you to another person or organization without your consent. We rarely use the information provided on this form for any purpose other than to respond to requests for SSA records information. However, the Privacy Act (5 U.S.C. § 552a(b)) permits us to disclose the information you provide on this form in accordance with approved routine uses, which include but are not limited to the following:

1. To enable an agency or third party to assist Social Security in establishing rights to Social Security benefits and or coverage;
2. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level;
3. To comply with Federal laws requiring the disclosure of the information from our records; and,
4. To facilitate statistical research, audit, or investigative activities necessary to assure the integrity of SSA programs.

We may also use the information you provide when we match records by computer. Computer matching programs compare our records with those of other Federal, State, or local government agencies. We use information from these matching programs to establish or verify a person's eligibility for Federally-funded or administered benefit programs and for repayment of incorrect payments or overpayments under these programs. Additional information regarding this form, routine uses of information, and other Social Security programs is available on our Internet website, www.socialsecurity.gov, or at your local Social Security office.

**PAPERWORK REDUCTION ACT STATEMENT**

This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 3 minutes to read the instructions, gather the facts, and answer the questions. **SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. You can find your local Social Security office through SSA's website at www.socialsecurity.gov. Offices are also listed under U.S. Government agencies in your telephone directory or you may call 1-800-772-1213 (TYY 1-800-325-0778).** You may send comments on our time estimate above to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. ***Send only comments relating to our time estimate to this address, not the completed form.***

Don L. Hearn, Jr.
GLANKLER BROWN
ATTORNEYS
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

FEB 1 8 2020

NEOPOST
FIRST-CLASS MAIL
02/14/2020
US POSTAGE $000.65⁰
ZIP 38119
041M11273286

Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

68103-233737

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

FEB 1 8 2020

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 14, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Sir/Madam:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter and the attached supplemental information from Mr. Carter's treating cardiologist as additional confirmation of his documented inability to perform sedentary work. Dr. Faulkner has opined, again, that Mr. Carter suffers from cardiomyopathy, suffers from shortness of breath, his condition will not improve, he condition is worsening, he has difficulty talking, he is not able to do prolonged walking or standing, exertional events throw Mr. Carter into further heart failure, and he has exacerbations requiring hospitalizations despite sometimes being stabilized by medications.

Finally, Dr. Faulkner opined that Mr. Carter "is totally disabled and spends most of his time in bed." All of Dr. Faulkner's opinions are consistent with his previous opinions and those outlined in my January 8, 2020 letter that Mr. Carter is totally disabled and cannot perform even sedentary work.

For these reasons and those previously presented, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

---

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4835-5376-8628, v. 1

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

**Physicians of Hearts**

# Fax:

| | |
|---|---|
| To: Don Hearn | From: Dr. Lee Faulkner/ |
| Fax: 525-2389 | Pages: 3 |
| Phone: | Date: 2/14/2020 |
| Re: | CC: |

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

> (SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.
>
> * * *
>
> Medical records dated 07/30/2018 with Dr. Faulkner (cardiology) indicate you denied chest pain; however, did indicate pain when you were stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath with problems standing and being dizzy. However, your examination showed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

As you can see, Lincoln has determined there is no supporting documentation to support an ongoing functional impairment despite your concluding that Mr. Carter is unable to work whatsoever due to his disabling condition of severely depressed left ventricular systolic function with an EF of 20-25%, akinesis of inferior wall, and mild tricuspid insufficiency, among other diagnoses and resulting symptoms.

Thus, we kindly request your response to the following questions:

1. Is it your medical opinion that from November 1, 2017, to the present date, Mr. Carter has been and is totally disabled and unable to perform sedentary work? If so, what medical conditions prevent him from performing sedentary work? Patient is short of breath
2. Do objective findings exist to support your medical diagnoses? If so, please identify them. Cardiomyopathy
3. Will Mr. Carter's medical condition improve? Is it worsening? Slightly – NO
4. Is Mr. Carter able to perform a job that requires walking or standing occasionally (1%-33% of the time), which is what sedentary work would require? What physical limitations and restrictions do you place on Mr. Carter? Difficulty talking √ Not able to do prolonged walking OR standing
5. Does Mr. Carter's physical condition upon examination (your review of systems) have any bearing on your opinion that Mr. Carter cannot work or would the review of symptoms depend on the presence of his symptoms at the time? Lincoln takes the position that a normal review of systems indicates Mr. Carter has no physical limitations. Exertional events throw Mr Carter into further heart failure

resolved.period.

---

6. Lincoln opines that Mr. Carter's symptoms and your physical findings regarding his condition are not consistent with your opinion that he cannot perform sedentary work. For example, Lincoln's July 12, 2019, letter relies upon notes from your file noting "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Can you reconcile your opinion and these notes? He is stabalized by medications but has exacerbation requiring hospitalization

7. Finally, I have attached the opinion of Steven Borzak, M.D., who reviewed the claim on behalf of Lincoln. Dr. Borzak accepted that Mr. Carter has NYHA FC III, but opines that Mr. Carter's condition would still permit full time employment in a sedentary capacity. He disagrees with your opinion that Mr. Carter is permanently and totally disabled. Can you address Dr. Borzak's opinion? ~~He has~~ He is totally disabled and spends most of his time in bed

Again, we greatly appreciate your continued treatment of Mr. Carter as well as your assistance gathering information for Mr. Carter's appeal with Lincoln. If you have any questions for me or would like to discuss anything contained herein, please do not hesitate to call.

Very truly yours,

**GLANKLER BROWN, PLLC**

[signature]

Don L. Hearn, Jr.

DLH, Jr:/bkp

4852-7826-5776, v. 1

Date: Tue Feb 18 09:50:31 CST 2020
From: Theresa Henderson <Theresa.Henderson@lfg.com>
To: DHEARN@GLANKLER.COM
Message-ID: <1395533739.3.1582041031362.JavaMail.gman@ne1pldb101c>
Subject:Lincoln Financial Group Information for Claim 1150128075 (SECURE)

E-communication from Lincoln Financial Group

Lincoln Financial Group

LINCOLN FOR GROUP BENEFITS

# Important Information for Claim #1150128075

Please review the attached letter and/or document(s) regarding the Claim #1150128075 for Sherman Carter. You may submit claim forms and additional documentation via email to DisabilityClaims@LFG.com. If you have any questions regarding this information, please contact us at claims@lfg.com or 1-800-423-2765.

**Theresa Henderson**
**Specialist, Claims**
LN10-Lincoln National Life Insurance Co
8801 Indian Hills Drive
Omaha, NE 68114
Toll Free Phone: 1-800-423-2765 ext 7277
Phone: 800-423-2765 *7277
Fax: 402-361-1280
Email: Theresa.Henderson@lfg.com

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

©2013 Lincoln National Corporation

LincolnFinancial.com

You're In Charge℠

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

February 18, 2020

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

This letter is in regard to your client's appeal claim for Long Term Disability benefits.

We are in receipt of your letters dated 02/13/2020, 02/14/2020 and supplemental information from Dr. Faulkner.

Your letter dated 02/13/2020 requests a 2 week extension to supplement your client's appeal. We will allow you the 2 week extension request.

Please have all documentation submitted to our office by 02/27/2020. This may include but not limited to office treatment notes, updated testing results, therapy notes and/or hospital notes.

For your convenience, all documents may be sent via facsimile to 402-361-1460.

©2020 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Please contact me directly at 402-361-7277 with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Theresa Henderson
800-423-2765 *7277
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** February 14, 2020

**DELIVER TO:** Claims Shared Services – Appeals Department
Attn: Document Request

**FACSIMILE NO.:** (402) 361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Please see attached regarding the above referenced.

TOTAL NUMBER OF PAGES (INCLUDING COVER): ~~5~~ 6

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4817-6371-3196, v. 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 14, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Sir/Madam:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter and the attached supplemental information from Mr. Carter's treating cardiologist as additional confirmation of his documented inability to perform sedentary work. Dr. Faulkner has opined, again, that Mr. Carter suffers from cardiomyopathy, suffers from shortness of breath, his condition will not improve, he condition is worsening, he has difficulty talking, he is not able to do prolonged walking or standing, exertional events throw Mr. Carter into further heart failure, and he has exacerbations requiring hospitalizations despite sometimes being stabilized by medications.

Finally, Dr. Faulkner opined that Mr. Carter "is totally disabled and spends most of his time in bed." All of Dr. Faulkner's opinions are consistent with his previous opinions and those outlined in my January 8, 2020 letter that Mr. Carter is totally disabled and cannot perform even sedentary work.

For these reasons and those previously presented, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

---

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4835-5376-8628, v. 1



PAGE 3/6 * RCVD AT 2/14/2020 3:27:26 PM [Central Standard Time] * SVR:NE1PWFAX101/8 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):03-41

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

**Physicians of Hearts**

# Fax:

To: Don Hearn From: Dr. Lee Faulkner/

Fax: 525-2389 Pages: 3

Phone: Date: 2/14/2020

Re: CC:

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

---

(SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

* * *

Medical records dated 07/30/2018 with Dr. Faulkner (cardiology) indicate you denied chest pain; however, did indicate pain when you were stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath with problems standing and being dizzy. However, your examination showed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

As you can see, Lincoln has determined there is no supporting documentation to support an ongoing functional impairment despite your concluding that Mr. Carter is unable to work whatsoever due to his disabling condition of severely depressed left ventricular systolic function with an EF of 20-25%, akinesis of inferior wall, and mild tricuspid insufficiency, among other diagnoses and resulting symptoms.

Thus, we kindly request your response to the following questions:

1. Is it your medical opinion that from November 1, 2017, to the present date, Mr. Carter has been and is totally disabled and unable to perform sedentary work? If so, what medical conditions prevent him from performing sedentary work? Patient is short of breath
2. Do objective findings exist to support your medical diagnoses? If so, please identify them. Cardiomyopathy
3. Will Mr. Carter's medical condition improve? Is it worsening? Slightly – NO
4. Is Mr. Carter able to perform a job that requires walking or standing occasionally (1%-33% of the time), which is what sedentary work would require? What physical limitations and restrictions do you place on Mr. Carter? Difficulty talking ✓ Not able to do prolonged walking OR standing
5. Does Mr. Carter's physical condition upon examination (your review of systems) have any bearing on your opinion that Mr. Carter cannot work or would the review of symptoms depend on the presence of his symptoms at the time? Lincoln takes the position that a normal review of systems indicates Mr. Carter has no physical limitations. Extended events throw Mr Carter into further heart failure

resolved.period.

6. Lincoln opines that Mr. Carter's symptoms and your physical findings regarding his condition are not consistent with your opinion that he cannot perform sedentary work. For example, Lincoln's July 12, 2019, letter relies upon notes from your file noting "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Can you reconcile your opinion and these notes? He is stabilized by medications but has exacerbations requiring hospitalization

7. Finally, I have attached the opinion of Steven Borzak, M.D., who reviewed the claim on behalf of Lincoln. Dr. Borzak accepted that Mr. Carter has NYHA FC III, but opines that Mr. Carter's condition would still permit full time employment in a sedentary capacity. He disagrees with your opinion that Mr. Carter is permanently and totally disabled. Can you address Dr. Borzak's opinion? ~~He has~~ He is totally disabled and spends most of his time in bed

Again, we greatly appreciate your continued treatment of Mr. Carter as well as your assistance gathering information for Mr. Carter's appeal with Lincoln. If you have any questions for me or would like to discuss anything contained herein, please do not hesitate to call.

Very truly yours,

GLANKLER BROWN, PLLC

[signature]

Don L. Hearn, Jr.

DLH, Jr.:/bkp

4852-7826-5776, v 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 14, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Sir/Madam:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter and the attached supplemental information from Mr. Carter's treating cardiologist as additional confirmation of his documented inability to perform sedentary work. Dr. Faulkner has opined, again, that Mr. Carter suffers from cardiomyopathy, suffers from shortness of breath, his condition will not improve, he condition is worsening, he has difficulty talking, he is not able to do prolonged walking or standing, exertional events throw Mr. Carter into further heart failure, and he has exacerbations requiring hospitalizations despite sometimes being stabilized by medications.

Finally, Dr. Faulkner opined that Mr. Carter "is totally disabled and spends most of his time in bed." All of Dr. Faulkner's opinions are consistent with his previous opinions and those outlined in my January 8, 2020 letter that Mr. Carter is totally disabled and cannot perform even sedentary work.

For these reasons and those previously presented, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4835-5376-8628, v. 1

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

**Physicians of Hearts**

# Fax:

| | |
|---|---|
| To: Don Hearn | From: Dr. Lee Faulkner/ |
| Fax: 525-2389 | Pages: 3 |
| Phone: | Date: 2/14/2020 |
| Re: | CC: |

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

---

(SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

* * *

Medical records dated 07/30/2018 with Dr. Faulkner (cardiology) indicate you denied chest pain; however, did indicate pain when you were stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath with problems standing and being dizzy. However, your examination showed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

As you can see, Lincoln has determined there is no supporting documentation to support an ongoing functional impairment despite your concluding that Mr. Carter is unable to work whatsoever due to his disabling condition of severely depressed left ventricular systolic function with an EF of 20-25%, akinesis of inferior wall, and mild tricuspid insufficiency, among other diagnoses and resulting symptoms.

Thus, we kindly request your response to the following questions:

1. Is it your medical opinion that from November 1, 2017, to the present date, Mr. Carter has been and is totally disabled and unable to perform sedentary work? If so, what medical conditions prevent him from performing sedentary work? Patient is short of breath

2. Do objective findings exist to support your medical diagnoses? If so, please identify them. Cardiomyopathy

3. Will Mr. Carter's medical condition improve? Is it worsening? Slightly – No

4. Is Mr. Carter able to perform a job that requires walking or standing occasionally (1%-33% of the time), which is what sedentary work would require? What physical limitations and restrictions do you place on Mr. Carter? Difficulty talking ✓ Not able to do prolonged walking OR standing

5. Does Mr. Carter's physical condition upon examination (your review of systems) have any bearing on your opinion that Mr. Carter cannot work or would the review of symptoms depend on the presence of his symptoms at the time? Lincoln takes the position that a normal review of systems indicates Mr. Carter has no physical limitations. Exceptional events throw Mr Carter into further heart failure

resolved.period.

---

6. Lincoln opines that Mr. Carter's symptoms and your physical findings regarding his condition are not consistent with your opinion that he cannot perform sedentary work. For example, Lincoln's July 12, 2019, letter relies upon notes from your file noting "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Can you reconcile your opinion and these notes? He is stabalized by medications but has exacerbations requiring hospitalization

7. Finally, I have attached the opinion of Steven Borzak, M.D., who reviewed the claim on behalf of Lincoln. Dr. Borzak accepted that Mr. Carter has NYHA FC III, but opines that Mr. Carter's condition would still permit full time employment in a sedentary capacity. He disagrees with your opinion that Mr. Carter is permanently and totally disabled. Can you address Dr. Borzak's opinion? ~~He has~~ He is totally disabled and spends most of his time in bed

Again, we greatly appreciate your continued treatment of Mr. Carter as well as your assistance gathering information for Mr. Carter's appeal with Lincoln. If you have any questions for me or would like to discuss anything contained herein, please do not hesitate to call.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp

4852-7826-5776, v 1

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 14, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Sir/Madam:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter and the attached supplemental information from Mr. Carter's treating cardiologist as additional confirmation of his documented inability to perform sedentary work. Dr. Faulkner has opined, again, that Mr. Carter suffers from cardiomyopathy, suffers from shortness of breath, his condition will not improve, he condition is worsening, he has difficulty talking, he is not able to do prolonged walking or standing, exertional events throw Mr. Carter into further heart failure, and he has exacerbations requiring hospitalizations despite sometimes being stabilized by medications.

Finally, Dr. Faulkner opined that Mr. Carter "is totally disabled and spends most of his time in bed." All of Dr. Faulkner's opinions are consistent with his previous opinions and those outlined in my January 8, 2020 letter that Mr. Carter is totally disabled and cannot perform even sedentary work.

For these reasons and those previously presented, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4835-5376-8628, v. 1

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

**Physicians of Hearts**

# Fax:

| | |
|---|---|
| To: Don Hearn | From: Dr. Lee Faulkner/ |
| Fax: 525-2389 | Pages: 3 |
| Phone: | Date: 2/14/2020 |
| Re: | CC: |

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

---

(SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

* * *

Medical records dated 07/30/2018 with Dr. Faulkner (cardiology) indicate you denied chest pain; however, did indicate pain when you were stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath with problems standing and being dizzy. However, your examination showed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

As you can see, Lincoln has determined there is no supporting documentation to support an ongoing functional impairment despite your concluding that Mr. Carter is unable to work whatsoever due to his disabling condition of severely depressed left ventricular systolic function with an EF of 20-25%, akinesis of inferior wall, and mild tricuspid insufficiency, among other diagnoses and resulting symptoms.

Thus, we kindly request your response to the following questions:

1. Is it your medical opinion that from November 1, 2017, to the present date, Mr. Carter has been and is totally disabled and unable to perform sedentary work? If so, what medical conditions prevent him from performing sedentary work? Patient is short of breath
2. Do objective findings exist to support your medical diagnoses? If so, please identify them. Cardiomyopathy
3. Will Mr. Carter's medical condition improve? Is it worsening? Slightly – NO
4. Is Mr. Carter able to perform a job that requires walking or standing occasionally (1%-33% of the time), which is what sedentary work would require? What physical limitations and restrictions do you place on Mr. Carter? Difficulty talking ✓ Not able to do prolonged walking OR standing
5. Does Mr. Carter's physical condition upon examination (your review of systems) have any bearing on your opinion that Mr. Carter cannot work or would the review of symptoms depend on the presence of his symptoms at the time? Lincoln takes the position that a normal review of systems indicates Mr. Carter has no physical limitations. Exceptional events throw Mr Carter into further heart failure

resolved.period.

---

6. Lincoln opines that Mr. Carter's symptoms and your physical findings regarding his condition are not consistent with your opinion that he cannot perform sedentary work. For example, Lincoln's July 12, 2019, letter relies upon notes from your file noting "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Can you reconcile your opinion and these notes? He is stabalized by medications but has exacerbations requiring hospitalization

7. Finally, I have attached the opinion of Steven Borzak, M.D., who reviewed the claim on behalf of Lincoln. Dr. Borzak accepted that Mr. Carter has NYHA FC III, but opines that Mr. Carter's condition would still permit full time employment in a sedentary capacity. He disagrees with your opinion that Mr. Carter is permanently and totally disabled. Can you address Dr. Borzak's opinion? ~~He has~~ He is totally disabled and spends most of his time in bed

Again, we greatly appreciate your continued treatment of Mr. Carter as well as your assistance gathering information for Mr. Carter's appeal with Lincoln. If you have any questions for me or would like to discuss anything contained herein, please do not hesitate to call.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr.:/bkp

4852-7826-5776, v 1

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

February 11, 2020

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 000010049220000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

This letter is in regard to your client's appeal claim for Long Term Disability benefits. Please refer to our letter dated 01/14/2020.

Your client's appeal is currently pending allowing you time to supplement the claim with documentation for review. Please have the medical records submitted to our office no later than 02/15/2020.

For your convenience, all documents may be sent via facsimile to 402-361-1460.

Please note that we are not making a final determination on Mr. Carter's disability claim at this time as we want to provide your client with every opportunity to submit a complete appeal.

Please contact me directly at 402-361-7277 with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Theresa Henderson
800-423-2765 *7277
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

©2020 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** February 13, 2020

**DELIVER TO:** Ms. Theresa Henderson
Specialist, Claims
The Lincoln National Life Insurance Company

**FACSIMILE NO.:** (402) 361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Please see attached regarding the above referenced.

TOTAL NUMBER OF PAGES (INCLUDING COVER): 9

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4817-6371-3196, v. 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901 525 1322 F 901.525 2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 13, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
c/o Theresa Henderson
Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
*ATTN: Document Request*

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Ms. Henderson:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

I received your January 14, 2020, correspondence regarding this matter granting my first request for additional time to submit information relevant to and in support of Mr. Carter's claim and second level appeal. We greatly appreciate Lincoln's grant of additional time to provide information relevant to the appeal.

In our January 8, 2020, submission, we provided additional medical records obtained from Mr. Carter's treating cardiologist, Dr. Faulkner. In addition, I requested additional information from Lincoln as follows:

> As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

Appeal Letter to Claims Shared Services/The Lincoln National Life Insurance Company
Document Request
February 13, 2020

---

I have not received a response to my inquiry regarding to which medical records Lincoln is referring above. I have assumed that Lincoln was referring to electronic radiology records, which I requested from Dr. Faulkner's office on December 13, 2020. I have yet to receive those records but have been in constant communication with Dr. Faulkner's office. My client has an appointment today at 3:45 pm with Dr. Faulkner and I believe he will be receiving these records. Are these the records Lincoln needs?

We respectfully request another 2 weeks to ensure we have all the records available in support of Mr. Carter's claim. Understand please that we have worked diligently to obtain these records and others so that we and Lincoln can ensure Mr. Carter's appeal is given a full and fair review. We also have requested the Social Security Administration file (requested November 19, 2019) which Lincoln noted was not provided or included on the claim file. We would like to provide this information but need more time as the activity of the Social Security Administration is beyond our control. Please advise of this extension request and thank you in advance for your assistance.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

GLANKLER BROWN
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

Paula Bethge
901.576.1780
pbethge@glankler.com

December 13, 2019

**HAND DELIVERY**
Physicians of Heart
Attn: Radiology Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 381119

Re: **For Immediate Attention - Medical Records Request**
Patient: Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Pursuant to your telephone conversation with Don Hearn yesterday regarding our client, Sherman Carter who is a patient of Dr. Faulkner, enclosed is a blank DVD. Please produce copies of all radiology and studies performed on Mr. Carter, including but not limited to the study that was done on November 1, 2018. A copy of that report is also enclosed. Additionally, I have enclosed a copy of our written request for records and medical authorization and release that was sent to your office on November 19, 2019.

Please provide us with these requested records immediately as we are under a strict deadline pertaining to Mr. Carter's disability benefits. Additionally, please call me at (901) 576-1780 when this request is complete and I will have someone from our office pick the records up from your clinic. Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**

Paula Bethge

Paula Bethge, Litigation Paralegal

PCB:

resolved.period.

**GENERAL MEDICAL RELEASE AND AUTHORIZATION IN COMPLIANCE WITH FEDERAL GUIDELINES INCLUDING HIPAA**

TO: Physicians of Hearts
Attn: Medical Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 38119

I, **SHERMAN CARTER**, hereby authorize you to disclose and release the following protected health information to any Partner, Associate or Paralegal of Glankler Brown, PLLC, 6000 Poplar Avenue, Suite 400, Memphis, Tennessee 38119: **WRITTEN MEDICAL RECORDS:** any and all medical records, all inpatient and outpatient charts and records, hospital charts and records, doctor and nurse notes, emergency room records, correspondence, memoranda, physical therapy and rehabilitation records, patient questionnaire forms, patient history forms, social service records, laboratory reports, diagnostic reports. **RADIOLOGY:** written reports of any and all x-rays, MRI films, CAT scans, brain scans, and EKG tracings in all forms. **PRESCRIPTION RECORDS:** any and all prescription records, the issuance of sale of prescription drugs, original doctor's prescription forms, refill records and pharmacy records. **PROTOCOL:** any and all documents describing the protocol and criteria for administration and interpretation of diagnostic tests or imaging. **BILLING:** any and all billing records, including itemized statements of charges, payments, all insurance records, including all claims, claim forms, correspondence, payments and reports. I agree that a copy of the original of this General Medical Release (the "Medical Release") shall be as effective and valid as the original. I further understand and agree that this Medical Release is in full compliance with all HIPAA regulations and complies fully with the requirements of 45 CFR § 164.508, as detailed below:

I understand that any disclosure of records concerning diagnosis and/or treatment related to alcohol and/or drug abuse is covered by Title 42 of the Code of Federal Regulations. If any records contain information governed by Title 42 CFR Part 2, I authorize the release of such information as indicated above.

I understand that the above named party to whom I authorize the release of these records is not a health care provider or a health care plan, and that the said party may re-disclose the information it receives without violation any federal or state privacy laws.

I understand that I have the right to revoke this Medical Release at any time by submitting a written revocation to any entity that provides information pursuant to this Medical Release, except for when the entity has already relied on my authorization to make a use or disclose. My written revocation will become effective once the specified entity receives and processes it.

This Medical Release is executed by me at this time for purposes of litigation.

I understand that the information to be released includes any and/or all information and records as stated in the opening paragraph of this Medical Release.

I understand that I have the right to inspect, copy, and/or amend information to be used or disclosed.

I understand that I am entitled to retain a copy of this Medical Release for my own records.

I direct that this Medical Release shall expire at the conclusion of the current litigation. Once this Medical Release expires, my health information is not to be used and/or disclosed for the described purposes, unless I sign a new Medical Release.

I understand that treatment and payment may not be conditioned on my authorization and/or execution of this Medical Release.

Execution of this document does not authorize communication with the healthcare provider other than for the provision of medical records.

Sherman Carter

SHERMAN CARTER

Date: 11-19-19

Date of Birth:

SSN:

STATE OF TENNESSEE
COUNTY OF SHELBY

Sworn to and subscribed before me this 19th day of November, 2019.

Brenda K. Parnell
Notary Public

BRENDA K PARNELL STATE OF TENNESSEE NOTARY PUBLIC SHELBY COUNTY My Commission Expires 04-01-2023

My Commission Expires:
April 1, 2023

GLANKLER BROWN
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P901.525.1322 F901.525.2389
www.glankler.com

Paula Bethge
901.576.1780
pbethge@glankler.com

November 19, 2019

Social Security Administration
1330 Monroe Avenue
Memphis, Tennessee 38104-9918

Re: Request for SSA File
Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Enclosed is a Consent for Release of Information executed by our client, Sherman Carter. We are requesting any and all information requested on this form for the time period of 11/05/2005 to 11/12/2019.

Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**

Paula Bethge

Paula Bethge, Litigation Paralegal

PCB:



resolved.period.

Social Security Administration

**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

You must complete all required fields. We will not honor your request unless all required fields are completed. (**Signifies a required field. **Please complete these fields in case we need to contact you about the consent form*).

**TO: Social Security Administration**

| Sherman Carter | | |
|---|---|---|
| ***My Full Name** | ***My Date of Birth (MM/DD/YYYY)** | ***My Social Security Number** |

I authorize the Social Security Administration to release information or records about me to:

| *NAME OF PERSON OR ORGANIZATION: | *ADDRESS OF PERSON OR ORGANIZATION: |
|---|---|
| Don L. Hearn, Esq. | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |
| Glankler Brown, PLLC | 6000 Poplar Ave., Ste. 400,Memphis, TN 38119 |

***I want this information released because:** Appeal of long term disability claim
We may charge a fee to release information for non-program purposes.

***Please release the following information selected from the list below:**
**Check at least one box. We will not disclose records unless you include date ranges where applicable.**

1. ☐ Verification of Social Security Number
2. ☒ Current monthly Social Security benefit amount
3. ☒ Current monthly Supplemental Security Income payment amount
4. ☒ My benefit or payment amounts from date 11/05/2005 to date 11/12/2019
5. ☒ My Medicare entitlement from date 11/05/2005 to date 11/12/2019
6. ☒ Medical records from my claims folder(s) from date 11/05/2005 to date 11/12/2019
   If you want us to release a minor child's medical records, do not use this form. Instead, contact your local Social Security office.
7. ☒ Complete medical records from my claims folder(s)
8. ☒ Other record(s) from my file (We will not honor a request for "any and all records" or "the entire file." You must specify other records; e.g., consultative exams, award/denial notices, benefit applications, appeals, questionnaires, doctor reports, determinations.)
   benefit applications, questionnaires, consultative exams, correspondence, doctor reports
   medical records, determinations, award and denial notices

**I am the individual, to whom the requested information or record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult. I declare under penalty of perjury (28 CFR § 16.41(d)(2004) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000. I also understand that I must pay all applicable fees for requesting information for a non-program-related purpose.**

***Signature:** Sherman Carter ***Date:** 11-19-19

****Address:** ****Daytime Phone:**

**Relationship (if not the subject of the record):** ****Daytime Phone:**

Witnesses must sign this form ONLY if the above signature is by mark (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1.Signature of witness | 2.Signature of witness |
|---|---|
| Brenda Pannell | [illegible] |
| Address(Number and street,City,State, and Zip Code) | Address(Number and street,City,State, and Zip Code) |
| 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |

**Form SSA-3288** (11-2016) uf

Social Security Administration

**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

**Instructions for Using this Form**

Complete this form only if you want us to give information or records about you, a minor, or a legally incompetent adult, to an individual or group (for example, a doctor or an insurance company). If you are the natural or adoptive parent or legal guardian, acting on behalf of a minor child, you may complete this form to release only the minor's non-medical records. We may charge a fee for providing information unrelated to the administration of a program under the Social Security Act.

**NOTE:** Do not use this form to:

- Request the release of medical records on behalf of a minor child. Instead, visit your local Social Security office or call our toll-free number, 1-800-772-1213 (TTY-1-800-325-0778), or
- Request detailed information about your earnings or employment history. Instead, complete and mail form SSA-7050-F4. You can obtain form SSA-7050-F4 from your local Social Security office or online at www.ssa.gov/online/ssa-7050.pdf.

**How to Complete this Form**

We will not honor this form unless all required fields are completed. An asterisk (*) indicates a required field. Also, we will not honor blanket requests for "any and all records" or the "entire file." You must specify the information you are requesting and you must sign and date this form. We may charge a fee to release information for non-program purposes.

- Fill in your name, date of birth, and social security number or the name, date of birth, and social security number of the person to whom the requested information pertains.
- Fill in the name and address of the person or organization where you want us to send the requested information.
- Specify the reason you want us to release the information.
- Check the box next to the type(s) of information you want us to release including the date ranges, where applicable.
- For non-medical information, you, the parent or the legal guardian acting on behalf of a minor child or legally incompetent adult, must sign and date this form and provide a daytime phone number.
- If you are not the individual to whom the requested information pertains, state your relationship to that person. We may require proof of relationship.

**PRIVACY ACT STATEMENT**

Section 205(a) of the Social Security Act, as amended, authorizes us to collect the information requested on this form. We will use the information you provide to respond to your request for access to the records we maintain about you or to process your request to release your records to a third party. You do not have to provide the requested information. Your response is voluntary; however, we cannot honor your request to release information or records about you to another person or organization without your consent. We rarely use the information provided on this form for any purpose other than to respond to requests for SSA records information. However, the Privacy Act (5 U.S.C. § 552a(b)) permits us to disclose the information you provide on this form in accordance with approved routine uses, which include but are not limited to the following:

1. To enable an agency or third party to assist Social Security in establishing rights to Social Security benefits and or coverage;
2. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level;
3. To comply with Federal laws requiring the disclosure of the information from our records; and,
4. To facilitate statistical research, audit, or investigative activities necessary to assure the integrity of SSA programs.

We may also use the information you provide when we match records by computer. Computer matching programs compare our records with those of other Federal, State, or local government agencies. We use information from these matching programs to establish or verify a person's eligibility for Federally-funded or administered benefit programs and for repayment of incorrect payments or overpayments under these programs. Additional information regarding this form, routine uses of information, and other Social Security programs is available on our Internet website, www.socialsecurity.gov, or at your local Social Security office.

**PAPERWORK REDUCTION ACT STATEMENT**

This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 3 minutes to read the instructions, gather the facts, and answer the questions. **SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. You can find your local Social Security office through SSA's website at www.socialsecurity.gov. Offices are also listed under U.S. Government agencies in your telephone directory or you may call 1-800-772-1213 (TYY 1-800-325-0778).** You may send comments on our time estimate above to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. ***Send only comments relating to our time estimate to this address, not the completed form.***

**Form SSA-3288** (11-2016) uf
Destroy Prior Editions

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

February 13, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
c/o Theresa Henderson
Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
*ATTN: Document Request*

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

Dear Ms. Henderson:

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

I received your January 14, 2020, correspondence regarding this matter granting my first request for additional time to submit information relevant to and in support of Mr. Carter's claim and second level appeal. We greatly appreciate Lincoln's grant of additional time to provide information relevant to the appeal.

In our January 8, 2020, submission, we provided additional medical records obtained from Mr. Carter's treating cardiologist, Dr. Faulkner. In addition, I requested additional information from Lincoln as follows:

> As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

---

I have not received a response to my inquiry regarding to which medical records Lincoln is referring above. I have assumed that Lincoln was referring to electronic radiology records, which I requested from Dr. Faulkner's office on December 13, 2020. I have yet to receive those records but have been in constant communication with Dr. Faulkner's office. My client has an appointment today at 3:45 pm with Dr. Faulkner and I believe he will be receiving these records. Are these the records Lincoln needs?

We respectfully request another 2 weeks to ensure we have all the records available in support of Mr. Carter's claim. Understand please that we have worked diligently to obtain these records and others so that we and Lincoln can ensure Mr. Carter's appeal is given a full and fair review. We also have requested the Social Security Administration file (requested November 19, 2019) which Lincoln noted was not provided or included on the claim file. We would like to provide this information but need more time as the activity of the Social Security Administration is beyond our control. Please advise of this extension request and thank you in advance for your assistance.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

Paula Bethge
901.576.1780
pbethge@glankler.com

December 13, 2019

**HAND DELIVERY**
Physicians of Heart
Attn: Radiology Records Custodian
6005 Park Avenue, Suite 702
Memphis, Tennessee 381119

Re: **For Immediate Attention - Medical Records Request**
Patient: Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Pursuant to your telephone conversation with Don Hearn yesterday regarding our client, Sherman Carter who is a patient of Dr. Faulkner, enclosed is a blank DVD. Please produce copies of all radiology and studies performed on Mr. Carter, including but not limited to the study that was done on November 1, 2018. A copy of that report is also enclosed. Additionally, I have enclosed a copy of our written request for records and medical authorization and release that was sent to your office on November 19, 2019.

Please provide us with these requested records immediately as we are under a strict deadline pertaining to Mr. Carter's disability benefits. Additionally, please call me at (901) 576-1780 when this request is complete and I will have someone from our office pick the records up from your clinic. Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

GLANKLER BROWN, PLLC
Paula Bethge
Paula Bethge, Litigation Paralegal

PCB:

**GENERAL MEDICAL RELEASE AND AUTHORIZATION
IN COMPLIANCE WITH FEDERAL GUIDELINES INCLUDING HIPAA**

Physicians of Hearts
TO: Attn: Medical Records Custodian

6005 Park Avenue, Suite 702

Memphis, Tennessee 38119

I, **SHERMAN CARTER**, hereby authorize you to disclose and release the following protected health information to any Partner, Associate or Paralegal of Glankler Brown, PLLC, 6000 Poplar Avenue, Suite 400, Memphis, Tennessee 38119: **WRITTEN MEDICAL RECORDS:** any and all medical records, all inpatient and outpatient charts and records, hospital charts and records, doctor and nurse notes, emergency room records, correspondence, memoranda, physical therapy and rehabilitation records, patient questionnaire forms, patient history forms, social service records, laboratory reports, diagnostic reports. **RADIOLOGY:** written reports of any and all x-rays, MRI films, CAT scans, brain scans, and EKG tracings in all forms. **PRESCRIPTION RECORDS:** any and all prescription records, the issuance of sale of prescription drugs, original doctor's prescription forms, refill records and pharmacy records. **PROTOCOL:** any and all documents describing the protocol and criteria for administration and interpretation of diagnostic tests or imaging. **BILLING:** any and all billing records, including itemized statements of charges, payments, all insurance records, including all claims, claim forms, correspondence, payments and reports. I agree that a copy of the original of this General Medical Release (the "Medical Release") shall be as effective and valid as the original. I further understand and agree that this Medical Release is in full compliance with all HIPAA regulations and complies fully with the requirements of 45 CFR § 164.508, as detailed below:

I understand that any disclosure of records concerning diagnosis and/or treatment related to alcohol and/or drug abuse is covered by Title 42 of the Code of Federal Regulations. If any records contain information governed by Title 42 CFR Part 2, I authorize the release of such information as indicated above.

I understand that the above named party to whom I authorize the release of these records is not a health care provider or a health care plan, and that the said party may re-disclose the information it receives without violation any federal or state privacy laws.

I understand that I have the right to revoke this Medical Release at any time by submitting a written revocation to any entity that provides information pursuant to this Medical Release, except for when the entity has already relied on my authorization to make a use or disclose. My written revocation will become effective once the specified entity receives and processes it.

This Medical Release is executed by me at this time for purposes of litigation.

I understand that the information to be released includes any and/or all information and records as stated in the opening paragraph of this Medical Release.

I understand that I have the right to inspect, copy, and/or amend information to be used or disclosed.

I understand that I am entitled to retain a copy of this Medical Release for my own records.

I direct that this Medical Release shall expire at the conclusion of the current litigation. Once this Medical Release expires, my health information is not to be used and/or disclosed for the described purposes, unless I sign a new Medical Release.

I understand that treatment and payment may not be conditioned on my authorization and/or execution of this Medical Release.

Execution of this document does not authorize communication with the healthcare provider other than for the provision of medical records.

Sherman Carter

SHERMAN CARTER

Date: 11-19-19

Date of Birth:

SSN:

STATE OF TENNESSEE
COUNTY OF SHELBY

Sworn to and subscribed before me this 19th day of November, 2019.

Brenda K. Parnell
Notary Public

BRENDA K PARNELL STATE OF TENNESSEE NOTARY PUBLIC SHELBY COUNTY My Commission Expires 04-01-2023

My Commission Expires:

April 1, 2023

GLANKLER
BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Paula Bethge**
**901.576.1780**
**pbethge@glankler.com**

November 19, 2019

Social Security Administration
1330 Monroe Avenue
Memphis, Tennessee 38104-9918

Re: Request for SSA File
Sherman Carter
Date of Birth:
SSN:

Dear Sir/Madam:

Enclosed is a Consent for Release of Information executed by our client, Sherman Carter. We are requesting any and all information requested on this form for the time period of 11/05/2005 to 11/12/2019.

Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

**GLANKLER BROWN, PLLC**

Paula Bethge

Paula Bethge, Litigation Paralegal

PCB:

Social Security Administration

# Consent for Release of Information

Form Approved
OMB No. 0960-0566

You must complete all required fields. We will not honor your request unless all required fields are completed. (*Signifies a required field. **Please complete these fields in case we need to contact you about the consent form).

**TO: Social Security Administration**

| Sherman Carter | | |
|---|---|---|
| *My Full Name | *My Date of Birth (MM/DD/YYYY) | *My Social Security Number |

I authorize the Social Security Administration to release information or records about me to:

| *NAME OF PERSON OR ORGANIZATION: | *ADDRESS OF PERSON OR ORGANIZATION: |
|---|---|
| Don L. Hearn, Esq. | 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 |
| Glankler Brown, PLLC | 6000 Poplar Ave., Ste. 400,Memphis, TN 38119 |
| | |

***I want this information released because:** Appeal of long term disability claim

We may charge a fee to release information for non-program purposes.

***Please release the following information selected from the list below:**
**Check at least one box. We will not disclose records unless you include date ranges where applicable.**

1. ☐ Verification of Social Security Number
2. ☒ Current monthly Social Security benefit amount
3. ☒ Current monthly Supplemental Security Income payment amount
4. ☒ My benefit or payment amounts from date 11/05/2005 to date 11/12/2019
5. ☒ My Medicare entitlement from date 11/05/2005 to date 11/12/2019
6. ☒ Medical records from my claims folder(s) from date 11/05/2005 to date 11/12/2019

   If you want us to release a minor child's medical records, do not use this form. Instead, contact your local Social Security office.
7. ☒ Complete medical records from my claims folder(s)
8. ☒ Other record(s) from my file (We will not honor a request for "any and all records" or "the entire file." You must specify other records; e.g., consultative exams, award/denial notices, benefit applications, appeals, questionnaires, doctor reports, determinations.)

   benefit applications, questionnaires, consultative exams, correspondence, doctor reports
   medical records, determinations, award and denial notices

**I am the individual, to whom the requested information or record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult. I declare under penalty of perjury (28 CFR § 16.41(d)(2004) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000. I also understand that I must pay all applicable fees for requesting information for a non-program-related purpose.**

***Signature:** Sherman Carter ***Date:** 11-19-19

****Address:** ****Daytime Phone:**

**Relationship (if not the subject of the record):** ****Daytime Phone:**

Witnesses must sign this form ONLY if the above signature is by mark (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1.Signature of witness Brenda Parnell | 2.Signature of witness [signature] |
|---|---|
| Address(Number and street,City,State, and Zip Code) 6000 Poplar Ave., Ste. 400, Memphis, TN 38119 | Address(Number and street,City,State, and Zip Code) 6000 Poplar Ave., ste. 400, Memphis, TN 38119 |

Form SSA-3288 (11-2016) uf

Social Security Administration

## Consent for Release of Information

Form Approved
OMB No. 0960-0566

**Instructions for Using this Form**

Complete this form only if you want us to give information or records about you, a minor, or a legally incompetent adult, to an individual or group (for example, a doctor or an insurance company). If you are the natural or adoptive parent or legal guardian, acting on behalf of a minor child, you may complete this form to release only the minor's non-medical records. We may charge a fee for providing information unrelated to the administration of a program under the Social Security Act.

**NOTE:** Do not use this form to:

- Request the release of medical records on behalf of a minor child. Instead, visit your local Social Security office or call our toll-free number, 1-800-772-1213 (TTY-1-800-325-0778), or
- Request detailed information about your earnings or employment history. Instead, complete and mail form SSA-7050-F4. You can obtain form SSA-7050-F4 from your local Social Security office or online at www.ssa.gov/online/ssa-7050.pdf.

**How to Complete this Form**

We will not honor this form unless all required fields are completed. An asterisk (*) indicates a required field. Also, we will not honor blanket requests for "any and all records" or the "entire file." You must specify the information you are requesting and you must sign and date this form. We may charge a fee to release information for non-program purposes.

- Fill in your name, date of birth, and social security number or the name, date of birth, and social security number of the person to whom the requested information pertains.
- Fill in the name and address of the person or organization where you want us to send the requested information.
- Specify the reason you want us to release the information.
- Check the box next to the type(s) of information you want us to release including the date ranges, where applicable.
- For non-medical information, you, the parent or the legal guardian acting on behalf of a minor child or legally incompetent adult, must sign and date this form and provide a daytime phone number.
- If you are not the individual to whom the requested information pertains, state your relationship to that person. We may require proof of relationship.

**PRIVACY ACT STATEMENT**

Section 205(a) of the Social Security Act, as amended, authorizes us to collect the information requested on this form. We will use the information you provide to respond to your request for access to the records we maintain about you or to process your request to release your records to a third party. You do not have to provide the requested information. Your response is voluntary; however, we cannot honor your request to release information or records about you to another person or organization without your consent. We rarely use the information provided on this form for any purpose other than to respond to requests for SSA records information. However, the Privacy Act (5 U.S.C. § 552a(b)) permits us to disclose the information you provide on this form in accordance with approved routine uses, which include but are not limited to the following:

1. To enable an agency or third party to assist Social Security in establishing rights to Social Security benefits and or coverage;
2. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level;
3. To comply with Federal laws requiring the disclosure of the information from our records; and,
4. To facilitate statistical research, audit, or investigative activities necessary to assure the integrity of SSA programs.

We may also use the information you provide when we match records by computer. Computer matching programs compare our records with those of other Federal, State, or local government agencies. We use information from these matching programs to establish or verify a person's eligibility for Federally-funded or administered benefit programs and for repayment of incorrect payments or overpayments under these programs. Additional information regarding this form, routine uses of information, and other Social Security programs is available on our Internet website, www.socialsecurity.gov, or at your local Social Security office.

**PAPERWORK REDUCTION ACT STATEMENT**

This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 3 minutes to read the instructions, gather the facts, and answer the questions. **SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. You can find your local Social Security office through SSA's website at www.socialsecurity.gov. Offices are also listed under U.S. Government agencies in your telephone directory or you may call 1-800-772-1213 (TYY 1-800-325-0778).** You may send comments on our time estimate above to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. ***Send only comments relating to our time estimate to this address, not the completed form.***

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** February 13, 2020

**DELIVER TO:** Ms. Theresa Henderson
Specialist, Claims
The Lincoln National Life Insurance Company

**FACSIMILE NO.:** (402) 361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Please see attached regarding the above referenced.

TOTAL NUMBER OF PAGES (INCLUDING COVER): 9

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4817-6371-3196, v. 1

Date: Tue Feb 11 14:45:30 CST 2020
From: Theresa Henderson <Theresa.Henderson@lfg.com>
To: DHEARN@GLANKLER.COM
Message-ID: <1843853990.3.1581453931072.JavaMail.gman@ne1pldb101c>
Subject:Lincoln Financial Group Information for Claim 1150128075 (SECURE)

E-communication from Lincoln Financial Group

Lincoln Financial Group

LINCOLN FOR GROUP BENEFITS

# Important Information for Claim #1150128075

Please review the attached letter and/or document(s) regarding the Claim #1150128075 for Sherman Carter. You may submit claim forms and additional documentation via email to DisabilityClaims@LFG.com. If you have any questions regarding this information, please contact us at claims@lfg.com or 1-800-423-2765.

**Theresa Henderson**
**Specialist, Claims**
LN10-Lincoln National Life Insurance Co
8801 Indian Hills Drive
Omaha, NE 68114
Toll Free Phone: 1-800-423-2765 ext 7277
Phone: 800-423-2765 *7277
Fax: 402-361-1280
Email: Theresa.Henderson@lfg.com

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

©2013 Lincoln National Corporation

LincolnFinancial.com

You're In Charge℠

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

February 11, 2020

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 000010049220000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

This letter is in regard to your client's appeal claim for Long Term Disability benefits. Please refer to our letter dated 01/14/2020.

Your client's appeal is currently pending allowing you time to supplement the claim with documentation for review. Please have the medical records submitted to our office no later than 02/15/2020.

For your convenience, all documents may be sent via facsimile to 402-361-1460.

Please note that we are not making a final determination on Mr. Carter's disability claim at this time as we want to provide your client with every opportunity to submit a complete appeal.

Please contact me directly at 402-361-7277 with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Theresa Henderson
800-423-2765 *7277
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

©2020 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

CV RELEASE TEMPLATE for Professional Staff

Fil Castillo

BSEMS, RN BSN
Nebraska RN Licensed
Certifications in nursing: BLS, PALS, ACLS
Insurance industry certifications: HIPAAA, HCAFA

15 years of various nursing experience comprising of medical review consultants in individual and group health insurance, group life, short term and long term disability, critical illness and accident and medical/surgical, emergency and home health nursing

**CURRICULUM VITAE**
Steven Borzak, M.D.
July, 2014

| | | |
|---|---|---|
| **COLLEGE EDUCATION:** Oberlin College<br>Oberlin, Ohio | A.B. Physics Major | 1980 |

**POSTGRADUATE EDUCATION:**

| | | |
|---|---|---|
| University of Illinois<br>College of Medicine<br>Chicago, Illinois | M.D. | 1984 |

**POSTGRADUATE TRAINING:**

| | | |
|---|---|---|
| Michael Reese Hospital<br>Chicago, Illinois | Internship/Residency | 1984-1987 |
| Michael Reese Hospital<br>Chicago, Illinois | Chief Residency | 1987-1988 |
| Brigham and Women's Hospital<br>& Harvard Medical School<br>Boston, Massachusetts | Research/Clinical Fellowship<br>in Cardiology | 1988-1991 |

**SPECIALITY CERTIFICATION & CERTIFICATION NUMBERS:**

| | |
|---|---|
| National Board of Medical Examiners Parts I, II, III<br>Number 3-291-172-9 | 1985 |
| Diplomat, American Board of Internal Medicine | 1987 |
| Diplomat, American Board of Internal Medicine-<br>Cardiovascular Diseases No. 113677 | 1991 |
| Recertification | 2001, 2011 |

**FILE REVIEW, IME AND LITIGATION CONSULTATION**
Twenty-three years of experience with disability and causality file reviews
Completed 12 hour SEAK disability file review course 2/2010 led by Drs. Robert Anfield and Alan Neuren

Eight years of experience with IME evaluations
Twenty-three years of experience with medical malpractice file review and consultation
Expert Medical Advisor, Division of Workers' Compensation
State of Florida 2013

**STATE LICENSURE & CERTIFICATE NUMBERS:**
Florida License Registration No. ME 82182 2001

**SPECIAL AWARDS & HONORS:**

| | |
|---|---|
| 1984 | Alpha Omega Alpha |
| 1991-1992 | Teaching Excellence in Critical Care Medicine, Department of Internal Medicine, Henry Ford Hospital, Detroit, Michigan |
| 1992-1993 | Teaching Excellence in Critical Care Medicine, Department of Internal Medicine, Henry Ford Hospital, Detroit, Michigan |
| 1994-1995 | Teaching Excellence in Critical Care Medicine, Department of Internal Medicine, Henry Ford Hospital, Detroit, Michigan |
| 1995 | Mentor to Young Investigator Award, second place, to Mushabbar Syed, American College of Chest Physicians, October, 1996 |
| 1996-1997 | Teaching Excellence in Critical Care Medicine, Department of Internal Medicine, Henry Ford Hospital, Detroit, Michigan |
| 1997-1998 | Teaching Excellence in Critical Care Medicine, Department of Internal Medicine, Henry Ford Hospital, Detroit, Michigan |
| 1997-1998 | Cardiology Fellow's Appreciation Award for Outstanding Teaching Efforts, Heart & Vascular Institute, Henry Ford Hospital, Detroit, Michigan |
| 1998-1999 | Teaching Excellence in Critical Care Medicine, Department of Internal Medicine, Henry Ford Hospital, Detroit, Michigan |
| 1999 | Mentor to Merck Young Investigator Award, to Ajay Manhapra, Central Society for Clinical Research, September, 1999 |
| 1999 | Mentor to finalist, Elizabeth Barrett Connor Young Investigator Award for Clinical Epidemiology, to Ajay Manhapra, American Heart Association Scientific Sessions, November, 1999 |
| 2000-2001 | Best Teacher Award (from Cardiology Fellows), Henry Ford Heart and Vascular Institute, Detroit, MI |
| 2001 | Appreciation award for outstanding teaching and dedication to the Department of Internal Medicine, Henry Ford Hospital, Detroit, MI |
| 2000 | How to Find the Best Doctors, Florida |
| 2001 | America's Top Doctors (Castle Connolly Guide), 1st Edition |
| 2002 | America's Top Doctors (Castle Connolly Guide), 2nd Edition |
| 2002 | Top Physician, South Florida CEO Magazine |
| 2003 | America's Top Doctors (Castle Connolly Guide), 3rd Edition |
| 2003 | Top Physician, South Florida CEO Magazine |
| 2004 | America's Top Doctors (Castle Connolly Guide), 4th Edition |
| 2005 | America's Top Doctors (Castle Connolly Guide), 5th Edition |
| 2006 | Best Doctors, Boca Life Magazine, May, 2006 |
| 2006 | Best Doctors, Gold Coast Magazine, May, 2006 |
| 2006 | America's Top Doctors (Castle Connolly Guide), 6th Edition |
| 2006 | Attending of the Year (Teaching Award from Family Practice, Internal Medicine |

| | |
|---|---|
| | Residents), Columbia Hospital and Palm Beach Center for Graduate Medical Education, West Palm Beach, FL |
| 2007-2014 | Best Doctors, Boca Life, Palm Beacher, Gold Coast Magazines, June 2007 |
| 2007 | America's Top Doctors (Castle Connolly Guide), 7th Edition |
| 2008 | America's Top Doctors (Castle Connolly Guide), 8th Edition |
| 2009 | America's Top Doctors (Castle Connolly Guide), 9th Edition |
| 2010 | America's Top Doctors (Castle Connolly Guide), 10th Edition |
| 2011 | America's Top Doctors (Castle Connolly Guide), 11th Edition |
| 2012 | America's Top Doctors (Castle Connolly Guide), 12th Edition |
| 2013 | America's Top Doctors (Castle Connolly Guide), 13th Edition |
| 2014 | America's Top Doctors (Castle Connolly Guide), 14th Edition |

**HOSPITAL POSITIONS:**

| | |
|---|---|
| July, 2001-<br>Present | CARDIOLOGIST<br>Bethesda Hospital, Boynton Beach, Florida |
| July, 2001-<br>Present | CARDIOLOGIST<br>JFK Hospital, Atlantis, Florida |

**CURRENT FACULTY POSITIONS:**

| | |
|---|---|
| 2014-present | CLINICAL PROFESSOR<br>Nova Southeastern College of Medicine, Ft. Lauderdale, FL |
| 2013-present | AFFILIATE PROFESSOR OF CLINICAL BIOMEDICAL SCIENCE<br>Charles E. Schmidt College of Medicine<br>Florida Atlantic University, Boca Raton, FL |
| 2013-present | VOLUNTARY PROFESSOR OF MEDICINE<br>University of Miami Miller School of Medicine<br>Miami, FL |

**RECENT LEADERSHIP POSITIONS:**

| | |
|---|---|
| 2001-2002 | Cardiothoracic Surgery Morbidity and Mortality Committee, JFK Hospital, Atlantis, FL |
| 2002-2003, 2008 | Special Care Committee, JFK Hospital, Atlantis, FL |
| 2004 | Pharmacy and Therapeutics Committee, JFK Hospital, Atlantis, FL |
| 2005 | Critical Care Committee, JFK Hospital, Atlantis, FL |
| 2006 | Special Care Committee, JFK Hospital, Atlantis, FL |
| 2006-2007 | Heart Institute Development Team, Bethesda Hospital, Boynton Beach, FL |
| 2006-2007 | Blood Committee, JFK Hospital, Atlantis, FL |
| 2006-2007 | Cardiovascular Multidisciplinary Team, JFK Hospital, Atlantis, FL |

| | |
|---|---|
| 2006 | Nominee, Chairman of Medicine, JFK Hospital, Atlantis, FL |
| 2006 | CT Angiography Development Committee, JFK Hospital, Atlantis, FL |
| 2005, 2007-present | Professional Education Committee, JFK Hospital, Atlantis, FL |
| 2007-2011 | Cardiovascular Services Committee, Bethesda Hospital, Boynton Beach, FL |
| 2007-present | Formulary Committee, Bethesda Hospital, Boynton Beach, FL |
| 2008-present | Research Committee, JFK Hospital, Atlantis, FL |
| 2010-2014 | Medical Executive Committee, JFK Hospital, Atlantis, FL |
| 2010-2011 | Secretary/Treasurer, Medical Staff, JFK Hospital, Atlantis, FL |
| 2010-2011 | Computerized Physician Order Entry Committee, JFK Hospital, Atlantis, FL |
| 2012-present | Formulary Committee, JFK Hospital, Atlantis, FL |
| 2014-2015 | Chairman, Credentials Committee and Chief of Staff Elect<br>JFK Hospital, Atlantis, FL |

**PROFESSIONAL SOCIETIES/ORGANIZATIONS:**

| | |
|---|---|
| American College of Physicians | 1988 |
| Fellow | 1992 |
| Fellow, American College of Chest Physicians | 1992 |
| American College of Cardiology | 1991 |
| Fellow | 1993 |
| American Heart Association, Council on Clinical Cardiology | 1992 |
| Fellow | 1994 |
| American Heart Association, Council on Emergency Cardiac Care | 1999 |
| Central Society for Clinical Research | 1996 |
| American Medical Association | 1997 |
| American College of Physician Executives | 1999 |
| Florida Medical Society | 2001 |
| Palm Beach County Medical Society | 2001 |

**BIBLIOGRAPHY AND GRANT SUPPORT**

Available upon request

Date: Tue Jan 14 15:10:39 CST 2020
From: Theresa Henderson <Theresa.Henderson@lfg.com>
To: DHEARN@GLANKLER.COM
Message-ID: <1661690256.3.1579036239965.JavaMail.gman@ne1pldb101c>
Subject:Lincoln Financial Group Information for Claim 1150128075 (SECURE)

E-communication from Lincoln Financial Group

Lincoln Financial Group

LINCOLN FOR GROUP BENEFITS

# Important Information for Claim #1150128075

Please review the attached letter and/or document(s) regarding the Claim #1150128075 for Sherman Carter. You may submit claim forms and additional documentation via email to DisabilityClaims@LFG.com. If you have any questions regarding this information, please contact us at claims@lfg.com or 1-800-423-2765.

**Theresa Henderson**
**Specialist, Claims**
LN10-Lincoln National Life Insurance Co
8801 Indian Hills Drive
Omaha, NE 68114
Toll Free Phone: 1-800-423-2765 ext 7277
Phone: 800-423-2765 *7277
Fax: 402-361-1280
Email: Theresa.Henderson@lfg.com

Insurance products are issued by the insurance company affiliates of Lincoln Financial Group: The Lincoln National Life Insurance Company and Lincoln Life & Annuity Company of New York. The Lincoln National Life Insurance Company is not authorized in the state of New York. Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

©2013 Lincoln National Corporation

LincolnFinancial.com

You're In Charge℠

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

January 14, 2020

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

This is to acknowledge receipt of your client's appeal for Long Term Disability benefits. We received your letter on 01/08/2020

Your appeal letter indicates you will require additional time to supplement your client's appeal with additional medical documentation. We will allow you the additional time requested. Please understand the appeal review will not continue until we have received your additional documents or until such time as you communicate with Lincoln that your appeal is complete. Please submit the additional information by 02/15/2020.

In an effort to provide Mr. Carter's claim with a full and fair review, it would be your best interest to submit medical records for our review of your client's appeal. This may include office treatment notes, testing results, therapy notes and/or hospital notes. For specific details regarding the basis of our determination and the information previously reviewed, please refer to our letter dated 07/12/2019.

It is important that we have all available medical records so that we have a clear picture of Mr. Carter's condition.

Please submit any and all additional medical evidence that you believe would support your client's appeal. Please have the medical records submitted to our office no later than 02/15/2020.

If we do not receive the additional information by 02/15/2020, we will review the appeal and render a decision based upon the information currently available in Mr. Carter's file.

©2020 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

For your convenience, all documents may be sent via facsimile to 402-361-1460.

Please note that we are not making a final determination on Mr. Carter's disability claim at this time as we want to provide your client with every opportunity to submit a complete appeal.

As part of our review of your client's appeal, you may also submit information associated with your client's SSD Award for our consideration, which may include a complete copy of your client's administrative file from the Social Security Administration. The pursuit and submission of this information will be at your own cost and is optional.

Due to these special circumstances as noted above, an extension of time to process your client's appeal is required and we are exercising our right to take a 45-day extension under the Employee Retirement Income Security Act (ERISA) to decide the appeal once all documentation has been provided.

Please contact me directly at 402-361-7277 with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Theresa Henderson
800-423-2765 *7277
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number: 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

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

## If You Have Any Questions

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

NEOPOST
PRIORITY MAIL
01/08/2020
US POSTAGE $009.45⁰

ZIP 38119
041M11273286

Don L. Hearn, Jr.
GLANKLER
BROWN
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

JAN 1 3 2020

Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

JAN 1 3 2020

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

January 8, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter as Mr. Carter's second level appeal of Lincoln's decision to deny long term disability benefits beyond October 30, 2018. We disagree with Lincoln's determination that Mr. Carter is able to perform the main duties of any gainful occupation for which his is qualified as set forth in Lincoln's July 12, 2019 letter detailing its review of Mr. Carter's first level appeal. Lincoln cites two reports prepared by medical reviewers as the basis for its determination; however, these reports fail to address significant portions of Mr. Carter's medical records and misstate the findings of his treating physician in material respects. In addition, Mr. Carter's additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work.

Mr. Carter's medical file and the opinion of his treating cardiologist contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve. I have attached hereto additional medical records of Lee E. Faulkner, MD, the cardiologist who has treated Mr. Carter since 2004. *See collective Exhibit "A" hereto.* Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019.

For example:

1. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling,

grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong. (*October 3, 2018, Physician's Statement attached hereto as Exhibit "B"*).

2. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%). (*September 4, 2018, Attending Physician's Statement attached hereto as Exhibit "C"*).

3. On June 2, 2017, Dr. Faulkner opined Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger or handle. (*June 2, 2017, Attending Physician's Statement attached hereto as Exhibit "D"*).

4. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%). (*November 21, 2016, Attending Physician's Statement attached hereto as Exhibit "E"*).

Dr. Faulkner has consistently opined (and communicated these opinions to Lincoln) that Mr. Carter is totally disabled and cannot perform sedentary work. His office notes of November 1, 2018, among others, provide that Mr. Carter has problems standing and frequently has dizzy spells. Mr. Carter's condition is chronic and worsening. Accommodations at work will not help. He simply cannot work or he risks heart failure. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

We disagree with Lincoln's conclusion that no objective findings exist to support Mr. Carter's documented diagnosis of cardiomyopathy or heart failure with a secondary diagnosis of hypertension. On November 1, 2018, Dr. Faulkner performed an echocardiogram on Mr. Carter and determined that Mr. Carter has a severely depressed left ventricular systolic function with an ejection fraction of 20–25% and nonsustained ventricular tachycardia. Dr. Faulkner further determined that Mr. Carter has posterior wall akinesis and that his left atrium chamber is enlarged in size. Mr. Carter has had and continues to have documented symptoms of dizziness, shortness of breath, and chest pain.

Lincoln opines that Mr. Carter's symptoms and Dr. Faulkner's physical findings regarding his condition are not consistent with Dr. Faulkner's opinion that he cannot perform sedentary work. In Lincoln's July 12, 2019 letter, it relies upon notes from Dr. Faulkner's file stating, "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Lincoln's conclusions here are disingenuous and tantamount to cherry picking statements from medical records to rebut Dr. Faulkner's actual findings, conclusions, and diagnoses. Dr. Faulkner's physical examination of Mr. Carter and review of his symptoms notes are consistent with and support his medical opinion that Mr. Carter cannot perform sedentary work. A review of symptoms encompasses multiple areas of the body,

assessing the symptoms presented at that time of the examination and also considers the physical restrictions and limitations of that particular patient. It is not a measure of Mr. Carter's ability to perform the full-time duties of a sedentary occupation nor do the review of symptoms notes accurately assess the reasons for Mr. Carter's visits. For Lincoln to base a file review examination solely on review of symptoms notes is very narrow and inaccurate. Simply because on a certain day (appointment) Dr. Faulkner notes that Mr. Carter is not experiencing chest pain or dizziness at that moment does not alter or change Dr. Faulkner's opinion that he suffers from severely depressed left ventricular systolic function with an ejection fraction of 20–25%. Dr. Faulkner's opinion is based upon objective findings and the multiple echocardiograms he has performed on Mr. Carter over the course of over 14 years of treatment. Simply because Mr. Carter has a good day or week does not mean that his conditions are improved. If he exerts himself, he is symptomatic, which is why he cannot perform even sedentary work.

In addition, the opinions of Lincoln's medical reviewers do not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concludes that Mr. Carter is "capable of full time work based on the available data, but only in sedentary capacity, with **no walking**, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provides: "[T]he claimant can do sedentary work with **no walking**, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

Sedentary work as defined by the DOT requires walking occasionally (activity or condition exists up to 1/3 of the time); therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*See Dictionary of Occupational Titles info attached hereto as Exhibit "F"*). Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require walking or standing occasionally, up to 1/3 of a work day. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

Mr. Carter suffers from dyspnea on exertion and has a New York Heart Association Functional class III. The NYHA Functional Classification for this level of heart failure is described as moderate and defined as marked or noticeable limitation of physical activity, comfortable at rest, but less than

ordinary physical activity causes tiredness, heart palpations, or shortness of breath. *See attached medical journal articles for more information on this NYHA Functional Class III.*

As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

We request up to, and until February 15, 2020, within which to submit all documents and information relevant to Mr. Carter's appeal. This should provide enough time to allow Lincoln to identify the records it believes are not included and for us to obtain them. In addition, please provide the identity and curriculum vitae of the medical reviewers that authored the October 26, 2018 December 5, 2018, and May 28, 2109 reports. Please also describe each reviewer's business relationship with Lincoln and compensation arrangement as well as a copy of their bills for services rendered in this matter.

For the above reasons, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

## Progress Notes

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

**Date:** 02/06/19 : 09:27am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 02/06/19
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/90
Height: 6', Weight: 215 lbs
BMI: 29.16 kg/m2

**Subjective:**
This 52 year old male presents for follow up visit. He denies chest pain and has had no shortness. He complains of an episode of chest tightness after lifting items. He is here for interrogation of his Single chamber AICD .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**AICD interrogation** - Single chamber ICD. SVT nonsustained

**Plan:**

Continue current medication(s) at same dose

**Follow-up:** 6 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

EXHIBIT
A

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

**Procedure:** Office Visit Level 4 : 99214

# SIGNED BY Lee E Faulkner, MD (LF) 02/06/2019 09:52AM

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 11/01/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 130/80
Height 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**ECHO** - Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan:**

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Follow-up:** 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**:
**AICD Interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

\# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

**Date:** 04/03/17 : 04:04pm
**Title:** FOLLOW UP OFFICE VISIT

**Date**: 04/03/17
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 140/70

**Subjective**:
This 50 year old male presents for follow up visit. He denies chest pain and has had no shortness of breath. .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**: Interrogation of AICD -Non sustained V tach

**EKG** - Sinus bradycardia rate 59, Nonspecific Twave abnormality

**Plan**:
Interrogation of AICD (complete)

Continue current medication(s)

**Follow-up**: 3 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

**Visit Time**: 30

**Procedure:** Office Visit Level 4 : 99214

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 Fax: (901) 682-7243

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 11/01/2018 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 25% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

Lee E. Faulkner M.D./LB

ID:CA1967 Nov 1,2018 8:06 AM

Name:Carter Sherman

Sex:Male Birth Date:Jan 15-1967 51 Years

inch lb mmHg

Medication:

Symptoms:

History:

| | | | |
|---|---|---|---|
| Vent rate | | 76 | bpm |
| PR int | | 184 | ms |
| QRS dur | | 104 | ms |
| QT/QTc int | 388, | 418 | ms |
| P/QRS/T axis | 50 | 2 | 40 |
| RV5/SV1 amp | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | 2.910 | mV |

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11)
4564 Twave abnormality, possible lateral ischemia
(negative T (V1, V5))
9150 ** Abnormal ECG **

Unconfirmed Report
Reviewed by: [signature]

10 mm/mV 25 mm/s Filter: H60 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1550A 05 05 05 05 Dept: Exam:



# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/24/2004 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 40%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/24/04 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Tricuspid Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/18/2005 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 50% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/18/05 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Mild global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace mitral regurgitation, and trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Mitral Regurgitation
4. Trace Tricuspid Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred By:**
**Date:** 7/10/2006
**Race:** African American

### ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 50%**
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/10/06 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 7/12/2007
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 50%**
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/12/07 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global Hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Global Hypokinesis
3. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 09/24/2004 |
| **Sex:** Male | **Race:** African American |

## HISTORY and PHYSICAL

**HISTORY OF PRESENT ILLNESS:** Sherman Carter is a 37y/o African American gentleman who reports to our office for cardiac evaluation. Patient complains of chest pains. Patient reports that he has sharp chest pain on left side while radiating to back. Patient has no associated symptoms that has occurred with chest pain. Patient states that the chest pain experienced six days ago, was aggravated with sudden movement or change in position. Patient denies any shortness of breath, nausea, vomiting, dizziness or edema.

**PAST MEDICAL HISTORY:** Chest Pain

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did Not Bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

**PHYSICAL EXAMINATION: BP:** 122/88

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy
2. Mitral Regurgitation
3. Pre Hypertension

**PLAN:**

1. ECHO-today
2. EKG-today

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter **Date of Birth:**
**Date of Visit:** 09/24/2004 **Sex:** Male
**Referred by:** **Race:** African American

**Follow up office visit**

Sherman Carter is a 37-year old African American gentleman who presents to our office for a follow up visit for elevated blood pressure. Patient reports that he had migraines earlier this week. Patient takes medications to resolve issue. Patient states no complaints of shortness of breath, chest pain, nausea, vomiting or edema.

**Vitals: BP:** 122/88

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy

**PLAN:**

1. Follow up in 4 months

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/7/2005 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 37 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of short pain to left anterior chest. The pain occurs occasionally during high stress time. Episodes usually last a few seconds then subsides. He reports no other complaints at this time. He denies any headaches, dizziness, and chest pain, shortness of breath, nausea, dementia, diarrhea, or constipation.

**BP:** 135/72
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. MR
3. TR

**PLAN:**
1. Alcohol Cessation
2. Follow up in 4 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/6/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter states that he has been feeling good since his last visit. He reports no complaints at this time. He denies any palpitations, chest pain, shortness of breath, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 152/90
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Cardiomyopathy
3. Hypertension

**PLAN:**
1. Current Cardiac Care
2. ETOH Cessation encouraged
3. Follow up in 2 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter complains of occasional shortness of breath. He states that he has been doing ok and reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 100/60
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Follow up in 6 months

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter reports one episode of shortness of breath but reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 136/88
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Current Cardiac Care
2. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 4/3/2009 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 42 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter states that he has had some mild chest pain. He reports no other complaints at this time. He denies any palpitations, shortness of breath, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 140/70
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. EKG/ECHO

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/12/2011 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 46%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/12/11 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals no abnormalities.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 46%
2. Left Ventricle Enlargement
3. Right Ventricle Enlargement

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 55%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 55%
2. Left Ventricular Enlargement
3. Mild Tricuspid Regurgitation
4. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 12/10/2012
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 45%**
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is enlarged in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 45%
2. Left Ventricular Enlargement
3. Global Hypokinesis
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 20%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/4/15 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Severe global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 pulmonary insufficiency.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 20%
2. Left Ventricle Enlargement
3. Severe Global Hypokinesis
4. Mild Mitral Regurgitation
5. Mild Pulmonary Insufficiency

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 07/21/2016 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 20% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 07/21/2016 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall abnormality appreciated.

**Doppler:** Interrogation of the valvular apparatus reveals mild mitral regurgitation.

**SUMMARY:**

1. severely depressed left ventricular systolic function with an ejection fraction of 20%.
2. Left Ventricular Chamber enlarged in size
3. Mild Mitral Regurgitation

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of chest pain when lifting things, shortness of breath on exertion, edema in hands and some numbness. He also reports occasional dizziness. He reports no other complaints at this time. He denies any nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 130/74
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Dyspnea
3. Gouty Arthritis

**PLAN:**
1. ETOH Restriction
2. Treadmill Thallium Stress Test

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred By:**
**Date:** 12/10/2012
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, vomiting, dizziness, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 132/80
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE
**Data:** Stress test negative for ischemia

**IMPRESSION:**
1. Hypertension
2. Gouty Arthritis

**PLAN:**
1. ECHO due to reduction in EF as reported by stress test
2. Follow up in 1 month

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac clearance for left hip replacement. Mr. Carter complains of chest pain on the left side of his chest while laying down, states this last a few minutes. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:**

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 9/4/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 140/90 **HT:** 6'0" **WT:** 209lbs

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Severe cardiomyopathy, worse since last visit
2. Hypertension-blood pressure elevated

**PLAN:**

1. AICD Referral

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/30/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for hip surgery. Mr. Carter complains of chest pain but states that they are becoming better. He states that Dr. Lan did prescribe him medication to strengthen his heart. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 10/30/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 170/120

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Hypertension-blood pressure controlled
3. Severe Dilated Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 2 weeks to re-check blood pressure
3. Patient has a follow up appointment on November 10, 2015 and will be re-evaluated at that time

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 11/10/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for left hip replacement. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, dizziness, vomiting, palpitations, orthopnea, paroxysmal nocturnal dyspnea and/or edema.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 11/10/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 130/90

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 3 months

______________________________

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals**: **BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

Lee E. Faulkner M.D./LB

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Date of Birth:** |
| **Date of Visit:** 07/21/2016 | **Sex:** Male |
| **Referred by:** | **Race:** African American |

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain on left side of chest while doing yard work. Patient also complains of shortness of breath when outside , that lasts 10-15 minutes. Patient states no complaints of chest pain, dizziness, nausea, vomiting or edema.

**Vitals:** **BP:** 138/96

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Hypertension
2. Cardiomyopathy

**PLAN:**
1. Continue Current Cardiac Care

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/29/2016
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient states that he is chest pain free. Patient states no complaints of chest pain, shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals**: **BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. Degenerative Joint Disease of Hip

**PLAN:**

1. ETOH Cessation
2. Follow Up in 6 Months

Lee E. Faulkner M.D./LB

CARTER, SHERMAN

ID: 000002995 24-Sep-2004 10:37:06

37 years
Male Black

| | |
| --- | --- |
| Vent. rate | 66 bpm |
| PR interval | 138 ms |
| QRS duration | 94 ms |
| QT/QTc | 408/424 ms |
| P-R-T axes | 46 86 16 |

Normal sinus rhythm with sinus arrhythmia
Normal ECG

Technician: AF
Test ind:

Referred by: LEF

Unconfirmed




150 Hz 25.0 mm/s 10.0 mm/mV 4 by 2.5s + 3 rhythm lds MAC 8 001F 12SL™ v250

# Progress Notes

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**:
**AICD Interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

## Progress Notes
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Referred by:**
**Date of Birth:**
**Date:** 11/01/2018
**Sex:** Male
**Race:** African American

**ECHOCARDIOGRAM**

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 25%**
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Akinesis
4. Moderate Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

Lee E. Faulkner M.D./LB

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# SAINT FRANCIS HOSPITAL-MEMPHIS
## TREADMILL/STRESS

MR#: 1037968SFH

**NAME:** CARTER, SHERMAN
**ENCOUNTER NUMBER:** 34017913SFH
**ROOM NUMBER:**
**DATE OF BIRTH:**
**READING PHYSICIAN:** ANTONIO C. QUIROZ, MD
**PHYSICIAN:** LEE E FAULKNER

HISTORY OF PRESENT ILLNESS: A 45-year-old male, height 6 feet, weight 190 pounds. Patient has hypertension and has been having some chest pains.

MEDICATIONS: Include ramipril and digoxin.

INTERPRETATION: Baseline EKG shows sinus rhythm with a rate of 52 beats per minute and nonspecific ST-T abnormalities. Patient exercised 11 minutes on the standard Bruce protocol achieving 13.1 METS of workload. Exercise was stopped because of fatigue. There was no chest pain. Heart rate increased from 52-157, which is 90% of the age-predicted maximal heart rate. Blood pressure increased from 143/83-180/110 for a double product of 28,260. Cardiolite was injected approximately 1 minute prior to stopping the exercise. There were no significant ST-segment depressions, no arrhythmias. One isolated PVC was noted during the exercise. There was normalization of the T-waves during and after the exercise.

CONCLUSIONS: Negative for ischemia by EKG criteria.

Nuclear imaging interpretation will be dictated separately. Hypertensive response to exercise.

______________________
ANTONIO C. QUIROZ, MD

TIME:____________
DATE:____________

D: 11/26/2012 09:53 CST
T: 11/26/2012 10:34 CST
R:
Job#: 252986
D#: 7926695 FI

 ATTENDING COPYFAULKNER, LEE

SAINT FRANCIS HOSPITAL
5959 PARK AVENUE
MEMPHIS, TN 38119

Name: CARTER, SHERMAN
MRN: 001037868
ACCT: 034017913

ANDREW T. WATSON, MD
ADM: 11/26/2012

Diagnostic Imaging

DATE OF EVALUATION: 11/26/2012

REFERRING PHYSICIAN: Lee Faulkner, M.D.

REASON FOR EVALUATION: Chest pain.

BRIEF HISTORY OF PRESENT ILLNESS: A 45-year-old African-American male who presents for evaluation with prior history of hypertension, no known coronary artery disease.

DESCRIPTION OF PROCEDURE: After obtaining written informed consent, patient underwent a Bruce protocol stress evaluation. Total exercise time was 11 minutes. Total METs obtained was 13.1.

This was a 1-day study. Rest images obtained using 3.1 mCi thallium to 1 stress image obtained using 30.2 mCi sestamibi technetium-99. Rest and stress images were compared.

Short axis, vertical long axis, horizontal long axis images appear to be well perfused and well matched. There is evidence of apical thinning. Otherwise, there is no evidence of overt segmental wall ischemia. Myocardial perfusion bull's eye map confirms the above finding. Myocardial perfusion gated study demonstrates mild-to-moderate global hypokinesis, ejection fraction calculated at 35%. Raw data cine analysis demonstrates no significant motion or other artifacts present.

OVERALL IMPRESSION: Abnormal Bruce protocol Cardiolite examination demonstrating no evidence of ischemia and ejection fraction estimated at 35%.

ANDREW T. WATSON, MD

Date: ________ and Time: ________

TR:ATW/SN
DD:11/26/2012 16:25 CST
DT:11/26/2012 19:00 CST
Dictation ID: 7930950/Confirmation #: 253112

Work Type: Diagnostic Imaging
T001

Work Type Code: DGI
Page: 1

PRINTED BY: PDacus

DATE 12/10/2012

2009 Oct 09 08:51 AM Central Scheduling 9017653296 1/2

Saint Francis Hospital
Memphis

1000-52

| DATE | TIME | PHYSICIAN'S ORDERS | DATE | TIME | PROGRESS RECORD |
|---|---|---|---|---|---|
| 11-19-12 | | Treadmill Thallium Stress Test<br><br>Dia. Chest Pain<br><br>Date - 11-19-12<br>Time - 8:30<br>Arrival - 8:00<br><br>No Precert Required per Tiwana c United Healthcare 10 25 12<br>Height - 6'<br>Weight<br><br>Physician's Signature: Lee E Faulkner NP<br><br>Date: _____ Time: _____ | | | |

Medications dispensed in accordance with the hospital formulary system

Carter, Sherman

MR# DOB:

PHYSICIAN ORDERS/PROGRESS RECORDS

R8/07

ID:CAP067 Nov-1-2018 8:06 AM
Name:Carter Sherman
Sex:Male Birth Date:Jan 15 1967 51 Years
inch lb mmHg
Medications:
Symptoms:
History:

| | | | | |
|---|---|---|---|---|
| Vent rate | | | 76 | bpm |
| PR int | | | 184 | ms |
| QRS dur | | | 104 | ms |
| QT/QTc int | | 388 | 418 | ms |
| P/QRS/T axis | 30 | 2 | 30 | |
| RV5/SV1 amp | | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | | 2.910 | mV |

1100 Sinus rhythm
1571 with frequent ventricular premature complexes (wide QRS dur, ectopic beat with shortened PR int (beat 3, 6, 11)).
1561 T wave abnormality - possible lateral ischemia (negative T (V4, V5))
9150 ** abnormal ECG **

Unconfirmed Report
Reviewed by: [signature]

10 mm/mV 25 mm/s Filter: 50.0 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1350A 05 05 03 05 Dept: Room:

Name Carter Sherman ID:131767 Jul 26 2013 1:01 PM 50 bpm
Sex Male Birth date:
inch lb mmHg
Medication 1
Medication 2
Room No

1100 Sinus rhythm
1068 Nonspecific T wave abnormality
9140 ** Borderline ECG **

| | | | |
|---|---|---|---|
| Vent | rate | | 60 bpm |
| PR | int | | 158 ms |
| QRS | dur | | 102 ms |
| QT/QTc | int | 401 | 407 ms |
| P-QRS-T | axis | 15 97 | 22 |
| RV5/SV1 | amp | 1.870 | 0.993 mV |
| RV5+SV1 | amp | | 2.863 mV |

c67

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz H 60 d 10 mm/mV 10 mm/mV 10 mm/mV



LFG Omaha Fax 10/3/2018 3:20:25 PM PAGE 4/004 Fax Server

Oct 03 18, 01:12p p.3

REF #3043267

Lincoln Financial Group

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

EXHIBIT B

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

Indicate frequency per day the listed activities below can be used performed using:
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A

What job modifications would allow the patient to return to work?

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

N/A

Continence ___/___/___

Dressing ___/___/___

Transferring ___/___/___

Bathing ___/___/___

Toileting ___/___/___

Eating ___/___/___

Date patient experienced loss of Cognitive Functioning: ___/___/___

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

___/___/___ to ___/___/___

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

901-682-7241
Phone Number

901-682-7243
Fax Number

[signature] Lee E Faulkner MD
Signature

__/__/__
Date

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)

LFG Omaha Fax 9/4/2018 11:50:52 AM PAGE 3/003 Fax Server

Sep 04 18, 09:43a

p.2

REF #2991745

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 25, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical- Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments:
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation.
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (circled) Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments (if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed [signature] MD (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

00000315 LFPH3GD1 00000970

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450PTD

EXHIBIT C

Page 1 of 3
10/10

PAGE 3/3 * RCVD AT 9/4/2018 11:50:51 AM [Central Daylight Time] * SVR:NE1PWFAX101/0 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):00-52

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 4/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.3

REF #1989621

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

EXHIBIT D

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

(To Avoid Delay Please Answer ALL Questions)
(This form is to be completed without expense to the Company and returned by ______________ )

Claim No: 1150128075 Policy No: 000010049220000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen?

Has patient ever had same or similar condition? Yes No If yes, state when and describe.

(a) Diagnosis (including ICD Code(s)) Cardiomyopathy

(b) Subjective Findings Worsening Dyspnea

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

(a) Date of First visit Sept. 25, 2005 (b) Date of Last visit April 3, 2017 (c) Frequency of visits Weekly Monthly Other (specify) Q2 to 6 months or more

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

(b) Mental Impairments (if applicable)

(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association) Class 1 (No limitation) Class 2 (Slight limitation) Class 3 (Marked limitation) Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 140/70 systolic/diastolic

Has patient Recovered? Improved? Unchanged? Retrogressed? (circled) Worsening

(b) Has patient been hospital confined? Yes No (circled) Delete
If Yes, give Name and Address of Hospital
Confined from ______________ to ______________
Several Hospitalizations over the years

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 5/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.4

REF #1989621

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled? (b) Date you are medically certifying patient unable to work.
Patient's Job (Yes) No
Any other work (Yes) No

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months (Never)
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received
- Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
- Dressing ________ (putting on, taking off garmets, braces or any artificial limbs normally worn)
- Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
- Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
- Continence ________ (voluntarily maintaining control of bladder and bowel function)
- Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ________________
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

| Name (Attending Physician) Print | Degree | Telephone Number | |
|---|---|---|---|
| Lee E. Faulkner | MD | | |
| Street Address | City or Town | State TN | Zip Code |
| Signature (By Physician) Lee E. Faulkner, MD | | Date 5/29/17 | |





00000012 LFPV6UT1 00000110

Lincoln Financial Group®

Please Return Response To:
The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765

## ABILITIES FORM

Patient Name: Sherman Carter Date of Birth:

Occupation: Claim Number: 1150128075

Date of Last Office Visit: April 3, 2017 Date of Next Office Visit:

☐ The patient does not have functional/limitations or restrictions

Provider's Signature: Lee E Faulkner, MD Date:

Provider Printed Name: Lee E Faulkner, MD Degree: ☒MD ☐DO Other

Specialty: Cardiology Phone:

OR

☐ The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | ~~✓~~ LE | ✓ | | |
| 11 - 20 lbs. | ✓ | | | |
| 21 - 35 lbs. | ✓ | | | |
| 36 - 50 lbs. | ✓ | | | |
| 51 - 100 lbs. | ✓ | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | | |
| Stand | | | | | |
| Walk | | | | | |
| Climb | | | | | |
| Bend | | | | | |
| Kneel | | | | | |
| Drive | | | | | |
| Finger | | | | | R / L / Both |
| Handle | | | | | R / L / Both |
| Operate Foot Controls | | | | | R / L / Both |
| Reach above the shoulder | | | | | R / L / Both |

N/A

Are there environmental factors that the patient should avoid? ☐Yes ☐No Specify:

Specific Limitations or Restrictions not noted above: No lifting or straining whatsoever as his condition is worsening over time.

The above statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud and Warning Statements.

Provider's Signature: Lee E Faulkner MD Date: 5/24/17

Provider Printed Name: Lee E. Faulkner, MD Degree: ☒MD ☐DO Other

Specialty: Cardiology Phone: 901 682-7241

Address: 6005 Park Ave Ste 702 Memphis, TN 38119

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BARDETT LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any)
Cardiomyopathy, HTN
3. a) Date of First Treatment Sept 25, 2005
b) Date of Most Recent Treatment Sept 29, 2016
c) Frequency of Treatments Q 2 to 6 months or more
d) Type of Treatment Rendered Medical – Cardiology
e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
If the patient is still disabled, when should the patient be able to return to work? unknown
5. Remarks or Comments: ______
6. List Restrictions and Limitations: Medical therapy for now. Severe limitation
7. Physical Impairment:
Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
Class 2 – Medium manual activity (15 – 30%)
Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
✓ Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 11/24/16 (Month Day Year) Signed N. Lee E. Faulkner MD (Attending Physician, No Stamps, please) Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN
Phone Number 901-682-7241
Fax Number 901-682-7243



EXHIBIT
tabbles
E

Lincoln Financial Group®

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765
www.LincolnFinancial.com

## ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)

*(To Avoid Delay Please Answer ALL Questions)*

(This form is to be completed without expense to the Company and returned by_______________ )

Claim No: 1150128075 Policy No: 00001004922000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen? Aug 2015

Has patient ever had same or similar condition? Yes (No) If yes, state when and describe.

(a) Diagnosis (including ICD Code(s))

(b) Subjective Findings

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)
Severely depressed EF of 20% by Echocardiogram

(a) Date of First visit Sept 25, 2005
(b) Date of Last visit July 15, 2016
(c) Frequency of visits
Weekly
Monthly
✓ Other (specify) every 2-3 months

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)
- Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
- Class 2 - Medium manual activity* (15-30%)
- *Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)*
- ✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

*(b) Mental Impairments (if applicable)*
- (a) Please define "stress" as it applies to this claimant.
- (b) What stress and problems in interpersonal relations has claimant had on job?
- Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
- Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
- Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
- Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
- Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
- *Class 1 (No limitation)*
- *Class 2 (Slight limitation)*
- Class 3 (Marked limitation)
- ✓ Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 120/80 *systolic/diastolic*

Has patient Recovered? Improved? ✓ Unchanged? Retrogressed?

(b) Has patient been hospital confined? Yes (No)
If Yes, give Name and Address of Hospital

Confined from ____________ to ____________

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes (No) If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received
Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
Continence ________ (voluntarily maintaining control of bladder and bowel function)
Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes (No)

(c) When could patient return to work? Unknown
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations
Medical Therapy for now

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner, MD
Degree: Medical Doctor
Telephone Number: 901-682-7241
Street Address: 6005 Park Ave, Ste 702
City or Town: Mphs
State: TN
Zip Code: 38119
Signature (By Physician): Lee E Faulkner, MD
Date

## Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Carter, Sherman
**Date of Visit:** 09/29/2016
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman present for follow up visit. Mr. Carter states that he is chest pain free. He has no complaints of vomiting, dizziness, palpitation, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. DJD of Hip

**PLAN:**

1. ETOH cessation
2. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 7/5/2016
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman who is present today for a follow up visit. Mr. Carter complains of chest pain in the middle of his chest with activity, states this last 10 minutes. He reports no other complaints at this time. He denies any shortness of breath, dizziness, palpitations, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** BP: 120/80 **HT:** 6'1" **WT:** 212lbs

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis, edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy (Non-Ischemic)

**PLAN:**

1. Current Cardiac Care

______________________
Lee E. Faulkner M.D.

AdChoices GED Classes Math Skills Math Problems




## Dictionary Of Occupational Titles
## Appendix C: Components of the Definition Trailer

APPENDIX C

COMPONENTS OF THE DEFINITION TRAILER

I. DATE OF LAST UPDATE (DLU)

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

The following descriptions of the components of the Definition Trailer are in inverse order to their placement in the trailer.

I. DATE OF LAST UPDATE (DLU)

Listed as the final element in the trailer following the definition, the Date of Last Update indicates the last year in which material was gathered for that occupation. A DLU of "77" would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977.

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. *Vocational education (high school; commercial or shop training; technical school; art school; and that* part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

EXHIBIT F

The following is an explanation of the various levels of specific vocational preparation:

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Note: The levels of this scale are mutually exclusive and do not overlap.

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

Scale of General Education Development (GED)

06 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

06 MATHEMATICAL DEVELOPMENT

Advanced calculus:

Work with limits, continuity, real number systems, mean value theorems, and implicit functions theorems.

Modern Algebra:

*Apply fundamental concepts of theories of groups, rings, and fields. Work with differential equations, linear* algebra, infinite series, advanced operations methods, and functions of real and complex variables.

Statistics:

Work with mathematical statistics, mathematical probability and applications, experimental design, statistical inference, and econometrics.

06 LANGUAGE DEVELOPMENT

Same as Level 5.

05 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables. 05 MATHEMATICAL DEVELOPMENT

Algebra:

Work with exponents and logarithms, linear equations, quadratic equations, mathematical induction and binomial theorem, and permutations.

Calculus:

Apply concepts of analytic geometry, differentiations, and integration of algebraic functions with applications.

*Statistics:*

Apply mathematical operations to frequency distributions, reliability and validity of tests, normal curve, analysis of variance, correlation techniques, chi-square application and sampling theory, and factor analysis.

05 LANGUAGE DEVELOPMENT

Reading:

Read literature, book and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.

Writing:

Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.

Speaking:

Coversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

04 LEVEL REASONING DEVELOPMENT

Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

04 MATHEMATICAL DEVELOPMENT

Algebra:

Deal with system of real numbers; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity; and probability and statistical inference.

Geometry:

Deductive axiomatic geometry, plane and solid, and rectangular coordinates.

Shop Math:

Practical application of fractions, percentages, ratio and proportion, measurement, logarithms, slide rule, practical algebra, geometric construction, and essentials of trigonometry.

04 LANGUAGE DEVELOPMENT

Reading:

Read novels, poems, newspapers, periodicals, journals, manuals, dictionaries, thesauruses, and encyclopedias.

Writing:

Prepare business letters, expositions, summaries, and reports, using prescribed format and conforming to all rules of punctuation, grammar, diction, and style.

Speaking:

Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. *Deal with problems involving several concrete variables in or from standardized situations.*

03 MATHEMATICAL DEVELOPMENT

Compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage. Calculate surfaces, volumes, weights, and measures.

Algebra:

*Calculate variables and formulas; monomials and polynomials; ratio and proportion variables; and square roots* and radicals.

Geometry:

Calculate plane and solid figures; circumference, area, and volume. Understand kinds of angles and properties of pairs of angles.

03 LANGUAGE DEVELOPMENT

Reading:

Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

Writing:

*Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.*

Speaking:

Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

02 LEVEL REASONING DEVELOPMENT

*Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.* Deal with problems involving a few concrete variables in or from standardized situations.

02 MATHEMATICAL DEVELOPMENT

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

02 LANGUAGE DEVELOPMENT

Reading:

Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Writing:

Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking:

Speak clearly and distinctly with appropiate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

01 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT

Add and subtract two digit numbers.

Multiply and divide 10's and 100's by 2, 3, 4, 5.

Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT

*Reading:*

Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

The Physical Demands Strength Rating reflects the estimated overall strength requirement of the job, expressed in terms of the letter corresponding to the particular strength rating. It represents the strength requirements which are considered to be important for average, successful work performance.

The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy. In order to determine the overall rating, an evaluation is made of the worker's involvement in the following activities:

a. Standing, Walking, Sitting

Standing - Remaining on one's feet in an upright position at a work station with-out moving about.

Walking - Moving about on foot.

Sitting - Remaining in a seated position.

b. Lifting, Carrying, Pushing, Pulling

Lifting - Raising or lowering an object from one level to another (includes upward pulling).

Carrying - Transporting an object, usually holding it in the hands or arms, or on the shoulder.

Pushing - Exerting force upon an object so that the object moves away from the force (includes slapping, striking, kicking, and treadle actions).

Pulling - Exerting force upon an object so that the object moves toward the force (includes jerking).

Lifting, pushing, and pulling are evaluated in terms of both intensity and duration. Consideration is given to the weight handled, position of the worker's body, and the aid given by helpers or mechanical equipment. Carrying most often is evaluated in terms of duration, weight carried, and distance carried.

Estimating the Strength factor rating for an occupation requires the exercise of care on the part of occupational analysts in evaluating the force and physical effort a worker must exert. For instance, if the worker is in a crouching position, it may be much more difficult to push an object than if pushed at waist height. Also, if the worker is required to lift and carry continuously or push and pull objects over long distances, the worker may exert as much physical effort as is required to similarly move objects twice as heavy, but less frequently and/or over shorter distances.

c. Controls

Controls entail the use of one or both arms or hands (hand/arm) and/or one or both feet or legs (foot/leg) to move controls on machinery or equipment. Controls include but are not limited to buttons, knobs, pedals, levers, and cranks.

Following are descriptions of the five terms in which the Strength Factor is expressed:

S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are

sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

V-Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work.

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work *requirements*.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

01 Artistic 05 Mechanical 09 Accommodating

02 Scientific 06 Industrial 10 Humanitarian

03 Plants-Animals 07 Business Detail 11 Leading-Influencing

04 Protective 08 Selling 12 Physical Performing

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

Download Google Chrome Browser

Chrome Safe Browsing will protect you from malicious sites.

DOWNLOAD

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables
- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/contents.html**

Translators on the www

| | Espa�ol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2003 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 05-Jun-03

CTR030418

CD-ROM OR DOWNLOAD DOT Android or Windows



CODE: **215.367-010** **Buy the DOT:Download**
TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

LEGAL

Drivers who switch to Allstate can save $356.

Allstate.

LEGAL

Drivers who switch to Allstate can save $356.

Allstate.

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page
- Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/21/215367010.html**

Language Translations
| | Espanol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

---

CODE: **215.367-010 Buy the DOT:Download** TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

CD-ROM OR DOWNLOAD DOT Android or Windows

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

| | | |
|---|---|---|
| A | B | C |
| D | E | F |
| G | H | I |
| J | K | L |
| M | N | O |
| P | Q | R |
| S | T | U |
| V | W | X |
| Y | Z | ? |

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **654.687-010** **Buy the DOT:Download**
TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

Ashley







- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/65/654687010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **654.687-010 Buy the DOT:Download** TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

[redacted]

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

The New York Heart Association (NYHA) Functional Classification scale associates a patient's heart failure according to the severity of the observable symptoms.

## New York Heart Association (NYHA) Functional Classification

The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification. It places patients in one of four categories based on the level of limitation during physical activity.

If the hospice diagnosis is heart disease, the NYHA classification should be Stage IV, to meet the criteria for hospice eligibility. Stage IV heart disease is characterized by symptoms of heart failure or anginal syndrome at rest. Symptoms include chest pain, dyspnea, weakness and inability to tolerate activity without discomfort. Additional criteria necessary for hospice eligibility with a terminal diagnosis of heart disease includes optimal treatment of heart disease, the patient declines or is ineligibility for surgical intervention, an ejection fraction of ≤ 20% and a history of a one of the following in the last 12 months: Treatment resistant SVT or ventricular arrhythmia, unexplained syncope, cardiac arrest, brain embolism of cardiac origin and/or concomitant HIV disease.

Classification is based on observable symptoms which must be clearly documented in the patient's clinical record to support the classification listed:

| ***Class*** | ***Objective Assessment*** | ***Patient Symptoms*** |
|---|---|---|
| *Class I (Mild)* | ***No objective evidence of cardiovascular disease.*** No symptoms and no limitation in ordinary physical activity. | ***No limitation of physical activity.*** Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea (shortness of breath). |
| *Class II (Mild)* | ***Objective evidence of minimal cardiovascular disease.*** Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. | ***Slight limitation of physical activity.*** Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. |
| *Class III (Moderate)* | ***Objective evidence of moderately severe cardiovascular disease.*** Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. | ***Marked limitation of physical activity.*** Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| *Class IV (Severe)* | ***Objective evidence of severe cardiovascular disease. Severe limitations.*** Experiences symptoms even while at rest. | ***Unable to carry out any physical activity without discomfort. Symptoms of cardiac insufficiency at rest.*** If any physical activity is undertaken, discomfort is increased. |

Reference: The Stages of Heart Failure – NYHA Classification (2002), Retrieved 07/31/2006 from http://www.abouthf.org/questions_stages.htm

# New York Heart Association (NYHA) Functional Classification

The original NYHA Functional Classification was published in 1928. This was a time before important diagnostic modalities like the portable ECG, echocardiogram, exercise stress test and the cardiovascular disease biomarker B-type natriuretic peptide (BNP) assay.

McDonald and Wilkinson (2017) and other researchers are advocating for the increased use of natriuretic peptides as part of the strategies for heart failure diagnosis and prevention. The use of these biomarkers has been shown to improve diagnostic accuracy for HF and provide prognostic information for more than a decade of use with recommendations by national and international cardiovascular organizations.

The NYHA classification has been updated many times. Today's version includes two sections; 1) a subjective description of functional capacity and 2) an objective diagnostic assessment of cardiovascular disease. While subjective inconsistencies may result when classifying patients in class II or III, functional capacity remains a powerful prognostic indicator and is routinely used for clinical staging of heart failure today.

**New York Heart Association (NYHA) Functional Classification**

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

Source: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure

One commonly used technique to assess the functional capacity of patients is the Six-minute walk test (6MWT). The 6MWT has been shown to be a reliable, inexpensive, safe and easy to administer test that correlates with health outcomes (Rostagno, C. Gensini, 2008). (https://www.lung.org/lung-health-and-diseases/lung-procedures-and-tests/six-minute-walk-test.html, updated 2018).

**Six Minute Walk Test**

- Explain that the test requires walking for 6 minutes in a straight line between to points 60 feet apart.
- Place a chair at either end of the course and explain that the patient may stop, rest or sit if necessary and that you will bring the chair to them if needed.
- Measure the total distance walked in 6 minutes.

Casanova et al (2011) studied 444 healthy subjects from seven countries to determine standard performance on the 6MWT. The 6MWT measures meters (m) walked as quickly as possible by the individual in six minutes.

The mean meters walked by all subjects was 571+ or – 90 m with male subjects walking 30m more than females. This is consistent with other similar studies. Older subjects walked shorter distances than younger subjects.

- 40–49 yrs of age, 611±85 m
- 50–59 yrs of age, 588±91 m
- 60–69 yrs of age, 559±80 m
- 70–80 yrs of age, 514±71 m

Rasekaba, Lee, Naughton, Williams & Holland (2009) determined a distance less than 350 m on the 6MWT to be associated with an increased mortality in chronic HF patients. A lowering of the walking distance of 50 m or more is considered clinically significant. Ferreira, et al. (2019) concluded in their research the 6-minute walk test distance at baseline and a decline in walking distance were both associated with worse prognosis.

Bittner et al (1993) studied 898 patients with left ventricular dysfunction with either radiological evidence of HF and/or an ejection fraction of 0.45 or lower. During the 242 days of follow up 114 patients either died or were hospitalized for CHF. The lowest performance group on the 6MWT had a statistically greater chance of dying or being hospitalized than the higher performing group. See detailed instruction about the 6MWT at the Heart Foundation website.

In an updated study by Wegrzynowska-Teodorczyk (2013), the researchers also found the distance covered during the 6MWT predicted the risk of death or hospitalization. Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. They studied 243 men with stable systolic heart failure.

- Class I 15%
- Class II 44%
- Class III 37%
- Class IV 4%

69% of the participants died or required hospitalization during the following 3 years. The statistical analysis showed the shorter the distance walked in the 6MWT, the greater the 1-year and 3-year mortality risk.
Du, et al., (2017) reviewed research on the 6MWT in chronic heart failure published from 2012 to 2017. The researchers found the 6MWT not to be as accurate as possible in determining peak VO2. They suggest using mobile apps to better assess actual distance walked and heart rate.

---

References

American Heart Association. Professional Heart Daily. Accessed 8/2/16 http://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp

Bittner et al. (1993). Prediction of mortality and morbidity with a 6-minute walk test in patients with left ventricular dysfunction. SOLVD Investigators. *JAMA,* 270(14), 1702-7.

Casanova, C. et al. (2011). The 6-min walk distance in healthy subjects: reference standards from seven countries. *European Respiratory Journal*, 37, 150-156.

Du, H., Wonggom, P., Tongpeth, J. & Clark, R.A. (2017). Six-Minute Walk Test for Assessing Physical Functional Capacity in Chronic Heart Failure. Curr Heart Fail Rep. 14(3),158-166.

Ferreira, J.P., Metra, M., Anker, S.D., Dickstein, K., Lang, C.C.. & Ng, L. (2019). Clinical correlates and outcome associated with changes in 6-minute walking distance in patients with heart failure: findings from the BIOSTAT-CHF study. Eur J Heart Fail. 21(2), 218-226.

McDonald, K., Wilkinson, M. (2017). Evolving Use of Natriuretic Peptides as Part of Strategies for Heart Failure Prevention. Clin Chem. 63(1), 66-72.

Rasekaba, T., Lee, A. L., Naughton, M. T. ,Williams, T. J. & Holland, A. E. (2009). The six-minute walk test: a useful metric for the cardiopulmonary patient. *Intern Med J.*, 39(8),495-501.

Rostagno C., Gensini G.F. (2008). Six minute walk test: a simple and useful test to evaluate functional capacity in patients with heart failure. *Intern Emerg Med.* 3(3):205-12.

The Criteria Committee of the New York Heart Association. (1994). *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels.* (9th ed.). Boston: Little, Brown & Co. pp. 253–256.

Wegrzynowska-Teodorczyk, K., Rudzinska, E., Lazorczyk, M., Nowakowska, K., Banasiak, W. Ponikowski, P et al. (2013). Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. J Physiother. 59(3), 177-87.

---

© RnCeus.com

# Classes of Heart Failure

Doctors usually classify patients' heart failure according to the severity of their symptoms. The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification[1]. It places patients in one of four categories based on how much they are limited during physical activity.

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

| Class | Objective Assessment |
|---|---|
| A | No objective evidence of cardiovascular disease. No symptoms and no limitation in ordinary physical activity. |
| B | Objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. |
| C | Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. |
| D | Objective evidence of severe cardiovascular disease. Severe limitations. Experiences symptoms even while at rest. |

**For Example:**

- A patient with minimal or no symptoms but a large pressure gradient across the aortic valve or severe obstruction of the left main coronary artery is classified:
  - **Function Capacity I, Objective Assessment D**
- A patient with severe anginal syndrome but angiographically normal coronary arteries is classified:
  - **Functional Capacity IV, Objective Assessment A**

Heart Failure

What is Heart Failure?

Types of Heart Failure

Classes of Heart Failure

Heart Failure in Children and Adolescents

Causes and Risks

Warning Signs of Heart Failure

Diagnosing Heart Failure

Treatment Options

Living with Heart Failure and Managing Advanced HF

Tools and Resources

Heart Failure Personal Stories

Related Articles

Heart Failure Questions to Ask Your Doctor

[1] *Adapted from Dolgin M, Association NYH, Fox AC, Gorlin R, Levin RI, New York Heart Association. Criteria Committee. Nomenclature and criteria for diagnosis of diseases of the heart and great vessels. 9th ed. Boston, MA: Lippincott Williams and Wilkins; March 1, 1994.*

*Original source: Criteria Committee, New York Heart Association, Inc. Diseases of the Heart and Blood Vessels. Nomenclature and Criteria for diagnosis, 6th edition Boston, Little, Brown and Co. 1964, p 114.*

Warning Signs of Heart Failure

Popular Articles

Heart Insight

In the first of a four-part series on heart failure, we investigate what it is, what causes it and what's the prognosis. ›I

The second installment explains heart failure with muscle intact. Queen Latifah and her mom, Rita, share their personal experience with Rita's own heart failure diagnosis. ›I

Heart failure patients are often hospitalized. This article looks at managing self-care to minimize just how often re-hospitalizations happen. ›I

When HF progresses to an advanced stage, there are many decisions to be made. Here we delve into the importance of shared decision making. ›I

Classes of Heart Failure

Last Reviewed: May 31, 2017

Diagnosing Heart Failure

HF Path™

A better quality of life for heart failure patients? We've got a tool for that!

Begin Your Journey Today ›I

## Explore My HF Guide

Our free interactive workbook to help manage heart failure symptoms

Open now ›I

European Journal of Heart Failure (2017) 19, 366–376
doi:10.1002/ejhf.563

RESEARCH ARTICLE

# New York Heart Association functional class, QRS duration, and survival in heart failure with reduced ejection fraction: implications for cardiac resychronization therapy

**Frieder Braunschweig[1,2]*, Cecilia Linde[1,2], Lina Benson[3], Marcus Ståhlberg[1,2], Ulf Dahlström[4], and Lars H. Lund[1,2]**

[1]Karolinska Institutet, Department of Medicine, Stockholm, Sweden; [2]Karolinska University Hospital, Department of Cardiology, Stockholm, Sweden; [3]Karolinska Institutet, Department of Clinical Science and Education, South Hospital, Stockholm, Sweden; and [4]Department of Cardiology and Department of Medicine and Health Sciences, Linköping University, Linköping, Sweden

*Received 14 January 2016; revised 23 March 2016; accepted 4 April 2016; online publish-ahead-of-print 23 June 2016*

**Aims** Symptom severity assessed by NYHA functional class and QRS duration are essential criteria for selection of heart failure (HF) patients for CRT. This study assessed the relationship between NYHA class, QRS duration, and survival in a nationwide HF registry.

**Methods and results** We studied 13 423 patients with HF in NYHA class II–IV and LVEF <40% in the Swedish Heart Failure Registry. Survival was followed via the Swedish Population Registry. Of 12 534 patients without CRT (age 71 ± 12 years, 29% women), 51% and 49% were in NYHA class II and III–IV, respectively. Patients in NYHA class II compared with class III–IV were younger (69 vs. 73 years), and had a better systolic function (49% vs. 58% with LVEF <30%), $P$ <0.001 for all, and a favourable co-morbidity profile. QRS duration was 116 ± 29 ms in NYHA class II and 119 ± 29 ms in NYHA class III–IV with QRS ≥120 ms found in 37% vs. 44%, and an LBBB in 23% vs. 28% ($P$ < 0.001 for all). Upon multivariable Cox regression adjusting for 40 clinically relevant variables, mortality risk was higher in NYHA class III–IV vs. class II, with a hazard ratio (HR) of 1.31, 95% confidence interval (CI) 1.23–1.40. Mortality was also higher with QRS prolongation ≥120 ms vs. narrow QRS. The HR in NYHA class II patients with non-LBBB was 1.19 (95% CI 1.05 – 1.36) and in those with LBBB it was 1.16 (95% CI 1.03–1.41). The corresponding HRs in NYHA class III–IV were 1.33 (95% CI 1.21–1.47) and 1.12 (95% CI 1.02–1.22). There was no significant interaction between the effects of NYHA class and QRS duration or morphology on mortality. Applying different scenarios to estimate guideline adherence, fewer patients with NYHA class II (range 14.4–42.6%) compared with NYHA class III–IV (18.0–45.4%) had received a CRT device when indicated.

**Conclusions** In HF with reduced LVEF, QRS prolongation is common and independently linked to worse survival. The increase in mortality risk associated with QRS prolongation of both LBBB and non-LBBB morphology is similar in NYHA class II and III–IV.

**Keywords** NYHA functional class • Heart failure • QRS width • Left bundle branch block • Epidemiology • Cardiac resynchronization therapy

*Corresponding author. Department of Cardiology, Karolinska University Hospital, Solna, 17176 Stockholm, Sweden. Tel: +46 8 51771629, Fax: +46 8 311044, Email: frieder.braunschweig@karolinska.se

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

# Introduction

Heart failure (HF) is a highly symptomatic syndrome and associated with poor quality of life, frequent hospitalizations, and a high mortality risk despite recent advances in treatment with drugs and devices.[1,2] It is estimated that 2–3% of the population in industrialized countries suffers from HF, with a marked rise in those aged above 65.[3,4] In 1928 the New York Heart Association published a classification of HF symptom severity relating cardinal symptoms of HF like shortness of breath and fatigue to the levels of physical activity on which they occur (NYHA functional class I–IV).[5] Despite well-known limitations such as the temporal variability of clinical findings, interoperator variation, and a poor correlation with measures of cardiac function,[6,7] the NYHA classification is universally used to grade symptoms and select therapy in clinical practice, and provides prognostic discrimination close to that of complex multivariable risk models.[8]

A wide QRS complex on the surface ECG, especially if displayed as an LBBB, indicates intraventricular dyssynchony, and is a marker of poor prognosis in HF.[9] Cardiac resynchronization therapy improves survival, functional capacity, and quality of life in selected patients with such ECG abnormalities. Following early pivotal trials establishing the effectiveness of CRT in NYHA class III and IV,[10,11] the concept of resynchronization was expanded to patients with mild HF.[12–14] Current guidelines recommend CRT for patients with HF in NYHA class II–IV,[15–17] with gradual differentiations in relation to QRS morphology and duration. Based on evidence from trials and meta-analyses, patients with a typical LBBB pattern are given the highest level of recommendation.[18,19] A recent individual patient meta-analysis, however, suggested QRS duration rather than morphology as an independent predictor of CRT outcomes.[20] The implementation of CRT guidelines shows wide national and regional variation.[21] Potential differences in the adoption of CRT in NYHA class II compared with class III–IV have not been explored.

Since NYHA class and QRS morphology and duration form essential selection criteria, it would be important to study the relationship between these variables and survival in CRT candidates. However, this has been difficult as randomized studies largely included patients with either NYHA class III–IV or NYHA class (I and) II. Furthermore, the impact of QRS characteristics on survival in different groups of NYHA class is confounded by many other variables. Thus, large samples with information on a wide spectrum of baseline variables would be required to reach valid conclusions. Therefore, we investigated the interaction between NYHA class, QRS morphology/duration, and survival in a large Swedish HF registry with information from long-term follow-up and complete survival status by linkage to the National Population Registry.

# Methods

The Swedish Heart Failure Registry (SwedeHF) has been described previously.[22,23] Including over 63 000 unique HF patients, it is one of the largest HF registries worldwide. The protocol, case report form, and annual registry reports are available at http://www.SwedeHF.se. Patients with clinician-judged HF are included at discharge from hospital or upon outpatient visits at cardiology or internal medicine units and primary care clinics. Approximately 80 variables are recorded. The HF registry in general as well as the present study conform to the Declaration of Helsinki and they were approved by the responsible ethics committees. Individual patient consent is not required, but patients are informed of entry into national registries and allowed to opt out.

## Patients

*Figure 1* provides details on patient inclusion and exclusion. Between 11 May 2000 and 5 June 2013, there were 85 291 registrations from inpatient and outpatient units at 68 of 94 hospitals and from 102 of ~1000 primary care outpatient clinics in Sweden. Coverage in 2012 was 55%. This was defined as the number of individuals reported to the registry divided by the sum of individuals with clinical HF encountered in Sweden according to ICD-10 (International Classification of Diseases-10th revision) code for HF plus those reported to the registry (to capture those few who may have been missed by ICD-10 code).

Survival status was updated monthly by linkage with the Swedish population registry (latest update 15 May 2013). For the purpose of this study, we included first registrations from patients with HF and reduced EF, defined as an EF ≤40%. Patients had to be in NYHA class II, III, or IV, with complete data on age, rhythm, device implantation status, as well as QRS duration and morphology. Patients with a prolonged QRS duration of ≥120 ms were defined as either LBBB or non-LBBB type at the discretion of the physician. We excluded repeat registrations and patients with a pacemaker or implantable cardioverter defibrillator (ICD) without a CRT component.

## Analyses

The analysis of the inter-relationship between NYHA class, QRS duration, and survival was performed after the exclusion of patients with a CRT and, thus, paced QRS complexes on the ECG (*Figure 1*), whereas the analysis of CRT utilization included patients with a CRT device.

Categorization and availability of data in the registry do not allow a perfect match with European Society of Cardiology (ESC) guidelines.[15–17] Therefore, we evaluated four different scenarios to account for different levels of recommendation in the guidelines and different strengths of fitting between guideline criteria and registry variables. In the registry, EF is reported as <30, 30–39, 40–49, and ≥50%. As EF in Sweden is overwhelmingly reported in 5–10% increments, we assumed that most patients registered in the group with EF 30–39% had an actual EF of 30% or 35% and that few had an EF of 36–39%. In contrast, when selecting only registry patients with EF <30%, all would fulfil the LVEF guideline criterion for CRT, but some patients with EF 30–35% would be missed.

The strength of evidence and recommendations for CRT varies depending on QRS duration (120–149; ≥150 ms), QRS morphology (LBBB vs. non-LBBB), and rhythm (sinus vs. AF). Therefore, we performed analyses with progressively stricter CRT selection criteria, based on the guideline-specified recommendations I-A, I-B, IIa-B, and IIb-B from the European Heart Rhythm Association Guidelines 2013.[16] Guidelines also recommend CRT in patients with an indication for conventional ventricular pacing. The registry contains data on the presence of conventional pacemakers but not on the original indication for implantation or the percentage of ventricular pacing. Therefore, this potential guideline indication was not taken into account and patients with a previous pacemaker were excluded.

© 2016 The Authors




**Figure 1** Flow chart showing the selection of study patients from the SwedeHF registry. HF, heart failure; ICD, implantable cardioverter defibrillator.

Scenario 1: sinus rhythm (NYHA II–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology) or AF (NYHA III–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology)
Scenario 2: sinus rhythm (NYHA II–IV, EF <40%, LBBB or QRS ≥150 ms) or AF (NYHA III–IV, EF <40%, LBBB, or QRS ≥150 ms)
Scenario 3: sinus rhythm (NYHA II–IV, EF <30%, LBBB, or QRS ≥150 ms) or AF (NYHA III–IV, EF <30%, or QRS ≥150 ms)
Scenario 4: sinus rhythm (NYHA II–IV, EF <30%, QRS ≥150 regardless of QRS morphology) or AF (NYHA III–IV, EF <30%, QRS ≥150 regardless of QRS morphology) (patients were only included after 1 January 2011 because evidence in NYHA II was not available before then).

## Statistical analysis

All analyses were performed in R version 3.0.2 (R Foundation for Statistical Computing, Vienna, Austria). The level of significance was set to 5% and all reported *P*-values are two-tailed.

Survival for narrow QRS, non-LBBB QRS prolongation, and LBBB was presented using the Kaplan–Meier method and groups were compared with the log-rank test, separately for patients with NYHA class II and III–IV. Univariable and multivariable Cox regressions, using the Efron method for tie handling, were performed for non-LBBB/LBBB as a categorical variable compared with narrow QRS with adjustment for the 40 variables listed in the Supplementary material online, *Table S1*, and the interaction between NYHA class and QRS morphology. The modelling of an interaction effect renders a similar interpretation as if the data had been analysed separately in NYHA class subgroups, but with the additional benefit of also being able statistically to test differences between groups of NYHA class in effects of non-LBBB and LBBB vs. narrow QRS on mortality.

The proportional hazards assumption was investigated for the scaled Schoenfeld residuals from the multivariable models, and the dfbetas [a measure of how much the hazard ratio (HR) changes owing to the deletion of a single observation] from the models were inspected to detect extreme outliers. As a result, location (inpatient vs. outpatient) and marital status were modelled as strata variables because they were deemed not to fulfil the proportional hazard assumption. All continuous variables were modelled using restricted cubic splines (enabling possible non-linear relationships between these variables and the outcome to be modelled) with four degrees of freedom.[24]

Some baseline variables had missing data. *Table S1* in the Supplementary material online specifies 40 clinically relevant baseline variables and percentage missing for each variable. In the multivariable Cox regressions, to avoid bias and confounding resulting from variables not missing completely at random, multiple imputation ($n = 10$) was performed for all variables with missing data, using predictive mean matching with QRS width as a continuous variable and the 40 variables in *Table S1* in the Supplementary material online, and the outcome, survival, included as the Nelson–Aalen estimator in the imputation model, although not imputed itself because it contained no missing values. Imputation corrections to the resulting standard errors were performed.

## Results

Of 85 291 entries in the registry, 13 423 unique patients fulfilled the selection criteria (*Figure 1*). Of these, 889 had a CRT device implanted including 447 with an ICD component, leaving 12 534 patients without CRT for the main analysis. Baseline characteristics are provided in *Table 1* (for a complete list of variables see *Table S1*

© 2016 The Authors


Lincoln/Carter 0378

**Table 1 Baseline characteristics**

| Variable | NYHA II (*n* = 6377) | NYHA III–IV (*n* = 6157) | *P*-value |
|---|---|---|---|
| Demographics | | | |
| Male gender | 4627 (73%) | 4273 (69%) | <0.001 |
| Age (years) | 69 ± 12 | 73 ± 12 | <0.001 |
| HF-related characteristics | | | |
| NYHA II | 6377 (100%) | – | <0.001 |
| NYHA III | – | 5554 (90%) | |
| NYHA IV | – | 603 (10%) | |
| Duration <6 months | 3741 (59%) | 2668 (44%) | <0.001 |
| IHD | 2870 (48%) | 3282 (56%) | <0.001 |
| DCM | 1276 (20%) | 1140 (19%) | 0.042 |
| HCM | 60 (2%) | 61 (2%) | 0.972 |
| LVEF 30–39% | 3246 (51%) | 2589 (42%) | <0.001 |
| LVEF <30% | 3131 (49%) | 3568 (58%) | |
| QRS-related characteristics | | | |
| QRS duration (ms) | 116 ± 29 | 119 ± 29 | <0.001 |
| QRS <120 ms | 4021 (63%) | 3437 (56%) | <0.001 |
| QRS 120–149 ms | 1305 (20%) | 1595 (26%) | |
| QRS ≥150 ms | 1051 (16%) | 1125 (18%) | |
| LBBB | 1497 (23%) | 1706 (28%) | <0.001 |
| Rhythm, blood pressure | | | |
| AF (any form) | 2548 (40%) | 2848 (46%) | <0.001 |
| Permanent AF | 2033 (32%) | 2333 (38%) | <0.001 |
| Heart rate (b.p.m.) | 72 ± 15 | 76 ± 16 | <0.001 |
| Systolic blood pressure (mmHg) | 126 ± 20 | 122 ± 21 | <0.001 |
| Co-morbidities | | | |
| Hypertension | 2722 (44%) | 2815 (47%) | <0.001 |
| Diabetes | 1284 (20%) | 1758 (29%) | <0.001 |
| Valve disease | 1003 (16%) | 1432 (24%) | <0.001 |
| Pulmonary disease | 845 (13%) | 1261 (21%) | <0.001 |
| Revascularization | 1710 (27%) | 1798 (29%) | 0.003 |
| Biochemistry | | | |
| Haemoglobin (g/L) | 138 ± 16 | 133 ± 17 | <0.001 |
| NT-proBNP (ng/L) | 2279 (1022–4902) | 3883 (1760–8456) | <0.001 |
| GFR (mL/min/1.73 m²) | 76 ± 36 | 64 ± 34 | <0.001 |
| Medications | | | |
| ACE inhibitor | 4845 (76%) | 4165 (68%) | <0.001 |
| ARB | 1353 (21%) | 1446 (24%) | 0.002 |
| Beta-blocker | 5900 (93%) | 5534 (90%) | <0.001 |
| MRA | 1991 (31%) | 2328 (38%) | <0.001 |
| Diuretic | 4674 (74%) | 5403 (88%) | <0.001 |
| Digitalis | 1119 (18%) | 1133 (18%) | 0.207 |
| Nitrate | 744 (12%) | 1147 (19%) | <0.001 |
| OAC | 2516 (40%) | 2439 (40%) | 0.838 |

Numbers are *n* (%) for categorical variables and mean ± SD for continuous variables, and tested with $\chi^2$ test and t-test, respectively.
NT-proBNP is given as median (interquartile range).
DCM, dilated cardiomyopathy; GFR, glomerular filtration rate; HCM, hypertrophic cardiomyopathy, IHD, ischaemic heart disease; MRA, mineralocorticoid receptor antagonist; OAC, oral anticoagulant.

in the Supplementary material online). There were 6377 patients (51%) with NYHA class II and 6157 (49%) in NYHA class III–IV.

Patients in NYHA class II were younger, more likely to be male, and had a shorter duration of HF, less ischaemic cardiomyopathy, and a higher LVEF. Furthermore, they had a lower propability of AF, a lower heart rate, higher systolic blood pressure, and a more favourable co-morbidity profile. Levels of NT-proBNP were lower, while haemoglobin and creatinine clearance were higher. Interestingly, a higher proportion of NYHA class II patients were on treatment with ACE inhibitors and beta-blockers. In contrast, use of ARBs, mineralocorticoid receptor antagonists (MRA), and diuretics was higher among patients with NYHA class III–IV.

## QRS duration and morphology in relation to New York Heart Association class

QRS prolongation was common in both groups (*Figure 2*). On average, patients in NYHA class II compared with NYHA class III–IV had a somewhat smaller QRS (116 ± 29 ms vs. 119 ± 29 ms; $P < 0.001$) and fewer had a QRS of ≥120 ms (37% vs. 44%;

© 2016 The Authors




**Figure 2** Prevalence of QRS duration. Distribution of QRS duration in increments of 10 ms and proportions with LBBB (hashed bars) in patients with NYHA class II and NYHA class III–IV.

$P < 0.001$), a QRS ≥150 ms (16% vs. 18%, $P = 0.009$), or an LBBB (23% vs. 28%; $P < 0.001$). However, among those with a QRS duration ≥120 ms, the proportion of patients with LBBB was similar: 64% in NYHA class II and 63% in NYHA class III–IV ($P = 0.55$), and increased with progressively wider QRS.

## Survival in relation to New York Heart Association class and QRS duration and morphology

As expected, NYHA class II patients had a better survival compared with those in NYHA class III–IV (*Figure 3*). In the resulting multivariable Cox model, the HR and 95% confidence interval (CI) for mortality in NYHA III–IV vs. II was 1.31, 95% CI 1.23–1.40 ($P < 0.001$). In both groups, prolonged QRS duration was associated with worse survival and the prognosis of patients with a non-LBBB morphology was inferior compared with those who had LBBB. The proportion of patients surviving at 1, 3, and 5 years is given in *Table 2*. After 5 years, 58% of patients in NYHA class II with QRS prolongation of non-LBBB type were alive, while the corresponding number of NYHA class III–IV patients was only 30%. In contrast, 69% and 49% of patients in NYHA class II and III–IV, respectively, survived at 5 years, if they had a narrow QRS. At each point of time, survival of NYHA class II patients with QRS prolongation of non-LBBB type was better compared with NYHA class III–IV patients with narrow QRS.

As shown in *Table 1*, there were significant differences in baseline characteristics probably explaining the better outcome in NYHA class II vs. NYHA class III–IV patients. Thus, to assess the independent contribution of QRS duration and morphology to the mortality risk in NYHA class II and NYHA class III–IV, survival data were adjusted for important confounding variables. These factors had been specified *a priori* and included all variables with statistical differences shown in *Table 1* and, in addition, civil status, housing, recruitment in or out of hospital, year of recruitment, setting of general follow-up, setting of HF follow-up, mean arterial pressure, pulse pressure, cardiomegaly, and/or congestion on X-ray.

In all settings, prolonged QRS duration was associated with a significant increase in mortality risk (*Figure 4*). After adjustment for multiple confounders, the HR for mortality in patients with non-LBBB type vs. narrow QRS was 1.19 (95% CI 1.05 – 1.36; $P = 0.009$) in NYHA class II and 1.33 (95% CI 1.21–1.47; $P < 0.001$) in NYHA class III–IV. Similarly, comparing patients with LBBB vs. narrow QRS, the adjusted HR was 1.16 (95% CI 1.03–1.41; $P = 0.013$) in NYHA class II and 1.12 (95% CI 1.02–1.22; $P = 0.014$) in NYHA class III–IV. Thus, QRS prolongation, both of LBBB and non-LBBB type, independently added a similar mortality risk in patients with NYHA class II and NYHA class III–IV (*P* for interaction: 0.521, crude and 0.244, adjusted).

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 3** Kaplan–Meier survival by NYHA class and QRS morphology. (*A*) NYHA class II; (*B*) NYHA class III–IV. Log-rank *P*-value for QRS/LBBB in both NYHA groups: <0.001.

**Table 2 Survival at 1, 3, and 5 years**

| Year | QRS <120 ms | | | QRS ≥120 ms non-LBBB | | | QRS ≥120 ms LBBB | | |
|---|---|---|---|---|---|---|---|---|---|
| | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI |
| NYHA class II | | | | | | | | | |
| 1 | 3287 | 0.92 | 0.92–0.93 | 680 | 0.88 | 0.86–0.91 | 1173 | 0.90 | 0.88–0.91 |
| 3 | 1967 | 0.80 | 0.79–0.82 | 400 | 0.71 | 0.68–0.75 | 681 | 0.74 | 0.72–0.77 |
| 5 | 945 | 0.69 | 0.67–0.70 | 190 | 0.58 | 0.54–0.62 | 296 | 0.62 | 0.59–0.65 |
| NYHA class III–IV | | | | | | | | | |
| 1 | 2477 | 0.82 | 0.80–0.83 | 631 | 0.70 | 0.70–0.73 | 1163 | 0.54 | 0.75–0.79 |
| 3 | 1290 | 0.63 | 0.61–0.65 | 304 | 0.45 | 0.42–0.49 | 591 | | (0.51–0.57) |
| 5 | 577 | 0.49 | 0.47–0.51 | 128 | 0.30 | 0.26–0.33 | 243 | 0.39 | 0.36–0.41 |

CI, confidence interval.

## Eligibility and utilization of cardiac resynchronization therapy according to New York Heart Association class

The proportion of patients eligible for CRT and the actual utilization of CRT in relation to current guideline recommendations was analysed in 13 423 individual patients, including those with an implanted CRT device. Eligibility was analysed in four scenarios representing increasing strength of recommendation and fit between guideline and registry criteria (*Figure 5*). Depending on the scenario chosen, between 14.5% and 30.4% of patients in NYHA class II and between 18.9% and 49.1% of patients in NYHA class III–IV fulfilled guideline recommendations for CRT. For example, in scenario 3, representing strict selection criteria according to current guidelines, 16.2% in NYHA class III–IV and 28.1% in NYHA class II met CRT selection criteria. In each scenario, more patients in NYHA class III–IV than in class II had a CRT indication.

Of patients meeting criteria for CRT, only a minority had actually received a device. This proportion ranged between 14.4% and 42.6% of eligible patients (4.4% and 6.2% of the total) with NYHA class II, and between 18.0% and 45.4% (8.6% and 8.8% of the total) in those with NYHA class III–IV. For example, in scenario 3, 27.1% and 31.4% had actually been implanted. Thus, irrespective of analysis, large proportions of both NYHA groups lacked CRT despite an indication. Consistently, the proportion of patients in NYHA class II who had an indication but were not treated with a device was lower compared with those in NYHA class III–IV, including scenario 4 which contained only

© 2016 The Authors




**Figure 4** Forest plots depicting hazard ratios (HRs) for all-cause mortality associated with different QRS morphologies in NYHA class II and NYHA class III–IV. Cox regressions were performed in the overall population with adjustment for the 40 variables in Supplementary material online, *Table S1* and the interaction between NYHA class and QRS morphology. Interaction between QRS/LBBB and NYHA class: 0.521 (crude); 0.244 (adjusted). CI, confidence interval.

patients who entered the registry after the first publication of CRT guidelines for NYHA class II patients in 2010. However, while the difference in CRT utilization was statistically significant in scenario 1–3, it did not reach statistical significance ($P = 0.507$) in the fourth scenario, evaluating only a total of 684 patients with an indication.

## Discussion

Grading of HF symptoms according to the NYHA classification is a cornerstone in the clinical assessment of HF patients and has important clinical implications for the selection of appropriate treatment. Specifically, current guidelines for CRT tailor recommendations in relation to NYHA class and QRS characteristics.[15,16] We analysed the relationship between NYHA class, QRS duration/morphology, and survival in a large group of HF patients with reduced LVEF <40% and long-term follow-up via Swedish national registries. A QRS prolongation of ≥120 ms was common in both NYHA class II (36%) and NYHA class III–IV (44%). Importantly, while NYHA II patients were healthier at baseline and survived longer, the independent risk attributable to QRS prolongation of LBBB or non-LBBB type was similar in NYHA class II and III–IV. Although CRT is highly recommended in current guidelines, only a minority of patients fulfilling guideline recommendations had received a device, and this underutilization appeared to be even greater in NYHA class II compared with NYHA class III–IV.

Our finding that QRS duration is associated with a similar hazard for death in patients with NYHA class II and III–IV gains particular strength by the large sample size, the long and complete follow-up through national registries, and a background medical therapy reflecting a high standard of care. Even after adjustment for a large number of confounders, the mortality risk in NYHA class II patients with LBBB and non-LBBB morphology was significantly increased. This supports the notion that QRS prolongation is not only a general marker of HF severity[25] but also a risk factor contributing to the adverse prognosis in HF independently of other prognostic factors, presumably through the induction of ventricular dyssynchrony.

Other studies have looked into the interaction between NYHA class, QRS duration, and prognosis. Two smaller studies also found a wider QRS duration with more advanced NYHA class, but multivariable analysis was not performed.[26,27] Similarly to the present study, a secondary analysis of a previous, smaller SwedeHF

© 2016 The Authors




**Figure 5** Estimation of CRT utilization in the SwedeHF registry. (*A*) The proportion of patients meeting selection criteria for CRT according to scenarios 1–3 reflecting progressively stricter CRT selection criteria based on guideline recommendations, and scenario 4 considering only patients included after 1 January 2011 (see the Methods for further details). (*B*) The proportion of patients meeting CRT selection criteria who actually were implanted with a device. *P*-values (NYHA II compared with NYHA III–IV): $^{1}P < 0.001$; $^{2}P < 0.001$; $^{3}P = 0.015$; $^{4}P = 0.507$.

cohort indicated that interactions between QRS width and NYHA class were not significant upon multivariate analysis.[9]

The proportion of patients with prolonged QRS ≥120 ms in our study (41%) corresponds well with previous reports. A broad QRS was also found in 41% of patients with an LVEF ≤35% evaluated in the EuroHeart failure survey,[28] 37% of patients in the Italian Network on CHF[29] (using 140 ms as a cut-off), and 34% of HF patients examined in the setting of a community HF clinic.[30] In the present study, there was a trend towards worse prognosis in subjects with non-LBBB morphology, found in approximately one-third of patients with prolonged QRS, compared with LBBB. Causing a characteristic U-shaped activation pattern of the left ventricle,[31] LBBB has been closely linked to left intraventricular dyssynchrony between the septum and the lateral wall, while QRS prolongation of non-LBBB type may result in various other electromechanical abnormalities.[32] This may explain why patients with LBBB have especially large effects by CRT while non-LBBB morphology is a predictor of non-response.[33] Among patients with non-LBBB morphology, we could not single out those with a right bundle branch block (RBBB). RBBB is associated with increased mortality in chronic HF,[34] but RBBB patients do not improve by CRT.[35]

Cardiac resynchronization therapy was first introduced in patients with NYHA class III.[10,36,37] The COMPANION trial also included a small proportion (14%) of patients in NYHA class IV provided they had not been hospitalized during the month before enrolment and had an estimated survival exceeding 6 months.[11] This subgroup showed a significant reduction in the combined primary study endpoint, and hence the indication of 'ambulatory' NYHA class IV was incorporated into current guidelines. However, NYHA class IV is a rare indication in clinical practice and patients hospitalized with acutely decompensated HF and/or receiving inotropic support are usually not considered for implantation. In the European CRT survey, only 8% were judged to be in NYHA class IV at baseline.[38] In the present study, a total of 4.8% had NYHA class IV. Considering the clinical context in which patients are recruited to the registry, we assume that most of them met the criteria of 'ambulatory' class IV.

Utilization of CRT in NYHA class II vs. III–IV was significantly worse in scenarios 1–3. This can be explained by the later introduction of NYHA II to CRT guidelines. The analysis in scenario 4, focusing on a smaller sample of patients with strict indications recruited after 2010, showed a similarly worse utilization but the difference was not significant. In a registry, some appropriate reasons to abstain from device therapy such as high biological age, clinical severity of co-morbidities, or patient refusal are difficult to discern. However, considering the baseline characteristics (*Table 1*), factors such as high age and severe co-morbidities are unlikely to explain the larger underutilization of CRT in NYHA class II.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. It may be speculated that it was easier to achieve drug target doses in those with mild HF, better renal function, and less compromised haemodynamics as reflected by higher blood pressure.

Only half of the patients received CRT together with a defibrillator, which is below the European average but in keeping with Swedish implantation statistics and on a similar level compared with countries such as the UK or Denmark.[21]

Our findings have clinical implications as they indicate that a wide QRS complex should alert physicians to the significantly increased mortality risk of the HF patient regardless of NYHA class and other conditions. Device treatment with CRT and, in most cases ICD, has strong evidence in this scenario and should be seriously considered. Studies indicate that CRT is similarly effective in appropriately selected NYHA class II and III–IV patients to improve outcomes.[14] As CRT appears particularly underutilized in NYHA class II, the value of early interventions to prevent disease progression should be highlighted. Recently, long-term effects of CRT on mortality[39] and measures of functional and LV remodelling[40] were shown in mild HF. However, these improvements were largely confined to patients with LBBB. Thus, our results also emphasize a particular need for additional treatment options in patients with mild to moderate HF and QRS prolongation of non-LBBB type who have limited effects by resynchronization.

## Limitations

Measurement of QRS duration and the categorization of LBBB was left to the individual physician, and misclassification may have occurred. We have no information regarding the presence of RBBB but only whether patients had LBBB or not. Categories used in the registry, in particular LVEF, allowed no perfect match with selection criteria in the guidelines. We sought to accommodate this by evaluating guideline adoption in different scenarios with progressively stricter CRT selection criteria. In addition, we could not assess whether patients with potential CRT indication had contraindications. The analysis of CRT utilization represents only a snap-shot of CRT prevalence, and we cannot rule out that patients without CRT may have received CRT during the later course of follow-up or that they improved such that CRT was no longer indicated. However, follow-up referral to cardiologists and HF nurse clinics was rare, suggesting that most patients were not considered for CRT by the clinician responsible. Furthermore, since only a minor portion of CRT candidates had received a device, it is unlikely that this portion had greatly increased during further follow-up. We reported all-cause but not cause-specific mortality. The latter may provide a stronger link between the pathophysiology of conduction delay and outcomes, but the former is more clinically relevant. Finally, patients with LV dysfunction and HF who had been previously implanted with an ICD were excluded from analysis.

## Conclusions

This study in a large national registry shows that QRS prolongation of both LBBB and non-LBBB type is an independent predictor of mortality in patients with HF and reduced LVEF. Importantly, the increase in mortality risk attributable to QRS prolongation was similar in those with NYHA class II and those with NYHA class III–IV, and remained significant even after adjustment for a large number of relevant confounders. Although many HF patients with prolonged QRS fulfil current guideline criteria, CRT appears to be underutilized particularly among NYHA class II patients.

## Supplementary Information

Additional Supporting Information may be found in the online version of this article:

**Table S1.** Complete baseline variables included in multivariable models among 12 534 patients (without CRT).

## Acknowledgements

We thank local investigators in the Swedish Heart Failure Registry for data entry and management.

## Funding

This work was supported in part by Boston Scientific, the Swedish Research Council, the Swedish Heart and Lung Foundation, and Stockholm County Council in the form of grants to L.H.L.'s institution. No funding organization had any role in the collection, analysis, or interpretation of data or approval/disapproval for publication.

**Conflict of interest:** L.H.L. reports speaker's honoraria from St Jude and research grants to his institution from Medtronic. C.L. was principal investigator of REVERSE, a CRT study sponsored by Medtronic, reports research grants, speaker honoraria, and consulting fees from Medtronic, and speaker honoraria and consulting fees from St. Jude Medical. F.B. reports research grants and speaker honoraria from Medtronic and consulting fees from Biotronik and Boston Scientific. M.S. and U.D. report no conflicts of interest.

## References

1. MacIntyre K, Capewell S, Stewart S, Chalmers JW, Boyd J, Finlayson A, Redpath A, Pell JP, McMurray JJ. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. *Circulation* 2000;102:1126–1131.
2. Schaufelberger M, Swedberg K, Koster M, Rosen M, Rosengren A. Decreasing one-year mortality and hospitalization rates for heart failure in Sweden; data from the Swedish Hospital Discharge Registry 1988 to 2000. *Eur Heart J* 2004;25:300–307.
3. Cowie MR, Mosterd A, Wood DA, Deckers JW, Poole-Wilson PA, Sutton GC, Grobbee DE. The epidemiology of heart failure. *Eur Heart J* 1997;18:208–225.
4. Dickstein K, Cohen-Solal A, Filippatos G, McMurray JJ, Ponikowski P, Poole-Wilson PA, Stromberg A, van Veldhuisen DJ, Atar D, Hoes AW, Keren A, Mebazaa A, Nieminen M, Priori SG, Swedberg K, Vahanian A, Camm J, De Caterina R, Dean V, Dickstein K, Filippatos G, Funck-Brentano C, Hellemans

© 2016 The Authors

4. Kristensen SD, McGregor K, Sechtem U, Silber S, Tendera M, Widimsky P, Zamorano JL, Tendera M, Auricchio A, Bax J, Bohm M, Corra U, della Bella P, Elliott PM, Follath F, Gheorghiade M, Hasin Y, Hernborg A, Jaarsma T, Komajda M, Kornowski R, Piepoli M, Prendergast B, Tavazzi L, Vachiery JL, Verheugt FW, Zamorano JL, Zannad F. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2008: the Task Force for the diagnosis and treatment of acute and chronic heart failure 2008 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association of the ESC (HFA) and endorsed by the European Society of Intensive Care Medicine (ESICM). *Eur J Heart Fail* 2008;**10**:933–989.
5. The Criteria Committee of the New York Heart Association. *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*. 9th ed. Boston: Little, Brown & Co.; 1994. p253–256.
6. Raphael C, Briscoe C, Davies J, Ian Whinnett Z, Manisty C, Sutton R, Mayet J, Francis DP. Limitations of the New York Heart Association functional classification system and self-reported walking distances in chronic heart failure. *Heart* 2007;**93**:476–482.
7. Adams KF Jr, Zannad F. Clinical definition and epidemiology of advanced heart failure. *Am Heart J* 1998;**135**:S204–S215.
8. Goda A, Williams P, Mancini D, Lund LH. Selecting patients for heart transplantation: comparison of the Heart Failure Survival Score (HFSS) and the Seattle Heart Failure Model (SHFM). *J Heart Lung Transplant* 2011;**30**:1236–1243.
9. Lund LH, Jurga J, Edner M, Benson L, Dahlstrom U, Linde C, Alehagen U. Prevalence, correlates, and prognostic significance of QRS prolongation in heart failure with reduced and preserved ejection fraction. *Eur Heart J* 2013;**34**:529–539.
10. Cleland JG, Daubert JC, Erdmann E, Freemantle N, Gras D, Kappenberger L, Tavazzi L. The effect of cardiac resynchronization on morbidity and mortality in heart failure. *N Engl J Med* 2005;**352**:1539–1549.
11. Bristow MR, Saxon LA, Boehmer J, Krueger S, Kass DA, De Marco T, Carson P, DiCarlo L, DeMets D, White BG, DeVries DW, Feldman AM. Cardiac-resynchronization therapy with or without an implantable defibrillator in advanced chronic heart failure. *N Engl J Med* 2004;**350**:2140–2150.
12. Linde C, Abraham WT, Gold MR, St John Sutton M, Ghio S, Daubert C. Randomized trial of cardiac resynchronization in mildly symptomatic heart failure patients and in asymptomatic patients with left ventricular dysfunction and previous heart failure symptoms. *J Am Coll Cardiol* 2008;**52**:1834–1843.
13. Moss AJ, Hall WJ, Cannom DS, Klein H, Brown MW, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Higgins SL, Pfeffer MA, Solomon SD, Wilber D, Zareba W. Cardiac-resynchronization therapy for the prevention of heart-failure events. *N Engl J Med* 2009;**361**:1329–1338.
14. Tang AS, Wells GA, Talajic M, Arnold MO, Sheldon R, Connolly S, Hohnloser SH, Nichol G, Birnie DH, Sapp JL, Yee R, Healey JS, Rouleau JL, Resynchronization-Defibrillation for Ambulatory Heart Failure Trial I. Cardiac-resynchronization therapy for mild-to-moderate heart failure. *N Engl J Med* 2010;**363**:2385–2395.
15. McMurray JJ, Adamopoulos S, Anker SD, Auricchio A, Bohm M, Dickstein K, Falk V, Filippatos G, Fonseca C, Gomez-Sanchez MA, Jaarsma T, Kober L, Lip GY, Maggioni AP, Parkhomenko A, Pieske BM, Popescu BA, Ronnevik PK, Rutten FH, Schwitter J, Seferovic P, Stepinska J, Trindade PT, Voors AA, Zannad F, Zeiher A, Bax JJ, Baumgartner H, Ceconi C, Dean V, Deaton C, Fagard R, Funck-Brentano C, Hasdai D, Hoes A, Kirchhof P, Knuuti J, Kolh P, McDonagh T, Moulin C, Reiner Z, Sechtem U, Sirnes PA, Tendera M, Torbicki A, Vahanian A, Windecker S, Bonet LA, Avraamides P, Ben Lamin HA, Brignole M, Coca A, Cowburn P, Dargie H, Elliott P, Flachskampf FA, Guida GF, Hardman S, Iung B, Merkely B, Mueller C, Nanas JN, Nielsen OW, Orn S, Parissis JT, Ponikowski P. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012: the Task Force for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2012 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association (HFA) of the ESC. *Eur J Heart Fail* 2012;**14**:803–869.
16. Brignole M, Auricchio A, Baron-Esquivias G, Bordachar P, Boriani G, Breithardt OA, Cleland J, Deharo JC, Delgado V, Elliott PM, Gorenek B, Israel CW, Leclercq C, Linde C, Mont L, Padeletti L, Sutton R, Vardas PE. ESC Committee for Practice Guidelines (CPG), Zamorano JL, Achenbach S, Baumgartner H, Bax JJ, Bueno H, Dean V, Deaton C, Erol C, Fagard R, Ferrari R, Hasdai D, Hoes AW, Kirchhof P, Knuuti J, Kolh P, Lancellotti P, Linhart A, Nihoyannopoulos P, Piepoli MF, Ponikowski P, Sirnes PA, Tamargo JL, Tendera M, Torbicki A, Wijns W, Windecker S, Document R, Kirchhof P, Blomstrom-Lundqvist C, Badano LP, Aliyev F, Bansch D, Baumgartner H, Bsata W, Buser P, Charron P, Daubert JC, Dobreanu D, Faerestrand S, Hasdai D, Hoes AW, Le Heuzey JY, Mavrakis H, McDonagh T, Merino JL, Nawar MM, Nielsen JC, Pieske B, Poposka L, Ruschitzka F, Tendera M, Van Gelder IC, Wilson CM. 2013 ESC Guidelines on cardiac pacing and cardiac resynchronization therapy: the Task Force on cardiac pacing and resynchronization therapy of the European Society of Cardiology (ESC). Developed in collaboration with the European Heart Rhythm Association (EHRA). *Eur Heart J* 2013;**34**:2281–2329.
17. Priori SG, Blomstrom-Lundqvist C, Mazzanti A, Blom N, Borggrefe M, Camm J, Elliott PM, Fitzsimons D, Hatala R, Hindricks G, Kirchhof P, Kjeldsen K, Kuck KH, Hernandez-Madrid A, Nikolaou N, Norekval TM, Spaulding C, Van Veldhuisen DJ. Authors/Task Force Members; Document Reviewers. 2015 ESC Guidelines for the management of patients with ventricular arrhythmias and the prevention of sudden cardiac death: the Task Force for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death of the European Society of Cardiology (ESC) Endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC). *Eur Heart J* 2015;**36**:2793–2867.
18. Sipahi I, Chou JC, Hyden M, Rowland DY, Simon DI, Fang JC. Effect of QRS morphology on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Am Heart J* 2012;**163**:260–267.
19. Sipahi I, Carrigan TP, Rowland DY, Stambler BS, Fang JC. Impact of QRS duration on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Arch Intern Med* 2011;**171**:1454–1462.
20. Cleland JG, Abraham WT, Linde C, Gold MR, Young JB, Claude Daubert J, Sherfesee L, Wells GA, Tang AS. An individual patient meta-analysis of five randomized trials assessing the effects of cardiac resynchronization therapy on morbidity and mortality in patients with symptomatic heart failure. *Eur Heart J* 2013;**34**:3547–3556.
21. Raatikainen MJ, Arnar DO, Zeppenfeld K, Merino JL, Levya F, Hindriks G, Kuck KH. Statistics on the use of cardiac electronic devices and electrophysiological procedures in the European Society of Cardiology countries: 2014 report from the European Heart Rhythm Association. *Europace* 2015;**17** Suppl 1:i1–175.
22. Lund LH, Benson L, Dahlstrom U, Edner M. Association between use of renin–angiotensin system antagonists and mortality in patients with heart failure and preserved ejection fraction. *JAMA* 2012;**308**:2108–2117.
23. Jonsson A, Edner M, Alehagen U, Dahlstrom U. Heart failure registry: a valuable tool for improving the management of patients with heart failure. *Eur J Heart Fail* 2010;**12**:25–31.
24. Therneau T, Grambsch P. Functional Form and Testing Proportional Hazards. In: Dietz K, Gail M, Krickeberg K, Samet J, Tsiatis A, eds *Modeling Survival Data: Extending the Cox Model*. New York: Springer-Verlag; 2000.
25. Kashani A, Barold SS. Significance of QRS complex duration in patients with heart failure. *J Am Coll Cardiol* 2005;**46**:2183–2192.
26. Stellbrink C, Auricchio A, Diem B, Breithardt OA, Kloss M, Schondube FA, Klein H, Messmer BJ, Hanrath P. Potential benefit of biventricular pacing in patients with congestive heart failure and ventricular tachyarrhythmia. *Am J Cardiol* 1999;**83**:143D–150D.
27. Gasparini M, Mantica M, Galimberti P, Marconi M, Genovese L, Faletra F, Simonini S, Klersy C, Coates R, Gronda E. Beneficial effects of biventricular pacing in patients with a 'narrow' QRS. *Pacing Clin Electrophysiol* 2003;**26**:169–174.
28. Khan NK, Goode KM, Cleland JG, Rigby AS, Freemantle N, Eastaugh J, Clark AL, de Silva R, Calvert MJ, Swedberg K, Komajda M, Mareev V, Follath F, EuroHeart Failure Survey I. Prevalence of ECG abnormalities in an international survey of patients with suspected or confirmed heart failure at death or discharge. *Eur J Heart Fail* 2007;**9**:491–501.
29. Baldasseroni S, Opasich C, Gorini M, Lucci D, Marchionni N, Marini M, Campana C, Perini G, Deorsola A, Masotti G, Tavazzi L, Maggioni AP, Italian Network on Congestive Heart Failure I. Left bundle-branch block is associated with increased 1-year sudden and total mortality rate in 5517 outpatients with congestive heart failure: a report from the Italian network on congestive heart failure. *Am Heart J* 2002;**143**:398–405.
30. Clark AL, Goode K, Cleland JG. The prevalence and incidence of left bundle branch block in ambulant patients with chronic heart failure. *Eur J Heart Fail* 2008;**10**:696–702.
31. Auricchio A, Fantoni C, Regoli F, Carbucicchio C, Goette A, Geller C, Kloss M, Klein H. Characterization of left ventricular activation in patients with heart failure and left bundle-branch block. *Circulation* 2004;**109**:1133–1139.
32. Andersson LG, Wu KC, Wieslander B, Loring Z, Frank TF, Maynard C, Gerstenblith G, Tomaselli GF, Weiss RG, Wagner GS, Ugander M, Strauss DG. Left ventricular mechanical dyssynchrony by cardiac magnetic resonance is greater in patients with strict vs nonstrict electrocardiogram criteria for left bundle-branch block. *Am Heart J* 2013;**165**:956–963.
33. Cleland J, Freemantle N, Ghio S, Fruhwald F, Shankar A, Marijanowski M, Verboven Y, Tavazzi L. Predicting the long-term effects of cardiac resynchronization therapy on mortality from baseline variables and the early response a report from the CARE-HF (Cardiac Resynchronization in Heart Failure) Trial. *J Am Coll Cardiol* 2008;**52**:438–445.
34. Xiong Y, Wang L, Liu W, Hankey GJ, Xu B, Wang S. The prognostic significance of right bundle branch block: a meta-analysis of prospective cohort studies. *Clin Cardiol* 2015;**38**:604–613.


© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

35. Bilchick KC, Kamath S, DiMarco JP, Stukenborg GJ. Bundle-branch block morphology and other predictors of outcome after cardiac resynchronization therapy in Medicare patients. *Circulation* 2010;**122**:2022–2030.
36. Cazeau S, Leclercq C, Lavergne T, Walker S, Varma C, Linde C, Garrigue S, Kappenberger L, Haywood GA, Santini M, Bailleul C, Daubert JC. Effects of multisite biventricular pacing in patients with heart failure and intraventricular conduction delay. *N Engl J Med* 2001;**344**:873–880.
37. Abraham WT, Fisher WG, Smith AL, Delurgio DB, Leon AR, Loh E, Kocovic DZ, Packer M, Clavell AL, Hayes DL, Ellestad M, Trupp RJ, Underwood J, Pickering F, Truex C, McAtee P, Messenger J. Cardiac resynchronization in chronic heart failure. *N Engl J Med* 2002;**346**:1845–1853.
38. Dickstein K, Bogale N, Priori S, Auricchio A, Cleland JG, Gitt A, Limbourg T, Linde C, van Veldhuisen DJ, Brugada J. The European cardiac resynchronization therapy survey. *Eur Heart J* 2009;**30**:2450–2460.
39. Goldenberg I, Kutyifa V, Klein HU, Cannom DS, Brown MW, Dan A, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Kautzner J, Klempfner R, Kuniss M, Merkely B, Pfeffer MA, Quesada A, Viskin S, McNitt S, Polonsky B, Ghanem A, Solomon SD, Wilber D, Zareba W, Moss AJ. Survival with cardiac-resynchronization therapy in mild heart failure. *N Engl J Med* 2014;**370**:1694–1701.
40. Linde C, Gold MR, Abraham WT, St John Sutton M, Ghio S, Cerkvenik J, Daubert C, Group REVERSE Study. Long-term impact of cardiac resynchronization therapy in mild heart failure: 5-year results from the REsynchronization reVErses Remodeling in Systolic left vEntricular dysfunction (REVERSE) study. *Eur Heart J* 2013;**34**:2592–2599.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

JACC: HEART FAILURE
VOL. 5, NO. 11, 2017
© 2017 BY THE AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION
ISSN 2213-1779/$36.00
PUBLISHED BY ELSEVIER
http://dx.doi.org/10.1016/j.jchf.2017.08.011

# Refining Classification of Heart Failure Based on Ejection Fraction

Gregg C. Fonarow, MD[a,b]

The complex clinical syndrome of heart failure (HF) is associated with a wide spectrum of left ventricular functional abnormalities (1). These range from preserved left ventricular ejection fraction (EF) and normal left ventricular size to severely reduced EF and marked dilation of the left ventricle. Although for many decades, HF was considered to be synonymous with diminished contractility of the left ventricle, in the early 2000s there was a growing appreciation for the fact that a substantial portion of patients with HF had relatively normal EF, frequently characterized as diastolic HF or diastolic dysfunctional HF. When carefully assessed, there is evidence for the presence of both systolic and diastolic functional abnormalities in most patients with HF (1). Dr. Milton Packer was one of the early proponents of using an EF-based classification for HF patients, suggesting that the term of diastolic HF be avoided and stating that "a less presumptuous approach is to refer to these patients as having HF with a normal ejection fraction, a descriptive approach that makes no assumptions about our knowledge about the pathophysiology of this disorder" (2). Since the 2005 American College of Cardiology/American Heart Association HF Guidelines adopted this approach (HF with reduced EF [HFrEF] and HF with preserved EF [HFpEF]), EF has been considered essential in the classification of patients with HF.

There have been extensive studies demonstrating that the demographics, causes, comorbidities, prognoses, and, most importantly, responses to therapy differ among HF patients based on EF classification (3). Differences among the evidence bases for therapies is, in and of itself, a compelling enough rationale for EF-based classification. Furthermore, to date, no measurement or marker other than EF has demonstrated utility in distinguishing which patient populations will or will not derive benefit from each guideline-directed therapy. Nevertheless, use of EF is not without limitations because it is dependent on the imaging technique used, the analysis methods, the operators, and the variability up to 5% (3). However, the use of EF is nearly ubiquitous in characterizing patients with HF in clinical practice and research, as well as being used as an indispensable component of the enrollment criteria in nearly every randomized clinical trial. Ejection fraction has proven to be of such substantial clinical and research value in the assessment and management of HF patients, there is a Class I level recommendation for EF measurement in every national and international HF guideline (1,4).

Despite the widespread adoption of EF-based classification of HF, the actual definitions of patients with hearts with reduced and preserved EFs have varied. HFrEF has been variably defined as EF values of ≤35%, <40%, and ≤40% (1). HFpEF has been classified as EF values of >40%, ≥45%, >45%, ≥50%, >50%, and ≥55% (1). In studies which explored the optimal cutpoint(s) for defining EF groups, data emerged suggesting there was an intermediate group of patients with EF in the range of 41% to 49% (3). These patients have a clinical profile and prognosis that are intermediate but closer to those of HFpEF patients defined by EF of ≥50% than those of HFrEF defined by EF of ≤40%, with certain exceptions. In addition, the large scale randomized controlled outcome trials in patients with HF have largely enrolled patients with EF values of ≤35% and ≤40%. It has been only in these HF patients that angiotensin-converting enzyme inhibitors, angiotensin receptor antagonists, angiotensin receptor neprilysin inhibitors, beta-blockers, aldosterone antagonists, and device therapies have demonstrated benefits of reduced mortality (1). Clinical trials to date in HF patients with an EF value of >40%, ≥45%, or ≥50% testing various therapies have not been successful (1). Furthermore, registry-based

From the [a]Division of Cardiology, David Geffen School of Medicine at UCLA, University of California Los Angeles, Los Angeles, California; and the [b]Ahmanson-UCLA Cardiomyopathy Center, University of California Los Angeles Medical Center, Los Angeles, California. Dr. Fonarow's research is supported by U.S. National Institute of Health; and he consults for Amgen, Janssen, Medtronic, Novartis, and St. Jude Medical.

Manuscript received August 10, 2017; accepted August 18, 2017.

JACC: HEART FAILURE VOL. 5, NO. 11, 2017
NOVEMBER 2017:808-9



studies have with few exceptions not observed benefits associated with the use of neurohormonal antagonists once the EF is >40% (3). Thus, there is not a sufficient evidence base and no current guideline recommendations to extend the use of therapies proven in patients with EF of ≤35% or ≤40% to those expressly with EF of >40% as a treatment for HF (1,4).

Based on the totality of available data, EF-based classification of HF was further refined, and an intermediate EF group, HF with borderline EF (HFbEF), was added to the 2013 the American College of Cardiology/American Heart Association HF guidelines. This group was defined by the presence of the typical symptoms of HF and EF of 41% to 49% (1). Following suit in 2016, the European Society of Cardiology specified HF with mid-range EF (HFmrEF) of 40% to 49% (4). It has also been recognized that there is a cohort of patients who present with HF with EF of ≤40%, whose EF subsequently improves. These patients with improved or recovered EF appear to be clinically distinct from patients with persistently reduced, borderline, or preserved EF and have a much better prognosis (1). A distinct classification was provided for these patients in the 2013 guidelines as well (1). Since these guidelines have been published, there has been ongoing debate as to whether these refined EF classifications are helpful or merely creating arbitrary distinctions. This debate notwithstanding, these refined classifications have fostered new studies that are improving the understanding of the causes, phenotypes, pathophysiologies, and prognoses in these patients. For example, a recent study of biomarker profiles analyzing 37 biomarkers from different pathophysiologic domains (myocardial stretch, inflammation, angiogenesis, oxidative stress, and hematopoiesis) found that patients with HFmrEF had an intermediate biomarker profile with interactions between both cardiac stretch and inflammation makers, whereas HFrEF profiles were mainly related to stretch and HFpEF to inflammation (5). These findings suggested that patients with HFmrEF may be a mixture of HFrEF and HFpEF patients (5). Biomarker-based profiling could potentially be used to identify the subset of patients who, despite having EF of >40%, could benefit from those therapies that benefit HFrEF patients.

There are certainly limitations to an HF classification system based on EF alone, and more detailed phenotyping may help to better characterize patients; provide greater prognostic discrimination; allow for more precise targeting of therapies to patients who will derive benefit; and facilitate the discovery of new, more effective treatments. Further research may establish the fact that there is a subset of patients with HF with EF of 41% to 49% who will benefit from therapies demonstrated to improve outcomes in patients with HF with EF of ≤40% (3). Whether this refined EF classification approach adopted in recent versions of the guidelines best serves the needs of patients, helps to advance the field, or needs to be further updated remains to be determined. However, the enduring value of EF for classifying and managing HF is something that physicians, no matter what their specialty, should be able to appreciate.

**ADDRESS FOR CORRESPONDENCE:** Dr. Gregg C. Fonarow, Ahmanson-UCLA Cardiomyopathy Center, Ronald Reagan UCLA Medical Center, 10833 LeConte Avenue, Room A2-237 CHS, Los Angeles, California 90095-1679. E-mail: gfonarow@mednet.ucla.edu.

## REFERENCES

**1.** Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.

**2.** Burkoff D, Maurer MS, Packer M. Heart failure with a normal ejection fraction: is it really a disorder of diastolic function? Circulation 2003;107:656-8.

**3.** Hsu JJ, Ziaeian B, Fonarow GC. Heart failure with mid-range (borderline) ejection faction: clinical implications and future directions. J Am Coll Cardiol HF 2017. In press.

**4.** Ponikowski P, Voors AA, Anker SD, et al. 2016 ESC guidelines for the diagnosis and treatment of acute and chronic heart failure: the Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC) developed with the special contribution of the Heart Failure Association (HFA) of the ESC. Eur Heart J 2016;37:2129-200.

**5.** Tromp J, Khan MAF, Mentz RJ, O'Connor CM, et al. Biomarker profiles of acute heart failure patients with a mid-range ejection fraction. J Am Coll Cardiol HF 2017;5:507-17.

**KEY WORDS** epidemiology, heart failure with borderline ejection fraction (HFbEF), heart failure with mid-range ejection fraction (HFmrEF), heart failure with preserved ejection fraction (HFpEF), outcomes

Don L. Hearn, Jr.
GLANKLER
BROWN
ATTORNEYS
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

NEOPOST PRIORITY MAIL
01/08/2020
US POSTAGE $009.45
ZIP 38119
041M11273286

JAN 1 3 2020

Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

JAN 1 3 2020

GLANKLER BROWN.

ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

January 8, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email:*** ***LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter as Mr. Carter's second level appeal of Lincoln's decision to deny long term disability benefits beyond October 30, 2018. We disagree with Lincoln's determination that Mr. Carter is able to perform the main duties of any gainful occupation for which his is qualified as set forth in Lincoln's July 12, 2019 letter detailing its review of Mr. Carter's first level appeal. Lincoln cites two reports prepared by medical reviewers as the basis for its determination; however, these reports fail to address significant portions of Mr. Carter's medical records and misstate the findings of his treating physician in material respects. In addition, Mr. Carter's additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work.

Mr. Carter's medical file and the opinion of his treating cardiologist contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve. I have attached hereto additional medical records of Lee E. Faulkner, MD, the cardiologist who has treated Mr. Carter since 2004. *See collective Exhibit "A" hereto.* Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019.

For example:

1. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling,

grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong. (*October 3, 2018, Physician's Statement attached hereto as Exhibit "B"*).

2. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%). (*September 4, 2018, Attending Physician's Statement attached hereto as Exhibit "C"*).

3. On June 2, 2017, Dr. Faulkner opined Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger or handle. (*June 2, 2017, Attending Physician's Statement attached hereto as Exhibit "D"*).

4. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%). (*November 21, 2016, Attending Physician's Statement attached hereto as Exhibit "E"*).

Dr. Faulkner has consistently opined (and communicated these opinions to Lincoln) that Mr. Carter is totally disabled and cannot perform sedentary work. His office notes of November 1, 2018, among others, provide that Mr. Carter has problems standing and frequently has dizzy spells. Mr. Carter's condition is chronic and worsening. Accommodations at work will not help. He simply cannot work or he risks heart failure. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

We disagree with Lincoln's conclusion that no objective findings exist to support Mr. Carter's documented diagnosis of cardiomyopathy or heart failure with a secondary diagnosis of hypertension. On November 1, 2018, Dr. Faulkner performed an echocardiogram on Mr. Carter and determined that Mr. Carter has a severely depressed left ventricular systolic function with an ejection fraction of 20–25% and nonsustained ventricular tachycardia. Dr. Faulkner further determined that Mr. Carter has posterior wall akinesis and that his left atrium chamber is enlarged in size. Mr. Carter has had and continues to have documented symptoms of dizziness, shortness of breath, and chest pain.

Lincoln opines that Mr. Carter's symptoms and Dr. Faulkner's physical findings regarding his condition are not consistent with Dr. Faulkner's opinion that he cannot perform sedentary work. In Lincoln's July 12, 2019 letter, it relies upon notes from Dr. Faulkner's file stating, "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Lincoln's conclusions here are disingenuous and tantamount to cherry picking statements from medical records to rebut Dr. Faulkner's actual findings, conclusions, and diagnoses. Dr. Faulkner's physical examination of Mr. Carter and review of his symptoms notes are consistent with and support his medical opinion that Mr. Carter cannot perform sedentary work. A review of symptoms encompasses multiple areas of the body,

assessing the symptoms presented at that time of the examination and also considers the physical restrictions and limitations of that particular patient. It is not a measure of Mr. Carter's ability to perform the full-time duties of a sedentary occupation nor do the review of symptoms notes accurately assess the reasons for Mr. Carter's visits. For Lincoln to base a file review examination solely on review of symptoms notes is very narrow and inaccurate. Simply because on a certain day (appointment) Dr. Faulkner notes that Mr. Carter is not experiencing chest pain or dizziness at that moment does not alter or change Dr. Faulkner's opinion that he suffers from severely depressed left ventricular systolic function with an ejection fraction of 20–25%. Dr. Faulkner's opinion is based upon objective findings and the multiple echocardiograms he has performed on Mr. Carter over the course of over 14 years of treatment. Simply because Mr. Carter has a good day or week does not mean that his conditions are improved. If he exerts himself, he is symptomatic, which is why he cannot perform even sedentary work.

In addition, the opinions of Lincoln's medical reviewers do not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concludes that Mr. Carter is "capable of full time work based on the available data, but only in sedentary capacity, with **<u>no walking</u>**, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provides: "[T]he claimant can do sedentary work with **<u>no walking</u>**, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

Sedentary work as defined by the DOT requires walking occasionally (activity or condition exists up to 1/3 of the time); therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*See Dictionary of Occupational Titles info attached hereto as Exhibit "F"*). Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require walking or standing occasionally, up to 1/3 of a work day. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

Mr. Carter suffers from dyspnea on exertion and has a New York Heart Association Functional class III. The NYHA Functional Classification for this level of heart failure is described as moderate and defined as marked or noticeable limitation of physical activity, comfortable at rest, but less than

ordinary physical activity causes tiredness, heart palpations, or shortness of breath. *See attached medical journal articles for more information on this NYHA Functional Class III.*

As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

We request up to, and until February 15, 2020, within which to submit all documents and information relevant to Mr. Carter's appeal. This should provide enough time to allow Lincoln to identify the records it believes are not included and for us to obtain them. In addition, please provide the identity and curriculum vitae of the medical reviewers that authored the October 26, 2018 December 5, 2018, and May 28, 2109 reports. Please also describe each reviewer's business relationship with Lincoln and compensation arrangement as well as a copy of their bills for services rendered in this matter.

For the above reasons, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

## Progress Notes

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Date:** 02/06/19 : 09:27am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 02/06/19
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/90
Height: 6', Weight: 215 lbs
BMI: 29.16 kg/m2

**Subjective:**
This 52 year old male presents for follow up visit. He denies chest pain and has had no shortness. He complains of an episode of chest tightness after lifting items. He is here for interrogation of his Single chamber AICD .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**AICD interrogation** - Single chamber ICD. SVT nonsustained

**Plan:**

Continue current medication(s) at same dose

**Follow-up:** 6 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

EXHIBIT
tabbles
A

Dec 03 19, 12:07a Physicians Of Hearts 9016827243 p.5

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

02/06/2019

**Procedure:** Office Visit Level 4 : 99214

# SIGNED BY Lee E Faulkner, MD (LF) 02/06/2019 09:52AM

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 11/01/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 130/80
Height 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM Intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**ECHO** - Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan:**

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

**Follow-up:** 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**:
**AICD Interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

07/30/2018

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Progress Notes

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

**Date:** 04/03/17 : 04:04pm
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 04/03/17
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 140/70

**Subjective:**
This 50 year old male presents for follow up visit. He denies chest pain and has had no shortness of breath. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:** Interrogation of AICD -Non sustained V tach

**EKG** - Sinus bradycardia rate 59, Nonspecific Twave abnormality

**Plan:**
Interrogation of AICD (complete)

Continue current medication(s)

**Follow-up:** 3 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

**Visit Time:** 30

**Procedure:** Office Visit Level 4 : 99214

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 Fax: (901) 682-7243

04/03/2017

---

| | | |
|---|---|---|
| # | SIGNED BY Lee E Faulkner, MD (LF) | 04/03/2017 04:18PM |
| # | REVISED BY Lee E Faulkner, MD (LF) | 04/03/2017 07:14PM |

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 11/01/2018
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 25%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

Lee E. Faulkner M.D./LB

ID:CA1967
Name:Carter, Sherman
Sex:Male Birth Date:Jan-15-1967 51 Years
inch lb mmHg
Medication:
Symptoms:
History:

Vent rate 76 bpm
PR int 184 ms
QRS dur 104 ms
QT/QTc int 388/ 418 ms
P/QRS/T axis 50/ 3/ 40
RV5/SV1 amp 2.155/ 0.755 mV
RV5+SV1 amp 2.910 mV

Nov 1,2018 8:06 AM

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11)
4564 Twave abnormality, possible lateral Ischemia
(negative T (V1; V5))
9150 ** abnormal ECG **

Unconfirmed Report
Reviewed by: [signature]

10 mm/mV 25 mm/s Filter: H60 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1950A 05 05 05 05 Dept.: Exam:

Name:Carter Sherman [illegible] Jul 30, 2018 1:01 PM [illegible]
Sex:Male Birth date: years
[illegible] 1[illegible] mmHg
Medication 1:
Medication 2:
Room No.

1100 Sinus rhythm
1[illegible] Nonspecific T wave abnormality
[illegible] ** Borderline ECG **

| | | | | |
|---|---|---|---|---|
| Vent. | rate | | 60 | bpm |
| PR | int. | | 158 | ms |
| QRS | dur. | | 102 | ms |
| QT/QTc | int. | 404 | 407 | ms |
| P QRS T | axis | 45 [illegible] | 22 | |
| RV5/SV1 | amp. | 1.870 | 0.995 | mV |
| RV5+SV1 | amp. | | 2.865 | mV |

Unconfirmed Report
Reviewed by:

10 mm mV 25 mm/s Filter 100 Hz [illegible] d 10 mm/mV 10 mm mV 10 mm mV



**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/24/2004 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 40%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/24/04 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Tricuspid Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/18/2005 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Mild global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace mitral regurgitation, and trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Mitral Regurgitation
4. Trace Tricuspid Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/10/06 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Referred By:**
**Date of Birth:**
**Date:** 7/12/2007
**Sex:** Male
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 50%
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/12/07 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global Hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Global Hypokinesis
3. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 09/24/2004 |
| **Sex:** Male | **Race:** African American |

**HISTORY and PHYSICAL**

**HISTORY OF PRESENT ILLNESS:** Sherman Carter is a 37y/o African American gentleman who reports to our office for cardiac evaluation. Patient complains of chest pains. Patient reports that he has sharp chest pain on left side while radiating to back. Patient has no associated symptoms that has occurred with chest pain. Patient states that the chest pain experienced six days ago, was aggravated with sudden movement or change in position. Patient denies any shortness of breath, nausea, vomiting, dizziness or edema.

**PAST MEDICAL HISTORY:** Chest Pain

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did Not Bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

**PHYSICAL EXAMINATION: BP:** 122/88

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy
2. Mitral Regurgitation
3. Pre Hypertension

**PLAN:**

1. ECHO-today
2. EKG-today

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/24/2004
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 37-year old African American gentleman who presents to our office for a follow up visit for elevated blood pressure. Patient reports that he had migraines earlier this week. Patient takes medications to resolve issue. Patient states no complaints of shortness of breath, chest pain, nausea, vomiting or edema.

**Vitals: BP:** 122/88

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy

**PLAN:**

1. Follow up in 4 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/7/2005 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 37 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of short pain to left anterior chest. The pain occurs occasionally during high stress time. Episodes usually last a few seconds then subsides. He reports no other complaints at this time. He denies any headaches, dizziness, and chest pain, shortness of breath, nausea, dementia, diarrhea, or constipation.

**BP:** 135/72
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. MR
3. TR

**PLAN:**
1. Alcohol Cessation
2. Follow up in 4 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/6/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter states that he has been feeling good since his last visit. He reports no complaints at this time. He denies any palpitations, chest pain, shortness of breath, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 152/90
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Cardiomyopathy
3. Hypertension

**PLAN:**
1. Current Cardiac Care
2. ETOH Cessation encouraged
3. Follow up in 2 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter complains of occasional shortness of breath. He states that he has been doing ok and reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 100/60
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Follow up in 6 months

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter reports one episode of shortness of breath but reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 136/88
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Current Cardiac Care
2. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 4/3/2009 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 42 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter states that he has had some mild chest pain. He reports no other complaints at this time. He denies any palpitations, shortness of breath, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 140/70
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. EKG/ECHO

________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/12/2011 |
| **Sex:** Male | **Race:** African American |

**ECHOCARDIOGRAM**

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 46%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/12/11 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals no abnormalities.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 46%
2. Left Ventricle Enlargement
3. Right Ventricle Enlargement

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 55%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 55%
2. Left Ventricular Enlargement
3. Mild Tricuspid Regurgitation
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 12/10/2012
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 45%**
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is enlarged in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 45%
2. Left Ventricular Enlargement
3. Global Hypokinesis
4. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 20%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/4/15 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Severe global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 pulmonary insufficiency.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 20%
2. Left Ventricle Enlargement
3. Severe Global Hypokinesis
4. Mild Mitral Regurgitation
5. Mild Pulmonary Insufficiency

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Referred by:**
**Date of Birth:**
**Date:** 07/21/2016
**Sex:** Male
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 20%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 07/21/2016 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall abnormality appreciated.

**Doppler:** Interrogation of the valvular apparatus reveals mild mitral regurgitation.

**SUMMARY:**

1. severely depressed left ventricular systolic function with an ejection fraction of 20%.
2. Left Ventricular Chamber enlarged in size
3. Mild Mitral Regurgitation

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of chest pain when lifting things, shortness of breath on exertion, edema in hands and some numbness. He also reports occasional dizziness. He reports no other complaints at this time. He denies any nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 130/74
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Dyspnea
3. Gouty Arthritis

**PLAN:**
1. ETOH Restriction
2. Treadmill Thallium Stress Test

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, vomiting, dizziness, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 132/80
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE
**Data:** Stress test negative for ischemia

**IMPRESSION:**
1. Hypertension
2. Gouty Arthritis

**PLAN:**
1. ECHO due to reduction in EF as reported by stress test
2. Follow up in 1 month

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac clearance for left hip replacement. Mr. Carter complains of chest pain on the left side of his chest while laying down, states this last a few minutes. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:**

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

**PHYSICAL EXAMINATION: BP:** 140/90 **HT:** 6'0" **WT:** 209lbs

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Severe cardiomyopathy, worse since last visit
2. Hypertension-blood pressure elevated

**PLAN:**

1. AICD Referral

_______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/30/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for hip surgery. Mr. Carter complains of chest pain but states that they are becoming better. He states that Dr. Lan did prescribe him medication to strengthen his heart. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 10/30/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 170/120

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Hypertension-blood pressure controlled
3. Severe Dilated Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 2 weeks to re-check blood pressure
3. Patient has a follow up appointment on November 10, 2015 and will be re-evaluated at that time

____________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 11/10/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for left hip replacement. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, dizziness, vomiting, palpitations, orthopnea, paroxysmal nocturnal dyspnea and/or edema.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 11/10/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 130/90

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 3 months

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals**: **BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**
1. Continue Current Cardiac Care
2. Follow Up in 3 months

________________________
Lee E. Faulkner M.D./LB

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Sherman Carter
**Date of Visit:** 07/21/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain on left side of chest while doing yard work. Patient also complains of shortness of breath when outside , that lasts 10-15 minutes. Patient states no complaints of chest pain, dizziness, nausea, vomiting or edema.

**Vitals:** **BP:** 138/96

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy

**PLAN:**

1. Continue Current Cardiac Care

________________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient states that he is chest pain free. Patient states no complaints of chest pain, shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals**: **BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. Degenerative Joint Disease of Hip

**PLAN:**

1. ETOH Cessation
2. Follow Up in 6 Months

Lee E. Faulkner M.D./LB

CARTER, SHERMAN

ID: 000002995

24-Sep-2004 10:37:06

37 years
Male Black

| | |
|---|---|
| Vent. rate | 65 bpm |
| PR interval | 138 ms |
| QRS duration | 94 ms |
| QT/QTc | 408/424 ms |
| P-R-T axes | 46 86 16 |

Normal sinus rhythm with sinus arrhythmia
Normal ECG

Technician: AF
Test ind:

Referred by: LEF

Unconfirmed




160 Hz 25.0 mm/s 10.0 mm/mV

4 by 2.5s + 3 rhythm lds

MAC 8 001F

12SL™ v250

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**:
**AICD Interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 11/01/2018 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 25% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Akinesis
4. Moderate Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

Lee E. Faulkner M.D./LB

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

| | | | |
|---|---|---|---|
| # | SIGNED BY Lee E Faulkner, MD | (LF) | 04/03/2017 04:18PM |
| # | REVISED BY Lee E Faulkner, MD | (LF) | 04/03/2017 07:14PM |

**SAINT FRANCIS HOSPITAL-MEMPHIS**
**TREADMILL/STRESS**

**MR#: 1037968SFH**

**NAME: CARTER, SHERMAN**
**ENCOUNTER NUMBER:** 340179135FH
**ROOM NUMBER:**
**DATE OF BIRTH:**
**READING PHYSICIAN:** ANTONIO C. QUIROZ, MD
**PHYSICIAN:** LEE E FAULKNER

HISTORY OF PRESENT ILLNESS: A 45-year-old male, height 6 feet, weight 190 pounds. Patient has hypertension and has been having some chest pains.

MEDICATIONS: Include ramipril and digoxin.

INTERPRETATION: Baseline EKG shows sinus rhythm with a rate of 52 beats per minute and nonspecific ST-T abnormalities. Patient exercised 11 minutes on the standard Bruce protocol achieving 13.1 METS of workload. Exercise was stopped because of fatigue. There was no chest pain. Heart rate increased from 52-157, which is 90% of the age-predicted maximal heart rate. Blood pressure increased from 143/83-180/110 for a double product of 28,260. Cardiolite was injected approximately 1 minute prior to stopping the exercise. There were no significant ST-segment depressions, no arrhythmias. One isolated PVC was noted during the exercise. There was normalization of the T-waves during and after the exercise.

CONCLUSIONS: Negative for ischemia by EKG criteria.

Nuclear imaging interpretation will be dictated separately. Hypertensive response to exercise.

________________________
ANTONIO C. QUIROZ, MD

TIME:__________
DATE:__________

D: 11/26/2012 09:53 CST
T: 11/26/2012 10:34 CST
R:
Job#: 252986
D#: 7926695TFI

SAINT FRANCIS HOSPITAL
5959 PARK AVENUE
MEMPHIS, TN 38119

Name: CARTER, SHERMAN
MRN: 001037868
ACCT: 034017913

ANDREW T. WATSON, MD
ADM: 11/26/2012

Diagnostic Imaging

DATE OF EVALUATION: 11/26/2012

REFERRING PHYSICIAN: Lee Faulkner, M.D.

REASON FOR EVALUATION: Chest pain.

BRIEF HISTORY OF PRESENT ILLNESS: A 45-year-old African-American male who presents for evaluation with prior history of hypertension, no known coronary artery disease.

DESCRIPTION OF PROCEDURE: After obtaining written informed consent, patient underwent a Bruce protocol stress evaluation. Total exercise time was 11 minutes. Total METs obtained was 13.1.

This was a 1-day study. Rest images obtained using 3.1 mCi thallium to 1 stress image obtained using 30.2 mCi sestamibi technetium-99. Rest and stress images were compared.

Short axis, vertical long axis, horizontal long axis images appear to be well perfused and well matched. There is evidence of apical thinning. Otherwise, there is no evidence of overt segmental wall ischemia. Myocardial perfusion bull's eye map confirms the above finding. Myocardial perfusion gated study demonstrates mild-to-moderate global hypokinesis, ejection fraction calculated at 35%. Raw data cine analysis demonstrates no significant motion or other artifacts present.

OVERALL IMPRESSION: Abnormal Bruce protocol Cardiolite examination demonstrating no evidence of ischemia and ejection fraction estimated at 35%.

ANDREW T. WATSON, MD

Date: ____ and Time: ____

TR:ATW/SN
DD:11/26/2012 16:25 CST
DT:11/26/2012 19:00 CST
Dictation ID: 7930950/Confirmation #: 253112

Work Type: Diagnostic Imaging
T001

Work Type Code: DGI
Page: 1

PRINTED BY: PDacus DATE 12/10/2012

12/10/2012 13:11 901-765-3133 ST FRANCIS H I M PAGE 02/02

2009 Oct-09 08:51 AM Central Scheduling 9017653296 1/2

**Saint Francis Hospital**
**Memphis**

1000-52

| DATE | TIME | PHYSICIAN'S ORDERS | DATE | TIME | PROGRESS RECORD |
|---|---|---|---|---|---|
| 11-9-12 | | Treadmill Thallium Stress Test<br><br>Dia. Chest Pain<br><br>Date - 11-19-12<br>Time - 8:30<br>Arrival - 8:00<br><br>No Precert Required per Tiwana c United Healthcare 10 25 12<br>Height - 6'<br>Weight<br><br>Physician's Signature: Lee E Faulkner MD<br>Date: Time: | | | |

Medications dispensed in accordance with the hospital formulary system

Carter, Sherman

**PHYSICIAN ORDERS/PROGRESS RECORDS**

MR# DOB:

R8/02

ID:CA1967 Nov-1 2018 8:06 AM
Name:Carter Sherman
Sex:Male Birth Date:Jan 15 1967 51 Years
inch lb mmHg
Medications:
Symptoms:
History:

| | | | | |
|---|---|---|---|---|
| Vent rate | | | 76 | bpm |
| PR int | | | 184 | ms |
| QRS dur | | | 104 | ms |
| QT/QTc int | | 388 | 418 | ms |
| P/QRS/T axis | 30 | 2 | 30 | |
| RV5/SV1 amp | | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | | 2.910 | mV |

1100 Sinus rhythm
1571 with frequent ventricular premature complexes
(wide QRS dur, ectopic beat with shortened RR
int (beat 3, 6, 11)).
1561 T wave abnormality - possible lateral ischemia
(negative T (V4, V5))
9150 ** abnormal ECG **

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter: 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1350A 05 05 03 05 Dept: Exam:

Name Carter Sherman ID:131767 Jul [illegible] 1:04 PM 50 bpm
Sex Male Birth date: [illegible]
Inch lb mmHg
Medication 1
Medication 2
Room No

E100 Sinus rhythm
R068 Nonspecific T wave abnormalities
9140 ** Borderline ECG **

| | | | |
|---|---|---|---|
| Vent | rate | | 60 bpm |
| PR | int | | 158 ms |
| QRS | dur | | 102 ms |
| QT QTc | int. | 401 | 407 ms |
| P QRS T | axis | 15 | 90 22 |
| RV5/SV1 | amp. | 1.870 | 0.993 mV |
| RV5+SV1 | amp | | 2.[illegible] mV |

c67

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz 0.50 d 10 mm/mV 10 mm/mV 10 mm/mV



LFG Omaha Fax 10/3/2018 3:20:25 PM PAGE 4/004 Fax Server

Oct 03 18, 01:12p p.3

REF #3043267

Lincoln Financial Group

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

EXHIBIT B

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

Indicate frequency per day the listed activities below can be used performed using:
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A

What job modifications would allow the patient to return to work?

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

N/A

Continence ___/___/___

Dressing ___/___/___

Transferring ___/___/___

Bathing ___/___/___

Toileting ___/___/___

Eating ___/___/___

Date patient experienced loss of Cognitive Functioning: ___/___/___

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

__/__/__ to __/__/__

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

901-682-7241
Phone Number

901-682-7243
Fax Number

[signature] Lee E. Faulkner MD
Signature

__/__/__
Date

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)



0000032/ LFPESRO1 00000982

PAGE 4/4 * RCVD AT 10/3/2018 3:20:24 PM [Central Daylight Time] * SVR:NE1PWFAX101/16 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):00-54

LFG Omaha Fax 9/4/2018 11:50:52 AM PAGE 3/003 Fax Server

Sep 04 18, 09:43a

p.2

REF #2991745

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 25, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical - Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments: ______
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation.
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (circled) Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments (if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed X Lee E Sullivan MD (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

*Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.*
*GLC-01450PTD*

EXHIBIT C

Page 1 of 3
10/10

00000315 LFPH3GD1 00000970

PAGE 3/3 * RCVD AT 9/4/2018 11:50:51 AM [Central Daylight Time] * SVR:NE1PWFAX101/0 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):00-52

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 4/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.3

REF #1989621

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

EXHIBIT D

# ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by ____________ )

Claim No: 1150128075 Policy No: 000010049220000000

Name of Patient: Sherman Carter

Date of Birth:

When did symptoms first appear or accident happen?

Has patient ever had same or similar condition? Yes No If yes, state when and describe.

(a) Diagnosis (including ICD Code(s)) Cardiomyopathy

(b) Subjective Findings Worsening Dyspnea

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

(a) Date of First visit Sept. 25, 2005

(b) Date of Last visit April 3, 2017

(c) Frequency of visits
Weekly
Monthly
Other (specify) Q2 to 6 months or more

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

(b) Mental Impairments (if applicable)

(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
Class 1 (No limitation) Class 2 (Slight limitation)
Class 3 (Marked limitation) Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 140/70 systolic/diastolic

Has patient Recovered? Improved? Unchanged? Retrogressed? (circled) Worsening

(b) Has patient been hospital confined? Yes No (No crossed out; "Delete")
If Yes, give Name and Address of Hospital
Confined from ____________ to ____________
Several Hospitalizations over the years



PAGE 4/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/9 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

REF #1989621

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job (Yes) No
Any other work (Yes) No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months (Never)
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

| ADL | Date on which assistance was first required and received | |
|---|---|---|
| Bathing | ________ | (washing self in tub, shower or by sponge bath, with or w/o equipment) |
| Dressing | ________ | (putting on, taking off garmets, braces or any artificial limbs normally worn) |
| Toileting | ________ | (getting to, from, on and off toilet; and performing related personal hygiene) |
| Transferring | ________ | (moving in & out of bed, chair or any wheelchair, with or w/o equipment) |
| Continence | ________ | (voluntarily maintaining control of bladder and bowel function) |
| Eating | ________ | (getting nourishment into one's body by any means (table/tray or special equipment) |

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ________________

Patient's Job Full-time Part-time

Any other Work Full-time Part-time

Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner Degree: MD Telephone Number

Street Address City or Town State: TN Zip Code

Signature (By Physician): Lee E. Faulkner, MD Date: 5/29/17



0000012 LFPV6UT1 00000110

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 3/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.2

REF #1989621

Lincoln Financial Group®

Please Return Response To:
The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765

## ABILITIES FORM

Patient Name: Sherman Carter Date of Birth:

Occupation: Claim Number: 1150128075

Date of Last Office Visit: April 3, 2017 Date of Next Office Visit:

☐ The patient does not have functional/limitations or restrictions

Provider's Signature: Lee E Faulkner, MD Date:

Provider Printed Name: Lee E Faulkner, MD Degree: ☒ MD ☐ DO Other

Specialty: Cardiology Phone:

OR

☐ The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | ✓ (crossed out, LEF) | ✓ | | |
| 11 - 20 lbs. | ✓ | | | |
| 21 - 35 lbs. | ✓ | | | |
| 36 - 50 lbs. | ✓ | | | |
| 51 - 100 lbs. | ✓ | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | | |
| Stand | | | | | |
| Walk | | | | | |
| Climb | | | | | |
| Bend | | | | | |
| Kneel | | | | | |
| Drive | | | | | |
| Finger | | | | | R / L / Both |
| Handle | | | | | R / L / Both |
| Operate Foot Controls | | | | | R / L / Both |
| Reach above the shoulder | | | | | R / L / Both |

N/A

Are there environmental factors that the patient should avoid? ☐Yes ☐No Specify:

Specific Limitations or Restrictions not noted above: No lifting or straining what so ever as his condition is worsening over time

The above statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud and Warning Statements.

Provider's Signature: Lee E Faulkner MD Date: 5/24/17

Provider Printed Name: Lee E. Faulkner, MD Degree: ☒ MD ☐ DO Other

Specialty: Cardiology Phone: 901 682-7241

Address: 6005 Park Ave Ste 702 Memphis, TN 38119

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BARDETT LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any)
   Cardiomyopathy, HTN
3. a) Date of First Treatment Sept 25, 2005
   b) Date of Most Recent Treatment Sept 29, 2016
   c) Frequency of Treatments Q 2 to 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
   If the patient is still disabled, when should the patient be able to return to work? unknown
5. Remarks or Comments: ______
6. List Restrictions and Limitations: Medical therapy for now. Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   ✓ Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 11/24/16 (Month Day Year) Signed N. Lee E. Faulkner MD (Attending Physician, No Stamps, please) Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN
Phone Number 901-682-7241
Fax Number 901-682-7243



EXHIBIT E

Lincoln Financial Group®

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765
www.LincolnFinancial.com

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

(To Avoid Delay Please Answer ALL Questions)
(This form is to be completed without expense to the Company and returned by ______________ )

Claim No: 1150128075 Policy No: 000010049222000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen? Aug 2015

Has patient ever had same or similar condition? Yes (No) If yes, state when and describe.

(a) Diagnosis (including ICD Code(s))

(b) Subjective Findings

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)
Severely depressed EF of 20% by Echocardiogram

(a) Date of First visit Sept 15, 2005
(b) Date of Last visit July 15, 2016
(c) Frequency of visits: Weekly / Monthly / ✓ Other (specify) every 2-3 months

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
*Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)*
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

*(b) Mental Impairments (if applicable)*

(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
*Class 1 (No limitation)* *Class 2 (Slight limitation)*
Class 3 (Marked limitation) ✓ Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 120/80 *systolic/diastolic*

Has patient Recovered? Improved? ✓ Unchanged? Retrogressed?

(b) Has patient been hospital confined? Yes (No)
If Yes, give Name and Address of Hospital

Confined from ____________ to ____________

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes (No) If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received

Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
Continence ________ (voluntarily maintaining control of bladder and bowel function)
Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes (No)

(c) When could patient return to work? Unknown
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations
Medical Therapy for now

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner, MD
Degree: Medical Doctor
Telephone Number: 901-682-7241
Street Address: 6005 Park Ave, Ste 702
City or Town: Mphs
State: TN
Zip Code: 38119
Signature (By Physician): Lee E. Faulkner, MD
Date:

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Carter, Sherman
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman present for follow up visit. Mr. Carter states that he is chest pain free. He has no complaints of vomiting, dizziness, palpitation, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. DJD of Hip

**PLAN:**

1. ETOH cessation
2. Follow up in 6 months

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 7/5/2016 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman who is present today for a follow up visit. Mr. Carter complains of chest pain in the middle of his chest with activity, states this last 10 minutes. He reports no other complaints at this time. He denies any shortness of breath, dizziness, palpitations, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** BP: 120/80 **HT:** 6'1" **WT:** 212lbs

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis, edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy (Non-Ischemic)

**PLAN:**

1. Current Cardiac Care

____________________
Lee E. Faulkner M.D.

Welcome to ITA - Information Technology Associates

DOT Dictionary of Occupational Titles
www.occupationalinfo.org

Search | Contents | ONET NEW | Glossary | Link to this page | About

AdChoices | GED Classes | Math Skills | Math Problems

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z ?




## Dictionary Of Occupational Titles
## Appendix C: Components of the Definition Trailer

APPENDIX C

COMPONENTS OF THE DEFINITION TRAILER

I. DATE OF LAST UPDATE (DLU)

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

The following descriptions of the components of the Definition Trailer are in inverse order to their placement in the trailer.

I. DATE OF LAST UPDATE (DLU)

Listed as the final element in the trailer following the definition, the Date of Last Update indicates the last year in which material was gathered for that occupation. A DLU of "77" would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977.

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. *Vocational education (high school; commercial or shop training; technical school; art school; and that* part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

EXHIBIT
tabbies
F

The following is an explanation of the various levels of specific vocational preparation:

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Note: The levels of this scale are mutually exclusive and do not overlap.

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

Scale of General Education Development (GED)

06 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

06 MATHEMATICAL DEVELOPMENT

Advanced calculus:

Work with limits, continuity, real number systems, mean value theorems, and implicit functions theorems.

Modern Algebra:

*Apply fundamental concepts of theories of groups, rings, and fields. Work with differential equations, linear* algebra, infinite series, advanced operations methods, and functions of real and complex variables.

Statistics:

Work with mathematical statistics, mathematical probability and applications, experimental design, statistical inference, and econometrics.

06 LANGUAGE DEVELOPMENT

Same as Level 5.

05 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables. 05 MATHEMATICAL DEVELOPMENT

Algebra:

Work with exponents and logarithms, linear equations, quadratic equations, mathematical induction and binomial theorem, and permutations.

Calculus:

Apply concepts of analytic geometry, differentiations, and integration of algebraic functions with applications.

*Statistics:*

Apply mathematical operations to frequency distributions, reliability and validity of tests, normal curve, analysis of variance, correlation techniques, chi-square application and sampling theory, and factor analysis.

05 LANGUAGE DEVELOPMENT

Reading:

Read literature, book and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.

Writing:

Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.

Speaking:

Coversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

04 LEVEL REASONING DEVELOPMENT

Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

04 MATHEMATICAL DEVELOPMENT

Algebra:

Deal with system of real numbers; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity; and probability and statistical inference.

Geometry:

Deductive axiomatic geometry, plane and solid, and rectangular coordinates.

Shop Math:

Practical application of fractions, percentages, ratio and proportion, measurement, logarithms, slide rule, practical algebra, geometric construction, and essentials of trigonometry.

04 LANGUAGE DEVELOPMENT

Reading:

Read novels, poems, newspapers, periodicals, journals, manuals, dictionaries, thesauruses, and encyclopedias.

Writing:

Prepare business letters, expositions, summaries, and reports, using prescribed format and conforming to all rules of punctuation, grammar, diction, and style.

Speaking:

Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

03 MATHEMATICAL DEVELOPMENT

Compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage. Calculate surfaces, volumes, weights, and measures.

Algebra:

Calculate variables and formulas; monomials and polynomials; ratio and proportion variables; and square roots and radicals.

Geometry:

Calculate plane and solid figures; circumference, area, and volume. Understand kinds of angles and properties of pairs of angles.

03 LANGUAGE DEVELOPMENT

Reading:

Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

Writing:

Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.

Speaking:

Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

02 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

02 MATHEMATICAL DEVELOPMENT

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

02 LANGUAGE DEVELOPMENT

Reading:

Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Writing:

Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking:

Speak clearly and distinctly with appropiate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

01 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT

Add and subtract two digit numbers.

Multiply and divide 10's and 100's by 2, 3, 4, 5.

Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT

*Reading:*

Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

The Physical Demands Strength Rating reflects the estimated overall strength requirement of the job, expressed in terms of the letter corresponding to the particular strength rating. It represents the strength requirements which are considered to be important for average, successful work performance.

The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy. In order to determine the overall rating, an evaluation is made of the worker's involvement in the following activities:

a. Standing, Walking, Sitting

Standing - Remaining on one's feet in an upright position at a work station with-out moving about.

Walking - Moving about on foot.

Sitting - Remaining in a seated position.

b. Lifting, Carrying, Pushing, Pulling

Lifting - Raising or lowering an object from one level to another (includes upward pulling).

Carrying - Transporting an object, usually holding it in the hands or arms, or on the shoulder.

Pushing - Exerting force upon an object so that the object moves away from the force (includes slapping, striking, kicking, and treadle actions).

Pulling - Exerting force upon an object so that the object moves toward the force (includes jerking).

Lifting, pushing, and pulling are evaluated in terms of both intensity and duration. Consideration is given to the weight handled, position of the worker's body, and the aid given by helpers or mechanical equipment. Carrying most often is evaluated in terms of duration, weight carried, and distance carried.

Estimating the Strength factor rating for an occupation requires the exercise of care on the part of occupational analysts in evaluating the force and physical effort a worker must exert. For instance, if the worker is in a crouching position, it may be much more difficult to push an object than if pushed at waist height. Also, if the worker is required to lift and carry continuously or push and pull objects over long distances, the worker may exert as much physical effort as is required to similarly move objects twice as heavy, but less frequently and/or over shorter distances.

c. Controls

Controls entail the use of one or both arms or hands (hand/arm) and/or one or both feet or legs (foot/leg) to move controls on machinery or equipment. Controls include but are not limited to buttons, knobs, pedals, levers, and cranks.

Following are descriptions of the five terms in which the Strength Factor is expressed:

S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are

sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

V-Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work.

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work *requirements*.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

01 Artistic 05 Mechanical 09 Accommodating

02 Scientific 06 Industrial 10 Humanitarian

03 Plants-Animals 07 Business Detail 11 Leading-Influencing

04 Protective 08 Selling 12 Physical Performing

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

## Download Google Chrome Browser

Chrome Safe Browsing will protect you from malicious sites.

DOWNLOAD

---

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables
- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/contents.html**

Translators on the www

| | Espa�ol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2003 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 05-Jun-03

CTR030418

CD-ROM OR DOWNLOAD DOT Android or Windows



CODE: **215.367-010** **Buy the DOT:Download**
TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

LEGAL
Drivers who switch to
Allstate can save $356.
Allstate.

LEGAL
Drivers who switch to
Allstate can save $356.
Allstate.

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback


Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/21/215367010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

---

CODE: **215.367-010 Buy the DOT:Download** TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

CD-ROM OR DOWNLOAD DOT Android or Windows

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

| | | |
|---|---|---|
| A | B | C |
| D | E | F |
| G | H | I |
| J | K | L |
| M | N | O |
| P | Q | R |
| S | T | U |
| V | W | X |
| Y | Z | ? |

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **654.687-010** **Buy the DOT:Download**
TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

Ashley








- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/65/654687010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **654.687-010 Buy the DOT:Download** TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

[redacted]

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

The New York Heart Association (NYHA) Functional Classification scale associates a patient's heart failure according to the severity of the observable symptoms.

## New York Heart Association (NYHA) Functional Classification

The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification. It places patients in one of four categories based on the level of limitation during physical activity.

If the hospice diagnosis is heart disease, the NYHA classification should be Stage IV, to meet the criteria for hospice eligibility. Stage IV heart disease is characterized by symptoms of heart failure or anginal syndrome at rest. Symptoms include chest pain, dyspnea, weakness and inability to tolerate activity without discomfort. Additional criteria necessary for hospice eligibility with a terminal diagnosis of heart disease includes optimal treatment of heart disease, the patient declines or is ineligibility for surgical intervention, an ejection fraction of ≤ 20% and a history of a one of the following in the last 12 months: Treatment resistant SVT or ventricular arrhythmia, unexplained syncope, cardiac arrest, brain embolism of cardiac origin and/or concomitant HIV disease.

Classification is based on observable symptoms which must be clearly documented in the patient's clinical record to support the classification listed:

| *Class* | *Objective Assessment* | *Patient Symptoms* |
|---|---|---|
| *Class I (Mild)* | ***No objective evidence of cardiovascular disease.*** No symptoms and no limitation in ordinary physical activity. | ***No limitation of physical activity.*** Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea (shortness of breath). |
| *Class II (Mild)* | ***Objective evidence of minimal cardiovascular disease.*** Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. | ***Slight limitation of physical activity.*** Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. |
| *Class III (Moderate)* | ***Objective evidence of moderately severe cardiovascular disease.*** Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. | ***Marked limitation of physical activity.*** Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| *Class IV (Severe)* | ***Objective evidence of severe cardiovascular disease. Severe limitations.*** Experiences symptoms even while at rest. | ***Unable to carry out any physical activity without discomfort. Symptoms of cardiac insufficiency at rest.*** If any physical activity is undertaken, discomfort is increased. |

Reference: The Stages of Heart Failure – NYHA Classification (2002), Retrieved 07/31/2006 from http://www.abouthf.org/questions_stages.htm

# New York Heart Association (NYHA) Functional Classification

The original NYHA Functional Classification was published in 1928. This was a time before important diagnostic modalities like the portable ECG, echocardiogram, exercise stress test and the cardiovascular disease biomarker B-type natriuretic peptide (BNP) assay.

McDonald and Wilkinson (2017) and other researchers are advocating for the increased use of natriuretic peptides as part of the strategies for heart failure diagnosis and prevention. The use of these biomarkers has been shown to improve diagnostic accuracy for HF and provide prognostic information for more than a decade of use with recommendations by national and international cardiovascular organizations.

The NYHA classification has been updated many times. Today's version includes two sections; 1) a subjective description of functional capacity and 2) an objective diagnostic assessment of cardiovascular disease. While subjective inconsistencies may result when classifying patients in class II or III, functional capacity remains a powerful prognostic indicator and is routinely used for clinical staging of heart failure today.

**New York Heart Association (NYHA) Functional Classification**

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |
| Source: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure | |

One commonly used technique to assess the functional capacity of patients is the Six-minute walk test (6MWT). The 6MWT has been shown to be a reliable, inexpensive, safe and easy to administer test that correlates with health outcomes (Rostagno, C. Gensini, 2008). (https://www.lung.org/lung-health-and-diseases/lung-procedures-and-tests/six-minute-walk-test.html, updated 2018).

**Six Minute Walk Test**

- Explain that the test requires walking for 6 minutes in a straight line between to points 60 feet apart.
- Place a chair at either end of the course and explain that the patient may stop, rest or sit if necessary and that you will bring the chair to them if needed.
- Measure the total distance walked in 6 minutes.

Casanova et al (2011) studied 444 healthy subjects from seven countries to determine standard performance on the 6MWT. The 6MWT measures meters (m) walked as quickly as possible by the individual in six minutes.

The mean meters walked by all subjects was 571+ or – 90 m with male subjects walking 30m more than females. This is consistent with other similar studies. Older subjects walked shorter distances than younger subjects.

- 40–49 yrs of age, 611±85 m
- 50–59 yrs of age, 588±91 m
- 60–69 yrs of age, 559±80 m
- 70–80 yrs of age, 514±71 m

Rasekaba, Lee, Naughton, Williams & Holland (2009) determined a distance less than 350 m on the 6MWT to be associated with an increased mortality in chronic HF patients. A lowering of the walking distance of 50 m or more is considered clinically significant. Ferreira, et al. (2019) concluded in their research the 6-minute walk test distance at baseline and a decline in walking distance were both associated with worse prognosis.

Bittner et al (1993) studied 898 patients with left ventricular dysfunction with either radiological evidence of HF and/or an ejection fraction of 0.45 or lower. During the 242 days of follow up 114 patients either died or were hospitalized for CHF. The lowest performance group on the 6MWT had a statistically greater chance of dying or being hospitalized than the higher performing group. See detailed instruction about the 6MWT at the Heart Foundation website.

In an updated study by Wegrzynowska-Teodorczyk (2013), the researchers also found the distance covered during the 6MWT predicted the risk of death or hospitalization. Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. They studied 243 men with stable systolic heart failure.

- Class I 15%
- Class II 44%
- Class III 37%
- Class IV 4%

69% of the participants died or required hospitalization during the following 3 years. The statistical analysis showed the shorter the distance walked in the 6MWT, the greater the 1-year and 3-year mortality risk.
Du, et al., (2017) reviewed research on the 6MWT in chronic heart failure published from 2012 to 2017. The researchers found the 6MWT not to be as accurate as possible in determining peak VO2. They suggest using mobile apps to better assess actual distance walked and heart rate.

---

References

American Heart Association. Professional Heart Daily. Accessed 8/2/16 http://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp

Bittner et al. (1993). Prediction of mortality and morbidity with a 6-minute walk test in patients with left ventricular dysfunction. SOLVD Investigators. *JAMA,* 270(14), 1702-7.

Casanova, C. et al. (2011). The 6-min walk distance in healthy subjects: reference standards from seven countries. *European Respiratory Journal*, 37, 150-156.

Du, H., Wonggom, P., Tongpeth, J. & Clark, R.A. (2017). Six-Minute Walk Test for Assessing Physical Functional Capacity in Chronic Heart Failure. Curr Heart Fail Rep. 14(3),158-166.

Ferreira, J.P., Metra, M., Anker, S.D., Dickstein, K., Lang, C.C.. & Ng, L. (2019). Clinical correlates and outcome associated with changes in 6-minute walking distance in patients with heart failure: findings from the BIOSTAT-CHF study. Eur J Heart Fail. 21(2), 218-226.

McDonald, K., Wilkinson, M. (2017). Evolving Use of Natriuretic Peptides as Part of Strategies for Heart Failure Prevention. Clin Chem. 63(1), 66-72.

Rasekaba, T., Lee, A. L., Naughton, M. T. ,Williams, T. J. & Holland, A. E. (2009). The six-minute walk test: a useful metric for the cardiopulmonary patient. *Intern Med J.*, 39(8),495-501.

Rostagno C., Gensini G.F. (2008). Six minute walk test: a simple and useful test to evaluate functional capacity in patients with heart failure. *Intern Emerg Med.* 3(3):205-12.

The Criteria Committee of the New York Heart Association. (1994). *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels.* (9th ed.). Boston: Little, Brown & Co. pp. 253–256.

Wegrzynowska-Teodorczyk, K., Rudzinska, E., Lazorczyk, M., Nowakowska, K., Banasiak, W. Ponikowski, P et al. (2013). Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. J Physiother. 59(3), 177-87.

---

© RnCeus.com

# Classes of Heart Failure

Doctors usually classify patients' heart failure according to the severity of their symptoms. The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification[1]. It places patients in one of four categories based on how much they are limited during physical activity.

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

| Class | Objective Assessment |
|---|---|
| A | No objective evidence of cardiovascular disease. No symptoms and no limitation in ordinary physical activity. |
| B | Objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. |
| C | Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. |
| D | Objective evidence of severe cardiovascular disease. Severe limitations. Experiences symptoms even while at rest. |

**For Example:**

- A patient with minimal or no symptoms but a large pressure gradient across the aortic valve or severe obstruction of the left main coronary artery is classified:
  - **Function Capacity I, Objective Assessment D**
- A patient with severe anginal syndrome but angiographically normal coronary arteries is classified:
  - **Functional Capacity IV, Objective Assessment A**

Heart Failure

What is Heart Failure?

Types of Heart Failure

Classes of Heart Failure

Heart Failure in Children and Adolescents

Causes and Risks

Warning Signs of Heart Failure

Diagnosing Heart Failure

Treatment Options

Living with Heart Failure and Managing Advanced HF

Tools and Resources

Heart Failure Personal Stories

Related Articles

Heart Failure Questions to Ask Your Doctor

*[1] Adapted from Dolgin M, Association NYH, Fox AC, Gorlin R, Levin RI, New York Heart Association. Criteria Committee. Nomenclature and criteria for diagnosis of diseases of the heart and great vessels. 9th ed. Boston, MA: Lippincott Williams and Wilkins; March 1, 1994.*

*Original source: Criteria Committee, New York Heart Association, Inc. Diseases of the Heart and Blood Vessels. Nomenclature and Criteria for diagnosis, 6th edition Boston, Little, Brown and Co. 1964, p 114.*

Warning Signs of Heart Failure

Popular Articles

Heart Insight

In the first of a four-part series on heart failure, we investigate what it is, what causes it and what's the prognosis. ›

The second installment explains heart failure with muscle intact. Queen Latifah and her mom, Rita, share their personal experience with Rita's own heart failure diagnosis. ›

Heart failure patients are often hospitalized. This article looks at managing self-care to minimize just how often re-hospitalizations happen. ›

When HF progresses to an advanced stage, there are many decisions to be made. Here we delve into the importance of shared decision making. ›

Classes of Heart Failure

Last Reviewed: May 31, 2017

Diagnosing Heart Failure

HF Path™

A better quality of life for heart failure patients? We've got a tool for that!

Begin Your Journey Today ›

## Explore My HF Guide

Our free interactive workbook to help manage heart failure symptoms

Open now ›

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number:

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

## If You Have Any Questions

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

European Journal of Heart Failure (2017) 19, 366–376
doi:10.1002/ejhf.563

RESEARCH ARTICLE

# New York Heart Association functional class, QRS duration, and survival in heart failure with reduced ejection fraction: implications for cardiac resychronization therapy

**Frieder Braunschweig[1,2]*, Cecilia Linde[1,2], Lina Benson[3], Marcus Ståhlberg[1,2], Ulf Dahlström[4], and Lars H. Lund[1,2]**

[1]Karolinska Institutet, Department of Medicine, Stockholm, Sweden; [2]Karolinska University Hospital, Department of Cardiology, Stockholm, Sweden; [3]Karolinska Institutet, Department of Clinical Science and Education, South Hospital, Stockholm, Sweden; and [4]Department of Cardiology and Department of Medicine and Health Sciences, Linköping University, Linköping, Sweden

*Received 14 January 2016; revised 23 March 2016; accepted 4 April 2016; online publish-ahead-of-print 23 June 2016*

**Aims** Symptom severity assessed by NYHA functional class and QRS duration are essential criteria for selection of heart failure (HF) patients for CRT. This study assessed the relationship between NYHA class, QRS duration, and survival in a nationwide HF registry.

**Methods and results** We studied 13 423 patients with HF in NYHA class II–IV and LVEF <40% in the Swedish Heart Failure Registry. Survival was followed via the Swedish Population Registry. Of 12 534 patients without CRT (age 71 ± 12 years, 29% women), 51% and 49% were in NYHA class II and III–IV, respectively. Patients in NYHA class II compared with class III–IV were younger (69 vs. 73 years), and had a better systolic function (49% vs. 58% with LVEF <30%), $P$ <0.001 for all, and a favourable co-morbidity profile. QRS duration was 116 ± 29 ms in NYHA class II and 119 ± 29 ms in NYHA class III–IV with QRS ≥120 ms found in 37% vs. 44%, and an LBBB in 23% vs. 28% ($P$ < 0.001 for all). Upon multivariable Cox regression adjusting for 40 clinically relevant variables, mortality risk was higher in NYHA class III–IV vs. class II, with a hazard ratio (HR) of 1.31, 95% confidence interval (CI) 1.23–1.40. Mortality was also higher with QRS prolongation ≥120 ms vs. narrow QRS. The HR in NYHA class II patients with non-LBBB was 1.19 (95% CI 1.05 – 1.36) and in those with LBBB it was 1.16 (95% CI 1.03–1.41). The corresponding HRs in NYHA class III–IV were 1.33 (95% CI 1.21–1.47) and 1.12 (95% CI 1.02–1.22). There was no significant interaction between the effects of NYHA class and QRS duration or morphology on mortality. Applying different scenarios to estimate guideline adherence, fewer patients with NYHA class II (range 14.4–42.6%) compared with NYHA class III–IV (18.0–45.4%) had received a CRT device when indicated.

**Conclusions** In HF with reduced LVEF, QRS prolongation is common and independently linked to worse survival. The increase in mortality risk associated with QRS prolongation of both LBBB and non-LBBB morphology is similar in NYHA class II and III–IV.

**Keywords** NYHA functional class • Heart failure • QRS width • Left bundle branch block • Epidemiology • Cardiac resynchronization therapy

*Corresponding author. Department of Cardiology, Karolinska University Hospital, Solna, 17176 Stockholm, Sweden. Tel: +46 8 51771629, Fax: +46 8 311044, Email: frieder.braunschweig@karolinska.se

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

# Introduction

Heart failure (HF) is a highly symptomatic syndrome and associated with poor quality of life, frequent hospitalizations, and a high mortality risk despite recent advances in treatment with drugs and devices.[1,2] It is estimated that 2–3% of the population in industrialized countries suffers from HF, with a marked rise in those aged above 65.[3,4] In 1928 the New York Heart Association published a classification of HF symptom severity relating cardinal symptoms of HF like shortness of breath and fatigue to the levels of physical activity on which they occur (NYHA functional class I–IV).[5] Despite well-known limitations such as the temporal variability of clinical findings, interoperator variation, and a poor correlation with measures of cardiac function,[6,7] the NYHA classification is universally used to grade symptoms and select therapy in clinical practice, and provides prognostic discrimination close to that of complex multivariable risk models.[8]

A wide QRS complex on the surface ECG, especially if displayed as an LBBB, indicates intraventricular dyssynchony, and is a marker of poor prognosis in HF.[9] Cardiac resynchronization therapy improves survival, functional capacity, and quality of life in selected patients with such ECG abnormalities. Following early pivotal trials establishing the effectiveness of CRT in NYHA class III and IV,[10,11] the concept of resynchronization was expanded to patients with mild HF.[12–14] Current guidelines recommend CRT for patients with HF in NYHA class II–IV,[15–17] with gradual differentiations in relation to QRS morphology and duration. Based on evidence from trials and meta-analyses, patients with a typical LBBB pattern are given the highest level of recommendation.[18,19] A recent individual patient meta-analysis, however, suggested QRS duration rather than morphology as an independent predictor of CRT outcomes.[20] The implementation of CRT guidelines shows wide national and regional variation.[21] Potential differences in the adoption of CRT in NYHA class II compared with class III–IV have not been explored.

Since NYHA class and QRS morphology and duration form essential selection criteria, it would be important to study the relationship between these variables and survival in CRT candidates. However, this has been difficult as randomized studies largely included patients with either NYHA class III–IV or NYHA class (I and) II. Furthermore, the impact of QRS characteristics on survival in different groups of NYHA class is confounded by many other variables. Thus, large samples with information on a wide spectrum of baseline variables would be required to reach valid conclusions. Therefore, we investigated the interaction between NYHA class, QRS morphology/duration, and survival in a large Swedish HF registry with information from long-term follow-up and complete survival status by linkage to the National Population Registry.

# Methods

The Swedish Heart Failure Registry (SwedeHF) has been described previously.[22,23] Including over 63 000 unique HF patients, it is one of the largest HF registries worldwide. The protocol, case report form, and annual registry reports are available at http://www.SwedeHF.se. Patients with clinician-judged HF are included at discharge from hospital or upon outpatient visits at cardiology or internal medicine units and primary care clinics. Approximately 80 variables are recorded. The HF registry in general as well as the present study conform to the Declaration of Helsinki and they were approved by the responsible ethics committees. Individual patient consent is not required, but patients are informed of entry into national registries and allowed to opt out.

## Patients

*Figure 1* provides details on patient inclusion and exclusion. Between 11 May 2000 and 5 June 2013, there were 85 291 registrations from inpatient and outpatient units at 68 of 94 hospitals and from 102 of ~1000 primary care outpatient clinics in Sweden. Coverage in 2012 was 55%. This was defined as the number of individuals reported to the registry divided by the sum of individuals with clinical HF encountered in Sweden according to ICD-10 (International Classification of Diseases-10th revision) code for HF plus those reported to the registry (to capture those few who may have been missed by ICD-10 code).

Survival status was updated monthly by linkage with the Swedish population registry (latest update 15 May 2013). For the purpose of this study, we included first registrations from patients with HF and reduced EF, defined as an EF ≤40%. Patients had to be in NYHA class II, III, or IV, with complete data on age, rhythm, device implantation status, as well as QRS duration and morphology. Patients with a prolonged QRS duration of ≥120 ms were defined as either LBBB or non-LBBB type at the discretion of the physician. We excluded repeat registrations and patients with a pacemaker or implantable cardioverter defibrillator (ICD) without a CRT component.

## Analyses

The analysis of the inter-relationship between NYHA class, QRS duration, and survival was performed after the exclusion of patients with a CRT and, thus, paced QRS complexes on the ECG (*Figure 1*), whereas the analysis of CRT utilization included patients with a CRT device.

Categorization and availability of data in the registry do not allow a perfect match with European Society of Cardiology (ESC) guidelines.[15–17] Therefore, we evaluated four different scenarios to account for different levels of recommendation in the guidelines and different strengths of fitting between guideline criteria and registry variables. In the registry, EF is reported as <30, 30–39, 40–49, and ≥50%. As EF in Sweden is overwhelmingly reported in 5–10% increments, we assumed that most patients registered in the group with EF 30–39% had an actual EF of 30% or 35% and that few had an EF of 36–39%. In contrast, when selecting only registry patients with EF <30%, all would fulfil the LVEF guideline criterion for CRT, but some patients with EF 30–35% would be missed.

The strength of evidence and recommendations for CRT varies depending on QRS duration (120–149; ≥150 ms), QRS morphology (LBBB vs. non-LBBB), and rhythm (sinus vs. AF). Therefore, we performed analyses with progressively stricter CRT selection criteria, based on the guideline-specified recommendations I-A, I-B, IIa-B, and IIb-B from the European Heart Rhythm Association Guidelines 2013.[16] Guidelines also recommend CRT in patients with an indication for conventional ventricular pacing. The registry contains data on the presence of conventional pacemakers but not on the original indication for implantation or the percentage of ventricular pacing. Therefore, this potential guideline indication was not taken into account and patients with a previous pacemaker were excluded.

© 2016 The Authors




**Figure 1** Flow chart showing the selection of study patients from the SwedeHF registry. HF, heart failure; ICD, implantable cardioverter defibrillator.

Scenario 1: sinus rhythm (NYHA II–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology) or AF (NYHA III–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology)
Scenario 2: sinus rhythm (NYHA II–IV, EF <40%, LBBB or QRS ≥150 ms) or AF (NYHA III–IV, EF <40%, LBBB, or QRS ≥150 ms)
Scenario 3: sinus rhythm (NYHA II–IV, EF <30%, LBBB, or QRS ≥150 ms) or AF (NYHA III–IV, EF <30%, or QRS ≥150 ms)
Scenario 4: sinus rhythm (NYHA II–IV, EF <30%, QRS ≥150 regardless of QRS morphology) or AF (NYHA III–IV, EF <30%, QRS ≥150 regardless of QRS morphology) (patients were only included after 1 January 2011 because evidence in NYHA II was not available before then).

## Statistical analysis

All analyses were performed in R version 3.0.2 (R Foundation for Statistical Computing, Vienna, Austria). The level of significance was set to 5% and all reported *P*-values are two-tailed.

Survival for narrow QRS, non-LBBB QRS prolongation, and LBBB was presented using the Kaplan–Meier method and groups were compared with the log-rank test, separately for patients with NYHA class II and III–IV. Univariable and multivariable Cox regressions, using the Efron method for tie handling, were performed for non-LBBB/LBBB as a categorical variable compared with narrow QRS with adjustment for the 40 variables listed in the Supplementary material online, *Table S1*, and the interaction between NYHA class and QRS morphology. The modelling of an interaction effect renders a similar interpretation as if the data had been analysed separately in NYHA class subgroups, but with the additional benefit of also being able statistically to test differences between groups of NYHA class in effects of non-LBBB and LBBB vs. narrow QRS on mortality.

The proportional hazards assumption was investigated for the scaled Schoenfeld residuals from the multivariable models, and the dfbetas [a measure of how much the hazard ratio (HR) changes owing to the deletion of a single observation] from the models were inspected to detect extreme outliers. As a result, location (inpatient vs. outpatient) and marital status were modelled as strata variables because they were deemed not to fulfil the proportional hazard assumption. All continuous variables were modelled using restricted cubic splines (enabling possible non-linear relationships between these variables and the outcome to be modelled) with four degrees of freedom.[24]

Some baseline variables had missing data. *Table S1* in the Supplementary material online specifies 40 clinically relevant baseline variables and percentage missing for each variable. In the multivariable Cox regressions, to avoid bias and confounding resulting from variables not missing completely at random, multiple imputation ($n = 10$) was performed for all variables with missing data, using predictive mean matching with QRS width as a continuous variable and the 40 variables in *Table S1* in the Supplementary material online, and the outcome, survival, included as the Nelson–Aalen estimator in the imputation model, although not imputed itself because it contained no missing values. Imputation corrections to the resulting standard errors were performed.

# Results

Of 85 291 entries in the registry, 13 423 unique patients fulfilled the selection criteria (*Figure 1*). Of these, 889 had a CRT device implanted including 447 with an ICD component, leaving 12 534 patients without CRT for the main analysis. Baseline characteristics are provided in *Table 1* (for a complete list of variables see *Table S1*

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

**Table 1 Baseline characteristics**

| Variable | NYHA II ($n = 6377$) | NYHA III–IV ($n = 6157$) | P-value |
|---|---|---|---|
| Demographics | | | |
| Male gender | 4627 (73%) | 4273 (69%) | <0.001 |
| Age (years) | 69 ± 12 | 73 ± 12 | <0.001 |
| HF-related characteristics | | | |
| NYHA II | 6377 (100%) | – | <0.001 |
| NYHA III | – | 5554 (90%) | |
| NYHA IV | – | 603 (10%) | |
| Duration <6 months | 3741 (59%) | 2668 (44%) | <0.001 |
| IHD | 2870 (48%) | 3282 (56%) | <0.001 |
| DCM | 1276 (20%) | 1140 (19%) | 0.042 |
| HCM | 60 (2%) | 61 (2%) | 0.972 |
| LVEF 30–39% | 3246 (51%) | 2589 (42%) | <0.001 |
| LVEF <30% | 3131 (49%) | 3568 (58%) | |
| QRS-related characteristics | | | |
| QRS duration (ms) | 116 ± 29 | 119 ± 29 | <0.001 |
| QRS <120 ms | 4021 (63%) | 3437 (56%) | <0.001 |
| QRS 120–149 ms | 1305 (20%) | 1595 (26%) | |
| QRS ≥150 ms | 1051 (16%) | 1125 (18%) | |
| LBBB | 1497 (23%) | 1706 (28%) | <0.001 |
| Rhythm, blood pressure | | | |
| AF (any form) | 2548 (40%) | 2848 (46%) | <0.001 |
| Permanent AF | 2033 (32%) | 2333 (38%) | <0.001 |
| Heart rate (b.p.m.) | 72 ± 15 | 76 ± 16 | <0.001 |
| Systolic blood pressure (mmHg) | 126 ± 20 | 122 ± 21 | <0.001 |
| Co-morbidities | | | |
| Hypertension | 2722 (44%) | 2815 (47%) | <0.001 |
| Diabetes | 1284 (20%) | 1758 (29%) | <0.001 |
| Valve disease | 1003 (16%) | 1432 (24%) | <0.001 |
| Pulmonary disease | 845 (13%) | 1261 (21%) | <0.001 |
| Revascularization | 1710 (27%) | 1798 (29%) | 0.003 |
| Biochemistry | | | |
| Haemoglobin (g/L) | 138 ± 16 | 133 ± 17 | <0.001 |
| NT-proBNP (ng/L) | 2279 (1022–4902) | 3883 (1760–8456) | <0.001 |
| GFR (mL/min/1.73 m$^2$) | 76 ± 36 | 64 ± 34 | <0.001 |
| Medications | | | |
| ACE inhibitor | 4845 (76%) | 4165 (68%) | <0.001 |
| ARB | 1353 (21%) | 1446 (24%) | 0.002 |
| Beta-blocker | 5900 (93%) | 5534 (90%) | <0.001 |
| MRA | 1991 (31%) | 2328 (38%) | <0.001 |
| Diuretic | 4674 (74%) | 5403 (88%) | <0.001 |
| Digitalis | 1119 (18%) | 1133 (18%) | 0.207 |
| Nitrate | 744 (12%) | 1147 (19%) | <0.001 |
| OAC | 2516 (40%) | 2439 (40%) | 0.838 |

Numbers are *n* (%) for categorical variables and mean ± SD for continuous variables, and tested with $\chi^2$ test and t-test, respectively.
NT-proBNP is given as median (interquartile range).
DCM, dilated cardiomyopathy; GFR, glomerular filtration rate; HCM, hypertrophic cardiomyopathy, IHD, ischaemic heart disease; MRA, mineralocorticoid receptor antagonist; OAC, oral anticoagulant.

in the Supplementary material online). There were 6377 patients (51%) with NYHA class II and 6157 (49%) in NYHA class III–IV.

Patients in NYHA class II were younger, more likely to be male, and had a shorter duration of HF, less ischaemic cardiomyopathy, and a higher LVEF. Furthermore, they had a lower propability of AF, a lower heart rate, higher systolic blood pressure, and a more favourable co-morbidity profile. Levels of NT-proBNP were lower, while haemoglobin and creatinine clearance were higher. Interestingly, a higher proportion of NYHA class II patients were on treatment with ACE inhibitors and beta-blockers. In contrast, use of ARBs, mineralocorticoid receptor antagonists (MRA), and diuretics was higher among patients with NYHA class III–IV.

## QRS duration and morphology in relation to New York Heart Association class

QRS prolongation was common in both groups (*Figure 2*). On average, patients in NYHA class II compared with NYHA class III–IV had a somewhat smaller QRS (116 ± 29 ms vs. 119 ± 29 ms; $P < 0.001$) and fewer had a QRS of ≥120 ms (37% vs. 44%;

© 2016 The Authors




**Figure 2** Prevalence of QRS duration. Distribution of QRS duration in increments of 10 ms and proportions with LBBB (hashed bars) in patients with NYHA class II and NYHA class III–IV.

$P < 0.001$), a QRS ≥150 ms (16% vs. 18%, $P = 0.009$), or an LBBB (23% vs. 28%; $P < 0.001$). However, among those with a QRS duration ≥120 ms, the proportion of patients with LBBB was similar: 64% in NYHA class II and 63% in NYHA class III–IV ($P = 0.55$), and increased with progressively wider QRS.

## Survival in relation to New York Heart Association class and QRS duration and morphology

As expected, NYHA class II patients had a better survival compared with those in NYHA class III–IV (*Figure 3*). In the resulting multivariable Cox model, the HR and 95% confidence interval (CI) for mortality in NYHA III–IV vs. II was 1.31, 95% CI 1.23–1.40 ($P < 0.001$). In both groups, prolonged QRS duration was associated with worse survival and the prognosis of patients with a non-LBBB morphology was inferior compared with those who had LBBB. The proportion of patients surviving at 1, 3, and 5 years is given in *Table 2*. After 5 years, 58% of patients in NYHA class II with QRS prolongation of non-LBBB type were alive, while the corresponding number of NYHA class III–IV patients was only 30%. In contrast, 69% and 49% of patients in NYHA class II and III–IV, respectively, survived at 5 years, if they had a narrow QRS. At each point of time, survival of NYHA class II patients with QRS prolongation of non-LBBB type was better compared with NYHA class III–IV patients with narrow QRS.

As shown in *Table 1*, there were significant differences in baseline characteristics probably explaining the better outcome in NYHA class II vs. NYHA class III–IV patients. Thus, to assess the independent contribution of QRS duration and morphology to the mortality risk in NYHA class II and NYHA class III–IV, survival data were adjusted for important confounding variables. These factors had been specified *a priori* and included all variables with statistical differences shown in *Table 1* and, in addition, civil status, housing, recruitment in or out of hospital, year of recruitment, setting of general follow-up, setting of HF follow-up, mean arterial pressure, pulse pressure, cardiomegaly, and/or congestion on X-ray.

In all settings, prolonged QRS duration was associated with a significant increase in mortality risk (*Figure 4*). After adjustment for multiple confounders, the HR for mortality in patients with non-LBBB type vs. narrow QRS was 1.19 (95% CI 1.05 – 1.36; $P = 0.009$) in NYHA class II and 1.33 (95% CI 1.21–1.47; $P < 0.001$) in NYHA class III–IV. Similarly, comparing patients with LBBB vs. narrow QRS, the adjusted HR was 1.16 (95% CI 1.03–1.41; $P = 0.013$) in NYHA class II and 1.12 (95% CI 1.02–1.22; $P = 0.014$) in NYHA class III–IV. Thus, QRS prolongation, both of LBBB and non-LBBB type, independently added a similar mortality risk in patients with NYHA class II and NYHA class III–IV (*P* for interaction: 0.521, crude and 0.244, adjusted).

© 2016 The Authors




**Figure 3** Kaplan–Meier survival by NYHA class and QRS morphology. (*A*) NYHA class II; (*B*) NYHA class III–IV. Log-rank *P*-value for QRS/LBBB in both NYHA groups: <0.001.

**Table 2 Survival at 1, 3, and 5 years**

| Year | QRS <120 ms | | | QRS ≥120 ms non-LBBB | | | QRS ≥120 ms LBBB | | |
|---|---|---|---|---|---|---|---|---|---|
| | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI |
| NYHA class II | | | | | | | | | |
| 1 | 3287 | 0.92 | 0.92–0.93 | 680 | 0.88 | 0.86–0.91 | 1173 | 0.90 | 0.88–0.91 |
| 3 | 1967 | 0.80 | 0.79–0.82 | 400 | 0.71 | 0.68–0.75 | 681 | 0.74 | 0.72–0.77 |
| 5 | 945 | 0.69 | 0.67–0.70 | 190 | 0.58 | 0.54–0.62 | 296 | 0.62 | 0.59–0.65 |
| NYHA class III–IV | | | | | | | | | |
| 1 | 2477 | 0.82 | 0.80–0.83 | 631 | 0.70 | 0.70–0.73 | 1163 | 0.54 | 0.75–0.79 |
| 3 | 1290 | 0.63 | 0.61–0.65 | 304 | 0.45 | 0.42–0.49 | 591 | | (0.51–0.57) |
| 5 | 577 | 0.49 | 0.47–0.51 | 128 | 0.30 | 0.26–0.33 | 243 | 0.39 | 0.36–0.41 |

CI, confidence interval.

## Eligibility and utilization of cardiac resynchronization therapy according to New York Heart Association class

The proportion of patients eligible for CRT and the actual utilization of CRT in relation to current guideline recommendations was analysed in 13 423 individual patients, including those with an implanted CRT device. Eligibility was analysed in four scenarios representing increasing strength of recommendation and fit between guideline and registry criteria (*Figure 5*). Depending on the scenario chosen, between 14.5% and 30.4% of patients in NYHA class II and between 18.9% and 49.1% of patients in NYHA class III–IV fulfilled guideline recommendations for CRT. For example, in scenario 3, representing strict selection criteria according to current guidelines, 16.2% in NYHA class III–IV and 28.1% in NYHA class II met CRT selection criteria. In each scenario, more patients in NYHA class III–IV than in class II had a CRT indication.

Of patients meeting criteria for CRT, only a minority had actually received a device. This proportion ranged between 14.4% and 42.6% of eligible patients (4.4% and 6.2% of the total) with NYHA class II, and between 18.0% and 45.4% (8.6% and 8.8% of the total) in those with NYHA class III–IV. For example, in scenario 3, 27.1% and 31.4% had actually been implanted. Thus, irrespective of analysis, large proportions of both NYHA groups lacked CRT despite an indication. Consistently, the proportion of patients in NYHA class II who had an indication but were not treated with a device was lower compared with those in NYHA class III–IV, including scenario 4 which contained only

© 2016 The Authors




**Figure 4** Forest plots depicting hazard ratios (HRs) for all-cause mortality associated with different QRS morphologies in NYHA class II and NYHA class III–IV. Cox regressions were performed in the overall population with adjustment for the 40 variables in Supplementary material online, *Table S1* and the interaction between NYHA class and QRS morphology. Interaction between QRS/LBBB and NYHA class: 0.521 (crude); 0.244 (adjusted). CI, confidence interval.

patients who entered the registry after the first publication of CRT guidelines for NYHA class II patients in 2010. However, while the difference in CRT utilization was statistically significant in scenario 1–3, it did not reach statistical significance ($P = 0.507$) in the fourth scenario, evaluating only a total of 684 patients with an indication.

## Discussion

Grading of HF symptoms according to the NYHA classification is a cornerstone in the clinical assessment of HF patients and has important clinical implications for the selection of appropriate treatment. Specifically, current guidelines for CRT tailor recommendations in relation to NYHA class and QRS characteristics.[15,16] We analysed the relationship between NYHA class, QRS duration/morphology, and survival in a large group of HF patients with reduced LVEF <40% and long-term follow-up via Swedish national registries. A QRS prolongation of ≥120 ms was common in both NYHA class II (36%) and NYHA class III–IV (44%). Importantly, while NYHA II patients were healthier at baseline and survived longer, the independent risk attributable to QRS prolongation of LBBB or non-LBBB type was similar in NYHA class II and III–IV. Although CRT is highly recommended in current guidelines, only a minority of patients fulfilling guideline recommendations had received a device, and this underutilization appeared to be even greater in NYHA class II compared with NYHA class III–IV.

Our finding that QRS duration is associated with a similar hazard for death in patients with NYHA class II and III–IV gains particular strength by the large sample size, the long and complete follow-up through national registries, and a background medical therapy reflecting a high standard of care. Even after adjustment for a large number of confounders, the mortality risk in NYHA class II patients with LBBB and non-LBBB morphology was significantly increased. This supports the notion that QRS prolongation is not only a general marker of HF severity[25] but also a risk factor contributing to the adverse prognosis in HF independently of other prognostic factors, presumably through the induction of ventricular dyssynchrony.

Other studies have looked into the interaction between NYHA class, QRS duration, and prognosis. Two smaller studies also found a wider QRS duration with more advanced NYHA class, but multivariable analysis was not performed.[26,27] Similarly to the present study, a secondary analysis of a previous, smaller SwedeHF

© 2016 The Authors




**Figure 5** Estimation of CRT utilization in the SwedeHF registry. (*A*) The proportion of patients meeting selection criteria for CRT according to scenarios 1–3 reflecting progressively stricter CRT selection criteria based on guideline recommendations, and scenario 4 considering only patients included after 1 January 2011 (see the Methods for further details). (*B*) The proportion of patients meeting CRT selection criteria who actually were implanted with a device. *P*-values (NYHA II compared with NYHA III–IV): $^1P < 0.001$; $^2P < 0.001$; $^3P = 0.015$; $^4P = 0.507$.

cohort indicated that interactions between QRS width and NYHA class were not significant upon multivariate analysis.[9]

The proportion of patients with prolonged QRS ≥120 ms in our study (41%) corresponds well with previous reports. A broad QRS was also found in 41% of patients with an LVEF ≤35% evaluated in the EuroHeart failure survey,[28] 37% of patients in the Italian Network on CHF[29] (using 140 ms as a cut-off), and 34% of HF patients examined in the setting of a community HF clinic.[30] In the present study, there was a trend towards worse prognosis in subjects with non-LBBB morphology, found in approximately one-third of patients with prolonged QRS, compared with LBBB. Causing a characteristic U-shaped activation pattern of the left ventricle,[31] LBBB has been closely linked to left intraventricular dyssynchrony between the septum and the lateral wall, while QRS prolongation of non-LBBB type may result in various other electromechanical abnormalities.[32] This may explain why patients with LBBB have especially large effects by CRT while non-LBBB morphology is a predictor of non-response.[33] Among patients with non-LBBB morphology, we could not single out those with a right bundle branch block (RBBB). RBBB is associated with increased mortality in chronic HF,[34] but RBBB patients do not improve by CRT.[35]

Cardiac resynchronization therapy was first introduced in patients with NYHA class III.[10,36,37] The COMPANION trial also included a small proportion (14%) of patients in NYHA class IV provided they had not been hospitalized during the month before enrolment and had an estimated survival exceeding 6 months.[11] This subgroup showed a significant reduction in the combined primary study endpoint, and hence the indication of 'ambulatory' NYHA class IV was incorporated into current guidelines. However, NYHA class IV is a rare indication in clinical practice and patients hospitalized with acutely decompensated HF and/or receiving inotropic support are usually not considered for implantation. In the European CRT survey, only 8% were judged to be in NYHA class IV at baseline.[38] In the present study, a total of 4.8% had NYHA class IV. Considering the clinical context in which patients are recruited to the registry, we assume that most of them met the criteria of 'ambulatory' class IV.

Utilization of CRT in NYHA class II vs. III–IV was significantly worse in scenarios 1–3. This can be explained by the later introduction of NYHA II to CRT guidelines. The analysis in scenario 4, focusing on a smaller sample of patients with strict indications recruited after 2010, showed a similarly worse utilization but the difference was not significant. In a registry, some appropriate reasons to abstain from device therapy such as high biological age, clinical severity of co-morbidities, or patient refusal are difficult to discern. However, considering the baseline characteristics (*Table 1*), factors such as high age and severe co-morbidities are unlikely to explain the larger underutilization of CRT in NYHA class II.

© 2016 The Authors

In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. It may be speculated that it was easier to achieve drug target doses in those with mild HF, better renal function, and less compromised haemodynamics as reflected by higher blood pressure.

Only half of the patients received CRT together with a defibrillator, which is below the European average but in keeping with Swedish implantation statistics and on a similar level compared with countries such as the UK or Denmark.[21]

Our findings have clinical implications as they indicate that a wide QRS complex should alert physicians to the significantly increased mortality risk of the HF patient regardless of NYHA class and other conditions. Device treatment with CRT and, in most cases ICD, has strong evidence in this scenario and should be seriously considered. Studies indicate that CRT is similarly effective in appropriately selected NYHA class II and III–IV patients to improve outcomes.[14] As CRT appears particularly underutilized in NYHA class II, the value of early interventions to prevent disease progression should be highlighted. Recently, long-term effects of CRT on mortality[39] and measures of functional and LV remodelling[40] were shown in mild HF. However, these improvements were largely confined to patients with LBBB. Thus, our results also emphasize a particular need for additional treatment options in patients with mild to moderate HF and QRS prolongation of non-LBBB type who have limited effects by resynchronization.

## Limitations

Measurement of QRS duration and the categorization of LBBB was left to the individual physician, and misclassification may have occurred. We have no information regarding the presence of RBBB but only whether patients had LBBB or not. Categories used in the registry, in particular LVEF, allowed no perfect match with selection criteria in the guidelines. We sought to accommodate this by evaluating guideline adoption in different scenarios with progressively stricter CRT selection criteria. In addition, we could not assess whether patients with potential CRT indication had contraindications. The analysis of CRT utilization represents only a snap-shot of CRT prevalence, and we cannot rule out that patients without CRT may have received CRT during the later course of follow-up or that they improved such that CRT was no longer indicated. However, follow-up referral to cardiologists and HF nurse clinics was rare, suggesting that most patients were not considered for CRT by the clinician responsible. Furthermore, since only a minor portion of CRT candidates had received a device, it is unlikely that this portion had greatly increased during further follow-up. We reported all-cause but not cause-specific mortality. The latter may provide a stronger link between the pathophysiology of conduction delay and outcomes, but the former is more clinically relevant. Finally, patients with LV dysfunction and HF who had been previously implanted with an ICD were excluded from analysis.

## Conclusions

This study in a large national registry shows that QRS prolongation of both LBBB and non-LBBB type is an independent predictor of mortality in patients with HF and reduced LVEF. Importantly, the increase in mortality risk attributable to QRS prolongation was similar in those with NYHA class II and those with NYHA class III–IV, and remained significant even after adjustment for a large number of relevant confounders. Although many HF patients with prolonged QRS fulfil current guideline criteria, CRT appears to be underutilized particularly among NYHA class II patients.

## Supplementary Information

Additional Supporting Information may be found in the online version of this article:

**Table S1.** Complete baseline variables included in multivariable models among 12 534 patients (without CRT).

## Acknowledgements

We thank local investigators in the Swedish Heart Failure Registry for data entry and management.

## Funding

This work was supported in part by Boston Scientific, the Swedish Research Council, the Swedish Heart and Lung Foundation, and Stockholm County Council in the form of grants to L.H.L.'s institution. No funding organization had any role in the collection, analysis, or interpretation of data or approval/disapproval for publication.

**Conflict of interest:** L.H.L. reports speaker's honoraria from St Jude and research grants to his institution from Medtronic. C.L. was principal investigator of REVERSE, a CRT study sponsored by Medtronic, reports research grants, speaker honoraria, and consulting fees from Medtronic, and speaker honoraria and consulting fees from St. Jude Medical. F.B. reports research grants and speaker honoraria from Medtronic and consulting fees from Biotronik and Boston Scientific. M.S. and U.D. report no conflicts of interest.

## References

1. MacIntyre K, Capewell S, Stewart S, Chalmers JW, Boyd J, Finlayson A, Redpath A, Pell JP, McMurray JJ. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. *Circulation* 2000;102:1126–1131.
2. Schaufelberger M, Swedberg K, Koster M, Rosen M, Rosengren A. Decreasing one-year mortality and hospitalization rates for heart failure in Sweden: data from the Swedish Hospital Discharge Registry 1988 to 2000. *Eur Heart J* 2004;25:300–307.
3. Cowie MR, Mosterd A, Wood DA, Deckers JW, Poole-Wilson PA, Sutton GC, Grobbee DE. The epidemiology of heart failure. *Eur Heart J* 1997;18:208–225.
4. Dickstein K, Cohen-Solal A, Filippatos G, McMurray JJ, Ponikowski P, Poole-Wilson PA, Stromberg A, van Veldhuisen DJ, Atar D, Hoes AW, Keren A, Mebazaa A, Nieminen M, Priori SG, Swedberg K, Vahanian A, Camm J, De Caterina R, Dean V, Dickstein K, Filippatos G, Funck-Brentano C, Hellemans

© 2016 The Authors

4. Kristensen SD, McGregor K, Sechtem U, Silber S, Tendera M, Widimsky P, Zamorano JL, Tendera M, Auricchio A, Bax J, Bohm M, Corra U, della Bella P, Elliott PM, Follath F, Gheorghiade M, Hasin Y, Hernborg A, Jaarsma T, Komajda M, Kornowski R, Piepoli M, Prendergast B, Tavazzi L, Vachiery JL, Verheugt FW, Zamorano JL, Zannad F. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2008: the Task Force for the diagnosis and treatment of acute and chronic heart failure 2008 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association of the ESC (HFA) and endorsed by the European Society of Intensive Care Medicine (ESICM). *Eur J Heart Fail* 2008;**10**:933–989.
5. The Criteria Committee of the New York Heart Association. *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*, 9th ed. Boston: Little, Brown & Co.; 1994. p253–256.
6. Raphael C, Briscoe C, Davies J, Ian Whinnett Z, Manisty C, Sutton R, Mayet J, Francis DP. Limitations of the New York Heart Association functional classification system and self-reported walking distances in chronic heart failure. *Heart* 2007;**93**:476–482.
7. Adams KF Jr, Zannad F. Clinical definition and epidemiology of advanced heart failure. *Am Heart J* 1998;**135**:S204–S215.
8. Goda A, Williams P, Mancini D, Lund LH. Selecting patients for heart transplantation: comparison of the Heart Failure Survival Score (HFSS) and the Seattle Heart Failure Model (SHFM). *J Heart Lung Transplant* 2011;**30**:1236–1243.
9. Lund LH, Jurga J, Edner M, Benson L, Dahlstrom U, Linde C, Alehagen U. Prevalence, correlates, and prognostic significance of QRS prolongation in heart failure with reduced and preserved ejection fraction. *Eur Heart J* 2013;**34**:529–539.
10. Cleland JG, Daubert JC, Erdmann E, Freemantle N, Gras D, Kappenberger L, Tavazzi L. The effect of cardiac resynchronization on morbidity and mortality in heart failure. *N Engl J Med* 2005;**352**:1539–1549.
11. Bristow MR, Saxon LA, Boehmer J, Krueger S, Kass DA, De Marco T, Carson P, DiCarlo L, DeMets D, White BG, DeVries DW, Feldman AM. Cardiac-resynchronization therapy with or without an implantable defibrillator in advanced chronic heart failure. *N Engl J Med* 2004;**350**:2140–2150.
12. Linde C, Abraham WT, Gold MR, St John Sutton M, Ghio S, Daubert C. Randomized trial of cardiac resynchronization in mildly symptomatic heart failure patients and in asymptomatic patients with left ventricular dysfunction and previous heart failure symptoms. *J Am Coll Cardiol* 2008;**52**:1834–1843.
13. Moss AJ, Hall WJ, Cannom DS, Klein H, Brown MW, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Higgins SL, Pfeffer MA, Solomon SD, Wilber D, Zareba W. Cardiac-resynchronization therapy for the prevention of heart-failure events. *N Engl J Med* 2009;**361**:1329–1338.
14. Tang AS, Wells GA, Talajic M, Arnold MO, Sheldon R, Connolly S, Hohnloser SH, Nichol G, Birnie DH, Sapp JL, Yee R, Healey JS, Rouleau JL, Resynchronization-Defibrillation for Ambulatory Heart Failure Trial I. Cardiac-resynchronization therapy for mild-to-moderate heart failure. *N Engl J Med* 2010;**363**:2385–2395.
15. McMurray JJ, Adamopoulos S, Anker SD, Auricchio A, Bohm M, Dickstein K, Falk V, Filippatos G, Fonseca C, Gomez-Sanchez MA, Jaarsma T, Kober L, Lip GY, Maggioni AP, Parkhomenko A, Pieske BM, Popescu BA, Ronnevik PK, Rutten FH, Schwitter J, Seferovic P, Stepinska J, Trindade PT, Voors AA, Zannad F, Zeiher A, Bax JJ, Baumgartner H, Ceconi C, Dean V, Deaton C, Fagard R, Funck-Brentano C, Hasdai D, Hoes A, Kirchhof P, Knuuti J, Kolh P, McDonagh T, Moulin C, Reiner Z, Sechtem U, Sirnes PA, Tendera M, Torbicki A, Vahanian A, Windecker S, Bonet LA, Avraamides P, Ben Lamin HA, Brignole M, Coca A, Cowburn P, Dargie H, Elliott P, Flachskampf FA, Guida GF, Hardman S, Iung B, Merkely B, Mueller C, Nanas JN, Nielsen OW, Orn S, Parissis JT, Ponikowski P. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012: the Task Force for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2012 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association (HFA) of the ESC. *Eur J Heart Fail* 2012;**14**:803–869.
16. Brignole M, Auricchio A, Baron-Esquivias G, Bordachar P, Boriani G, Breithardt OA, Cleland J, Deharo JC, Delgado V, Elliott PM, Gorenek B, Israel CW, Leclercq C, Linde C, Mont L, Padeletti L, Sutton R, Vardas PE, ESC Committee for Practice Guidelines (CPG), Zamorano JL, Achenbach S, Baumgartner H, Bax JJ, Bueno H, Dean V, Deaton C, Erol C, Fagard R, Ferrari R, Hasdai D, Hoes AW, Kirchhof P, Knuuti J, Kolh P, Lancellotti P, Linhart A, Nihoyannopoulos P, Piepoli MF, Ponikowski P, Sirnes PA, Tamargo JL, Tendera M, Torbicki A, Wijns W, Windecker S, Document R, Kirchhof P, Blomstrom-Lundqvist C, Badano LP, Aliyev F, Bansch D, Baumgartner H, Bsata W, Buser P, Charron P, Daubert JC, Dobreanu D, Faerestrand S, Hasdai D, Hoes AW, Le Heuzey JY, Mavrakis H, McDonagh T, Merino JL, Nawar MM, Nielsen JC, Pieske B, Poposka L, Ruschitzka F, Tendera M, Van Gelder IC, Wilson CM. 2013 ESC Guidelines on cardiac pacing and cardiac resynchronization therapy: the Task Force on cardiac pacing and resynchronization therapy of the European Society of Cardiology (ESC). Developed in collaboration with the European Heart Rhythm Association (EHRA). *Eur Heart J* 2013;**34**:2281–2329.
17. Priori SG, Blomstrom-Lundqvist C, Mazzanti A, Blom N, Borggrefe M, Camm J, Elliott PM, Fitzsimons D, Hatala R, Hindricks G, Kirchhof P, Kjeldsen K, Kuck KH, Hernandez-Madrid A, Nikolaou N, Norekval TM, Spaulding C, Van Veldhuisen DJ. Authors/Task Force Members; Document Reviewers. 2015 ESC Guidelines for the management of patients with ventricular arrhythmias and the prevention of sudden cardiac death: the Task Force for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death of the European Society of Cardiology (ESC) Endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC). *Eur Heart J* 2015;**36**:2793–2867.
18. Sipahi I, Chou JC, Hyden M, Rowland DY, Simon DI, Fang JC. Effect of QRS morphology on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Am Heart J* 2012;**163**:260–267.
19. Sipahi I, Carrigan TP, Rowland DY, Stambler BS, Fang JC. Impact of QRS duration on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Arch Intern Med* 2011;**171**:1454–1462.
20. Cleland JG, Abraham WT, Linde C, Gold MR, Young JB, Claude Daubert J, Sherfesee L, Wells GA, Tang AS. An individual patient meta-analysis of five randomized trials assessing the effects of cardiac resynchronization therapy on morbidity and mortality in patients with symptomatic heart failure. *Eur Heart J* 2013;**34**:3547–3556.
21. Raatikainen MJ, Arnar DO, Zeppenfeld K, Merino JL, Levya F, Hindriks G, Kuck KH. Statistics on the use of cardiac electronic devices and electrophysiological procedures in the European Society of Cardiology countries: 2014 report from the European Heart Rhythm Association. *Europace* 2015;**17** Suppl 1:i1–175.
22. Lund LH, Benson L, Dahlstrom U, Edner M. Association between use of renin–angiotensin system antagonists and mortality in patients with heart failure and preserved ejection fraction. *JAMA* 2012;**308**:2108–2117.
23. Jonsson A, Edner M, Alehagen U, Dahlstrom U. Heart failure registry: a valuable tool for improving the management of patients with heart failure. *Eur J Heart Fail* 2010;**12**:25–31.
24. Therneau T, Grambsch P. Functional Form and Testing Proportional Hazards. In: Dietz K, Gail M, Krickeberg K, Samet J, Tsiatis A, eds *Modeling Survival Data: Extending the Cox Model*. New York: Springer-Verlag; 2000.
25. Kashani A, Barold SS. Significance of QRS complex duration in patients with heart failure. *J Am Coll Cardiol* 2005;**46**:2183–2192.
26. Stellbrink C, Auricchio A, Diem B, Breithardt OA, Kloss M, Schondube FA, Klein H, Messmer BJ, Hanrath P. Potential benefit of biventricular pacing in patients with congestive heart failure and ventricular tachyarrhythmia. *Am J Cardiol* 1999;**83**:143D–150D.
27. Gasparini M, Mantica M, Galimberti P, Marconi M, Genovese L, Faletra F, Simonini S, Klersy C, Coates R, Gronda E. Beneficial effects of biventricular pacing in patients with a 'narrow' QRS. *Pacing Clin Electrophysiol* 2003;**26**:169–174.
28. Khan NK, Goode KM, Cleland JG, Rigby AS, Freemantle N, Eastaugh J, Clark AL, de Silva R, Calvert MJ, Swedberg K, Komajda M, Mareev V, Follath F, EuroHeart Failure Survey I. Prevalence of ECG abnormalities in an international survey of patients with suspected or confirmed heart failure at death or discharge. *Eur J Heart Fail* 2007;**9**:491–501.
29. Baldasseroni S, Opasich C, Gorini M, Lucci D, Marchionni N, Marini M, Campana C, Perini G, Deorsola A, Masotti G, Tavazzi L, Maggioni AP, Italian Network on Congestive Heart Failure I. Left bundle-branch block is associated with increased 1-year sudden and total mortality rate in 5517 outpatients with congestive heart failure: a report from the Italian network on congestive heart failure. *Am Heart J* 2002;**143**:398–405.
30. Clark AL, Goode K, Cleland JG. The prevalence and incidence of left bundle branch block in ambulant patients with chronic heart failure. *Eur J Heart Fail* 2008;**10**:696–702.
31. Auricchio A, Fantoni C, Regoli F, Carbucicchio C, Goette A, Geller C, Kloss M, Klein H. Characterization of left ventricular activation in patients with heart failure and left bundle-branch block. *Circulation* 2004;**109**:1133–1139.
32. Andersson LG, Wu KC, Wieslander B, Loring Z, Frank TF, Maynard C, Gerstenblith G, Tomaselli GF, Weiss RG, Wagner GS, Ugander M, Strauss DG. Left ventricular mechanical dyssynchrony by cardiac magnetic resonance is greater in patients with strict vs nonstrict electrocardiogram criteria for left bundle-branch block. *Am Heart J* 2013;**165**:956–963.
33. Cleland J, Freemantle N, Ghio S, Fruhwald F, Shankar A, Marijanowski M, Verboven Y, Tavazzi L. Predicting the long-term effects of cardiac resynchronization therapy on mortality from baseline variables and the early response a report from the CARE-HF (Cardiac Resynchronization in Heart Failure) Trial. *J Am Coll Cardiol* 2008;**52**:438–445.
34. Xiong Y, Wang L, Liu W, Hankey GJ, Xu B, Wang S. The prognostic significance of right bundle branch block: a meta-analysis of prospective cohort studies. *Clin Cardiol* 2015;**38**:604–613.


© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

35. Bilchick KC, Kamath S, DiMarco JP, Stukenborg GJ. Bundle-branch block morphology and other predictors of outcome after cardiac resynchronization therapy in Medicare patients. *Circulation* 2010;**122**:2022–2030.
36. Cazeau S, Leclercq C, Lavergne T, Walker S, Varma C, Linde C, Garrigue S, Kappenberger L, Haywood GA, Santini M, Bailleul C, Daubert JC. Effects of multisite biventricular pacing in patients with heart failure and intraventricular conduction delay. *N Engl J Med* 2001;**344**:873–880.
37. Abraham WT, Fisher WG, Smith AL, Delurgio DB, Leon AR, Loh E, Kocovic DZ, Packer M, Clavell AL, Hayes DL, Ellestad M, Trupp RJ, Underwood J, Pickering F, Truex C, McAtee P, Messenger J. Cardiac resynchronization in chronic heart failure. *N Engl J Med* 2002;**346**:1845–1853.
38. Dickstein K, Bogale N, Priori S, Auricchio A, Cleland JG, Gitt A, Limbourg T, Linde C, van Veldhuisen DJ, Brugada J. The European cardiac resynchronization therapy survey. *Eur Heart J* 2009;**30**:2450–2460.
39. Goldenberg I, Kutyifa V, Klein HU, Cannom DS, Brown MW, Dan A, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Kautzner J, Klempfner R, Kuniss M, Merkely B, Pfeffer MA, Quesada A, Viskin S, McNitt S, Polonsky B, Ghanem A, Solomon SD, Wilber D, Zareba W, Moss AJ. Survival with cardiac-resynchronization therapy in mild heart failure. *N Engl J Med* 2014;**370**:1694–1701.
40. Linde C, Gold MR, Abraham WT, St John Sutton M, Ghio S, Cerkvenik J, Daubert C, Group RErRiSlvdS. Long-term impact of cardiac resynchronization therapy in mild heart failure: 5-year results from the REsynchronization reVErses Remodeling in Systolic left vEntricular dysfunction (REVERSE) study. *Eur Heart J* 2013;**34**:2592–2599.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

JACC: HEART FAILURE
VOL. 5, NO. 11, 2017
© 2017 BY THE AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION
ISSN 2213-1779/$36.00
PUBLISHED BY ELSEVIER
http://dx.doi.org/10.1016/j.jchf.2017.08.011

# Refining Classification of Heart Failure Based on Ejection Fraction

Gregg C. Fonarow, MD[a,b]

The complex clinical syndrome of heart failure (HF) is associated with a wide spectrum of left ventricular functional abnormalities (1). These range from preserved left ventricular ejection fraction (EF) and normal left ventricular size to severely reduced EF and marked dilation of the left ventricle. Although for many decades, HF was considered to be synonymous with diminished contractility of the left ventricle, in the early 2000s there was a growing appreciation for the fact that a substantial portion of patients with HF had relatively normal EF, frequently characterized as diastolic HF or diastolic dysfunctional HF. When carefully assessed, there is evidence for the presence of both systolic and diastolic functional abnormalities in most patients with HF (1). Dr. Milton Packer was one of the early proponents of using an EF-based classification for HF patients, suggesting that the term of diastolic HF be avoided and stating that "a less presumptuous approach is to refer to these patients as having HF with a normal ejection fraction, a descriptive approach that makes no assumptions about our knowledge about the pathophysiology of this disorder" (2). Since the 2005 American College of Cardiology/American Heart Association HF Guidelines adopted this approach (HF with reduced EF [HFrEF] and HF with preserved EF [HFpEF]), EF has been considered essential in the classification of patients with HF.

There have been extensive studies demonstrating that the demographics, causes, comorbidities, prognoses, and, most importantly, responses to therapy differ among HF patients based on EF classification (3). *Differences among the evidence bases for therapies is*, in and of itself, a compelling enough rationale for EF-based classification. Furthermore, to date, no measurement or marker other than EF has demonstrated utility in distinguishing which patient populations will or will not derive benefit from each guideline-directed therapy. Nevertheless, use of EF is not without limitations because it is dependent on the imaging technique used, the analysis methods, the operators, and the variability up to 5% (3). However, the use of EF is nearly ubiquitous in characterizing patients with HF in clinical practice and research, as well as being used as an indispensable component of the enrollment criteria in nearly every randomized clinical trial. Ejection fraction has proven to be of such substantial clinical and research value in the assessment and management of HF patients, there is a Class I level recommendation for EF measurement in every national and international HF guideline (1,4).

Despite the widespread adoption of EF-based classification of HF, the actual definitions of patients with hearts with reduced and preserved EFs have varied. HFrEF has been variably defined as EF values of ≤35%, <40%, and ≤40% (1). HFpEF has been classified as EF values of >40%, ≥45%, >45%, ≥50%, >50%, and ≥55% (1). In studies which explored the optimal cutpoint(s) for defining EF groups, data emerged suggesting there was an intermediate group of patients with EF in the range of 41% to 49% (3). These patients have a clinical profile and prognosis that are intermediate but closer to those of HFpEF patients defined by EF of ≥50% than those of HFrEF defined by EF of ≤40%, with certain exceptions. In addition, the large scale randomized controlled outcome trials in patients with HF have largely enrolled patients with EF values of ≤35% and ≤40%. It has been only in these HF patients that angiotensin-converting enzyme inhibitors, angiotensin receptor antagonists, angiotensin receptor neprilysin inhibitors, beta-blockers, aldosterone antagonists, and device therapies have demonstrated benefits of reduced mortality (1). Clinical trials to date in HF patients with an EF value of >40%, ≥45%, or ≥50% testing various therapies have not been successful (1). Furthermore, registry-based

From the [a]Division of Cardiology, David Geffen School of Medicine at UCLA, University of California Los Angeles, Los Angeles, California; and the [b]Ahmanson-UCLA Cardiomyopathy Center, University of California Los Angeles Medical Center, Los Angeles, California. Dr. Fonarow's research is supported by U.S. National Institute of Health; and he consults for Amgen, Janssen, Medtronic, Novartis, and St. Jude Medical.

Manuscript received August 10, 2017; accepted August 18, 2017.

JACC: HEART FAILURE VOL. 5, NO. 11, 2017
NOVEMBER 2017:808-9



studies have with few exceptions not observed benefits associated with the use of neurohormonal antagonists once the EF is >40% (3). Thus, there is not a sufficient evidence base and no current guideline recommendations to extend the use of therapies proven in patients with EF of ≤35% or ≤40% to those expressly with EF of >40% as a treatment for HF (1,4).

Based on the totality of available data, EF-based classification of HF was further refined, and an intermediate EF group, HF with borderline EF (HFbEF), was added to the 2013 the American College of Cardiology/American Heart Association HF guidelines. This group was defined by the presence of the typical symptoms of HF and EF of 41% to 49% (1). Following suit in 2016, the European Society of Cardiology specified HF with mid-range EF (HFmrEF) of 40% to 49% (4). It has also been recognized that there is a cohort of patients who present with HF with EF of ≤40%, whose EF subsequently improves. These patients with improved or recovered EF appear to be clinically distinct from patients with persistently reduced, borderline, or preserved EF and have a much better prognosis (1). A distinct classification was provided for these patients in the 2013 guidelines as well (1). Since these guidelines have been published, there has been ongoing debate as to whether these refined EF classifications are helpful or merely creating arbitrary distinctions. This debate notwithstanding, these refined classifications have fostered new studies that are improving the understanding of the causes, phenotypes, pathophysiologies, and prognoses in these patients. For example, a recent study of biomarker profiles analyzing 37 biomarkers from different pathophysiologic domains (myocardial stretch, inflammation, angiogenesis, oxidative stress, and hematopoiesis) found that patients with HFmrEF had an intermediate biomarker profile with interactions between both cardiac stretch and inflammation makers, whereas HFrEF profiles were mainly related to stretch and HFpEF to inflammation (5). These findings suggested that patients with HFmrEF may be a mixture of HFrEF and HFpEF patients (5). Biomarker-based profiling could potentially be used to identify the subset of patients who, despite having EF of >40%, could benefit from those therapies that benefit HFrEF patients.

There are certainly limitations to an HF classification system based on EF alone, and more detailed phenotyping may help to better characterize patients; provide greater prognostic discrimination; allow for more precise targeting of therapies to patients who will derive benefit; and facilitate the discovery of new, more effective treatments. Further research may establish the fact that there is a subset of patients with HF with EF of 41% to 49% who will benefit from therapies demonstrated to improve outcomes in patients with HF with EF of ≤40% (3). Whether this refined EF classification approach adopted in recent versions of the guidelines best serves the needs of patients, helps to advance the field, or needs to be further updated remains to be determined. However, the enduring value of EF for classifying and managing HF is something that physicians, no matter what their specialty, should be able to appreciate.

**ADDRESS FOR CORRESPONDENCE:** Dr. Gregg C. Fonarow, Ahmanson-UCLA Cardiomyopathy Center, Ronald Reagan UCLA Medical Center, 10833 LeConte Avenue, Room A2-237 CHS, Los Angeles, California 90095-1679. E-mail: gfonarow@mednet.ucla.edu.

**REFERENCES**

1. Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.

2. Burkoff D, Maurer MS, Packer M. Heart failure with a normal ejection fraction: is it really a disorder of diastolic function? Circulation 2003;107:656-8.

3. Hsu JJ, Ziaeian B, Fonarow GC. Heart failure with mid-range (borderline) ejection faction: clinical implications and future directions. J Am Coll Cardiol HF 2017. In press.

4. Ponikowski P, Voors AA, Anker SD, et al. 2016 ESC guidelines for the diagnosis and treatment of acute and chronic heart failure: the Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC) developed with the special contribution of the Heart Failure Association (HFA) of the ESC. Eur Heart J 2016;37:2129-200.

5. Tromp J, Khan MAF, Mentz RJ, O'Connor CM, et al. Biomarker profiles of acute heart failure patients with a mid-range ejection fraction. J Am Coll Cardiol HF 2017;5:507-17.

**KEY WORDS** epidemiology, heart failure with borderline ejection fraction (HFbEF), heart failure with mid-range ejection fraction (HFmrEF), heart failure with preserved ejection fraction (HFpEF), outcomes

ID:2005
Name:SHERMAN CARTER
Sex:Male Birth Date:
inch lb mmHg
Medication:
Symptoms:
History:

19 Years

Jul 21 2016 1:01 PM

1130 Sinus bradycardia vent. rate < 60 bpm
1068 Nonspecific Twave abnormality (flat T or negative T (I, II, V4, V5, V6)
9140 ** abnormal rhythm ECG **

| | | | | |
|---|---|---|---|---|
| Vent rate | | | 58 | bpm |
| PR int | | | 176 | ms |
| QRS dur | | | 102 | ms |
| QT/QTc int | | 412 | 409 | ms |
| P/QRS/T axis | 90 | 14 | 10 | |
| RV5/SV1 amp | 1.895 | 1.415 | | mV |
| RV5+SV1 amp | | 3.310 | | mV |

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter: Hnd/d 35 Hz 10 mm/mV

10 mm/mV

10 mm/mV




1350A 05 05 03 05 Dead : Exam:Ir

ID:2995 Jul 5 2016 1:08 PM
Name:SHERMAN CARTER
Sex:Male Birth Date:Jan 19 Years 1100 Sinus rhythm
inch lb mmHg 9110 ** normal ECG **
Medication:
Symptoms:
History:

| | | | |
|---|---|---|---|
| Vent rate | | 78 | bpm |
| PR int | | 154 | ms |
| QRS dur | | 100 | ms |
| QT QTc int | 372 | 405 | ms |
| P QRS T axis | 13 17 | 28 | |
| RV5 SV1 amp | 1.700 | 1.115 | mV |
| RV5+SV1 amp | | 3.115 | mV |

Unconfirmed Report
Reviewed by: 1d87

10 mm mV 25 mm/s Filter: H60 d 150 Hz 10 mm mV 10 mm mV 10 mm mV




1350A 05 05 03 05 Dept.. [redacted] Exam:Tr

ID:2995
Name:SHERMAN CARTER
Sex:Male Birth Date: 18 Years
Inch lb mmHg:
Medication:
Symptoms:
History:

Sep 1 2015 0:05 PM

1100 Sinus rhythm
1018 Nonspecific Twave abnormality Flat T or negative T (II, aVF, V1, V5, V6)
0140 ** borderline ECG **

Unconfirmed Report
Reviewed by:

| | | | | |
|---|---|---|---|---|
| Vent rate | | | 60 | bpm |
| PR int | | | 110 | ms |
| QRS dur | | | 102 | ms |
| QT QTc int | | 416 | 418 | ms |
| P QRS T axis | 19 | 19 | 30 | |
| RV5+SV1 amp | | 2.830 | 1.370 | mV |
| RV5-SV1 amp | | | 1.300 | mV |

10 mm mV 25 mm/s Filter: 10Hz d 150 Hz 10 mm mV

10 mm mV

5 mm mV




1350A 05 05 03 05 Dept.

Examiner

ID:9995 Dec 10 2012 2:19 PM
Name:Carter, Sherman
Sex: Male Birth Date: [illegible] ?? Years
inch lb mmHg
Medications:
Symptoms:
History:

1150 Sinus bradycardia [illegible] rate [illegible] rhythm
1401 T wave abnormality, possible anterolateral ischemia [illegible] negative T [illegible]
[illegible] abnormal ECG [illegible]

| | | | | |
|---|---|---|---|---|
| Vent rate | | | 56 | bpm |
| PR int | | | 172 | ms |
| QRS dur | | | 94 | ms |
| QT/QTc int | | 491 | 487 | ms |
| P/QRS/T axes | 19 | 11 | 30 | |
| RV5/SV1 amp | | 1.685 | 0.795 | mV |
| RV5+SV1 amp | | | 2.480 | mV |

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter: H50 d 100 Hz 10 mm/mV
10 mm/mV
10 mm/mV



Name: Carter, Sh[illegible]
Sex: Male Birth date: [illegible]
Medication 1
Medication 2
Room No.

Vent. rate 65 bpm
PR int. 1?0 ms
QRS dur. 92 ms
QT/QTc int. 382/398 ms
P-R-T axes [illegible]
RV5/SV1 amp. 1.465/0.840 mV
R+S amp. 2.305 mV

Sinus rhythm
Nonspecific T wave abnormality
Abnormal ECG

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter: 100 Hz



Name: Carter, Sherman

Sex: Male Birth date:

Medication 1

Medication 2

Room No

Vent. rate

PR int

QRS dur

QT/QTc int

P-QRS-T axis

RV5/SV1 amp

RV5+SV1 amp

10 mm/mV 25 mm/s



Rhythm

Name:Carter Sherman ID:2445 Jul 10, 2006 2:19 PM 60 bpm
Sex:Male Birth date: 30 years
Inch lb mmHg
Medication 1:
Medication 2:
Room No.
LEI Kit

1100 Sinus rhythm
1161 Twave abnormality, possible anterior ischemia
0130 ** abnormal ECG **

Vent. rate 60 bpm
PR int. 116 ms
QRS dur. 98 ms
QT/QTc int. 470 471 ms
P/QRS/T axis 13 65 8
RV5/SV1 amp. 1.175 0.810 mV
RV5+SV1 amp. 2.295 mV

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz H 60 d 10 mm/mV 10 mm mV 10 mm mV



01 08 01 12 01 02 01 21

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

January 8, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter as Mr. Carter's second level appeal of Lincoln's decision to deny long term disability benefits beyond October 30, 2018. We disagree with Lincoln's determination that Mr. Carter is able to perform the main duties of any gainful occupation for which his is qualified as set forth in Lincoln's July 12, 2019 letter detailing its review of Mr. Carter's first level appeal. Lincoln cites two reports prepared by medical reviewers as the basis for its determination; however, these reports fail to address significant portions of Mr. Carter's medical records and misstate the findings of his treating physician in material respects. In addition, Mr. Carter's additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work.

Mr. Carter's medical file and the opinion of his treating cardiologist contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve. I have attached hereto additional medical records of Lee E. Faulkner, MD, the cardiologist who has treated Mr. Carter since 2004. *See collective Exhibit "A" hereto.* Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019.

For example:

1. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling,

grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong. (*October 3, 2018, Physician's Statement attached hereto as Exhibit "B"*).

2. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%). (*September 4, 2018, Attending Physician's Statement attached hereto as Exhibit "C"*).

3. On June 2, 2017, Dr. Faulkner opined Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger or handle. (*June 2, 2017, Attending Physician's Statement attached hereto as Exhibit "D"*).

4. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%). (*November 21, 2016, Attending Physician's Statement attached hereto as Exhibit "E"*).

Dr. Faulkner has consistently opined (and communicated these opinions to Lincoln) that Mr. Carter is totally disabled and cannot perform sedentary work. His office notes of November 1, 2018, among others, provide that Mr. Carter has problems standing and frequently has dizzy spells. Mr. Carter's condition is chronic and worsening. Accommodations at work will not help. He simply cannot work or he risks heart failure. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

We disagree with Lincoln's conclusion that no objective findings exist to support Mr. Carter's documented diagnosis of cardiomyopathy or heart failure with a secondary diagnosis of hypertension. On November 1, 2018, Dr. Faulkner performed an echocardiogram on Mr. Carter and determined that Mr. Carter has a severely depressed left ventricular systolic function with an ejection fraction of 20–25% and nonsustained ventricular tachycardia. Dr. Faulkner further determined that Mr. Carter has posterior wall akinesis and that his left atrium chamber is enlarged in size. Mr. Carter has had and continues to have documented symptoms of dizziness, shortness of breath, and chest pain.

Lincoln opines that Mr. Carter's symptoms and Dr. Faulkner's physical findings regarding his condition are not consistent with Dr. Faulkner's opinion that he cannot perform sedentary work. In Lincoln's July 12, 2019 letter, it relies upon notes from Dr. Faulkner's file stating, "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Lincoln's conclusions here are disingenuous and tantamount to cherry picking statements from medical records to rebut Dr. Faulkner's actual findings, conclusions, and diagnoses. Dr. Faulkner's physical examination of Mr. Carter and review of his symptoms notes are consistent with and support his medical opinion that Mr. Carter cannot perform sedentary work. A review of symptoms encompasses multiple areas of the body,

assessing the symptoms presented at that time of the examination and also considers the physical restrictions and limitations of that particular patient. It is not a measure of Mr. Carter's ability to perform the full-time duties of a sedentary occupation nor do the review of symptoms notes accurately assess the reasons for Mr. Carter's visits. For Lincoln to base a file review examination solely on review of symptoms notes is very narrow and inaccurate. Simply because on a certain day (appointment) Dr. Faulkner notes that Mr. Carter is not experiencing chest pain or dizziness at that moment does not alter or change Dr. Faulkner's opinion that he suffers from severely depressed left ventricular systolic function with an ejection fraction of 20–25%. Dr. Faulkner's opinion is based upon objective findings and the multiple echocardiograms he has performed on Mr. Carter over the course of over 14 years of treatment. Simply because Mr. Carter has a good day or week does not mean that his conditions are improved. If he exerts himself, he is symptomatic, which is why he cannot perform even sedentary work.

In addition, the opinions of Lincoln's medical reviewers do not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concludes that Mr. Carter is "capable of full time work based on the available data, but only in sedentary capacity, with **no walking**, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provides: "[T]he claimant can do sedentary work with **no walking**, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

Sedentary work as defined by the DOT requires walking occasionally (activity or condition exists up to 1/3 of the time); therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*See Dictionary of Occupational Titles info attached hereto as Exhibit "F"*). Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require walking or standing occasionally, up to 1/3 of a work day. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

Mr. Carter suffers from dyspnea on exertion and has a New York Heart Association Functional class III. The NYHA Functional Classification for this level of heart failure is described as moderate and defined as marked or noticeable limitation of physical activity, comfortable at rest, but less than

---

ordinary physical activity causes tiredness, heart palpations, or shortness of breath. *See attached medical journal articles for more information on this NYHA Functional Class III.*

As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

We request up to, and until February 15, 2020, within which to submit all documents and information relevant to Mr. Carter's appeal. This should provide enough time to allow Lincoln to identify the records it believes are not included and for us to obtain them. In addition, please provide the identity and curriculum vitae of the medical reviewers that authored the October 26, 2018 December 5, 2018, and May 28, 2109 reports. Please also describe each reviewer's business relationship with Lincoln and compensation arrangement as well as a copy of their bills for services rendered in this matter.

For the above reasons, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

02/06/2019

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

---

**Date:** 02/06/19 : 09:27am
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 02/06/19
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/90
Height: 6', Weight: 215 lbs
BMI: 29.16 kg/m2

**Subjective:**
This 52 year old male presents for follow up visit. He denies chest pain and has had no shortness. He complains of an episode of chest tightness after lifting items. He is here for interrogation of his Single chamber AICD .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**AICD interrogation** - Single chamber ICD. SVT nonsustained

**Plan:**

Continue current medication(s) at same dose

**Follow-up:** 6 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

EXHIBIT
A

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Procedure:** Office Visit Level 4 : 99214

# SIGNED BY Lee E Faulkner, MD (LF) 02/06/2019 09:52AM

## Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:** (
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 11/01/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 130/80
Height 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
ECHO - Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan:**

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Follow-up:** 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 07/30/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan:**

Continue current medication(s)

**Follow-up:** 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

**Progress Notes**

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

**Date:** 04/03/17 : 04:04pm
**Title:** FOLLOW UP OFFICE VISIT

**Date**: 04/03/17
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 140/70

**Subjective**:
This 50 year old male presents for follow up visit. He denies chest pain and has had no shortness of breath.

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**: Interrogation of AICD -Non sustained V tach

**EKG** - Sinus bradycardia rate 59, Nonspecific Twave abnormality

**Plan**:
Interrogation of AICD (complete)

Continue current medication(s)

**Follow-up**: 3 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

**Visit Time**: 30

**Procedure:** Office Visit Level 4 : 99214

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 Fax: (901) 682-7243

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 11/01/2018 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 25% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

Aortic Root: Normal

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

________________________

Lee E. Faulkner M.D./LB

ID:CA1967
Name:Carter, Sherman
Sex:Male Birth Date:Jan-15-1967 51 Years
inch lb mmHg
Medication:
Symptoms:
History:

Nov 1,2018 8:06 AM

| | | | |
|---|---|---|---|
| Vent rate | | 76 | bpm |
| PR int | | 184 | ms |
| QRS dur | | 104 | ms |
| QT QTc int | 388 | 418 | ms |
| P QRS T axis | 50 | -2 | 40 |
| RV5/SV1 amp | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | 2.910 | mV |

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11)
4564 Twave abnormality, possible lateral Ischemia
(negative T (V1, V5))
9150 ** abnormal ECG **

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter: H60 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1550A 05 05 08 05 Dept.: Exam:

Dec 03 19, 12:10a Physicians Of Hearts 9016827243 p.15



# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/24/2004 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 40%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/24/04 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Tricuspid Regurgitation

____________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/18/2005 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 50% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Mild global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace mitral regurgitation, and trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Mitral Regurgitation
4. Trace Tricuspid Regurgitation

____________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 7/10/2006
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 50%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/10/06 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/12/07 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global Hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Global Hypokinesis
3. Mild Mitral Regurgitation

____________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred by:**
**Date:** 09/24/2004
**Race:** African American

**HISTORY and PHYSICAL**

**HISTORY OF PRESENT ILLNESS:** Sherman Carter is a 37y/o African American gentleman who reports to our office for cardiac evaluation. Patient complains of chest pains. Patient reports that he has sharp chest pain on left side while radiating to back. Patient has no associated symptoms that has occurred with chest pain. Patient states that the chest pain experienced six days ago, was aggravated with sudden movement or change in position. Patient denies any shortness of breath, nausea, vomiting, dizziness or edema.

**PAST MEDICAL HISTORY:** Chest Pain

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did Not Bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

**PHYSICAL EXAMINATION: BP:** 122/88

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy
2. Mitral Regurgitation
3. Pre Hypertension

**PLAN:**

1. ECHO-today
2. EKG-today

____________________________

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Sherman Carter
**Date of Visit:** 09/24/2004
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 37-year old African American gentleman who presents to our office for a follow up visit for elevated blood pressure. Patient reports that he had migraines earlier this week. Patient takes medications to resolve issue. Patient states no complaints of shortness of breath, chest pain, nausea, vomiting or edema.

**Vitals: BP:** 122/88

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy

**PLAN:**

1. Follow up in 4 months

________________________

Lee E. Faulkner M.D.

## Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/7/2005 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 37 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of short pain to left anterior chest. The pain occurs occasionally during high stress time. Episodes usually last a few seconds then subsides. He reports no other complaints at this time. He denies any headaches, dizziness, and chest pain, shortness of breath, nausea, dementia, diarrhea, or constipation.

**BP:** 135/72
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. MR
3. TR

**PLAN:**
1. Alcohol Cessation
2. Follow up in 4 months

________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/6/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter states that he has been feeling good since his last visit. He reports no complaints at this time. He denies any palpitations, chest pain, shortness of breath, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 152/90
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Cardiomyopathy
3. Hypertension

**PLAN:**
1. Current Cardiac Care
2. ETOH Cessation encouraged
3. Follow up in 2 months

________________________
Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter complains of occasional shortness of breath. He states that he has been doing ok and reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 100/60
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 7/12/2007
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter reports one episode of shortness of breath but reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 136/88
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Current Cardiac Care
2. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 4/3/2009
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 42 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter states that he has had some mild chest pain. He reports no other complaints at this time. He denies any palpitations, shortness of breath, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 140/70
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. EKG/ECHO

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 9/12/2011
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 46%**
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/12/11 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals no abnormalities.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 46%
2. Left Ventricle Enlargement
3. Right Ventricle Enlargement

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 55% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 55%
2. Left Ventricular Enlargement
3. Mild Tricuspid Regurgitation
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred By:**
**Date:** 12/10/2012
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 45%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is enlarged in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 45%
2. Left Ventricular Enlargement
3. Global Hypokinesis
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 20%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/4/15 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Severe global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 pulmonary insufficiency.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 20%
2. Left Ventricle Enlargement
3. Severe Global Hypokinesis
4. Mild Mitral Regurgitation
5. Mild Pulmonary Insufficiency

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 07/21/2016
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 20%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 07/21/2016 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall abnormality appreciated.

**Doppler:** Interrogation of the valvular apparatus reveals mild mitral regurgitation.

**SUMMARY:**

1. severely depressed left ventricular systolic function with an ejection fraction of 20%.
2. Left Ventricular Chamber enlarged in size
3. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of chest pain when lifting things, shortness of breath on exertion, edema in hands and some numbness. He also reports occasional dizziness. He reports no other complaints at this time. He denies any nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 130/74
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Dyspnea
3. Gouty Arthritis

**PLAN:**
1. ETOH Restriction
2. Treadmill Thallium Stress Test

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, vomiting, dizziness, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 132/80
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE
**Data:** Stress test negative for ischemia

**IMPRESSION:**
1. Hypertension
2. Gouty Arthritis

**PLAN:**
1. ECHO due to reduction in EF as reported by stress test
2. Follow up in 1 month

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac clearance for left hip replacement. Mr. Carter complains of chest pain on the left side of his chest while laying down, states this last a few minutes. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:**

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 9/4/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 140/90 **HT:** 6'0" **WT:** 209lbs

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Severe cardiomyopathy, worse since last visit
2. Hypertension-blood pressure elevated

**PLAN:**

1. AICD Referral

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/30/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for hip surgery. Mr. Carter complains of chest pain but states that they are becoming better. He states that Dr. Lan did prescribe him medication to strengthen his heart. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 10/30/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 170/120

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Hypertension-blood pressure controlled
3. Severe Dilated Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 2 weeks to re-check blood pressure
3. Patient has a follow up appointment on November 10, 2015 and will be re-evaluated at that time

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 11/10/2015 |
| **Sex:** Male | **Race:** African American |

## History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for left hip replacement. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, dizziness, vomiting, palpitations, orthopnea, paroxysmal nocturnal dyspnea and/or edema.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

<u>Sherman Carter 11/10/15 H&P cont.</u>

**PHYSICAL EXAMINATION: BP:** 130/90

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 3 months

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

______________________
Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/21/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain on left side of chest while doing yard work. Patient also complains of shortness of breath when outside , that lasts 10-15 minutes. Patient states no complaints of chest pain, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 138/96

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Hypertension
2. Cardiomyopathy

**PLAN:**
1. Continue Current Cardiac Care

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient states that he is chest pain free. Patient states no complaints of chest pain, shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. Degenerative Joint Disease of Hip

**PLAN:**

1. ETOH Cessation
2. Follow Up in 6 Months

Lee E. Faulkner M.D./LB

CARTER, SHERMAN
37 years
Male Black

Vent. rate 65 bpm
PR interval 138 ms
QRS duration 94 ms
QT/QTc 408/424 ms
P-R-T axes 46 86 16

ID: 000002996 24-Sep-2004 10:37:06

Normal sinus rhythm with sinus arrhythmia
Normal ECG

Technician: AF
Test ind:

Referred by: LEF

Unconfirmed




160 Hz 25.0 mm/s 10.0 mm/mV 4 by 2.5s + 3 rhythm lds MAC 8 001F 12SL™ v250

## Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**: 01/15/67
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,



Printed On: 02/04/2019

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 11/01/2018
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 25%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Akinesis
4. Moderate Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

____________________________

Lee E. Faulkner M.D./LB

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

| | | |
|---|---|---|
| # | SIGNED BY Lee E Faulkner, MD (LF) | 04/03/2017 04:18PM |
| # | REVISED BY Lee E Faulkner, MD (LF) | 04/03/2017 07:14PM |

# SAINT FRANCIS HOSPITAL-MEMPHIS
## TREADMILL/STRESS

MR#: 1037968SFH

NAME: CARTER, SHERMAN
ENCOUNTER NUMBER: 34017913SFH
ROOM NUMBER:
DATE OF BIRTH:
READING PHYSICIAN: ANTONIO C. QUIROZ, MD
PHYSICIAN: LEE E FAULKNER

HISTORY OF PRESENT ILLNESS: A 45-year-old male, height 6 feet, weight 190 pounds. Patient has hypertension and has been having some chest pains.

MEDICATIONS: Include ramipril and digoxin.

INTERPRETATION. Baseline EKG shows sinus rhythm with a rate of 52 beats per minute and nonspecific ST-T abnormalities. Patient exercised 11 minutes on the standard Bruce protocol achieving 13.1 METS of workload. Exercise was stopped because of fatigue. There was no chest pain. Heart rate increased from 52-157, which is 90% of the age-predicted maximal heart rate. Blood pressure increased from 143/83-180/110 for a double product of 28,260. Cardiolite was injected approximately 1 minute prior to stopping the exercise. There were no significant ST-segment depressions, no arrhythmias. One isolated PVC was noted during the exercise. There was normalization of the T-waves during and after the exercise.

CONCLUSIONS: Negative for ischemia by EKG criteria.

Nuclear imaging interpretation will be dictated separately. Hypertensive response to exercise.

________________
ANTONIO C. QUIROZ, MD

TIME: ________
DATE: ________

D: 11/26/2012 09:53 CST
T: 11/26/2012 10:34 CST
R:
Job#: 252986
D#: 7926695/FI

SAINT FRANCIS HOSPITAL
5959 PARK AVENUE
MEMPHIS, TN 38119

Name: CARTER, SHERMAN
MRN: 001037868
ACCT: 034017913

ANDREW T. WATSON, MD
ADM: 11/26/2012

Diagnostic Imaging

DATE OF EVALUATION: 11/26/2012

REFERRING PHYSICIAN: Lee Faulkner, M.D.

REASON FOR EVALUATION: Chest pain.

BRIEF HISTORY OF PRESENT ILLNESS: A 45-year-old African-American male who presents for evaluation with prior history of hypertension, no known coronary artery disease.

DESCRIPTION OF PROCEDURE: After obtaining written informed consent, patient underwent a Bruce protocol stress evaluation. Total exercise time was 11 minutes. Total METs obtained was 13.1.

This was a 1-day study. Rest images obtained using 3.1 mCi thallium to 1 stress image obtained using 30.2 mCi sestamibi technetium-99. Rest and stress images were compared.

Short axis, vertical long axis, horizontal long axis images appear to be well perfused and well matched. There is evidence of apical thinning. Otherwise, there is no evidence of overt segmental wall ischemia. Myocardial perfusion bull's eye map confirms the above finding. Myocardial perfusion gated study demonstrates mild-to-moderate global hypokinesis, ejection fraction calculated at 35%. Raw data cine analysis demonstrates no significant motion or other artifacts present.

OVERALL IMPRESSION: Abnormal Bruce protocol Cardiolite examination demonstrating no evidence of ischemia and ejection fraction estimated at 35%.

ANDREW T. WATSON, MD

Date: ______ and Time: ______

TR:ATW/SN
DD:11/26/2012 16:23 CST
DT:11/26/2012 19:00 CST
Dictation ID: 7930950/Confirmation #: 253112

Work Type: Diagnostic Imaging
T001

Work Type Code: DGI
Page: 1

PRINTED BY: PDacus

DATE 12/10/2012

12/10/2012 13:11 901-765-3133 ST FRANCIS H I M PAGE 02/02

2009 Oct-09 08:51 AM Central Scheduling 9017653296 1/2

# Saint Francis Hospital
Memphis

1000-52

| DATE | TIME | PHYSICIAN'S ORDERS | DATE | TIME | PROGRESS RECORD |
|---|---|---|---|---|---|
| 11-9-12 | | Treadmill Thallium Stress Test<br><br>Dia. Chest Pain<br><br>Date - 11-19-12<br>Time - 8:30<br>Arrival - 8:00<br><br>No Precert Required per Tiwana @ United Healthcare 10-25-12<br>Height - 6'<br>Weight<br><br>Physician's Signature: Lee E Faulkner MD<br>Date: ____ Time: ____ | | | |

Medications dispensed in accordance with the hospital formulary system

Carter, Sherman

MR# DOB:

PHYSICIAN ORDERS/PROGRESS RECORDS

R8/07

Nov-1 2018 8:06 AM

ID:CA1967
Name:Carter Sherman
Sex:Male Birth Date:Jan 15 1967 51 Years
inch lb mmHg
Medication:
Symptoms:
History:

Vent rate 76 bpm
PR int 184 ms
QRS dur 104 ms
QT/QTc int 388 418 ms
P-QRS-T axis 30 2 40
RV5/SV1 amp 2.155 0.755 mV
RV5+SV1 amp 2.910 mV

1100 Sinus rhythm
1571 with frequent ventricular premature complexes
(wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11))
1561 T wave abnormality, possible lateral ischemia
(negative T (V4, V5))
9150 ** abnormal ECG **

Unconfirmed Report
Reviewed by: [signature]

10 mm/mV 25 mm/s Filter: 860 d 150 Hz 40 mm/mV 10 mm/mV 5 mm/mV




1350A 05 05 03 05 Dept : Exam:

Name: Carter Sherman ID:

Sex: Male Birth date:

inch lb mmHg

Medication 1

Medication 2

Room No.

Jul 26, 2012 1:04 PM 59 bpm

E100 Sinus rhythm

I06R Nonspecific T wave abnormality

9130 ** borderline ECG **

| | | | | |
|---|---|---|---|---|
| Vent. | rate | | 60 | bpm |
| PR | int. | | 158 | ms |
| QRS | dur. | | 102 | ms |
| QT/QTc | int. | 401 | 407 | ms |
| P-QRS-T | axis | 45 30 | 22 | |
| RV5/SV1 | amp. | 1.870 0.995 | | mV |
| RV5+SV1 | amp | | 2.865 | mV |

Unconfirmed Report

Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz 0.50 d 10 mm/mV 10 mm/mV 10 mm/mV



REF #3043267

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609 Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

EXHIBIT B

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

**Indicate frequency per day the listed activities below can be used performed using:**
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A

What job modifications would allow the patient to return to work?

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

N/A

Continence ___/___/___

Dressing ___/___/___

Transferring ___/___/___

Bathing ___/___/___

Toileting ___/___/___

Eating ___/___/___

Date patient experienced loss of Cognitive Functioning: ___/___/___

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

__/__/__ to __/__/__

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

901-682-7241 | 901-682-724?
Phone Number | Fax Number

[signature] | __/__/__
Signature | Date

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.



00000032/ LFPESRD1 00000982

LFG Omaha Fax 9/4/2018 11:50:52 AM PAGE 3/003 Fax Server

Sep 04 18, 09:43a p.2

REF #2991745

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

## GROUP CONTINUANCE OF DISABILITY
## (PLEASE see FRAUD NOTICES attached)

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth
2. Diagnosis/Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 25, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments:
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation.
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (circled) Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed [signature] (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450PTD

EXHIBIT C

Page 1 of 3
10/10

00003315 LFPH3GD1 00000970

PAGE 3/3 * RCVD AT 9/4/2018 11:50:51 AM [Central Daylight Time] * SVR:NE1PWFAX101/0 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):00-52

REF #1989621

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

EXHIBIT D

## ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by ________________)

Claim No: 1150128075 Policy No: 000010049220000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen?

Has patient ever had same or similar condition? Yes No If yes, state when and describe.

(a) Diagnosis (including ICD Code(s)) Cardiomyopathy

(b) Subjective Findings Worsening Dyspnea

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

(a) Date of First visit Sept. 25, 2005

(b) Date of Last visit April 3, 2017

(c) Frequency of visits
Weekly
Monthly
Other (specify) Q2 to 6 months or more

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

(b) Mental Impairments (if applicable)

(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
Class 1 (No limitation) Class 2 (Slight limitation)
Class 3 (Marked limitation) Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 140/70 systolic/diastolic

Has patient Recovered? Improved? Unchanged? Retrogressed? worsening

(b) Has patient been hospital confined? Yes No (delete)
If Yes, give Name and Address of Hospital
Confined from ____________ to ____________
Several Hospitalizations over the years

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job (Yes) No
Any other work (Yes) No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months (Never)
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received

- Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
- Dressing ________ (putting on, taking off garmets, braces or any artificial limbs normally worn)
- Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
- Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
- Continence ________ (voluntarily maintaining control of bladder and bowel function)
- Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ________
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner Degree: MD Telephone Number

Street Address City or Town State: TN Zip Code

Signature (By Physician): Lee E. Faulkner, MD Date: 5/29/17

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 3/005 Fax Server
901-682-7243 p.2
Jun 02 17 11:55a Physicians of Hearts
REF #1989621

Lincoln Financial Group®

Please Return Response To:
The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765

# ABILITIES FORM

Date of Birth: ______

Patient Name: Sherman Carter

Claim Number: 1150128075

Occupation: ______

Date of Last Office Visit: April 3, 2017

Date of Next Office Visit: ______

☐ The patient does not have functional/limitations or restrictions

Provider's Signature: Lee E Faulkner, MD

Date: ______

Provider Printed Name: Lee E Faulkner, MD

Degree: ☒ MD ☐ DO Other ______

Specialty: Cardiology

Phone: ______

OR

☐ The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | ✓ LEF | ✓ | | |
| 11 - 20 lbs. | ✓ | | | |
| 21 - 35 lbs. | ✓ | | | |
| 36 - 50 lbs. | ✓ | | | |
| 51 - 100 lbs. | ✓ | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | | |
| Stand | | | | | |
| Walk | | | | | |
| Climb | | | | | |
| Bend | | | | | |
| Kneel | | | | | |
| Drive | | | | | R / L / Both |
| Finger | | | | | R / L / Both |
| Handle | | | | | R / L / Both |
| Operate Foot Controls | | | | | R / L / Both |
| Reach above the shoulder | | | | | |

N/A

Are there environmental factors that the patient should avoid? ☐Yes ☐No Specify: ______

Specific Limitations or Restrictions not noted above: No lifting or straining whatsoever as his condition is worsening over time

The above statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud and Warning Statements.

Provider's Signature: Lee E Faulkner MD

Date: 5/24/17

Provider Printed Name: Lee E. Faulkner, MD

Degree: ☒ MD ☐ DO Other ______

Specialty: Cardiology

Phone: 901 682-7241

Address: 6005 Park Ave Ste 702 Memphis, TN 38119

Page 1 of 1
3/13

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLA10631

PAGE 3/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/9 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

00000012 LFPV6UT1 00000106

LFG Omaha Fax 11/7/2016 1:58:51 PM PAGE 4/007 Fax Server

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

## GROUP CONTINUANCE OF DISABILITY
## (PLEASE see FRAUD NOTICES attached)

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BARDETT LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept 25 2005
   b) Date of Most Recent Treatment Sept 29, 2016
   c) Frequency of Treatments Q 2 to 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
   If the patient is still disabled, when should the patient be able to return to work? unknown
5. Remarks or Comments: Medical therapy for now.
6. List Restrictions and Limitations: Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   ✓ Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 11/24/16 (Month Day Year) Signed N Lee E Faulkner MD (Attending Physician, No Stamps, please) Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN
Phone Number 901-682-7241
Fax Number 901-682-7243



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01460PTD

EXHIBIT E

Lincoln Financial Group®

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765
www.LincolnFinancial.com

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

*(To Avoid Delay Please Answer ALL Questions)*

(This form is to be completed without expense to the Company and returned by ____________ )

Claim No: 1150128075 Policy No: 000010049220000000

Name of Patient: Date of Birth:

Sherman Carter

When did symptoms first appear or accident happen? Aug 2015

Has patient ever had same or similar condition? Yes (No) If yes, state when and describe.

(a) Diagnosis (including ICD Code(s))

(b) Subjective Findings

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings) Severely depressed EF of 20% by Echocardiogram

(a) Date of First visit Sept 15, 2005

(b) Date of Last visit July 5, 2016

(c) Frequency of visits
Weekly
Monthly
✓ Other (specify) every 2-3 months

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)
Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
*Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)*
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

*(b) Mental Impairments (if applicable)*
(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?
Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
*Class 1 (No limitation)* *Class 2 (Slight limitation)*
Class 3 (Marked limitation) ✓ Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 120/80 *systolic/diastolic*

Has patient Recovered? Improved? ✓ Unchanged? Retrogressed?

(b) Has patient been hospital confined? Yes (No)
If Yes, give Name and Address of Hospital
Confined from ____________ to ____________



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450 ATTPHYSTM

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes (No) If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received
- Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
- Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
- Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
- Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
- Continence ________ (voluntarily maintaining control of bladder and bowel function)
- Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes (No)

(c) When could patient return to work? Unknown
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations Medical Therapy for now

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner, MD
Degree: Medical Doctor
Telephone Number: 901-682-7241
Street Address: 6005 Park Ave Ste 702
City or Town: Mphs
State: TN
Zip Code: 38119
Signature (By Physician): Lee E. Faulkner, MD
Date:

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Carter, Sherman
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman present for follow up visit. Mr. Carter states that he is chest pain free. He has no complaints of vomiting, dizziness, palpitation, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. DJD of Hip

**PLAN:**

1. ETOH cessation
2. Follow up in 6 months

Lee E. Faulkner MD

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 7/5/2016
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman who is present today for a follow up visit. Mr. Carter complains of chest pain in the middle of his chest with activity, states this last 10 minutes. He reports no other complaints at this time. He denies any shortness of breath, dizziness, palpitations, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** BP: 120/80 **HT:** 6'1" **WT:** 212lbs

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis, edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Hypertension
2. Cardiomyopathy (Non-Ischemic)

**PLAN:**
1. Current Cardiac Care

______________________
Lee E. Faulkner M.D.

Welcome to ITA - Information Technology Associates

DOT Dictionary of Occupational Titles
www.occupationalinfo.org

Search | Contents | ONET NEW | Glossary | Link to this page | About

AdChoices | GED Classes | Math Skills | Math Problems

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z ?




## Dictionary Of Occupational Titles
## Appendix C: Components of the Definition Trailer

APPENDIX C

COMPONENTS OF THE DEFINITION TRAILER

I. DATE OF LAST UPDATE (DLU)

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

The following descriptions of the components of the Definition Trailer are in inverse order to their placement in the trailer.

I. DATE OF LAST UPDATE (DLU)

Listed as the final element in the trailer following the definition, the Date of Last Update indicates the last year in which material was gathered for that occupation. A DLU of ``77'' would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977.

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

EXHIBIT
tabbies
F

The following is an explanation of the various levels of specific vocational preparation:

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Note: The levels of this scale are mutually exclusive and do not overlap.

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

Scale of General Education Development (GED)

06 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

06 MATHEMATICAL DEVELOPMENT

Advanced calculus:

Work with limits, continuity, real number systems, mean value theorems, and implicit functions theorems.

Modern Algebra:

Apply fundamental concepts of theories of groups, rings, and fields. Work with differential equations, linear algebra, infinite series, advanced operations methods, and functions of real and complex variables.

Statistics:

Work with mathematical statistics, mathematical probability and applications, experimental design, statistical inference, and econometrics.

06 LANGUAGE DEVELOPMENT

Same as Level 5.

05 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables. 05 MATHEMATICAL DEVELOPMENT

Algebra:

Work with exponents and logarithms, linear equations, quadratic equations, mathematical induction and binomial theorem, and permutations.

Calculus:

Apply concepts of analytic geometry, differentiations, and integration of algebraic functions with applications.

Statistics:

Apply mathematical operations to frequency distributions, reliability and validity of tests, normal curve, analysis of variance, correlation techniques, chi-square application and sampling theory, and factor analysis.

05 LANGUAGE DEVELOPMENT

Reading:

Read literature, book and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.

Writing:

Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.

Speaking:

Coversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

04 LEVEL REASONING DEVELOPMENT

Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

04 MATHEMATICAL DEVELOPMENT

Algebra:

Deal with system of real numbers; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity; and probability and statistical inference.

Geometry:

Deductive axiomatic geometry, plane and solid, and rectangular coordinates.

Shop Math:

Practical application of fractions, percentages, ratio and proportion, measurement, logarithms, slide rule, practical algebra, geometric construction, and essentials of trigonometry.

04 LANGUAGE DEVELOPMENT

Reading:

Read novels, poems, newspapers, periodicals, journals, manuals, dictionaries, thesauruses, and encyclopedias.

Writing:

Prepare business letters, expositions, summaries, and reports, using prescribed format and conforming to all rules of punctuation, grammar, diction, and style.

Speaking:

Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

03 MATHEMATICAL DEVELOPMENT

Compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage. Calculate surfaces, volumes, weights, and measures.

Algebra:

Calculate variables and formulas; monomials and polynomials; ratio and proportion variables; and square roots and radicals.

Geometry:

Calculate plane and solid figures; circumference, area, and volume. Understand kinds of angles and properties of pairs of angles.

03 LANGUAGE DEVELOPMENT

Reading:

Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

Writing:

Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.

Speaking:

Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

02 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

02 MATHEMATICAL DEVELOPMENT

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

02 LANGUAGE DEVELOPMENT

Reading:

Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Writing:

Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking:

Speak clearly and distinctly with appropiate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

01 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT

Add and subtract two digit numbers.

Multiply and divide 10's and 100's by 2, 3, 4, 5.

Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT

Reading:

Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

The Physical Demands Strength Rating reflects the estimated overall strength requirement of the job, expressed in terms of the letter corresponding to the particular strength rating. It represents the strength requirements which are considered to be important for average, successful work performance.

The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy. In order to determine the overall rating, an evaluation is made of the worker's involvement in the following activities:

a. Standing, Walking, Sitting

Standing - Remaining on one's feet in an upright position at a work station with-out moving about.

Walking - Moving about on foot.

Sitting - Remaining in a seated position.

b. Lifting, Carrying, Pushing, Pulling

Lifting - Raising or lowering an object from one level to another (includes upward pulling).

Carrying - Transporting an object, usually holding it in the hands or arms, or on the shoulder.

Pushing - Exerting force upon an object so that the object moves away from the force (includes slapping, striking, kicking, and treadle actions).

Pulling - Exerting force upon an object so that the object moves toward the force (includes jerking).

Lifting, pushing, and pulling are evaluated in terms of both intensity and duration. Consideration is given to the weight handled, position of the worker's body, and the aid given by helpers or mechanical equipment. Carrying most often is evaluated in terms of duration, weight carried, and distance carried.

Estimating the Strength factor rating for an occupation requires the exercise of care on the part of occupational analysts in evaluating the force and physical effort a worker must exert. For instance, if the worker is in a crouching position, it may be much more difficult to push an object than if pushed at waist height. Also, if the worker is required to lift and carry continuously or push and pull objects over long distances, the worker may exert as much physical effort as is required to similarly move objects twice as heavy, but less frequently and/or over shorter distances.

c. Controls

Controls entail the use of one or both arms or hands (hand/arm) and/or one or both feet or legs (foot/leg) to move controls on machinery or equipment. Controls include but are not limited to buttons, knobs, pedals, levers, and cranks.

Following are descriptions of the five terms in which the Strength Factor is expressed:

S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are

sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

V-Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work.

## V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work requirements.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

| | | |
|---|---|---|
| 01 Artistic | 05 Mechanical | 09 Accommodating |
| 02 Scientific | 06 Industrial | 10 Humanitarian |
| 03 Plants-Animals | 07 Business Detail | 11 Leading-Influencing |
| 04 Protective | 08 Selling | 12 Physical Performing |

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

## Download Google Chrome Browser

Chrome Safe Browsing will protect you from malicious sites.

DOWNLOAD


- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables
- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/contents.html**

Translators on the www

| | Espa�ol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2003 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 05-Jun-03

CTR030418

DICTIONARY OF OCCUPATIONAL TITLES CD-ROM OR DOWNLOAD DOT Android or Windows

A B C
D E F
G H I
J K L
M N O
P Q R
S T U
V W X
Y Z ?

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **215.367-010** **Buy the DOT:Download**
TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

LEGAL
Drivers who switch to
Allstate can save $356.
Allstate

LEGAL
Drivers who switch to
Allstate can save $356.
Allstate

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/21/215367010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **215.367-010 Buy the DOT:**Download TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks




© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

| | | |
|---|---|---|
| A | B | C |
| D | E | F |
| G | H | I |
| J | K | L |
| M | N | O |
| P | Q | R |
| S | T | U |
| V | W | X |
| Y | Z | ? |

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **654.687-010** **Buy the DOT:Download**
TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers






- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/65/654687010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **654.687-010 Buy the DOT:Download** TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers



© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

The New York Heart Association (NYHA) Functional Classification scale associates a patient's heart failure according to the severity of the observable symptoms.

## New York Heart Association (NYHA) Functional Classification

The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification. It places patients in one of four categories based on the level of limitation during physical activity.

If the hospice diagnosis is heart disease, the NYHA classification should be Stage IV, to meet the criteria for hospice eligibility. Stage IV heart disease is characterized by symptoms of heart failure or anginal syndrome at rest. Symptoms include chest pain, dyspnea, weakness and inability to tolerate activity without discomfort. Additional criteria necessary for hospice eligibility with a terminal diagnosis of heart disease includes optimal treatment of heart disease, the patient declines or is ineligibility for surgical intervention, an ejection fraction of ≤ 20% and a history of a one of the following in the last 12 months: Treatment resistant SVT or ventricular arrhythmia, unexplained syncope, cardiac arrest, brain embolism of cardiac origin and/or concomitant HIV disease.

Classification is based on observable symptoms which must be clearly documented in the patient's clinical record to support the classification listed:

| ***Class*** | ***Objective Assessment*** | ***Patient Symptoms*** |
|---|---|---|
| ***Class I (Mild)*** | ***No objective evidence of cardiovascular disease.***<br>No symptoms and no limitation in ordinary physical activity. | ***No limitation of physical activity.***<br>Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea (shortness of breath). |
| ***Class II (Mild)*** | ***Objective evidence of minimal cardiovascular disease.***<br>Mild symptoms and slight limitation during ordinary activity.<br>Comfortable at rest. | ***Slight limitation of physical activity.***<br>Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. |
| ***Class III (Moderate)*** | ***Objective evidence of moderately severe cardiovascular disease.***<br>Marked limitation in activity due to symptoms, even during less-than-ordinary activity.<br>Comfortable only at rest. | ***Marked limitation of physical activity.***<br>Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| ***Class IV (Severe)*** | ***Objective evidence of severe cardiovascular disease. Severe limitations.***<br>Experiences symptoms even while at rest. | ***Unable to carry out any physical activity without discomfort. Symptoms of cardiac insufficiency at rest.***<br>If any physical activity is undertaken, discomfort is increased. |

Reference: The Stages of Heart Failure – NYHA Classification (2002), Retrieved 07/31/2006 from http://www.abouthf.org/questions_stages.htm

## New York Heart Association (NYHA) Functional Classification

The original NYHA Functional Classification was published in 1928. This was a time before important diagnostic modalities like the portable ECG, echocardiogram, exercise stress test and the cardiovascular disease biomarker B-type natriuretic peptide (BNP) assay.

McDonald and Wilkinson (2017) and other researchers are advocating for the increased use of natriuretic peptides as part of the strategies for heart failure diagnosis and prevention. The use of these biomarkers has been shown to improve diagnostic accuracy for HF and provide prognostic information for more than a decade of use with recommendations by national and international cardiovascular organizations.

The NYHA classification has been updated many times. Today's version includes two sections; 1) a subjective description of functional capacity and 2) an objective diagnostic assessment of cardiovascular disease. While subjective inconsistencies may result when classifying patients in class II or III, functional capacity remains a powerful prognostic indicator and is routinely used for clinical staging of heart failure today.

| New York Heart Association (NYHA) Functional Classification | |
|---|---|
| **Class** | **Patient Symptoms** |
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |
| Source: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure | |

One commonly used technique to assess the functional capacity of patients is the Six-minute walk test (6MWT). The 6MWT has been shown to be a reliable, inexpensive, safe and easy to administer test that correlates with health outcomes (Rostagno, C. Gensini, 2008). (https://www.lung.org/lung-health-and-diseases/lung-procedures-and-tests/six-minute-walk-test.html, updated 2018).

**Six Minute Walk Test**

- **Explain that the test requires walking for 6 minutes in a straight line between to points 60 feet apart.**
- **Place a chair at either end of the course and explain that the patient may stop, rest or sit if necessary and that you will bring the chair to them if needed.**
- **Measure the total distance walked in 6 minutes.**

Casanova et al (2011) studied 444 healthy subjects from seven countries to determine standard performance on the 6MWT. The 6MWT measures meters (m) walked as quickly as possible by the individual in six minutes.

The mean meters walked by all subjects was 571+ or – 90 m with male subjects walking 30m more than females. This is consistent with other similar studies. Older subjects walked shorter distances than younger subjects.

- 40–49 yrs of age, 611±85 m
- 50–59 yrs of age, 588±91 m
- 60–69 yrs of age, 559±80 m
- 70–80 yrs of age, 514±71 m

Rasekaba, Lee, Naughton, Williams & Holland (2009) determined a distance less than 350 m on the 6MWT to be associated with an increased mortality in chronic HF patients. A lowering of the walking distance of 50 m or more is considered clinically significant. Ferreira, et al. (2019) concluded in their research the 6-minute walk test distance at baseline and a decline in walking distance were both associated with worse prognosis.

Bittner et al (1993) studied 898 patients with left ventricular dysfunction with either radiological evidence of HF and/or an ejection fraction of 0.45 or lower. During the 242 days of follow up 114 patients either died or were hospitalized for CHF. The lowest performance group on the 6MWT had a statistically greater chance of dying or being hospitalized than the higher performing group. See detailed instruction about the 6MWT at the Heart Foundation website.

In an updated study by Wegrzynowska-Teodorczyk (2013), the researchers also found the distance covered during the 6MWT predicted the risk of death or hospitalization. Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. They studied 243 men with stable systolic heart failure.

- Class I 15%
- Class II 44%
- Class III 37%
- Class IV 4%

69% of the participants died or required hospitalization during the following 3 years. The statistical analysis showed the shorter the distance walked in the 6MWT, the greater the 1-year and 3-year mortality risk.
Du, et al., (2017) reviewed research on the 6MWT in chronic heart failure published from 2012 to 2017. The researchers found the 6MWT not to be as accurate as possible in determining peak VO2. They suggest using mobile apps to better assess actual distance walked and heart rate.

---

References

American Heart Association. Professional Heart Daily. Accessed 8/2/16 http://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp

Bittner et al. (1993). Prediction of mortality and morbidity with a 6-minute walk test in patients with left ventricular dysfunction. SOLVD Investigators. *JAMA,* 270(14), 1702-7.

Casanova, C. et al. (2011). The 6-min walk distance in healthy subjects: reference standards from seven countries. *European Respiratory Journal*, 37, 150-156.

Du, H., Wonggom, P., Tongpeth, J. & Clark, R.A. (2017). Six-Minute Walk Test for Assessing Physical Functional Capacity in Chronic Heart Failure. Curr Heart Fail Rep. 14(3),158-166.

Ferreira, J.P., Metra, M., Anker, S.D., Dickstein, K., Lang, C.C.. & Ng, L. (2019). Clinical correlates and outcome associated with changes in 6-minute walking distance in patients with heart failure: findings from the BIOSTAT-CHF study. Eur J Heart Fail. 21(2), 218-226.

McDonald, K., Wilkinson, M. (2017). Evolving Use of Natriuretic Peptides as Part of Strategies for Heart Failure Prevention. Clin Chem. 63(1), 66-72.

Rasekaba, T., Lee, A. L., Naughton, M. T. ,Williams, T. J. & Holland, A. E. (2009). The six-minute walk test: a useful metric for the cardiopulmonary patient. *Intern Med J.*, 39(8),495-501.

Rostagno C., Gensini G.F. (2008). Six minute walk test: a simple and useful test to evaluate functional capacity in patients with heart failure. *Intern Emerg Med.* 3(3):205-12.

The Criteria Committee of the New York Heart Association. (1994). *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels.* (9th ed.). Boston: Little, Brown & Co. pp. 253–256.

Wegrzynowska-Teodorczyk, K., Rudzinska, E., Lazorczyk, M., Nowakowska, K., Banasiak, W. Ponikowski, P et al. (2013). Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. J Physiother. 59(3), 177-87.

---

© RnCeus.com

# Classes of Heart Failure

Doctors usually classify patients' heart failure according to the severity of their symptoms. The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification[1]. It places patients in one of four categories based on how much they are limited during physical activity.

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

| Class | Objective Assessment |
|---|---|
| A | No objective evidence of cardiovascular disease. No symptoms and no limitation in ordinary physical activity. |
| B | Objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. |
| C | Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. |
| D | Objective evidence of severe cardiovascular disease. Severe limitations. Experiences symptoms even while at rest. |

**For Example:**

- A patient with minimal or no symptoms but a large pressure gradient across the aortic valve or severe obstruction of the left main coronary artery is classified:
  - **Function Capacity I, Objective Assessment D**
- A patient with severe anginal syndrome but angiographically normal coronary arteries is classified:
  - **Functional Capacity IV, Objective Assessment A**

Heart Failure

What is Heart Failure?

Types of Heart Failure

Classes of Heart Failure

Heart Failure in Children and Adolescents

Causes and Risks

Warning Signs of Heart Failure

Diagnosing Heart Failure

Treatment Options

Living with Heart Failure and Managing Advanced HF

Tools and Resources

Heart Failure Personal Stories

Related Articles

Heart Failure Questions to Ask Your Doctor

[1] *Adapted from Dolgin M, Association NYH, Fox AC, Gorlin R, Levin RI, New York Heart Association. Criteria Committee. Nomenclature and criteria for diagnosis of diseases of the heart and great vessels. 9th ed. Boston, MA: Lippincott Williams and Wilkins; March 1, 1994.*

*Original source: Criteria Committee, New York Heart Association , Inc. Diseases of the Heart and Blood Vessels. Nomenclature and Criteria for diagnosis, 6th edition Boston, Little, Brown and Co. 1964, p 114.*

Warning Signs of Heart Failure

Popular Articles

Heart Insight

In the first of a four-part series on heart failure, we investigate what it is, what causes it and what's the prognosis.

The second installment explains heart failure with muscle intact. Queen Latifah and her mom, Rita, share their personal experience with Rita's own heart failure diagnosis.

Heart failure patients are often hospitalized. This article looks at managing self-care to minimize just how often re-hospitalizations happen.

When HF progresses to an advanced stage, there are many decisions to be made. Here we delve into the importance of shared decision making.

Classes of Heart Failure

Last Reviewed: May 31, 2017

Diagnosing Heart Failure

HF Path™

A better quality of life for heart failure patients? We've got a tool for that!

Begin Your Journey Today

Explore My HF Guide

Our free interactive workbook to help manage heart failure symptoms

Open now

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number:

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

## If You Have Any Questions

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

European Journal of Heart Failure (2017) 19, 366–376
doi:10.1002/ejhf.563

RESEARCH ARTICLE

# New York Heart Association functional class, QRS duration, and survival in heart failure with reduced ejection fraction: implications for cardiac resychronization therapy

**Frieder Braunschweig[1,2*], Cecilia Linde[1,2], Lina Benson[3], Marcus Ståhlberg[1,2], Ulf Dahlström[4], and Lars H. Lund[1,2]**

[1]Karolinska Institutet, Department of Medicine, Stockholm, Sweden; [2]Karolinska University Hospital, Department of Cardiology, Stockholm, Sweden; [3]Karolinska Institutet, Department of Clinical Science and Education, South Hospital, Stockholm, Sweden; and [4]Department of Cardiology and Department of Medicine and Health Sciences, Linköping University, Linköping, Sweden

*Received 14 January 2016; revised 23 March 2016; accepted 4 April 2016; online publish-ahead-of-print 23 June 2016*

**Aims** Symptom severity assessed by NYHA functional class and QRS duration are essential criteria for selection of heart failure (HF) patients for CRT. This study assessed the relationship between NYHA class, QRS duration, and survival in a nationwide HF registry.

**Methods and results** We studied 13 423 patients with HF in NYHA class II–IV and LVEF <40% in the Swedish Heart Failure Registry. Survival was followed via the Swedish Population Registry. Of 12 534 patients without CRT (age 71 ± 12 years, 29% women), 51% and 49% were in NYHA class II and III–IV, respectively. Patients in NYHA class II compared with class III–IV were younger (69 vs. 73 years), and had a better systolic function (49% vs. 58% with LVEF <30%), *P* <0.001 for all, and a favourable co-morbidity profile. QRS duration was 116 ± 29 ms in NYHA class II and 119 ± 29 ms in NYHA class III–IV with QRS ≥120 ms found in 37% vs. 44%, and an LBBB in 23% vs. 28% (*P* < 0.001 for all). Upon multivariable Cox regression adjusting for 40 clinically relevant variables, mortality risk was higher in NYHA class III–IV vs. class II, with a hazard ratio (HR) of 1.31, 95% confidence interval (CI) 1.23–1.40. Mortality was also higher with QRS prolongation ≥120 ms vs. narrow QRS. The HR in NYHA class II patients with non-LBBB was 1.19 (95% CI 1.05 – 1.36) and in those with LBBB it was 1.16 (95% CI 1.03–1.41). The corresponding HRs in NYHA class III–IV were 1.33 (95% CI 1.21–1.47) and 1.12 (95% CI 1.02–1.22). There was no significant interaction between the effects of NYHA class and QRS duration or morphology on mortality. Applying different scenarios to estimate guideline adherence, fewer patients with NYHA class II (range 14.4–42.6%) compared with NYHA class III–IV (18.0–45.4%) had received a CRT device when indicated.

**Conclusions** In HF with reduced LVEF, QRS prolongation is common and independently linked to worse survival. The increase in mortality risk associated with QRS prolongation of both LBBB and non-LBBB morphology is similar in NYHA class II and III–IV.

**Keywords** NYHA functional class • Heart failure • QRS width • Left bundle branch block • Epidemiology • Cardiac resynchronization therapy

*Corresponding author. Department of Cardiology, Karolinska University Hospital, Solna, 17176 Stockholm, Sweden. Tel: +46 8 51771629, Fax: +46 8 311044, Email: frieder.braunschweig@karolinska.se

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

# Introduction

Heart failure (HF) is a highly symptomatic syndrome and associated with poor quality of life, frequent hospitalizations, and a high mortality risk despite recent advances in treatment with drugs and devices.[1,2] It is estimated that 2–3% of the population in industrialized countries suffers from HF, with a marked rise in those aged above 65.[3,4] In 1928 the New York Heart Association published a classification of HF symptom severity relating cardinal symptoms of HF like shortness of breath and fatigue to the levels of physical activity on which they occur (NYHA functional class I–IV).[5] Despite well-known limitations such as the temporal variability of clinical findings, interoperator variation, and a poor correlation with measures of cardiac function,[6,7] the NYHA classification is universally used to grade symptoms and select therapy in clinical practice, and provides prognostic discrimination close to that of complex multivariable risk models.[8]

A wide QRS complex on the surface ECG, especially if displayed as an LBBB, indicates intraventricular dyssynchony, and is a marker of poor prognosis in HF.[9] Cardiac resynchronization therapy improves survival, functional capacity, and quality of life in selected patients with such ECG abnormalities. Following early pivotal trials establishing the effectiveness of CRT in NYHA class III and IV,[10,11] the concept of resynchronization was expanded to patients with mild HF.[12–14] Current guidelines recommend CRT for patients with HF in NYHA class II–IV,[15–17] with gradual differentiations in relation to QRS morphology and duration. Based on evidence from trials and meta-analyses, patients with a typical LBBB pattern are given the highest level of recommendation.[18,19] A recent individual patient meta-analysis, however, suggested QRS duration rather than morphology as an independent predictor of CRT outcomes.[20] The implementation of CRT guidelines shows wide national and regional variation.[21] Potential differences in the adoption of CRT in NYHA class II compared with class III–IV have not been explored.

Since NYHA class and QRS morphology and duration form essential selection criteria, it would be important to study the relationship between these variables and survival in CRT candidates. However, this has been difficult as randomized studies largely included patients with either NYHA class III–IV or NYHA class (I and) II. Furthermore, the impact of QRS characteristics on survival in different groups of NYHA class is confounded by many other variables. Thus, large samples with information on a wide spectrum of baseline variables would be required to reach valid conclusions. Therefore, we investigated the interaction between NYHA class, QRS morphology/duration, and survival in a large Swedish HF registry with information from long-term follow-up and complete survival status by linkage to the National Population Registry.

# Methods

The Swedish Heart Failure Registry (SwedeHF) has been described previously.[22,23] Including over 63 000 unique HF patients, it is one of the largest HF registries worldwide. The protocol, case report form, and annual registry reports are available at http://www.SwedeHF.se. Patients with clinician-judged HF are included at discharge from hospital or upon outpatient visits at cardiology or internal medicine units and primary care clinics. Approximately 80 variables are recorded. The HF registry in general as well as the present study conform to the Declaration of Helsinki and they were approved by the responsible ethics committees. Individual patient consent is not required, but patients are informed of entry into national registries and allowed to opt out.

## Patients

*Figure 1* provides details on patient inclusion and exclusion. Between 11 May 2000 and 5 June 2013, there were 85 291 registrations from inpatient and outpatient units at 68 of 94 hospitals and from 102 of ~1000 primary care outpatient clinics in Sweden. Coverage in 2012 was 55%. This was defined as the number of individuals reported to the registry divided by the sum of individuals with clinical HF encountered in Sweden according to ICD-10 (International Classification of Diseases-10th revision) code for HF plus those reported to the registry (to capture those few who may have been missed by ICD-10 code).

Survival status was updated monthly by linkage with the Swedish population registry (latest update 15 May 2013). For the purpose of this study, we included first registrations from patients with HF and reduced EF, defined as an EF ≤40%. Patients had to be in NYHA class II, III, or IV, with complete data on age, rhythm, device implantation status, as well as QRS duration and morphology. Patients with a prolonged QRS duration of ≥120 ms were defined as either LBBB or non-LBBB type at the discretion of the physician. We excluded repeat registrations and patients with a pacemaker or implantable cardioverter defibrillator (ICD) without a CRT component.

## Analyses

The analysis of the inter-relationship between NYHA class, QRS duration, and survival was performed after the exclusion of patients with a CRT and, thus, paced QRS complexes on the ECG (*Figure 1*), whereas the analysis of CRT utilization included patients with a CRT device.

Categorization and availability of data in the registry do not allow a perfect match with European Society of Cardiology (ESC) guidelines.[15–17] Therefore, we evaluated four different scenarios to account for different levels of recommendation in the guidelines and different strengths of fitting between guideline criteria and registry variables. In the registry, EF is reported as <30, 30–39, 40–49, and ≥50%. As EF in Sweden is overwhelmingly reported in 5–10% increments, we assumed that most patients registered in the group with EF 30–39% had an actual EF of 30% or 35% and that few had an EF of 36–39%. In contrast, when selecting only registry patients with EF <30%, all would fulfil the LVEF guideline criterion for CRT, but some patients with EF 30–35% would be missed.

The strength of evidence and recommendations for CRT varies depending on QRS duration (120–149; ≥150 ms), QRS morphology (LBBB vs. non-LBBB), and rhythm (sinus vs. AF). Therefore, we performed analyses with progressively stricter CRT selection criteria, based on the guideline-specified recommendations I-A, I-B, IIa-B, and IIb-B from the European Heart Rhythm Association Guidelines 2013.[16] Guidelines also recommend CRT in patients with an indication for conventional ventricular pacing. The registry contains data on the presence of conventional pacemakers but not on the original indication for implantation or the percentage of ventricular pacing. Therefore, this potential guideline indication was not taken into account and patients with a previous pacemaker were excluded.

© 2016 The Authors

Case 2:20-cv-02921-SHM-atc Document 20-3 Filed 03/29/21 Page 529 of 1050
PageID 751






**Figure 1** Flow chart showing the selection of study patients from the SwedeHF registry. HF, heart failure; ICD, implantable cardioverter defibrillator.

Scenario 1: sinus rhythm (NYHA II–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology) or AF (NYHA III–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology)
Scenario 2: sinus rhythm (NYHA II–IV, EF <40%, LBBB or QRS ≥150 ms) or AF (NYHA III–IV, EF <40%, LBBB, or QRS ≥150 ms)
Scenario 3: sinus rhythm (NYHA II–IV, EF <30%, LBBB, or QRS ≥150 ms) or AF (NYHA III–IV, EF <30%, or QRS ≥150 ms)
Scenario 4: sinus rhythm (NYHA II–IV, EF <30%, QRS ≥150 regardless of QRS morphology) or AF (NYHA III–IV, EF <30%, QRS ≥150 regardless of QRS morphology) (patients were only included after 1 January 2011 because evidence in NYHA II was not available before then).

## Statistical analysis

All analyses were performed in R version 3.0.2 (R Foundation for Statistical Computing, Vienna, Austria). The level of significance was set to 5% and all reported *P*-values are two-tailed.

Survival for narrow QRS, non-LBBB QRS prolongation, and LBBB was presented using the Kaplan–Meier method and groups were compared with the log-rank test, separately for patients with NYHA class II and III–IV. Univariable and multivariable Cox regressions, using the Efron method for tie handling, were performed for non-LBBB/LBBB as a categorical variable compared with narrow QRS with adjustment for the 40 variables listed in the Supplementary material online, *Table S1*, and the interaction between NYHA class and QRS morphology. The modelling of an interaction effect renders a similar interpretation as if the data had been analysed separately in NYHA class subgroups, but with the additional benefit of also being able statistically to test differences between groups of NYHA class in effects of non-LBBB and LBBB vs. narrow QRS on mortality.

The proportional hazards assumption was investigated for the scaled Schoenfeld residuals from the multivariable models, and the dfbetas [a measure of how much the hazard ratio (HR) changes owing to the deletion of a single observation] from the models were inspected to detect extreme outliers. As a result, location (inpatient vs. outpatient) and marital status were modelled as strata variables because they were deemed not to fulfil the proportional hazard assumption. All continuous variables were modelled using restricted cubic splines (enabling possible non-linear relationships between these variables and the outcome to be modelled) with four degrees of freedom.[24]

Some baseline variables had missing data. *Table S1* in the Supplementary material online specifies 40 clinically relevant baseline variables and percentage missing for each variable. In the multivariable Cox regressions, to avoid bias and confounding resulting from variables not missing completely at random, multiple imputation ($n = 10$) was performed for all variables with missing data, using predictive mean matching with QRS width as a continuous variable and the 40 variables in *Table S1* in the Supplementary material online, and the outcome, survival, included as the Nelson–Aalen estimator in the imputation model, although not imputed itself because it contained no missing values. Imputation corrections to the resulting standard errors were performed.

# Results

Of 85 291 entries in the registry, 13 423 unique patients fulfilled the selection criteria (*Figure 1*). Of these, 889 had a CRT device implanted including 447 with an ICD component, leaving 12 534 patients without CRT for the main analysis. Baseline characteristics are provided in *Table 1* (for a complete list of variables see *Table S1*

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

Lincoln/Carter 0608

**Table 1 Baseline characteristics**

| Variable | NYHA II ($n = 6377$) | NYHA III–IV ($n = 6157$) | *P*-value |
|---|---|---|---|
| Demographics | | | |
| Male gender | 4627 (73%) | 4273 (69%) | <0.001 |
| Age (years) | 69 ± 12 | 73 ± 12 | <0.001 |
| HF-related characteristics | | | |
| NYHA II | 6377 (100%) | – | <0.001 |
| NYHA III | – | 5554 (90%) | |
| NYHA IV | – | 603 (10%) | |
| Duration <6 months | 3741 (59%) | 2668 (44%) | <0.001 |
| IHD | 2870 (48%) | 3282 (56%) | <0.001 |
| DCM | 1276 (20%) | 1140 (19%) | 0.042 |
| HCM | 60 (2%) | 61 (2%) | 0.972 |
| LVEF 30–39% | 3246 (51%) | 2589 (42%) | <0.001 |
| LVEF <30% | 3131 (49%) | 3568 (58%) | |
| QRS-related characteristics | | | |
| QRS duration (ms) | 116 ± 29 | 119 ± 29 | <0.001 |
| QRS <120 ms | 4021 (63%) | 3437 (56%) | <0.001 |
| QRS 120–149 ms | 1305 (20%) | 1595 (26%) | |
| QRS ≥150 ms | 1051 (16%) | 1125 (18%) | |
| LBBB | 1497 (23%) | 1706 (28%) | <0.001 |
| Rhythm, blood pressure | | | |
| AF (any form) | 2548 (40%) | 2848 (46%) | <0.001 |
| Permanent AF | 2033 (32%) | 2333 (38%) | <0.001 |
| Heart rate (b.p.m.) | 72 ± 15 | 76 ± 16 | <0.001 |
| Systolic blood pressure (mmHg) | 126 ± 20 | 122 ± 21 | <0.001 |
| Co-morbidities | | | |
| Hypertension | 2722 (44%) | 2815 (47%) | <0.001 |
| Diabetes | 1284 (20%) | 1758 (29%) | <0.001 |
| Valve disease | 1003 (16%) | 1432 (24%) | <0.001 |
| Pulmonary disease | 845 (13%) | 1261 (21%) | <0.001 |
| Revascularization | 1710 (27%) | 1798 (29%) | 0.003 |
| Biochemistry | | | |
| Haemoglobin (g/L) | 138 ± 16 | 133 ± 17 | <0.001 |
| NT-proBNP (ng/L) | 2279 (1022–4902) | 3883 (1760–8456) | <0.001 |
| GFR (mL/min/1.73 $m^2$) | 76 ± 36 | 64 ± 34 | <0.001 |
| Medications | | | |
| ACE inhibitor | 4845 (76%) | 4165 (68%) | <0.001 |
| ARB | 1353 (21%) | 1446 (24%) | 0.002 |
| Beta-blocker | 5900 (93%) | 5534 (90%) | <0.001 |
| MRA | 1991 (31%) | 2328 (38%) | <0.001 |
| Diuretic | 4674 (74%) | 5403 (88%) | <0.001 |
| Digitalis | 1119 (18%) | 1133 (18%) | 0.207 |
| Nitrate | 744 (12%) | 1147 (19%) | <0.001 |
| OAC | 2516 (40%) | 2439 (40%) | 0.838 |

Numbers are *n* (%) for categorical variables and mean ± SD for continuous variables, and tested with $\chi^2$ test and *t*-test, respectively.
NT-proBNP is given as median (interquartile range).
DCM, dilated cardiomyopathy; GFR, glomerular filtration rate; HCM, hypertrophic cardiomyopathy, IHD, ischaemic heart disease; MRA, mineralocorticoid receptor antagonist; OAC, oral anticoagulant.

in the Supplementary material online). There were 6377 patients (51%) with NYHA class II and 6157 (49%) in NYHA class III–IV.

Patients in NYHA class II were younger, more likely to be male, and had a shorter duration of HF, less ischaemic cardiomyopathy, and a higher LVEF. Furthermore, they had a lower propability of AF, a lower heart rate, higher systolic blood pressure, and a more favourable co-morbidity profile. Levels of NT-proBNP were lower, while haemoglobin and creatinine clearance were higher. Interestingly, a higher proportion of NYHA class II patients were on treatment with ACE inhibitors and beta-blockers. In contrast, use of ARBs, mineralocorticoid receptor antagonists (MRA), and diuretics was higher among patients with NYHA class III–IV.

## QRS duration and morphology in relation to New York Heart Association class

QRS prolongation was common in both groups (*Figure 2*). On average, patients in NYHA class II compared with NYHA class III–IV had a somewhat smaller QRS (116 ± 29 ms vs. 119 ± 29 ms; $P < 0.001$) and fewer had a QRS of ≥120 ms (37% vs. 44%;

© 2016 The Authors




**Figure 2** Prevalence of QRS duration. Distribution of QRS duration in increments of 10 ms and proportions with LBBB (hashed bars) in patients with NYHA class II and NYHA class III–IV.

$P < 0.001$), a QRS ≥150 ms (16% vs. 18%, $P = 0.009$), or an LBBB (23% vs. 28%; $P < 0.001$). However, among those with a QRS duration ≥120 ms, the proportion of patients with LBBB was similar: 64% in NYHA class II and 63% in NYHA class III–IV ($P = 0.55$), and increased with progressively wider QRS.

## Survival in relation to New York Heart Association class and QRS duration and morphology

As expected, NYHA class II patients had a better survival compared with those in NYHA class III–IV (*Figure 3*). In the resulting multivariable Cox model, the HR and 95% confidence interval (CI) for mortality in NYHA III–IV vs. II was 1.31, 95% CI 1.23–1.40 ($P < 0.001$). In both groups, prolonged QRS duration was associated with worse survival and the prognosis of patients with a non-LBBB morphology was inferior compared with those who had LBBB. The proportion of patients surviving at 1, 3, and 5 years is given in *Table 2*. After 5 years, 58% of patients in NYHA class II with QRS prolongation of non-LBBB type were alive, while the corresponding number of NYHA class III–IV patients was only 30%. In contrast, 69% and 49% of patients in NYHA class II and III–IV, respectively, survived at 5 years, if they had a narrow QRS. At each point of time, survival of NYHA class II patients with QRS prolongation of non-LBBB type was better compared with NYHA class III–IV patients with narrow QRS.

As shown in *Table 1*, there were significant differences in baseline characteristics probably explaining the better outcome in NYHA class II vs. NYHA class III–IV patients. Thus, to assess the independent contribution of QRS duration and morphology to the mortality risk in NYHA class II and NYHA class III–IV, survival data were adjusted for important confounding variables. These factors had been specified *a priori* and included all variables with statistical differences shown in *Table 1* and, in addition, civil status, housing, recruitment in or out of hospital, year of recruitment, setting of general follow-up, setting of HF follow-up, mean arterial pressure, pulse pressure, cardiomegaly, and/or congestion on X-ray.

In all settings, prolonged QRS duration was associated with a significant increase in mortality risk (*Figure 4*). After adjustment for multiple confounders, the HR for mortality in patients with non-LBBB type vs. narrow QRS was 1.19 (95% CI 1.05 – 1.36; $P = 0.009$) in NYHA class II and 1.33 (95% CI 1.21–1.47; $P < 0.001$) in NYHA class III–IV. Similarly, comparing patients with LBBB vs. narrow QRS, the adjusted HR was 1.16 (95% CI 1.03–1.41; $P = 0.013$) in NYHA class II and 1.12 (95% CI 1.02–1.22; $P = 0.014$) in NYHA class III–IV. Thus, QRS prolongation, both of LBBB and non-LBBB type, independently added a similar mortality risk in patients with NYHA class II and NYHA class III–IV (*P* for interaction: 0.521, crude and 0.244, adjusted).

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 3** Kaplan–Meier survival by NYHA class and QRS morphology. *(A)* NYHA class II; *(B)* NYHA class III–IV. Log-rank *P*-value for QRS/LBBB in both NYHA groups: <0.001.

**Table 2 Survival at 1, 3, and 5 years**

| Year | QRS <120 ms | | | QRS ≥120 ms non-LBBB | | | QRS ≥120 ms LBBB | | |
|---|---|---|---|---|---|---|---|---|---|
| | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI |
| NYHA class II | | | | | | | | | |
| 1 | 3287 | 0.92 | 0.92–0.93 | 680 | 0.88 | 0.86–0.91 | 1173 | 0.90 | 0.88–0.91 |
| 3 | 1967 | 0.80 | 0.79–0.82 | 400 | 0.71 | 0.68–0.75 | 681 | 0.74 | 0.72–0.77 |
| 5 | 945 | 0.69 | 0.67–0.70 | 190 | 0.58 | 0.54–0.62 | 296 | 0.62 | 0.59–0.65 |
| NYHA class III–IV | | | | | | | | | |
| 1 | 2477 | 0.82 | 0.80–0.83 | 631 | 0.70 | 0.70–0.73 | 1163 | 0.54 | 0.75–0.79 |
| 3 | 1290 | 0.63 | 0.61–0.65 | 304 | 0.45 | 0.42–0.49 | 591 | | (0.51–0.57) |
| 5 | 577 | 0.49 | 0.47–0.51 | 128 | 0.30 | 0.26–0.33 | 243 | 0.39 | 0.36–0.41 |

CI, confidence interval.

## Eligibility and utilization of cardiac resynchronization therapy according to New York Heart Association class

The proportion of patients eligible for CRT and the actual utilization of CRT in relation to current guideline recommendations was analysed in 13 423 individual patients, including those with an implanted CRT device. Eligibility was analysed in four scenarios representing increasing strength of recommendation and fit between guideline and registry criteria (*Figure 5*). Depending on the scenario chosen, between 14.5% and 30.4% of patients in NYHA class II and between 18.9% and 49.1% of patients in NYHA class III–IV fulfilled guideline recommendations for CRT. For example, in scenario 3, representing strict selection criteria according to current guidelines, 16.2% in NYHA class III–IV and 28.1% in NYHA class II met CRT selection criteria. In each scenario, more patients in NYHA class III–IV than in class II had a CRT indication.

Of patients meeting criteria for CRT, only a minority had actually received a device. This proportion ranged between 14.4% and 42.6% of eligible patients (4.4% and 6.2% of the total) with NYHA class II, and between 18.0% and 45.4% (8.6% and 8.8% of the total) in those with NYHA class III–IV. For example, in scenario 3, 27.1% and 31.4% had actually been implanted. Thus, irrespective of analysis, large proportions of both NYHA groups lacked CRT despite an indication. Consistently, the proportion of patients in NYHA class II who had an indication but were not treated with a device was lower compared with those in NYHA class III–IV, including scenario 4 which contained only

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 4** Forest plots depicting hazard ratios (HRs) for all-cause mortality associated with different QRS morphologies in NYHA class II and NYHA class III–IV. Cox regressions were performed in the overall population with adjustment for the 40 variables in Supplementary material online, *Table S1* and the interaction between NYHA class and QRS morphology. Interaction between QRS/LBBB and NYHA class: 0.521 (crude); 0.244 (adjusted). CI, confidence interval.

patients who entered the registry after the first publication of CRT guidelines for NYHA class II patients in 2010. However, while the difference in CRT utilization was statistically significant in scenario 1–3, it did not reach statistical significance ($P = 0.507$) in the fourth scenario, evaluating only a total of 684 patients with an indication.

## Discussion

Grading of HF symptoms according to the NYHA classification is a cornerstone in the clinical assessment of HF patients and has important clinical implications for the selection of appropriate treatment. Specifically, current guidelines for CRT tailor recommendations in relation to NYHA class and QRS characteristics.[15,16] We analysed the relationship between NYHA class, QRS duration/morphology, and survival in a large group of HF patients with reduced LVEF <40% and long-term follow-up via Swedish national registries. A QRS prolongation of ≥120 ms was common in both NYHA class II (36%) and NYHA class III–IV (44%). Importantly, while NYHA II patients were healthier at baseline and survived longer, the independent risk attributable to QRS prolongation of LBBB or non-LBBB type was similar in NYHA class II and III–IV. Although CRT is highly recommended in current guidelines, only a minority of patients fulfilling guideline recommendations had received a device, and this underutilization appeared to be even greater in NYHA class II compared with NYHA class III–IV.

Our finding that QRS duration is associated with a similar hazard for death in patients with NYHA class II and III–IV gains particular strength by the large sample size, the long and complete follow-up through national registries, and a background medical therapy reflecting a high standard of care. Even after adjustment for a large number of confounders, the mortality risk in NYHA class II patients with LBBB and non-LBBB morphology was significantly increased. This supports the notion that QRS prolongation is not only a general marker of HF severity[25] but also a risk factor contributing to the adverse prognosis in HF independently of other prognostic factors, presumably through the induction of ventricular dyssynchrony.

Other studies have looked into the interaction between NYHA class, QRS duration, and prognosis. Two smaller studies also found a wider QRS duration with more advanced NYHA class, but multivariable analysis was not performed.[26,27] Similarly to the present study, a secondary analysis of a previous, smaller SwedeHF

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

Case 2:20-cv-02921-SHM-atc Document 20-3 Filed 03/29/21 Page 534 of 1050
PageID 756






**Figure 5** Estimation of CRT utilization in the SwedeHF registry. (*A*) The proportion of patients meeting selection criteria for CRT according to scenarios 1–3 reflecting progressively stricter CRT selection criteria based on guideline recommendations, and scenario 4 considering only patients included after 1 January 2011 (see the Methods for further details). (*B*) The proportion of patients meeting CRT selection criteria who actually were implanted with a device. *P*-values (NYHA II compared with NYHA III–IV): [1]$P < 0.001$; [2]$P < 0.001$; [3]$P = 0.015$; [4]$P = 0.507$.

cohort indicated that interactions between QRS width and NYHA class were not significant upon multivariate analysis.[9]

The proportion of patients with prolonged QRS ≥120 ms in our study (41%) corresponds well with previous reports. A broad QRS was also found in 41% of patients with an LVEF ≤35% evaluated in the EuroHeart failure survey,[28] 37% of patients in the Italian Network on CHF[29] (using 140 ms as a cut-off), and 34% of HF patients examined in the setting of a community HF clinic.[30] In the present study, there was a trend towards worse prognosis in subjects with non-LBBB morphology, found in approximately one-third of patients with prolonged QRS, compared with LBBB. Causing a characteristic U-shaped activation pattern of the left ventricle,[31] LBBB has been closely linked to left intraventricular dyssynchrony between the septum and the lateral wall, while QRS prolongation of non-LBBB type may result in various other electromechanical abnormalities.[32] This may explain why patients with LBBB have especially large effects by CRT while non-LBBB morphology is a predictor of non-response.[33] Among patients with non-LBBB morphology, we could not single out those with a right bundle branch block (RBBB). RBBB is associated with increased mortality in chronic HF,[34] but RBBB patients do not improve by CRT.[35]

Cardiac resynchronization therapy was first introduced in patients with NYHA class III.[10,36,37] The COMPANION trial also included a small proportion (14%) of patients in NYHA class IV provided they had not been hospitalized during the month before enrolment and had an estimated survival exceeding 6 months.[11] This subgroup showed a significant reduction in the combined primary study endpoint, and hence the indication of 'ambulatory' NYHA class IV was incorporated into current guidelines. However, NYHA class IV is a rare indication in clinical practice and patients hospitalized with acutely decompensated HF and/or receiving inotropic support are usually not considered for implantation. In the European CRT survey, only 8% were judged to be in NYHA class IV at baseline.[38] In the present study, a total of 4.8% had NYHA class IV. Considering the clinical context in which patients are recruited to the registry, we assume that most of them met the criteria of 'ambulatory' class IV.

Utilization of CRT in NYHA class II vs. III–IV was significantly worse in scenarios 1–3. This can be explained by the later introduction of NYHA II to CRT guidelines. The analysis in scenario 4, focusing on a smaller sample of patients with strict indications recruited after 2010, showed a similarly worse utilization but the difference was not significant. In a registry, some appropriate reasons to abstain from device therapy such as high biological age, clinical severity of co-morbidities, or patient refusal are difficult to discern. However, considering the baseline characteristics (*Table 1*), factors such as high age and severe co-morbidities are unlikely to explain the larger underutilization of CRT in NYHA class II.

© 2016 The Authors


Lincoln/Carter 0613

In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. It may be speculated that it was easier to achieve drug target doses in those with mild HF, better renal function, and less compromised haemodynamics as reflected by higher blood pressure.

Only half of the patients received CRT together with a defibrillator, which is below the European average but in keeping with Swedish implantation statistics and on a similar level compared with countries such as the UK or Denmark.[21]

Our findings have clinical implications as they indicate that a wide QRS complex should alert physicians to the significantly increased mortality risk of the HF patient regardless of NYHA class and other conditions. Device treatment with CRT and, in most cases ICD, has strong evidence in this scenario and should be seriously considered. Studies indicate that CRT is similarly effective in appropriately selected NYHA class II and III–IV patients to improve outcomes.[14] As CRT appears particularly underutilized in NYHA class II, the value of early interventions to prevent disease progression should be highlighted. Recently, long-term effects of CRT on mortality[39] and measures of functional and LV remodelling[40] were shown in mild HF. However, these improvements were largely confined to patients with LBBB. Thus, our results also emphasize a particular need for additional treatment options in patients with mild to moderate HF and QRS prolongation of non-LBBB type who have limited effects by resynchronization.

## Limitations

Measurement of QRS duration and the categorization of LBBB was left to the individual physician, and misclassification may have occurred. We have no information regarding the presence of RBBB but only whether patients had LBBB or not. Categories used in the registry, in particular LVEF, allowed no perfect match with selection criteria in the guidelines. We sought to accommodate this by evaluating guideline adoption in different scenarios with progressively stricter CRT selection criteria. In addition, we could not assess whether patients with potential CRT indication had contraindications. The analysis of CRT utilization represents only a snap-shot of CRT prevalence, and we cannot rule out that patients without CRT may have received CRT during the later course of follow-up or that they improved such that CRT was no longer indicated. However, follow-up referral to cardiologists and HF nurse clinics was rare, suggesting that most patients were not considered for CRT by the clinician responsible. Furthermore, since only a minor portion of CRT candidates had received a device, it is unlikely that this portion had greatly increased during further follow-up. We reported all-cause but not cause-specific mortality. The latter may provide a stronger link between the pathophysiology of conduction delay and outcomes, but the former is more clinically relevant. Finally, patients with LV dysfunction and HF who had been previously implanted with an ICD were excluded from analysis.

## Conclusions

This study in a large national registry shows that QRS prolongation of both LBBB and non-LBBB type is an independent predictor of mortality in patients with HF and reduced LVEF. Importantly, the increase in mortality risk attributable to QRS prolongation was similar in those with NYHA class II and those with NYHA class III–IV, and remained significant even after adjustment for a large number of relevant confounders. Although many HF patients with prolonged QRS fulfil current guideline criteria, CRT appears to be underutilized particularly among NYHA class II patients.

## Supplementary Information

Additional Supporting Information may be found in the online version of this article:

**Table S1.** Complete baseline variables included in multivariable models among 12 534 patients (without CRT).

## Acknowledgements

We thank local investigators in the Swedish Heart Failure Registry for data entry and management.

## Funding

This work was supported in part by Boston Scientific, the Swedish Research Council, the Swedish Heart and Lung Foundation, and Stockholm County Council in the form of grants to L.H.L.'s institution. No funding organization had any role in the collection, analysis, or interpretation of data or approval/disapproval for publication.

**Conflict of interest:** L.H.L. reports speaker's honoraria from St Jude and research grants to his institution from Medtronic. C.L. was principal investigator of REVERSE, a CRT study sponsored by Medtronic, reports research grants, speaker honoraria, and consulting fees from Medtronic, and speaker honoraria and consulting fees from St. Jude Medical. F.B. reports research grants and speaker honoraria from Medtronic and consulting fees from Biotronik and Boston Scientific. M.S. and U.D. report no conflicts of interest.

## References

1. MacIntyre K, Capewell S, Stewart S, Chalmers JW, Boyd J, Finlayson A, Redpath A, Pell JP, McMurray JJ. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. *Circulation* 2000;**102**:1126–1131.
2. Schaufelberger M, Swedberg K, Koster M, Rosen M, Rosengren A. Decreasing one-year mortality and hospitalization rates for heart failure in Sweden; data from the Swedish Hospital Discharge Registry 1988 to 2000. *Eur Heart J* 2004;**25**:300–307.
3. Cowie MR, Mosterd A, Wood DA, Deckers JW, Poole-Wilson PA, Sutton GC, Grobbee DE. The epidemiology of heart failure. *Eur Heart J* 1997;**18**:208–225.
4. Dickstein K, Cohen-Solal A, Filippatos G, McMurray JJ, Ponikowski P, Poole-Wilson PA, Stromberg A, van Veldhuisen DJ, Atar D, Hoes AW, Keren A, Mebazaa A, Nieminen M, Priori SG, Swedberg K, Vahanian A, Camm J, De Caterina R, Dean V, Dickstein K, Filippatos G, Funck-Brentano C, Hellemans

© 2016 The Authors

I, Kristensen SD, McGregor K, Sechtem U, Silber S, Tendera M, Widimsky P, Zamorano JL, Tendera M, Auricchio A, Bax J, Bohm M, Corra U, della Bella P, Elliott PM, Follath F, Gheorghiade M, Hasin Y, Hernborg A, Jaarsma T, Komajda M, Kornowski R, Piepoli M, Prendergast B, Tavazzi L, Vachiery JL, Verheugt FW, Zamorano JL, Zannad F. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2008: the Task Force for the diagnosis and treatment of acute and chronic heart failure 2008 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association of the ESC (HFA) and endorsed by the European Society of Intensive Care Medicine (ESICM). *Eur J Heart Fail* 2008;**10**:933–989.

5. The Criteria Committee of the New York Heart Association. *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*, 9th ed. Boston: Little, Brown & Co.; 1994. p253–256.
6. Raphael C, Briscoe C, Davies J, Ian Whinnett Z, Manisty C, Sutton R, Mayet J, Francis DP. Limitations of the New York Heart Association functional classification system and self-reported walking distances in chronic heart failure. *Heart* 2007;**93**:476–482.
7. Adams KF Jr, Zannad F. Clinical definition and epidemiology of advanced heart failure. *Am Heart J* 1998;**135**:S204–S215.
8. Goda A, Williams P, Mancini D, Lund LH. Selecting patients for heart transplantation: comparison of the Heart Failure Survival Score (HFSS) and the Seattle Heart Failure Model (SHFM). *J Heart Lung Transplant* 2011;**30**:1236–1243.
9. Lund LH, Jurga J, Edner M, Benson L, Dahlstrom U, Linde C, Alehagen U. Prevalence, correlates, and prognostic significance of QRS prolongation in heart failure with reduced and preserved ejection fraction. *Eur Heart J* 2013;**34**:529–539.
10. Cleland JG, Daubert JC, Erdmann E, Freemantle N, Gras D, Kappenberger L, Tavazzi L. The effect of cardiac resynchronization on morbidity and mortality in heart failure. *N Engl J Med* 2005;**352**:1539–1549.
11. Bristow MR, Saxon LA, Boehmer J, Krueger S, Kass DA, De Marco T, Carson P, DiCarlo L, DeMets D, White BG, DeVries DW, Feldman AM. Cardiac-resynchronization therapy with or without an implantable defibrillator in advanced chronic heart failure. *N Engl J Med* 2004;**350**:2140–2150.
12. Linde C, Abraham WT, Gold MR, St John Sutton M, Ghio S, Daubert C. Randomized trial of cardiac resynchronization in mildly symptomatic heart failure patients and in asymptomatic patients with left ventricular dysfunction and previous heart failure symptoms. *J Am Coll Cardiol* 2008;**52**:1834–1843.
13. Moss AJ, Hall WJ, Cannom DS, Klein H, Brown MW, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Higgins SL, Pfeffer MA, Solomon SD, Wilber D, Zareba W. Cardiac-resynchronization therapy for the prevention of heart-failure events. *N Engl J Med* 2009;**361**:1329–1338.
14. Tang AS, Wells GA, Talajic M, Arnold MO, Sheldon R, Connolly S, Hohnloser SH, Nichol G, Birnie DH, Sapp JL, Yee R, Healey JS, Rouleau JL, Resynchronization-Defibrillation for Ambulatory Heart Failure Trial I. Cardiac-resynchronization therapy for mild-to-moderate heart failure. *N Engl J Med* 2010;**363**:2385–2395.
15. McMurray JJ, Adamopoulos S, Anker SD, Auricchio A, Bohm M, Dickstein K, Falk V, Filippatos G, Fonseca C, Gomez-Sanchez MA, Jaarsma T, Kober L, Lip GY, Maggioni AP, Parkhomenko A, Pieske BM, Popescu BA, Ronnevik PK, Rutten FH, Schwitter J, Seferovic P, Stepinska J, Trindade PT, Voors AA, Zannad F, Zeiher A, Bax JJ, Baumgartner H, Ceconi C, Dean V, Deaton C, Fagard R, Funck-Brentano C, Hasdai D, Hoes A, Kirchhof P, Knuuti J, Kolh P, McDonagh T, Moulin C, Reiner Z, Sechtem U, Sirnes PA, Tendera M, Torbicki A, Vahanian A, Windecker S, Bonet LA, Avraamides P, Ben Lamin HA, Brignole M, Coca A, Cowburn P, Dargie H, Elliott P, Flachskampf FA, Guida GF, Hardman S, Iung B, Merkely B, Mueller C, Nanas JN, Nielsen OW, Orn S, Parissis JT, Ponikowski P. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012: the Task Force for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2012 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association (HFA) of the ESC. *Eur J Heart Fail* 2012;**14**:803–869.
16. Brignole M, Auricchio A, Baron-Esquivias G, Bordachar P, Boriani G, Breithardt OA, Cleland J, Deharo JC, Delgado V, Elliott PM, Gorenek B, Israel CW, Leclercq C, Linde C, Mont L, Padeletti L, Sutton R, Vardas PE, ESC Committee for Practice Guidelines (CPG), Zamorano JL, Achenbach S, Baumgartner H, Bax JJ, Bueno H, Dean V, Deaton C, Erol C, Fagard R, Ferrari R, Hasdai D, Hoes AW, Kirchhof P, Knuuti J, Kolh P, Lancellotti P, Linhart A, Nihoyannopoulos P, Piepoli MF, Ponikowski P, Sirnes PA, Tamargo JL, Tendera M, Torbicki A, Wijns W, Windecker S, Document R, Kirchhof P, Blomstrom-Lundqvist C, Badano LP, Aliyev F, Bansch D, Baumgartner H, Bsata W, Buser P, Charron P, Daubert JC, Dobreanu D, Faerestrand S, Hasdai D, Hoes AW, Le Heuzey JY, Mavrakis H, McDonagh T, Merino JL, Nawar MM, Nielsen JC, Pieske B, Poposka L, Ruschitzka F, Tendera M, Van Gelder IC, Wilson CM. 2013 ESC Guidelines on cardiac pacing and cardiac resynchronization therapy: the Task Force on cardiac pacing and resynchronization therapy of the European Society of Cardiology (ESC). Developed in collaboration with the European Heart Rhythm Association (EHRA). *Eur Heart J* 2013;**34**:2281–2329.
17. Priori SG, Blomstrom-Lundqvist C, Mazzanti A, Blom N, Borggrefe M, Camm J, Elliott PM, Fitzsimons D, Hatala R, Hindricks G, Kirchhof P, Kjeldsen K, Kuck KH, Hernandez-Madrid A, Nikolaou N, Norekval TM, Spaulding C, Van Veldhuisen DJ. Authors/Task Force Members; Document Reviewers. 2015 ESC Guidelines for the management of patients with ventricular arrhythmias and the prevention of sudden cardiac death: the Task Force for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death of the European Society of Cardiology (ESC) Endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC). *Eur Heart J* 2015;**36**:2793–2867.
18. Sipahi I, Chou JC, Hyden M, Rowland DY, Simon DI, Fang JC. Effect of QRS morphology on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Am Heart J* 2012;**163**:260–267.
19. Sipahi I, Carrigan TP, Rowland DY, Stambler BS, Fang JC. Impact of QRS duration on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Arch Intern Med* 2011;**171**:1454–1462.
20. Cleland JG, Abraham WT, Linde C, Gold MR, Young JB, Claude Daubert J, Sherfesee L, Wells GA, Tang AS. An individual patient meta-analysis of five randomized trials assessing the effects of cardiac resynchronization therapy on morbidity and mortality in patients with symptomatic heart failure. *Eur Heart J* 2013;**34**:3547–3556.
21. Raatikainen MJ, Arnar DO, Zeppenfeld K, Merino JL, Levya F, Hindriks G, Kuck KH. Statistics on the use of cardiac electronic devices and electrophysiological procedures in the European Society of Cardiology countries: 2014 report from the European Heart Rhythm Association. *Europace* 2015;**17** Suppl 1:i1–175.
22. Lund LH, Benson L, Dahlstrom U, Edner M. Association between use of renin–angiotensin system antagonists and mortality in patients with heart failure and preserved ejection fraction. *JAMA* 2012;**308**:2108–2117.
23. Jonsson A, Edner M, Alehagen U, Dahlstrom U. Heart failure registry: a valuable tool for improving the management of patients with heart failure. *Eur J Heart Fail* 2010;**12**:25–31.
24. Therneau T, Grambsch P. Functional Form and Testing Proportional Hazards. In: Dietz K, Gail M, Krickeberg K, Samet J, Tsiatis A, eds *Modeling Survival Data: Extending the Cox Model*. New York: Springer-Verlag; 2000.
25. Kashani A, Barold SS. Significance of QRS complex duration in patients with heart failure. *J Am Coll Cardiol* 2005;**46**:2183–2192.
26. Stellbrink C, Auricchio A, Diem B, Breithardt OA, Kloss M, Schondube FA, Klein H, Messmer BJ, Hanrath P. Potential benefit of biventricular pacing in patients with congestive heart failure and ventricular tachyarrhythmia. *Am J Cardiol* 1999;**83**:143D–150D.
27. Gasparini M, Mantica M, Galimberti P, Marconi M, Genovese L, Faletra F, Simonini S, Klersy C, Coates R, Gronda E. Beneficial effects of biventricular pacing in patients with a 'narrow' QRS. *Pacing Clin Electrophysiol* 2003;**26**:169–174.
28. Khan NK, Goode KM, Cleland JG, Rigby AS, Freemantle N, Eastaugh J, Clark AL, de Silva R, Calvert MJ, Swedberg K, Komajda M, Mareev V, Follath F, EuroHeart Failure Survey I. Prevalence of ECG abnormalities in an international survey of patients with suspected or confirmed heart failure at death or discharge. *Eur J Heart Fail* 2007;**9**:491–501.
29. Baldasseroni S, Opasich C, Gorini M, Lucci D, Marchionni N, Marini M, Campana C, Perini G, Deorsola A, Masotti G, Tavazzi L, Maggioni AP, Italian Network on Congestive Heart Failure I. Left bundle-branch block is associated with increased 1-year sudden and total mortality rate in 5517 outpatients with congestive heart failure: a report from the Italian network on congestive heart failure. *Am Heart J* 2002;**143**:398–405.
30. Clark AL, Goode K, Cleland JG. The prevalence and incidence of left bundle branch block in ambulant patients with chronic heart failure. *Eur J Heart Fail* 2008;**10**:696–702.
31. Auricchio A, Fantoni C, Regoli F, Carbucicchio C, Goette A, Geller C, Kloss M, Klein H. Characterization of left ventricular activation in patients with heart failure and left bundle-branch block. *Circulation* 2004;**109**:1133–1139.
32. Andersson LG, Wu KC, Wieslander B, Loring Z, Frank TF, Maynard C, Gerstenblith G, Tomaselli GF, Weiss RG, Wagner GS, Ugander M, Strauss DG. Left ventricular mechanical dyssynchrony by cardiac magnetic resonance is greater in patients with strict vs nonstrict electrocardiogram criteria for left bundle-branch block. *Am Heart J* 2013;**165**:956–963.
33. Cleland J, Freemantle N, Ghio S, Fruhwald F, Shankar A, Marijanowski M, Verboven Y, Tavazzi L. Predicting the long-term effects of cardiac resynchronization therapy on mortality from baseline variables and the early response a report from the CARE-HF (Cardiac Resynchronization in Heart Failure) Trial. *J Am Coll Cardiol* 2008;**52**:438–445.
34. Xiong Y, Wang L, Liu W, Hankey GJ, Xu B, Wang S. The prognostic significance of right bundle branch block: a meta-analysis of prospective cohort studies. *Clin Cardiol* 2015;**38**:604–613.


© 2016 The Authors

35. Bilchick KC, Kamath S, DiMarco JP, Stukenborg GJ. Bundle-branch block morphology and other predictors of outcome after cardiac resynchronization therapy in Medicare patients. *Circulation* 2010;**122**:2022–2030.
36. Cazeau S, Leclercq C, Lavergne T, Walker S, Varma C, Linde C, Garrigue S, Kappenberger L, Haywood GA, Santini M, Bailleul C, Daubert JC. Effects of multisite biventricular pacing in patients with heart failure and intraventricular conduction delay. *N Engl J Med* 2001;**344**:873–880.
37. Abraham WT, Fisher WG, Smith AL, Delurgio DB, Leon AR, Loh E, Kocovic DZ, Packer M, Clavell AL, Hayes DL, Ellestad M, Trupp RJ, Underwood J, Pickering F, Truex C, McAtee P, Messenger J. Cardiac resynchronization in chronic heart failure. *N Engl J Med* 2002;**346**:1845–1853.
38. Dickstein K, Bogale N, Priori S, Auricchio A, Cleland JG, Gitt A, Limbourg T, Linde C, van Veldhuisen DJ, Brugada J. The European cardiac resynchronization therapy survey. *Eur Heart J* 2009;**30**:2450–2460.
39. Goldenberg I, Kutyifa V, Klein HU, Cannom DS, Brown MW, Dan A, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Kautzner J, Klempfner R, Kuniss M, Merkely B, Pfeffer MA, Quesada A, Viskin S, McNitt S, Polonsky B, Ghanem A, Solomon SD, Wilber D, Zareba W, Moss AJ. Survival with cardiac-resynchronization therapy in mild heart failure. *N Engl J Med* 2014;**370**:1694–1701.
40. Linde C, Gold MR, Abraham WT, St John Sutton M, Ghio S, Cerkvenik J, Daubert C, Group REVERSE. Long-term impact of cardiac resynchronization therapy in mild heart failure: 5-year results from the REsynchronization reVErses Remodeling in Systolic left vEntricular dysfunction (REVERSE) study. *Eur Heart J* 2013;**34**:2592–2599.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

JACC: HEART FAILURE
VOL. 5, NO. 11, 2017
ISSN 2213-1779/$36.00
http://dx.doi.org/10.1016/j.jchf.2017.08.011
© 2017 BY THE AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION
PUBLISHED BY ELSEVIER

# Refining Classification of Heart Failure Based on Ejection Fraction

Gregg C. Fonarow, MD[a,b]

The complex clinical syndrome of heart failure (HF) is associated with a wide spectrum of left ventricular functional abnormalities (1). These range from preserved left ventricular ejection fraction (EF) and normal left ventricular size to severely reduced EF and marked dilation of the left ventricle. Although for many decades, HF was considered to be synonymous with diminished contractility of the left ventricle, in the early 2000s there was a growing appreciation for the fact that a substantial portion of patients with HF had relatively normal EF, frequently characterized as diastolic HF or diastolic dysfunctional HF. When carefully assessed, there is evidence for the presence of both systolic and diastolic functional abnormalities in most patients with HF (1). Dr. Milton Packer was one of the early proponents of using an EF-based classification for HF patients, suggesting that the term of diastolic HF be avoided and stating that "a less presumptuous approach is to refer to these patients as having HF with a normal ejection fraction, a descriptive approach that makes no assumptions about our knowledge about the pathophysiology of this disorder" (2). Since the 2005 American College of Cardiology/American Heart Association HF Guidelines adopted this approach (HF with reduced EF [HFrEF] and HF with preserved EF [HFpEF]), EF has been considered essential in the classification of patients with HF.

There have been extensive studies demonstrating that the demographics, causes, comorbidities, prognoses, and, most importantly, responses to therapy differ among HF patients based on EF classification (3). Differences among the evidence bases for therapies is, in and of itself, a compelling enough rationale for EF-based classification. Furthermore, to date, no measurement or marker other than EF has demonstrated utility in distinguishing which patient populations will or will not derive benefit from each guideline-directed therapy. Nevertheless, use of EF is not without limitations because it is dependent on the imaging technique used, the analysis methods, the operators, and the variability up to 5% (3). However, the use of EF is nearly ubiquitous in characterizing patients with HF in clinical practice and research, as well as being used as an indispensable component of the enrollment criteria in nearly every randomized clinical trial. Ejection fraction has proven to be of such substantial clinical and research value in the assessment and management of HF patients, there is a Class I level recommendation for EF measurement in every national and international HF guideline (1,4).

Despite the widespread adoption of EF-based classification of HF, the actual definitions of patients with hearts with reduced and preserved EFs have varied. HFrEF has been variably defined as EF values of ≤35%, <40%, and ≤40% (1). HFpEF has been classified as EF values of >40%, ≥45%, >45%, ≥50%, >50%, and ≥55% (1). In studies which explored the optimal cutpoint(s) for defining EF groups, data emerged suggesting there was an intermediate group of patients with EF in the range of 41% to 49% (3). These patients have a clinical profile and prognosis that are intermediate but closer to those of HFpEF patients defined by EF of ≥50% than those of HFrEF defined by EF of ≤40%, with certain exceptions. In addition, the large scale randomized controlled outcome trials in patients with HF have largely enrolled patients with EF values of ≤35% and ≤40%. It has been only in these HF patients that angiotensin-converting enzyme inhibitors, angiotensin receptor antagonists, angiotensin receptor neprilysin inhibitors, beta-blockers, aldosterone antagonists, and device therapies have demonstrated benefits of reduced mortality (1). Clinical trials to date in HF patients with an EF value of >40%, ≥45%, or ≥50% testing various therapies have not been successful (1). Furthermore, registry-based

From the [a]Division of Cardiology, David Geffen School of Medicine at UCLA, University of California Los Angeles, Los Angeles, California; and the [b]Ahmanson-UCLA Cardiomyopathy Center, University of California Los Angeles Medical Center, Los Angeles, California. Dr. Fonarow's research is supported by U.S. National Institute of Health; and he consults for Amgen, Janssen, Medtronic, Novartis, and St. Jude Medical.

Manuscript received August 10, 2017; accepted August 18, 2017.

studies have with few exceptions not observed benefits associated with the use of neurohormonal antagonists once the EF is >40% (3). Thus, there is not a sufficient evidence base and no current guideline recommendations to extend the use of therapies proven in patients with EF of ≤35% or ≤40% to those expressly with EF of >40% as a treatment for HF (1,4).

Based on the totality of available data, EF-based classification of HF was further refined, and an intermediate EF group, HF with borderline EF (HFbEF), was added to the 2013 the American College of Cardiology/American Heart Association HF guidelines. This group was defined by the presence of the typical symptoms of HF and EF of 41% to 49% (1). Following suit in 2016, the European Society of Cardiology specified HF with mid-range EF (HFmrEF) of 40% to 49% (4). It has also been recognized that there is a cohort of patients who present with HF with EF of ≤40%, whose EF subsequently improves. These patients with improved or recovered EF appear to be clinically distinct from patients with persistently reduced, borderline, or preserved EF and have a much better prognosis (1). A distinct classification was provided for these patients in the 2013 guidelines as well (1). Since these guidelines have been published, there has been ongoing debate as to whether these refined EF classifications are helpful or merely creating arbitrary distinctions. This debate notwithstanding, these refined classifications have fostered new studies that are improving the understanding of the causes, phenotypes, pathophysiologies, and prognoses in these patients. For example, a recent study of biomarker profiles analyzing 37 biomarkers from different pathophysiologic domains (myocardial stretch, inflammation, angiogenesis, oxidative stress, and hematopoiesis) found that patients with HFmrEF had an intermediate biomarker profile with interactions between both cardiac stretch and inflammation makers, whereas HFrEF profiles were mainly related to stretch and HFpEF to inflammation (5). These findings suggested that patients with HFmrEF may be a mixture of HFrEF and HFpEF patients (5). Biomarker-based profiling could potentially be used to identify the subset of patients who, despite having EF of >40%, could benefit from those therapies that benefit HFrEF patients.

There are certainly limitations to an HF classification system based on EF alone, and more detailed phenotyping may help to better characterize patients; provide greater prognostic discrimination; allow for more precise targeting of therapies to patients who will derive benefit; and facilitate the discovery of new, more effective treatments. Further research may establish the fact that there is a subset of patients with HF with EF of 41% to 49% who will benefit from therapies demonstrated to improve outcomes in patients with HF with EF of ≤40% (3). Whether this refined EF classification approach adopted in recent versions of the guidelines best serves the needs of patients, helps to advance the field, or needs to be further updated remains to be determined. However, the enduring value of EF for classifying and managing HF is something that physicians, no matter what their specialty, should be able to appreciate.

**ADDRESS FOR CORRESPONDENCE:** Dr. Gregg C. Fonarow, Ahmanson-UCLA Cardiomyopathy Center, Ronald Reagan UCLA Medical Center, 10833 LeConte Avenue, Room A2-237 CHS, Los Angeles, California 90095-1679. E-mail: gfonarow@mednet.ucla.edu.

## REFERENCES

**1.** Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.

**2.** Burkoff D, Maurer MS, Packer M. Heart failure with a normal ejection fraction: is it really a disorder of diastolic function? Circulation 2003;107:656-8.

**3.** Hsu JJ, Ziaeian B, Fonarow GC. Heart failure with mid-range (borderline) ejection faction: clinical implications and future directions. J Am Coll Cardiol HF 2017. In press.

**4.** Ponikowski P, Voors AA, Anker SD, et al. 2016 ESC guidelines for the diagnosis and treatment of acute and chronic heart failure: the Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC) developed with the special contribution of the Heart Failure Association (HFA) of the ESC. Eur Heart J 2016;37:2129-200.

**5.** Tromp J, Khan MAF, Mentz RJ, O'Connor CM, et al. Biomarker profiles of acute heart failure patients with a mid-range ejection fraction. J Am Coll Cardiol HF 2017;5:507-17.

**KEY WORDS** epidemiology, heart failure with borderline ejection fraction (HFbEF), heart failure with mid-range ejection fraction (HFmrEF), heart failure with preserved ejection fraction (HFpEF), outcomes

Physicians of Hearts
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Date:** 02/06/19 : 09:27am
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 02/06/19
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/90
Height: 6', Weight: 215 lbs
BMI: 29.16 kg/m2

**Subjective:**
This 52 year old male presents for follow up visit. He denies chest pain and has had no shortness. He complains of an episode of chest tightness after lifting items. He is here for interrogation of his Single chamber AICD .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**AICD Interrogation** - Single chamber ICD. SVT nonsustained

**Plan:**

Continue current medication(s) at same dose

**Follow-up:** 6 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

EXHIBIT
A

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Procedure:** Office Visit Level 4 : 99214

# SIGNED BY Lee E Faulkner, MD (LF) 02/06/2019 09:52AM

# Progress Notes

Physicians of Hearts
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 11/01/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 130/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

Data:
ECHO - Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan:**

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

**Follow-up:** 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title:** FOLLOW UP OFFICE VISIT

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**:
**AICD interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

EKG - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

**Date:** 04/03/17 : 04:04pm
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 04/03/17
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 140/70

**Subjective:**
This 50 year old male presents for follow up visit. He denies chest pain and has had no shortness of breath.

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:** Interrogation of AICD -Non sustained V tach

EKG - Sinus bradycardia rate 59, Nonspecific Twave abnormality

**Plan:**
Interrogation of AICD (complete)

Continue current medication(s)

**Follow-up:** 3 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

**Visit Time:** 30

**Procedure:** Office Visit Level 4 : 99214

Physicians of Hearts
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| Name: Sherman Carter | Referred by: |
| Date of Birth | Date: 11/01/2018 |
| Sex: Male | Race: African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| RIVID: | AORTIC ROOT: |
| LVIDd: | AORTIC VALVE: |
| LVIDs: | LA SIZE: |
| IV SEPTUM-D: | FRACTIONAL SHORTENING: |
| EJECTION FRACTION: 25% | POST LV WALL-D: |
| PERICARDIAL SEPARATION: | PA PRESSURE: |
| IVSS: | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

Aortic Root: Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

______________________________

Lee E. Faulkner M.D./LB

ID:CA1967 Nov 1,2018 8:06 AM
Name:Carter Sherman
Sex:Male Birth Date:Ja 51 Years
Inch lb mmHg
Medication:
Symptoms:
History:

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11)
4561 Twave abnormality, possible lateral ischemia
(negative T (V1; V5))
9150 ** abnormal ECG **

| | | | |
|---|---|---|---|
| Vent rate | | 76 | bpm |
| PR int | | 184 | ms |
| QRS dur | | 104 | ms |
| QT QTc int | 388 | 418 | ms |
| P QRS T axis | 30 | 3 | 40 |
| RV5/SV1 amp | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | 2.910 | mV |

Unconfirmed Report
Reviewed by: [signature]

10 mm/mV 25 mm/s Filter: H60 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1S50A 05 05 03 05 Dept.: Exam:

01/08/2020 12:01 #852

From:

Dec 03 19, 12:10a Physicians Of Hearts 9016827243 p.15




11:19:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/24/2004 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 40%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/24/04 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Tricuspid Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/18/2005 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/18/05 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Mild global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace mitral regurgitation, and trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Mitral Regurgitation
4. Trace Tricuspid Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/10/06 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/12/07 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global Hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Global Hypokinesis
3. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 09/24/2004 |
| **Sex:** Male | **Race:** African American |

## HISTORY and PHYSICAL

**HISTORY OF PRESENT ILLNESS:** Sherman Carter is a 37y/o African American gentleman who reports to our office for cardiac evaluation. Patient complains of chest pains. Patient reports that he has sharp chest pain on left side while radiating to back. Patient has no associated symptoms that has occurred with chest pain. Patient states that the chest pain experienced six days ago, was aggravated with sudden movement or change in position. Patient denies any shortness of breath, nausea, vomiting, dizziness or edema.

**PAST MEDICAL HISTORY:** Chest Pain

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did Not Bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 09/24/2004 H&P cont.

**PHYSICAL EXAMINATION: BP:** 122/88

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy
2. Mitral Regurgitation
3. Pre Hypertension

**PLAN:**

1. ECHO-today
2. EKG-today

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter **Date of Birth:**
**Date of Visit:** 09/24/2004 **Sex:** Male
**Referred by:** **Race:** African American

**Follow up office visit**

Sherman Carter is a 37-year old African American gentleman who presents to our office for a follow up visit for elevated blood pressure. Patient reports that he had migraines earlier this week. Patient takes medications to resolve issue. Patient states no complaints of shortness of breath, chest pain, nausea, vomiting or edema.

**Vitals: BP:** 122/88

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy

**PLAN:**

1. Follow up in 4 months

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/7/2005 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 37 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of short pain to left anterior chest. The pain occurs occasionally during high stress time. Episodes usually last a few seconds then subsides. He reports no other complaints at this time. He denies any headaches, dizziness, and chest pain, shortness of breath, nausea, dementia, diarrhea, or constipation.

**BP:** 135/72
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. MR
3. TR

**PLAN:**
1. Alcohol Cessation
2. Follow up in 4 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/6/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter states that he has been feeling good since his last visit. He reports no complaints at this time. He denies any palpitations, chest pain, shortness of breath, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 152/90
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Cardiomyopathy
3. Hypertension

**PLAN:**
1. Current Cardiac Care
2. ETOH Cessation encouraged
3. Follow up in 2 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter complains of occasional shortness of breath. He states that he has been doing ok and reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 100/60
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter reports one episode of shortness of breath but reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 136/88
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Current Cardiac Care
2. Follow up in 6 months

_______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 4/3/2009 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 42 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter states that he has had some mild chest pain. He reports no other complaints at this time. He denies any palpitations, shortness of breath, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 140/70
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. EKG/ECHO

________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/12/2011 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 46%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/12/11 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals no abnormalities.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 46%
2. Left Ventricle Enlargement
3. Right Ventricle Enlargement

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred By:**
**Date:** 10/19/2012
**Race:** African American

### ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 55%**
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 55%
2. Left Ventricular Enlargement
3. Mild Tricuspid Regurgitation
4. Mild Mitral Regurgitation

________________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** Male | **Race:** *African American* |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 45%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is *normal in size.*
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is enlarged in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 45%
2. Left Ventricular Enlargement
3. Global Hypokinesis
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 20%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/4/15 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Severe global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 pulmonary insufficiency.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 20%
2. Left Ventricle Enlargement
3. Severe Global Hypokinesis
4. Mild Mitral Regurgitation
5. Mild Pulmonary Insufficiency

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Referred by:**
**Date of Birth:**
**Date:** 07/21/2016
**Sex:** Male
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 20%
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 07/21/2016 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall abnormality appreciated.

**Doppler:** Interrogation of the valvular apparatus reveals mild mitral regurgitation.

**SUMMARY:**

1. severely depressed left ventricular systolic function with an ejection fraction of 20%.
2. Left Ventricular Chamber enlarged in size
3. Mild Mitral Regurgitation

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of chest pain when lifting things, shortness of breath on exertion, edema in hands and some numbness. He also reports occasional dizziness. He reports no other complaints at this time. He denies any nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 130/74
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Dyspnea
3. Gouty Arthritis

**PLAN:**
1. ETOH Restriction
2. Treadmill Thallium Stress Test

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, vomiting, dizziness, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 132/80
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE
**Data:** Stress test negative for ischemia

**IMPRESSION:**
1. Hypertension
2. Gouty Arthritis

**PLAN:**
1. ECHO due to reduction in EF as reported by stress test
2. Follow up in 1 month

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

## History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac clearance for left hip replacement. Mr. Carter complains of chest pain on the left side of his chest while laying down, states this last a few minutes. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:**

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 9/4/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 140/90 **HT:** 6'0" **WT:** 209lbs

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Severe cardiomyopathy, worse since last visit
2. Hypertension-blood pressure elevated

**PLAN:**

1. AICD Referral

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/30/2015 |
| **Sex:** Male | **Race:** African American |

## History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for hip surgery. Mr. Carter complains of chest pain but states that they are becoming better. He states that Dr. Lan did prescribe him medication to strengthen his heart. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 10/30/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 170/120
**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Hypertension-blood pressure controlled
3. Severe Dilated Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 2 weeks to re-check blood pressure
3. Patient has a follow up appointment on November 10, 2015 and will be re-evaluated at that time

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 11/10/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for left hip replacement. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, dizziness, vomiting, palpitations, orthopnea, paroxysmal nocturnal dyspnea and/or edema.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 11/10/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 130/90

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. *Cardiomyopathy*

**PLAN:**

1. Current Cardiac Care
2. Follow up in 3 months

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:** .
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

______________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals:** **BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

______________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/21/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

***Follow up office visit***

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain on left side of chest while doing yard work. Patient also complains of shortness of breath when outside , that lasts 10-15 minutes. Patient states no complaints of chest pain, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 138/96

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy

**PLAN:**

1. Continue Current Cardiac Care

____________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/29/2016
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient states that he is chest pain free. Patient states no complaints of chest pain, shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. Degenerative Joint Disease of Hip

**PLAN:**

1. ETOH Cessation
2. Follow Up in 6 Months

Lee E. Faulkner M.D./LB

CARTER SHERMAN ID: 000002995 24-Sep 2004 10:37:06

37 years
Male Black

| | |
|---|---|
| Vent. rate | 65 bpm |
| PR interval | 138 ms |
| QRS duration | 94 ms |
| QT/QTc | 408/424 ms |
| P-R-T axes | 46 86 16 |

Normal sinus rhythm with sinus arrhythmia
Normal ECG

Technician: AF
Test ind:

Referred by: LEF

Unconfirmed




150 Hz 25.0 mm/s 10.0 mm/mV 4 by 2.5s + 3 rhythm lds MAC 8 001F 12SL™ v250

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD Interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Referred by:**
**Date of Birth:**
**Date:** 11/01/2018
**Sex:** Male
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 25%
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Akinesis
4. Moderate Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

______________________________

Lee E. Faulkner M.D./LB

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# SAINT FRANCIS HOSPITAL-MEMPHIS
## TREADMILL/STRESS

MR#: 1037968SFH

NAME: CARTER, SHERMAN
ENCOUNTER NUMBER: 34017913SFH
ROOM NUMBER:
DATE OF BIRTH:
*READING PHYSICIAN: ANTONIO C. QUIROZ, MD*
PHYSICIAN: LEE E FAULKNER

HISTORY OF PRESENT ILLNESS: A 45-year-old male, height 6 feet, weight 190 pounds. Patient has hypertension and has been having some chest pains.

MEDICATIONS: Include ramipril and digoxin.

INTERPRETATION. Baseline EKG shows sinus rhythm with a rate of 52 beats per minute and nonspecific ST-T abnormalities. Patient exercised 11 minutes on the standard Bruce protocol achieving 13.1 METS of workload. Exercise was stopped because of fatigue. There was no chest pain. Heart rate increased from 52-157, which is 90% of the age-predicted maximal heart rate. Blood pressure increased from 143/83-180/110 for a double product of 28.260. Cardiolite was injected approximately 1 minute prior to stopping the exercise. There were no significant ST-segment depressions, no arrhythmias. One isolated PVC was noted during the exercise. There was normalization of the T-waves during and after the exercise.

CONCLUSIONS: Negative for ischemia by EKG criteria.

Nuclear imaging interpretation will be dictated separately. Hypertensive response to exercise.

ANTONIO C. QUIROZ, MD

TIME: ________
DATE: ________

D: 11/26/2012 09:53 CST
T: 11/26/2012 10:34 CST
R:
Job#: 252986
D#: 7926695/FI

SAINT FRANCIS HOSPITAL
5959 PARK AVENUE
MEMPHIS, TN 38119

Name: CARTER, SHERMAN
MRN: 001037868
ACCT: 034017913

ANDREW T. WATSON, MD
ADM: 11/26/2012

Diagnostic Imaging

DATE OF EVALUATION: 11/26/2012

REFERRING PHYSICIAN: Lee Faulkner, M.D.

REASON FOR EVALUATION: Chest pain.

BRIEF HISTORY OF PRESENT ILLNESS: A 45-year-old African-American male who presents for evaluation with prior history of hypertension, no known coronary artery disease.

DESCRIPTION OF PROCEDURE: After obtaining written informed consent, patient underwent a Bruce protocol stress evaluation. Total exercise time was 11 minutes. Total METs obtained was 13.1.

This was a 1-day study. Rest images obtained using 3.1 mCi thallium to 1 stress image obtained using 30.2 mCi sestamibi technetium-99. Rest and stress images were compared.

Short axis, vertical long axis, horizontal long axis images appear to be well perfused and well matched. There is evidence of apical thinning. Otherwise, there is no evidence of overt segmental wall ischemia. Myocardial perfusion bull's eye map confirms the above finding. Myocardial perfusion gated study demonstrates mild-to-moderate global hypokinesis, ejection fraction calculated at 35%. Raw data cine analysis demonstrates no significant motion or other artifacts present.

OVERALL IMPRESSION: Abnormal Bruce protocol Cardiolite examination demonstrating no evidence of ischemia and ejection fraction estimated at 35%.

ANDREW T. WATSON, MD

Date: and Time: ____________

TR:ATW/SN
DD:11/26/2012 16:23 CST
DT:11/26/2012 19:00 CST
Dictation ID: 7930950/Confirmation #: 253112

Work Type: Diagnostic Imaging
T001

Work Type Code: DGI
Page: 1

PRINTED BY: PDacus

DATE 12/10/2012

12/10/2012 13:11 901-765-3133 ST FRANCIS H I M PAGE 02/02

# Saint Francis Hospital
Memphis

1000-52

| DATE | TIME | PHYSICIAN'S ORDERS | DATE | TIME | PROGRESS RECORD |
|---|---|---|---|---|---|
| 11-9-12 | | Treadmill Thallium Stress Test<br><br>Dia. Chest Pain<br><br>Date - 11-19-12<br>Time - 8:30<br>Arrival - 8:00<br><br>No Precert Required per Tiwana ē United Healthcare 10 25 12<br>Height - 6'<br>Weight<br><br>Physician's Signature: Lee E Faulkner MD<br>Date: _______ Time: _______ | | | |

Medications dispensed in accordance with the hospital formulary system

Carter, Sherman

PHYSICIAN ORDERS/PROGRESS RECORDS

MR# DOB:

R8/05


ID 2341967
Name: Carter Sherman
Sex: Male
Medication:
Symptoms:
History:
52 Years
Vent rate 70 BPM
PR int 184 ms
QRS dur 104 ms
QT/QTc int 388 418 ms
P QRS T axis
Sinus rhythm
with frequent ventricular premature complexes
T wave abnormality, possible lateral ischemia
** Abnormal ECG **
Unconfirmed Report
Reviewed by:
10 mm/mV 25 mm/s Filter
I
aVR
V1
V4
II
aVL
V2
V5
III
aVF
V3
V6
Rhythm: II 5 mm/mV
Dept.
Form.


Sinus rhythm
Unconfirmed Report
Reviewed by
10 mm/mV

From: 01/08/2020 12:12 #852 P.067/111

LFG Omaha Fax 10/3/2018 3:20:25 PM PAGE 4/004 Fax Server

Oct 03 18, 01:12p p.3

REF #3043267

Lincoln Financial Group

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609 Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

EXHIBIT B

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

**Indicate frequency per day the listed activities below can be used performed using:**
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A

What job modifications would allow the patient to return to work?

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so (M/D/Y)

N/A

Continence ____/____/________

Dressing ____/____/________

Transferring ____/____/________

Bathing ____/____/________

Toileting ____/____/________

Eating ____/____/________

Date patient experienced loss of Cognitive Functioning: ____/____/________

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

___/___/___ to ___/___/___

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change

901-682-7241 | 901-682-7243
Phone Number | Fax Number

Lee E Faulkner MD
Signature

___/___/___
Date

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)



00000032/ LFPESRD1 00000982

REF #2991745

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 23, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments:
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (circled) Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed [signature] MD (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450PTO

EXHIBIT C

REF #1989621

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

EXHIBIT
D

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by ____________ )

Claim No: 1150128075 Policy No: 00001004922000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen?

Has patient ever had same or similar condition? Yes No If yes, state when and describe.

(a) Diagnosis (including ICD Code(s)) Cardiomyopathy

(b) Subjective Findings Worsening Dyspnea

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

(a) Date of First visit Sept. 25, 2005 (b) Date of Last visit April 3, 2017 (c) Frequency of visits Weekly Monthly Other (specify) Q 2 to 6 months or more

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)

Class 2 - Medium manual activity* (15-30%)

Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)

✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

(b) Mental Impairments (if applicable)

(a) Please define "stress" as it applies to this claimant.

(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)

Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)

Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)

Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)

Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
Class 1 (No limitation) Class 2 (Slight limitation)
Class 3 (Marked limitation) Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 140/70 systolic/diastolic

Has patient Recovered? Improved? Unchanged? Retrogressed? Worsening

(b) Has patient been hospital confined? Yes No Delete
If Yes, give Name and Address of Hospital
Confined from ____________ to ____________
Several Hospitalizations over the years

REF #1989621

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received

- Bathing ______ (washing self in tub, shower or by sponge bath, with or w/o equipment)
- Dressing ______ (putting on, taking off garments, braces or any artificial limbs normally worn)
- Toileting ______ (getting to, from, on and off toilet; and performing related personal hygiene)
- Transferring ______ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
- Continence ______ (voluntarily maintaining control of bladder and bowel function)
- Eating ______ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ______

Patient's Job Full-time Part-time

Any other Work Full-time Part-time

Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner Degree: MD Telephone Number

Street Address City or Town State: TN Zip Code

Signature (By Physician): Lee E Faulkner, MD Date: 5/29/17





00000012 LFPV6UT1 00000110

From: 01/08/2020 12:14 #852 P.071/111

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 3/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.2

REF #1989621

Lincoln Financial Group®

Please Return Response To:
The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765

## ABILITIES FORM

Patient Name: Sherman Carter Date of Birth:

Occupation: Claim Number: 1150128075

Date of Last Office Visit: April 3, 2017 Date of Next Office Visit:

☐ The patient does not have functional/limitations or restrictions

Provider's Signature: Lee E Faulkner, MD Date:

Provider Printed Name: Lee E Faulkner, MD Degree: ☒ MD ☐ DO Other

Specialty: Cardiology Phone:

OR

☐ The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | ✓ (LEF) | ✓ | | |
| 11 - 20 lbs. | ✓ | | | |
| 21 - 35 lbs. | ✓ | | | |
| 36 - 50 lbs. | ✓ | | | |
| 51 - 100 lbs. | ✓ | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | | |
| Stand | | | | | |
| Walk | | | | | |
| Climb | | | | | |
| Bend | | | | | |
| Kneel | | | | | |
| Drive | | | | | |
| Finger | | | | | R / L / Both |
| Handle | | | | | R / L / Both |
| Operate Foot Controls | | | | | R / L / Both |
| Reach above the shoulder | | | | | R / L / Both |

N/A

Are there environmental factors that the patient should avoid? ☐Yes ☐No Specify:

Specific Limitations or Restrictions not noted above: No lifting or straining whatsoever as his condition is worsening over time

The above statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud and Warning Statements.

Provider's Signature: Lee E Faulkner MD Date: 5/24/17

Provider Printed Name: Lee E. Faulkner, MD Degree: ☒ MD ☐ DO Other

Specialty: Cardiology Phone: 901 682-7241

Address: 6005 Park Ave Ste 702 Memphis, TN 38119



0000012 1 FPVBUT1 00000106

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
*BARDETT LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.*

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ____
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept 25, 2005
   b) Date of Most Recent Treatment Sept 29, 2016
   c) Frequency of Treatments Q 2 to 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ____
   *If the patient is still disabled, when should the patient be able to return to work?* unknown
5. Remarks or Comments: ____
6. List Restrictions and Limitations: Medical therapy for now. Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   ✓ Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 11/21/16 (Month Day Year) Signed K Lee E Faulkner MD (Attending Physician, No Stamps, please) Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN
Phone Number 901-682-7241
Fax Number 901-682-7243

*Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.*
GLC-01450PTD



EXHIBIT E

Lincoln Financial Group®

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765
www.LincolnFinancial.com

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by________________ )

Claim No: 1150128075 Policy No: 000010049220000000

Name of Patient: Sherman Carter

Date of Birth:

When did symptoms first appear or accident happen? Aug 2015

Has patient ever had same or similar condition? Yes (No) If yes, state when and describe.

(a) Diagnosis (including ICD Code(s))

(b) Subjective Findings

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

Severely depressed EF of 20% by Echocardiogram

(a) Date of First visit Sept 25, 2005

(b) Date of Last visit July 15, 2019

(c) Frequency of visits
Weekly
Monthly
✓ Other (specify) every 2-3 months

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)

Class 2 - Medium manual activity* (15-30%)

*Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)*

✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

*(b) Mental Impairments (if applicable)*

(a) Please define "stress" as it applies to this claimant.

(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)

Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)

Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)

Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)

Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)

*Class 1 (No limitation)* *Class 2 (Slight limitation)*

Class 3 (Marked limitation) ✓ Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 120/80 *systolic/diastolic*

Has patient Recovered? Improved? ✓ Unchanged? Retrogressed?

(b) Has patient been hospital confined? Yes (No)

If Yes, give Name and Address of Hospital

Confined from ____________ to ____________

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes (No) If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received

- Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
- Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
- Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
- Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
- Continence ________ (voluntarily maintaining control of bladder and bowel function)
- Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes (No)

(c) When could patient return to work? Unknown

Patient's Job Full-time Part-time

Any other Work Full-time Part-time

Restrictions and Limitations
Medical Therapy for now

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner, MD
Degree: Medical Doctor
Telephone Number: 901-682-7241
Street Address: 6005 Park Ave, Ste 702
City or Town: Mphs
State: TN
Zip Code: 38119
Signature (By Physician): Lee E Faulkner, MD
Date

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Carter, Sherman
**Date of Visit:** 09/29/2016
**Referred by:**
**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman present for follow up visit. Mr. Carter states that he is chest pain free. He has no complaints of vomiting, dizziness, palpitation, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** **BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. DJD of Hip

**PLAN:**

1. ETOH cessation
2. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 7/5/2016 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman who is present today for a follow up visit. Mr. Carter complains of chest pain in the middle of his chest with activity, states this last 10 minutes. He reports no other complaints at this time. He denies any shortness of breath, dizziness, palpitations, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** BP: 120/80 **HT:** 6'1" **WT:** 212lbs

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis, edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy (Non-Ischemic)

**PLAN:**

1. Current Cardiac Care

Lee E. Faulkner M.D.

Welcome to ITA - Information Technology Associates

DOT Dictionary of Occupational Titles
www.occupationalinfo.org

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z ?

Search | Contents | ONET NEW | Glossary | Link to this page | About

AdChoices | GED Classes | Math Skills | Math Problems




## Dictionary Of Occupational Titles
## Appendix C: Components of the Definition Trailer

APPENDIX C

COMPONENTS OF THE DEFINITION TRAILER

I. DATE OF LAST UPDATE (DLU)

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

*IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)*

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

The following descriptions of the components of the Definition Trailer are in inverse order to their placement in the trailer.

I. DATE OF LAST UPDATE (DLU)

Listed as the final element in the trailer following the definition, the Date of Last Update indicates the last year in which material was gathered for that occupation. A DLU of ``77" would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977.

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. *Specific vocational training includes: vocational education, apprenticeship training, in-plant* training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

EXHIBIT F

The following is an explanation of the various levels of specific vocational preparation:

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Note: The levels of this scale are mutually exclusive and do not overlap.

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

Scale of General Education Development (GED)

06 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

06 MATHEMATICAL DEVELOPMENT

Advanced calculus:

Work with limits, continuity, real number systems, mean value theorems, and implicit functions theorems.

Modern Algebra:

Apply fundamental concepts of theories of groups, rings, and fields. Work with differential equations, linear algebra, infinite series, advanced operations methods, and functions of real and complex variables.

Statistics:

Work with mathematical statistics, mathematical probability and applications, experimental design, statistical inference, and econometrics.

06 LANGUAGE DEVELOPMENT

Same as Level 5.

05 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables. 05 MATHEMATICAL DEVELOPMENT

Algebra:

Work with exponents and logarithms, linear equations, quadratic equations, mathematical induction and binomial theorem, and permutations.

Calculus:

Apply concepts of analytic geometry, differentiations, and integration of algebraic functions with applications.

Statistics:

Apply mathematical operations to frequency distributions, reliability and validity of tests, normal curve, analysis of variance, correlation techniques, chi-square application and sampling theory, and factor analysis.

05 LANGUAGE DEVELOPMENT

Reading:

Read literature, book and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.

Writing:

Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.

Speaking:

Coversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

04 LEVEL REASONING DEVELOPMENT

Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

04 MATHEMATICAL DEVELOPMENT

Algebra:

Deal with system of real numbers; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity; and probability and statistical inference.

Geometry:

Deductive axiomatic geometry, plane and solid, and rectangular coordinates.

Shop Math:

Practical application of fractions, percentages, ratio and proportion, measurement, logarithms, slide rule, practical algebra, geometric construction, and essentials of trigonometry.

04 LANGUAGE DEVELOPMENT

Reading:

Read novels, poems, newspapers, periodicals, journals, manuals, dictionaries, thesauruses, and encyclopedias.

Writing:

Prepare business letters, expositions, summaries, and reports, using prescribed format and conforming to all rules of punctuation, grammar, diction, and style.

Speaking:

Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

03 MATHEMATICAL DEVELOPMENT

Compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage. Calculate surfaces, volumes, weights, and measures.

Algebra:

Calculate variables and formulas; monomials and polynomials; ratio and proportion variables; and square roots and radicals.

Geometry:

Calculate plane and solid figures; circumference, area, and volume. Understand kinds of angles and properties of pairs of angles.

03 LANGUAGE DEVELOPMENT

Reading:

Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

*Writing:*

Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.

Speaking:

Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

02 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

02 MATHEMATICAL DEVELOPMENT

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

02 LANGUAGE DEVELOPMENT

*Reading:*

Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Writing:

Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking:

Speak clearly and distinctly with appropiate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

01 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT

Add and subtract two digit numbers.

Multiply and divide 10's and 100's by 2, 3, 4, 5.

Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT

Reading:

Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

The Physical Demands Strength Rating reflects the estimated overall strength requirement of the job, expressed in terms of the letter corresponding to the particular strength rating. It represents the strength requirements which are considered to be important for average, successful work performance.

The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy. In order to determine the overall rating, an evaluation is made of the worker's involvement in the following activities:

a. Standing, Walking, Sitting

Standing - Remaining on one's feet in an upright position at a work station with-out moving about.

Walking - Moving about on foot.

Sitting - Remaining in a seated position.

b. Lifting, Carrying, Pushing, Pulling

Lifting - Raising or lowering an object from one level to another (includes upward pulling).

Carrying - Transporting an object, usually holding it in the hands or arms, or on the shoulder.

Pushing - Exerting force upon an object so that the object moves away from the force (includes slapping, striking, kicking, and treadle actions).

Pulling - Exerting force upon an object so that the object moves toward the force (includes jerking).

Lifting, pushing, and pulling are evaluated in terms of both intensity and duration. Consideration is given to the weight handled, position of the worker's body, and the aid given by helpers or mechanical equipment. Carrying most often is evaluated in terms of duration, weight carried, and distance carried.

Estimating the Strength factor rating for an occupation requires the exercise of care on the part of occupational analysts in evaluating the force and physical effort a worker must exert. For instance, if the worker is in a crouching position, it may be much more difficult to push an object than if pushed at waist height. Also, if the worker is required to lift and carry continuously or push and pull objects over long distances, the worker may exert as much physical effort as is required to similarly move objects twice as heavy, but less frequently and/or over shorter distances.

c. Controls

Controls entail the use of one or both arms or hands (hand/arm) and/or one or both feet or legs (foot/leg) to move controls on machinery or equipment. Controls include but are not limited to buttons, knobs, pedals, levers, and cranks.

Following are descriptions of the five terms in which the Strength Factor is expressed:

S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are

sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

V-Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work.

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work requirements.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

01 Artistic 05 Mechanical 09 Accommodating

02 Scientific 06 Industrial 10 Humanitarian

03 Plants-Animals 07 Business Detail 11 Leading-Influencing

04 Protective 08 Selling 12 Physical Performing

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

Download Google Chrome Browser

Chrome Safe Browsing will protect you from malicious sites.

DOWNLOAD

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables
- *China Statistical Tables*
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- *Airport Codes*
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/contents.html**

Translators on the www

| | Espa�ol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2003 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 05-Jun-03

CTR030418

DICTIONARY OF OCCUPATIONAL TITLES CD-ROM OR DOWNLOAD DOT Android or Windows

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z ?

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **215.367-010** Buy the DOT:Download
TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

Drivers who switch to Allstate can save $356.

Allstate

Drivers who switch to Allstate can save $356.

Allstate

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

WWWITA Design


URL address of this page: https://occupationalinfo.org/21/215367010.html

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **215.367-010** Buy the DOT:Download TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

CTIONARY OCCUPATIONAL TLES CD-ROM OR DOWNLOAD DOT Android or Windows

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

A B C
D E F
G H I
J K L
M N O
P Q R
S T U
V W X
Y Z ?

<Previous | Next > | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **654.687-010** **Buy the DOT:Download**
TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers







- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- *China Statistical Tables*
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page
- Feedback

Please Add this page to your FAVORITES

*URL address of this page:* ***https://occupationalinfo.org/65/654687010.html***

Language Translations
| | Espanol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **654.687-010 Buy the DOT:**Download TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

The New York Heart Association (NYHA) Functional Classification scale associates a patient's heart failure according to the severity of the observable symptoms.

## New York Heart Association (NYHA) Functional Classification

The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification. It places patients in one of four categories based on the level of limitation during physical activity.

If the hospice diagnosis is heart disease, the NYHA classification should be Stage IV, to meet the criteria for hospice eligibility. Stage IV heart disease is characterized by symptoms of heart failure or anginal syndrome at rest. Symptoms include chest pain, dyspnea, weakness and inability to tolerate activity without discomfort. Additional criteria necessary for hospice eligibility with a terminal diagnosis of heart disease includes optimal treatment of heart disease, the patient declines or is ineligibility for surgical intervention, an ejection fraction of ≤ 20% and a history of a one of the following in the last 12 months: Treatment resistant SVT or ventricular arrhythmia, unexplained syncope, cardiac arrest, brain embolism of cardiac origin and/or concomitant HIV disease.

Classification is based on observable symptoms which must be clearly documented in the patient's clinical record to support the classification listed:

| ***Class*** | ***Objective Assessment*** | ***Patient Symptoms*** |
|---|---|---|
| *Class I (Mild)* | ***No objective evidence of cardiovascular disease.*** No symptoms and no limitation in ordinary physical activity. | ***No limitation of physical activity.*** Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea (shortness of breath). |
| *Class II (Mild)* | ***Objective evidence of minimal cardiovascular disease.*** Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. | ***Slight limitation of physical activity.*** Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. |
| *Class III (Moderate)* | ***Objective evidence of moderately severe cardiovascular disease.*** Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. | ***Marked limitation of physical activity.*** Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| *Class IV (Severe)* | ***Objective evidence of severe cardiovascular disease. Severe limitations.*** Experiences symptoms even while at rest. | ***Unable to carry out any physical activity without discomfort. Symptoms of cardiac insufficiency at rest.*** If any physical activity is undertaken, discomfort is increased. |

Reference: The Stages of Heart Failure – NYHA Classification (2002), Retrieved 07/31/2006 from http://www.abouthf.org/questions_stages.htm

New York Heart Association (NYHA) Functional Classification

---

The original NYHA Functional Classification was published in 1928. This was a time before important diagnostic modalities like the portable ECG, echocardiogram, exercise stress test and the cardiovascular disease biomarker B-type natriuretic peptide (BNP) assay.

McDonald and Wilkinson (2017) and other researchers are advocating for the increased use of natriuretic peptides as part of the strategies for heart failure diagnosis and prevention. The use of these biomarkers has been shown to improve diagnostic accuracy for HF and provide prognostic information for more than a decade of use with recommendations by national and *international cardiovascular organizations*.

The NYHA classification has been updated many times. Today's version includes two sections; 1) a subjective description of functional capacity and 2) an objective diagnostic assessment of cardiovascular disease. While subjective inconsistencies may result when classifying patients in class II or III, functional capacity remains a powerful prognostic indicator and is routinely used for clinical staging of heart failure today.

| **New York Heart Association (NYHA) Functional Classification** | |
|---|---|
| **Class** | **Patient Symptoms** |
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |
| Source: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure | |


PAGE 91/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30

One commonly used technique to assess the functional capacity of patients is the Six-minute walk test (6MWT). The 6MWT has been shown to be a reliable, inexpensive, safe and easy to administer test that correlates with health outcomes (Rostagno, C. Gensini, 2008). (https://www.lung.org/lung-health-and-diseases/lung-procedures-and-tests/six-minute-walk-test.html, updated 2018).

**Six Minute Walk Test**

- **Explain that the test requires walking for 6 minutes in a straight line between to points 60 feet apart.**
- **Place a chair at either end of the course and explain that the patient may stop, rest or sit if necessary and that you will bring the chair to them if needed.**
- **Measure the total distance walked in 6 minutes.**

Casanova et al (2011) studied 444 healthy subjects from seven countries to determine standard performance on the 6MWT. The 6MWT measures meters (m) walked as quickly as possible by the individual in six minutes.

The mean meters walked by all subjects was 571+ or – 90 m with male subjects walking 30m more than females. This is consistent with other similar studies. Older subjects walked shorter distances than younger subjects.

- 40–49 yrs of age, 611±85 m
- 50–59 yrs of age, 588±91 m
- 60–69 yrs of age, 559±80 m
- 70–80 yrs of age, 514±71 m

Rasekaba, Lee, Naughton, Williams & Holland (2009) determined a distance less than 350 m on the 6MWT to be associated with an increased mortality in chronic HF patients. A lowering of the walking distance of 50 m or more is considered clinically significant. Ferreira, et al. (2019) concluded in their research the 6-minute walk test distance at baseline and a decline in walking distance were both associated with worse prognosis.

Bittner et al (1993) studied 898 patients with left ventricular dysfunction with either radiological evidence of HF and/or an ejection fraction of 0.45 or lower. During the 242 days of follow up 114 patients either died or were hospitalized for CHF. The lowest performance group on the 6MWT had a statistically greater chance of dying or being hospitalized than the higher performing group. See detailed instruction about the 6MWT at the Heart Foundation website.

In an updated study by Wegrzynowska-Teodorczyk (2013), the researchers also found the distance covered during the 6MWT predicted the risk of death or hospitalization. Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. They studied 243 men with stable systolic heart failure.

- Class I 15%
- Class II 44%
- Class III 37%
- Class IV 4%

69% of the participants died or required hospitalization during the following 3 years. The statistical analysis showed the shorter the distance walked in the 6MWT, the greater the 1-year and 3-year mortality risk.
Du, et al., (2017) reviewed research on the 6MWT in chronic heart failure published from 2012 to 2017. The researchers found the 6MWT not to be as accurate as possible in determining peak VO2. They suggest using mobile apps to better assess actual distance walked and heart rate.

---

References

American Heart Association. Professional Heart Daily. Accessed 8/2/16 http://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp

Bittner et al. (1993). Prediction of mortality and morbidity with a 6-minute walk test in patients with left ventricular dysfunction. SOLVD Investigators. *JAMA,* 270(14), 1702-7.

Casanova, C. et al. (2011). The 6-min walk distance in healthy subjects: reference standards from seven countries. *European Respiratory Journal*, 37, 150-156.

Du, H., Wonggom, P., Tongpeth, J. & Clark, R.A. (2017). Six-Minute Walk Test for Assessing Physical Functional Capacity in Chronic Heart Failure. Curr Heart Fail Rep. 14(3),158-166.

Ferreira, J.P., Metra, M., Anker, S.D., Dickstein, K., Lang, C.C.. & Ng, L. (2019). Clinical correlates and outcome associated with changes in 6-minute walking distance in patients with heart failure: findings from the BIOSTAT-CHF study. Eur J Heart Fail. 21(2), 218-226.

McDonald, K., Wilkinson, M. (2017). Evolving Use of Natriuretic Peptides as Part of Strategies for Heart Failure Prevention. Clin Chem. 63(1), 66-72.

Rasekaba, T., Lee, A. L., Naughton, M. T. ,Williams, T. J. & Holland, A. E. (2009). The six-minute walk test: a useful metric for the cardiopulmonary patient. *Intern Med J.*, 39(8),495-501.

Rostagno C., Gensini G.F. (2008). Six minute walk test: a simple and useful test to evaluate functional capacity in patients with heart failure. *Intern Emerg Med.* 3(3):205-12.

The Criteria Committee of the New York Heart Association. (1994). *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels.* (9th ed.). Boston: Little, Brown & Co. pp. 253–256.

Wegrzynowska-Teodorczyk, K., Rudzinska, E., Lazorczyk, M., Nowakowska, K., Banasiak, W. Ponikowski, P et al. (2013). Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. J Physiother. 59(3), 177-87.

---

© RnCeus.com

# Classes of Heart Failure

Doctors usually classify patients' heart failure according to the severity of their symptoms. The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification[1]. It places patients in one of four categories based on how much they are limited during physical activity.

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

| Class | Objective Assessment |
|---|---|
| A | No objective evidence of cardiovascular disease. No symptoms and no limitation in ordinary physical activity. |
| B | Objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. |
| C | Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. |
| D | Objective evidence of severe cardiovascular disease. Severe limitations. Experiences symptoms even while at rest. |

**For Example:**

- A patient with minimal or no symptoms but a large pressure gradient across the aortic valve or severe obstruction of the left main coronary artery is classified:
  - **Function Capacity I, Objective Assessment D**
- A patient with severe anginal syndrome but angiographically normal coronary arteries is classified.
  - **Functional Capacity IV, Objective Assessment A**

Heart Failure

What is Heart Failure?
Types of Heart Failure
Classes of Heart Failure
Heart Failure in Children and Adolescents

Causes and Risks

Warning Signs of Heart Failure

Diagnosing Heart Failure

Treatment Options

Living with Heart Failure and Managing Advanced HF

Tools and Resources

Heart Failure Personal Stories

Related Articles

Heart Failure Questions to Ask Your Doctor

*[1] Adapted from Dolgin M, Association NYH, Fox AC, Gorlin R, Levin RI, New York Heart Association. Criteria Committee. Nomenclature and criteria for diagnosis of diseases of the heart and great vessels. 9th ed. Boston, MA: Lippincott Williams and Wilkins; March 1, 1994.*

*Original source: Criteria Committee, New York Heart Association, Inc. Diseases of the Heart and Blood Vessels. Nomenclature and Criteria for diagnosis, 6th edition Boston, Little, Brown and Co. 1964, p 114.*

Warning Signs of Heart Failure

## Heart Insight

Popular Articles

In the first of a four-part series on heart failure, we investigate what it is, what causes it and what's the prognosis.

The second installment explains heart failure with muscle intact. Queen Latifah and her mom, Rita, share their personal experience with Rita's own heart failure diagnosis.

Heart failure patients are often hospitalized. This article looks at managing self-care to minimize just how often re-hospitalizations happen.

When HF progresses to an advanced stage, there are many decisions to be made. Here we delve into the importance of shared decision making.

Classes of Heart Failure

Last Reviewed: May 31, 2017

Diagnosing Heart Failure

HF Path™

A better quality of life for heart failure patients? We've got a tool for that!

Begin Your Journey Today

Explore My HF Guide

Our free interactive workbook to help manage heart failure symptoms

Open now

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number:

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

## If You Have Any Questions

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

European Journal of Heart Failure (2017) 19, 366–376
doi:10.1002/ejhf.563

RESEARCH ARTICLE

# New York Heart Association functional class, QRS duration, and survival in heart failure with reduced ejection fraction: implications for cardiac resychronization therapy

**Frieder Braunschweig[1,2]*, Cecilia Linde[1,2], Lina Benson[3], Marcus Ståhlberg[1,2], Ulf Dahlström[4], and Lars H. Lund[1,2]**

[1]Karolinska Institutet, Department of Medicine, Stockholm, Sweden; [2]Karolinska University Hospital, Department of Cardiology, Stockholm, Sweden; [3]Karolinska Institutet, Department of Clinical Science and Education, South Hospital, Stockholm, Sweden; and [4]Department of Cardiology and Department of Medicine and Health Sciences, Linköping University, Linköping, Sweden

*Received 14 January 2016; revised 23 March 2016; accepted 4 April 2016; online publish-ahead-of-print 23 June 2016*

**Aims** Symptom severity assessed by NYHA functional class and QRS duration are essential criteria for selection of heart failure (HF) patients for CRT. This study assessed the relationship between NYHA class, QRS duration, and survival in a nationwide HF registry.

**Methods and results** We studied 13 423 patients with HF in NYHA class II–IV and LVEF <40% in the Swedish Heart Failure Registry. Survival was followed via the Swedish Population Registry. Of 12 534 patients without CRT (age 71 ± 12 years, 29% women), 51% and 49% were in NYHA class II and III–IV, respectively. Patients in NYHA class II compared with class III–IV were younger (69 vs. 73 years), and had a better systolic function (49% vs. 58% with LVEF <30%), $P$ <0.001 for all, and a favourable co-morbidity profile. QRS duration was 116 ± 29 ms in NYHA class II and 119 ± 29 ms in NYHA class III–IV with QRS ≥120 ms found in 37% vs. 44%, and an LBBB in 23% vs. 28% ($P$ < 0.001 for all). Upon multivariable Cox regression adjusting for 40 clinically relevant variables, mortality risk was higher in NYHA class III–IV vs. class II, with a hazard ratio (HR) of 1.31, 95% confidence interval (CI) 1.23–1.40. Mortality was also higher with QRS prolongation ≥120 ms vs. narrow QRS. The HR in NYHA class II patients with non-LBBB was 1.19 (95% CI 1.05 – 1.36) and in those with LBBB it was 1.16 (95% CI 1.03–1.41). The corresponding HRs in NYHA class III–IV were 1.33 (95% CI 1.21–1.47) and 1.12 (95% CI 1.02–1.22). There was no significant interaction between the effects of NYHA class and QRS duration or morphology on mortality. Applying different scenarios to estimate guideline adherence, fewer patients with NYHA class II (range 14.4–42.6%) compared with NYHA class III–IV (18.0–45.4%) had received a CRT device when indicated.

**Conclusions** In HF with reduced LVEF, QRS prolongation is common and independently linked to worse survival. The increase in mortality risk associated with QRS prolongation of both LBBB and non-LBBB morphology is similar in NYHA class II and III–IV.

**Keywords** NYHA functional class • Heart failure • QRS width • Left bundle branch block • Epidemiology • Cardiac resynchronization therapy

*Corresponding author. Department of Cardiology, Karolinska University Hospital, Solna, 17176 Stockholm, Sweden. Tel: +46 8 51771629, Fax: +46 8 311044, Email: frieder.braunschweig@karolinska.se

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

## Introduction

Heart failure (HF) is a highly symptomatic syndrome and associated with poor quality of life, frequent hospitalizations, and a high mortality risk despite recent advances in treatment with drugs and devices.[1,2] It is estimated that 2–3% of the population in industrialized countries suffers from HF, with a marked rise in those aged above 65.[3,4] In 1928 the New York Heart Association published a classification of HF symptom severity relating cardinal symptoms of HF like shortness of breath and fatigue to the levels of physical activity on which they occur (NYHA functional class I–IV).[5] Despite well-known limitations such as the temporal variability of clinical findings, interoperator variation, and a poor correlation with measures of cardiac function,[6,7] the NYHA classification is universally used to grade symptoms and select therapy in clinical practice, and provides prognostic discrimination close to that of complex multivariable risk models.[8]

A wide QRS complex on the surface ECG, especially if displayed as an LBBB, indicates intraventricular dyssynchony, and is a marker of poor prognosis in HF.[9] Cardiac resynchronization therapy improves survival, functional capacity, and quality of life in selected patients with such ECG abnormalities. Following early pivotal trials establishing the effectiveness of CRT in NYHA class III and IV,[10,11] the concept of resynchronization was expanded to patients with mild HF.[12–14] Current guidelines recommend CRT for patients with HF in NYHA class II–IV,[15–17] with gradual differentiations in relation to QRS morphology and duration. Based on evidence from trials and meta-analyses, patients with a typical LBBB pattern are given the highest level of recommendation.[18,19] A recent individual patient meta-analysis, however, suggested QRS duration rather than morphology as an independent predictor of CRT outcomes.[20] The implementation of CRT guidelines shows wide national and regional variation.[21] Potential differences in the adoption of CRT in NYHA class II compared with class III–IV have not been explored.

Since NYHA class and QRS morphology and duration form essential selection criteria, it would be important to study the relationship between these variables and survival in CRT candidates. However, this has been difficult as randomized studies largely included patients with either NYHA class III–IV or NYHA class (I and) II. Furthermore, the impact of QRS characteristics on survival in different groups of NYHA class is confounded by many other variables. Thus, large samples with information on a wide spectrum of baseline variables would be required to reach valid conclusions. Therefore, we investigated the interaction between NYHA class, QRS morphology/duration, and survival in a large Swedish HF registry with information from long-term follow-up and complete survival status by linkage to the National Population Registry.

## Methods

The Swedish Heart Failure Registry (SwedeHF) has been described previously.[22,23] Including over 63 000 unique HF patients, it is one of the largest HF registries worldwide. The protocol, case report form, and annual registry reports are available at http://www.SwedeHF.se. Patients with clinician-judged HF are included at discharge from hospital or upon outpatient visits at cardiology or internal medicine units and primary care clinics. Approximately 80 variables are recorded. The HF registry in general as well as the present study conform to the Declaration of Helsinki and they were approved by the responsible ethics committees. Individual patient consent is not required, but patients are informed of entry into national registries and allowed to opt out.

### Patients

*Figure 1* provides details on patient inclusion and exclusion. Between 11 May 2000 and 5 June 2013, there were 85 291 registrations from inpatient and outpatient units at 68 of 94 hospitals and from 102 of ~1000 primary care outpatient clinics in Sweden. Coverage in 2012 was 55%. This was defined as the number of individuals reported to the registry divided by the sum of individuals with clinical HF encountered in Sweden according to ICD-10 (International Classification of Diseases-10th revision) code for HF plus those reported to the registry (to capture those few who may have been missed by ICD-10 code).

Survival status was updated monthly by linkage with the Swedish population registry (latest update 15 May 2013). For the purpose of this study, we included first registrations from patients with HF and reduced EF, defined as an EF ≤40%. Patients had to be in NYHA class II, III, or IV, with complete data on age, rhythm, device implantation status, as well as QRS duration and morphology. Patients with a prolonged QRS duration of ≥120 ms were defined as either LBBB or non-LBBB type at the discretion of the physician. We excluded repeat registrations and patients with a pacemaker or implantable cardioverter defibrillator (ICD) without a CRT component.

### Analyses

The analysis of the inter-relationship between NYHA class, QRS duration, and survival was performed after the exclusion of patients with a CRT and, thus, paced QRS complexes on the ECG (*Figure 1*), whereas the analysis of CRT utilization included patients with a CRT device.

Categorization and availability of data in the registry do not allow a perfect match with European Society of Cardiology (ESC) guidelines.[15–17] Therefore, we evaluated four different scenarios to account for different levels of recommendation in the guidelines and different strengths of fitting between guideline criteria and registry variables. In the registry, EF is reported as <30, 30–39, 40–49, and ≥50%. As EF in Sweden is overwhelmingly reported in 5–10% increments, we assumed that most patients registered in the group with EF 30–39% had an actual EF of 30% or 35% and that few had an EF of 36–39%. In contrast, when selecting only registry patients with EF <30%, all would fulfil the LVEF guideline criterion for CRT, but some patients with EF 30–35% would be missed.

The strength of evidence and recommendations for CRT varies depending on QRS duration (120–149; ≥150 ms), QRS morphology (LBBB vs. non-LBBB), and rhythm (sinus vs. AF). Therefore, we performed analyses with progressively stricter CRT selection criteria, based on the guideline-specified recommendations I-A, I-B, IIa-B, and IIb-B from the European Heart Rhythm Association Guidelines 2013.[16] Guidelines also recommend CRT in patients with an indication for conventional ventricular pacing. The registry contains data on the presence of conventional pacemakers but not on the original indication for implantation or the percentage of ventricular pacing. Therefore, this potential guideline indication was not taken into account and patients with a previous pacemaker were excluded.

© 2016 The Authors




**Figure 1** Flow chart showing the selection of study patients from the SwedeHF registry. HF, heart failure; ICD, implantable cardioverter defibrillator.

Scenario 1: sinus rhythm (NYHA II–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology) or AF (NYHA III–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology)
Scenario 2: sinus rhythm (NYHA II–IV, EF <40%, LBBB or QRS ≥150 ms) or AF (NYHA III–IV, EF <40%, LBBB, or QRS ≥150 ms)
Scenario 3: sinus rhythm (NYHA II–IV, EF <30%, LBBB, or QRS ≥150 ms) or AF (NYHA III–IV, EF <30%, or QRS ≥150 ms)
Scenario 4: sinus rhythm (NYHA II–IV, EF <30%, QRS ≥150 regardless of QRS morphology) or AF (NYHA III–IV, EF <30%, QRS ≥150 regardless of QRS morphology) (patients were only included after 1 January 2011 because evidence in NYHA II was not available before then).

## Statistical analysis

All analyses were performed in R version 3.0.2 (R Foundation for Statistical Computing, Vienna, Austria). The level of significance was set to 5% and all reported *P*-values are two-tailed.

Survival for narrow QRS, non-LBBB QRS prolongation, and LBBB was presented using the Kaplan–Meier method and groups were compared with the log-rank test, separately for patients with NYHA class II and III–IV. Univariable and multivariable Cox regressions, using the Efron method for tie handling, were performed for non-LBBB/LBBB as a categorical variable compared with narrow QRS with adjustment for the 40 variables listed in the Supplementary material online, *Table S1*, and the interaction between NYHA class and QRS morphology. The modelling of an interaction effect renders a similar interpretation as if the data had been analysed separately in NYHA class subgroups, but with the additional benefit of also being able statistically to test differences between groups of NYHA class in effects of non-LBBB and LBBB vs. narrow QRS on mortality.

The proportional hazards assumption was investigated for the scaled Schoenfeld residuals from the multivariable models, and the dfbetas [a measure of how much the hazard ratio (HR) changes owing to the deletion of a single observation] from the models were inspected to detect extreme outliers. As a result, location (inpatient vs. outpatient) and marital status were modelled as strata variables because they were deemed not to fulfil the proportional hazard assumption. All continuous variables were modelled using restricted cubic splines (enabling possible non-linear relationships between these variables and the outcome to be modelled) with four degrees of freedom.[24]

Some baseline variables had missing data. *Table S1* in the Supplementary material online specifies 40 clinically relevant baseline variables and percentage missing for each variable. In the multivariable Cox regressions, to avoid bias and confounding resulting from variables not missing completely at random, multiple imputation ($n = 10$) was performed for all variables with missing data, using predictive mean matching with QRS width as a continuous variable and the 40 variables in *Table S1* in the Supplementary material online, and the outcome, survival, included as the Nelson–Aalen estimator in the imputation model, although not imputed itself because it contained no missing values. Imputation corrections to the resulting standard errors were performed.

# Results

Of 85 291 entries in the registry, 13 423 unique patients fulfilled the selection criteria (*Figure 1*). Of these, 889 had a CRT device implanted including 447 with an ICD component, leaving 12 534 patients without CRT for the main analysis. Baseline characteristics are provided in *Table 1* (for a complete list of variables see *Table S1*

© 2016 The Authors

**Table 1 Baseline characteristics**

| Variable | NYHA II ($n = 6377$) | NYHA III–IV ($n = 6157$) | P-value |
|---|---|---|---|
| Demographics | | | |
| Male gender | 4627 (73%) | 4273 (69%) | <0.001 |
| Age (years) | 69 ± 12 | 73 ± 12 | <0.001 |
| HF-related characteristics | | | |
| NYHA II | 6377 (100%) | – | <0.001 |
| NYHA III | – | 5554 (90%) | |
| NYHA IV | – | 603 (10%) | |
| Duration <6 months | 3741 (59%) | 2668 (44%) | <0.001 |
| IHD | 2870 (48%) | 3282 (56%) | <0.001 |
| DCM | 1276 (20%) | 1140 (19%) | 0.042 |
| HCM | 60 (2%) | 61 (2%) | 0.972 |
| LVEF 30–39% | 3246 (51%) | 2589 (42%) | <0.001 |
| LVEF <30% | 3131 (49%) | 3568 (58%) | |
| QRS-related characteristics | | | |
| QRS duration (ms) | 116 ± 29 | 119 ± 29 | <0.001 |
| QRS <120 ms | 4021 (63%) | 3437 (56%) | <0.001 |
| QRS 120–149 ms | 1305 (20%) | 1595 (26%) | |
| QRS ≥150 ms | 1051 (16%) | 1125 (18%) | |
| LBBB | 1497 (23%) | 1706 (28%) | <0.001 |
| Rhythm, blood pressure | | | |
| AF (any form) | 2548 (40%) | 2848 (46%) | <0.001 |
| Permanent AF | 2033 (32%) | 2333 (38%) | <0.001 |
| Heart rate (b.p.m.) | 72 ± 15 | 76 ± 16 | <0.001 |
| Systolic blood pressure (mmHg) | 126 ± 20 | 122 ± 21 | <0.001 |
| Co-morbidities | | | |
| Hypertension | 2722 (44%) | 2815 (47%) | <0.001 |
| Diabetes | 1284 (20%) | 1758 (29%) | <0.001 |
| Valve disease | 1003 (16%) | 1432 (24%) | <0.001 |
| Pulmonary disease | 845 (13%) | 1261 (21%) | <0.001 |
| Revascularization | 1710 (27%) | 1798 (29%) | 0.003 |
| Biochemistry | | | |
| Haemoglobin (g/L) | 138 ± 16 | 133 ± 17 | <0.001 |
| NT-proBNP (ng/L) | 2279 (1022–4902) | 3883 (1760–8456) | <0.001 |
| GFR (mL/min/1.73 m$^2$) | 76 ± 36 | 64 ± 34 | <0.001 |
| Medications | | | |
| ACE inhibitor | 4845 (76%) | 4165 (68%) | <0.001 |
| ARB | 1353 (21%) | 1446 (24%) | 0.002 |
| Beta-blocker | 5900 (93%) | 5534 (90%) | <0.001 |
| MRA | 1991 (31%) | 2328 (38%) | <0.001 |
| Diuretic | 4674 (74%) | 5403 (88%) | <0.001 |
| Digitalis | 1119 (18%) | 1133 (18%) | 0.207 |
| Nitrate | 744 (12%) | 1147 (19%) | <0.001 |
| OAC | 2516 (40%) | 2439 (40%) | 0.838 |

Numbers are $n$ (%) for categorical variables and mean ± SD for continuous variables, and tested with $\chi^2$ test and t-test, respectively.
NT-proBNP is given as median (interquartile range).
DCM, dilated cardiomyopathy; GFR, glomerular filtration rate; HCM, hypertrophic cardiomyopathy; IHD, ischaemic heart disease; MRA, mineralocorticoid receptor antagonist; OAC, oral anticoagulant.

in the Supplementary material online). There were 6377 patients (51%) with NYHA class II and 6157 (49%) in NYHA class III–IV.

Patients in NYHA class II were younger, more likely to be male, and had a shorter duration of HF, less ischaemic cardiomyopathy, and a higher LVEF. Furthermore, they had a lower propability of AF, a lower heart rate, higher systolic blood pressure, and a more favourable co-morbidity profile. Levels of NT-proBNP were lower, while haemoglobin and creatinine clearance were higher. Interestingly, a higher proportion of NYHA class II patients were on treatment with ACE inhibitors and beta-blockers. In contrast, use of ARBs, mineralocorticoid receptor antagonists (MRA), and diuretics was higher among patients with NYHA class III–IV.

## QRS duration and morphology in relation to New York Heart Association class

QRS prolongation was common in both groups (*Figure 2*). On average, patients in NYHA class II compared with NYHA class III–IV had a somewhat smaller QRS (116 ± 29 ms vs. 119 ± 29 ms; $P < 0.001$) and fewer had a QRS of ≥120 ms (37% vs. 44%;

© 2016 The Authors




**Figure 2** Prevalence of QRS duration. Distribution of QRS duration in increments of 10 ms and proportions with LBBB (hashed bars) in patients with NYHA class II and NYHA class III–IV.

$P < 0.001$), a QRS ≥150 ms (16% vs. 18%, $P = 0.009$), or an LBBB (23% vs. 28%; $P < 0.001$). However, among those with a QRS duration ≥120 ms, the proportion of patients with LBBB was similar: 64% in NYHA class II and 63% in NYHA class III–IV ($P = 0.55$), and increased with progressively wider QRS.

## Survival in relation to New York Heart Association class and QRS duration and morphology

As expected, NYHA class II patients had a better survival compared with those in NYHA class III–IV (*Figure 3*). In the resulting multivariable Cox model, the HR and 95% confidence interval (CI) for mortality in NYHA III–IV vs. II was 1.31, 95% CI 1.23–1.40 ($P < 0.001$). In both groups, prolonged QRS duration was associated with worse survival and the prognosis of patients with a non-LBBB morphology was inferior compared with those who had LBBB. The proportion of patients surviving at 1, 3, and 5 years is given in *Table 2*. After 5 years, 58% of patients in NYHA class II with QRS prolongation of non-LBBB type were alive, while the corresponding number of NYHA class III–IV patients was only 30%. In contrast, 69% and 49% of patients in NYHA class II and III–IV, respectively, survived at 5 years, if they had a narrow QRS. At each point of time, survival of NYHA class II patients with QRS prolongation of non-LBBB type was better compared with NYHA class III–IV patients with narrow QRS.

As shown in *Table 1*, there were significant differences in baseline characteristics probably explaining the better outcome in NYHA class II vs. NYHA class III–IV patients. Thus, to assess the independent contribution of QRS duration and morphology to the mortality risk in NYHA class II and NYHA class III–IV, survival data were adjusted for important confounding variables. These factors had been specified *a priori* and included all variables with statistical differences shown in *Table 1* and, in addition, civil status, housing, recruitment in or out of hospital, year of recruitment, setting of general follow-up, setting of HF follow-up, mean arterial pressure, pulse pressure, cardiomegaly, and/or congestion on X-ray.

In all settings, prolonged QRS duration was associated with a significant increase in mortality risk (*Figure 4*). After adjustment for multiple confounders, the HR for mortality in patients with non-LBBB type vs. narrow QRS was 1.19 (95% CI 1.05 – 1.36; $P = 0.009$) in NYHA class II and 1.33 (95% CI 1.21–1.47; $P < 0.001$) in NYHA class III–IV. Similarly, comparing patients with LBBB vs. narrow QRS, the adjusted HR was 1.16 (95% CI 1.03–1.41; $P = 0.013$) in NYHA class II and 1.12 (95% CI 1.02–1.22; $P = 0.014$) in NYHA class III–IV. Thus, QRS prolongation, both of LBBB and non-LBBB type, independently added a similar mortality risk in patients with NYHA class II and NYHA class III–IV ($P$ for interaction: 0.521, crude and 0.244, adjusted).

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

Case 2:20-cv-02921-SHM-atc Document 20-3 Filed 03/29/21 Page 638 of 1050
PageID 860

From: 01/08/2020 12:27 #852 P.104/111






**Figure 3** Kaplan–Meier survival by NYHA class and QRS morphology. (*A*) NYHA class II; (*B*) NYHA class III–IV. Log-rank *P*-value for QRS/LBBB in both NYHA groups: <0.001.

**Table 2 Survival at 1, 3, and 5 years**

| Year | QRS <120 ms | | | QRS ≥120 ms non-LBBB | | | QRS ≥120 ms LBBB | | |
|---|---|---|---|---|---|---|---|---|---|
| | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI |
| NYHA class II | | | | | | | | | |
| 1 | 3287 | 0.92 | 0.92–0.93 | 680 | 0.88 | 0.86–0.91 | 1173 | 0.90 | 0.88–0.91 |
| 3 | 1967 | 0.80 | 0.79–0.82 | 400 | 0.71 | 0.68–0.75 | 681 | 0.74 | 0.72–0.77 |
| 5 | 945 | 0.69 | 0.67–0.70 | 190 | 0.58 | 0.54–0.62 | 296 | 0.62 | 0.59–0.65 |
| NYHA class III–IV | | | | | | | | | |
| 1 | 2477 | 0.82 | 0.80–0.83 | 631 | 0.70 | 0.70–0.73 | 1163 | 0.54 | 0.75–0.79 |
| 3 | 1290 | 0.63 | 0.61–0.65 | 304 | 0.45 | 0.42–0.49 | 591 | | (0.51–0.57) |
| 5 | 577 | 0.49 | 0.47–0.51 | 128 | 0.30 | 0.26–0.33 | 243 | 0.39 | 0.36–0.41 |

CI, confidence interval.

## Eligibility and utilization of cardiac resynchronization therapy according to New York Heart Association class

The proportion of patients eligible for CRT and the actual utilization of CRT in relation to current guideline recommendations was analysed in 13 423 individual patients, including those with an implanted CRT device. Eligibility was analysed in four scenarios representing increasing strength of recommendation and fit between guideline and registry criteria (*Figure 5*). Depending on the scenario chosen, between 14.5% and 30.4% of patients in NYHA class II and between 18.9% and 49.1% of patients in NYHA class III–IV fulfilled guideline recommendations for CRT. For example, in scenario 3, representing strict selection criteria according to current guidelines, 16.2% in NYHA class III–IV and 28.1% in NYHA class II met CRT selection criteria. In each scenario, more patients in NYHA class III–IV than in class II had a CRT indication.

Of patients meeting criteria for CRT, only a minority had actually received a device. This proportion ranged between 14.4% and 42.6% of eligible patients (4.4% and 6.2% of the total) with NYHA class II, and between 18.0% and 45.4% (8.6% and 8.8% of the total) in those with NYHA class III–IV. For example, in scenario 3, 27.1% and 31.4% had actually been implanted. Thus, irrespective of analysis, large proportions of both NYHA groups lacked CRT despite an indication. Consistently, the proportion of patients in NYHA class II who had an indication but were not treated with a device was lower compared with those in NYHA class III–IV, including scenario 4 which contained only

© 2016 The Authors


PAGE 104/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30
Lincoln/Carter 0717




Figure 4 Forest plots depicting hazard ratios (HRs) for all-cause mortality associated with different QRS morphologies in NYHA class II and NYHA class III–IV. Cox regressions were performed in the overall population with adjustment for the 40 variables in Supplementary material online, *Table S1* and the interaction between NYHA class and QRS morphology. Interaction between QRS/LBBB and NYHA class: 0.521 (crude); 0.244 (adjusted). CI, confidence interval.

patients who entered the registry after the first publication of CRT guidelines for NYHA class II patients in 2010. However, while the difference in CRT utilization was statistically significant in scenario 1–3, it did not reach statistical significance ($P = 0.507$) in the fourth scenario, evaluating only a total of 684 patients with an indication.

## Discussion

Grading of HF symptoms according to the NYHA classification is a cornerstone in the clinical assessment of HF patients and has important clinical implications for the selection of appropriate treatment. Specifically, current guidelines for CRT tailor recommendations in relation to NYHA class and QRS characteristics.[15,16] We analysed the relationship between NYHA class, QRS duration/morphology, and survival in a large group of HF patients with reduced LVEF <40% and long-term follow-up via Swedish national registries. A QRS prolongation of ≥120 ms was common in both NYHA class II (36%) and NYHA class III–IV (44%). Importantly, while NYHA II patients were healthier at baseline and survived longer, the independent risk attributable to QRS prolongation of LBBB or non-LBBB type was similar in NYHA class II and III–IV. Although CRT is highly recommended in current guidelines, only a minority of patients fulfilling guideline recommendations had received a device, and this underutilization appeared to be even greater in NYHA class II compared with NYHA class III–IV.

Our finding that QRS duration is associated with a similar hazard for death in patients with NYHA class II and III–IV gains particular strength by the large sample size, the long and complete follow-up through national registries, and a background medical therapy reflecting a high standard of care. Even after adjustment for a large number of confounders, the mortality risk in NYHA class II patients with LBBB and non-LBBB morphology was significantly increased. This supports the notion that QRS prolongation is not only a general marker of HF severity[25] but also a risk factor contributing to the adverse prognosis in HF independently of other prognostic factors, presumably through the induction of ventricular dyssynchrony.

Other studies have looked into the interaction between NYHA class, QRS duration, and prognosis. Two smaller studies also found a wider QRS duration with more advanced NYHA class, but multivariable analysis was not performed.[26,27] Similarly to the present study, a secondary analysis of a previous, smaller SwedeHF

© 2016 The Authors




**Figure 5** Estimation of CRT utilization in the SwedeHF registry. (*A*) The proportion of patients meeting selection criteria for CRT according to scenarios 1–3 reflecting progressively stricter CRT selection criteria based on guideline recommendations, and scenario 4 considering only patients included after 1 January 2011 (see the Methods for further details). (*B*) The proportion of patients meeting CRT selection criteria who actually were implanted with a device. *P*-values (NYHA II compared with NYHA III–IV): $^1P < 0.001$; $^2P < 0.001$; $^3P = 0.015$; $^4P = 0.507$.

cohort indicated that interactions between QRS width and NYHA class were not significant upon multivariate analysis.[9]

The proportion of patients with prolonged QRS ≥120 ms in our study (41%) corresponds well with previous reports. A broad QRS was also found in 41% of patients with an LVEF ≤35% evaluated in the EuroHeart failure survey,[28] 37% of patients in the Italian Network on CHF[29] (using 140 ms as a cut-off), and 34% of HF patients examined in the setting of a community HF clinic.[30] In the present study, there was a trend towards worse prognosis in subjects with non-LBBB morphology, found in approximately one-third of patients with prolonged QRS, compared with LBBB. Causing a characteristic U-shaped activation pattern of the left ventricle,[31] LBBB has been closely linked to left intraventricular dyssynchrony between the septum and the lateral wall, while QRS prolongation of non-LBBB type may result in various other electromechanical abnormalities.[32] This may explain why patients with LBBB have especially large effects by CRT while non-LBBB morphology is a predictor of non-response.[33] Among patients with non-LBBB morphology, we could not single out those with a right bundle branch block (RBBB). RBBB is associated with increased mortality in chronic HF,[34] but RBBB patients do not improve by CRT.[35]

Cardiac resynchronization therapy was first introduced in patients with NYHA class III.[10,36,37] The COMPANION trial also included a small proportion (14%) of patients in NYHA class IV provided they had not been hospitalized during the month before enrolment and had an estimated survival exceeding 6 months.[11] This subgroup showed a significant reduction in the combined primary study endpoint, and hence the indication of 'ambulatory' NYHA class IV was incorporated into current guidelines. However, NYHA class IV is a rare indication in clinical practice and patients hospitalized with acutely decompensated HF and/or receiving inotropic support are usually not considered for implantation. In the European CRT survey, only 8% were judged to be in NYHA class IV at baseline.[38] In the present study, a total of 4.8% had NYHA class IV. Considering the clinical context in which patients are recruited to the registry, we assume that most of them met the criteria of 'ambulatory' class IV.

Utilization of CRT in NYHA class II vs. III–IV was significantly worse in scenarios 1–3. This can be explained by the later introduction of NYHA II to CRT guidelines. The analysis in scenario 4, focusing on a smaller sample of patients with strict indications recruited after 2010, showed a similarly worse utilization but the difference was not significant. In a registry, some appropriate reasons to abstain from device therapy such as high biological age, clinical severity of co-morbidities, or patient refusal are difficult to discern. However, considering the baseline characteristics (*Table 1*), factors such as high age and severe co-morbidities are unlikely to explain the larger underutilization of CRT in NYHA class II.

© 2016 The Authors

From: 01/08/2020 12:28 #852 P.107/111



In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. It may be speculated that it was easier to achieve drug target doses in those with mild HF, better renal function, and less compromised haemodynamics as reflected by higher blood pressure.

Only half of the patients received CRT together with a defibrillator, which is below the European average but in keeping with Swedish implantation statistics and on a similar level compared with countries such as the UK or Denmark.[21]

Our findings have clinical implications as they indicate that a wide QRS complex should alert physicians to the significantly increased mortality risk of the HF patient regardless of NYHA class and other conditions. Device treatment with CRT and, in most cases ICD, has strong evidence in this scenario and should be seriously considered. Studies indicate that CRT is similarly effective in appropriately selected NYHA class II and III–IV patients to improve outcomes.[14] As CRT appears particularly underutilized in NYHA class II, the value of early interventions to prevent disease progression should be highlighted. Recently, long-term effects of CRT on mortality[39] and measures of functional and LV remodelling[40] were shown in mild HF. However, these improvements were largely confined to patients with LBBB. Thus, our results also emphasize a particular need for additional treatment options in patients with mild to moderate HF and QRS prolongation of non-LBBB type who have limited effects by resynchronization.

## Limitations

Measurement of QRS duration and the categorization of LBBB was left to the individual physician, and misclassification may have occurred. We have no information regarding the presence of RBBB but only whether patients had LBBB or not. Categories used in the registry, in particular LVEF, allowed no perfect match with selection criteria in the guidelines. We sought to accommodate this by evaluating guideline adoption in different scenarios with progressively stricter CRT selection criteria. In addition, we could not assess whether patients with potential CRT indication had contraindications. The analysis of CRT utilization represents only a snap-shot of CRT prevalence, and we cannot rule out that patients without CRT may have received CRT during the later course of follow-up or that they improved such that CRT was no longer indicated. However, follow-up referral to cardiologists and HF nurse clinics was rare, suggesting that most patients were not considered for CRT by the clinician responsible. Furthermore, since only a minor portion of CRT candidates had received a device, it is unlikely that this portion had greatly increased during further follow-up. We reported all-cause but not cause-specific mortality. The latter may provide a stronger link between the pathophysiology of conduction delay and outcomes, but the former is more clinically relevant. Finally, patients with LV dysfunction and HF who had been previously implanted with an ICD were excluded from analysis.

## Conclusions

This study in a large national registry shows that QRS prolongation of both LBBB and non-LBBB type is an independent predictor of mortality in patients with HF and reduced LVEF. Importantly, the increase in mortality risk attributable to QRS prolongation was similar in those with NYHA class II and those with NYHA class III–IV, and remained significant even after adjustment for a large number of relevant confounders. Although many HF patients with prolonged QRS fulfil current guideline criteria, CRT appears to be underutilized particularly among NYHA class II patients.

## Supplementary Information

Additional Supporting Information may be found in the online version of this article:

**Table S1.** Complete baseline variables included in multivariable models among 12 534 patients (without CRT).

## Acknowledgements

We thank local investigators in the Swedish Heart Failure Registry for data entry and management.

## Funding

This work was supported in part by Boston Scientific, the Swedish Research Council, the Swedish Heart and Lung Foundation, and Stockholm County Council in the form of grants to L.H.L.'s institution. No funding organization had any role in the collection, analysis, or interpretation of data or approval/disapproval for publication.

**Conflict of interest:** L.H.L. reports speaker's honoraria from St Jude and research grants to his institution from Medtronic. C.L. was principal investigator of REVERSE, a CRT study sponsored by Medtronic, reports research grants, speaker honoraria, and consulting fees from Medtronic, and speaker honoraria and consulting fees from St. Jude Medical. F.B. reports research grants and speaker honoraria from Medtronic and consulting fees from Biotronik and Boston Scientific. M.S. and U.D. report no conflicts of interest.

## References

1. MacIntyre K, Capewell S, Stewart S, Chalmers JW, Boyd J, Finlayson A, Redpath A, Pell JP, McMurray JJ. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. *Circulation* 2000;**102**:1126–1131.
2. Schaufelberger M, Swedberg K, Koster M, Rosen M, Rosengren A. Decreasing one-year mortality and hospitalization rates for heart failure in Sweden; data from the Swedish Hospital Discharge Registry 1988 to 2000. *Eur Heart J* 2004;**25**:300–307.
3. Cowie MR, Mosterd A, Wood DA, Deckers JW, Poole-Wilson PA, Sutton GC, Grobbee DE. The epidemiology of heart failure. *Eur Heart J* 1997;**18**:208–225.
4. Dickstein K, Cohen-Solal A, Filippatos G, McMurray JJ, Ponikowski P, Poole-Wilson PA, Stromberg A, van Veldhuisen DJ, Atar D, Hoes AW, Keren A, Mebazaa A, Nieminen M, Priori SG, Swedberg K, Vahanian A, Camm J, De Caterina R, Dean V, Dickstein K, Filippatos G, Funck-Brentano C, Hellemans

© 2016 The Authors


PAGE 107/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30

From: 01/08/2020 12:29 #852 P.108/111



I, Kristensen SD, McGregor K, Sechtem U, Silber S, Tendera M, Widimsky P, Zamorano JL, Tendera M, Auricchio A, Bax J, Bohm M, Corra U, della Bella P, Elliott PM, Follath F, Gheorghiade M, Hasin Y, Hernberg A, Jaarsma T, Komajda M, Kornowski R, Piepoli M, Prendergast B, Tavazzi L, Vachiery JL, Verheugt FW, Zamorano JL, Zannad F. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2008: the Task Force for the diagnosis and treatment of acute and chronic heart failure 2008 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association of the ESC (HFA) and endorsed by the European Society of Intensive Care Medicine (ESICM). *Eur J Heart Fail* 2008;**10**:933–989.
5. The Criteria Committee of the New York Heart Association. *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*. 9th ed. Boston: Little, Brown & Co.; 1994. p253–256.
6. Raphael C, Briscoe C, Davies J, Ian Whinnett Z, Manisty C, Sutton R, Mayet J, Francis DP. Limitations of the New York Heart Association functional classification system and self-reported walking distances in chronic heart failure. *Heart* 2007;**93**:476–482.
7. Adams KF Jr, Zannad F. Clinical definition and epidemiology of advanced heart failure. *Am Heart J* 1998;**135**:S204–S215.
8. Goda A, Williams P, Mancini D, Lund LH. Selecting patients for heart transplantation: comparison of the Heart Failure Survival Score (HFSS) and the Seattle Heart Failure Model (SHFM). *J Heart Lung Transplant* 2011;**30**:1236–1243.
9. Lund LH, Jurga J, Edner M, Benson L, Dahlstrom U, Linde C, Alehagen U. Prevalence, correlates, and prognostic significance of QRS prolongation in heart failure with reduced and preserved ejection fraction. *Eur Heart J* 2013;**34**:529–539.
10. Cleland JG, Daubert JC, Erdmann E, Freemantle N, Gras D, Kappenberger L, Tavazzi L. The effect of cardiac resynchronization on morbidity and mortality in heart failure. *N Engl J Med* 2005;**352**:1539–1549.
11. Bristow MR, Saxon LA, Boehmer J, Krueger S, Kass DA, De Marco T, Carson P, DiCarlo L, DeMets D, White BG, DeVries DW, Feldman AM. Cardiac-resynchronization therapy with or without an implantable defibrillator in advanced chronic heart failure. *N Engl J Med* 2004;**350**:2140–2150.
12. Linde C, Abraham WT, Gold MR, St John Sutton M, Ghio S, Daubert C. Randomized trial of cardiac resynchronization in mildly symptomatic heart failure patients and in asymptomatic patients with left ventricular dysfunction and previous heart failure symptoms. *J Am Coll Cardiol* 2008;**52**:1834–1843.
13. Moss AJ, Hall WJ, Cannom DS, Klein H, Brown MW, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Higgins SL, Pfeffer MA, Solomon SD, Wilber D, Zareba W. Cardiac-resynchronization therapy for the prevention of heart-failure events. *N Engl J Med* 2009;**361**:1329–1338.
14. Tang AS, Wells GA, Talajic M, Arnold MO, Sheldon R, Connolly S, Hohnloser SH, Nichol G, Birnie DH, Sapp JL, Yee R, Healey JS, Rouleau JL, Resynchronization-Defibrillation for Ambulatory Heart Failure Trial I. Cardiac-resynchronization therapy for mild-to-moderate heart failure. *N Engl J Med* 2010;**363**:2385–2395.
15. McMurray JJ, Adamopoulos S, Anker SD, Auricchio A, Bohm M, Dickstein K, Falk V, Filippatos G, Fonseca C, Gomez-Sanchez MA, Jaarsma T, Kober L, Lip GY, Maggioni AP, Parkhomenko A, Pieske BM, Popescu BA, Ronnevik PK, Rutten FH, Schwitter J, Seferovic P, Stepinska J, Trindade PT, Voors AA, Zannad F, Zeiher A, Bax JJ, Baumgartner H, Ceconi C, Dean V, Deaton C, Fagard R, Funck-Brentano C, Hasdai D, Hoes A, Kirchhof P, Knuuti J, Kolh P, McDonagh T, Moulin C, Reiner Z, Sechtem U, Sirnes PA, Tendera M, Torbicki A, Vahanian A, Windecker S, Bonet LA, Avraamides P, Ben Lamin HA, Brignole M, Coca A, Cowburn P, Dargie H, Elliott P, Flachskampf FA, Guida GF, Hardman S, Iung B, Merkely B, Mueller C, Nanas JN, Nielsen OW, Orn S, Parissis JT, Ponikowski P. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012: the Task Force for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2012 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association (HFA) of the ESC. *Eur J Heart Fail* 2012;**14**:803–869.
16. Brignole M, Auricchio A, Baron-Esquivias G, Bordachar P, Boriani G, Breithardt OA, Cleland J, Deharo JC, Delgado V, Elliott PM, Gorenek B, Israel CW, Leclercq C, Linde C, Mont L, Padeletti L, Sutton R, Vardas PE, ESC Committee for Practice Guidelines (CPG), Zamorano JL, Achenbach S, Baumgartner H, Bax JJ, Bueno H, Dean V, Deaton C, Erol C, Fagard R, Ferrari R, Hasdai D, Hoes AW, Kirchhof P, Knuuti J, Kolh P, Lancellotti P, Linhart A, Nihoyannopoulos P, Piepoli MF, Ponikowski P, Sirnes PA, Tamargo JL, Tendera M, Torbicki A, Wijns W, Windecker S, Document R, Kirchhof P, Blomstrom-Lundqvist C, Badano LP, Aliyev F, Bansch D, Baumgartner H, Bsata W, Buser P, Charron P, Daubert JC, Dobreanu D, Faerestrand S, Hasdai D, Hoes AW, Le Heuzey JY, Mavrakis H, McDonagh T, Merino JL, Nawar MM, Nielsen JC, Pieske B, Poposka L, Ruschitzka F, Tendera M, Van Gelder IC, Wilson CM. 2013 ESC Guidelines on cardiac pacing and cardiac resynchronization therapy: the Task Force on cardiac pacing and resynchronization therapy of the European Society of Cardiology (ESC). Developed in collaboration with the European Heart Rhythm Association (EHRA). *Eur Heart J* 2013;**34**:2281–2329.
17. Priori SG, Blomstrom-Lundqvist C, Mazzanti A, Blom N, Borggrefe M, Camm J, Elliott PM, Fitzsimons D, Hatala R, Hindricks G, Kirchhof P, Kjeldsen K, Kuck KH, Hernandez-Madrid A, Nikolaou N, Norekval TM, Spaulding C, Van Veldhuisen DJ. Authors/Task Force Members; Document Reviewers. 2015 ESC Guidelines for the management of patients with ventricular arrhythmias and the prevention of sudden cardiac death: the Task Force for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death of the European Society of Cardiology (ESC) Endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC). *Eur Heart J* 2015;**36**:2793–2867.
18. Sipahi I, Chou JC, Hyden M, Rowland DY, Simon DI, Fang JC. Effect of QRS morphology on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Am Heart J* 2012;**163**:260–267.
19. Sipahi I, Carrigan TP, Rowland DY, Stambler BS, Fang JC. Impact of QRS duration on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Arch Intern Med* 2011;**171**:1454–1462.
20. Cleland JG, Abraham WT, Linde C, Gold MR, Young JB, Claude Daubert J, Sherfesee L, Wells GA, Tang AS. An individual patient meta-analysis of five randomized trials assessing the effects of cardiac resynchronization therapy on morbidity and mortality in patients with symptomatic heart failure. *Eur Heart J* 2013;**34**:3547–3556.
21. Raatikainen MJ, Arnar DO, Zeppenfeld K, Merino JL, Levya F, Hindriks G, Kuck KH. Statistics on the use of cardiac electronic devices and electrophysiological procedures in the European Society of Cardiology countries: 2014 report from the European Heart Rhythm Association. *Europace* 2015;**17** Suppl 1:i1–175.
22. Lund LH, Benson L, Dahlstrom U, Edner M. Association between use of renin–angiotensin system antagonists and mortality in patients with heart failure and preserved ejection fraction. *JAMA* 2012;**308**:2108–2117.
23. Jonsson A, Edner M, Alehagen U, Dahlstrom U. Heart failure registry: a valuable tool for improving the management of patients with heart failure. *Eur J Heart Fail* 2010;**12**:25–31.
24. Therneau T, Grambsch P. Functional Form and Testing Proportional Hazards. In: Dietz K, Gail M, Krickeberg K, Samet J, Tsiatis A, eds *Modeling Survival Data: Extending the Cox Model*. New York: Springer-Verlag; 2000.
25. Kashani A, Barold SS. Significance of QRS complex duration in patients with heart failure. *J Am Coll Cardiol* 2005;**46**:2183–2192.
26. Stellbrink C, Auricchio A, Diem B, Breithardt OA, Kloss M, Schondube FA, Klein H, Messmer BJ, Hanrath P. Potential benefit of biventricular pacing in patients with congestive heart failure and ventricular tachyarrhythmia. *Am J Cardiol* 1999;**83**:143D–150D.
27. Gasparini M, Mantica M, Galimberti P, Marconi M, Genovese L, Faletra F, Simonini S, Klersy C, Coates R, Gronda E. Beneficial effects of biventricular pacing in patients with a 'narrow' QRS. *Pacing Clin Electrophysiol* 2003;**26**:169–174.
28. Khan NK, Goode KM, Cleland JG, Rigby AS, Freemantle N, Eastaugh J, Clark AL, de Silva R, Calvert MJ, Swedberg K, Komajda M, Mareev V, Follath F, EuroHeart Failure Survey I. Prevalence of ECG abnormalities in an international survey of patients with suspected or confirmed heart failure at death or discharge. *Eur J Heart Fail* 2007;**9**:491–501.
29. Baldasseroni S, Opasich C, Gorini M, Lucci D, Marchionni N, Marini M, Campana C, Perini G, Deorsola A, Masotti G, Tavazzi L, Maggioni AP, Italian Network on Congestive Heart Failure I. Left bundle-branch block is associated with increased 1-year sudden and total mortality rate in 5517 outpatients with congestive heart failure: a report from the Italian network on congestive heart failure. *Am Heart J* 2002;**143**:398–405.
30. Clark AL, Goode K, Cleland JG. The prevalence and incidence of left bundle branch block in ambulant patients with chronic heart failure. *Eur J Heart Fail* 2008;**10**:696–702.
31. Auricchio A, Fantoni C, Regoli F, Carbucicchio C, Goette A, Geller C, Kloss M, Klein H. Characterization of left ventricular activation in patients with heart failure and left bundle-branch block. *Circulation* 2004;**109**:1133–1139.
32. Andersson LG, Wu KC, Wieslander B, Loring Z, Frank TF, Maynard C, Gerstenblith G, Tomaselli GF, Weiss RG, Wagner GS, Ugander M, Strauss DG. Left ventricular mechanical dyssynchrony by cardiac magnetic resonance is greater in patients with strict vs nonstrict electrocardiogram criteria for left bundle-branch block. *Am Heart J* 2013;**165**:956–963.
33. Cleland J, Freemantle N, Ghio S, Fruhwald F, Shankar A, Marijanowski M, Verboven Y, Tavazzi L. Predicting the long-term effects of cardiac resynchronization therapy on mortality from baseline variables and the early response a report from the CARE-HF (Cardiac Resynchronization in Heart Failure) Trial. *J Am Coll Cardiol* 2008;**52**:438–445.
34. Xiong Y, Wang L, Liu W, Hankey GJ, Xu B, Wang S. The prognostic significance of right bundle branch block: a meta-analysis of prospective cohort studies. *Clin Cardiol* 2015;**38**:604–613.

© 2016 The Authors


PAGE 108/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30

35. Bilchick KC, Kamath S, DiMarco JP, Stukenborg GJ. Bundle-branch block morphology and other predictors of outcome after cardiac resynchronization therapy in Medicare patients. *Circulation* 2010;**122**:2022–2030.
36. Cazeau S, Leclercq C, Lavergne T, Walker S, Varma C, Linde C, Garrigue S, Kappenberger L, Haywood GA, Santini M, Bailleul C, Daubert JC. Effects of multisite biventricular pacing in patients with heart failure and intraventricular conduction delay. *N Engl J Med* 2001;**344**:873–880.
37. Abraham WT, Fisher WG, Smith AL, Delurgio DB, Leon AR, Loh E, Kocovic DZ, Packer M, Clavell AL, Hayes DL, Ellestad M, Trupp RJ, Underwood J, Pickering F, Truex C, McAtee P, Messenger J. Cardiac resynchronization in chronic heart failure. *N Engl J Med* 2002;**346**:1845–1853.
38. Dickstein K, Bogale N, Priori S, Auricchio A, Cleland JG, Gitt A, Limbourg T, Linde C, van Veldhuisen DJ, Brugada J. The European cardiac resynchronization therapy survey. *Eur Heart J* 2009;**30**:2450–2460.
39. Goldenberg I, Kutyifa V, Klein HU, Cannom DS, Brown MW, Dan A, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Kautzner J, Klempfner R, Kuniss M, Merkely B, Pfeffer MA, Quesada A, Viskin S, McNitt S, Polonsky B, Ghanem A, Solomon SD, Wilber D, Zareba W, Moss AJ. Survival with cardiac-resynchronization therapy in mild heart failure. *N Engl J Med* 2014;**370**:1694–1701.
40. Linde C, Gold MR, Abraham WT, St John Sutton M, Ghio S, Cerkvenik J, Daubert C, Group REVERSE. Long-term impact of cardiac resynchronization therapy in mild heart failure: 5-year results from the REsynchronization reVErses Remodeling in Systolic left vEntricular dysfunction (REVERSE) study. *Eur Heart J* 2013;**34**:2592–2599.


© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

JACC: HEART FAILURE
© 2017 BY THE AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION
PUBLISHED BY ELSEVIER
VOL. 5, NO. 11, 2017
ISSN 2213-1779/$36.00
http://dx.doi.org/10.1016/j.jchf.2017.08.011

# Refining Classification of Heart Failure Based on Ejection Fraction

Gregg C. Fonarow, MD[a,b]

The complex clinical syndrome of heart failure (HF) is associated with a wide spectrum of left ventricular functional abnormalities (1). These range from preserved left ventricular ejection fraction (EF) and normal left ventricular size to severely reduced EF and marked dilation of the left ventricle. Although for many decades, HF was considered to be synonymous with diminished contractility of the left ventricle, in the early 2000s there was a growing appreciation for the fact that a substantial portion of patients with HF had relatively normal EF, frequently characterized as diastolic HF or diastolic dysfunctional HF. When carefully assessed, there is evidence for the presence of both systolic and diastolic functional abnormalities in most patients with HF (1). Dr. Milton Packer was one of the early proponents of using an EF-based classification for HF patients, suggesting that the term of diastolic HF be avoided and stating that "a less presumptuous approach is to refer to these patients as having HF with a normal ejection fraction, a descriptive approach that makes no assumptions about our knowledge about the pathophysiology of this disorder" (2). Since the 2005 American College of Cardiology/American Heart Association HF Guidelines adopted this approach (HF with reduced EF [HFrEF] and HF with preserved EF [HFpEF]), EF has been considered essential in the classification of patients with HF.

There have been extensive studies demonstrating that the demographics, causes, comorbidities, prognoses, and, most importantly, responses to therapy differ among HF patients based on EF classification (3). Differences among the evidence bases for therapies is, in and of itself, a compelling enough rationale for EF-based classification. Furthermore, to date, no measurement or marker other than EF has demonstrated utility in distinguishing which patient populations will or will not derive benefit from each guideline-directed therapy. Nevertheless, use of EF is not without limitations because it is dependent on the imaging technique used, the analysis methods, the operators, and the variability up to 5% (3). However, the use of EF is nearly ubiquitous in characterizing patients with HF in clinical practice and research, as well as being used as an indispensable component of the enrollment criteria in nearly every randomized clinical trial. Ejection fraction has proven to be of such substantial clinical and research value in the assessment and management of HF patients, there is a Class I level recommendation for EF measurement in every national and international HF guideline (1,4).

Despite the widespread adoption of EF-based classification of HF, the actual definitions of patients with hearts with reduced and preserved EFs have varied. HFrEF has been variably defined as EF values of ≤35%, <40%, and ≤40% (1). HFpEF has been classified as EF values of >40%, ≥45%, >45%, ≥50%, >50%, and ≥55% (1). In studies which explored the optimal cutpoint(s) for defining EF groups, data emerged suggesting there was an intermediate group of patients with EF in the range of 41% to 49% (3). These patients have a clinical profile and prognosis that are intermediate but closer to those of HFpEF patients defined by EF of ≥50% than those of HFrEF defined by EF of ≤40%, with certain exceptions. In addition, the large scale randomized controlled outcome trials in patients with HF have largely enrolled patients with EF values of ≤35% and ≤40%. It has been only in these HF patients that angiotensin-converting enzyme inhibitors, angiotensin receptor antagonists, angiotensin receptor neprilysin inhibitors, beta-blockers, aldosterone antagonists, and device therapies have demonstrated benefits of reduced mortality (1). Clinical trials to date in HF patients with an EF value of >40%, ≥45%, or ≥50% testing various therapies have not been successful (1). Furthermore, registry-based

From the [a]Division of Cardiology, David Geffen School of Medicine at UCLA, University of California Los Angeles, Los Angeles, California; and the [b]Ahmanson-UCLA Cardiomyopathy Center, University of California Los Angeles Medical Center, Los Angeles, California. Dr. Fonarow's research is supported by U.S. National Institute of Health; and he consults for Amgen, Janssen, Medtronic, Novartis, and St. Jude Medical.

Manuscript received August 10, 2017; accepted August 18, 2017.

studies have with few exceptions not observed benefits associated with the use of neurohormonal antagonists once the EF is >40% (3). Thus, there is not a sufficient evidence base and no current guideline recommendations to extend the use of therapies proven in patients with EF of ≤35% or ≤40% to those expressly with EF of >40% as a treatment for HF (1,4).

Based on the totality of available data, EF-based classification of HF was further refined, and an intermediate EF group, HF with borderline EF (HFbEF), was added to the 2013 the American College of Cardiology/American Heart Association HF guidelines. This group was defined by the presence of the typical symptoms of HF and EF of 41% to 49% (1). Following suit in 2016, the European Society of Cardiology specified HF with mid-range EF (HFmrEF) of 40% to 49% (4). It has also been recognized that there is a cohort of patients who present with HF with EF of ≤40%, whose EF subsequently improves. These patients with improved or recovered EF appear to be clinically distinct from patients with persistently reduced, borderline, or preserved EF and have a much better prognosis (1). A distinct classification was provided for these patients in the 2013 guidelines as well (1). Since these guidelines have been published, there has been ongoing debate as to whether these refined EF classifications are helpful or merely creating arbitrary distinctions. This debate notwithstanding, these refined classifications have fostered new studies that are improving the understanding of the causes, phenotypes, pathophysiologies, and prognoses in these patients. For example, a recent study of biomarker profiles analyzing 37 biomarkers from different pathophysiologic domains (myocardial stretch, inflammation, angiogenesis, oxidative stress, and hematopoiesis) found that patients with HFmrEF had an intermediate biomarker profile with interactions between both cardiac stretch and inflammation makers, whereas HFrEF profiles were mainly related to stretch and HFpEF to inflammation (5). These findings suggested that patients with HFmrEF may be a mixture of HFrEF and HFpEF patients (5). Biomarker-based profiling could potentially be used to identify the subset of patients who, despite having EF of >40%, could benefit from those therapies that benefit HFrEF patients.

There are certainly limitations to an HF classification system based on EF alone, and more detailed phenotyping may help to better characterize patients; provide greater prognostic discrimination; allow for more precise targeting of therapies to patients who will derive benefit; and facilitate the discovery of new, more effective treatments. Further research may establish the fact that there is a subset of patients with HF with EF of 41% to 49% who will benefit from therapies demonstrated to improve outcomes in patients with HF with EF of ≤40% (3). Whether this refined EF classification approach adopted in recent versions of the guidelines best serves the needs of patients, helps to advance the field, or needs to be further updated remains to be determined. However, the enduring value of EF for classifying and managing HF is something that physicians, no matter what their specialty, should be able to appreciate.

**ADDRESS FOR CORRESPONDENCE:** Dr. Gregg C. Fonarow, Ahmanson-UCLA Cardiomyopathy Center, Ronald Reagan UCLA Medical Center, 10833 LeConte Avenue, Room A2-237 CHS, Los Angeles, California 90095-1679. E-mail: gfonarow@mednet.ucla.edu.

**REFERENCES**

**1.** Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.

**2.** Burkoff D, Maurer MS, Packer M. Heart failure with a normal ejection fraction: is it really a disorder of diastolic function? Circulation 2003;107:656-8.

**3.** Hsu JJ, Ziaeian B, Fonarow GC. Heart failure with mid-range (borderline) ejection fraction: clinical implications and future directions. J Am Coll Cardiol HF 2017. In press.

**4.** Ponikowski P, Voors AA, Anker SD, et al. 2016 ESC guidelines for the diagnosis and treatment of acute and chronic heart failure: the Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC) developed with the special contribution of the Heart Failure Association (HFA) of the ESC. Eur Heart J 2016;37:2129-200.

**5.** Tromp J, Khan MAF, Mentz RJ, O'Connor CM, et al. Biomarker profiles of acute heart failure patients with a mid-range ejection fraction. J Am Coll Cardiol HF 2017;5:507-17.

**KEY WORDS** epidemiology, heart failure with borderline ejection fraction (HFbEF), heart failure with mid-range ejection fraction (HFmrEF), heart failure with preserved ejection fraction (HFpEF), outcomes

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** January 8, 2020

**DELIVER TO:** Claims Shared Services
ATTN: Document Request
The Lincoln National Life Insurance Company

**FACSIMILE NO.:** 402-361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy Number: 00001004922000000
Claim Number: 1150128075

TOTAL NUMBER OF PAGES (INCLUDING COVER): 111

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4849-6532-7966, v. 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901 525 1322 F 901 525 2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

January 8, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter as Mr. Carter's second level appeal of Lincoln's decision to deny long term disability benefits beyond October 30, 2018. We disagree with Lincoln's determination that Mr. Carter is able to perform the main duties of any gainful occupation for which his is qualified as set forth in Lincoln's July 12, 2019 letter detailing its review of Mr. Carter's first level appeal. Lincoln cites two reports prepared by medical reviewers as the basis for its determination; however, these reports fail to address significant portions of Mr. Carter's medical records and misstate the findings of his treating physician in material respects. In addition, Mr. Carter's additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work.

Mr. Carter's medical file and the opinion of his treating cardiologist contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve. I have attached hereto additional medical records of Lee E. Faulkner, MD, the cardiologist who has treated Mr. Carter since 2004. *See collective Exhibit "A" hereto.* Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019.

For example:

1. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling,

---

grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong. (*October 3, 2018, Physician's Statement attached hereto as Exhibit "B"*).

2. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%). (*September 4, 2018, Attending Physician's Statement attached hereto as Exhibit "C"*).

3. On June 2, 2017, Dr. Faulkner opined Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger or handle. (*June 2, 2017, Attending Physician's Statement attached hereto as Exhibit "D"*).

4. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%). (*November 21, 2016, Attending Physician's Statement attached hereto as Exhibit "E"*).

Dr. Faulkner has consistently opined (and communicated these opinions to Lincoln) that Mr. Carter is totally disabled and cannot perform sedentary work. His office notes of November 1, 2018, among others, provide that Mr. Carter has problems standing and frequently has dizzy spells. Mr. Carter's condition is chronic and worsening. Accommodations at work will not help. He simply cannot work or he risks heart failure. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

We disagree with Lincoln's conclusion that no objective findings exist to support Mr. Carter's documented diagnosis of cardiomyopathy or heart failure with a secondary diagnosis of hypertension. On November 1, 2018, Dr. Faulkner performed an echocardiogram on Mr. Carter and determined that Mr. Carter has a severely depressed left ventricular systolic function with an ejection fraction of 20–25% and nonsustained ventricular tachycardia. Dr. Faulkner further determined that Mr. Carter has posterior wall akinesis and that his left atrium chamber is enlarged in size. Mr. Carter has had and continues to have documented symptoms of dizziness, shortness of breath, and chest pain.

Lincoln opines that Mr. Carter's symptoms and Dr. Faulkner's physical findings regarding his condition are not consistent with Dr. Faulkner's opinion that he cannot perform sedentary work. In Lincoln's July 12, 2019 letter, it relies upon notes from Dr. Faulkner's file stating, "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Lincoln's conclusions here are disingenuous and tantamount to cherry picking statements from medical records to rebut Dr. Faulkner's actual findings, conclusions, and diagnoses. Dr. Faulkner's physical examination of Mr. Carter and review of his symptoms notes are consistent with and support his medical opinion that Mr. Carter cannot perform sedentary work. A review of symptoms encompasses multiple areas of the body,

---

assessing the symptoms presented at that time of the examination and also considers the physical restrictions and limitations of that particular patient. It is not a measure of Mr. Carter's ability to perform the full-time duties of a sedentary occupation nor do the review of symptoms notes accurately assess the reasons for Mr. Carter's visits. For Lincoln to base a file review examination solely on review of symptoms notes is very narrow and inaccurate. Simply because on a certain day (appointment) Dr. Faulkner notes that Mr. Carter is not experiencing chest pain or dizziness at that moment does not alter or change Dr. Faulkner's opinion that he suffers from severely depressed left ventricular systolic function with an ejection fraction of 20–25%. Dr. Faulkner's opinion is based upon objective findings and the multiple echocardiograms he has performed on Mr. Carter over the course of over 14 years of treatment. Simply because Mr. Carter has a good day or week does not mean that his conditions are improved. If he exerts himself, he is symptomatic, which is why he cannot perform even sedentary work.

In addition, the opinions of Lincoln's medical reviewers do not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concludes that Mr. Carter is "capable of full time work based on the available data, but only in sedentary capacity, with **no walking**, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provides: "[T]he claimant can do sedentary work with **no walking**, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

Sedentary work as defined by the DOT requires walking occasionally (activity or condition exists up to 1/3 of the time); therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*See Dictionary of Occupational Titles info attached hereto as Exhibit "F"*). Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require walking or standing occasionally, up to 1/3 of a work day. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

Mr. Carter suffers from dyspnea on exertion and has a New York Heart Association Functional class III. The NYHA Functional Classification for this level of heart failure is described as moderate and defined as marked or noticeable limitation of physical activity, comfortable at rest, but less than

---

ordinary physical activity causes tiredness, heart palpations, or shortness of breath. *See attached medical journal articles for more information on this NYHA Functional Class III.*

As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

We request up to, and until February 15, 2020, within which to submit all documents and information relevant to Mr. Carter's appeal. This should provide enough time to allow Lincoln to identify the records it believes are not included and for us to obtain them. In addition, please provide the identity and curriculum vitae of the medical reviewers that authored the October 26, 2018 December 5, 2018, and May 28, 2109 reports. Please also describe each reviewer's business relationship with Lincoln and compensation arrangement as well as a copy of their bills for services rendered in this matter.

For the above reasons, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

January 8, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter as Mr. Carter's second level appeal of Lincoln's decision to deny long term disability benefits beyond October 30, 2018. We disagree with Lincoln's determination that Mr. Carter is able to perform the main duties of any gainful occupation for which his is qualified as set forth in Lincoln's July 12, 2019 letter detailing its review of Mr. Carter's first level appeal. Lincoln cites two reports prepared by medical reviewers as the basis for its determination; however, these reports fail to address significant portions of Mr. Carter's medical records and misstate the findings of his treating physician in material respects. In addition, Mr. Carter's additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work.

Mr. Carter's medical file and the opinion of his treating cardiologist contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve. I have attached hereto additional medical records of Lee E. Faulkner, MD, the cardiologist who has treated Mr. Carter since 2004. *See collective Exhibit "A" hereto.* Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019.

For example:

1. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling,

grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong. (*October 3, 2018, Physician's Statement attached hereto as Exhibit "B"*).

2. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%). (*September 4, 2018, Attending Physician's Statement attached hereto as Exhibit "C"*).

3. On June 2, 2017, Dr. Faulkner opined Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger or handle. (*June 2, 2017, Attending Physician's Statement attached hereto as Exhibit "D"*).

4. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%). (*November 21, 2016, Attending Physician's Statement attached hereto as Exhibit "E"*).

Dr. Faulkner has consistently opined (and communicated these opinions to Lincoln) that Mr. Carter is totally disabled and cannot perform sedentary work. His office notes of November 1, 2018, among others, provide that Mr. Carter has problems standing and frequently has dizzy spells. Mr. Carter's condition is chronic and worsening. Accommodations at work will not help. He simply cannot work or he risks heart failure. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

We disagree with Lincoln's conclusion that no objective findings exist to support Mr. Carter's documented diagnosis of cardiomyopathy or heart failure with a secondary diagnosis of hypertension. On November 1, 2018, Dr. Faulkner performed an echocardiogram on Mr. Carter and determined that Mr. Carter has a severely depressed left ventricular systolic function with an ejection fraction of 20–25% and nonsustained ventricular tachycardia. Dr. Faulkner further determined that Mr. Carter has posterior wall akinesis and that his left atrium chamber is enlarged in size. Mr. Carter has had and continues to have documented symptoms of dizziness, shortness of breath, and chest pain.

Lincoln opines that Mr. Carter's symptoms and Dr. Faulkner's physical findings regarding his condition are not consistent with Dr. Faulkner's opinion that he cannot perform sedentary work. In Lincoln's July 12, 2019 letter, it relies upon notes from Dr. Faulkner's file stating, "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Lincoln's conclusions here are disingenuous and tantamount to cherry picking statements from medical records to rebut Dr. Faulkner's actual findings, conclusions, and diagnoses. Dr. Faulkner's physical examination of Mr. Carter and review of his symptoms notes are consistent with and support his medical opinion that Mr. Carter cannot perform sedentary work. A review of symptoms encompasses multiple areas of the body,

assessing the symptoms presented at that time of the examination and also considers the physical restrictions and limitations of that particular patient. It is not a measure of Mr. Carter's ability to perform the full-time duties of a sedentary occupation nor do the review of symptoms notes accurately assess the reasons for Mr. Carter's visits. For Lincoln to base a file review examination solely on review of symptoms notes is very narrow and inaccurate. Simply because on a certain day (appointment) Dr. Faulkner notes that Mr. Carter is not experiencing chest pain or dizziness at that moment does not alter or change Dr. Faulkner's opinion that he suffers from severely depressed left ventricular systolic function with an ejection fraction of 20–25%. Dr. Faulkner's opinion is based upon objective findings and the multiple echocardiograms he has performed on Mr. Carter over the course of over 14 years of treatment. Simply because Mr. Carter has a good day or week does not mean that his conditions are improved. If he exerts himself, he is symptomatic, which is why he cannot perform even sedentary work.

In addition, the opinions of Lincoln's medical reviewers do not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concludes that Mr. Carter is "capable of full time work based on the available data, but only in sedentary capacity, with **no walking**, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provides: "[T]he claimant can do sedentary work with **no walking**, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

Sedentary work as defined by the DOT requires walking occasionally (activity or condition exists up to 1/3 of the time); therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*See Dictionary of Occupational Titles info attached hereto as Exhibit "F"*). Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require walking or standing occasionally, up to 1/3 of a work day. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

Mr. Carter suffers from dyspnea on exertion and has a New York Heart Association Functional class III. The NYHA Functional Classification for this level of heart failure is described as moderate and defined as marked or noticeable limitation of physical activity, comfortable at rest, but less than

---

ordinary physical activity causes tiredness, heart palpations, or shortness of breath. *See attached medical journal articles for more information on this NYHA Functional Class III.*

As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

We request up to, and until February 15, 2020, within which to submit all documents and information relevant to Mr. Carter's appeal. This should provide enough time to allow Lincoln to identify the records it believes are not included and for us to obtain them. In addition, please provide the identity and curriculum vitae of the medical reviewers that authored the October 26, 2018 December 5, 2018, and May 28, 2109 reports. Please also describe each reviewer's business relationship with Lincoln and compensation arrangement as well as a copy of their bills for services rendered in this matter.

For the above reasons, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Date:** 02/06/19 : 09:27am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 02/06/19
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/90
Height: 6', Weight: 215 lbs
BMI: 29.16 kg/m2

**Subjective:**
This 52 year old male presents for follow up visit. He denies chest pain and has had no shortness. He complains of an episode of chest tightness after lifting items. He is here for interrogation of his Single chamber AICD .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**AICD interrogation** - Single chamber ICD. SVT nonsustained

**Plan:**

Continue current medication(s) at same dose

**Follow-up:** 6 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

EXHIBIT
A

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Procedure:** Office Visit Level 4 : 99214

# SIGNED BY Lee E Faulkner, MD (LF) 02/06/2019 09:52AM

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:** (
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 11/01/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 130/80
Height 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**ECHO** - Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan:**

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Follow-up:** 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**:
**AICD interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

04/03/2017

---

**Date:** 04/03/17 : 04:04pm
**Title:** FOLLOW UP OFFICE VISIT

**Date**: 04/03/17
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 140/70

**Subjective**:
This 50 year old male presents for follow up visit. He denies chest pain and has had no shortness of breath.

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data**: Interrogation of AICD -Non sustained V tach

EKG - Sinus bradycardia rate 59, Nonspecific Twave abnormality

**Plan**:
Interrogation of AICD (complete)

Continue current medication(s)

**Follow-up**: 3 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

**Visit Time**: 30

**Procedure:** Office Visit Level 4 : 99214

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 Fax: (901) 682-7243

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 11/01/2018
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 25%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

Aortic Root: Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

Lee E. Faulkner M.D./LB

ID:CA1967
Name:Carter Sherman
Sex:Male Birth Date:Jan 15 1967 51 Years
inch lb mmHg
Medication:
Symptoms:
History:

Nov 1 2018 8:06 AM

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11)
4564 Twave abnormality, possible lateral Ischemia
(negative T (V1, V5))
9150 ** abnormal ECG **

| | | | | |
|---|---|---|---|---|
| Vent rate | | 76 | bpm |
| PR int | | 184 | ms |
| QRS dur | | 104 | ms |
| QT QTc int | 388 | 418 | ms |
| P QRS T axis | 50 | 2 40 | |
| RV5 SV1 amp | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | 2.910 | mV |

Unconfirmed Report
Reviewed by: [signature]




1350A 05 05 03 05 Dept.: Exam:

Name:Carter Sherman ID:(illegible) Jul 30, 2018 1:01 PM
Sex:Male Birth date: years
inch lb mmHg
Medication 1:
Medication 2:
Room No.

1100 Sinus rhythm
R0C8 Nonspecific T wave abnormality
9150 ** borderline ECG **

Vent. rate 60 bpm
PR int. 158 ms
QRS dur. 102 ms
QT/QTc int. 404 407 ms
P/QRS/T axis 45 50 22
RV5/SV1 amp. 1.870 0.995 mV
RV5+SV1 amp. 2.865 mV

d62

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz H 60 d 10 mm/mV 10 mm/mV 10 mm/mV



# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/24/2004 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 40%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/24/04 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Tricuspid Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/18/2005 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 50% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/18/05 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Mild global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace mitral regurgitation, and trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Mitral Regurgitation
4. Trace Tricuspid Regurgitation

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 50% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/10/06 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/12/07 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global Hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Global Hypokinesis
3. Mild Mitral Regurgitation

____________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 09/24/2004
**Race:** African American

### HISTORY and PHYSICAL

**HISTORY OF PRESENT ILLNESS:** Sherman Carter is a 37y/o African American gentleman who reports to our office for cardiac evaluation. Patient complains of chest pains. Patient reports that he has sharp chest pain on left side while radiating to back. Patient has no associated symptoms that has occurred with chest pain. Patient states that the chest pain experienced six days ago, was aggravated with sudden movement or change in position. Patient denies any shortness of breath, nausea, vomiting, dizziness or edema.

**PAST MEDICAL HISTORY:** Chest Pain

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did Not Bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 09/24/2004 H&P cont.

**PHYSICAL EXAMINATION: BP:** 122/88

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy
2. Mitral Regurgitation
3. Pre Hypertension

**PLAN:**

1. ECHO-today
2. EKG-today

____________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/24/2004
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 37-year old African American gentleman who presents to our office for a follow up visit for elevated blood pressure. Patient reports that he had migraines earlier this week. Patient takes medications to resolve issue. Patient states no complaints of shortness of breath, chest pain, nausea, vomiting or edema.

**Vitals:** **BP:** 122/88

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy

**PLAN:**

1. Follow up in 4 months

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/7/2005 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 37 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of short pain to left anterior chest. The pain occurs occasionally during high stress time. Episodes usually last a few seconds then subsides. He reports no other complaints at this time. He denies any headaches, dizziness, and chest pain, shortness of breath, nausea, dementia, diarrhea, or constipation.

**BP:** 135/72
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. MR
3. TR

**PLAN:**
1. Alcohol Cessation
2. Follow up in 4 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/6/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter states that he has been feeling good since his last visit. He reports no complaints at this time. He denies any palpitations, chest pain, shortness of breath, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 152/90
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Cardiomyopathy
3. Hypertension

**PLAN:**
1. Current Cardiac Care
2. ETOH Cessation encouraged
3. Follow up in 2 months

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:** :
**Sex:** Male

**Referred By:**
**Date:** 7/10/2006
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter complains of occasional shortness of breath. He states that he has been doing ok and reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 100/60
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter reports one episode of shortness of breath but reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 136/88
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Current Cardiac Care
2. Follow up in 6 months

_______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 4/3/2009
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 42 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter states that he has had some mild chest pain. He reports no other complaints at this time. He denies any palpitations, shortness of breath, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 140/70
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. EKG/ECHO

Lee E. Faulkner M.D.

Lee Edwin Faulkner, M.D.
Physicians of Hearts, P.L.L.C.
CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/12/2011 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION: 46%**
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/12/11 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals no abnormalities.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 46%
2. Left Ventricle Enlargement
3. Right Ventricle Enlargement

Lee E. Faulkner M.D.

Lee Edwin Faulkner, M.D.
Physicians of Hearts, P.L.L.C.
CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred By:**
**Date:** 10/19/2012
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 55%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 55%
2. Left Ventricular Enlargement
3. Mild Tricuspid Regurgitation
4. Mild Mitral Regurgitation

Lee E. Faulkner M.D.

Lee Edwin Faulkner, M.D.
Physicians of Hearts, P.L.L.C.
CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred By:**
**Date:** 12/10/2012
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 45%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is enlarged in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 45%
2. Left Ventricular Enlargement
3. Global Hypokinesis
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 20%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/4/15 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Severe global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 pulmonary insufficiency.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 20%
2. Left Ventricle Enlargement
3. Severe Global Hypokinesis
4. Mild Mitral Regurgitation
5. Mild Pulmonary Insufficiency

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 07/21/2016
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 20%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 07/21/2016 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall abnormality appreciated.

**Doppler:** Interrogation of the valvular apparatus reveals mild mitral regurgitation.

**SUMMARY:**

1. severely depressed left ventricular systolic function with an ejection fraction of 20%.
2. Left Ventricular Chamber enlarged in size
3. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of chest pain when lifting things, shortness of breath on exertion, edema in hands and some numbness. He also reports occasional dizziness. He reports no other complaints at this time. He denies any nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 130/74
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Dyspnea
3. Gouty Arthritis

**PLAN:**
1. ETOH Restriction
2. Treadmill Thallium Stress Test

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, vomiting, dizziness, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 132/80
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE
**Data:** Stress test negative for ischemia

**IMPRESSION:**
1. Hypertension
2. Gouty Arthritis

**PLAN:**
1. ECHO due to reduction in EF as reported by stress test
2. Follow up in 1 month

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac clearance for left hip replacement. Mr. Carter complains of chest pain on the left side of his chest while laying down, states this last a few minutes. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:**

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

**PHYSICAL EXAMINATION: BP:** 140/90 **HT:** 6'0" **WT:** 209lbs

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Severe cardiomyopathy, worse since last visit
2. Hypertension-blood pressure elevated

**PLAN:**

1. AICD Referral

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/30/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for hip surgery. Mr. Carter complains of chest pain but states that they are becoming better. He states that Dr. Lan did prescribe him medication to strengthen his heart. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 10/30/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 170/120

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Hypertension-blood pressure controlled
3. Severe Dilated Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 2 weeks to re-check blood pressure
3. Patient has a follow up appointment on November 10, 2015 and will be re-evaluated at that time

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 11/10/2015 |
| **Sex:** Male | **Race:** African American |

## History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for left hip replacement. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, dizziness, vomiting, palpitations, orthopnea, paroxysmal nocturnal dyspnea and/or edema.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 11/10/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 130/90

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 3 months

______________________________

Lee E. Faulkner M.D.

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals:** **BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

__________________________
Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/21/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain on left side of chest while doing yard work. Patient also complains of shortness of breath when outside , that lasts 10-15 minutes. Patient states no complaints of chest pain, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 138/96

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy

**PLAN:**

1. Continue Current Cardiac Care

______________________
Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient states that he is chest pain free. Patient states no complaints of chest pain, shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. Degenerative Joint Disease of Hip

**PLAN:**

1. ETOH Cessation
2. Follow Up in 6 Months

Lee E. Faulkner M.D./LB

CARTER, SHERMAN    ID: 000002996    24-Sep-2004    10:37:06

37 years
Male    Black

| | |
|---|---|
| Vent. rate | 65 bpm |
| PR interval | 138 ms |
| QRS duration | 94 ms |
| QT/QTc | 408/424 ms |
| P-R-T axes | 46 86 16 |

Normal sinus rhythm with sinus arrhythmia
Normal ECG

Technician: AF
Test ind:

Referred by: LEF

Unconfirmed




160 Hz    25.0 mm/s    10.0 mm/mV    4 by 2.5s + 3 rhythm lds    MAC 8 001F    12SL™ v250

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**: 01/15/67
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

Physicians of Hearts
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 11/01/2018
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**
**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 25%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Akinesis
4. Moderate Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

______________________________

Lee E. Faulkner M.D./LB

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

04/03/2017

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# SAINT FRANCIS HOSPITAL-MEMPHIS
## TREADMILL/STRESS

MR#: 1037968SFH

**NAME:** CARTER, SHERMAN
**ENCOUNTER NUMBER:** 34017913SFH
**ROOM NUMBER:**
**DATE OF BIRTH:**
**READING PHYSICIAN:** ANTONIO C. QUIROZ, MD
**PHYSICIAN:** LEE E FAULKNER

HISTORY OF PRESENT ILLNESS: A 45-year-old male, height 6 feet, weight 190 pounds. Patient has hypertension and has been having some chest pains.

MEDICATIONS: Include ramipril and digoxin.

INTERPRETATION. Baseline EKG shows sinus rhythm with a rate of 52 beats per minute and nonspecific ST-T abnormalities. Patient exercised 11 minutes on the standard Bruce protocol achieving 13.1 METS of workload. Exercise was stopped because of fatigue. There was no chest pain. Heart rate increased from 52-157, which is 90% of the age-predicted maximal heart rate. Blood pressure increased from 143/83-180/110 for a double product of 28,260. Cardiolite was injected approximately 1 minute prior to stopping the exercise. There were no significant ST-segment depressions, no arrhythmias. One isolated PVC was noted during the exercise. There was normalization of the T-waves during and after the exercise.

CONCLUSIONS: Negative for ischemia by EKG criteria.

Nuclear imaging interpretation will be dictated separately. Hypertensive response to exercise.

ANTONIO C. QUIROZ, MD

TIME: ____________
DATE: ____________

D: 11/26/2012 09:53 CST
T: 11/26/2012 10:34 CST
R:
Job#: 252986
D#: 7926695/FI

SAINT FRANCIS HOSPITAL
5959 PARK AVENUE
MEMPHIS, TN 38119

Name: CARTER, SHERMAN
MRN: 001037868
ACCT: 034017913

ANDREW T. WATSON, MD
ADM: 11/26/2012

Diagnostic Imaging

DATE OF EVALUATION: 11/26/2012

REFERRING PHYSICIAN: Lee Faulkner, M.D.

REASON FOR EVALUATION: Chest pain.

BRIEF HISTORY OF PRESENT ILLNESS: A 45-year-old African-American male who presents for evaluation with prior history of hypertension, no known coronary artery disease.

DESCRIPTION OF PROCEDURE: After obtaining written informed consent, patient underwent a Bruce protocol stress evaluation. Total exercise time was 11 minutes. Total METs obtained was 13.1.

This was a 1-day study. Rest images obtained using 3.1 mCi thallium to 1 stress image obtained using 30.2 mCi sestamibi technetium-99. Rest and stress images were compared.

Short axis, vertical long axis, horizontal long axis images appear to be well perfused and well matched. There is evidence of apical thinning. Otherwise, there is no evidence of overt segmental wall ischemia. Myocardial perfusion bull's eye map confirms the above finding. Myocardial perfusion gated study demonstrates mild-to-moderate global hypokinesis, ejection fraction calculated at 35%. Raw data cine analysis demonstrates no significant motion or other artifacts present.

OVERALL IMPRESSION: Abnormal Bruce protocol Cardiolite examination demonstrating no evidence of ischemia and ejection fraction estimated at 35%.

ANDREW T. WATSON, MD

Date: ________ and Time: ________

TR:ATW/SN
DD:11/26/2012 16:23 CST
DT:11/26/2012 19:00 CST
Dictation ID: 7930950/Confirmation #: 253112

Work Type: Diagnostic Imaging
T001

Work Type Code: DGI
Page: 1

PRINTED BY: PDacus

DATE 12/10/2012

12/10/2012 13:11 901-765-3133 ST FRANCIS H I M PAGE 02/02

2009 Oct-09 08:51 AM Central Scheduling 9017653296 1/2

Saint Francis Hospital
Memphis

1000-52

| DATE | TIME | PHYSICIAN'S ORDERS | DATE | TIME | PROGRESS RECORD |
|---|---|---|---|---|---|
| 11-9-12 | | Treadmill Thallium Stress Test<br>Dia. Chest Pain<br>Date - 11-19-12<br>Time - 8:30<br>Arrival - 8:00<br>No Precert Required per Tiwana @ United Healthcare 10 25 12<br>Height - 6'<br>Weight<br>Physician's Signature: Lee E Faulkner MD<br>Date: ______ Time: ______ | | | |

Medications dispensed in accordance with the hospital formulary system

Carter, Sherman

MR# DOB:

PHYSICIAN ORDERS/PROGRESS RECORDS

R8/07

Nov- 1 2018 8:06 AM

ID:CA1967
Name:Carter Sherman
Sex:Male Birth Date:Jan 15 1967 51 Years
inch lb mmHg
Medication:
Symptoms:
History:

| | | |
|---|---|---|
| Vent rate | 76 | BPM |
| PR int | 184 | ms |
| QRS dur | 104 | ms |
| QT/QTc int | 388 418 | ms |
| P-QRS-T axis | 30 2 40 | |
| RV5/SV1 amp | 2.155 0.755 | mV |
| RV5+SV1 amp | 2.910 | mV |

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
(wide QRS dur; ectopic beat with shortened PR
int. (beat 3, 6, 11))
1561 T wave abnormality, possible lateral ischemia
(negative T (V4, V5))
9190 ** abnormal ECG **

Unconfirmed Report
Reviewed by: [signature] Faulkner

10 mm/mV 25 mm/s Filter: 80.0 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




1350A 05 05 03 05 Dept : Exam:

Name: Carter Sherman

Sex: Male Birth date:

inch 16 lbs

Medication 1:

Medication 2:

Room No.

Jul 16, 2012 1:01 PM 59 bpm

1100 Sinus rhythm

1068 Nonspecific T wave abnormality

9130 ** borderline ECG **

Unconfirmed Report

Reviewed by:

| | | | |
|---|---|---|---|
| Vent. | rate | | 60 bpm |
| PR | int. | | 158 ms |
| QRS | dur. | | 102 ms |
| QT/QTc | int. | 401 | 407 ms |
| P-QRS-T | axis | 45 30 | 22 |
| RV5/SV1 | amp. | 1.870 | 0.995 mV |
| RV5+SV1 | amp. | | 2.865 mV |

10 mm/mV 25 mm/s Filter 100 Hz 0.50 d 10 mm/mV 10 mm/mV 10 mm/mV



REF #3043267

Lincoln Financial Group

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

EXHIBIT B

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

Indicate frequency per day the listed activities below can be used performed using:
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A
What job modifications would allow the patient to return to work?

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

## Activities of Daily Living

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

N/A

Continence ___/___/______

Dressing ___/___/______

Transferring ___/___/______

Bathing ___/___/______

Toileting ___/___/______

Eating ___/___/______

Date patient experienced loss of Cognitive Functioning: ___/___/______

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

___/___/______ to ___/___/______

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

901-682-7241
Phone Number

901-682-7243
Fax Number

[signature] Lee E. Faulkner MD
Signature

___/___/___
Date

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Claim Submission Part 2 of 2
GLC11750LTD-C

0000032/ LFPESRD1 00000982

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

## GROUP CONTINUANCE OF DISABILITY
## (PLEASE see FRAUD NOTICES attached)

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis/Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 23, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical - Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments: ______
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation.
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (circled) Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed [signature] MD (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

00003315 LFPH3GD1 00000970

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450PTO

EXHIBIT C

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 4/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.3

REF #1989621

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

EXHIBIT D

00000012 LFPV6UT1 00000109

# ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by ________________ )

Claim No: 1150128075 Policy No: 00001004922000000

Name of Patient: Date of Birth:

Sherman Carter

When did symptoms first appear or accident happen?

Has patient ever had same or similar condition? Yes No If yes, state when and describe.

(a) Diagnosis (including ICD Code(s)) Cardiomyopathy

(b) Subjective Findings Worsening Dyspnea

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

(a) Date of First visit Sept. 25, 2005 (b) Date of Last visit April 3, 2017 (c) Frequency of visits Weekly Monthly Other (specify) Q 2 to 6 months or more

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)

Class 2 - Medium manual activity* (15-30%)

Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)

✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

(b) Mental Impairments (if applicable)

(a) Please define "stress" as it applies to this claimant.

(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)

Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)

Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)

Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)

Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)

Class 1 (No limitation) Class 2 (Slight limitation)

Class 3 (Marked limitation) Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 140/70 systolic/diastolic

Has patient Recovered? Improved? Unchanged? Retrogressed? Worsening

(b) Has patient been hospital confined? Yes No Delete
If Yes, give Name and Address of Hospital

Confined from ____________ to ____________
Several Hospitalizations over the years



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450 ATTPHYSTM

PAGE 4/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/9 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job (Yes) No
Any other work (Yes) No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months (Never)
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received

- Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
- Dressing ________ (putting on, taking off garmets, braces or any artificial limbs normally worn)
- Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
- Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
- Continence ________ (voluntarily maintaining control of bladder and bowel function)
- Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ________
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner Degree: MD Telephone Number

Street Address City or Town State: TN Zip Code

Signature (By Physician): Lee E Faulkner, MD Date: 5/29/17

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 3/005 Fax Server

901-682-7243 p.2

Jun 02 17 11:55a Physicians of Hearts

REF #1989621

Lincoln Financial Group®

Please Return Response To:
The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765

## ABILITIES FORM

Date of Birth: ______

Patient Name: Sherman Carter

Claim Number: 1150128075

Occupation: ______

Date of Next Office Visit: ______

Date of Last Office Visit: April 3, 2017

☐ The patient does not have functional/limitations or restrictions

Provider's Signature: Lee E Faulkner, MD

Date: ______

Degree: ☒ MD ☐ DO Other ______

Provider Printed Name: Lee E Faulkner, MD

Phone: ______

Specialty: Cardiology

OR

☐ The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | ✓ LF | ✓ | | |
| 11 - 20 lbs. | ✓ | | | |
| 21 - 35 lbs. | ✓ | | | |
| 36 - 50 lbs. | ✓ | | | |
| 51 - 100 lbs. | ✓ | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | | |
| Stand | | | | | |
| Walk | | | | | |
| Climb | | | | | |
| Bend | | | | | |
| Kneel | | | | | |
| Drive | | | | | R / L / Both |
| Finger | | | | | R / L / Both |
| Handle | | | | | R / L / Both |
| Operate Foot Controls | | | | | R / L / Both |
| Reach above the shoulder | | | | | |

N/A

Are there environmental factors that the patient should avoid? ☐Yes ☐No Specify: ______

Specific Limitations or Restrictions not noted above: No lifting or straining what so ever as his condition is worsening over time

The above statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud and Warning Statements.

Provider's Signature: Lee E Faulkner MD

Date: 5/24/17

Provider Printed Name: Lee E. Faulkner, MD

Degree: ☒ MD ☐ DO Other ______

Phone: 901 682-7241

Specialty: Cardiology

Address: 6005 Park Ave Ste 702 Memphis, TN 38119

Page 1 of 1
3/13

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLA10631

00000012 LFPV6UT1 00000106

PAGE 3/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/9 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

LFG Omaha Fax 11/7/2016 1:50:51 PM PAGE 4/007 Fax Server

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BARDETT LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept 25, 2005
   b) Date of Most Recent Treatment Sept 29, 2016
   c) Frequency of Treatments Q 2 to 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
   If the patient is still disabled, when should the patient be able to return to work? unknown
5. Remarks or Comments: Medical therapy for now.
6. List Restrictions and Limitations: Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   ✓ Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 11/24/16 (Month Day Year) Signed N Lee E Faulkner MD (Attending Physician, No Stamps, please) Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN
Phone Number 901-682-7241
Fax Number 901-682-7243



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450PTD

EXHIBIT E

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765
www.LincolnFinancial.com

Lincoln
Financial Group®

# ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by_______________ )

Claim No: 1150128075 Policy No: 000010049220000000

Date of Birth:

Name of Patient:

Sherman Carter

When did symptoms first appear or accident happen? Aug 2015

Has patient ever had same or similar condition? Yes (No) If yes, state when and describe.

(a) Diagnosis (including ICD Code(s))

(b) Subjective Findings

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

Severely depressed EF of 20% by Echocardiogram

(a) Date of First visit Sept 25, 2005

(b) Date of Last visit July 15, 2016

(c) Frequency of visits
Weekly
Monthly
✓ Other (specify) every 2-3 months

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)

Class 2 - Medium manual activity* (15-30%)

*Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)*

✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

*(b) Mental Impairments (if applicable)*

(a) Please define "stress" as it applies to this claimant.

(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)

Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)

Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)

Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)

Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)

*Class 1 (No limitation)* *Class 2 (Slight limitation)*

Class 3 (Marked limitation) ✓ Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 120/80 *systolic/diastolic*

Has patient Recovered? Improved? ✓ Unchanged? Retrogressed?

(b) Has patient been hospital confined? Yes (No)

If Yes, give Name and Address of Hospital

Confined from __________ to __________



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450 ATTPHYSTM

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes (No) If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received
Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
Continence ________ (voluntarily maintaining control of bladder and bowel function)
Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?
(b) Can present job be modified to allow for handling with impairment? Yes (No)
(c) When could patient return to work? unknown
Patient's Job Full-time Part-time
Any other Work Full-time Part-time
Restrictions and Limitations Medical Therapy for now

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner, MD
Degree: Medical Doctor
Telephone Number: 901-682-7241
Street Address: 6005 Park Ave Ste 702
City or Town: Mphs
State: TN
Zip Code: 38119
Signature (By Physician): Lee E Faulkner, MD
Date

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Carter, Sherman
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman present for follow up visit. Mr. Carter states that he is chest pain free. He has no complaints of vomiting, dizziness, palpitation, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals: BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Hypertension
2. Alcoholism
3. DJD of Hip

**PLAN:**
1. ETOH cessation
2. Follow up in 6 months

Lee E. Faulkner MD

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male
**Referred by:**
**Date:** 7/5/2016
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman who is present today for a follow up visit. Mr. Carter complains of chest pain in the middle of his chest with activity, states this last 10 minutes. He reports no other complaints at this time. He denies any shortness of breath, dizziness, palpitations, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** BP: 120/80 **HT:** 6'1" **WT:** 212lbs

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis, edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy (Non-Ischemic)

**PLAN:**

1. Current Cardiac Care

Lee E. Faulkner M.D.




## Dictionary Of Occupational Titles
## Appendix C: Components of the Definition Trailer

APPENDIX C

COMPONENTS OF THE DEFINITION TRAILER

I. DATE OF LAST UPDATE (DLU)

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

The following descriptions of the components of the Definition Trailer are in inverse order to their placement in the trailer.

I. DATE OF LAST UPDATE (DLU)

Listed as the final element in the trailer following the definition, the Date of Last Update indicates the last year in which material was gathered for that occupation. A DLU of ``77" would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977.

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

EXHIBIT F

The following is an explanation of the various levels of specific vocational preparation:

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Note: The levels of this scale are mutually exclusive and do not overlap.

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

Scale of General Education Development (GED)

06 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

06 MATHEMATICAL DEVELOPMENT

Advanced calculus:

Work with limits, continuity, real number systems, mean value theorems, and implicit functions theorems.

Modern Algebra:

Apply fundamental concepts of theories of groups, rings, and fields. Work with differential equations, linear algebra, infinite series, advanced operations methods, and functions of real and complex variables.

Statistics:

Work with mathematical statistics, mathematical probability and applications, experimental design, statistical inference, and econometrics.

06 LANGUAGE DEVELOPMENT

Same as Level 5.

05 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables. 05 MATHEMATICAL DEVELOPMENT

Algebra:

Work with exponents and logarithms, linear equations, quadratic equations, mathematical induction and binomial theorem, and permutations.

Calculus:

Apply concepts of analytic geometry, differentiations, and integration of algebraic functions with applications.

Statistics:

Apply mathematical operations to frequency distributions, reliability and validity of tests, normal curve, analysis of variance, correlation techniques, chi-square application and sampling theory, and factor analysis.

05 LANGUAGE DEVELOPMENT

Reading:

Read literature, book and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.

Writing:

Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.

Speaking:

Coversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

04 LEVEL REASONING DEVELOPMENT

Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

04 MATHEMATICAL DEVELOPMENT

Algebra:

Deal with system of real numbers; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity; and probability and statistical inference.

Geometry:

Deductive axiomatic geometry, plane and solid, and rectangular coordinates.

Shop Math:

Practical application of fractions, percentages, ratio and proportion, measurement, logarithms, slide rule, practical algebra, geometric construction, and essentials of trigonometry.

04 LANGUAGE DEVELOPMENT

Reading:

Read novels, poems, newspapers, periodicals, journals, manuals, dictionaries, thesauruses, and encyclopedias.

Writing:

Prepare business letters, expositions, summaries, and reports, using prescribed format and conforming to all rules of punctuation, grammar, diction, and style.

Speaking:

Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

03 MATHEMATICAL DEVELOPMENT

Compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage. Calculate surfaces, volumes, weights, and measures.

Algebra:

Calculate variables and formulas; monomials and polynomials; ratio and proportion variables; and square roots and radicals.

Geometry:

Calculate plane and solid figures; circumference, area, and volume. Understand kinds of angles and properties of pairs of angles.

03 LANGUAGE DEVELOPMENT

Reading:

Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

Writing:

Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.

Speaking:

Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

02 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

02 MATHEMATICAL DEVELOPMENT

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

02 LANGUAGE DEVELOPMENT

Reading:

Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Writing:

Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking:

Speak clearly and distinctly with appropiate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

01 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT

Add and subtract two digit numbers.

Multiply and divide 10's and 100's by 2, 3, 4, 5.

Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT

Reading:

Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

The Physical Demands Strength Rating reflects the estimated overall strength requirement of the job, expressed in terms of the letter corresponding to the particular strength rating. It represents the strength requirements which are considered to be important for average, successful work performance.

The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy. In order to determine the overall rating, an evaluation is made of the worker's involvement in the following activities:

a. Standing, Walking, Sitting

Standing - Remaining on one's feet in an upright position at a work station with-out moving about.

Walking - Moving about on foot.

Sitting - Remaining in a seated position.

b. Lifting, Carrying, Pushing, Pulling

Lifting - Raising or lowering an object from one level to another (includes upward pulling).

Carrying - Transporting an object, usually holding it in the hands or arms, or on the shoulder.

Pushing - Exerting force upon an object so that the object moves away from the force (includes slapping, striking, kicking, and treadle actions).

Pulling - Exerting force upon an object so that the object moves toward the force (includes jerking).

Lifting, pushing, and pulling are evaluated in terms of both intensity and duration. Consideration is given to the weight handled, position of the worker's body, and the aid given by helpers or mechanical equipment. Carrying most often is evaluated in terms of duration, weight carried, and distance carried.

Estimating the Strength factor rating for an occupation requires the exercise of care on the part of occupational analysts in evaluating the force and physical effort a worker must exert. For instance, if the worker is in a crouching position, it may be much more difficult to push an object than if pushed at waist height. Also, if the worker is required to lift and carry continuously or push and pull objects over long distances, the worker may exert as much physical effort as is required to similarly move objects twice as heavy, but less frequently and/or over shorter distances.

c. Controls

Controls entail the use of one or both arms or hands (hand/arm) and/or one or both feet or legs (foot/leg) to move controls on machinery or equipment. Controls include but are not limited to buttons, knobs, pedals, levers, and cranks.

Following are descriptions of the five terms in which the Strength Factor is expressed:

S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are

sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

V-Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work.

## V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work requirements.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

01 Artistic 05 Mechanical 09 Accommodating

02 Scientific 06 Industrial 10 Humanitarian

03 Plants-Animals 07 Business Detail 11 Leading-Influencing

04 Protective 08 Selling 12 Physical Performing

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

Download Google Chrome Browser

Chrome Safe Browsing will protect you from malicious sites.

DOWNLOAD


- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables
- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES


URL address of this page: **https://occupationalinfo.org/contents.html**

Translators on the www

| | Espa�ol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2003 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).

Revised 05-Jun-03

CTR030418

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z ?

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search Search

CODE: **215.367-010** **Buy the DOT:Download**
TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

LEGAL
Drivers who switch to Allstate can save $356.

Allstate

LEGAL
Drivers who switch to Allstate can save $356.

Allstate

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/21/215367010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **215.367-010 Buy the DOT:**Download TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

CD-ROM OR DOWNLOAD DOT Android or Windows

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

CODE: **654.687-010** **Buy the DOT:Download**
TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers






- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

www ita Design

URL address of this page: **https://occupationalinfo.org/65/654687010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **654.687-010 Buy the DOT:Download** TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

The New York Heart Association (NYHA) Functional Classification scale associates a patient's heart failure according to the severity of the observable symptoms.

## New York Heart Association (NYHA) Functional Classification

The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification. It places patients in one of four categories based on the level of limitation during physical activity.

If the hospice diagnosis is heart disease, the NYHA classification should be Stage IV, to meet the criteria for hospice eligibility. Stage IV heart disease is characterized by symptoms of heart failure or anginal syndrome at rest. Symptoms include chest pain, dyspnea, weakness and inability to tolerate activity without discomfort. Additional criteria necessary for hospice eligibility with a terminal diagnosis of heart disease includes optimal treatment of heart disease, the patient declines or is ineligibility for surgical intervention, an ejection fraction of ≤ 20% and a history of a one of the following in the last 12 months: Treatment resistant SVT or ventricular arrhythmia, unexplained syncope, cardiac arrest, brain embolism of cardiac origin and/or concomitant HIV disease.

Classification is based on observable symptoms which must be clearly documented in the patient's clinical record to support the classification listed:

| ***Class*** | ***Objective Assessment*** | ***Patient Symptoms*** |
|---|---|---|
| ***Class I (Mild)*** | ***No objective evidence of cardiovascular disease.***<br>No symptoms and no limitation in ordinary physical activity. | ***No limitation of physical activity.***<br>Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea (shortness of breath). |
| ***Class II (Mild)*** | ***Objective evidence of minimal cardiovascular disease.***<br>Mild symptoms and slight limitation during ordinary activity.<br>Comfortable at rest. | ***Slight limitation of physical activity.***<br>Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. |
| ***Class III (Moderate)*** | ***Objective evidence of moderately severe cardiovascular disease.***<br>Marked limitation in activity due to symptoms, even during less-than-ordinary activity.<br>Comfortable only at rest. | ***Marked limitation of physical activity.***<br>Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| ***Class IV (Severe)*** | ***Objective evidence of severe cardiovascular disease. Severe limitations.***<br>Experiences symptoms even while at rest. | ***Unable to carry out any physical activity without discomfort. Symptoms of cardiac insufficiency at rest.***<br>If any physical activity is undertaken, discomfort is increased. |

Reference: The Stages of Heart Failure – NYHA Classification (2002), Retrieved 07/31/2006 from http://www.abouthf.org/questions_stages.htm

# New York Heart Association (NYHA) Functional Classification

The original NYHA Functional Classification was published in 1928. This was a time before important diagnostic modalities like the portable ECG, echocardiogram, exercise stress test and the cardiovascular disease biomarker B-type natriuretic peptide (BNP) assay.

McDonald and Wilkinson (2017) and other researchers are advocating for the increased use of natriuretic peptides as part of the strategies for heart failure diagnosis and prevention. The use of these biomarkers has been shown to improve diagnostic accuracy for HF and provide prognostic information for more than a decade of use with recommendations by national and international cardiovascular organizations.

The NYHA classification has been updated many times. Today's version includes two sections; 1) a subjective description of functional capacity and 2) an objective diagnostic assessment of cardiovascular disease. While subjective inconsistencies may result when classifying patients in class II or III, functional capacity remains a powerful prognostic indicator and is routinely used for clinical staging of heart failure today.

| **New York Heart Association (NYHA) Functional Classification** | |
|---|---|
| **Class** | **Patient Symptoms** |
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |
| Source: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure | |

One commonly used technique to assess the functional capacity of patients is the Six-minute walk test (6MWT). The 6MWT has been shown to be a reliable, inexpensive, safe and easy to administer test that correlates with health outcomes (Rostagno, C. Gensini, 2008). (https://www.lung.org/lung-health-and-diseases/lung-procedures-and-tests/six-minute-walk-test.html, updated 2018).

**Six Minute Walk Test**

- **Explain that the test requires walking for 6 minutes in a straight line between to points 60 feet apart.**
- **Place a chair at either end of the course and explain that the patient may stop, rest or sit if necessary and that you will bring the chair to them if needed.**
- **Measure the total distance walked in 6 minutes.**

Casanova et al (2011) studied 444 healthy subjects from seven countries to determine standard performance on the 6MWT. The 6MWT measures meters (m) walked as quickly as possible by the individual in six minutes.

The mean meters walked by all subjects was 571+ or – 90 m with male subjects walking 30m more than females. This is consistent with other similar studies. Older subjects walked shorter distances than younger subjects.

- 40–49 yrs of age, 611±85 m
- 50–59 yrs of age, 588±91 m
- 60–69 yrs of age, 559±80 m
- 70–80 yrs of age, 514±71 m

Rasekaba, Lee, Naughton, Williams & Holland (2009) determined a distance less than 350 m on the 6MWT to be associated with an increased mortality in chronic HF patients. A lowering of the walking distance of 50 m or more is considered clinically significant. Ferreira, et al. (2019) concluded in their research the 6-minute walk test distance at baseline and a decline in walking distance were both associated with worse prognosis.

Bittner et al (1993) studied 898 patients with left ventricular dysfunction with either radiological evidence of HF and/or an ejection fraction of 0.45 or lower. During the 242 days of follow up 114 patients either died or were hospitalized for CHF. The lowest performance group on the 6MWT had a statistically greater chance of dying or being hospitalized than the higher performing group. See detailed instruction about the 6MWT at the Heart Foundation website.

In an updated study by Wegrzynowska-Teodorczyk (2013), the researchers also found the distance covered during the 6MWT predicted the risk of death or hospitalization. Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. They studied 243 men with stable systolic heart failure.

- Class I 15%
- Class II 44%
- Class III 37%
- Class IV 4%

69% of the participants died or required hospitalization during the following 3 years. The statistical analysis showed the shorter the distance walked in the 6MWT, the greater the 1-year and 3-year mortality risk.
Du, et al., (2017) reviewed research on the 6MWT in chronic heart failure published from 2012 to 2017. The researchers found the 6MWT not to be as accurate as possible in determining peak VO2. They suggest using mobile apps to better assess actual distance walked and heart rate.

---

References

American Heart Association. Professional Heart Daily. Accessed 8/2/16 http://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp

Bittner et al. (1993). Prediction of mortality and morbidity with a 6-minute walk test in patients with left ventricular dysfunction. SOLVD Investigators. *JAMA,* 270(14), 1702-7.

Casanova, C. et al. (2011). The 6-min walk distance in healthy subjects: reference standards from seven countries. *European Respiratory Journal*, 37, 150-156.

Du, H., Wonggom, P., Tongpeth, J. & Clark, R.A. (2017). Six-Minute Walk Test for Assessing Physical Functional Capacity in Chronic Heart Failure. Curr Heart Fail Rep. 14(3),158-166.

Ferreira, J.P., Metra, M., Anker, S.D., Dickstein, K., Lang, C.C.. & Ng, L. (2019). Clinical correlates and outcome associated with changes in 6-minute walking distance in patients with heart failure: findings from the BIOSTAT-CHF study. Eur J Heart Fail. 21(2), 218-226.

McDonald, K., Wilkinson, M. (2017). Evolving Use of Natriuretic Peptides as Part of Strategies for Heart Failure Prevention. Clin Chem. 63(1), 66-72.

Rasekaba, T., Lee, A. L., Naughton, M. T. ,Williams, T. J. & Holland, A. E. (2009). The six-minute walk test: a useful metric for the cardiopulmonary patient. *Intern Med J.*, 39(8),495-501.

Rostagno C., Gensini G.F. (2008). Six minute walk test: a simple and useful test to evaluate functional capacity in patients with heart failure. *Intern Emerg Med.* 3(3):205-12.

The Criteria Committee of the New York Heart Association. (1994). *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels.* (9th ed.). Boston: Little, Brown & Co. pp. 253–256.

Wegrzynowska-Teodorczyk, K., Rudzinska, E., Lazorczyk, M., Nowakowska, K., Banasiak, W. Ponikowski, P et al. (2013). Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. J Physiother. 59(3), 177-87.

© RnCeus.com

# Classes of Heart Failure

Doctors usually classify patients' heart failure according to the severity of their symptoms. The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification[1]. It places patients in one of four categories based on how much they are limited during physical activity.

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

| Class | Objective Assessment |
|---|---|
| A | No objective evidence of cardiovascular disease. No symptoms and no limitation in ordinary physical activity. |
| B | Objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. |
| C | Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. |
| D | Objective evidence of severe cardiovascular disease. Severe limitations. Experiences symptoms even while at rest. |

**For Example:**

- A patient with minimal or no symptoms but a large pressure gradient across the aortic valve or severe obstruction of the left main coronary artery is classified:
  - **Function Capacity I, Objective Assessment D**
- A patient with severe anginal syndrome but angiographically normal coronary arteries is classified:
  - **Functional Capacity IV, Objective Assessment A**

Heart Failure

What is Heart Failure?

Types of Heart Failure

Classes of Heart Failure

Heart Failure in Children and Adolescents

Causes and Risks

Warning Signs of Heart Failure

Diagnosing Heart Failure

Treatment Options

Living with Heart Failure and Managing Advanced HF

Tools and Resources

Heart Failure Personal Stories

Related Articles

Heart Failure Questions to Ask Your Doctor

[1] *Adapted from Dolgin M, Association NYH, Fox AC, Gorlin R, Levin RI, New York Heart Association. Criteria Committee. Nomenclature and criteria for diagnosis of diseases of the heart and great vessels. 9th ed. Boston, MA: Lippincott Williams and Wilkins; March 1, 1994.*

*Original source: Criteria Committee, New York Heart Association , Inc. Diseases of the Heart and Blood Vessels. Nomenclature and Criteria for diagnosis, 6th edition Boston, Little, Brown and Co. 1964, p 114.*

Warning Signs of Heart Failure

Heart Insight

Popular Articles

In the first of a four-part series on heart failure, we investigate what it is, what causes it and what's the prognosis. >|

The second installment explains heart failure with muscle intact. Queen Latifah and her mom, Rita, share their personal experience with Rita's own heart failure diagnosis. >|

Heart failure patients are often hospitalized. This article looks at managing self-care to minimize just how often re-hospitalizations happen. >|

When HF progresses to an advanced stage, there are many decisions to be made. Here we delve into the importance of shared decision making. >|

Classes of Heart Failure

Last Reviewed: May 31, 2017

Diagnosing Heart Failure

HF Path™

A better quality of life for heart failure patients? We've got a tool for that!

Begin Your Journey Today >|

Explore My HF Guide

Our free interactive workbook to help manage heart failure symptoms

Open now >|

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number:

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

**If You Have Any Questions**

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

EUROPEAN SOCIETY OF CARDIOLOGY®
European Journal of Heart Failure (2017) **19**, 366–376
doi:10.1002/ejhf.563

RESEARCH ARTICLE

# New York Heart Association functional class, QRS duration, and survival in heart failure with reduced ejection fraction: implications for cardiac resychronization therapy

**Frieder Braunschweig[1,2]*, Cecilia Linde[1,2], Lina Benson[3], Marcus Ståhlberg[1,2], Ulf Dahlström[4], and Lars H. Lund[1,2]**

[1]Karolinska Institutet, Department of Medicine, Stockholm, Sweden; [2]Karolinska University Hospital, Department of Cardiology, Stockholm, Sweden; [3]Karolinska Institutet, Department of Clinical Science and Education, South Hospital, Stockholm, Sweden; and [4]Department of Cardiology and Department of Medicine and Health Sciences, Linköping University, Linköping, Sweden

*Received 14 January 2016; revised 23 March 2016; accepted 4 April 2016; online publish-ahead-of-print 23 June 2016*

**Aims** Symptom severity assessed by NYHA functional class and QRS duration are essential criteria for selection of heart failure (HF) patients for CRT. This study assessed the relationship between NYHA class, QRS duration, and survival in a nationwide HF registry.

**Methods and results** We studied 13 423 patients with HF in NYHA class II–IV and LVEF <40% in the Swedish Heart Failure Registry. Survival was followed via the Swedish Population Registry. Of 12 534 patients without CRT (age 71 ± 12 years, 29% women), 51% and 49% were in NYHA class II and III–IV, respectively. Patients in NYHA class II compared with class III–IV were younger (69 vs. 73 years), and had a better systolic function (49% vs. 58% with LVEF <30%), $P$ <0.001 for all, and a favourable co-morbidity profile. QRS duration was 116 ± 29 ms in NYHA class II and 119 ± 29 ms in NYHA class III–IV with QRS ≥120 ms found in 37% vs. 44%, and an LBBB in 23% vs. 28% ($P$ < 0.001 for all). Upon multivariable Cox regression adjusting for 40 clinically relevant variables, mortality risk was higher in NYHA class III–IV vs. class II, with a hazard ratio (HR) of 1.31, 95% confidence interval (CI) 1.23–1.40. Mortality was also higher with QRS prolongation ≥120 ms vs. narrow QRS. The HR in NYHA class II patients with non-LBBB was 1.19 (95% CI 1.05 – 1.36) and in those with LBBB it was 1.16 (95% CI 1.03–1.41). The corresponding HRs in NYHA class III–IV were 1.33 (95% CI 1.21–1.47) and 1.12 (95% CI 1.02–1.22). There was no significant interaction between the effects of NYHA class and QRS duration or morphology on mortality. Applying different scenarios to estimate guideline adherence, fewer patients with NYHA class II (range 14.4–42.6%) compared with NYHA class III–IV (18.0–45.4%) had received a CRT device when indicated.

**Conclusions** In HF with reduced LVEF, QRS prolongation is common and independently linked to worse survival. The increase in mortality risk associated with QRS prolongation of both LBBB and non-LBBB morphology is similar in NYHA class II and III–IV.

**Keywords** NYHA functional class • Heart failure • QRS width • Left bundle branch block • Epidemiology • Cardiac resynchronization therapy

*Corresponding author. Department of Cardiology, Karolinska University Hospital, Solna, 17176 Stockholm, Sweden. Tel: +46 8 51771629, Fax: +46 8 311044, Email: frieder.braunschweig@karolinska.se

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

## Introduction

Heart failure (HF) is a highly symptomatic syndrome and associated with poor quality of life, frequent hospitalizations, and a high mortality risk despite recent advances in treatment with drugs and devices.[1,2] It is estimated that 2–3% of the population in industrialized countries suffers from HF, with a marked rise in those aged above 65.[3,4] In 1928 the New York Heart Association published a classification of HF symptom severity relating cardinal symptoms of HF like shortness of breath and fatigue to the levels of physical activity on which they occur (NYHA functional class I–IV).[5] Despite well-known limitations such as the temporal variability of clinical findings, interoperator variation, and a poor correlation with measures of cardiac function,[6,7] the NYHA classification is universally used to grade symptoms and select therapy in clinical practice, and provides prognostic discrimination close to that of complex multivariable risk models.[8]

A wide QRS complex on the surface ECG, especially if displayed as an LBBB, indicates intraventricular dyssynchony, and is a marker of poor prognosis in HF.[9] Cardiac resynchronization therapy improves survival, functional capacity, and quality of life in selected patients with such ECG abnormalities. Following early pivotal trials establishing the effectiveness of CRT in NYHA class III and IV,[10,11] the concept of resynchronization was expanded to patients with mild HF.[12–14] Current guidelines recommend CRT for patients with HF in NYHA class II–IV,[15–17] with gradual differentiations in relation to QRS morphology and duration. Based on evidence from trials and meta-analyses, patients with a typical LBBB pattern are given the highest level of recommendation.[18,19] A recent individual patient meta-analysis, however, suggested QRS duration rather than morphology as an independent predictor of CRT outcomes.[20] The implementation of CRT guidelines shows wide national and regional variation.[21] Potential differences in the adoption of CRT in NYHA class II compared with class III–IV have not been explored.

Since NYHA class and QRS morphology and duration form essential selection criteria, it would be important to study the relationship between these variables and survival in CRT candidates. However, this has been difficult as randomized studies largely included patients with either NYHA class III–IV or NYHA class (I and) II. Furthermore, the impact of QRS characteristics on survival in different groups of NYHA class is confounded by many other variables. Thus, large samples with information on a wide spectrum of baseline variables would be required to reach valid conclusions. Therefore, we investigated the interaction between NYHA class, QRS morphology/duration, and survival in a large Swedish HF registry with information from long-term follow-up and complete survival status by linkage to the National Population Registry.

## Methods

The Swedish Heart Failure Registry (SwedeHF) has been described previously.[22,23] Including over 63 000 unique HF patients, it is one of the largest HF registries worldwide. The protocol, case report form, and annual registry reports are available at http://www.SwedeHF.se. Patients with clinician-judged HF are included at discharge from hospital or upon outpatient visits at cardiology or internal medicine units and primary care clinics. Approximately 80 variables are recorded. The HF registry in general as well as the present study conform to the Declaration of Helsinki and they were approved by the responsible ethics committees. Individual patient consent is not required, but patients are informed of entry into national registries and allowed to opt out.

### Patients

*Figure 1* provides details on patient inclusion and exclusion. Between 11 May 2000 and 5 June 2013, there were 85 291 registrations from inpatient and outpatient units at 68 of 94 hospitals and from 102 of ~1000 primary care outpatient clinics in Sweden. Coverage in 2012 was 55%. This was defined as the number of individuals reported to the registry divided by the sum of individuals with clinical HF encountered in Sweden according to ICD-10 (International Classification of Diseases-10th revision) code for HF plus those reported to the registry (to capture those few who may have been missed by ICD-10 code).

Survival status was updated monthly by linkage with the Swedish population registry (latest update 15 May 2013). For the purpose of this study, we included first registrations from patients with HF and reduced EF, defined as an EF ≤40%. Patients had to be in NYHA class II, III, or IV, with complete data on age, rhythm, device implantation status, as well as QRS duration and morphology. Patients with a prolonged QRS duration of ≥120 ms were defined as either LBBB or non-LBBB type at the discretion of the physician. We excluded repeat registrations and patients with a pacemaker or implantable cardioverter defibrillator (ICD) without a CRT component.

### Analyses

The analysis of the inter-relationship between NYHA class, QRS duration, and survival was performed after the exclusion of patients with a CRT and, thus, paced QRS complexes on the ECG (*Figure 1*), whereas the analysis of CRT utilization included patients with a CRT device.

Categorization and availability of data in the registry do not allow a perfect match with European Society of Cardiology (ESC) guidelines.[15–17] Therefore, we evaluated four different scenarios to account for different levels of recommendation in the guidelines and different strengths of fitting between guideline criteria and registry variables. In the registry, EF is reported as <30, 30–39, 40–49, and ≥50%. As EF in Sweden is overwhelmingly reported in 5–10% increments, we assumed that most patients registered in the group with EF 30–39% had an actual EF of 30% or 35% and that few had an EF of 36–39%. In contrast, when selecting only registry patients with EF <30%, all would fulfil the LVEF guideline criterion for CRT, but some patients with EF 30–35% would be missed.

The strength of evidence and recommendations for CRT varies depending on QRS duration (120–149; ≥150 ms), QRS morphology (LBBB vs. non-LBBB), and rhythm (sinus vs. AF). Therefore, we performed analyses with progressively stricter CRT selection criteria, based on the guideline-specified recommendations I-A, I-B, IIa-B, and IIb-B from the European Heart Rhythm Association Guidelines 2013.[16] Guidelines also recommend CRT in patients with an indication for conventional ventricular pacing. The registry contains data on the presence of conventional pacemakers but not on the original indication for implantation or the percentage of ventricular pacing. Therefore, this potential guideline indication was not taken into account and patients with a previous pacemaker were excluded.

© 2016 The Authors




**Figure 1** Flow chart showing the selection of study patients from the SwedeHF registry. HF, heart failure; ICD, implantable cardioverter defibrillator.

Scenario 1: sinus rhythm (NYHA II–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology) or AF (NYHA III–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology)
Scenario 2: sinus rhythm (NYHA II–IV, EF <40%, LBBB or QRS ≥150 ms) or AF (NYHA III–IV, EF <40%, LBBB, or QRS ≥150 ms)
Scenario 3: sinus rhythm (NYHA II–IV, EF <30%, LBBB, or QRS ≥150 ms) or AF (NYHA III–IV, EF <30%, or QRS ≥150 ms)
Scenario 4: sinus rhythm (NYHA II–IV, EF <30%, QRS ≥150 regardless of QRS morphology) or AF (NYHA III–IV, EF <30%, QRS ≥150 regardless of QRS morphology) (patients were only included after 1 January 2011 because evidence in NYHA II was not available before then).

## Statistical analysis

All analyses were performed in R version 3.0.2 (R Foundation for Statistical Computing, Vienna, Austria). The level of significance was set to 5% and all reported *P*-values are two-tailed.

Survival for narrow QRS, non-LBBB QRS prolongation, and LBBB was presented using the Kaplan–Meier method and groups were compared with the log-rank test, separately for patients with NYHA class II and III–IV. Univariable and multivariable Cox regressions, using the Efron method for tie handling, were performed for non-LBBB/LBBB as a categorical variable compared with narrow QRS with adjustment for the 40 variables listed in the Supplementary material online, *Table S1*, and the interaction between NYHA class and QRS morphology. The modelling of an interaction effect renders a similar interpretation as if the data had been analysed separately in NYHA class subgroups, but with the additional benefit of also being able statistically to test differences between groups of NYHA class in effects of non-LBBB and LBBB vs. narrow QRS on mortality.

The proportional hazards assumption was investigated for the scaled Schoenfeld residuals from the multivariable models, and the dfbetas [a measure of how much the hazard ratio (HR) changes owing to the deletion of a single observation] from the models were inspected to detect extreme outliers. As a result, location (inpatient vs. outpatient) and marital status were modelled as strata variables because they were deemed not to fulfil the proportional hazard assumption. All continuous variables were modelled using restricted cubic splines (enabling possible non-linear relationships between these variables and the outcome to be modelled) with four degrees of freedom.[24]

Some baseline variables had missing data. *Table S1* in the Supplementary material online specifies 40 clinically relevant baseline variables and percentage missing for each variable. In the multivariable Cox regressions, to avoid bias and confounding resulting from variables not missing completely at random, multiple imputation ($n = 10$) was performed for all variables with missing data, using predictive mean matching with QRS width as a continuous variable and the 40 variables in *Table S1* in the Supplementary material online, and the outcome, survival, included as the Nelson–Aalen estimator in the imputation model, although not imputed itself because it contained no missing values. Imputation corrections to the resulting standard errors were performed.

## Results

Of 85 291 entries in the registry, 13 423 unique patients fulfilled the selection criteria (*Figure 1*). Of these, 889 had a CRT device implanted including 447 with an ICD component, leaving 12 534 patients without CRT for the main analysis. Baseline characteristics are provided in *Table 1* (for a complete list of variables see *Table S1*

© 2016 The Authors

**Table 1 Baseline characteristics**

| Variable | NYHA II ($n = 6377$) | NYHA III–IV ($n = 6157$) | P-value |
|---|---|---|---|
| Demographics | | | |
| Male gender | 4627 (73%) | 4273 (69%) | <0.001 |
| Age (years) | 69 ± 12 | 73 ± 12 | <0.001 |
| HF-related characteristics | | | |
| NYHA II | 6377 (100%) | – | <0.001 |
| NYHA III | – | 5554 (90%) | |
| NYHA IV | – | 603 (10%) | |
| Duration <6 months | 3741 (59%) | 2668 (44%) | <0.001 |
| IHD | 2870 (48%) | 3282 (56%) | <0.001 |
| DCM | 1276 (20%) | 1140 (19%) | 0.042 |
| HCM | 60 (2%) | 61 (2%) | 0.972 |
| LVEF 30–39% | 3246 (51%) | 2589 (42%) | <0.001 |
| LVEF <30% | 3131 (49%) | 3568 (58%) | |
| QRS-related characteristics | | | |
| QRS duration (ms) | 116 ± 29 | 119 ± 29 | <0.001 |
| QRS <120 ms | 4021 (63%) | 3437 (56%) | <0.001 |
| QRS 120–149 ms | 1305 (20%) | 1595 (26%) | |
| QRS ≥150 ms | 1051 (16%) | 1125 (18%) | |
| LBBB | 1497 (23%) | 1706 (28%) | <0.001 |
| Rhythm, blood pressure | | | |
| AF (any form) | 2548 (40%) | 2848 (46%) | <0.001 |
| Permanent AF | 2033 (32%) | 2333 (38%) | <0.001 |
| Heart rate (b.p.m.) | 72 ± 15 | 76 ± 16 | <0.001 |
| Systolic blood pressure (mmHg) | 126 ± 20 | 122 ± 21 | <0.001 |
| Co-morbidities | | | |
| Hypertension | 2722 (44%) | 2815 (47%) | <0.001 |
| Diabetes | 1284 (20%) | 1758 (29%) | <0.001 |
| Valve disease | 1003 (16%) | 1432 (24%) | <0.001 |
| Pulmonary disease | 845 (13%) | 1261 (21%) | <0.001 |
| Revascularization | 1710 (27%) | 1798 (29%) | 0.003 |
| Biochemistry | | | |
| Haemoglobin (g/L) | 138 ± 16 | 133 ± 17 | <0.001 |
| NT-proBNP (ng/L) | 2279 (1022–4902) | 3883 (1760–8456) | <0.001 |
| GFR (mL/min/1.73 m$^2$) | 76 ± 36 | 64 ± 34 | <0.001 |
| Medications | | | |
| ACE inhibitor | 4845 (76%) | 4165 (68%) | <0.001 |
| ARB | 1353 (21%) | 1446 (24%) | 0.002 |
| Beta-blocker | 5900 (93%) | 5534 (90%) | <0.001 |
| MRA | 1991 (31%) | 2328 (38%) | <0.001 |
| Diuretic | 4674 (74%) | 5403 (88%) | <0.001 |
| Digitalis | 1119 (18%) | 1133 (18%) | 0.207 |
| Nitrate | 744 (12%) | 1147 (19%) | <0.001 |
| OAC | 2516 (40%) | 2439 (40%) | 0.838 |

Numbers are *n* (%) for categorical variables and mean ± SD for continuous variables, and tested with $\chi^2$ test and *t*-test, respectively.
NT-proBNP is given as median (interquartile range).
DCM, dilated cardiomyopathy; GFR, glomerular filtration rate; HCM, hypertrophic cardiomyopathy; IHD, ischaemic heart disease; MRA, mineralocorticoid receptor antagonist; OAC, oral anticoagulant.

in the Supplementary material online). There were 6377 patients (51%) with NYHA class II and 6157 (49%) in NYHA class III–IV.

Patients in NYHA class II were younger, more likely to be male, and had a shorter duration of HF, less ischaemic cardiomyopathy, and a higher LVEF. Furthermore, they had a lower propability of AF, a lower heart rate, higher systolic blood pressure, and a more favourable co-morbidity profile. Levels of NT-proBNP were lower, while haemoglobin and creatinine clearance were higher. Interestingly, a higher proportion of NYHA class II patients were on treatment with ACE inhibitors and beta-blockers. In contrast, use of ARBs, mineralocorticoid receptor antagonists (MRA), and diuretics was higher among patients with NYHA class III–IV.

## QRS duration and morphology in relation to New York Heart Association class

QRS prolongation was common in both groups (*Figure 2*). On average, patients in NYHA class II compared with NYHA class III–IV had a somewhat smaller QRS (116 ± 29 ms vs. 119 ± 29 ms; $P < 0.001$) and fewer had a QRS of ≥120 ms (37% vs. 44%;

© 2016 The Authors




**Figure 2** Prevalence of QRS duration. Distribution of QRS duration in increments of 10 ms and proportions with LBBB (hashed bars) in patients with NYHA class II and NYHA class III–IV.

$P < 0.001$), a QRS ≥150 ms (16% vs. 18%, $P = 0.009$), or an LBBB (23% vs. 28%; $P < 0.001$). However, among those with a QRS duration ≥120 ms, the proportion of patients with LBBB was similar: 64% in NYHA class II and 63% in NYHA class III–IV ($P = 0.55$), and increased with progressively wider QRS.

## Survival in relation to New York Heart Association class and QRS duration and morphology

As expected, NYHA class II patients had a better survival compared with those in NYHA class III–IV (*Figure 3*). In the resulting multivariable Cox model, the HR and 95% confidence interval (CI) for mortality in NYHA III–IV vs. II was 1.31, 95% CI 1.23–1.40 ($P < 0.001$). In both groups, prolonged QRS duration was associated with worse survival and the prognosis of patients with a non-LBBB morphology was inferior compared with those who had LBBB. The proportion of patients surviving at 1, 3, and 5 years is given in *Table 2*. After 5 years, 58% of patients in NYHA class II with QRS prolongation of non-LBBB type were alive, while the corresponding number of NYHA class III–IV patients was only 30%. In contrast, 69% and 49% of patients in NYHA class II and III–IV, respectively, survived at 5 years, if they had a narrow QRS. At each point of time, survival of NYHA class II patients with QRS prolongation of non-LBBB type was better compared with NYHA class III–IV patients with narrow QRS.

As shown in *Table 1*, there were significant differences in baseline characteristics probably explaining the better outcome in NYHA class II vs. NYHA class III–IV patients. Thus, to assess the independent contribution of QRS duration and morphology to the mortality risk in NYHA class II and NYHA class III–IV, survival data were adjusted for important confounding variables. These factors had been specified *a priori* and included all variables with statistical differences shown in *Table 1* and, in addition, civil status, housing, recruitment in or out of hospital, year of recruitment, setting of general follow-up, setting of HF follow-up, mean arterial pressure, pulse pressure, cardiomegaly, and/or congestion on X-ray.

In all settings, prolonged QRS duration was associated with a significant increase in mortality risk (*Figure 4*). After adjustment for multiple confounders, the HR for mortality in patients with non-LBBB type vs. narrow QRS was 1.19 (95% CI 1.05 – 1.36; $P = 0.009$) in NYHA class II and 1.33 (95% CI 1.21–1.47; $P < 0.001$) in NYHA class III–IV. Similarly, comparing patients with LBBB vs. narrow QRS, the adjusted HR was 1.16 (95% CI 1.03–1.41; $P = 0.013$) in NYHA class II and 1.12 (95% CI 1.02–1.22; $P = 0.014$) in NYHA class III–IV. Thus, QRS prolongation, both of LBBB and non-LBBB type, independently added a similar mortality risk in patients with NYHA class II and NYHA class III–IV (*P* for interaction: 0.521, crude and 0.244, adjusted).

© 2016 The Authors




**Figure 3** Kaplan–Meier survival by NYHA class and QRS morphology. (*A*) NYHA class II; (*B*) NYHA class III–IV. Log-rank *P*-value for QRS/LBBB in both NYHA groups: <0.001.

**Table 2 Survival at 1, 3, and 5 years**

| Year | QRS <120 ms | | | QRS ≥120 ms non-LBBB | | | QRS ≥120 ms LBBB | | |
|---|---|---|---|---|---|---|---|---|---|
| | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI |
| NYHA class II | | | | | | | | | |
| 1 | 3287 | 0.92 | 0.92–0.93 | 680 | 0.88 | 0.86–0.91 | 1173 | 0.90 | 0.88–0.91 |
| 3 | 1967 | 0.80 | 0.79–0.82 | 400 | 0.71 | 0.68–0.75 | 681 | 0.74 | 0.72–0.77 |
| 5 | 945 | 0.69 | 0.67–0.70 | 190 | 0.58 | 0.54–0.62 | 296 | 0.62 | 0.59–0.65 |
| NYHA class III–IV | | | | | | | | | |
| 1 | 2477 | 0.82 | 0.80–0.83 | 631 | 0.70 | 0.70–0.73 | 1163 | 0.54 | 0.75–0.79 |
| 3 | 1290 | 0.63 | 0.61–0.65 | 304 | 0.45 | 0.42–0.49 | 591 | | (0.51–0.57) |
| 5 | 577 | 0.49 | 0.47–0.51 | 128 | 0.30 | 0.26–0.33 | 243 | 0.39 | 0.36–0.41 |

CI, confidence interval.

## Eligibility and utilization of cardiac resynchronization therapy according to New York Heart Association class

The proportion of patients eligible for CRT and the actual utilization of CRT in relation to current guideline recommendations was analysed in 13 423 individual patients, including those with an implanted CRT device. Eligibility was analysed in four scenarios representing increasing strength of recommendation and fit between guideline and registry criteria (*Figure 5*). Depending on the scenario chosen, between 14.5% and 30.4% of patients in NYHA class II and between 18.9% and 49.1% of patients in NYHA class III–IV fulfilled guideline recommendations for CRT. For example, in scenario 3, representing strict selection criteria according to current guidelines, 16.2% in NYHA class III–IV and 28.1% in NYHA class II met CRT selection criteria. In each scenario, more patients in NYHA class III–IV than in class II had a CRT indication.

Of patients meeting criteria for CRT, only a minority had actually received a device. This proportion ranged between 14.4% and 42.6% of eligible patients (4.4% and 6.2% of the total) with NYHA class II, and between 18.0% and 45.4% (8.6% and 8.8% of the total) in those with NYHA class III–IV. For example, in scenario 3, 27.1% and 31.4% had actually been implanted. Thus, irrespective of analysis, large proportions of both NYHA groups lacked CRT despite an indication. Consistently, the proportion of patients in NYHA class II who had an indication but were not treated with a device was lower compared with those in NYHA class III–IV, including scenario 4 which contained only

© 2016 The Authors




**Figure 4** Forest plots depicting hazard ratios (HRs) for all-cause mortality associated with different QRS morphologies in NYHA class II and NYHA class III–IV. Cox regressions were performed in the overall population with adjustment for the 40 variables in Supplementary material online, *Table S1* and the interaction between NYHA class and QRS morphology. Interaction between QRS/LBBB and NYHA class: 0.521 (crude); 0.244 (adjusted). CI, confidence interval.

patients who entered the registry after the first publication of CRT guidelines for NYHA class II patients in 2010. However, while the difference in CRT utilization was statistically significant in scenario 1–3, it did not reach statistical significance ($P = 0.507$) in the fourth scenario, evaluating only a total of 684 patients with an indication.

## Discussion

Grading of HF symptoms according to the NYHA classification is a cornerstone in the clinical assessment of HF patients and has important clinical implications for the selection of appropriate treatment. Specifically, current guidelines for CRT tailor recommendations in relation to NYHA class and QRS characteristics.[15,16] We analysed the relationship between NYHA class, QRS duration/morphology, and survival in a large group of HF patients with reduced LVEF <40% and long-term follow-up via Swedish national registries. A QRS prolongation of ≥120 ms was common in both NYHA class II (36%) and NYHA class III–IV (44%). Importantly, while NYHA II patients were healthier at baseline and survived longer, the independent risk attributable to QRS prolongation of LBBB or non-LBBB type was similar in NYHA class II and III–IV. Although CRT is highly recommended in current guidelines, only a minority of patients fulfilling guideline recommendations had received a device, and this underutilization appeared to be even greater in NYHA class II compared with NYHA class III–IV.

Our finding that QRS duration is associated with a similar hazard for death in patients with NYHA class II and III–IV gains particular strength by the large sample size, the long and complete follow-up through national registries, and a background medical therapy reflecting a high standard of care. Even after adjustment for a large number of confounders, the mortality risk in NYHA class II patients with LBBB and non-LBBB morphology was significantly increased. This supports the notion that QRS prolongation is not only a general marker of HF severity[25] but also a risk factor contributing to the adverse prognosis in HF independently of other prognostic factors, presumably through the induction of ventricular dyssynchrony.

Other studies have looked into the interaction between NYHA class, QRS duration, and prognosis. Two smaller studies also found a wider QRS duration with more advanced NYHA class, but multivariable analysis was not performed.[26,27] Similarly to the present study, a secondary analysis of a previous, smaller SwedeHF

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 5** Estimation of CRT utilization in the SwedeHF registry. (*A*) The proportion of patients meeting selection criteria for CRT according to scenarios 1–3 reflecting progressively stricter CRT selection criteria based on guideline recommendations, and scenario 4 considering only patients included after 1 January 2011 (see the Methods for further details). (*B*) The proportion of patients meeting CRT selection criteria who actually were implanted with a device. *P*-values (NYHA II compared with NYHA III–IV): $^{1}P < 0.001$; $^{2}P < 0.001$; $^{3}P = 0.015$; $^{4}P = 0.507$.

cohort indicated that interactions between QRS width and NYHA class were not significant upon multivariate analysis.[9]

The proportion of patients with prolonged QRS ≥120 ms in our study (41%) corresponds well with previous reports. A broad QRS was also found in 41% of patients with an LVEF ≤35% evaluated in the EuroHeart failure survey,[28] 37% of patients in the Italian Network on CHF[29] (using 140 ms as a cut-off), and 34% of HF patients examined in the setting of a community HF clinic.[30] In the present study, there was a trend towards worse prognosis in subjects with non-LBBB morphology, found in approximately one-third of patients with prolonged QRS, compared with LBBB. Causing a characteristic U-shaped activation pattern of the left ventricle,[31] LBBB has been closely linked to left intraventricular dyssynchrony between the septum and the lateral wall, while QRS prolongation of non-LBBB type may result in various other electromechanical abnormalities.[32] This may explain why patients with LBBB have especially large effects by CRT while non-LBBB morphology is a predictor of non-response.[33] Among patients with non-LBBB morphology, we could not single out those with a right bundle branch block (RBBB). RBBB is associated with increased mortality in chronic HF,[34] but RBBB patients do not improve by CRT.[35]

Cardiac resynchronization therapy was first introduced in patients with NYHA class III.[10,36,37] The COMPANION trial also included a small proportion (14%) of patients in NYHA class IV provided they had not been hospitalized during the month before enrolment and had an estimated survival exceeding 6 months.[11] This subgroup showed a significant reduction in the combined primary study endpoint, and hence the indication of 'ambulatory' NYHA class IV was incorporated into current guidelines. However, NYHA class IV is a rare indication in clinical practice and patients hospitalized with acutely decompensated HF and/or receiving inotropic support are usually not considered for implantation. In the European CRT survey, only 8% were judged to be in NYHA class IV at baseline.[38] In the present study, a total of 4.8% had NYHA class IV. Considering the clinical context in which patients are recruited to the registry, we assume that most of them met the criteria of 'ambulatory' class IV.

Utilization of CRT in NYHA class II vs. III–IV was significantly worse in scenarios 1–3. This can be explained by the later introduction of NYHA II to CRT guidelines. The analysis in scenario 4, focusing on a smaller sample of patients with strict indications recruited after 2010, showed a similarly worse utilization but the difference was not significant. In a registry, some appropriate reasons to abstain from device therapy such as high biological age, clinical severity of co-morbidities, or patient refusal are difficult to discern. However, considering the baseline characteristics (*Table 1*), factors such as high age and severe co-morbidities are unlikely to explain the larger underutilization of CRT in NYHA class II.

© 2016 The Authors

In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids.
In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. It may be speculated that it was easier to achieve drug target doses in those with mild HF, better renal function, and less compromised haemodynamics as reflected by higher blood pressure.

Only half of the patients received CRT together with a defibrillator, which is below the European average but in keeping with Swedish implantation statistics and on a similar level compared with countries such as the UK or Denmark.[21]

Our findings have clinical implications as they indicate that a wide QRS complex should alert physicians to the significantly increased mortality risk of the HF patient regardless of NYHA class and other conditions. Device treatment with CRT and, in most cases ICD, has strong evidence in this scenario and should be seriously considered. Studies indicate that CRT is similarly effective in appropriately selected NYHA class II and III–IV patients to improve outcomes.[14] As CRT appears particularly underutilized in NYHA class II, the value of early interventions to prevent disease progression should be highlighted. Recently, long-term effects of CRT on mortality[39] and measures of functional and LV remodelling[40] were shown in mild HF. However, these improvements were largely confined to patients with LBBB. Thus, our results also emphasize a particular need for additional treatment options in patients with mild to moderate HF and QRS prolongation of non-LBBB type who have limited effects by resynchronization.

## Limitations

Measurement of QRS duration and the categorization of LBBB was left to the individual physician, and misclassification may have occurred. We have no information regarding the presence of RBBB but only whether patients had LBBB or not. Categories used in the registry, in particular LVEF, allowed no perfect match with selection criteria in the guidelines. We sought to accommodate this by evaluating guideline adoption in different scenarios with progressively stricter CRT selection criteria. In addition, we could not assess whether patients with potential CRT indication had contraindications. The analysis of CRT utilization represents only a snap-shot of CRT prevalence, and we cannot rule out that patients without CRT may have received CRT during the later course of follow-up or that they improved such that CRT was no longer indicated. However, follow-up referral to cardiologists and HF nurse clinics was rare, suggesting that most patients were not considered for CRT by the clinician responsible. Furthermore, since only a minor portion of CRT candidates had received a device, it is unlikely that this portion had greatly increased during further follow-up. We reported all-cause but not cause-specific mortality. The latter may provide a stronger link between the pathophysiology of conduction delay and outcomes, but the former is more clinically relevant. Finally, patients with LV dysfunction and HF who had been previously implanted with an ICD were excluded from analysis.

## Conclusions

This study in a large national registry shows that QRS prolongation of both LBBB and non-LBBB type is an independent predictor of mortality in patients with HF and reduced LVEF. Importantly, the increase in mortality risk attributable to QRS prolongation was similar in those with NYHA class II and those with NYHA class III–IV, and remained significant even after adjustment for a large number of relevant confounders. Although many HF patients with prolonged QRS fulfil current guideline criteria, CRT appears to be underutilized particularly among NYHA class II patients.

## Supplementary Information

Additional Supporting Information may be found in the online version of this article:

**Table S1.** Complete baseline variables included in multivariable models among 12 534 patients (without CRT).

## Acknowledgements

We thank local investigators in the Swedish Heart Failure Registry for data entry and management.

## Funding

This work was supported in part by Boston Scientific, the Swedish Research Council, the Swedish Heart and Lung Foundation, and Stockholm County Council in the form of grants to L.H.L.'s institution. No funding organization had any role in the collection, analysis, or interpretation of data or approval/disapproval for publication.

**Conflict of interest:** L.H.L. reports speaker's honoraria from St Jude and research grants to his institution from Medtronic. C.L. was principal investigator of REVERSE, a CRT study sponsored by Medtronic, reports research grants, speaker honoraria, and consulting fees from Medtronic, and speaker honoraria and consulting fees from St. Jude Medical. F.B. reports research grants and speaker honoraria from Medtronic and consulting fees from Biotronik and Boston Scientific. M.S. and U.D. report no conflicts of interest.

## References

1. MacIntyre K, Capewell S, Stewart S, Chalmers JW, Boyd J, Finlayson A, Redpath A, Pell JP, McMurray JJ. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. *Circulation* 2000;**102**:1126–1131.
2. Schaufelberger M, Swedberg K, Koster M, Rosen M, Rosengren A. Decreasing one-year mortality and hospitalization rates for heart failure in Sweden; data from the Swedish Hospital Discharge Registry 1988 to 2000. *Eur Heart J* 2004;**25**:300–307.
3. Cowie MR, Mosterd A, Wood DA, Deckers JW, Poole-Wilson PA, Sutton GC, Grobbee DE. The epidemiology of heart failure. *Eur Heart J* 1997;**18**:208–225.
4. Dickstein K, Cohen-Solal A, Filippatos G, McMurray JJ, Ponikowski P, Poole-Wilson PA, Stromberg A, van Veldhuisen DJ, Atar D, Hoes AW, Keren A, Mebazaa A, Nieminen M, Priori SG, Swedberg K, Vahanian A, Camm J, De Caterina R, Dean V, Dickstein K, Filippatos G, Funck-Brentano C, Hellemans

© 2016 The Authors

I, Kristensen SD, McGregor K, Sechtem U, Silber S, Tendera M, Widimsky P, Zamorano JL, Tendera M, Auricchio A, Bax J, Bohm M, Corra U, della Bella P, Elliott PM, Follath F, Gheorghiade M, Hasin Y, Hernborg A, Jaarsma T, Komajda M, Kornowski R, Piepoli M, Prendergast B, Tavazzi L, Vachiery JL, Verheugt FW, Zamorano JL, Zannad F. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2008: the Task Force for the diagnosis and treatment of acute and chronic heart failure 2008 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association of the ESC (HFA) and endorsed by the European Society of Intensive Care Medicine (ESICM). *Eur J Heart Fail* 2008;**10**:933–989.

5. The Criteria Committee of the New York Heart Association. *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*, 9th ed. Boston: Little, Brown & Co.; 1994. p253–256.
6. Raphael C, Briscoe C, Davies J, Ian Whinnett Z, Manisty C, Sutton R, Mayet J, Francis DP. Limitations of the New York Heart Association functional classification system and self-reported walking distances in chronic heart failure. *Heart* 2007;**93**:476–482.
7. Adams KF Jr, Zannad F. Clinical definition and epidemiology of advanced heart failure. *Am Heart J* 1998;**135**:S204–S215.
8. Goda A, Williams P, Mancini D, Lund LH. Selecting patients for heart transplantation: comparison of the Heart Failure Survival Score (HFSS) and the Seattle Heart Failure Model (SHFM). *J Heart Lung Transplant* 2011;**30**:1236–1243.
9. Lund LH, Jurga J, Edner M, Benson L, Dahlstrom U, Linde C, Alehagen U. Prevalence, correlates, and prognostic significance of QRS prolongation in heart failure with reduced and preserved ejection fraction. *Eur Heart J* 2013;**34**:529–539.
10. Cleland JG, Daubert JC, Erdmann E, Freemantle N, Gras D, Kappenberger L, Tavazzi L. The effect of cardiac resynchronization on morbidity and mortality in heart failure. *N Engl J Med* 2005;**352**:1539–1549.
11. Bristow MR, Saxon LA, Boehmer J, Krueger S, Kass DA, De Marco T, Carson P, DiCarlo L, DeMets D, White BG, DeVries DW, Feldman AM. Cardiac-resynchronization therapy with or without an implantable defibrillator in advanced chronic heart failure. *N Engl J Med* 2004;**350**:2140–2150.
12. Linde C, Abraham WT, Gold MR, St John Sutton M, Ghio S, Daubert C. Randomized trial of cardiac resynchronization in mildly symptomatic heart failure patients and in asymptomatic patients with left ventricular dysfunction and previous heart failure symptoms. *J Am Coll Cardiol* 2008;**52**:1834–1843.
13. Moss AJ, Hall WJ, Cannom DS, Klein H, Brown MW, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Higgins SL, Pfeffer MA, Solomon SD, Wilber D, Zareba W. Cardiac-resynchronization therapy for the prevention of heart-failure events. *N Engl J Med* 2009;**361**:1329–1338.
14. Tang AS, Wells GA, Talajic M, Arnold MO, Sheldon R, Connolly S, Hohnloser SH, Nichol G, Birnie DH, Sapp JL, Yee R, Healey JS, Rouleau JL, Resynchronization-Defibrillation for Ambulatory Heart Failure Trial I. Cardiac-resynchronization therapy for mild-to-moderate heart failure. *N Engl J Med* 2010;**363**:2385–2395.
15. McMurray JJ, Adamopoulos S, Anker SD, Auricchio A, Bohm M, Dickstein K, Falk V, Filippatos G, Fonseca C, Gomez-Sanchez MA, Jaarsma T, Kober L, Lip GY, Maggioni AP, Parkhomenko A, Pieske BM, Popescu BA, Ronnevik PK, Rutten FH, Schwitter J, Seferovic P, Stepinska J, Trindade PT, Voors AA, Zannad F, Zeiher A, Bax JJ, Baumgartner H, Ceconi C, Dean V, Deaton C, Fagard R, Funck-Brentano C, Hasdai D, Hoes A, Kirchhof P, Knuuti J, Kolh P, McDonagh T, Moulin C, Reiner Z, Sechtem U, Sirnes PA, Tendera M, Torbicki A, Vahanian A, Windecker S, Bonet LA, Avraamides P, Ben Lamin HA, Brignole M, Coca A, Cowburn P, Dargie H, Elliott P, Flachskampf FA, Guida GF, Hardman S, Iung B, Merkely B, Mueller C, Nanas JN, Nielsen OW, Orn S, Parissis JT, Ponikowski P. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012: the Task Force for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2012 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association (HFA) of the ESC. *Eur J Heart Fail* 2012;**14**:803–869.
16. Brignole M, Auricchio A, Baron-Esquivias G, Bordachar P, Boriani G, Breithardt OA, Cleland J, Deharo JC, Delgado V, Elliott PM, Gorenek B, Israel CW, Leclercq C, Linde C, Mont L, Padeletti L, Sutton R, Vardas PE, ESC Committee for Practice Guidelines (CPG), Zamorano JL, Achenbach S, Baumgartner H, Bax JJ, Bueno H, Dean V, Deaton C, Erol C, Fagard R, Ferrari R, Hasdai D, Hoes AW, Kirchhof P, Knuuti J, Kolh P, Lancellotti P, Linhart A, Nihoyannopoulos P, Piepoli MF, Ponikowski P, Sirnes PA, Tamargo JL, Tendera M, Torbicki A, Wijns W, Windecker S, Document R, Kirchhof P, Blomstrom-Lundqvist C, Badano LP, Aliyev F, Bansch D, Baumgartner H, Bsata W, Buser P, Charron P, Daubert JC, Dobreanu D, Faerestrand S, Hasdai D, Hoes AW, Le Heuzey JY, Mavrakis H, McDonagh T, Merino JL, Nawar MM, Nielsen JC, Pieske B, Poposka L, Ruschitzka F, Tendera M, Van Gelder IC, Wilson CM. 2013 ESC Guidelines on cardiac pacing and cardiac resynchronization therapy: the Task Force on cardiac pacing and resynchronization therapy of the European Society of Cardiology (ESC). Developed in collaboration with the European Heart Rhythm Association (EHRA). *Eur Heart J* 2013;**34**:2281–2329.
17. Priori SG, Blomstrom-Lundqvist C, Mazzanti A, Blom N, Borggrefe M, Camm J, Elliott PM, Fitzsimons D, Hatala R, Hindricks G, Kirchhof P, Kjeldsen K, Kuck KH, Hernandez-Madrid A, Nikolaou N, Norekval TM, Spaulding C, Van Veldhuisen DJ. Authors/Task Force Members; Document Reviewers. 2015 ESC Guidelines for the management of patients with ventricular arrhythmias and the prevention of sudden cardiac death: the Task Force for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death of the European Society of Cardiology (ESC) Endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC). *Eur Heart J* 2015;**36**:2793–2867.
18. Sipahi I, Chou JC, Hyden M, Rowland DY, Simon DI, Fang JC. Effect of QRS morphology on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Am Heart J* 2012;**163**:260–267.
19. Sipahi I, Carrigan TP, Rowland DY, Stambler BS, Fang JC. Impact of QRS duration on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Arch Intern Med* 2011;**171**:1454–1462.
20. Cleland JG, Abraham WT, Linde C, Gold MR, Young JB, Claude Daubert J, Sherfesee L, Wells GA, Tang AS. An individual patient meta-analysis of five randomized trials assessing the effects of cardiac resynchronization therapy on morbidity and mortality in patients with symptomatic heart failure. *Eur Heart J* 2013;**34**:3547–3556.
21. Raatikainen MJ, Arnar DO, Zeppenfeld K, Merino JL, Levya F, Hindriks G, Kuck KH. Statistics on the use of cardiac electronic devices and electrophysiological procedures in the European Society of Cardiology countries: 2014 report from the European Heart Rhythm Association. *Europace* 2015;**17** Suppl 1:i1–175.
22. Lund LH, Benson L, Dahlstrom U, Edner M. Association between use of renin–angiotensin system antagonists and mortality in patients with heart failure and preserved ejection fraction. *JAMA* 2012;**308**:2108–2117.
23. Jonsson A, Edner M, Alehagen U, Dahlstrom U. Heart failure registry: a valuable tool for improving the management of patients with heart failure. *Eur J Heart Fail* 2010;**12**:25–31.
24. Therneau T, Grambsch P. Functional Form and Testing Proportional Hazards. In: Dietz K, Gail M, Krickeberg K, Samet J, Tsiatis A, eds *Modeling Survival Data: Extending the Cox Model*. New York: Springer-Verlag; 2000.
25. Kashani A, Barold SS. Significance of QRS complex duration in patients with heart failure. *J Am Coll Cardiol* 2005;**46**:2183–2192.
26. Stellbrink C, Auricchio A, Diem B, Breithardt OA, Kloss M, Schondube FA, Klein H, Messmer BJ, Hanrath P. Potential benefit of biventricular pacing in patients with congestive heart failure and ventricular tachyarrhythmia. *Am J Cardiol* 1999;**83**:143D–150D.
27. Gasparini M, Mantica M, Galimberti P, Marconi M, Genovese L, Faletra F, Simonini S, Klersy C, Coates R, Gronda E. Beneficial effects of biventricular pacing in patients with a 'narrow' QRS. *Pacing Clin Electrophysiol* 2003;**26**:169–174.
28. Khan NK, Goode KM, Cleland JG, Rigby AS, Freemantle N, Eastaugh J, Clark AL, de Silva R, Calvert MJ, Swedberg K, Komajda M, Mareev V, Follath F, EuroHeart Failure Survey I. Prevalence of ECG abnormalities in an international survey of patients with suspected or confirmed heart failure at death or discharge. *Eur J Heart Fail* 2007;**9**:491–501.
29. Baldasseroni S, Opasich C, Gorini M, Lucci D, Marchionni N, Marini M, Campana C, Perini G, Deorsola A, Masotti G, Tavazzi L, Maggioni AP, Italian Network on Congestive Heart Failure I. Left bundle-branch block is associated with increased 1-year sudden and total mortality rate in 5517 outpatients with congestive heart failure: a report from the Italian network on congestive heart failure. *Am Heart J* 2002;**143**:398–405.
30. Clark AL, Goode K, Cleland JG. The prevalence and incidence of left bundle branch block in ambulant patients with chronic heart failure. *Eur J Heart Fail* 2008;**10**:696–702.
31. Auricchio A, Fantoni C, Regoli F, Carbucicchio C, Goette A, Geller C, Kloss M, Klein H. Characterization of left ventricular activation in patients with heart failure and left bundle-branch block. *Circulation* 2004;**109**:1133–1139.
32. Andersson LG, Wu KC, Wieslander B, Loring Z, Frank TF, Maynard C, Gerstenblith G, Tomaselli GF, Weiss RG, Wagner GS, Ugander M, Strauss DG. Left ventricular mechanical dyssynchrony by cardiac magnetic resonance is greater in patients with strict vs nonstrict electrocardiogram criteria for left bundle-branch block. *Am Heart J* 2013;**165**:956–963.
33. Cleland J, Freemantle N, Ghio S, Fruhwald F, Shankar A, Marijanowski M, Verboven Y, Tavazzi L. Predicting the long-term effects of cardiac resynchronization therapy on mortality from baseline variables and the early response a report from the CARE-HF (Cardiac Resynchronization in Heart Failure) Trial. *J Am Coll Cardiol* 2008;**52**:438–445.
34. Xiong Y, Wang L, Liu W, Hankey GJ, Xu B, Wang S. The prognostic significance of right bundle branch block: a meta-analysis of prospective cohort studies. *Clin Cardiol* 2015;**38**:604–613.

© 2016 The Authors

35. Bilchick KC, Kamath S, DiMarco JP, Stukenborg GJ. Bundle-branch block morphology and other predictors of outcome after cardiac resynchronization therapy in Medicare patients. *Circulation* 2010;**122**:2022–2030.
36. Cazeau S, Leclercq C, Lavergne T, Walker S, Varma C, Linde C, Garrigue S, Kappenberger L, Haywood GA, Santini M, Bailleul C, Daubert JC. Effects of multisite biventricular pacing in patients with heart failure and intraventricular conduction delay. *N Engl J Med* 2001;**344**:873–880.
37. Abraham WT, Fisher WG, Smith AL, Delurgio DB, Leon AR, Loh E, Kocovic DZ, Packer M, Clavell AL, Hayes DL, Ellestad M, Trupp RJ, Underwood J, Pickering F, Truex C, McAtee P, Messenger J. Cardiac resynchronization in chronic heart failure. *N Engl J Med* 2002;**346**:1845–1853.
38. Dickstein K, Bogale N, Priori S, Auricchio A, Cleland JG, Gitt A, Limbourg T, Linde C, van Veldhuisen DJ, Brugada J. The European cardiac resynchronization therapy survey. *Eur Heart J* 2009;**30**: 2450–2460.
39. Goldenberg I, Kutyifa V, Klein HU, Cannom DS, Brown MW, Dan A, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Kautzner J, Klempfner R, Kuniss M, Merkely B, Pfeffer MA, Quesada A, Viskin S, McNitt S, Polonsky B, Ghanem A, Solomon SD, Wilber D, Zareba W, Moss AJ. Survival with cardiac-resynchronization therapy in mild heart failure. *N Engl J Med* 2014;**370**:1694–1701.
40. Linde C, Gold MR, Abraham WT, St John Sutton M, Ghio S, Cerkvenik J, Daubert C, Group RErRiSlvdS. Long-term impact of cardiac resynchronization therapy in mild heart failure: 5-year results from the REsynchronization reVErses Remodeling in Systolic left vEntricular dysfunction (REVERSE) study. *Eur Heart J* 2013;**34**:2592–2599.


© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

JACC: HEART FAILURE
VOL. 5, NO. 11, 2017
ISSN 2213-1779/$36.00
http://dx.doi.org/10.1016/j.jchf.2017.08.011
PUBLISHED BY ELSEVIER
© 2017 BY THE AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION

# Refining Classification of Heart Failure Based on Ejection Fraction

Gregg C. Fonarow, MD[a,b]

The complex clinical syndrome of heart failure (HF) is associated with a wide spectrum of left ventricular functional abnormalities (1). These range from preserved left ventricular ejection fraction (EF) and normal left ventricular size to severely reduced EF and marked dilation of the left ventricle. Although for many decades, HF was considered to be synonymous with diminished contractility of the left ventricle, in the early 2000s there was a growing appreciation for the fact that a substantial portion of patients with HF had relatively normal EF, frequently characterized as diastolic HF or diastolic dysfunctional HF. When carefully assessed, there is evidence for the presence of both systolic and diastolic functional abnormalities in most patients with HF (1). Dr. Milton Packer was one of the early proponents of using an EF-based classification for HF patients, suggesting that the term of diastolic HF be avoided and stating that "a less presumptuous approach is to refer to these patients as having HF with a normal ejection fraction, a descriptive approach that makes no assumptions about our knowledge about the pathophysiology of this disorder" (2). Since the 2005 American College of Cardiology/American Heart Association HF Guidelines adopted this approach (HF with reduced EF [HFrEF] and HF with preserved EF [HFpEF]), EF has been considered essential in the classification of patients with HF.

There have been extensive studies demonstrating that the demographics, causes, comorbidities, prognoses, and, most importantly, responses to therapy differ among HF patients based on EF classification (3). Differences among the evidence bases for therapies is, in and of itself, a compelling enough rationale for EF-based classification. Furthermore, to date, no measurement or marker other than EF has demonstrated utility in distinguishing which patient populations will or will not derive benefit from each guideline-directed therapy. Nevertheless, use of EF is not without limitations because it is dependent on the imaging technique used, the analysis methods, the operators, and the variability up to 5% (3). However, the use of EF is nearly ubiquitous in characterizing patients with HF in clinical practice and research, as well as being used as an indispensable component of the enrollment criteria in nearly every randomized clinical trial. Ejection fraction has proven to be of such substantial clinical and research value in the assessment and management of HF patients, there is a Class I level recommendation for EF measurement in every national and international HF guideline (1,4).

Despite the widespread adoption of EF-based classification of HF, the actual definitions of patients with hearts with reduced and preserved EFs have varied. HFrEF has been variably defined as EF values of ≤35%, <40%, and ≤40% (1). HFpEF has been classified as EF values of >40%, ≥45%, >45%, ≥50%, >50%, and ≥55% (1). In studies which explored the optimal cutpoint(s) for defining EF groups, data emerged suggesting there was an intermediate group of patients with EF in the range of 41% to 49% (3). These patients have a clinical profile and prognosis that are intermediate but closer to those of HFpEF patients defined by EF of ≥50% than those of HFrEF defined by EF of ≤40%, with certain exceptions. In addition, the large scale randomized controlled outcome trials in patients with HF have largely enrolled patients with EF values of ≤35% and ≤40%. It has been only in these HF patients that angiotensin-converting enzyme inhibitors, angiotensin receptor antagonists, angiotensin receptor neprilysin inhibitors, beta-blockers, aldosterone antagonists, and device therapies have demonstrated benefits of reduced mortality (1). Clinical trials to date in HF patients with an EF value of >40%, ≥45%, or ≥50% testing various therapies have not been successful (1). Furthermore, registry-based

From the [a]Division of Cardiology, David Geffen School of Medicine at UCLA, University of California Los Angeles, Los Angeles, California; and the [b]Ahmanson-UCLA Cardiomyopathy Center, University of California Los Angeles Medical Center, Los Angeles, California. Dr. Fonarow's research is supported by U.S. National Institute of Health; and he consults for Amgen, Janssen, Medtronic, Novartis, and St. Jude Medical.

Manuscript received August 10, 2017; accepted August 18, 2017.

studies have with few exceptions not observed benefits associated with the use of neurohormonal antagonists once the EF is >40% (3). Thus, there is not a sufficient evidence base and no current guideline recommendations to extend the use of therapies proven in patients with EF of ≤35% or ≤40% to those expressly with EF of >40% as a treatment for HF (1,4).

Based on the totality of available data, EF-based classification of HF was further refined, and an intermediate EF group, HF with borderline EF (HFbEF), was added to the 2013 the American College of Cardiology/American Heart Association HF guidelines. This group was defined by the presence of the typical symptoms of HF and EF of 41% to 49% (1). Following suit in 2016, the European Society of Cardiology specified HF with mid-range EF (HFmrEF) of 40% to 49% (4). It has also been recognized that there is a cohort of patients who present with HF with EF of ≤40%, whose EF subsequently improves. These patients with improved or recovered EF appear to be clinically distinct from patients with persistently reduced, borderline, or preserved EF and have a much better prognosis (1). A distinct classification was provided for these patients in the 2013 guidelines as well (1). Since these guidelines have been published, there has been ongoing debate as to whether these refined EF classifications are helpful or merely creating arbitrary distinctions. This debate notwithstanding, these refined classifications have fostered new studies that are improving the understanding of the causes, phenotypes, pathophysiologies, and prognoses in these patients. For example, a recent study of biomarker profiles analyzing 37 biomarkers from different pathophysiologic domains (myocardial stretch, inflammation, angiogenesis, oxidative stress, and hematopoiesis) found that patients with HFmrEF had an intermediate biomarker profile with interactions between both cardiac stretch and inflammation makers, whereas HFrEF profiles were mainly related to stretch and HFpEF to inflammation (5). These findings suggested that patients with HFmrEF may be a mixture of HFrEF and HFpEF patients (5). Biomarker-based profiling could potentially be used to identify the subset of patients who, despite having EF of >40%, could benefit from those therapies that benefit HFrEF patients.

There are certainly limitations to an HF classification system based on EF alone, and more detailed phenotyping may help to better characterize patients; provide greater prognostic discrimination; allow for more precise targeting of therapies to patients who will derive benefit; and facilitate the discovery of new, more effective treatments. Further research may establish the fact that there is a subset of patients with HF with EF of 41% to 49% who will benefit from therapies demonstrated to improve outcomes in patients with HF with EF of ≤40% (3). Whether this refined EF classification approach adopted in recent versions of the guidelines best serves the needs of patients, helps to advance the field, or needs to be further updated remains to be determined. However, the enduring value of EF for classifying and managing HF is something that physicians, no matter what their specialty, should be able to appreciate.

**ADDRESS FOR CORRESPONDENCE:** Dr. Gregg C. Fonarow, Ahmanson-UCLA Cardiomyopathy Center, Ronald Reagan UCLA Medical Center, 10833 LeConte Avenue, Room A2-237 CHS, Los Angeles, California 90095-1679. E-mail: gfonarow@mednet.ucla.edu.

## REFERENCES

**1.** Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.

**2.** Burkoff D, Maurer MS, Packer M. Heart failure with a normal ejection fraction: is it really a disorder of diastolic function? Circulation 2003;107:656-8.

**3.** Hsu JJ, Ziaeian B, Fonarow GC. Heart failure with mid-range (borderline) ejection faction: clinical implications and future directions. J Am Coll Cardiol HF 2017. In press.

**4.** Ponikowski P, Voors AA, Anker SD, et al. 2016 ESC guidelines for the diagnosis and treatment of acute and chronic heart failure: the Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC) developed with the special contribution of the Heart Failure Association (HFA) of the ESC. Eur Heart J 2016;37:2129-200.

**5.** Tromp J, Khan MAF, Mentz RJ, O'Connor CM, et al. Biomarker profiles of acute heart failure patients with a mid-range ejection fraction. J Am Coll Cardiol HF 2017;5:507-17.

**KEY WORDS** epidemiology, heart failure with borderline ejection fraction (HFbEF), heart failure with mid-range ejection fraction (HFmrEF), heart failure with preserved ejection fraction (HFpEF), outcomes

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** January 8, 2020

**DELIVER TO:** Claims Shared Services
ATTN: Document Request
The Lincoln National Life Insurance Company

**FACSIMILE NO.:** 402-361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy Number: 00001004922000000
Claim Number: 1150128075

TOTAL NUMBER OF PAGES (INCLUDING COVER): 111

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4849-6532-7966, v. 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901 525 1322 F 901 525 2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

January 8, 2020

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Claims Shared Services
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | |
|---|---|
| **Claimant:** | **Sherman Carter** |
| **Policyholder:** | **Ajax Distributing Company of Memphis** |
| **Policy Number:** | **00001004922000000** |
| **Claim Number:** | **1150128075** |

As you are aware, the undersigned and this law firm represent Sherman Carter ("Mr. Carter") in regard to his long term disability claim under policy number 00001004922000000 (the "Policy") through his employer, Ajax Distributing Company of Memphis, and issued by The Lincoln National Life Insurance Company ("Lincoln").

Please accept this letter as Mr. Carter's second level appeal of Lincoln's decision to deny long term disability benefits beyond October 30, 2018. We disagree with Lincoln's determination that Mr. Carter is able to perform the main duties of any gainful occupation for which his is qualified as set forth in Lincoln's July 12, 2019 letter detailing its review of Mr. Carter's first level appeal. Lincoln cites two reports prepared by medical reviewers as the basis for its determination; however, these reports fail to address significant portions of Mr. Carter's medical records and misstate the findings of his treating physician in material respects. In addition, Mr. Carter's additional and more recent medical records provide further confirmation of his documented inability to perform sedentary work.

Mr. Carter's medical file and the opinion of his treating cardiologist contains significant evidence and documentation of Mr. Carter's severely depressed left ventricular systolic function with an ejection fraction of 20-25% and nonsustained ventricular tachycardia, all of which is worsening and will not improve. I have attached hereto additional medical records of Lee E. Faulkner, MD, the cardiologist who has treated Mr. Carter since 2004. *See collective Exhibit "A" hereto.* Dr. Faulkner has opined on numerous occasions that Mr. Carter cannot work or perform sedentary work due to his severe, chronic, and worsening cardiomyopathy. His opinions are based upon his treatment of Mr. Carter for over 15 years, his objective findings, and multiple and frequent cardiograms spanning from 2004 through 2019.

For example:

1. On October 3, 2018, Dr. Faulkner opined that no job modifications would allow Mr. Carter to return to work and that Mr. Carter cannot perform (0% of the time) a job requiring standing, walking, sitting, balancing, stooping, kneeling, fingering, crouching, crawling,

grasping, climbing, pushing, pulling, or bending. He also opined that Mr. Carter's condition is lifelong. (*October 3, 2018, Physician's Statement attached hereto as Exhibit "B"*).

2. On September 4, 2018, Dr. Faulkner opined that Mr. Carter has been totally disabled from August 2015 to the present date and that Mr. Carter had a Class 5 of 5 physical impairment defined by Lincoln as a severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%). (*September 4, 2018, Attending Physician's Statement attached hereto as Exhibit "C"*).

3. On June 2, 2017, Dr. Faulkner opined Lincoln that Mr. Carter's cardiomyopathy was "worsening" and that Mr. Carter was totally disabled from his job and totally disabled from any other work. Dr. Faulkner opined that Mr. Carter would never experience a fundamental or marked change in his condition permitting him to work. He also gave Mr. Carter specific limitations and restrictions of "No lifting or straining whatsoever as his condition is worsening over time." He also indicated that Mr. Carter could not sit, stand, walk, climb, bend, kneel, drive, finger or handle. (*June 2, 2017, Attending Physician's Statement attached hereto as Exhibit "D"*).

4. On November 21, 2016, Dr. Faulkner opined that Mr. Carter had severe physical limitations and suffered from a Class 5 of 5 physical impairment, defined as severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 –100%). (*November 21, 2016, Attending Physician's Statement attached hereto as Exhibit "E"*).

Dr. Faulkner has consistently opined (and communicated these opinions to Lincoln) that Mr. Carter is totally disabled and cannot perform sedentary work. His office notes of November 1, 2018, among others, provide that Mr. Carter has problems standing and frequently has dizzy spells. Mr. Carter's condition is chronic and worsening. Accommodations at work will not help. He simply cannot work or he risks heart failure. The evidence of Mr. Carter's totally disabling condition to date is overwhelming.

We disagree with Lincoln's conclusion that no objective findings exist to support Mr. Carter's documented diagnosis of cardiomyopathy or heart failure with a secondary diagnosis of hypertension. On November 1, 2018, Dr. Faulkner performed an echocardiogram on Mr. Carter and determined that Mr. Carter has a severely depressed left ventricular systolic function with an ejection fraction of 20–25% and nonsustained ventricular tachycardia. Dr. Faulkner further determined that Mr. Carter has posterior wall akinesis and that his left atrium chamber is enlarged in size. Mr. Carter has had and continues to have documented symptoms of dizziness, shortness of breath, and chest pain.

Lincoln opines that Mr. Carter's symptoms and Dr. Faulkner's physical findings regarding his condition are not consistent with Dr. Faulkner's opinion that he cannot perform sedentary work. In Lincoln's July 12, 2019 letter, it relies upon notes from Dr. Faulkner's file stating, "intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema." Lincoln's conclusions here are disingenuous and tantamount to cherry picking statements from medical records to rebut Dr. Faulkner's actual findings, conclusions, and diagnoses. Dr. Faulkner's physical examination of Mr. Carter and review of his symptoms notes are consistent with and support his medical opinion that Mr. Carter cannot perform sedentary work. A review of symptoms encompasses multiple areas of the body,

assessing the symptoms presented at that time of the examination and also considers the physical restrictions and limitations of that particular patient. It is not a measure of Mr. Carter's ability to perform the full-time duties of a sedentary occupation nor do the review of symptoms notes accurately assess the reasons for Mr. Carter's visits. For Lincoln to base a file review examination solely on review of symptoms notes is very narrow and inaccurate. Simply because on a certain day (appointment) Dr. Faulkner notes that Mr. Carter is not experiencing chest pain or dizziness at that moment does not alter or change Dr. Faulkner's opinion that he suffers from severely depressed left ventricular systolic function with an ejection fraction of 20–25%. Dr. Faulkner's opinion is based upon objective findings and the multiple echocardiograms he has performed on Mr. Carter over the course of over 14 years of treatment. Simply because Mr. Carter has a good day or week does not mean that his conditions are improved. If he exerts himself, he is symptomatic, which is why he cannot perform even sedentary work.

In addition, the opinions of Lincoln's medical reviewers do not support Lincoln's determination that Mr. Carter can perform sedentary work. In fact, Lincoln's medical reviewers' opinions support Mr. Carter's total disability. Dr. Borzak's December 5, 2018 Report concludes that Mr. Carter is "capable of full time work based on the available data, but only in sedentary capacity, with **no walking**, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally." (emphasis added). The May 28, 2019 Report of the Nurse Disability Consultant reached the same conclusion. It provides: "[T]he claimant can do sedentary work with **no walking**, occasional standing, lifting < 10 lbs occasionally." (emphasis added).

Sedentary work as defined by the DOT requires walking occasionally (activity or condition exists up to 1/3 of the time); therefore, neither of the medical reviewer's opinions support the ability to perform sedentary work. The DOT defines sedentary work as follows:

> S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*See Dictionary of Occupational Titles info attached hereto as Exhibit "F"*). Lincoln's proposed jobs of Assignment Clerk and Matrix inspector both require walking or standing occasionally, up to 1/3 of a work day. Both of the medical professionals that have reviewed Mr. Carter's file on Lincoln's behalf (Dr. Borzak and the Nurse Disability Consultant) have opined that Mr. Carter cannot perform the act of walking as a part of his job duties. In addition, Dr. Faulkner has consistently opined that Mr. Carter cannot perform sedentary work. Lincoln has no medical support for its denial. Mr. Carter cannot stand and walk for multiple hours a day, which is what sedentary work would require. Lincoln's own medical professionals confirm this; and Lincoln's conclusion to the contrary is untenable and must be reversed.

Mr. Carter suffers from dyspnea on exertion and has a New York Heart Association Functional class III. The NYHA Functional Classification for this level of heart failure is described as moderate and defined as marked or noticeable limitation of physical activity, comfortable at rest, but less than

---

ordinary physical activity causes tiredness, heart palpations, or shortness of breath. *See attached medical journal articles for more information on this NYHA Functional Class III.*

As stated above, please accept this letter as a portion of the materials we intend to submit in support of Mr. Carter's appeal. It is unclear whether Lincoln is in possession of the pertinent records. Lincoln also states in its denial letter that the medical records lacked "clear, overt clinical signs of sustained heart failure" and that "no study was provided for review." What information does Lincoln reference here? Please identify the records, study, and/or data (physical, electronic, imaging, etc.) that Lincoln believes are needed for the review, and I will obtain them. Many of the records I have reviewed from Dr. Faulkner and Dr. Dabov were in the claim file, but we want to ensure Lincoln has all of the information it needs to provide a full and fair review.

We request up to, and until February 15, 2020, within which to submit all documents and information relevant to Mr. Carter's appeal. This should provide enough time to allow Lincoln to identify the records it believes are not included and for us to obtain them. In addition, please provide the identity and curriculum vitae of the medical reviewers that authored the October 26, 2018 December 5, 2018, and May 28, 2109 reports. Please also describe each reviewer's business relationship with Lincoln and compensation arrangement as well as a copy of their bills for services rendered in this matter.

For the above reasons, we disagree with Lincoln's determination that Mr. Carter can perform sedentary work. We respectfully request Lincoln reverse its denial.

Should you have any questions, please do not hesitate to contact me at the number or address above.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

cc: Sherman Carter (via U.S. Mail w/ encls.)

4817-8101-3932, v. 1

Physicians of Hearts
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Date:** 02/06/19 : 09:27am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 02/06/19
**Name:** Sherman Carter
**Date of Birth:** _
**Referred By:**

**Vital Signs:**
Bp: 150/90
Height: 6', Weight: 215 lbs
BMI: 29.16 kg/m2

**Subjective:**
This 52 year old male presents for follow up visit. He denies chest pain and has had no shortness. He complains of an episode of chest tightness after lifting items. He is here for interrogation of his Single chamber AICD .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
**AICD Interrogation** - Single chamber ICD. SVT nonsustained

**Plan:**

Continue current medication(s) at same dose

**Follow-up:** 6 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

EXHIBIT
A

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

02/06/2019

---

**Procedure:** Office Visit Level 4 : 99214

# SIGNED BY Lee E Faulkner, MD (LF) 02/06/2019 09:52AM

Printed On: 11/22/2019

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date:** 11/01/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 130/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data:**
ECHO - Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan:**

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Follow-up:** 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

\# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
\# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 07/30/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

EKG - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan:**

Continue current medication(s)

**Follow-up:** 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

04/03/2017

---

**Date:** 04/03/17 : 04:04pm
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 04/03/17
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 140/70

**Subjective:**
This 50 year old male presents for follow up visit. He denies chest pain and has had no shortness of breath.

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:** Interrogation of AICD -Non sustained V tach

EKG - Sinus bradycardia rate 59, Nonspecific Twave abnormality

**Plan:**
Interrogation of AICD (complete)

Continue current medication(s)

**Follow-up:** 3 months

25 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 25

**Visit Time:** 30

**Procedure:** Office Visit Level 4 : 99214

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 Fax: (901) 682-7243

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 11/01/2018 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| RIVID: | AORTIC ROOT: |
| LVIDd: | AORTIC VALVE: |
| LVIDs: | LA SIZE: |
| IV SEPTUM-D: | FRACTIONAL SHORTENING: |
| EJECTION FRACTION: 25% | POST LV WALL-D: |
| PERICARDIAL SEPARATION: | PA PRESSURE: |
| IVSS: | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

Aortic Root: Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

___________________________

Lee E. Faulkner M.D./LB

From: 01/08/2020 12:01 #852 P.016/111

Dec 03 19, 12:10a Physicians Of Hearts 9016827243 p.14

ID:CA1967 Nov 1,2018 8:06 AM
Name:Carter Sherman
Sex:Male Birth Date:Jan 51 Years
Inch lb mmHg
Medication:
Symptoms:
History:

1100 Sinus rhythm
1574 with frequent ventricular premature complexes
wide QRS dur, ectopic beat with shortened RR
int. (beat 3, 6, 11)
4561 Twave abnormality, possible lateral ischemia
(negative T (V1, V5))
9150 ** abnormal ECG **

| | | | |
|---|---|---|---|
| Vent rate | | 76 | bpm |
| PR int | | 184 | ms |
| QRS dur | | 104 | ms |
| QT QTc int | 388 | 418 | ms |
| P QRS T axis | 30 | 3 | 40 |
| RV5/SV1 amp | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | 2.910 | mV |

Unconfirmed Report
Reviewed by: [signature]




1350A 05 05 03 05 Dept.: Exam:

From:





# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/24/2004 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 40%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/24/04 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Tricuspid Regurgitation

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/18/2005 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 50% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/18/05 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Mild global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals trace mitral regurgitation, and trace tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Global Hypokinesis
3. Trace Mitral Regurgitation
4. Trace Tricuspid Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 50% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/10/06 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 50%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 7/12/07 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global Hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 50%
2. Global Hypokinesis
3. Mild Mitral Regurgitation

________________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 09/24/2004 |
| **Sex:** Male | **Race:** African American |

## HISTORY and PHYSICAL

**HISTORY OF PRESENT ILLNESS:** Sherman Carter is a 37y/o African American gentleman who reports to our office for cardiac evaluation. Patient complains of chest pains. Patient reports that he has sharp chest pain on left side while radiating to back. Patient has no associated symptoms that has occurred with chest pain. Patient states that the chest pain experienced six days ago, was aggravated with sudden movement or change in position. Patient denies any shortness of breath, nausea, vomiting, dizziness or edema.

**PAST MEDICAL HISTORY:** Chest Pain

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did Not Bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 09/24/2004 H&P cont.

**PHYSICAL EXAMINATION: BP:** 122/88
**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Cardiomyopathy
2. Mitral Regurgitation
3. Pre Hypertension

**PLAN:**
1. ECHO-today
2. EKG-today

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Date of Visit:** 09/24/2004
**Sex:** Male
**Referred by:**
**Race:** African American

**Follow up office visit**

Sherman Carter is a 37-year old African American gentleman who presents to our office for a follow up visit for elevated blood pressure. Patient reports that he had migraines earlier this week. Patient takes medications to resolve issue. Patient states no complaints of shortness of breath, chest pain, nausea, vomiting or edema.

**Vitals: BP:** 122/88

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Cardiomyopathy

**PLAN:**

1. Follow up in 4 months

________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/7/2005 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 37 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of short pain to left anterior chest. The pain occurs occasionally during high stress time. Episodes usually last a few seconds then subsides. He reports no other complaints at this time. He denies any headaches, dizziness, and chest pain, shortness of breath, nausea, dementia, diarrhea, or constipation.

**BP:** 135/72
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. MR
3. TR

**PLAN:**
1. Alcohol Cessation
2. Follow up in 4 months

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 3/6/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter states that he has been feeling good since his last visit. He reports no complaints at this time. He denies any palpitations, chest pain, shortness of breath, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 152/90
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Cardiomyopathy
3. Hypertension

**PLAN:**
1. Current Cardiac Care
2. ETOH Cessation encouraged
3. Follow up in 2 months

________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/10/2006 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter complains of occasional shortness of breath. He states that he has been doing ok and reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 100/60
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Follow up in 6 months

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 7/12/2007 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 39 y/o African American gentleman who presents for cardiac evaluation due to elevated blood pressure. Mr. Carter reports one episode of shortness of breath but reports no other complaints at this time. He denies any palpitations, chest pain, dizziness, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 136/88
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. Current Cardiac Care
2. Follow up in 6 months

____________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 4/3/2009 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 42 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter states that he has had some mild chest pain. He reports no other complaints at this time. He denies any palpitations, shortness of breath, nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 140/70
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Cardiomyopathy
2. Hypertension

**PLAN:**
1. EKG/ECHO

______________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/12/2011 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 46%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/12/11 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals no abnormalities.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 46%
2. Left Ventricle Enlargement
3. Right Ventricle Enlargement

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 55%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall motion abnormality appreciated

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 tricuspid regurgitation.

**SUMMARY:**

1. Normal left ventricular systolic function with an ejection fraction of 55%
2. Left Ventricular Enlargement
3. Mild Tricuspid Regurgitation
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** *Male* | **Race:** *African American* |

## ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION: 45%** | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is *normal in size.*
- **Right Ventricle:** The right ventricular chamber is enlarged in size
- **Right Atrium:** The right atrium chamber is enlarged in size.

**Aortic Root:** Normal

Sherman Carter 12/10/12 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation.

**SUMMARY:**

1. Depressed left ventricular systolic function with an ejection fraction of 45%
2. Left Ventricular Enlargement
3. Global Hypokinesis
4. Mild Mitral Regurgitation

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### ECHOCARDIOGRAM

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 20% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** The left ventricle is measured to have normal thickness, same as right ventricle.

**Chambers:**
- **Left Ventricle:** The left ventricular chamber is enlarged in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 9/4/15 echo cont.

**Valves:** The aortic, mitral, tricuspid and pulmonic valves are normal.

**Walls Motion:** Severe global hypokinesis

**Doppler:** Interrogation of the valvular apparatus reveals +1 mitral regurgitation, and +1 pulmonary insufficiency.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 20%
2. Left Ventricle Enlargement
3. Severe Global Hypokinesis
4. Mild Mitral Regurgitation
5. Mild Pulmonary Insufficiency

______________________________

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Birth:**
**Sex:** Male

**Referred by:**
**Date:** 07/21/2016
**Race:** African American

**ECHOCARDIOGRAM**

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 20%
**PERICARDIAL SEPARATION:**
**IVSS:**

**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is normal in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 07/21/2016 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is no segmental wall abnormality appreciated.

**Doppler:** Interrogation of the valvular apparatus reveals mild mitral regurgitation.

**SUMMARY:**

1. severely depressed left ventricular systolic function with an ejection fraction of 20%.
2. Left Ventricular Chamber enlarged in size
3. Mild Mitral Regurgitation

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/19/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter complains of chest pain when lifting things, shortness of breath on exertion, edema in hands and some numbness. He also reports occasional dizziness. He reports no other complaints at this time. He denies any nausea, vomiting, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 130/74
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE

**IMPRESSION:**
1. Chest Pain
2. Dyspnea
3. Gouty Arthritis

**PLAN:**
1. ETOH Restriction
2. Treadmill Thallium Stress Test

Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 12/10/2012 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 45 y/o African American gentleman who presents for cardiac evaluation. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, vomiting, dizziness, orthopnea, or paroxysmal nocturnal dyspnea.

**BP:** 132/80
**Lungs:** Clear to Auscultation
**CVS:** RRR
**Abd:** NABS
**Ext:** 0 CCE
**Data:** Stress test negative for ischemia

**IMPRESSION:**
1. Hypertension
2. Gouty Arthritis

**PLAN:**
1. ECHO due to reduction in EF as reported by stress test
2. Follow up in 1 month

________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 9/4/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac clearance for left hip replacement. Mr. Carter complains of chest pain on the left side of his chest while laying down, states this last a few minutes. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:**

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 9/4/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 140/90 **HT:** 6'0" **WT:** 209lbs

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Severe cardiomyopathy, worse since last visit
2. Hypertension-blood pressure elevated

**PLAN:**

1. AICD Referral

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 10/30/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for hip surgery. Mr. Carter complains of chest pain but states that they are becoming better. He states that Dr. Lan did prescribe him medication to strengthen his heart. He reports no complaints at this time. He denies any shortness of breath, palpitations, edema, orthopnea, PND, nausea, vomiting or dizziness.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

- **GENERAL:** No lethargy, malaise, insomnia
- **PSYCH:** No sadness, crying, outbursts, confusion
- **NEURO:** No seizures, tremors, weakness, numbness
- **HEENT:** No headaches, vision changes, hearing loss, sore throat
- **CV:** No chest pain, palpitations, edema, orthopnea or PND
- **RESP:** No shortness of breath, cough or wheezes.
- **GI:** No nausea, vomiting, diarrhea, constipation, indigestion
- **GU:** No dysuria, urgency, frequency, incontinence
- **MS:** No joint/ muscle pains
- **SKIN:** No rash, itching
- **ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 10/30/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 170/120

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. Hypertension-blood pressure controlled
3. Severe Dilated Cardiomyopathy

**PLAN:**

1. Current Cardiac Care
2. Follow up in 2 weeks to re-check blood pressure
3. Patient has a follow up appointment on November 10, 2015 and will be re-evaluated at that time

________________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred By:** |
| **Date of Birth:** | **Date:** 11/10/2015 |
| **Sex:** Male | **Race:** African American |

### History & Physical

**HISTORY OF PRESENT ILLNESS:** Mr. Sherman Carter is a 48 y/o African American gentleman who presents for cardiac evaluation and clearance for left hip replacement. Mr. Carter reports no complaints at this time. He denies any chest pain, shortness of breath, nausea, dizziness, vomiting, palpitations, orthopnea, paroxysmal nocturnal dyspnea and/or edema.

**PAST MEDICAL HISTORY:** Not Pertinent

**FAMILY MEDICAL HISTORY:** Hypertension

**SOCIAL HISTORY:** (-) ETOH (-) Tobacco

**ALLERGIES:** NKDA

**MEDICATIONS:** Did not bring

**REVIEW OF SYSTEMS:**

**GENERAL:** No lethargy, malaise, insomnia
**PSYCH:** No sadness, crying, outbursts, confusion
**NEURO:** No seizures, tremors, weakness, numbness
**HEENT:** No headaches, vision changes, hearing loss, sore throat
**CV:** No chest pain, palpitations, edema, orthopnea or PND
**RESP:** No shortness of breath, cough or wheezes.
**GI:** No nausea, vomiting, diarrhea, constipation, indigestion
**GU:** No dysuria, urgency, frequency, incontinence
**MS:** No joint/ muscle pains
**SKIN:** No rash, itching
**ENDO:** No polyuria, excessive thirst, weight loss/gain

Sherman Carter 11/10/15 H&P cont.

**PHYSICAL EXAMINATION: BP:** 130/90

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis or edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. S/P AICD
2. *Cardiomyopathy*

**PLAN:**

1. Current Cardiac Care
2. Follow up in 3 months

______________________________
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 07/05/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals:** **BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

____________________________

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Date of Birth:** |
| **Date of Visit:** 07/05/2016 | **Sex:** Male |
| **Referred by:** | **Race:** African American |

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain in the middle of his chest with activity which last 10 minutes. Patient states no complaints of shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals:** **BP:** 120/80

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy -non ischemic

**PLAN:**

1. Continue Current Cardiac Care
2. Follow Up in 3 months

______________________
Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Date of Birth:** |
| **Date of Visit:** 07/21/2016 | **Sex:** Male |
| **Referred by:** | **Race:** African American |

***Follow up office visit***

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient complains of chest pain on left side of chest while doing yard work. Patient also complains of shortness of breath when outside , that lasts 10-15 minutes. Patient states no complaints of chest pain, dizziness, nausea, vomiting or edema.

**Vitals: BP:** 138/96

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**
1. Hypertension
2. Cardiomyopathy

**PLAN:**
1. Continue Current Cardiac Care

Lee E. Faulkner M.D./LB

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

**Name:** Sherman Carter
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Sherman Carter is a 49-year old African American gentleman who presents to our office for a follow up visit. Patient states that he is chest pain free. Patient states no complaints of chest pain, shortness of breath, dizziness, nausea, vomiting or edema.

**Vitals**: **BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. Degenerative Joint Disease of Hip

**PLAN:**

1. ETOH Cessation
2. Follow Up in 6 Months

______________________
Lee E. Faulkner M.D./LB

From: 01/08/2020 12:09 #852 P.056/111

CARTER SHERMAN ID: 000002995 24-Sep 2004 10:37:06

37 years
Male Black

Vent. rate 65 bpm
PR interval 138 ms
QRS duration 94 ms
QT/QTc 408/424 ms
P-R-T axes 46 86 16

Normal sinus rhythm with sinus arrhythmia
Normal ECG

Technician: AF
Test ind:

Referred by: LEE

Unconfirmed




150 Hz 25.0 mm/s 10.0 mm/mV 4 by 2.5s + 3 rhythm lds MAC 8 001F 12SL™ v250

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title:** FOLLOW UP OFFICE VISIT

**Date:** 07/30/18
**Name:** Sherman Carter
**Date of Birth:**
**Referred By:**

**Vital Signs:**
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective:**
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination:**
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression:**
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD Interrogation** - Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan:**

Continue current medication(s)

**Follow-up:** 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

Physicians of Hearts
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:** (
**Age:** 52 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 11/01/2018 |
| **Sex:** Male | **Race:** African American |

**ECHOCARDIOGRAM**

**DIMENSIONS:**

| | |
|---|---|
| **RIVID:** | **AORTIC ROOT:** |
| **LVIDd:** | **AORTIC VALVE:** |
| **LVIDs:** | **LA SIZE:** |
| **IV SEPTUM-D:** | **FRACTIONAL SHORTENING:** |
| **EJECTION FRACTION:** 25% | **POST LV WALL-D:** |
| **PERICARDIAL SEPARATION:** | **PA PRESSURE:** |
| **IVSS:** | |

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**

**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Akinesis
4. Moderate Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

______________________________

Lee E. Faulkner M.D./LB

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
*Age:* 52 years *Gender:* M

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

04/03/2017

---

# SIGNED BY Lee E Faulkner, MD (LF) 04/03/2017 04:18PM
# REVISED BY Lee E Faulkner, MD (LF) 04/03/2017 07:14PM

# SAINT FRANCIS HOSPITAL-MEMPHIS
## TREADMILL/STRESS

MR#: 1037968SFH

NAME: CARTER, SHERMAN
ENCOUNTER NUMBER: 34017913SFH
ROOM NUMBER:
DATE OF BIRTH:
*READING PHYSICIAN: ANTONIO C. QUIROZ, MD*
PHYSICIAN: LEE E FAULKNER

HISTORY OF PRESENT ILLNESS: A 45-year-old male, height 6 feet, weight 190 pounds. Patient has hypertension and has been having some chest pains.

MEDICATIONS: Include ramipril and digoxin.

INTERPRETATION. Baseline EKG shows sinus rhythm with a rate of 52 beats per minute and nonspecific ST-T abnormalities. Patient exercised 11 minutes on the standard Bruce protocol achieving 13.1 METS of workload. Exercise was stopped because of fatigue. There was no chest pain. Heart rate increased from 52-157, which is 90% of the age-predicted maximal heart rate. Blood pressure increased from 143/83-180/110 for a double product of 28,260. Cardiolite was injected approximately 1 minute prior to stopping the exercise. There were no significant ST-segment depressions, no arrhythmias. One isolated PVC was noted during the exercise. There was normalization of the T-waves during and after the exercise.

CONCLUSIONS: Negative for ischemia by EKG criteria.

Nuclear imaging interpretation will be dictated separately. Hypertensive response to exercise.

ANTONIO C. QUIROZ, MD

TIME: ________
DATE: ________

D: 11/26/2012 09:53 CST
T: 11/26/2012 10:34 CST
R:
Job#: 252986
D#: 7926695/FI

SAINT FRANCIS HOSPITAL
5959 PARK AVENUE
MEMPHIS, TN 38119

Name: CARTER, SHERMAN
MRN: 001037868
ACCT: 034017913

ANDREW T. WATSON, MD
ADM: 11/26/2012

Diagnostic Imaging

DATE OF EVALUATION: 11/26/2012

REFERRING PHYSICIAN: Lee Faulkner, M.D.

REASON FOR EVALUATION: Chest pain.

BRIEF HISTORY OF PRESENT ILLNESS: A 45-year-old African-American male who presents for evaluation with prior history of hypertension, no known coronary artery disease.

DESCRIPTION OF PROCEDURE: After obtaining written informed consent, patient underwent a Bruce protocol stress evaluation. Total exercise time was 11 minutes. Total METs obtained was 13.1.

This was a 1-day study. Rest images obtained using 3.1 mCi thallium to 1 stress image obtained using 30.2 mCi sestamibi technetium-99. Rest and stress images were compared.

Short axis, vertical long axis, horizontal long axis images appear to be well perfused and well matched. There is evidence of apical thinning. Otherwise, there is no evidence of overt segmental wall ischemia. Myocardial perfusion bull's eye map confirms the above finding. Myocardial perfusion gated study demonstrates mild-to-moderate global hypokinesis, ejection fraction calculated at 35%. Raw data cine analysis demonstrates no significant motion or other artifacts present.

OVERALL IMPRESSION: Abnormal Bruce protocol Cardiolite examination demonstrating no evidence of ischemia and ejection fraction estimated at 35%.

ANDREW T. WATSON, MD

Date: and Time:

TR:ATW/SN
DD:11/26/2012 16:23 CST
DT:11/26/2012 19:00 CST
Dictation ID: 7930950/Confirmation #: 253112

Work Type: Diagnostic Imaging
T001

Work Type Code: DGI
Page: 1

PRINTED BY: PDacus

DATE 12/10/2012

12/10/2012 13:11 901-765-3133 ST FRANCIS H I M PAGE 02/02

Saint Francis Hospital
Memphis

1000-52

| DATE | TIME | PHYSICIAN'S ORDERS | DATE | TIME | PROGRESS RECORD |
|---|---|---|---|---|---|
| 11-9-12 | | Treadmill Thallium Stress Test<br><br>Dia. Chest Pain<br><br>Date - 11-19-12<br>Time - 8:30<br>Arrival - 8:00<br><br>No Precert Required per Tiwana c United Healthcare 10 2512<br>Height - 6'<br>Weight<br><br>Physician's Signature: Lee E Faulkner MD<br><br>Date: _____ Time: _____ | | | |

Medications dispensed in accordance with the hospital formulary system

Carter, Sherman

MR# DOB:

PHYSICIAN ORDERS/PROGRESS RECORDS

R9/03

ID 2M1967
Name:Carter Sherman
Sex:Male Birth Date:Jan 15 1967 52 Years
inch lb mmHg
Medication:
Symptoms:
History:

Nov-1 2018 8:06 AM

1100 Sinus rhythm
1571 with frequent ventricular premature complexes
(wide QRS dur ectopic beat with shortened RR
int. (beat 3, 6, 11))
1561 T wave abnormality - possible lateral ischemia
(negative T (V4, V5))
9150 ** abnormal ECG **

| | | | | |
|---|---|---|---|---|
| Vent rate | | | 76 | BPM |
| PR int | | | 184 | ms |
| QRS dur | | | 104 | ms |
| QT/QTc int | | 388 | 418 | ms |
| P/QRS/T axis | 30 | 2 | 10 | |
| RV5/SV1 amp | | 2.155 | 0.755 | mV |
| RV5+SV1 amp | | | 2.910 | mV |

Unconfirmed Report
Reviewed by: [signature]

10 mm/mV 25 mm/s Filter: H50 d 150 Hz 10 mm/mV 10 mm/mV 5 mm/mV




13301 05 05 03 05 Dept . From.

Name Carter Sherman ID:[illegible]
Sex Male Birth date:
[illegible] inch lb mmHg
Medication 1
Medication 2
Room No

Vent. rate 60 bpm
PR int. 158 ms
QRS dur. 102 ms
QT/QTc int. 401 407 ms
P/QRS/T axis 45 [illegible] 22
RV5/SV1 amp. 1.870 0.995 mV
RV5+SV1 amp. 2.865 mV

[illegible] 2017 1:01 PM 60 bpm

1100 Sinus rhythm
1068 Nonspecific T wave abnormality
9140 ** Borderline ECG **

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz H 50 d 10 mm/mV 10 mm/mV 10 mm/mV



REF #3043267

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609 Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

EXHIBIT B

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

Indicate frequency per day the listed activities below can be used performed using:
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A

What job modifications would allow the patient to return to work?

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

### Activities of Daily Living

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so (M/D/Y)

N/A

Continence ____/____/________

Dressing ____/____/________

Transferring ____/____/________

Bathing ____/____/________

Toileting ____/____/________

Eating ____/____/________

Date patient experienced loss of

Cognitive Functioning: ____/____/________

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

__/__/__ to __/__/__

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change

901-682-7241
Phone Number

901-682-7243
Fax Number

Lee E Faulkner MD
Signature

__/__/__
Date

0000332 LFPESRD1 00000982

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)

From: 01/08/2020 12:13 #852 P.068/111

LFG Omaha Fax 9/4/2018 11:50:52 AM PAGE 3/003 Fax Server

Sep 04 18, 09:43a

p.2

REF #2991745

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

## GROUP CONTINUANCE OF DISABILITY
## (PLEASE see FRAUD NOTICES attached)

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

### Attending Physician's Statement

0000031 51 LFPH3G0T 00000970

1. Patient's Name Sherman Carter Date of Birth
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 23, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical - Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments:
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (circled) Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed [signature] MD (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC-01450PTO

EXHIBIT C

Page 1 of 3
10/10

PAGE 3/3 * RCVD AT 9/4/2018 11:50:51 AM [Central Daylight Time] * SVR:NE1PWFAX101/0 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):00-52

PAGE 68/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30

REF #1989621

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

EXHIBIT D

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

(To Avoid Delay Please Answer ALL Questions)

(This form is to be completed without expense to the Company and returned by ________________ )

Claim No: 1150128075 Policy No: 00001004922000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen? Has patient ever had same or similar condition? Yes No If yes, state when and describe.

(a) Diagnosis (including ICD Code(s)) Cardiomyopathy (b) Subjective Findings Worsening Dyspnea

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)

(a) Date of First visit Sept. 25, 2005 (b) Date of Last visit April 3, 2017 (c) Frequency of visits
Weekly
Monthly
Other (specify) Q 2 to 6 months or more

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

(b) Mental Impairments (if applicable)

(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association) (d) Blood Pressure (last visit) 140/70 systolic/diastolic
Class 1 (No limitation) Class 2 (Slight limitation)
Class 3 (Marked limitation) Class 4 (Complete limitation)

Has patient Recovered? Improved? Unchanged? Retrogressed? Worsening

(b) Has patient been hospital confined? Yes ~~No~~ Delete
If Yes, give Name and Address of Hospital
Confined from ____________ to ____________
Several Hospitalizations over the years





00000012 LFPV6UT1 00000109

From: 01/08/2020 12:14 #852 P.070/111

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 5/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.4

REF #1989621

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received
Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
Continence ________ (voluntarily maintaining control of bladder and bowel function)
Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ________________
Patient's Job Full-time Part-time
Any other Work Full-time Part-time
Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner Degree: MD Telephone Number
Street Address City or Town State: TN Zip Code
Signature (By Physician): Lee E Faulkner, MD Date: 5/29/17

00000012 LFPV6UT1 00000110



PAGE 5/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/9 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

PAGE 70/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):35-30

From: 01/08/2020 12:14 #852 P.071/111

LFG Omaha Fax 6/2/2017 12:03:28 PM PAGE 3/005 Fax Server

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.2

REF #1989621

Lincoln Financial Group®

Please Return Response To:
*The Lincoln National Life Insurance Company*
8801 Indian Hills Drive, Omaha, NE 68114-4066
*Toll free (800) 423-2765*

## ABILITIES FORM

Patient Name: Sherman Carter Date of Birth: _______

Occupation: _______ Claim Number: 1150128075

Date of Last Office Visit: April 3, 2017 Date of Next Office Visit: _______

☐ The patient does not have functional/limitations or restrictions

Provider's Signature: Lee E Faulkner, MD Date: /

Provider Printed Name: Lee E Faulkner, MD Degree: ☒MD ☐DO Other_______

Specialty: Cardiology Phone: _______

OR

☐ The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | ✓ (LEF) | ✓ | | |
| 11 - 20 lbs. | ✓ | | | |
| 21 - 35 lbs. | ✓ | | | |
| 36 - 50 lbs. | ✓ | | | |
| 51 - 100 lbs. | ✓ | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | | |
| Stand | | | | | |
| Walk | | | | | |
| Climb | | | | | |
| Bend | | | | | |
| Kneel | | | | | |
| Drive | | | | | |
| Finger | | | | | R / L / Both |
| Handle | | | | | R / L / Both |
| Operate Foot Controls | | | | | R / L / Both |
| Reach above the shoulder | | | | | R / L / Both |

N/A

Are there environmental factors that the patient should avoid? ☐Yes ☐No Specify: _______

Specific Limitations or Restrictions not noted above: No lifting or straining whatsoever as his condition is worsening over time

The above statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud and Warning Statements.

Provider's Signature: Lee E Faulkner MD Date: 5/24/17

Provider Printed Name: Lee E. Faulkner, MD Degree: ☒MD ☐DO Other_______

Specialty: Cardiology Phone: 901 682-7241

Address: 6005 Park Ave Ste 702 Memphis, TN 38119

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLA10631



00000012 1 FPVAUT1 00000106

PAGE 3/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/9 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

PAGE 71/111 * RCVD AT 1/8/2020 11:49:20 AM [Central Standard Time] * SVR:NE1PWFAX101/7 * DNIS:1460 * CSID: * ANI:9016807904 * DURATION (mm-ss):25-30

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
*BARDETT LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.*

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ____
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept 25, 2005
   b) Date of Most Recent Treatment Sept 29, 2016
   c) Frequency of Treatments Q 2 to 6 months or more
   d) Type of Treatment Rendered Medical - Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ____
   *If the patient is still disabled, when should the patient be able to return to work?* unknown
5. Remarks or Comments: ____
6. List Restrictions and Limitations: Medical therapy for now. Severe limitation
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   ✓ Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 11/21/16 (Month Day Year) Signed K Lee E. Faulkner MD (Attending Physician, No Stamps, please) Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN
Phone Number 901-682-7241
Fax Number 901-682-7243



EXHIBIT
E

Lincoln Financial Group®

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765
www.LincolnFinancial.com

**ATTENDING PHYSICIAN'S STATEMENT - DISABILITY (PLEASE see FRAUD NOTICES attached)**

(To Avoid Delay Please Answer ALL Questions)

*(This form is to be completed without expense to the Company and returned by____________ )*

Claim No: 1150128075 Policy No: 000010049220000000

Name of Patient: Sherman Carter Date of Birth:

When did symptoms first appear or accident happen? Aug 2015

Has patient ever had same or similar condition? Yes (No) If yes, state when and describe.

(a) Diagnosis (including ICD Code(s))

(b) Subjective Findings

(c) Objective Findings (including x-rays, EKG's, laboratory data and any clinical findings)
Severely depressed EF of 20% by Echocardiogram

(a) Date of First visit Sept 25, 2005
(b) Date of Last visit July 5, 2010
(c) Frequency of visits
Weekly
Monthly
✓ Other (specify) every 2-3 months

(d) Nature of treatment (including surgery, and medications prescribed)

(a) Physical Impairments (*As defined in Federal Dictionary of Occupational Titles)

Class 1 - No limitations of functional capacity; capable of heavy work* No restrictions. (0-10%)
Class 2 - Medium manual activity* (15-30%)
*Class 3 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60-70%)*
✓ Class 4 - Severe limitation of functional capacity; incapable of minimum (sedentary*) activity (74-100%)

Remarks:

*(b) Mental Impairments (if applicable)*

(a) Please define "stress" as it applies to this claimant.
(b) What stress and problems in interpersonal relations has claimant had on job?

Class 1 - Patient is able to function under stress and engage in most interpersonal relations (no limitations)
Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)
Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relationships (moderate limitations)
Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
Class 5 - Patient has significant loss of psychological, physiological, person and social adjustment (severe limitations)

Remarks:

(c) Functional Capacity (American Heart Association)
*Class 1 (No limitation)* *Class 2 (Slight limitation)*
Class 3 (Marked limitation) ✓ Class 4 (Complete limitation)

(d) Blood Pressure (last visit) 120/80 *systolic/diastolic*

Has patient Recovered? Improved? ✓ Unchanged? Retrogressed?

(b) Has patient been hospital confined? Yes (No)
If Yes, give Name and Address of Hospital
Confined from __________ to __________

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled?
Patient's Job Yes No
Any other work Yes No

(b) Date you are medically certifying patient unable to work.

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months Never
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes (No) If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received
Bathing ________ (washing self in tub, shower or by sponge bath, with or w/o equipment)
Dressing ________ (putting on, taking off garments, braces or any artificial limbs normally worn)
Toileting ________ (getting to, from, on and off toilet; and performing related personal hygiene)
Transferring ________ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
Continence ________ (voluntarily maintaining control of bladder and bowel function)
Eating ________ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes (No)

(c) When could patient return to work? Unknown
Patient's Job Full-time Part-time
Any other Work Full-time Part-time

Restrictions and Limitations
Medical Therapy for now

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner, MD Degree: Medical Doctor Telephone Number: 901-682-7241
Street Address: 6005 Park Ave, Ste 702 City or Town: Mphs State: TN Zip Code: 38119
Signature (By Physician): Lee E. Faulkner, MD Date:

**Lee Edwin Faulkner, M.D.**
**Physicians of Hearts, P.L.L.C.**
**CARDIOLOGY**

**Name:** Carter, Sherman
**Date of Visit:** 09/29/2016
**Referred by:**

**Date of Birth:**
**Sex:** Male
**Race:** African American

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman present for follow up visit. Mr. Carter states that he is chest pain free. He has no complaints of vomiting, dizziness, palpitation, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** **BP:** 130/90

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Alcoholism
3. DJD of Hip

**PLAN:**

1. ETOH cessation
2. Follow up in 6 months

Lee E. Faulkner M.D.
Lee E. Faulkner M.D.

# Lee Edwin Faulkner, M.D.
## Physicians of Hearts, P.L.L.C.
## CARDIOLOGY

| | |
|---|---|
| **Name:** Sherman Carter | **Referred by:** |
| **Date of Birth:** | **Date:** 7/5/2016 |
| **Sex:** Male | **Race:** African American |

**Follow up office visit**

Mr. Sherman Carter is a 49 y/o African American gentleman who is present today for a follow up visit. Mr. Carter complains of chest pain in the middle of his chest with activity, states this last 10 minutes. He reports no other complaints at this time. He denies any shortness of breath, dizziness, palpitations, dyspnea, orthopnea, and/or paroxysmal nocturnal dyspnea.

**Vitals:** BP: 120/80 **HT:** 6'1" **WT:** 212lbs

**Physical Examination**

**Head:** Normocephalic, atraumatic
**Pupils:** Equally round, reactive to light, extra ocular muscles intact
**Neck:** Supple without any carotid bruit
**Trachea:** Midline. There is no thyromegaly
**Lungs:** Clear to auscultation and percussion
**Cardio:** Normal 1st and 2nd heart sounds. There is no S-3 or S-4 gallop
**Abdomen:** Normal abdominal bowel sounds; non-tender
**Extremities:** Revealed no evidence of clubbing, cyanosis, edema
**CNS:** Cranial nerves II – XII are grossly intact. There are no focal or neurological deficits

**IMPRESSION:**

1. Hypertension
2. Cardiomyopathy (Non-Ischemic)

**PLAN:**

1. Current Cardiac Care

Lee E. Faulkner M.D.

Welcome to ITA - Information Technology Associates

DOT Dictionary of Occupational Titles
www.occupationalinfo.org

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z ?

Search | Contents | ONET NEW | Glossary | Link to this page | About

AdChoices | GED Classes | Math Skills | Math Problems




## Dictionary Of Occupational Titles
## Appendix C: Components of the Definition Trailer

APPENDIX C

COMPONENTS OF THE DEFINITION TRAILER

I. DATE OF LAST UPDATE (DLU)

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

The following descriptions of the components of the Definition Trailer are in inverse order to their placement in the trailer.

I. DATE OF LAST UPDATE (DLU)

Listed as the final element in the trailer following the definition, the Date of Last Update indicates the last year in which material was gathered for that occupation. A DLU of ``77" would indicate that the occupation has not been studied by an analyst since publication of the fourth edition DOT in 1977.

II. SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

EXHIBIT
F

The following is an explanation of the various levels of specific vocational preparation:

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Note: The levels of this scale are mutually exclusive and do not overlap.

III. GENERAL EDUCATIONAL DEVELOPMENT (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

Scale of General Education Development (GED)

06 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

06 MATHEMATICAL DEVELOPMENT

Advanced calculus:

Work with limits, continuity, real number systems, mean value theorems, and implicit functions theorems.

Modern Algebra:

Apply fundamental concepts of theories of groups, rings, and fields. Work with differential equations, linear algebra, infinite series, advanced operations methods, and functions of real and complex variables.

Statistics:

Work with mathematical statistics, mathematical probability and applications, experimental design, statistical inference, and econometrics.

06 LANGUAGE DEVELOPMENT

Same as Level 5.

05 LEVEL REASONING DEVELOPMENT

Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables. 05 MATHEMATICAL DEVELOPMENT

Algebra:

Work with exponents and logarithms, linear equations, quadratic equations, mathematical induction and binomial theorem, and permutations.

Calculus:

Apply concepts of analytic geometry, differentiations, and integration of algebraic functions with applications.

Statistics:

Apply mathematical operations to frequency distributions, reliability and validity of tests, normal curve, analysis of variance, correlation techniques, chi-square application and sampling theory, and factor analysis.

05 LANGUAGE DEVELOPMENT

Reading:

Read literature, book and play reviews, scientific and technical journals, abstracts, financial reports, and legal documents.

Writing:

Write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs.

Speaking:

Coversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics, and discussion and debate.

04 LEVEL REASONING DEVELOPMENT

Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

04 MATHEMATICAL DEVELOPMENT

Algebra:

Deal with system of real numbers; linear, quadratic, rational, exponential, logarithmic, angle and circular functions, and inverse functions; related algebraic solution of equations and inequalities; limits and continuity; and probability and statistical inference.

Geometry:

Deductive axiomatic geometry, plane and solid, and rectangular coordinates.

Shop Math:

Practical application of fractions, percentages, ratio and proportion, measurement, logarithms, slide rule, practical algebra, geometric construction, and essentials of trigonometry.

04 LANGUAGE DEVELOPMENT

Reading:

Read novels, poems, newspapers, periodicals, journals, manuals, dictionaries, thesauruses, and encyclopedias.

Writing:

Prepare business letters, expositions, summaries, and reports, using prescribed format and conforming to all rules of punctuation, grammar, diction, and style.

Speaking:

Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects.

03 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

03 MATHEMATICAL DEVELOPMENT

Compute discount, interest, profit and loss; commission, markup, and selling price; ratio and proportion; and percentage. Calculate surfaces, volumes, weights, and measures.

Algebra:

Calculate variables and formulas; monomials and polynomials; ratio and proportion variables; and square roots and radicals.

Geometry:

Calculate plane and solid figures; circumference, area, and volume. Understand kinds of angles and properties of pairs of angles.

03 LANGUAGE DEVELOPMENT

Reading:

Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.

*Writing:*

Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.

Speaking:

Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

02 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

02 MATHEMATICAL DEVELOPMENT

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

02 LANGUAGE DEVELOPMENT

*Reading:*

Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Writing:

Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking:

Speak clearly and distinctly with appropiate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

01 LEVEL REASONING DEVELOPMENT

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT

Add and subtract two digit numbers.

Multiply and divide 10's and 100's by 2, 3, 4, 5.

Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT

Reading:

Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

Compare similarities and differences between words and between series of numbers.

Writing:

Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Speaking:

Speak simple sentences, using normal word order, and present and past tenses.

IV. PHYSICAL DEMANDS - STRENGTH RATING (Strength)

The Physical Demands Strength Rating reflects the estimated overall strength requirement of the job, expressed in terms of the letter corresponding to the particular strength rating. It represents the strength requirements which are considered to be important for average, successful work performance.

The strength rating is expressed by one of five terms: Sedentary, Light, Medium, Heavy, and Very Heavy. In order to determine the overall rating, an evaluation is made of the worker's involvement in the following activities:

a. Standing, Walking, Sitting

Standing - Remaining on one's feet in an upright position at a work station with-out moving about.

Walking - Moving about on foot.

Sitting - Remaining in a seated position.

b. Lifting, Carrying, Pushing, Pulling

Lifting - Raising or lowering an object from one level to another (includes upward pulling).

Carrying - Transporting an object, usually holding it in the hands or arms, or on the shoulder.

Pushing - Exerting force upon an object so that the object moves away from the force (includes slapping, striking, kicking, and treadle actions).

Pulling - Exerting force upon an object so that the object moves toward the force (includes jerking).

Lifting, pushing, and pulling are evaluated in terms of both intensity and duration. Consideration is given to the weight handled, position of the worker's body, and the aid given by helpers or mechanical equipment. Carrying most often is evaluated in terms of duration, weight carried, and distance carried.

Estimating the Strength factor rating for an occupation requires the exercise of care on the part of occupational analysts in evaluating the force and physical effort a worker must exert. For instance, if the worker is in a crouching position, it may be much more difficult to push an object than if pushed at waist height. Also, if the worker is required to lift and carry continuously or push and pull objects over long distances, the worker may exert as much physical effort as is required to similarly move objects twice as heavy, but less frequently and/or over shorter distances.

c. Controls

Controls entail the use of one or both arms or hands (hand/arm) and/or one or both feet or legs (foot/leg) to move controls on machinery or equipment. Controls include but are not limited to buttons, knobs, pedals, levers, and cranks.

Following are descriptions of the five terms in which the Strength Factor is expressed:

S-Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are

sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

M-Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

H-Heavy Work - Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work.

V-Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work.

V. GUIDE FOR OCCUPATIONAL EXPLORATION (GOE)

Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work requirements.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

01 Artistic 05 Mechanical 09 Accommodating

02 Scientific 06 Industrial 10 Humanitarian

03 Plants-Animals 07 Business Detail 11 Leading-Influencing

04 Protective 08 Selling 12 Physical Performing

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

▷ ×

Download Google Chrome Browser

Chrome Safe Browsing will protect you from malicious sites.

DOWNLOAD

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables
- *China Statistical Tables*
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- *Airport Codes*
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/contents.html**

Translators on the www

| | Espa�ol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2003 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 05-Jun-03

CTR030418

DICTIONARY OF OCCUPATIONAL TITLES CD-ROM OR DOWNLOAD DOT Android or Windows

| A | B | C |
|---|---|---|
| D | E | F |
| G | H | I |
| J | K | L |
| M | N | O |
| P | Q | R |
| S | T | U |
| V | W | X |
| Y | Z | ? |



Like 0 Custom Search Search

CODE: **215.367-010** Buy the DOT:Download
TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

Drivers who switch to Allstate can save $356.
Allstate
Drivers who switch to Allstate can save $356.
Allstate

- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page

. Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/21/215367010.html**

Language Translations
| | Espanol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **215.367-010 Buy the DOT:**Download TITLE(s): **ASSIGNMENT CLERK (motor trans.) alternate titles: assignment agent; bulletin clerk**

Assigns operating personnel of busline to partial, temporary, or rush hour runs to meet daily human resource and transportation needs of company: Records driver staffing requirements for unstaffed scheduled runs from data received from personnel department. Prepares list of extra drivers available in ready room for assignment for regular, special, or charter trips. Selects drivers according to such considerations as seniority, experience, and time, location, and duration of assignment. Records and submits data on assignments to personnel department. May prepare and issue bulletins regarding policy, procedure, and schedule changes.
**GOE: 07.05.01 STRENGTH: S GED: R3 M2 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 58008 Production, Planning, and Expediting Clerks

CTIONARY OCCUPATIONAL TLES CD-ROM OR DOWNLOAD DOT Android or Windows

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

| | | |
|---|---|---|
| A | B | C |
| D | E | F |
| G | H | I |
| J | K | L |
| M | N | O |
| P | Q | R |
| S | T | U |
| V | W | X |
| Y | Z | ? |

‹Previous | Next › | Search | Contents | ONET NEW | Link to this page | About

Like 0 Custom Search | Search

CODE: **654.687-010** **Buy the DOT:**Download
TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers






- Dictionary of Occupational Titles (DOT) Index
- Standard Industrial Classifications (SIC) Index
- Occupational Information Network (ONET) Index
- US Census Statistical Tables

- China Statistical Tables
- World Facts
- Quick Maps (for your web site)
- Flags of All Countries (for your web site)
- Digraphs - Internet Country Codes
- Airport Codes
- Seaport Codes
- About Climate (+ Glossary)
- Immigration Superhighway
- ITA Main Page
- Feedback

Please Add this page to your FAVORITES

URL address of this page: **https://occupationalinfo.org/65/654687010.html**

Language Translations
| | Espapol | Children | Lawyers | E-mail

"Immigration Superhighway", "Immigration Central", "Immigration Assistant", "Immigration Expert", "Immigration Expert Pro" and "Immigration USA" are trademarks of Information Technology Associates.

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved).
Revised 26-May-03

Previous | Next | Contents | ONET | About

CODE: **654.687-010** **Buy the DOT:**Download TITLE(s): **MATRIX INSPECTOR (machinery mfg.)**

Examines metal matrices (dies) for defects which are discernible with naked eye.
**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**
ONET CROSSWALK: 83005A Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers

© 1995 - 2015 Photius Coutsoukis and Information Technology Associates (All Rights Reserved). Revised 26-May-03

The New York Heart Association (NYHA) Functional Classification scale associates a patient's heart failure according to the severity of the observable symptoms.

## New York Heart Association (NYHA) Functional Classification

The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification. It places patients in one of four categories based on the level of limitation during physical activity.

If the hospice diagnosis is heart disease, the NYHA classification should be Stage IV, to meet the criteria for hospice eligibility. Stage IV heart disease is characterized by symptoms of heart failure or anginal syndrome at rest. Symptoms include chest pain, dyspnea, weakness and inability to tolerate activity without discomfort. Additional criteria necessary for hospice eligibility with a terminal diagnosis of heart disease includes optimal treatment of heart disease, the patient declines or is ineligibility for surgical intervention, an ejection fraction of ≤ 20% and a history of a one of the following in the last 12 months: Treatment resistant SVT or ventricular arrhythmia, unexplained syncope, cardiac arrest, brain embolism of cardiac origin and/or concomitant HIV disease.

Classification is based on observable symptoms which must be clearly documented in the patient's clinical record to support the classification listed:

| ***Class*** | ***Objective Assessment*** | ***Patient Symptoms*** |
|---|---|---|
| *Class I (Mild)* | ***No objective evidence of cardiovascular disease.*** No symptoms and no limitation in ordinary physical activity. | ***No limitation of physical activity.*** Ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea (shortness of breath). |
| *Class II (Mild)* | ***Objective evidence of minimal cardiovascular disease.*** Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. | ***Slight limitation of physical activity.*** Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. |
| *Class III (Moderate)* | ***Objective evidence of moderately severe cardiovascular disease.*** Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. | ***Marked limitation of physical activity.*** Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| *Class IV (Severe)* | ***Objective evidence of severe cardiovascular disease. Severe limitations.*** Experiences symptoms even while at rest. | ***Unable to carry out any physical activity without discomfort. Symptoms of cardiac insufficiency at rest.*** If any physical activity is undertaken, discomfort is increased. |

Reference: The Stages of Heart Failure – NYHA Classification (2002). Retrieved 07/31/2006 from http://www.abouthf.org/questions_stages.htm

# New York Heart Association (NYHA) Functional Classification

The original NYHA Functional Classification was published in 1928. This was a time before important diagnostic modalities like the portable ECG, echocardiogram, exercise stress test and the cardiovascular disease biomarker B-type natriuretic peptide (BNP) assay.

McDonald and Wilkinson (2017) and other researchers are advocating for the increased use of natriuretic peptides as part of the strategies for heart failure diagnosis and prevention. The use of these biomarkers has been shown to improve diagnostic accuracy for HF and provide prognostic information for more than a decade of use with recommendations by national and *international cardiovascular organizations*.

The NYHA classification has been updated many times. Today's version includes two sections; 1) a subjective description of functional capacity and 2) an objective diagnostic assessment of cardiovascular disease. While subjective inconsistencies may result when classifying patients in class II or III, functional capacity remains a powerful prognostic indicator and is routinely used for clinical staging of heart failure today.

**New York Heart Association (NYHA) Functional Classification**

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

Source: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure

One commonly used technique to assess the functional capacity of patients is the Six-minute walk test (6MWT). The 6MWT has been shown to be a reliable, inexpensive, safe and easy to administer test that correlates with health outcomes (Rostagno, C. Gensini, 2008). (https://www.lung.org/lung-health-and-diseases/lung-procedures-and-tests/six-minute-walk-test.html, updated 2018).

**Six Minute Walk Test**

- **Explain that the test requires walking for 6 minutes in a straight line between to points 60 feet apart.**
- **Place a chair at either end of the course and explain that the patient may stop, rest or sit if necessary and that you will bring the chair to them if needed.**
- **Measure the total distance walked in 6 minutes.**

Casanova et al (2011) studied 444 healthy subjects from seven countries to determine standard performance on the 6MWT. The 6MWT measures meters (m) walked as quickly as possible by the individual in six minutes.

The mean meters walked by all subjects was 571+ or – 90 m with male subjects walking 30m more than females. This is consistent with other similar studies. Older subjects walked shorter distances than younger subjects.

- 40–49 yrs of age, 611±85 m
- 50–59 yrs of age, 588±91 m
- 60–69 yrs of age, 559±80 m
- 70–80 yrs of age, 514±71 m

Rasekaba, Lee, Naughton, Williams & Holland (2009) determined a distance less than 350 m on the 6MWT to be associated with an increased mortality in chronic HF patients. A lowering of the walking distance of 50 m or more is considered clinically significant. Ferreira, et al. (2019) concluded in their research the 6-minute walk test distance at baseline and a decline in walking distance were both associated with worse prognosis.

Bittner et al (1993) studied 898 patients with left ventricular dysfunction with either radiological evidence of HF and/or an ejection fraction of 0.45 or lower. During the 242 days of follow up 114 patients either died or were hospitalized for CHF. The lowest performance group on the 6MWT had a statistically greater chance of dying or being hospitalized than the higher performing group. See detailed instruction about the 6MWT at the Heart Foundation website.

In an updated study by Wegrzynowska-Teodorczyk (2013), the researchers also found the distance covered during the 6MWT predicted the risk of death or hospitalization. Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. They studied 243 men with stable systolic heart failure.

- Class I 15%
- Class II 44%
- Class III 37%
- Class IV 4%

69% of the participants died or required hospitalization during the following 3 years. The statistical analysis showed the shorter the distance walked in the 6MWT, the greater the 1-year and 3-year mortality risk.
Du, et al., (2017) reviewed research on the 6MWT in chronic heart failure published from 2012 to 2017. The researchers found the 6MWT not to be as accurate as possible in determining peak VO2. They suggest using mobile apps to better assess actual distance walked and heart rate.

---

References

American Heart Association. Professional Heart Daily. Accessed 8/2/16 http://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp

Bittner et al. (1993). Prediction of mortality and morbidity with a 6-minute walk test in patients with left ventricular dysfunction. SOLVD Investigators. *JAMA*, 270(14), 1702-7.

Casanova, C. et al. (2011). The 6-min walk distance in healthy subjects: reference standards from seven countries. *European Respiratory Journal*, 37, 150-156.

Du, H., Wonggom, P., Tongpeth, J. & Clark, R.A. (2017). Six-Minute Walk Test for Assessing Physical Functional Capacity in Chronic Heart Failure. Curr Heart Fail Rep. 14(3),158-166.

Ferreira, J.P., Metra, M., Anker, S.D., Dickstein, K., Lang, C.C.. & Ng, L. (2019). Clinical correlates and outcome associated with changes in 6-minute walking distance in patients with heart failure: findings from the BIOSTAT-CHF study. Eur J Heart Fail. 21(2), 218-226.

McDonald, K., Wilkinson, M. (2017). Evolving Use of Natriuretic Peptides as Part of Strategies for Heart Failure Prevention. Clin Chem. 63(1), 66-72.

Rasekaba, T., Lee, A. L., Naughton, M. T. ,Williams, T. J. & Holland, A. E. (2009). The six-minute walk test: a useful metric for the cardiopulmonary patient. *Intern Med J.*, 39(8),495-501.

Rostagno C., Gensini G.F. (2008). Six minute walk test: a simple and useful test to evaluate functional capacity in patients with heart failure. *Intern Emerg Med.* 3(3):205-12.

The Criteria Committee of the New York Heart Association. (1994). *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels.* (9th ed.). Boston: Little, Brown & Co. pp. 253–256.

Wegrzynowska-Teodorczyk, K., Rudzinska, E., Lazorczyk, M., Nowakowska, K., Banasiak, W. Ponikowski, P et al. (2013). Distance covered during a six-minute walk test predicts long-term cardiovascular mortality and hospitalization rates in men with systolic heart failure: an observational study. J Physiother. 59(3), 177-87.

---

© RnCeus.com

# Classes of Heart Failure

Doctors usually classify patients' heart failure according to the severity of their symptoms. The table below describes the most commonly used classification system, the New York Heart Association (NYHA) Functional Classification[1]. It places patients in one of four categories based on how much they are limited during physical activity.

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea (shortness of breath). |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. |
| IV | Unable to carry on any physical activity without discomfort. Symptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases. |

| Class | Objective Assessment |
|---|---|
| A | No objective evidence of cardiovascular disease. No symptoms and no limitation in ordinary physical activity. |
| B | Objective evidence of minimal cardiovascular disease. Mild symptoms and slight limitation during ordinary activity. Comfortable at rest. |
| C | Objective evidence of moderately severe cardiovascular disease. Marked limitation in activity due to symptoms, even during less-than-ordinary activity. Comfortable only at rest. |
| D | Objective evidence of severe cardiovascular disease. Severe limitations. Experiences symptoms even while at rest. |

**For Example:**

- A patient with minimal or no symptoms but a large pressure gradient across the aortic valve or severe obstruction of the left main coronary artery is classified:
  - **Function Capacity I, Objective Assessment D**
- A patient with severe anginal syndrome but angiographically normal coronary arteries is classified:
  - **Functional Capacity IV, Objective Assessment A**

[Heart Failure](#)

[What is Heart Failure?](#)
Types of Heart Failure
Classes of Heart Failure
Heart Failure in Children and Adolescents

Causes and Risks

Warning Signs of Heart Failure

Diagnosing Heart Failure

Treatment Options

Living with Heart Failure and Managing Advanced HF

Tools and Resources

Heart Failure Personal Stories

Related Articles

Heart Failure Questions to Ask Your Doctor

*[1] Adapted from Dolgin M, Association NYH, Fox AC, Gorlin R, Levin RI, New York Heart Association. Criteria Committee. Nomenclature and criteria for diagnosis of diseases of the heart and great vessels. 9th ed. Boston, MA: Lippincott Williams and Wilkins; March 1, 1994.*

*Original source: Criteria Committee, New York Heart Association, Inc. Diseases of the Heart and Blood Vessels. Nomenclature and Criteria for diagnosis, 6th edition Boston, Little, Brown and Co. 1964, p 114.*

Warning Signs of Heart Failure

Popular Articles

Heart Insight

In the first of a four-part series on heart failure, we investigate what it is, what causes it and what's the prognosis.

The second installment explains heart failure with muscle intact. Queen Latifah and her mom, Rita, share their personal experience with Rita's own heart failure diagnosis.

Heart failure patients are often hospitalized. This article looks at managing self-care to minimize just how often re-hospitalizations happen.

When HF progresses to an advanced stage, there are many decisions to be made. Here we delve into the importance of shared decision making.

Classes of Heart Failure

Last Reviewed: May 31, 2017

Diagnosing Heart Failure

HF Path™

A better quality of life for heart failure patients? We've got a tool for that!

Begin Your Journey Today

Explore My HF Guide

Our free interactive workbook to help manage heart failure symptoms

Open now

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number:

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

## If You Have Any Questions

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

European Journal of Heart Failure (2017) 19, 366–376
doi:10.1002/ejhf.563

RESEARCH ARTICLE

# New York Heart Association functional class, QRS duration, and survival in heart failure with reduced ejection fraction: implications for cardiac resychronization therapy

**Frieder Braunschweig[1,2]*, Cecilia Linde[1,2], Lina Benson[3], Marcus Ståhlberg[1,2], Ulf Dahlström[4], and Lars H. Lund[1,2]**

[1]Karolinska Institutet, Department of Medicine, Stockholm, Sweden, [2]Karolinska University Hospital, Department of Cardiology, Stockholm, Sweden; [3]Karolinska Institutet, Department of Clinical Science and Education, South Hospital, Stockholm, Sweden; and [4]Department of Cardiology and Department of Medicine and Health Sciences, Linköping University, Linköping, Sweden

*Received 14 January 2016; revised 23 March 2016; accepted 4 April 2016; online publish-ahead-of-print 23 June 2016*

**Aims** Symptom severity assessed by NYHA functional class and QRS duration are essential criteria for selection of heart failure (HF) patients for CRT. This study assessed the relationship between NYHA class, QRS duration, and survival in a nationwide HF registry.

**Methods and results** We studied 13 423 patients with HF in NYHA class II–IV and LVEF <40% in the Swedish Heart Failure Registry. Survival was followed via the Swedish Population Registry. Of 12 534 patients without CRT (age 71 ± 12 years, 29% women), 51% and 49% were in NYHA class II and III–IV, respectively. Patients in NYHA class II compared with class III–IV were younger (69 vs. 73 years), and had a better systolic function (49% vs. 58% with LVEF <30%), $P$ <0.001 for all, and a favourable co-morbidity profile. QRS duration was 116 ± 29 ms in NYHA class II and 119 ± 29 ms in NYHA class III–IV with QRS ≥120 ms found in 37% vs. 44%, and an LBBB in 23% vs. 28% ($P$ < 0.001 for all). Upon multivariable Cox regression adjusting for 40 clinically relevant variables, mortality risk was higher in NYHA class III–IV vs. class II, with a hazard ratio (HR) of 1.31, 95% confidence interval (CI) 1.23–1.40. Mortality was also higher with QRS prolongation ≥120 ms vs. narrow QRS. The HR in NYHA class II patients with non-LBBB was 1.19 (95% CI 1.05 – 1.36) and in those with LBBB it was 1.16 (95% CI 1.03–1.41). The corresponding HRs in NYHA class III–IV were 1.33 (95% CI 1.21–1.47) and 1.12 (95% CI 1.02–1.22). There was no significant interaction between the effects of NYHA class and QRS duration or morphology on mortality. Applying different scenarios to estimate guideline adherence, fewer patients with NYHA class II (range 14.4–42.6%) compared with NYHA class III–IV (18.0–45.4%) had received a CRT device when indicated.

**Conclusions** In HF with reduced LVEF, QRS prolongation is common and independently linked to worse survival. The increase in mortality risk associated with QRS prolongation of both LBBB and non-LBBB morphology is similar in NYHA class II and III–IV.

**Keywords** NYHA functional class • Heart failure • QRS width • Left bundle branch block • Epidemiology • Cardiac resynchronization therapy

*Corresponding author. Department of Cardiology, Karolinska University Hospital, Solna, 17176 Stockholm, Sweden. Tel: +46 8 51771629, Fax: +46 8 311044, Email: frieder.braunschweig@karolinska.se

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

## Introduction

Heart failure (HF) is a highly symptomatic syndrome and associated with poor quality of life, frequent hospitalizations, and a high mortality risk despite recent advances in treatment with drugs and devices.[1,2] It is estimated that 2–3% of the population in industrialized countries suffers from HF, with a marked rise in those aged above 65.[3,4] In 1928 the New York Heart Association published a classification of HF symptom severity relating cardinal symptoms of HF like shortness of breath and fatigue to the levels of physical activity on which they occur (NYHA functional class I–IV).[5] Despite well-known limitations such as the temporal variability of clinical findings, interoperator variation, and a poor correlation with measures of cardiac function,[6,7] the NYHA classification is universally used to grade symptoms and select therapy in clinical practice, and provides prognostic discrimination close to that of complex multivariable risk models.[8]

A wide QRS complex on the surface ECG, especially if displayed as an LBBB, indicates intraventricular dyssynchony, and is a marker of poor prognosis in HF.[9] Cardiac resynchronization therapy improves survival, functional capacity, and quality of life in selected patients with such ECG abnormalities. Following early pivotal trials establishing the effectiveness of CRT in NYHA class III and IV,[10,11] the concept of resynchronization was expanded to patients with mild HF.[12–14] Current guidelines recommend CRT for patients with HF in NYHA class II–IV,[15–17] with gradual differentiations in relation to QRS morphology and duration. Based on evidence from trials and meta-analyses, patients with a typical LBBB pattern are given the highest level of recommendation.[18,19] A recent individual patient meta-analysis, however, suggested QRS duration rather than morphology as an independent predictor of CRT outcomes.[20] The implementation of CRT guidelines shows wide national and regional variation.[21] Potential differences in the adoption of CRT in NYHA class II compared with class III–IV have not been explored.

Since NYHA class and QRS morphology and duration form essential selection criteria, it would be important to study the relationship between these variables and survival in CRT candidates. However, this has been difficult as randomized studies largely included patients with either NYHA class III–IV or NYHA class (I and) II. Furthermore, the impact of QRS characteristics on survival in different groups of NYHA class is confounded by many other variables. Thus, large samples with information on a wide spectrum of baseline variables would be required to reach valid conclusions. Therefore, we investigated the interaction between NYHA class, QRS morphology/duration, and survival in a large Swedish HF registry with information from long-term follow-up and complete survival status by linkage to the National Population Registry.

## Methods

The Swedish Heart Failure Registry (SwedeHF) has been described previously.[22,23] Including over 63 000 unique HF patients, it is one of the largest HF registries worldwide. The protocol, case report form, and annual registry reports are available at http://www.SwedeHF.se. Patients with clinician-judged HF are included at discharge from hospital or upon outpatient visits at cardiology or internal medicine units and primary care clinics. Approximately 80 variables are recorded. The HF registry in general as well as the present study conform to the Declaration of Helsinki and they were approved by the responsible ethics committees. Individual patient consent is not required, but patients are informed of entry into national registries and allowed to opt out.

## Patients

*Figure 1* provides details on patient inclusion and exclusion. Between 11 May 2000 and 5 June 2013, there were 85 291 registrations from inpatient and outpatient units at 68 of 94 hospitals and from 102 of ~1000 primary care outpatient clinics in Sweden. Coverage in 2012 was 55%. This was defined as the number of individuals reported to the registry divided by the sum of individuals with clinical HF encountered in Sweden according to ICD-10 (International Classification of Diseases-10th revision) code for HF plus those reported to the registry (to capture those few who may have been missed by ICD-10 code).

Survival status was updated monthly by linkage with the Swedish population registry (latest update 15 May 2013). For the purpose of this study, we included first registrations from patients with HF and reduced EF, defined as an EF ≤40%. Patients had to be in NYHA class II, III, or IV, with complete data on age, rhythm, device implantation status, as well as QRS duration and morphology. Patients with a prolonged QRS duration of ≥120 ms were defined as either LBBB or non-LBBB type at the discretion of the physician. We excluded repeat registrations and patients with a pacemaker or implantable cardioverter defibrillator (ICD) without a CRT component.

## Analyses

The analysis of the inter-relationship between NYHA class, QRS duration, and survival was performed after the exclusion of patients with a CRT and, thus, paced QRS complexes on the ECG (*Figure 1*), whereas the analysis of CRT utilization included patients with a CRT device.

Categorization and availability of data in the registry do not allow a perfect match with European Society of Cardiology (ESC) guidelines.[15–17] Therefore, we evaluated four different scenarios to account for different levels of recommendation in the guidelines and different strengths of fitting between guideline criteria and registry variables. In the registry, EF is reported as <30, 30–39, 40–49, and ≥50%. As EF in Sweden is overwhelmingly reported in 5–10% increments, we assumed that most patients registered in the group with EF 30–39% had an actual EF of 30% or 35% and that few had an EF of 36–39%. In contrast, when selecting only registry patients with EF <30%, all would fulfil the LVEF guideline criterion for CRT, but some patients with EF 30–35% would be missed.

The strength of evidence and recommendations for CRT varies depending on QRS duration (120–149; ≥150 ms), QRS morphology (LBBB vs. non-LBBB), and rhythm (sinus vs. AF). Therefore, we performed analyses with progressively stricter CRT selection criteria, based on the guideline-specified recommendations I-A, I-B, IIa-B, and IIb-B from the European Heart Rhythm Association Guidelines 2013.[16] Guidelines also recommend CRT in patients with an indication for conventional ventricular pacing. The registry contains data on the presence of conventional pacemakers but not on the original indication for implantation or the percentage of ventricular pacing. Therefore, this potential guideline indication was not taken into account and patients with a previous pacemaker were excluded.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 1** Flow chart showing the selection of study patients from the SwedeHF registry. HF, heart failure; ICD, implantable cardioverter defibrillator.

Scenario 1: sinus rhythm (NYHA II–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology) or AF (NYHA III–IV, EF <40%, QRS ≥120 ms regardless of QRS morphology)
Scenario 2: sinus rhythm (NYHA II–IV, EF <40%, LBBB or QRS ≥150 ms) or AF (NYHA III–IV, EF <40%, LBBB, or QRS ≥150 ms)
Scenario 3: sinus rhythm (NYHA II–IV, EF <30%, LBBB, or QRS ≥150 ms) or AF (NYHA III–IV, EF <30%, or QRS ≥150 ms)
Scenario 4: sinus rhythm (NYHA II–IV, EF <30%, QRS ≥150 regardless of QRS morphology) or AF (NYHA III–IV, EF <30%, QRS ≥150 regardless of QRS morphology) (patients were only included after 1 January 2011 because evidence in NYHA II was not available before then).

## Statistical analysis

All analyses were performed in R version 3.0.2 (R Foundation for Statistical Computing, Vienna, Austria). The level of significance was set to 5% and all reported *P*-values are two-tailed.

Survival for narrow QRS, non-LBBB QRS prolongation, and LBBB was presented using the Kaplan–Meier method and groups were compared with the log-rank test, separately for patients with NYHA class II and III–IV. Univariable and multivariable Cox regressions, using the Efron method for tie handling, were performed for non-LBBB/LBBB as a categorical variable compared with narrow QRS with adjustment for the 40 variables listed in the Supplementary material online, *Table S1*, and the interaction between NYHA class and QRS morphology. The modelling of an interaction effect renders a similar interpretation as if the data had been analysed separately in NYHA class subgroups, but with the additional benefit of also being able statistically to test differences between groups of NYHA class in effects of non-LBBB and LBBB vs. narrow QRS on mortality.

The proportional hazards assumption was investigated for the scaled Schoenfeld residuals from the multivariable models, and the dfbetas [a measure of how much the hazard ratio (HR) changes owing to the deletion of a single observation] from the models were inspected to detect extreme outliers. As a result, location (inpatient vs. outpatient) and marital status were modelled as strata variables because they were deemed not to fulfil the proportional hazard assumption. All continuous variables were modelled using restricted cubic splines (enabling possible non-linear relationships between these variables and the outcome to be modelled) with four degrees of freedom.[24]

Some baseline variables had missing data. *Table S1* in the Supplementary material online specifies 40 clinically relevant baseline variables and percentage missing for each variable. In the multivariable Cox regressions, to avoid bias and confounding resulting from variables not missing completely at random, multiple imputation ($n = 10$) was performed for all variables with missing data, using predictive mean matching with QRS width as a continuous variable and the 40 variables in *Table S1* in the Supplementary material online, and the outcome, survival, included as the Nelson–Aalen estimator in the imputation model, although not imputed itself because it contained no missing values. Imputation corrections to the resulting standard errors were performed.

# Results

Of 85 291 entries in the registry, 13 423 unique patients fulfilled the selection criteria (*Figure 1*). Of these, 889 had a CRT device implanted including 447 with an ICD component, leaving 12 534 patients without CRT for the main analysis. Baseline characteristics are provided in *Table 1* (for a complete list of variables see *Table S1*

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

**Table 1 Baseline characteristics**

| Variable | NYHA II (*n* = 6377) | NYHA III–IV (*n* = 6157) | *P*-value |
|---|---|---|---|
| Demographics | | | |
| Male gender | 4627 (73%) | 4273 (69%) | <0.001 |
| Age (years) | 69 ± 12 | 73 ± 12 | <0.001 |
| HF-related characteristics | | | |
| NYHA II | 6377 (100%) | – | <0.001 |
| NYHA III | – | 5554 (90%) | |
| NYHA IV | – | 603 (10%) | |
| Duration <6 months | 3741 (59%) | 2668 (44%) | <0.001 |
| IHD | 2870 (48%) | 3282 (56%) | <0.001 |
| DCM | 1276 (20%) | 1140 (19%) | 0.042 |
| HCM | 60 (2%) | 61 (2%) | 0.972 |
| LVEF 30–39% | 3246 (51%) | 2589 (42%) | <0.001 |
| LVEF <30% | 3131 (49%) | 3568 (58%) | |
| QRS-related characteristics | | | |
| QRS duration (ms) | 116 ± 29 | 119 ± 29 | <0.001 |
| QRS <120 ms | 4021 (63%) | 3437 (56%) | <0.001 |
| QRS 120–149 ms | 1305 (20%) | 1595 (26%) | |
| QRS ≥150 ms | 1051 (16%) | 1125 (18%) | |
| LBBB | 1497 (23%) | 1706 (28%) | <0.001 |
| Rhythm, blood pressure | | | |
| AF (any form) | 2548 (40%) | 2848 (46%) | <0.001 |
| Permanent AF | 2033 (32%) | 2333 (38%) | <0.001 |
| Heart rate (b.p.m.) | 72 ± 15 | 76 ± 16 | <0.001 |
| Systolic blood pressure (mmHg) | 126 ± 20 | 122 ± 21 | <0.001 |
| Co-morbidities | | | |
| Hypertension | 2722 (44%) | 2815 (47%) | <0.001 |
| Diabetes | 1284 (20%) | 1758 (29%) | <0.001 |
| Valve disease | 1003 (16%) | 1432 (24%) | <0.001 |
| Pulmonary disease | 845 (13%) | 1261 (21%) | <0.001 |
| Revascularization | 1710 (27%) | 1798 (29%) | 0.003 |
| Biochemistry | | | |
| Haemoglobin (g/L) | 138 ± 16 | 133 ± 17 | <0.001 |
| NT-proBNP (ng/L) | 2279 (1022–4902) | 3883 (1760–8456) | <0.001 |
| GFR (mL/min/1.73 m$^2$) | 76 ± 36 | 64 ± 34 | <0.001 |
| Medications | | | |
| ACE inhibitor | 4845 (76%) | 4165 (68%) | <0.001 |
| ARB | 1353 (21%) | 1446 (24%) | 0.002 |
| Beta-blocker | 5900 (93%) | 5534 (90%) | <0.001 |
| MRA | 1991 (31%) | 2328 (38%) | <0.001 |
| Diuretic | 4674 (74%) | 5403 (88%) | <0.001 |
| Digitalis | 1119 (18%) | 1133 (18%) | 0.207 |
| Nitrate | 744 (12%) | 1147 (19%) | <0.001 |
| OAC | 2516 (40%) | 2439 (40%) | 0.838 |

Numbers are *n* (%) for categorical variables and mean ± SD for continuous variables, and tested with $\chi^2$ test and t-test, respectively.
NT-proBNP is given as median (interquartile range).
DCM, dilated cardiomyopathy, GFR, glomerular filtration rate; HCM, hypertrophic cardiomyopathy, IHD, ischaemic heart disease; MRA, mineralocorticoid receptor antagonist; OAC, oral anticoagulant

in the Supplementary material online). There were 6377 patients (51%) with NYHA class II and 6157 (49%) in NYHA class III–IV.

Patients in NYHA class II were younger, more likely to be male, and had a shorter duration of HF, less ischaemic cardiomyopathy, and a higher LVEF. Furthermore, they had a lower propability of AF, a lower heart rate, higher systolic blood pressure, and a more favourable co-morbidity profile. Levels of NT-proBNP were lower, while haemoglobin and creatinine clearance were higher. Interestingly, a higher proportion of NYHA class II patients were on treatment with ACE inhibitors and beta-blockers. In contrast, use of ARBs, mineralocorticoid receptor antagonists (MRA), and diuretics was higher among patients with NYHA class III–IV.

## QRS duration and morphology in relation to New York Heart Association class

QRS prolongation was common in both groups (*Figure 2*). On average, patients in NYHA class II compared with NYHA class III–IV had a somewhat smaller QRS (116 ± 29 ms vs. 119 ± 29 ms; $P < 0.001$) and fewer had a QRS of ≥120 ms (37% vs. 44%;

© 2016 The Authors




**Figure 2** Prevalence of QRS duration. Distribution of QRS duration in increments of 10 ms and proportions with LBBB (hashed bars) in patients with NYHA class II and NYHA class III–IV.

$P < 0.001$), a QRS ≥150 ms (16% vs. 18%, $P = 0.009$), or an LBBB (23% vs. 28%; $P < 0.001$). However, among those with a QRS duration ≥120 ms, the proportion of patients with LBBB was similar: 64% in NYHA class II and 63% in NYHA class III–IV ($P = 0.55$), and increased with progressively wider QRS.

## Survival in relation to New York Heart Association class and QRS duration and morphology

As expected, NYHA class II patients had a better survival compared with those in NYHA class III–IV (*Figure 3*). In the resulting multivariable Cox model, the HR and 95% confidence interval (CI) for mortality in NYHA III–IV vs. II was 1.31, 95% CI 1.23–1.40 ($P < 0.001$). In both groups, prolonged QRS duration was associated with worse survival and the prognosis of patients with a non-LBBB morphology was inferior compared with those who had LBBB. The proportion of patients surviving at 1, 3, and 5 years is given in *Table 2*. After 5 years, 58% of patients in NYHA class II with QRS prolongation of non-LBBB type were alive, while the corresponding number of NYHA class III–IV patients was only 30%. In contrast, 69% and 49% of patients in NYHA class II and III–IV, respectively, survived at 5 years, if they had a narrow QRS. At each point of time, survival of NYHA class II patients with QRS prolongation of non-LBBB type was better compared with NYHA class III–IV patients with narrow QRS.

As shown in *Table 1*, there were significant differences in baseline characteristics probably explaining the better outcome in NYHA class II vs. NYHA class III–IV patients. Thus, to assess the independent contribution of QRS duration and morphology to the mortality risk in NYHA class II and NYHA class III–IV, survival data were adjusted for important confounding variables. These factors had been specified *a priori* and included all variables with statistical differences shown in *Table 1* and, in addition, civil status, housing, recruitment in or out of hospital, year of recruitment, setting of general follow-up, setting of HF follow-up, mean arterial pressure, pulse pressure, cardiomegaly, and/or congestion on X-ray.

In all settings, prolonged QRS duration was associated with a significant increase in mortality risk (*Figure 4*). After adjustment for multiple confounders, the HR for mortality in patients with non-LBBB type vs. narrow QRS was 1.19 (95% CI 1.05 – 1.36; $P = 0.009$) in NYHA class II and 1.33 (95% CI 1.21–1.47; $P < 0.001$) in NYHA class III–IV. Similarly, comparing patients with LBBB vs. narrow QRS, the adjusted HR was 1.16 (95% CI 1.03–1.41; $P = 0.013$) in NYHA class II and 1.12 (95% CI 1.02–1.22; $P = 0.014$) in NYHA class III–IV. Thus, QRS prolongation, both of LBBB and non-LBBB type, independently added a similar mortality risk in patients with NYHA class II and NYHA class III–IV (*P* for interaction: 0.521, crude and 0.244, adjusted).

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 3** Kaplan–Meier survival by NYHA class and QRS morphology. (*A*) NYHA class II; (*B*) NYHA class III–IV. Log-rank *P*-value for QRS/LBBB in both NYHA groups: <0.001.

**Table 2 Survival at 1, 3, and 5 years**

| Year | QRS <120 ms | | | QRS ≥120 ms non-LBBB | | | QRS ≥120 ms LBBB | | |
|---|---|---|---|---|---|---|---|---|---|
| | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI | *n* at risk | Survival | 95% CI |
| NYHA class II | | | | | | | | | |
| 1 | 3287 | 0.92 | 0.92–0.93 | 680 | 0.88 | 0.86–0.91 | 1173 | 0.90 | 0.88–0.91 |
| 3 | 1967 | 0.80 | 0.79–0.82 | 400 | 0.71 | 0.68–0.75 | 681 | 0.74 | 0.72–0.77 |
| 5 | 945 | 0.69 | 0.67–0.70 | 190 | 0.58 | 0.54–0.62 | 296 | 0.62 | 0.59–0.65 |
| NYHA class III–IV | | | | | | | | | |
| 1 | 2477 | 0.82 | 0.80–0.83 | 631 | 0.70 | 0.70–0.73 | 1163 | 0.54 | 0.75–0.79 |
| 3 | 1290 | 0.63 | 0.61–0.65 | 304 | 0.45 | 0.42–0.49 | 591 | | (0.51–0.57) |
| 5 | 577 | 0.49 | 0.47–0.51 | 128 | 0.30 | 0.26–0.33 | 243 | 0.39 | 0.36–0.41 |

CI, confidence interval.

## Eligibility and utilization of cardiac resynchronization therapy according to New York Heart Association class

The proportion of patients eligible for CRT and the actual utilization of CRT in relation to current guideline recommendations was analysed in 13 423 individual patients, including those with an implanted CRT device. Eligibility was analysed in four scenarios representing increasing strength of recommendation and fit between guideline and registry criteria (*Figure 5*). Depending on the scenario chosen, between 14.5% and 30.4% of patients in NYHA class II and between 18.9% and 49.1% of patients in NYHA class III–IV fulfilled guideline recommendations for CRT. For example, in scenario 3, representing strict selection criteria according to current guidelines, 16.2% in NYHA class III–IV and 28.1% in NYHA class II met CRT selection criteria. In each scenario, more patients in NYHA class III–IV than in class II had a CRT indication.

Of patients meeting criteria for CRT, only a minority had actually received a device. This proportion ranged between 14.4% and 42.6% of eligible patients (4.4% and 6.2% of the total) with NYHA class II, and between 18.0% and 45.4% (8.6% and 8.8% of the total) in those with NYHA class III–IV. For example, in scenario 3, 27.1% and 31.4% had actually been implanted. Thus, irrespective of analysis, large proportions of both NYHA groups lacked CRT despite an indication. Consistently, the proportion of patients in NYHA class II who had an indication but were not treated with a device was lower compared with those in NYHA class III–IV, including scenario 4 which contained only

© 2016 The Authors




**Figure 4** Forest plots depicting hazard ratios (HRs) for all-cause mortality associated with different QRS morphologies in NYHA class II and NYHA class III–IV. Cox regressions were performed in the overall population with adjustment for the 40 variables in Supplementary material online, *Table S1* and the interaction between NYHA class and QRS morphology. Interaction between QRS/LBBB and NYHA class: 0.521 (crude); 0.244 (adjusted). CI, confidence interval.

patients who entered the registry after the first publication of CRT guidelines for NYHA class II patients in 2010. However, while the difference in CRT utilization was statistically significant in scenario 1–3, it did not reach statistical significance ($P = 0.507$) in the fourth scenario, evaluating only a total of 684 patients with an indication.

## Discussion

Grading of HF symptoms according to the NYHA classification is a cornerstone in the clinical assessment of HF patients and has important clinical implications for the selection of appropriate treatment. Specifically, current guidelines for CRT tailor recommendations in relation to NYHA class and QRS characteristics.[15,16] We analysed the relationship between NYHA class, QRS duration/morphology, and survival in a large group of HF patients with reduced LVEF <40% and long-term follow-up via Swedish national registries. A QRS prolongation of ≥120 ms was common in both NYHA class II (36%) and NYHA class III–IV (44%). Importantly, while NYHA II patients were healthier at baseline and survived longer, the independent risk attributable to QRS prolongation of LBBB or non-LBBB type was similar in NYHA class II and III–IV. Although CRT is highly recommended in current guidelines, only a minority of patients fulfilling guideline recommendations had received a device, and this underutilization appeared to be even greater in NYHA class II compared with NYHA class III–IV.

Our finding that QRS duration is associated with a similar hazard for death in patients with NYHA class II and III–IV gains particular strength by the large sample size, the long and complete follow-up through national registries, and a background medical therapy reflecting a high standard of care. Even after adjustment for a large number of confounders, the mortality risk in NYHA class II patients with LBBB and non-LBBB morphology was significantly increased. This supports the notion that QRS prolongation is not only a general marker of HF severity[25] but also a risk factor contributing to the adverse prognosis in HF independently of other prognostic factors, presumably through the induction of ventricular dyssynchrony.

Other studies have looked into the interaction between NYHA class, QRS duration, and prognosis. Two smaller studies also found a wider QRS duration with more advanced NYHA class, but multivariable analysis was not performed.[26,27] Similarly to the present study, a secondary analysis of a previous, smaller SwedeHF

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology




**Figure 5** Estimation of CRT utilization in the SwedeHF registry. (*A*) The proportion of patients meeting selection criteria for CRT according to scenarios 1–3 reflecting progressively stricter CRT selection criteria based on guideline recommendations, and scenario 4 considering only patients included after 1 January 2011 (see the Methods for further details). (*B*) The proportion of patients meeting CRT selection criteria who actually were implanted with a device. *P*-values (NYHA II compared with NYHA III–IV): $^1P < 0.001$; $^2P < 0.001$; $^3P = 0.015$; $^4P = 0.507$.

cohort indicated that interactions between QRS width and NYHA class were not significant upon multivariate analysis.[9]

The proportion of patients with prolonged QRS ≥120 ms in our study (41%) corresponds well with previous reports. A broad QRS was also found in 41% of patients with an LVEF ≤35% evaluated in the EuroHeart failure survey,[28] 37% of patients in the Italian Network on CHF[29] (using 140 ms as a cut-off), and 34% of HF patients examined in the setting of a community HF clinic.[30] In the present study, there was a trend towards worse prognosis in subjects with non-LBBB morphology, found in approximately one-third of patients with prolonged QRS, compared with LBBB. Causing a characteristic U-shaped activation pattern of the left ventricle,[31] LBBB has been closely linked to left intraventricular dyssynchrony between the septum and the lateral wall, while QRS prolongation of non-LBBB type may result in various other electromechanical abnormalities.[32] This may explain why patients with LBBB have especially large effects by CRT while non-LBBB morphology is a predictor of non-response.[33] Among patients with non-LBBB morphology, we could not single out those with a right bundle branch block (RBBB). RBBB is associated with increased mortality in chronic HF,[34] but RBBB patients do not improve by CRT.[35]

Cardiac resynchronization therapy was first introduced in patients with NYHA class III.[10,36,37] The COMPANION trial also included a small proportion (14%) of patients in NYHA class IV provided they had not been hospitalized during the month before enrolment and had an estimated survival exceeding 6 months.[11] This subgroup showed a significant reduction in the combined primary study endpoint, and hence the indication of 'ambulatory' NYHA class IV was incorporated into current guidelines. However, NYHA class IV is a rare indication in clinical practice and patients hospitalized with acutely decompensated HF and/or receiving inotropic support are usually not considered for implantation. In the European CRT survey, only 8% were judged to be in NYHA class IV at baseline.[38] In the present study, a total of 4.8% had NYHA class IV. Considering the clinical context in which patients are recruited to the registry, we assume that most of them met the criteria of 'ambulatory' class IV.

Utilization of CRT in NYHA class II vs. III–IV was significantly worse in scenarios 1–3. This can be explained by the later introduction of NYHA II to CRT guidelines. The analysis in scenario 4, focusing on a smaller sample of patients with strict indications recruited after 2010, showed a similarly worse utilization but the difference was not significant. In a registry, some appropriate reasons to abstain from device therapy such as high biological age, clinical severity of co-morbidities, or patient refusal are difficult to discern. However, considering the baseline characteristics (*Table 1*), factors such as high age and severe co-morbidities are unlikely to explain the larger underutilization of CRT in NYHA class II.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. In contrast to the poor utilization of CRT, a total of 94% and 91% received ACE inhibitors (or ARBs) and beta-blockers, respectively. Fewer patients in NYHA class III–IV were treated with these drugs, while they more often received diuretics and mineralocorticoids. It may be speculated that it was easier to achieve drug target doses in those with mild HF, better renal function, and less compromised haemodynamics as reflected by higher blood pressure.

Only half of the patients received CRT together with a defibrillator, which is below the European average but in keeping with Swedish implantation statistics and on a similar level compared with countries such as the UK or Denmark.[21]

Our findings have clinical implications as they indicate that a wide QRS complex should alert physicians to the significantly increased mortality risk of the HF patient regardless of NYHA class and other conditions. Device treatment with CRT and, in most cases ICD, has strong evidence in this scenario and should be seriously considered. Studies indicate that CRT is similarly effective in appropriately selected NYHA class II and III–IV patients to improve outcomes.[14] As CRT appears particularly underutilized in NYHA class II, the value of early interventions to prevent disease progression should be highlighted. Recently, long-term effects of CRT on mortality[39] and measures of functional and LV remodelling[40] were shown in mild HF. However, these improvements were largely confined to patients with LBBB. Thus, our results also emphasize a particular need for additional treatment options in patients with mild to moderate HF and QRS prolongation of non-LBBB type who have limited effects by resynchronization.

## Limitations

Measurement of QRS duration and the categorization of LBBB was left to the individual physician, and misclassification may have occurred. We have no information regarding the presence of RBBB but only whether patients had LBBB or not. Categories used in the registry, in particular LVEF, allowed no perfect match with selection criteria in the guidelines. We sought to accommodate this by evaluating guideline adoption in different scenarios with progressively stricter CRT selection criteria. In addition, we could not assess whether patients with potential CRT indication had contraindications. The analysis of CRT utilization represents only a snap-shot of CRT prevalence, and we cannot rule out that patients without CRT may have received CRT during the later course of follow-up or that they improved such that CRT was no longer indicated. However, follow-up referral to cardiologists and HF nurse clinics was rare, suggesting that most patients were not considered for CRT by the clinician responsible. Furthermore, since only a minor portion of CRT candidates had received a device, it is unlikely that this portion had greatly increased during further follow-up. We reported all-cause but not cause-specific mortality. The latter may provide a stronger link between the pathophysiology of conduction delay and outcomes, but the former is more clinically relevant. Finally, patients with LV dysfunction and HF who had been previously implanted with an ICD were excluded from analysis.

## Conclusions

This study in a large national registry shows that QRS prolongation of both LBBB and non-LBBB type is an independent predictor of mortality in patients with HF and reduced LVEF. Importantly, the increase in mortality risk attributable to QRS prolongation was similar in those with NYHA class II and those with NYHA class III–IV, and remained significant even after adjustment for a large number of relevant confounders. Although many HF patients with prolonged QRS fulfil current guideline criteria, CRT appears to be underutilized particularly among NYHA class II patients.

## Supplementary Information

Additional Supporting Information may be found in the online version of this article:

**Table S1.** Complete baseline variables included in multivariable models among 12 534 patients (without CRT).

## Acknowledgements

We thank local investigators in the Swedish Heart Failure Registry for data entry and management.

## Funding

This work was supported in part by Boston Scientific, the Swedish Research Council, the Swedish Heart and Lung Foundation, and Stockholm County Council in the form of grants to L.H.L.'s institution. No funding organization had any role in the collection, analysis, or interpretation of data or approval/disapproval for publication.

**Conflict of interest:** L.H.L. reports speaker's honoraria from St Jude and research grants to his institution from Medtronic. C.L. was principal investigator of REVERSE, a CRT study sponsored by Medtronic, reports research grants, speaker honoraria, and consulting fees from Medtronic, and speaker honoraria and consulting fees from St. Jude Medical. F.B. reports research grants and speaker honoraria from Medtronic and consulting fees from Biotronik and Boston Scientific. M.S. and U.D. report no conflicts of interest.

## References

1. MacIntyre K, Capewell S, Stewart S, Chalmers JW, Boyd J, Finlayson A, Redpath A, Pell JP, McMurray JJ. Evidence of improving prognosis in heart failure: trends in case fatality in 66 547 patients hospitalized between 1986 and 1995. *Circulation* 2000;**102**:1126–1131.
2. Schaufelberger M, Swedberg K, Koster M, Rosen M, Rosengren A. Decreasing one-year mortality and hospitalization rates for heart failure in Sweden; data from the Swedish Hospital Discharge Registry 1988 to 2000. *Eur Heart J* 2004;**25**:300–307.
3. Cowie MR, Mosterd A, Wood DA, Deckers JW, Poole-Wilson PA, Sutton GC, Grobbee DE. The epidemiology of heart failure. *Eur Heart J* 1997;**18**:208–225.
4. Dickstein K, Cohen-Solal A, Filippatos G, McMurray JJ, Ponikowski P, Poole-Wilson PA, Stromberg A, van Veldhuisen DJ, Atar D, Hoes AW, Keren A, Mebazaa A, Nieminen M, Priori SG, Swedberg K, Vahanian A, Camm J, De Caterina R, Dean V, Dickstein K, Filippatos G, Funck-Brentano C, Hellemans

© 2016 The Authors

I, Kristensen SD, McGregor K, Sechtem U, Silber S, Tendera M, Widimsky P, Zamorano JL, Tendera M, Auricchio A, Bax J, Bohm M, Corra U, della Bella P, Elliott PM, Follath F, Gheorghiade M, Hasin Y, Hernborg A, Jaarsma T, Komajda M, Kornowski R, Piepoli M, Prendergast B, Tavazzi L, Vachiery JL, Verheugt FW, Zamorano JL, Zannad F. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2008: the Task Force for the diagnosis and treatment of acute and chronic heart failure 2008 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association of the ESC (HFA) and endorsed by the European Society of Intensive Care Medicine (ESICM). *Eur J Heart Fail* 2008;**10**:933–989.

5. The Criteria Committee of the New York Heart Association. *Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels*. 9th ed. Boston: Little, Brown & Co.; 1994. p253–256.
6. Raphael C, Briscoe C, Davies J, Ian Whinnett Z, Manisty C, Sutton R, Mayet J, Francis DP. Limitations of the New York Heart Association functional classification system and self-reported walking distances in chronic heart failure. *Heart* 2007;**93**:476–482.
7. Adams KF Jr, Zannad F. Clinical definition and epidemiology of advanced heart failure. *Am Heart J* 1998;**135**:S204–S215.
8. Goda A, Williams P, Mancini D, Lund LH. Selecting patients for heart transplantation: comparison of the Heart Failure Survival Score (HFSS) and the Seattle Heart Failure Model (SHFM). *J Heart Lung Transplant* 2011;**30**:1236–1243.
9. Lund LH, Jurga J, Edner M, Benson L, Dahlstrom U, Linde C, Alehagen U. Prevalence, correlates, and prognostic significance of QRS prolongation in heart failure with reduced and preserved ejection fraction. *Eur Heart J* 2013;**34**:529–539.
10. Cleland JG, Daubert JC, Erdmann E, Freemantle N, Gras D, Kappenberger L, Tavazzi L. The effect of cardiac resynchronization on morbidity and mortality in heart failure. *N Engl J Med* 2005;**352**:1539–1549.
11. Bristow MR, Saxon LA, Boehmer J, Krueger S, Kass DA, De Marco T, Carson P, DiCarlo L, DeMets D, White BG, DeVries DW, Feldman AM. Cardiac-resynchronization therapy with or without an implantable defibrillator in advanced chronic heart failure. *N Engl J Med* 2004;**350**:2140–2150.
12. Linde C, Abraham WT, Gold MR, St John Sutton M, Ghio S, Daubert C. Randomized trial of cardiac resynchronization in mildly symptomatic heart failure patients and in asymptomatic patients with left ventricular dysfunction and previous heart failure symptoms. *J Am Coll Cardiol* 2008;**52**:1834–1843.
13. Moss AJ, Hall WJ, Cannom DS, Klein H, Brown MW, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Higgins SL, Pfeffer MA, Solomon SD, Wilber D, Zareba W. Cardiac-resynchronization therapy for the prevention of heart-failure events. *N Engl J Med* 2009;**361**:1329–1338.
14. Tang AS, Wells GA, Talajic M, Arnold MO, Sheldon R, Connolly S, Hohnloser SH, Nichol G, Birnie DH, Sapp JL, Yee R, Healey JS, Rouleau JL, Resynchronization-Defibrillation for Ambulatory Heart Failure Trial I. Cardiac-resynchronization therapy for mild-to-moderate heart failure. *N Engl J Med* 2010;**363**:2385–2395.
15. McMurray JJ, Adamopoulos S, Anker SD, Auricchio A, Bohm M, Dickstein K, Falk V, Filippatos G, Fonseca C, Gomez-Sanchez MA, Jaarsma T, Kober L, Lip GY, Maggioni AP, Parkhomenko A, Pieske BM, Popescu BA, Ronnevik PK, Rutten FH, Schwitter J, Seferovic P, Stepinska J, Trindade PT, Voors AA, Zannad F, Zeiher A, Bax JJ, Baumgartner H, Ceconi C, Dean V, Deaton C, Fagard R, Funck-Brentano C, Hasdai D, Hoes A, Kirchhof P, Knuuti J, Kolh P, McDonagh T, Moulin C, Reiner Z, Sechtem U, Sirnes PA, Tendera M, Torbicki A, Vahanian A, Windecker S, Bonet LA, Avraamides P, Ben Lamin HA, Brignole M, Coca A, Cowburn P, Dargie H, Elliott P, Flachskampf FA, Guida GF, Hardman S, Iung B, Merkely B, Mueller C, Nanas JN, Nielsen OW, Orn S, Parissis JT, Ponikowski P. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012: the Task Force for the Diagnosis and Treatment of Acute and Chronic Heart Failure 2012 of the European Society of Cardiology. Developed in collaboration with the Heart Failure Association (HFA) of the ESC. *Eur J Heart Fail* 2012;**14**:803–869.
16. Brignole M, Auricchio A, Baron-Esquivias G, Bordachar P, Boriani G, Breithardt OA, Cleland J, Deharo JC, Delgado V, Elliott PM, Gorenek B, Israel CW, Leclercq C, Linde C, Mont L, Padeletti L, Sutton R, Vardas PE, ESC Committee for Practice Guidelines (CPG), Zamorano JL, Achenbach S, Baumgartner H, Bax JJ, Bueno H, Dean V, Deaton C, Erol C, Fagard R, Ferrari R, Hasdai D, Hoes AW, Kirchhof P, Knuuti J, Kolh P, Lancellotti P, Linhart A, Nihoyannopoulos P, Piepoli MF, Ponikowski P, Sirnes PA, Tamargo JL, Tendera M, Torbicki A, Wijns W, Windecker S, Document R, Kirchhof P, Blomstrom-Lundqvist C, Badano LP, Aliyev F, Bansch D, Baumgartner H, Bsata W, Buser P, Charron P, Daubert JC, Dobreanu D, Faerestrand S, Hasdai D, Hoes AW, Le Heuzey JY, Mavrakis H, McDonagh T, Merino JL, Nawar MM, Nielsen JC, Pieske B, Poposka L, Ruschitzka F, Tendera M, Van Gelder IC, Wilson CM. 2013 ESC Guidelines on cardiac pacing and cardiac resynchronization therapy: the Task Force on cardiac pacing and resynchronization therapy of the European Society of Cardiology (ESC). Developed in collaboration with the European Heart Rhythm Association (EHRA). *Eur Heart J* 2013;**34**:2281–2329.
17. Priori SG, Blomstrom-Lundqvist C, Mazzanti A, Blom N, Borggrefe M, Camm J, Elliott PM, Fitzsimons D, Hatala R, Hindricks G, Kirchhof P, Kjeldsen K, Kuck KH, Hernandez-Madrid A, Nikolaou N, Norekval TM, Spaulding C, Van Veldhuisen DJ, Authors/Task Force Members; Document Reviewers. 2015 ESC Guidelines for the management of patients with ventricular arrhythmias and the prevention of sudden cardiac death: the Task Force for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death of the European Society of Cardiology (ESC) Endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC). *Eur Heart J* 2015;**36**:2793–2867.
18. Sipahi I, Chou JC, Hyden M, Rowland DY, Simon DI, Fang JC. Effect of QRS morphology on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Am Heart J* 2012;**163**:260–267.
19. Sipahi I, Carrigan TP, Rowland DY, Stambler BS, Fang JC. Impact of QRS duration on clinical event reduction with cardiac resynchronization therapy: meta-analysis of randomized controlled trials. *Arch Intern Med* 2011;**171**:1454–1462.
20. Cleland JG, Abraham WT, Linde C, Gold MR, Young JB, Claude Daubert J, Sherfesee L, Wells GA, Tang AS. An individual patient meta-analysis of five randomized trials assessing the effects of cardiac resynchronization therapy on morbidity and mortality in patients with symptomatic heart failure. *Eur Heart J* 2013;**34**:3547–3556.
21. Raatikainen MJ, Arnar DO, Zeppenfeld K, Merino JL, Levya F, Hindriks G, Kuck KH. Statistics on the use of cardiac electronic devices and electrophysiological procedures in the European Society of Cardiology countries: 2014 report from the European Heart Rhythm Association. *Europace* 2015;**17** Suppl 1:i1–175.
22. Lund LH, Benson L, Dahlstrom U, Edner M. Association between use of renin–angiotensin system antagonists and mortality in patients with heart failure and preserved ejection fraction. *JAMA* 2012;**308**:2108–2117.
23. Jonsson A, Edner M, Alehagen U, Dahlstrom U. Heart failure registry: a valuable tool for improving the management of patients with heart failure. *Eur J Heart Fail* 2010;**12**:25–31.
24. Therneau T, Grambsch P. Functional Form and Testing Proportional Hazards. In: Dietz K, Gail M, Krickeberg K, Samet J, Tsiatis A, eds *Modeling Survival Data: Extending the Cox Model*. New York: Springer-Verlag; 2000.
25. Kashani A, Barold SS. Significance of QRS complex duration in patients with heart failure. *J Am Coll Cardiol* 2005;**46**:2183–2192.
26. Stellbrink C, Auricchio A, Diem B, Breithardt OA, Kloss M, Schondube FA, Klein H, Messmer BJ, Hanrath P. Potential benefit of biventricular pacing in patients with congestive heart failure and ventricular tachyarrhythmia. *Am J Cardiol* 1999;**83**:143D–150D.
27. Gasparini M, Mantica M, Galimberti P, Marconi M, Genovese L, Faletra F, Simonini S, Klersy C, Coates R, Gronda E. Beneficial effects of biventricular pacing in patients with a 'narrow' QRS. *Pacing Clin Electrophysiol* 2003;**26**:169–174.
28. Khan NK, Goode KM, Cleland JG, Rigby AS, Freemantle N, Eastaugh J, Clark AL, de Silva R, Calvert MJ, Swedberg K, Komajda M, Mareev V, Follath F, EuroHeart Failure Survey I. Prevalence of ECG abnormalities in an international survey of patients with suspected or confirmed heart failure at death or discharge. *Eur J Heart Fail* 2007;**9**:491–501.
29. Baldasseroni S, Opasich C, Gorini M, Lucci D, Marchionni N, Marini M, Campana C, Perini G, Deorsola A, Masotti G, Tavazzi L, Maggioni AP, Italian Network on Congestive Heart Failure I. Left bundle-branch block is associated with increased 1-year sudden and total mortality rate in 5517 outpatients with congestive heart failure: a report from the Italian network on congestive heart failure. *Am Heart J* 2002;**143**:398–405.
30. Clark AL, Goode K, Cleland JG. The prevalence and incidence of left bundle branch block in ambulant patients with chronic heart failure. *Eur J Heart Fail* 2008;**10**:696–702.
31. Auricchio A, Fantoni C, Regoli F, Carbucicchio C, Goette A, Geller C, Kloss M, Klein H. Characterization of left ventricular activation in patients with heart failure and left bundle-branch block. *Circulation* 2004;**109**:1133–1139.
32. Andersson LG, Wu KC, Wieslander B, Loring Z, Frank TF, Maynard C, Gerstenblith G, Tomaselli GF, Weiss RG, Wagner GS, Ugander M, Strauss DG. Left ventricular mechanical dyssynchrony by cardiac magnetic resonance is greater in patients with strict vs nonstrict electrocardiogram criteria for left bundle-branch block. *Am Heart J* 2013;**165**:956–963.
33. Cleland J, Freemantle N, Ghio S, Fruhwald F, Shankar A, Marijanowski M, Verboven Y, Tavazzi L. Predicting the long-term effects of cardiac resynchronization therapy on mortality from baseline variables and the early response a report from the CARE-HF (Cardiac Resynchronization in Heart Failure) Trial. *J Am Coll Cardiol* 2008;**52**:438–445.
34. Xiong Y, Wang L, Liu W, Hankey GJ, Xu B, Wang S. The prognostic significance of right bundle branch block: a meta-analysis of prospective cohort studies. *Clin Cardiol* 2015;**38**:604–613.

© 2016 The Authors

35. Bilchick KC, Kamath S, DiMarco JP, Stukenborg GJ. Bundle-branch block morphology and other predictors of outcome after cardiac resynchronization therapy in Medicare patients. *Circulation* 2010;**122**:2022–2030.
36. Cazeau S, Leclercq C, Lavergne T, Walker S, Varma C, Linde C, Garrigue S, Kappenberger L, Haywood GA, Santini M, Bailleul C, Daubert JC. Effects of multisite biventricular pacing in patients with heart failure and intraventricular conduction delay. *N Engl J Med* 2001;**344**:873–880.
37. Abraham WT, Fisher WG, Smith AL, Delurgio DB, Leon AR, Loh E, Kocovic DZ, Packer M, Clavell AL, Hayes DL, Ellestad M, Trupp RJ, Underwood J, Pickering F, Truex C, McAtee P, Messenger J. Cardiac resynchronization in chronic heart failure. *N Engl J Med* 2002;**346**:1845–1853.
38. Dickstein K, Bogale N, Priori S, Auricchio A, Cleland JG, Gitt A, Limbourg T, Linde C, van Veldhuisen DJ, Brugada J. The European cardiac resynchronization therapy survey. *Eur Heart J* 2009;**30**:2450–2460.
39. Goldenberg I, Kutyifa V, Klein HU, Cannom DS, Brown MW, Dan A, Daubert JP, Estes NA, 3rd, Foster E, Greenberg H, Kautzner J, Klempfner R, Kuniss M, Merkely B, Pfeffer MA, Quesada A, Viskin S, McNitt S, Polonsky B, Ghanem A, Solomon SD, Wilber D, Zareba W, Moss AJ. Survival with cardiac-resynchronization therapy in mild heart failure. *N Engl J Med* 2014;**370**:1694–1701.
40. Linde C, Gold MR, Abraham WT, St John Sutton M, Ghio S, Cerkvenik J, Daubert C, Group REVERSE. Long-term impact of cardiac resynchronization therapy in mild heart failure: 5-year results from the REsynchronization reVErses Remodeling in Systolic left vEntricular dysfunction (REVERSE) study. *Eur Heart J* 2013;**34**:2592–2599.

© 2016 The Authors
*European Journal of Heart Failure* © 2016 European Society of Cardiology

JACC: HEART FAILURE VOL. 5, NO. 11, 2017
© 2017 BY THE AMERICAN COLLEGE OF CARDIOLOGY FOUNDATION ISSN 2213-1779/$36.00
PUBLISHED BY ELSEVIER http://dx.doi.org/10.1016/j.jchf.2017.08.011

# Refining Classification of Heart Failure Based on Ejection Fraction

Gregg C. Fonarow, MD[a,b]

The complex clinical syndrome of heart failure (HF) is associated with a wide spectrum of left ventricular functional abnormalities (1). These range from preserved left ventricular ejection fraction (EF) and normal left ventricular size to severely reduced EF and marked dilation of the left ventricle. Although for many decades, HF was considered to be synonymous with diminished contractility of the left ventricle, in the early 2000s there was a growing appreciation for the fact that a substantial portion of patients with HF had relatively normal EF, frequently characterized as diastolic HF or diastolic dysfunctional HF. When carefully assessed, there is evidence for the presence of both systolic and diastolic functional abnormalities in most patients with HF (1). Dr. Milton Packer was one of the early proponents of using an EF-based classification for HF patients, suggesting that the term of diastolic HF be avoided and stating that "a less presumptuous approach is to refer to these patients as having HF with a normal ejection fraction, a descriptive approach that makes no assumptions about our knowledge about the pathophysiology of this disorder" (2). Since the 2005 American College of Cardiology/American Heart Association HF Guidelines adopted this approach (HF with reduced EF [HFrEF] and HF with preserved EF [HFpEF]), EF has been considered essential in the classification of patients with HF.

There have been extensive studies demonstrating that the demographics, causes, comorbidities, prognoses, and, most importantly, responses to therapy differ among HF patients based on EF classification (3). Differences among the evidence bases for therapies is, in and of itself, a compelling enough rationale for EF-based classification. Furthermore, to date, no measurement or marker other than EF has demonstrated utility in distinguishing which patient populations will or will not derive benefit from each guideline-directed therapy. Nevertheless, use of EF is not without limitations because it is dependent on the imaging technique used, the analysis methods, the operators, and the variability up to 5% (3). However, the use of EF is nearly ubiquitous in characterizing patients with HF in clinical practice and research, as well as being used as an indispensable component of the enrollment criteria in nearly every randomized clinical trial. Ejection fraction has proven to be of such substantial clinical and research value in the assessment and management of HF patients, there is a Class I level recommendation for EF measurement in every national and international HF guideline (1,4).

Despite the widespread adoption of EF-based classification of HF, the actual definitions of patients with hearts with reduced and preserved EFs have varied. HFrEF has been variably defined as EF values of ≤35%, <40%, and ≤40% (1). HFpEF has been classified as EF values of >40%, ≥45%, >45%, ≥50%, >50%, and ≥55% (1). In studies which explored the optimal cutpoint(s) for defining EF groups, data emerged suggesting there was an intermediate group of patients with EF in the range of 41% to 49% (3). These patients have a clinical profile and prognosis that are intermediate but closer to those of HFpEF patients defined by EF of ≥50% than those of HFrEF defined by EF of ≤40%, with certain exceptions. In addition, the large scale randomized controlled outcome trials in patients with HF have largely enrolled patients with EF values of ≤35% and ≤40%. It has been only in these HF patients that angiotensin-converting enzyme inhibitors, angiotensin receptor antagonists, angiotensin receptor neprilysin inhibitors, beta-blockers, aldosterone antagonists, and device therapies have demonstrated benefits of reduced mortality (1). Clinical trials to date in HF patients with an EF value of >40%, ≥45%, or ≥50% testing various therapies have not been successful (1). Furthermore, registry-based

From the [a]Division of Cardiology, David Geffen School of Medicine at UCLA, University of California Los Angeles, Los Angeles, California; and the [b]Ahmanson-UCLA Cardiomyopathy Center, University of California Los Angeles Medical Center, Los Angeles, California. Dr. Fonarow's research is supported by U.S. National Institute of Health; and he consults for Amgen, Janssen, Medtronic, Novartis, and St. Jude Medical.

Manuscript received August 10, 2017; accepted August 18, 2017.

JACC: HEART FAILURE VOL. 5, NO. 11, 2017
NOVEMBER 2017 808-9



studies have with few exceptions not observed benefits associated with the use of neurohormonal antagonists once the EF is >40% (3). Thus, there is not a sufficient evidence base and no current guideline recommendations to extend the use of therapies proven in patients with EF of ≤35% or ≤40% to those expressly with EF of >40% as a treatment for HF (1,4).

Based on the totality of available data, EF-based classification of HF was further refined, and an intermediate EF group, HF with borderline EF (HFbEF), was added to the 2013 the American College of Cardiology/American Heart Association HF guidelines. This group was defined by the presence of the typical symptoms of HF and EF of 41% to 49% (1). Following suit in 2016, the European Society of Cardiology specified HF with mid-range EF (HFmrEF) of 40% to 49% (4). It has also been recognized that there is a cohort of patients who present with HF with EF of ≤40%, whose EF subsequently improves. These patients with improved or recovered EF appear to be clinically distinct from patients with persistently reduced, borderline, or preserved EF and have a much better prognosis (1). A distinct classification was provided for these patients in the 2013 guidelines as well (1). Since these guidelines have been published, there has been ongoing debate as to whether these refined EF classifications are helpful or merely creating arbitrary distinctions. This debate notwithstanding, these refined classifications have fostered new studies that are improving the understanding of the causes, phenotypes, pathophysiologies, and prognoses in these patients. For example, a recent study of biomarker profiles analyzing 37 biomarkers from different pathophysiologic domains (myocardial stretch, inflammation, angiogenesis, oxidative stress, and hematopoiesis) found that patients with HFmrEF had an intermediate biomarker profile with interactions between both cardiac stretch and inflammation makers, whereas HFrEF profiles were mainly related to stretch and HFpEF to inflammation (5). These findings suggested that patients with HFmrEF may be a mixture of HFrEF and HFpEF patients (5). Biomarker-based profiling could potentially be used to identify the subset of patients who, despite having EF of >40%, could benefit from those therapies that benefit HFrEF patients.

There are certainly limitations to an HF classification system based on EF alone, and more detailed phenotyping may help to better characterize patients; provide greater prognostic discrimination; allow for more precise targeting of therapies to patients who will derive benefit; and facilitate the discovery of new, more effective treatments. Further research may establish the fact that there is a subset of patients with HF with EF of 41% to 49% who will benefit from therapies demonstrated to improve outcomes in patients with HF with EF of ≤40% (3). Whether this refined EF classification approach adopted in recent versions of the guidelines best serves the needs of patients, helps to advance the field, or needs to be further updated remains to be determined. However, the enduring value of EF for classifying and managing HF is something that physicians, no matter what their specialty, should be able to appreciate.

**ADDRESS FOR CORRESPONDENCE:** Dr. Gregg C. Fonarow, Ahmanson-UCLA Cardiomyopathy Center, Ronald Reagan UCLA Medical Center, 10833 LeConte Avenue, Room A2-237 CHS, Los Angeles, California 90095-1679. E-mail: gfonarow@mednet.ucla.edu.

**REFERENCES**

1. Yancy CW, Jessup M, Bozkurt B, et al. 2013 ACCF/AHA guideline for the management of heart failure: a report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines. J Am Coll Cardiol 2013;62:e147-239.

2. Burkoff D, Maurer MS, Packer M. Heart failure with a normal ejection fraction: is it really a disorder of diastolic function? Circulation 2003;107:656-8.

3. Hsu JJ, Ziaeian B, Fonarow GC. Heart failure with mid-range (borderline) ejection faction: clinical implications and future directions. J Am Coll Cardiol HF 2017. In press.

4. Ponikowski P, Voors AA, Anker SD, et al. 2016 ESC guidelines for the diagnosis and treatment of acute and chronic heart failure: the Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC) developed with the special contribution of the Heart Failure Association (HFA) of the ESC. Eur Heart J 2016;37:2129-200.

5. Tromp J, Khan MAF, Mentz RJ, O'Connor CM, et al. Biomarker profiles of acute heart failure patients with a mid-range ejection fraction. J Am Coll Cardiol HF 2017;5:507-17.

**KEY WORDS** **epidemiology, heart failure with borderline ejection fraction (HFbEF), heart failure with mid-range ejection fraction (HFmrEF), heart failure with preserved ejection fraction (HFpEF), outcomes**

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

November 8, 2019

GLANKLER BROWN
ATTN DON L HEARN, JR
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear DON L HEARN, JR:

We have received your request for a copy of the Long Term Disability claim file for the above-named insured.

We are enclosing the information as requested, including a copy of the policy; all file documentation and any correspondence in the file.

INSERT ADDITIONAL DATA HERE AS SPECIFICALLY REQUESTED BY ATTORNEY, IF APPLICABLE. **REMEMBER!** YOU MUST ADDRESS ALL OF THE ITEMS IN THE ATTORNEY LETTER.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com.

Sincerely,

Kathleen Portrey
Assisting on behalf of Dronji Watts
800-423-2765*3015
Coordinator, Administrative Services
The Lincoln National Life Insurance Company

©2019 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Don L. Hearn, Jr.
GLANKLER BROWN
ATTORNEYS
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119

MEMPHIS
TN 380
12 NOV '19
PM 5 L

NEOPOST
11/12/2019
US POSTAGE $000.50º
FIRST-CLASS MAIL
ZIP 38119
041M11273286

NOV 1 5 2019

Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

68103-233737

NOV 1 5 2019

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

November 12, 2019

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 00001004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

On October 28, 2019, I had requested a copy of the claim file and Plan document, as well as all relevant documentation with respect to the above referenced claim via email to you.

I am enclosing another copy of a letter signed by Sherman Carter acknowledging myself and Glankler Brown, PLLC's representation of Mr. Sherman.

Accordingly, pursuant to 29 C.F.R. § 2560.503-1(h)(2), (h)(3), and (m)(8) please provide me copies of all documents, records, and other information relative to Mr. Sherman's claim as the term "relevant" is defined by 29 C.F.R. § 2560.503-1(m)(8), including, but not limited to, the following:

(1) all medical records and other documents submitted, considered, or generated in the course of making your benefit determination, as well as the Plan document.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

4817-8101-3932, v. 1

**Brenda Pannell**

| | |
|---|---|
| **From:** | Don L.Hearn |
| **Sent:** | Monday, October 28, 2019 11:44 AM |
| **To:** | lfgappeals@lfg.com |
| **Cc:** | Brenda Pannell |
| **Subject:** | FW: Claimant: Sherman Carter |
| **Attachments:** | 2019-09-25 SIGNED-Sherman Carter representation letter.pdf |

Ms. Kurtz,

Please accept this correspondence as a request for a copy of Mr. Carter's claim file as well as a copy of the plan document. Please confirm receipt of this email. Many thanks, Don

**Don L. Hearn, Jr., Member**
**GLANKLER BROWN**
P 901.576.1767 | F 901.525.2389
dhearn@glankler.com
Vcard | Bio | www.glankler.com
6000 Poplar Avenue, Suite 400, Memphis, TN 38119

**From:** Don L.Hearn <DHearn@Glankler.com>
**Sent:** Thursday, September 26, 2019 2:22 PM
**To:** LFGAppeals@lfg.com
**Cc:** Don L.Hearn <DHearn@Glankler.com>
**Subject:** Claimant: Sherman Carter

Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Ms. Kurtz,

Please see attached correspondence regarding the above referenced matter.

Don Hearn

**Don L. Hearn, Jr., Member**
P 901 576 1767 | F 901.525.2389
dhearn@glankler.com
Vcard | Bio | www.glankler.com
6000 Poplar Avenue, Suite 400, Memphis, TN 38119

100 YEARS
GLANKLER BROWN.

GLANKLER BROWN.

**Don L. Hearn, Jr.**
Direct 901 576 1767
dhearn@glankler.com

September 25, 2019

*via U.S. Mail and Email: LFGAppeals@lfg.com*
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 000010004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

GLANKLER BROWN, PLLC

Don L. Hearn, Jr.

DLH, Jr:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

SHERMAN CARTER

Dated: Sep-25-19

4835-7164-6119, v. 1

resolved. period.

100 YEARS
GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

November 12, 2019

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 00001004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

On October 28, 2019, I had requested a copy of the claim file and Plan document, as well as all relevant documentation with respect to the above referenced claim via email to you.

I am enclosing another copy of a letter signed by Sherman Carter acknowledging myself and Glankler Brown, PLLC's representation of Mr. Sherman.

Accordingly, pursuant to 29 C.F.R. § 2560.503-1(h)(2), (h)(3), and (m)(8) please provide me copies of all documents, records, and other information relative to Mr. Sherman's claim as the term "relevant" is defined by 29 C.F.R. § 2560.503-1(m)(8), including, but not limited to, the following:

(1) all medical records and other documents submitted, considered, or generated in the course of making your benefit determination, as well as the Plan document.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

4817-8101-3932, v. 1

**Brenda Pannell**

| | |
|---|---|
| **From:** | Don L.Hearn |
| **Sent:** | Monday, October 28, 2019 11:44 AM |
| **To:** | lfgappeals@lfg.com |
| **Cc:** | Brenda Pannell |
| **Subject:** | FW: Claimant: Sherman Carter |
| **Attachments:** | 2019-09-25 SIGNED-Sherman Carter representation letter.pdf |

Ms. Kurtz,

Please accept this correspondence as a request for a copy of Mr. Carter's claim file as well as a copy of the plan document. Please confirm receipt of this email. Many thanks, Don

**Don L. Hearn, Jr., Member**
**GLANKLER BROWN**
P 901.576.1767 | F 901.525.2389
dhearn@glankler.com
Vcard | Bio | www.glankler.com
6000 Poplar Avenue, Suite 400, Memphis, TN 38119

**From:** Don L.Hearn <DHearn@Glankler.com>
**Sent:** Thursday, September 26, 2019 2:22 PM
**To:** LFGAppeals@lfg.com
**Cc:** Don L.Hearn <DHearn@Glankler.com>
**Subject:** Claimant: Sherman Carter

Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Ms. Kurtz,

Please see attached correspondence regarding the above referenced matter.

Don Hearn

**Don L. Hearn, Jr., Member**
P 901 576 1767 | F 901.525.2389
dhearn@glankler.com
Vcard | Bio | www.glankler.com
6000 Poplar Avenue, Suite 400, Memphis, TN 38119

100 YEARS
GLANKLER BROWN.

100

GLANKLER BROWN.

Don L. Hearn, Jr.
Direct 901 576 1767
dhearn@glankler.com

September 25, 2019

*via U.S. Mail and Email: LFGAppeals@lfg.com*
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 000010004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr.:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

S. Carter
SHERMAN CARTER

Dated: Sep-25-19

4835-7164-6119 v 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** November 12, 2019

**DELIVER TO:** Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company

**FACSIMILE NO.:** (402) 361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Please see attached regarding the above referenced.

TOTAL NUMBER OF PAGES (INCLUDING COVER): 4

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4849-6532-7966, v. 1

resolved. period.

GLANKLER BROWN.
ATTORNEYS

[illegible]

**Don L. Hearn, Jr.**
Direct 901.576 1767
dhearn@glankler.com

November 12, 2019

***via U.S. Mail, Facsimile (402) 361-1460 and Email: LFGAppeals@lfg.com***
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2337
Omaha, NE 68103
ATTN: Document Request

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 000010049220000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

On October 28, 2019, I had requested a copy of the claim file and Plan document, as well as all relevant documentation with respect to the above referenced claim via email to you.

I am enclosing another copy of a letter signed by Sherman Carter acknowledging myself and Glankler Brown, PLLC's representation of Mr. Sherman.

Accordingly, pursuant to 29 C.F.R. § 2560.503-1(h)(2), (h)(3), and (m)(8) please provide me copies of all documents, records, and other information relative to Mr. Sherman's claim as the term "relevant" is defined by 29 C.F.R. § 2560.503-1(m)(8), including, but not limited to, the following:

(1) all medical records and other documents submitted, considered, or generated in the course of making your benefit determination, as well as the Plan document.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp
Enclosure

4817-8101-3932, v. 1

**Brenda Pannell**

| | |
|---|---|
| **From:** | Don L.Hearn |
| **Sent:** | Monday, October 28, 2019 11:44 AM |
| **To:** | lfgappeals@lfg.com |
| **Cc:** | Brenda Pannell |
| **Subject:** | FW: Claimant: Sherman Carter |
| **Attachments:** | 2019-09-25 SIGNED-Sherman Carter representation letter.pdf |

Ms. Kurtz,

Please accept this correspondence as a request for a copy of Mr. Carter's claim file as well as a copy of the plan document. Please confirm receipt of this email. Many thanks, Don

Don L. Hearn, Jr., Member
GLANKLER BROWN
P 901.576.1767 | F 901.525.2389
dhearn@glankler.com
Vcard | Bio | www.glankler.com
6000 Poplar Avenue, Suite 400, Memphis, TN 38119

**From:** Don L.Hearn <DHearn@Glankler.com>
**Sent:** Thursday, September 26, 2019 2:22 PM
**To:** LFGAppeals@lfg.com
**Cc:** Don L.Hearn <DHearn@Glankler.com>
**Subject:** Claimant: Sherman Carter

Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Ms. Kurtz,

Please see attached correspondence regarding the above referenced matter.

Don Hearn

Don L. Hearn, Jr., Member
P 901 576 1767 | F 901.525.2389
dhearn@glankler.com
Vcard | Bio | www.glankler.com
6000 Poplar Avenue, Suite 400, Memphis, TN 38119

100 YEARS
GLANKLER BROWN.

GLANKLER BROWN.

**Don L. Hearn, Jr.**
Direct 901 576 1767
dhearn@glankler.com

September 25, 2019

*via U.S. Mail and Email: LFGAppeals@lfg.com*
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 00001004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr.:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

S. Carter
**SHERMAN CARTER**

Dated: Sep-25-19

4835-7164-6119, v. 1

resolved. period.

GLANKLER BROWN. ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

# FACSIMILE COVER SHEET

**DATE:** October 28, 2019

**DELIVER TO:** Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company

**FACSIMILE NO.:** 1-402-361-1460

**FROM:** Don L. Hearn, Jr.

**MESSAGE:** RE: Claimant: Sherman Carter
Policyholder: Ajax Distributing Company of Memphis
Policy No.: 00001004922000000
Claim No.: 1150128075

Please see attached regarding the above referenced.

TOTAL NUMBER OF PAGES (INCLUDING COVER): 2

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL US AT (901) 525-1322 AS SOON AS POSSIBLE. THANK YOU.

**CONFIDENTIALITY NOTICE:** The information contained in this facsimile message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited.
4849-6532-7966, v. 1

resolved. period.

GLANKLER BROWN.

Don L. Hearn, Jr.
Direct 901 576 1767
dhearn@glankler.com

September 25, 2019

*via U.S. Mail and Email: LFGAppeals@lfg.com*
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | *Claimant:* | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 000010049220000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr.:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

SHERMAN CARTER

Dated: Sep-25-19

4835-7164-6119 v 1

resolved. period.

100 YEARS
GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

September 25, 2019

***via U.S. Mail and Email: LFGAppeals@lfg.com***
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 00001004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr.:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

**SHERMAN CARTER**

Dated: Sep-25-19

4835-7164-6119, v. 1

Don L. Hearn, Jr.,
GLANKLER
BROWN

OCT 0 1 2019

Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

68103-260909

OCT 0 1 2019

GLANKLER BROWN
ATTORNEYS

[illegible] Poplar Avenue [illegible]
Memphis [illegible]
[illegible]
[illegible]

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

September 25, 2019

***via U.S. Mail and Email: LFGAppeals@lfg.com***
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 00001004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

**SHERMAN CARTER**

Dated: Sep-25-19

4835-7164-6119, v. 1

resolved. period.

100 YEARS
GLANKLER BROWN.
ATTORNEYS

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
P 901.525.1322 F 901.525.2389
www.glankler.com

**Don L. Hearn, Jr.**
Direct 901.576.1767
dhearn@glankler.com

September 25, 2019

***via U.S. Mail and Email: LFGAppeals@lfg.com***
Ms. Lisa Kurtz, HIA
Specialist, Claims – Appeals Department
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68114-4066

| | | |
|---|---|---|
| RE: | Claimant: | Sherman Carter |
| | Policyholder: | Ajax Distributing Company of Memphis |
| | Policy Number: | 00001004922000000 |
| | Claim Number: | 1150128075 |

Dear Ms. Kurtz:

Please allow this letter to confirm by signature below of Sherman Carter that Glankler Brown, PLLC and I represent Sherman Carter regarding the above referenced claim number 1150128075.

Should you need additional information, please feel free to contact me.

Very truly yours,

**GLANKLER BROWN, PLLC**

Don L. Hearn, Jr.

DLH, Jr.:/bkp

**APPROVED AND ACKNOWLEDGE REPRESENTATION OF GLANKLER BROWN, PLLC and DON L. HEARN, JR., regarding Lincoln Financial Group, Claim No. 1150128075 - Appeal for Long Term Disability Benefits.**

**SHERMAN CARTER**

Dated: Sep-25-19

4835-7164-6119, v. 1

REF #4267573

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68114-4066
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

July 12, 2019

SHERMAN CARTER

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

We have completed our review of your Long Term Disability appeal. Based on the information provided, we have determined that we are unable to approve benefits beyond 10/30/2018. In our appeal review process, all information previously submitted as well as any new documentation was used to make a determination.

To receive benefits under the policy issued to Ajax Distributing Company of Memphis,, an individual must satisfy all of the provisions of the policy. This includes, but is not limited to, the following:

**"Total Disability" or "Totally Disabled"** will be defined as follows.

1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

This policy has a 24 month Own Occupation Period which ended on 11/05/2017. In order to be considered Totally Disabled beyond this date, the medical evidence must support that you would be unable to perform each of the main duties of any occupation for which you are qualified. As such, in considering whether you qualify for Long Term Disability benefits beyond 10/30/2018, we evaluated whether you would be restricted or limited from performing the main duties of any occupation for which you are qualified.

©2019 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #4267573

Your entire file was reviewed upon appeal. Disability must be supported from 10/30/2018 forward, which was the focus of our determination.

**Summary of Initial Claim Filing**

As you know your claim was originally approved from 11/05/2015 to 10/30/2018 as we found you met the definition of Total Disability that applied during that period. Benefits were terminated as of 10/30/2018, because we determined you were not Totally Disabled from performing the main duties of any occupation. Our evaluation included review of the medical documentation, including consultation with and/or review of a written report from Dr. Steven Borzak, an independent physician who is Board Certified in Cardiology. For complete details please refer to our letters dated 10/30/0218 and 12/06/0218.

The letter dated 10/30/2018, stated in part, the following:

> There are no objective findings to support the diagnosis of either cardiomyopathy or heat failure. Dr. Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath with heavy exertion, but otherwise no symptoms to support a diagnosis of heart failure with New York Heart Association Functional Classification II (NYHA FC II). This conclusion is based on the premise that the Ejection (EF) Fraction (but no study was provide for review) is in fact reduced, based on the available data but without the source documentation. Therefore he would be restricted from lifting/carry more than 25 pounds ever, no more than 10-25 pounds occasionally and no restrictions with less than 10 pounds. No limit on standing, walking no more than 4 of 8 hours, and no limit on reaching or stooping. The claimant has an implantable cardioverter defibrillator (ICD) and reportedly non sustained ventricular tachycardia (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

**Summary of Appeal**

On 11/20/2018, you filed an appeal in response to our determination to terminate benefits. Additional information was submitted with your appeal, including but not limited to office records from both Dr. Dabov and Dr. Fulkner(list what information was provided) OR was not submitted with your appeal.

As part of your appeal review, all current and new medical information was reviewed by a Healthcare Consultant. For details of these medical records please refer to the medical review that was sent to you on 05/29/2019.

The review noted in part, the following:

> File does not indicate an instance of ongoing 100% nonweightbearing status, bedridden status or wheelchair dependency. File does not indicate an instance of constant, daily ADL assistance or that the claimant needs active hands on help from a secondary individual. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) with no significant radiographic abnormalities to the left hip and the claimant to be navigating the room reasonably well.

> There is insufficient documented evidence of significant or severe high grade joint weakness and instability, significant gait instability resulting in frequently witnessed falls, significant distal extremity circulatory, sensory and motor deficits, muscular atrophy, dexterity or coordination problems that would otherwise translate into a wholly diminished sitting, standing, walking, lifting and fingering functional capacity. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) with intact motor, sensation, etc. and no deformities and indicated again, no significant radiographic abnormalities on the left hip xrays.
>
> Although the 11/1/18 and 11/11/18 medical records from Dr Faulkner noted the claimant continues to have a severely depressed left ventricular function (LV) and nonsustained ventricular tachycardia (VT) along with having shortness of breath (SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

We received no response to the report that was sent to you.

**<u>Appeal Decision</u>**

We understand that you have an extensive cardiac history entailing hypertension, cardiomyopathy, depresses left ventricular function, nonsustained VT for which you underwent AICD placement 09/2015. You have also been diagnosed with osteoarthritis of the left hip and underwent an uncomplicated total left hip replacement on 03/2018. However, our review of the medical documentation, which included consultation with and/or review of a written report from a health care consultant, does not support restrictions and limitations that would render you unable to perform each of the main duties of any gainful occupation that you have the training, education, and experience to perform beyond 10/30/2018. We therefore find that you are no longer Totally Disabled under the terms of the policy.

Medical records dated 07/30/2018 with Dr. Faulkner (cardiology) indicate you denied chest pain; however, did indicate pain when you were stressed or overexerting yourself. You denied syncope and dizziness. Your EKG noted normal sinus rhythm and your examination indicated intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema. During your appointment on 11/01/2018 you reported having shortness of breath with problems standing and being dizzy. However, your examination showed intact lung and heart sounds, heart rate and rhythm, no deformities, clubbing cyanosis or edema.

Dr. Dabov (orthopedics) noted on 02/25/2019 that your exam revealed you to be in no acute distress and that you were intact to orientation, sensation and motor. You had limited range of motion in the right hip vs left. Your arthroplasty was in good position with no loosening or failure. You were able to navigate reasonably well and he advised you were permanently disabled from heavy work.

Although the records indicate that the claimant has chronic musculoskeletal pain and paresthesias, it would be reasonable to periodically adjust positions throughout the workday

per position of comfort. i.e. taking reasonable breaks, stretching, alternating sitting, standing and walking throughout the day to minimize or mitigate the aforementioned symptomatology.

**Vocational**

We reviewed your past training, education and work experience to evaluate your capacity to perform work-related activity. The documentation provided suggests you are not limited from working in a sedentary work capacity. The definition of sedentary work capacity, as defined by the Department of Labor, is:

Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are only required occasionally (1-33%) and if all other sedentary criteria are met. Sedentary work may require exertion up to 10 lbs. occasionally and a negligible degree of exertion on a frequent (34-66%) or constant (67-100%) basis.

Using *The Dictionary of Occupational Titles* as a reference, we found that you are capable of performing the following sedentary occupations:

| DOT# | Occupation | Wage (mean) |
|---|---|---|
| 215.367-010 | Assignment Clerk | $20.31/hour |
| 654.687-010 | Matrix Inspector | $16.31/hour |

The preceding list is just a sample of various jobs that you show transferable skills to perform. The list is not all-inclusive and is only a sample of possibilities. The jobs listed are found to exist within your area and are appropriate from the standpoint of adequate salary levels relative to your prior earnings. NOTE: Current hiring or job availability is not a consideration when identifying occupational alternatives, only that the occupations identified exists within the local labor market.

We are aware that you are receiving other income benefits, such as Social Security Disability Income (SSDI). Our records indicate you were awarded on 09/06/2017. However, please understand our group policy and review process is independent from that of the Social Security Administration (SSA). In our appeal acknowledgement letter sent to you on 04/05/2019 we gave you the option of providing a copy of the Social Security file for our consideration. We did not receive any additional information pertaining to the SSDI award. Although benefits have been approved for SSDI, this decision was based on the SSA's plan provisions and may have ben awarded due to approaching advanced age and the treating provider rule. Lincoln does not have similar rules. Also, keep in mind Lincoln has more updated medical records than when you were awarded in 2017. The claim decision made under the Lincoln Financial Group policy was based upon information we have obtained from you, your treating medical professionals and the results of any internal and/or independent reviews of your claim.

We evaluated this claim by applying the provisions of the policy to the facts and opinions contained in the claim file. We relied upon the following internal rule in reaching this claim determination:

REF #4267573

Our Internal Rule for Gainful Occupation indicate: A gainful occupation is one in which an individual is qualified to perform and could reasonably expect to earn income that is at least 70% of his or her pre-disability income within 12 months of returning to work.

**Appeal Rights**

As a reminder, you have exhausted your first level of appeal. If you disagree with this decision, you, your attorney, or a person legally authorized as your representative, may pursue a final administrative appeal.

To initiate this process submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103
Fax: 402-361-1460

The following should be included with the appeal letter:

1. The policy number and claim number;
2. The reason(s) for appealing; and
3. If applicable, any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results.

Following receipt of your appeal, we will review the claim and provide you with a full written explanation of the decision within 45 days. You may also request copies of records and other information relevant to your claim free of charge.

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law.

Your employer's plan has a contractual limitations period of five years, which means that a lawsuit must be brought within five years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is 10/30/2023.

REF #4267573

Please contact me directly at the number listed below with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Lisa Kurtz, HIA
800-423-2765 *7616
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

REF #4267573

Chinese (Simplified)

注意：如果您说普通话，可以选择免费语言支持服务。 请拨打 1-800-423-2765.

Chinese (Traditional)

注意：若您講國語，可使用我們的免費語言支援服務。 請致電 1-800-423-2765.

Tagalog

Pansinin: Kung nagsasalita ka ng Tagalog, mayroon kang magagamit na mga libreng serbisyo ng tulong sa wika. Tumawag sa 1-800-423-2765.

Spanish

Atención: si habla español, tenemos disponibles servicios de apoyo con el idioma sin costo para usted. Llame al 1-800-423-2765.

Navajo

DÍÍ BAA AKÓ NÍNÍZIN: Díí bee yáníłti’go Diné bizaad, saad bee áká’ánida’áwo’dę́ę́’ t’áá jiik’eh, ná hólǫ́. Kojį’ hódíílnih áǫįóóǫéąą́ǫąíę́ę.

REF #4020998

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68114-4066
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

May 29, 2019

SHERMAN CARTER

Re: Policyholder: Ajax Distributing Company of Memphis,
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

This letter is in regard to your appeal for Long Term Disability benefits.

As part of your appeal review, your medical information was reviewed by a health care consultant. We are enclosing a copy of the report with this letter for your review prior to completion of our appeal decision.

You may wish to provide this assessment to your treating physician(s) for further review. Any additional written information or comments must be provided within 21 days.

The 21-day period will expire on 06/19/2019. Please submit any written comments or documentation to us at the address in the upper right hand corner of this letter or fax it to 402-361-1460. If you will not be responding to the review, please advise us in writing immediately.

We are not making a final determination on your disability claim at this time as we want to provide you every opportunity to review our assessment and provide a response.

If we do not receive a response by 06/19/2019, then we will render a decision based on the information currently in the file.

©2019 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #4020998

Please contact me directly at the number listed below with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Lisa Kurtz, HIA
800-423-2765 *7616
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

REF #4020998

Date: May 28, 2019

Subject: Nursing Memorandum

Claim#: 1150128075
Claimant: Sherman Carter
DOD: 8/7/15
COD: 11/5/17

Conclusion:
Essentially unchanged since the previous 12/5/18 peer review which stated the claimant can do "sedentary work with no walking, occasional standing, lifting <10 lbs occasionally.

Rationale:
Since the peer review, there has been no new significant illness or injury reported that would otherwise contribute to new medically reasonable work restrictions or limitations. No new physical examinations or diagnostic tests was provided. New hospitalizations or surgeries either for musculoskeletal diagnoses or cardiopulmonary diagnoses were not noted.

File does not indicate an instance of ongoing 100% nonweightbearing status, bedridden status or wheelchair dependency. File does not indicate an instance of constant, daily ADL assistance or that the claimant needs active hands on help from a secondary individual. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) with no significant radiographic abnormalities to the left hip and the claimant to be navigating the room reasonably well.

There is insufficient documented evidence of significant or severe high grade joint weakness and instability, significant gait instability resulting in frequently witnessed falls, significant distal extremity circulatory, sensory and motor deficits, muscular atrophy, dexterity or coordination problems that would otherwise translate into a wholly diminished sitting, standing, walking, lifting and fingering functional capacity. 2/25/19 ortho exam noted the claimant to be in no acute distress (NAD) with intact motor, sensation, etc. and no deformities and indicated again, no significant radiographic abnormalities on the left hip xrays.

Although the 11/1/18 and 11/11/18 medical records from Dr Faulkner noted the claimant continues to have a severely depressed left ventricular function (LV) and nonsustained ventricular tachycardia (VT) along with having shortness of breath (SOB), problems standing, frequent dizzy spells, dyspnea on exertion (DOE) and orthopnea, the medical examinations prior to that date on 7/30/18 and 11/1/18 noted no clear, overt clinical signs of sustained heart failure or symptomatic arrhythmias. For example, the examinations noted the claimant to have: intact vital signs, lung and heart sounds, heart rates (hr) and rhythm, neurological functions, with no syncope, swelling, clubbing or cyanosis.

Although the records indicate that the claimant has chronic musculoskeletal pain and paresthesias, it would be reasonable to periodically adjust positions throughout the workday per position of comfort. i.e. taking reasonable breaks, stretching, alternating sitting, standing and walking throughout the day to minimize or mitigate the aforementioned symptomatology.

Background history:

The medical records indicate that the claimant is a 52 yr old truck driver (med occ) with an extensive cardiac history entailing hypertension, cardiomyopathy, depressed left ventricular function, nonsustained VT whom underwent AICD placement on Sept 2015. The claimant has ongoing reported symptoms of dizziness, shortness of breath, chest pain with stress and activity, etc.
File also noted the claimant had a dx of OA of the left hip and underwent uncomplicated total left hip replacement on March 2018. The claimant has ongoing reported symptoms of leg pain and paresthesias.

Recent R+L's as so stated by the treating medical providers:
3/22/18 Dr Dabov (ortho) off work
4/23/18 Dr Dabov: permanently disabled from medium or heavy work…….I do want him getting involved in a good walking program and fitness…..
10/1/18 Dr Dabov "see notes."
2/25/19 Dr Dabov Permanently disabled from heavy work…..i do want him exercising as far as what his heart doctor wants, mainly walking and maybe riding a bike. No running, heavy lifting, bending, squatting, climbing, etc.

Medical office notes or hospital reports as so stated in the records:
3/19/18 Dr Dabov: using walker to ambulate
4/23/18 Dr Dabov: has done well no major issues.
7/30/18 Dr Faulkner cardio: denies CP, however pain when stressed or overexerting himself. Denies syncope or dizziness. ICD interrogation noted nonsustained VT. EKG in office noted normal sinus rhythm rate of 60. Exam noted intact lung and heart sounds, hr and rhythm, no deformities, clubbing, cyanosis or edema. neuro intact.
11/1/18 Dr Faulkner: continues having SOB. having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia and difficulty walking. He continues to have numbness of his leg and expresses DOE and orthopnea. Exam: 130/80 intact lung and heart sounds, hr and rhythm, neurological functions. no deformities, swelling, clubbing or cyanosis.
11/1/18 echocardiogram severely depressed LV function with EF 25%. Posterior wall akinesis
11/11/18 Dr Borzak IM/cardio: clmt has severely depressed LV function with an EF of 20-25%. EKG with frequent ventricular ectopy. s/p AICD. Nonsustained VT.

REF #4020998

Unable to walk 6 minutes without stopping due to dizziness and numbness since hip replacement. Has DOE. He has 3 pillow orthopnea. NYHA class III. 2/25/19 Dr Dabov exam: NAD. intact orientation, sensation, motor. Limited ROM in right hip vs left. Xrays noted arthroplasty in good position. Intact lengths. No loosening or failure. navigates the room reasonably well. Permanently disabled from heavy work…..i do want him exercising as far as what his heart doctor wants, mainly walking and maybe riding a bike. No running, heavy lifting, bending, squatting, climbing, etc.

NDC Fil C, RN
Nurse Disability Consultant, Lincoln Financial Group

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

Physicians of Hearts

# Fax: Lincoln Financial

To: Lisa Kurtz From: Dr. Lee Faulkner/

Fax: 402-361-1460 Pages: 2

Phone: Date: 5/14/19

Re: Sherman Carter CC:

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

... 5/14/2019 11:53:57 AM [Central Daylight Time] * SVR:NE1PWFAX101/3 * DNIS:1460 * CSID: * ANI:9016827243 * DURATION (mm-ss):01-05

# Lee Edwin Faulkner, M.D.
# Physicians of Hearts, P.L.L.C.
# CARDIOLOGY

**Name:** Sherman Carter
**Referred by:**
**Date of Birth:**
**Date:** 11/01/2018
**Sex:** Male
**Race:** African American

## ECHOCARDIOGRAM

**DIMENSIONS:**

**RIVID:**
**LVIDd:**
**LVIDs:**
**IV SEPTUM-D:**
**EJECTION FRACTION:** 25%
**PERICARDIAL SEPARATION:**
**IVSS:**
**AORTIC ROOT:**
**AORTIC VALVE:**
**LA SIZE:**
**FRACTIONAL SHORTENING:**
**POST LV WALL-D:**
**PA PRESSURE:**

**IMPRESSION:** 2D and M Mode images are obtained from the apical, parasternal and sub-costal projections. There is color-coded and spectral Doppler interrogation as well.

**INTERPRETATION:**
**Pericardial:** There was no pericardial effusion or separation noted.

**Ventricular Wall Thickness:** Left ventricle is measured to have normal thickness. Right ventricle is measured to have normal thickness.

**Chambers:**

- **Left Ventricle:** The left ventricular chamber is normal in size.
- **Left Atrium:** The left atrium chamber is enlarged in size.
- **Right Ventricle:** The right ventricular chamber is normal in size
- **Right Atrium:** The right atrium chamber is normal in size.

**Aortic Root:** Normal

Sherman Carter 11/01/2018 echo cont.

**Valves:** The mitral, aortic, tricuspid and pulmonic valves are normal.

**Walls Motion:** There is posterior Akinesis.

**Doppler:** Interrogation of the valvular apparatus reveals moderate tricuspid regurgitation.

**SUMMARY:**

1. Severely depressed left ventricular systolic function with an ejection fraction of 25%.
2. Left Atrium Chamber enlarged in size
3. Posterior Wall Akinesis
4. Mild Tricuspid Regurgitation
5. Pacing Wire in Right Heart Chamber

Lee E. Faulkner M.D./LB

REF #3925287

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

May 10, 2019

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

This is to acknowledge receipt of the additional information you submitted to complete your appeal.

We have resumed our review of your appeal and will notify you of the results as soon as a decision is rendered. If additional information is needed or if we have questions regarding the information being reviewed, we will contact you as soon as possible.

Please contact me directly at the number listed below with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Lisa Kurtz, HIA
800-423-2765 *7616
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

©2019 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

PRESS FIRMLY TO SEAL.

UNITED STATES POSTAL SERVICE. Retail

P

US POSTAGE PAID
$7.35
Origin: 38118
04/29/19
4795150968-18

PRIORITY MAIL 2-Day ®

0 Lb 8.00 Oz
1006

EXPECTED DELIVERY DAY: 05/01/19

B050

SHIP
TO:
PO BOX 2337
OMAHA NE 68103-2337

USPS TRACKING NUMBER

9505 5149 1561 9119 0657 87

# PRIORITY® ★ MAIL ★

FROM:

- DATE OF DELIVERY SPECIFIED*
- USPS TRACKING™ INCL[...]
- INSURANCE INCLUDE[...]
- PICKUP AVAILABLE

* Domestic only

MAY 0 1 2019

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

PS00001000014

PRIORITY® ★ MAIL ★

UNITED STATES POSTAL SERVICE.
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FR[...] Sherman Carter 01

TO: Attention: Lisa Kurtza
Claims Shared Services
The Lincoln National Life Ins. Co
P.O. Box 2337
Omaha, NE 68103

Label 228, March 2016 FOR DOMESTIC AND INTERNATIONAL USE

[...]S.COM®
[...]S ONLINE

UNITED STATES POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

April 24, 2019

MAY 0 1 2019

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103

**RE: Policyholder: BarDett, LLC**
**Policy Number: 00001004922000000**
**Claim Number: 1150128075**
**Claimant: Sherman Carter**
**Appeal of Decision on December 6, 2018**

Dear Lisa Kurtza:

Thank you for the opportunity to have reconsideration made about my long term disability. I am writing to appeal the decision made for denying my long term disability on December 6, 2018. You acknowledged receipt of my appeal letter received on 4/01/2019 and granted additional time to add supporting documents. I am providing information previously submitted from attending physicians and medical decision letter from the Social Security Administration. My packet includes the following:

- Medical decision letter for disability from Social Security Administration – June 17, 2017.
- Campbell Clinic, Progress Notes for visit on 2/25/19, Dr. Gregory D. Dabov, MD.
- Campbell Clinic, Certificate for return to work on March 7, 2018, Dr. Gregory D. Dabov, MD.
- Campbell Clinic, Progress Notes for visit on 4/23/18, Dr. Gregory D. Dabov, MD.
- Physicians of Hearts, Progress Notes for visit on 11/01/2018, Dr. Lee Faulkner, MD.
- Assessment questions from Lincoln Financial Consulting Physician, Steven Borzak, MD to Dr. Lee Faulkner, MD of Physicians of Hearts on 10/23/18 and answered by Dr. Faulkner on 11/2018.
- Lincoln Financial Group assessment, REF#1989621 to Dr. Lee Faulkner, Physicians of Hearts, and answered by Dr. Faulkner on 5/24/17.
- Lincoln Financial Group denial letter, REF #3269137. Peer reviewer, Dr. Steven Borzak's altered opinion stating new data supports sedentary work 12/6/2018.
- Lincoln Financial Group summary, REF #3169499 denial of benefits on 10/30/2018.
- Lincoln Financial Group letter, REF #2044671 determined my eligibility as current totally disabled from any occupation, June 12, 2017.
- Lincoln Financial Group Recovery Unit, REF #2245346, and notification I was awarded Social Security Disability Income. Statement claim overpayment of $32,755.53, September 19, 2017.
- Lincoln Financial Group, REF #2949770, applied a portion of monthly benefit, $581.00, toward existing overpayment leaving a balance of $29,269.53. Stated I would receive quarterly updates until overpayment satisfied in full. Shortly after, Lincoln Financial Group determined I was not totally disabled, benefits denied. No additional updates provided in reference to monthly benefit amount.

I am unaware what lead to this decision since I provided more than enough medical documentation to support my permanent disability. The explanation of denial did not adequately describe the reason you denied my claim.

I received a letter from Lincoln Financial dated June 12, 2017 stating you concluded that I was totally disabled from any occupation and benefits will continue provided I remain partially or totally disabled according to the provisions of policy issued to BarDett, LLC. In the letter dated September 19, 2018 you stated that notification was received, by LFG Recovery Unit that I was awarded Social Security Disability Income, which

SSA declared me permanently disabled. This means I cannot do the work that I once did, cannot adjust to other forms of work because of my medical condition and my disability can result in death.

In the denial letter dated 10/30/2018 you conducted a transferable skills assessment that revealed occupations with light and sedentary capacity for which I don't have skills, work experience and or background nor able to do because I am permanently disabled. In the letter dated December 6, 2018 your doctor reviewed my provider's response and altered his/her opinion. He/she stated that "data now supports only sedentary work" and identified from your transferable skills assessment two sedentary occupations based on the clinical findings and vocational findings, that I am not disabled from any occupation, again denying my long term disability. Despite documents from my doctors and permanent disability status from Social Security Administration, your peer reviewer made a decision without physically examining me that is unfounded. There is no question of my disability status, I am permanently disabled and my condition has not changed. Due to the numbness and poor circulation caused from hip replacement in my left leg it remains hard for me to stand and or sit for long periods of time. I am also unable to walk for short or long periods of time and as a result experience shortness of breath and dizziness, all related to my heart problems. I still take Entresto for my heart and have an implantable cardiac defibrillator in my chest.

In order to properly evaluate your decision, please provide me with the name and credentials of representative who made the decision to discontinue my long term disability, an outline of the records reviewed and all other information to support your decision. I also would like a complete copy of all records pertaining to my case. Additionally, I have included copies of my medical records again from the attending physicians who are also prepared to provide a rebuttal to your decision once you have provided me with the requested information. I also want my case to remain open.

It is my hope that we can settle this matter promptly, as I have been unable to work for years and very much need this money to live on. Until the date my health started to fail, I was a healthy, working, tax-paying citizen, paying into a system that guaranteed me help should I ever need it. I would like nothing better than to work, but my health issues prevent that. Please reconsider my disability claim that you denied on December 6, 2018.

I thank you for your patience and look forward to hearing from you.

Sincerely,

S. Carter

Sherman Carter

CC/File:
Larry Montgomery

SOCIAL SECURITY ADMINISTRATION

Notice of Decision

SHERMAN CARTER

Telephone: (866) 336-2212
Date: June 20, 2017 Reprint 4/15/19
Claim Number:

As a result of our additional review, we are able to make a fully favorable medical decision and find that you meet the medical requirements for disability benefits. The onset of your disability is established as of 08/06/2015. Therefore, it is not necessary to have your case decided at the hearing level. We have not yet made a decision about whether you meet the non-medical requirements, but we will make that decision soon. You will soon get two notices. The payment notice will inform you about the amount of your payments if you meet the nonmedical requirements. The dismissal notice will inform you that the Office of Disability Adjudication and Review dismissed your hearing because we are able to make a fully favorable medical determination.

If you agree with our revised determination, you need to take no further action and your hearing request will be dismissed. If you disagree with our revised determination, you may request that the Office of Disability Adjudication and Review proceed with your pending request for hearing. Your request must be in writing and filed **within 60 days** from the mailing date of the dismissal notice. You may file your request with any Social Security Office.

**If You Have Any Questions**

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at (866) 336-2212. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:
SOCIAL SECURITY
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly.

**Suspect Social Security Fraud?**

If you suspect Social Security fraud, please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

Social Security Administration

c: THEODORE NORWOOD
PO BOX 7200
JEFFERSON CITY MO 65102

CDCACE

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

SOCIAL SECURITY ADMINISTRATION
Federal Disability Unit
525 F.D.Roosevelt AveSuite 500
San Juan, PR 00918

CDCACE

THEODORE NORWOOD
PO BOX 7200
JEFFERSON CITY MO 65102

June 19, 2017

| | |
|---|---|
| NAME: | SHERMAN CARTER |
| SSN: | |
| CASE NUMBER: | 208218 |

We are forwarding you a copy of the correspondence sent to your client in connection with their claim for disability benefits under the Social Security Act. Please advise your client to read the entire letter and respond appropriately.

C Caceres, Disability Examiner

**(SSA-L8561)**
NFM-G02-1
OC-NFM G02 (06/12)

# Social Security Administration
## **Important Information**

From: Social Security Administration

Date: 04/15/2019
Telephone No.: 1-800-772-1213

SHERMAN CARTER

The enclosed form(s) has been sent to you based on your recent contact with Social Security's toll-free telephone service. It is important that you complete the enclosed form(s) and mail/return it to the address shown below.

**SOCIAL SECURITY ADMINISTRATION**
1330 MONROE AVENUE
MEMPHIS TN 38104-9918

| Office Hours : | | |
|---|---|---|
| | Monday | 09:00AM to 04:00PM |
| | Tuesday | 09:00AM to 04:00PM |
| | Wednesday | 09:00AM to 12:00PM |
| | Thursday | 09:00AM to 04:00PM |
| | Friday | 09:00AM to 04:00PM |

If you have any questions or need further assistance, please call our toll-free number **(1-800-772-1213) between 7:00 a.m. - 7:00 p.m.**, Monday through Friday, or contact your local Social Security Office at 866-336-2212.

**Suspect Social Security Fraud?**

If you suspect Social Security fraud, please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

Social Security Administration

UNIT:861

Campbell Clinic ORTHOPAEDICS

PATIENT NUMBER: 992736
PATIENT NAME: SHERMAN CARTER
SSN:
DOB:
ADDRESS:

02/25/19

TEL:

---

GREGORY D. DABOV, MD

DESOTO

**GDD**

HISTORY OF PRESENT ILLNESS: Mr. Carter comes in today. He is a year out from his left total hip. He notes his right hip has been giving him some trouble. He also has some heart disease. He is currently disabled from his previous heavy work as a truck driver, especially with regards to moving product, etc.

PHYSICAL EXAMINATION: This is a well-developed, well-nourished, very pleasant gentleman in no acute distress. Alert and oriented x3. Cooperative to exam. Navigates the exam room reasonably well. He is somewhat uncomfortable with Stinchfield's on the right. He is nontender with this maneuver on the left. He does have some decreased sensation about his lateral femoral cutaneous nerve on the left. His calves are otherwise soft and nontender. He is motor and sensory are intact. Has equal and palpable pulses. Limited range of motion of his right hip as compared to the left, especially on internal rotation.

IMAGING: AP pelvis and lateral of the left hip show left total hip arthroplasty in good position. Limb lengths and offset look good. Components are well sized and well placed. No signs of loosening or failure.

ASSESSMENT:

1. STATUS POST LEFT TOTAL HIP.
2. OSTEOARTHRITIS, RIGHT HIP.

PLAN: From an orthopedic standpoint, I do believe that Mr. Sherman is permanently disabled from heavy work since his truck driving warehouse work moving heavy product, etc. He understands this. I do want him exercising as far as what his heart doctor wants, mainly walking and maybe riding a bike. He is not to run or jog or do heavy lifting. No squatting, bending, ladder climbing, etc. I do expect his right hip to start acting up. If it does, I want him coming back. I told him to talk to his cardiologist about use of nonsteroidal drugs as more than likely they do not want him taking that kind of medicine. He will return to see me on a p.r.n. basis.

Electronically signed by Gregory D. Dabov, MD
GDD:brandivr
DD: 02/25/19 DT: 02/25/19

**Campbell Clinic**
901-759-3100
7545 Airways Boulevard
Southaven, MS 38671

* 9 9 2 7 3 6 - 1 8 *

Patient Name: CARTER. SHERMAN
DOB:
Age: 51y
Gender: Male

**CERTIFICATE FOR RETURN TO SCHOOL OR WORK**

SHERMAN CARTER has been under my care

from 3/7/2018 to PRESENT and is able to return to

work / school on OFF WORK

Remarks: Mr. Sherman had a total hip arthroplasty on 03/07/218

Dr. [signature] Date: March 22, 2018

Campbell Clinic ORTHOPAEDICS

PATIENT NUMBER: 992736
PATIENT NAME: SHERMAN CARTER
SSN:
DOB:
ADDRESS:

04/23/18

TEL:

GREGORY D. DABOV, MD DESOTO

**GDD**

Mr. Carter comes in today. He is now 6 weeks out from his left total hip. He has done well with this, having no major issues. He has some startup pain, but for the most part, he is quite pleased. He previously worked as a warehouseman and certainly that is not the type of work I like to get my total hip patients back at. In workup for total hip, we found out he had severe cardiac issues and he has a low ejection fraction. His cardiologist told him he does not want him doing heavy-type work. It is my opinion that he is permanently disabled from medium- or heavy-type of work, which is really all he knows. I do want him getting involved in a good walking program and fitness; doing maybe elliptical machine or stationary bike. I talked about the need for antibiotics about dental procedures. If he has any problems or concerns, I want him to let us know. Otherwise, I will see him back in 10 months with AP pelvis and lateral of the left hip.

Electronically signed by Gregory D. Dabov, MD
GDD:jcvr/bcqa5
DD: 04/23/18 DT: 04/23/18

OPD - PERMANENT RECORD

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 11/01/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 130/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data**:
**ECHO -** Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan**:

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

**Follow-up**: 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

PDA

10/23/18

Dr. Lee Faulkner
Fax: 901-682-7243

Re: Sherman Carter
DOB:

Dear Dr. Faulkner:

I am a consulting physician to Lincoln Financial and I have been asked to assess Mr. Carter's functional status. I spoke with you on 10/22/18 at 1:00 PM but was unsuccessful in addressing my concerns with you, as you wanted to consult your records, and agreed to call me back. As my report is due today and I have not yet received a call back, the purpose of this letter is to share with you my opinion regarding Mr. Carter's functional status and obtain additional information from you to help resolve Mr. Carter's disability claim.

Since we were unable to speak again on the phone, I would ask that you answer the following questions:

1. What is the most recent objective assessment of Mr. Carter's LV function (echocardiogram) and etiology of cardiomyopathy (cardiac cath, cardiac MRI, imaging stress test)? Severely depressed LV systolic function with an EF of 20-25% EKG with frequent ventricular ectopy, S/P AICD Nonsustained V. Tach [illegible] by AICD Documentation

2. Is there objective assessment of Mr. Carter's functional capacity and physical ability (stress test, 6 minute walk)? Unable to walk 6 minutes without stopping, due to dizziness and numbness since hip replacement. Patient has dyspnea on exertion He has 3 pillow orthopnea

3. Your disability forms state that Mr. Carter is totally and permanently disabled due to cardiomyopathy, yet your office notes do not detail symptoms or findings suggesting any more than NYHA class II functional status. What is the basis for your determination that Mr. Carter is disabled and incapable of sedentary work or work with mild or medium level of exertion?

NYHA Functional functional class III

**Please review and respond to this letter.** Because Lincoln Financial is required to make claim decisions in accordance with certain timeframes, we would appreciate a response no more than three (3) business days from receipt of the letter. **Please sign, date, and fax this letter to 207-899-4629.**

Sincerely,

Steven Borzak, MD
Diplomate, American Board of Internal Medicine
Board Certified in Cardiovascular Disease
Active License in FL
Medical Consultant, PDA

Signature: Lee E Faulkner, MD Date: 01/01/2018

Jun 02 17 11:55a Physicians of Hearts 901-682-7243 p.4

REF #1989621

(c) Is patient Ambulatory? House Confined? Bed Confined? Hospital Confined?

(a) Is patient now totally disabled? (b) Date you are medically certifying patient unable to work.
Patient's Job (Yes) No
Any other work (Yes) No

(c) When do you expect a fundamental or marked change in the future?
1 Month 1-3 Months 3-6 Months (Never)
Applies to: Patient's Job Other Work

Has your patient had loss of cognitive functioning? "Cognitive impairment" means a permanent deterioration or loss of cognitive or intellectual capacity and requires another person's hands-on help or verbal cues to prevent harm to self or others due to impairment.
Yes No If "yes", please explain and provide supporting medical documentation and testing:

Based on your observations of this patient, medical history and condition, has your patient lost the ability to safely and completely perform Activities of Daily Living (ADLs) without another person's active hands-on help with all or most of the activity:

ADL Date on which assistance was first required and received

Bathing ______ (washing self in tub, shower or by sponge bath, with or w/o equipment)
Dressing ______ (putting on, taking off garmets, braces or any artificial limbs normally worn)
Toileting ______ (getting to, from, on and off toilet, and performing related personal hygiene)
Transferring ______ (moving in & out of bed, chair or any wheelchair, with or w/o equipment)
Continence ______ (voluntarily maintaining control of bladder and bowel function)
Eating ______ (getting nourishment into one's body by any means (table/tray or special equipment)

If the claimant has lost the ability to perform ADLs listed above, please provide any supporting medical documentation and testing.

If the patient has lost the ability to perform any ADLs listed above, do you expect the limitations to be permanent?
Yes No If "no", please explain when improvement may be expected

(a) Is patient a suitable candidate for occupational rehabilitation?

(b) Can present job be modified to allow for handling with impairment? Yes No

(c) When could patient return to work? ______

Patient's Job Full-time Part-time

Any other Work Full-time Part-time

Restrictions and Limitations

The above Statements are true and complete to the best of my knowledge and belief. I have read and understand the attached Fraud Warning Statements.

Name (Attending Physician) Print: Lee E. Faulkner Degree: MD Telephone Number

Street Address City or Town State: TN Zip Code

Signature (By Physician): Lee E Faulkner, MD Date: 5/29/17



00000012 LFPV6UT1 0000110

PAGE 5/5 * RCVD AT 6/2/2017 12:03:27 PM [Central Daylight Time] * SVR:NE1PWFAX101/8 * DNIS:7929 * CSID:LFG Omaha Fax * DURATION (mm-ss):01-21

REF #3269137

Lincoln Financial Group®

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

December 6, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

We are writing in reference to your claim for Long Term Disability.

You provided our office with Dr. Steven Borzak's response to the peer reviewer's questions. The information was sent to the peer reviewer and we requested that an addendum be completed. The doctor reviewed your provider's response and made the following conclusion:

> *"The new data caused me to alter my opinion. Ratner than the data supporting light or sedentary work, the data now supports only sedentary work with no walking, occasional standing, no professional driving, no lifting/carrying greater than 10 pounds ever and greater than 10 pounds occasionally in full time capacity, with respect to the claimant's cardiac condition. "*

If you reference your initial denial letter dated 10/30/2018, a transferable skills assessment was performed on your claim. The Assessment revealed:

Using the Dictonary of Occupation Title as a reference, we found that you would be capable of performing the following occupations:

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3269137

| DOT# | OCCUPATION | WAGE(MEAN) | PHYSICAL DEMAND |
|---|---|---|---|
| 215.367-010 | Assignment Clerk | $20.31/hr | Sedentary |
| 237.367-018 | Information Clerk | $12.58 | Light |
| 654.687-010 | Matrix Inspector | $16.31 | Sedentary |
| 209.562-010 | Clerk, General | $14.36 | Light |
| 222.367-066 | Truckload Checker | $13.68 | Light |

Based on the updated Peer review, you are ONLY capable of performing at a sedentary capacity. However, based on the transferable skills assessment, two sedentary occupations have been identified. As such, the initial denial for benefits beyond 11/05/2018 remains in effect. Based on the clinical findings and vocational findings you are not disabled from any occupation.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

**Appeal Rights**

You, your attorney or a person legally authorized as your representative may appeal the denial by requesting a review of your denied claim. To initiate this process, submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services

The Lincoln National Life Insurance Company

PO Box 2337

Omaha, NE 68103

The Lincoln National Life Insurance Company

REF #3169499

In our review of your claim, all previously submitted as well as any new documentation is used to make a determination. We evaluated current information from your physician(s), as well as other sources, including vocational information.

The documentation contained in your claim file includes the following:

- Attending Physician Statement signed by Dr. Lee Faulkner form not dated
- Certification of Health Care Provider for FMLA signed by Dr. Gregory Dabov dated 08/31/2015
- ▪ Me
- Group Continuance of Disability form signed by Dr. Lee Faulkner dated 11/21/2016
- Abilities form signed by Dr. Lee Faulkner dated 05/24/2017
- Attending Physician Statement signed by Dr. Lee Faulkner dated 05/29/2017
- Medical records from Dr. Gregory Dabov from 03/19/2018 to 04/23/2018
- Certificate for Return to School or Work form signed by Dr. Gregory Dabov dated 03/22/2018
- Group Continuance of Disability form signed by Dr. Lee Faulkner dated 09/14/2018
- Attending Physician Statement signed by Dr. Gregory Dabov dated 10/01/2018
- ▪ Ext
Board Certified of Internal Medicine and Board Certified in Cardiovascular Disease dated 10/26/2018

According to the information contained in your claim file, you stopped working on 08/06/2015 due to a diagnosis of osteoarthritis of the left hip. Dr. Gregory Dabov completed an Attending Physician Statement on 10/14/2015 noting that you would require hip surgery, however you would require cardiac surgery first. The cardiac surgery was slated to be completed on 09/18/2015. Your restrictions and limitations were noted as no prolonged walking, standing, or sitting. Based on this information along with the supporting medical records your claim was approved for Long Term Disability benefits.

You remained under the care of Dr. Lee Faulkner for your diagnosis of cardiomyopathy. You obtained cardiology clearance to have left total hip arthroplasty surgery that was performed on 03/07/2018 by Dr. Gregory Dabov. You were seen by Dr. Dabov following your surgery on 04/23/2018. On this date Dr. Dabov indicated that you did not have any major issues, but did report startup pain. Dr. Dabov opinioned that you are permanently disabled from medium or heavy type of work.

You were seen by Dr. Lee Faulkner on 07/30/2018. The medical record noted that you had chest pain when stressed out or when overexerting yourself, but did not have dizziness or syncope. Your blood pressure was noted as 150.80. Your Implantable Cardioverter Defibrillator was checked which revealed no sustained VT.

On 09/14/2018 Dr. Lee Faulkner completed an Attending Physician Statement. He noted that you had diagnosis of cardiomyopathy and hypertension which made you incapable of sedentary activity.

periods of time. Jobs are sedentary if walking and standing are only required occasionally (1-33%) and if all other sedentary criteria are met. Sedentary work may require exertion up to 10 lbs. occasionally and a negligible degree of exertion on a frequent (34-66%) or constant (67-100%) basis.

Using The Dictionary of Occupation Titles as a reference, we found that you would be capable of performing the following occupations:

| DOT# | Occupation | Wage (mean) | Physical Demand |
|---|---|---|---|
| 215.367-010 | Assignment Clerk | $20.31 | Sedentary |
| 237.367-018 | Information Clerk | $12.58 | Light |
| 654.687-010 | Matrix Inspector | $16.31 | Sedentary |
| 209.562-010 | Clerk, General | $14.36 | Light |
| 222.367-066 | Truckload Checker | $13.68 | Light |

The preceding list is just a sample of various jobs that you show transferable skills to perform. The list is not all-inclusive and is only a sample of possibilities. The jobs listed are found to exist within your area and are appropriate from the standpoint of adequate salary levels relative to your prior earnings. NOTE: Current hiring or job availability is not a consideration when identifying occupational alternatives; only that the occupations identified exist within the local labor market.

**Summary**

In summary, it is our determination that based upon your age, education, training, past work experience and your current abilities, that you are not prevented from performing work in other occupations, even if you can no longer perform your Own Occupation. Therefore, you no longer meet the definition of disability in this policy and benefits will be denied as of 10/30/2018. Your payment for benefits through 10/30/2018 is being applied to your outstanding over payment balance and your claim is being closed.

Your Own Occupation Period of the policy ended on 11/05/2017. This means to qualify for ongoing Total Disability benefits, you must have restrictions and limitations that render you unable to work in any gainful occupation that your past training, education and experience will reasonably allow. On 11/05/2017 you had not been cleared by cardiology to have your total hip replacement. Since that time, you had your left hip replacement surgery and your claim was re-evaluated to determine your current functionality. Based on our investigation that included both clinical and vocational insight, you are not precluded from performing in any occupation beyond 10/30/2018.

We evaluated this claim by applying the provisions of the policy to the facts and opinions contained in the claim file. We relied upon the following guidelines, internal rules, protocols, standards or other similar criteria in reaching this claim determination: A gainful occupation is one in which an individual is qualified to perform and could reasonably expect to earn income that is at least 60% of his or her pre-disability income within 12 months of returning to work.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

REF #3169499

**Appeal Rights**

You, your attorney or a person legally authorized as your representative may appeal the denial by requesting a review of your denied claim. To initiate this process, submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103
Fax: 402-361-1460

Please include the following with your appeal:

1. The policy and claim number;
2. Your reason(s) for appealing; and
3. If applicable, any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results.

Following receipt of your appeal, we will review the claim and provide you with a full written explanation of the decision within 45 days. You may also request copies of records and other information relevant to your claim free of charge.

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law.

Your employer's plan has a contractual limitations period of five years, which means that a lawsuit must be brought within five years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is 10/30/2023.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

REF #2044671

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

June 12, 2017

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

This letter is in reference to your claim for Long Term Disability claim.

We have concluded our investigation into your eligibility for benefits beyond your Own Occupation Period as defined in your policy. We have determined that you are currently Totally Disabled from Any Occupation, and your benefits will continue provided that you remain Totally or Partially Disabled according to the provisions of the policy issued to BarDett, LLC.

We will continue to monitor your claim to determine if your restrictions and limitations have changed. As such, will continue to request that both you and your physician complete a supplementary report of disability. Our office will notify you when a report is needed and the necessary forms will be mailed to you.

Benefits could potentially be payable to 01/15/2034 for your claim. If you remain eligible through this period, benefits for your claim will expire on that date.

Thank you for your patience during this review process. Please contact our office with any questions you may have at the number listed above.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional

The Lincoln National Life Insurance Company
CC: {CONTACT.COMPANY_NAME}
ATTN: {CONTACT.CONTACT_NAME}
{CONTACT.ADDR1}
{CONTACT.CITY}, {CONTACT.STATE} {CONTACT.ZIP}

©2017 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Lincoln Financial Group®

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

September 19, 2017

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

The LFG Recovery Unit has received notification that you have been awarded Social Security Disability Income at $1,369.00 per month beginning 02/01/16. In addition, we have placed a Social Security Dependent benefit in the amount not less than $386.00 per month from 02/01/16 to 07/01/15.

As you are aware, this benefit from Social Security Disability has been paid for a period during which you had received unreduced Long Term Disability benefits. Therefore, your claim has been overpaid.

**LTD Claim #1150128075 Overpayment $32,755.53**

You are required to repay The Lincoln National Life Insurance Company this amount and we ask that this matter receive your immediate attention. A copy of the calculation is attached.

To assist with the repayment process, please contact John Mattox with Integrated Benefits, Inc. to do a one-time account transfer. He can be reached at 800-535-6575, ext. 206. If he has already contacted you, and this payment has already been made, simply keep this letter for your records.

Please contact me with any questions you may have at extension 3020 when using the tollfree number listed above.

©2017 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
(678) 295-3020
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

REF #2949770

Lincoln Financial Group®

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 3, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

We have applied a portion of your monthly benefit for the period of 07/05/2018 to 08/05/2018 toward your existing overpayment. After crediting $581.00 to the overpayment, the remaining balance is now $29,269.53.

You will receive quarterly updates on this amount until your overpayment has been satisfied in full.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
678-295-3020

Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3761720

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

April 5, 2019

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

This is to acknowledge receipt of your appeal for Long Term Disability benefits. We received your letter on 04/01/2019.

During our conversation on 04/05/2018 you indicated you will require additional time to supplement your appeal with additional medical documentation. We will allow the additional time requested.

Please understand the appeal review will not continue until we have received the additional documents or until such time as you communicate with Lincoln the appeal is complete.

Please submit any and all additional medical evidence that you believe would support your appeal. Please have the medical records submitted to our office within 30 days of the date of this letter or no later than 05/05/2019.

If you will not be submitting new medical records, please advise us in writing so that we may begin an immediate review of the appeal.

In addition, as part of our review of your appeal, you may also submit information associated with the Social Security Disability Award for our consideration, which may include a copy of the Administrative Law Judge's Favorable Decision letter or a complete copy of the administrative file from the Social Security Administration. The pursuit and submission of this information will be at your own cost and is optional.

For your convenience, all documents may be sent via facsimile to 402-361-1460.

©2019 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3761720

We are allowing you time to submit additional information, as requested. Due to these special circumstances an extension of time to process your appeal is required and we are exercising our right to take a 45-day extension of time to decide the appeal.

Please note that we are not making a final determination on the disability claim at this time as we want to provide your client with every opportunity to submit a complete appeal.

Please contact me directly at the number listed below with any questions you may have or email us at LFGAppeals@lfg.com.

Sincerely,

Lisa Kurtz, HIA
800-423-2765 *7616
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
POSTAGE REQUIRED

Retail

UNITED STATES POSTAL SERVICE.

P

US POSTAGE PAID

$7.35

Origin: 38637
03/27/19
2736010637-05

PRIORITY MAIL 2-Day ®

0 Lb 3.40 Oz
1006

EXPECTED DELIVERY DAY: 03/28/19

B050

SHIP
TO:
PO BOX 2337
OMAHA NE 68103-2337

USPS TRACKING NUMBER

9505 5139 6116 9086 2776 59

APR 0 1 2019

FROM:

PRIORITY®
★ MAIL ★

UNITED STATES POSTAL SERVICE®
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Sherman Carter

TO: Claims Shared Services
The Lincoln National Life Ins. Co.
P.O. Box 2337
Omaha, NE 68103

Label 228, March 2016

FOR DOMESTIC AND INTERNATIONAL USE

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

PDA

10/23/18

Dr. Lee Faulkner
Fax: 901-682-7243

Re: Sherman Carter
DOB:

Dear Dr. Faulkner:

I am a consulting physician to Lincoln Financial and I have been asked to assess Mr. Carter's functional status. I spoke with you on 10/22/18 at 1:00 PM but was unsuccessful in addressing my concerns with you, as you wanted to consult your records, and agreed to call me back. As my report is due today and I have not yet received a call back, the purpose of this letter is to share with you my opinion regarding Mr. Carter's functional status and obtain additional information from you to help resolve Mr. Carter's disability claim.

Since we were unable to speak again on the phone, I would ask that you answer the following questions:

1. What is the most recent objective assessment of Mr. Carter's LV function (echocardiogram) and etiology of cardiomyopathy (cardiac cath, cardiac MRI, imaging stress test)? Severely depressed LV systolic function with an EF of 20-25%, EKG with frequent ventricular ectopy, S/P AICD Nonsustained V. Tach [illegible] by AICD Documentation

2. Is there objective assessment of Mr. Carter's functional capacity and physical ability (stress test, 6 minute walk)? Unable to walk 6 minutes without stopping, due to dizziness and numbness since hip replacement. Patient has dyspnea on exertion He has 3 pillow orthopnea

3. Your disability forms state that Mr. Carter is totally and permanently disabled due to cardiomyopathy, yet your office notes do not detail symptoms or findings suggesting any more than NYHA class II functional status. What is the basis for your determination that Mr. Carter is disabled and incapable of sedentary work or work with mild or medium level of exertion?

NYHA Functional functional class III

**Please review and respond to this letter.** Because Lincoln Financial is required to make claim decisions in accordance with certain timeframes, we would appreciate a response no more than three (3) business days from receipt of the letter. **Please sign, date, and fax this letter to 207-899-4629.**

Sincerely,

Steven Borzak, MD
Diplomate, American Board of Internal Medicine
Board Certified in Cardiovascular Disease
Active License in FL
Medical Consultant, PDA

**Signature:** Lee E Faulkner, MD **Date:** 01/08/2018

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

## Progress Notes
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 11/01/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 130/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data**:
**ECHO -** Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan**:

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

## Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

**Follow-up**: 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

Campbell Clinic ORTHOPAEDICS

PATIENT NUMBER: 992736
PATIENT NAME: SHERMAN CARTER
SSN:
DOB:
ADDRESS:

02/25/19

TEL:

---

GREGORY D. DABOV, MD

DESOTO

**GDD**

HISTORY OF PRESENT ILLNESS: Mr. Carter comes in today. He is a year out from his left total hip. He notes his right hip has been giving him some trouble. He also has some heart disease. He is currently disabled from his previous heavy work as a truck driver, especially with regards to moving product, etc.

PHYSICAL EXAMINATION: This is a well-developed, well-nourished, very pleasant gentleman in no acute distress. Alert and oriented x3. Cooperative to exam. Navigates the exam room reasonably well. He is somewhat uncomfortable with Stinchfield's on the right. He is nontender with this maneuver on the left. He does have some decreased sensation about his lateral femoral cutaneous nerve on the left. His calves are otherwise soft and nontender. He is motor and sensory are intact. Has equal and palpable pulses. Limited range of motion of his right hip as compared to the left, especially on internal rotation.

IMAGING: AP pelvis and lateral of the left hip show left total hip arthroplasty in good position. Limb lengths and offset look good. Components are well sized and well placed. No signs of loosening or failure.

ASSESSMENT:

1. STATUS POST LEFT TOTAL HIP.
2. OSTEOARTHRITIS, RIGHT HIP.

PLAN: From an orthopedic standpoint, I do believe that Mr. Sherman is permanently disabled from heavy work since his truck driving warehouse work moving heavy product, etc. He understands this. I do want him exercising as far as what his heart doctor wants, mainly walking and maybe riding a bike. He is not to run or jog or do heavy lifting. No squatting, bending, ladder climbing, etc. I do expect his right hip to start acting up. If it does, I want him coming back. I told him to talk to his cardiologist about use of nonsteroidal drugs as more than likely they do not want him taking that kind of medicine. He will return to see me on a p.r.n. basis.

Electronically signed by Gregory D. Dabov, MD
GDD:brandivr
DD: 02/25/19 DT: 02/25/19

**Campbell Clinic**
901-759-3100
7545 Airways Boulevard
Southaven, MS 38671

* 9 9 2 7 3 6 - 1 8 *

Patient Name: CARTER, SHERMAN
DOB:
Age: 51y
Gender: Male

**CERTIFICATE FOR RETURN TO SCHOOL OR WORK**

SHERMAN CARTER has been under my care

from 3/7/2018 to PRESENT and is able to return to

work / school on OFF WORK

Remarks: Mr. Sherman had a total hip arthroplasty on 03/07/218

Dr. [signature] Date: March 22, 2018

APR 0 1 2019

March 25, 2019

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103

**RE: Policyholder: BarDett, LLC**
**Policy Number: 00001004922000000**
**Claim Number: 1150128075**
**Claimant: Sherman Carter**
**Appeal of Decision on December 6, 2018**

Dear Kameetrice Farrell:

I am writing to appeal the decision made for denying my long term disability on December 6, 2018. I am unaware what lead to this decision since I provided more than enough medical documentation to support my permanent disability. The explanation of denial did not adequately describe the reason you denied my claim.

I received a letter from Lincoln Financial dated June 12, 2017 stating you concluded that I was totally disabled from any occupation and benefits will continue provided I remain partially or totally disabled according to the provisions of policy issued to BarDett, LLC. In the letter dated September 19, 2018 you stated that notification was received, by LFG Recovery Unit that I was awarded Social Security Disability Income, which SSA declared me permanently disabled. This means I cannot do the work that I once did, cannot adjust to other forms of work because of my medical condition and my disability can result in death.

In the denial letter dated 10/30/2018 you conducted a transferable skills assessment that revealed occupations with light and sedentary capacity for which I don't have skills, work experience and or background nor able to do because I am permanently disabled. In the letter dated December 6, 2018 your doctor reviewed my provider's response and altered his/her opinion. He/she stated that "data now supports only sedentary work" and identified from your transferable skills assessment two sedentary occupations based on the clinical findings and vocational findings, that I am not disabled from any occupation, again denying my long term disability. Despite documents from my doctors and permanent disability status from Social Security Administration, your peer reviewer made a decision without physically examining me that is unfounded. There is no question of my disability status, I am permanently disabled and my condition has not changed. Due to the numbness and poor circulation caused from hip replacement in my left leg it remains hard for me to stand and or sit for long periods of time. I am also unable to walk for short or long periods of time and as a result experience shortness of breath and dizziness, all related to my heart problems. I still take Entresto for my heart and have an implantable cardiac defibrillator in my chest.

In order to properly evaluate your decision, please provide me with the name and credentials of representative who made the decision to discontinue my long term disability, an outline of the records reviewed and all other information to support your decision. I also would like a complete copy of all records pertaining to my case. Additionally, I have included copies of my medical records again from the attending physicians who are also prepared to provide a rebuttal to your decision once you have provided me with the requested information. I also want my case to remain open.

It is my hope that we can settle this matter promptly, as I have been unable to work for years and very much need this money to live on. Until the date my health started to fail, I was a healthy, working, tax-paying citizen, paying into a system that guaranteed me help should I ever need it. I would like nothing better than to work, but my health issues prevent that. Please reconsider my disability claim that you denied on December 6, 2018.

I thank you for your patience and look forward to hearing from you.

Sincerely,

Sherman Carter

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
POSTAGE REQUIRED

UNITED STATES POSTAL SERVICE. Retail

P

US POSTAGE PAID
$7.35
Origin: 38637
03/27/19
2736010637-05

PRIORITY MAIL 2-Day ®

0 Lb 3.40 Oz
1006

EXPECTED DELIVERY DAY: 03/28/19

B050

SHIP
TO:
PO BOX 2337
OMAHA NE 68103-2337

USPS TRACKING NUMBER

9505 5139 6116 9086 2776 59

APR 0 1 2019

FROM:

PRIORITY®
★ MAIL ★

UNITED STATES POSTAL SERVICE®
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Sherman Carter

TO: Claims Shared Services
The Lincoln National Life Ins. Co.
P.O. Box 2337
Omaha. NE 68103

Label 228, March 2016

FOR DOMESTIC AND INTERNATIONAL USE

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

APR 0 1 2019

March 25, 2019

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103

**RE: Policyholder: BarDett, LLC**
**Policy Number: 00001004922000000**
**Claim Number: 1150128075**
**Claimant: Sherman Carter**
**Appeal of Decision on December 6, 2018**

Dear Kameetrice Farrell:

I am writing to appeal the decision made for denying my long term disability on December 6, 2018. I am unaware what lead to this decision since I provided more than enough medical documentation to support my permanent disability. The explanation of denial did not adequately describe the reason you denied my claim.

I received a letter from Lincoln Financial dated June 12, 2017 stating you concluded that I was totally disabled from any occupation and benefits will continue provided I remain partially or totally disabled according to the provisions of policy issued to BarDett, LLC. In the letter dated September 19, 2018 you stated that notification was received, by LFG Recovery Unit that I was awarded Social Security Disability Income, which SSA declared me permanently disabled. This means I cannot do the work that I once did, cannot adjust to other forms of work because of my medical condition and my disability can result in death.

In the denial letter dated 10/30/2018 you conducted a transferable skills assessment that revealed occupations with light and sedentary capacity for which I don't have skills, work experience and or background nor able to do because I am permanently disabled. In the letter dated December 6, 2018 your doctor reviewed my provider's response and altered his/her opinion. He/she stated that "data now supports only sedentary work" and identified from your transferable skills assessment two sedentary occupations based on the clinical findings and vocational findings, that I am not disabled from any occupation, again denying my long term disability. Despite documents from my doctors and permanent disability status from Social Security Administration, your peer reviewer made a decision without physically examining me that is unfounded. There is no question of my disability status, I am permanently disabled and my condition has not changed. Due to the numbness and poor circulation caused from hip replacement in my left leg it remains hard for me to stand and or sit for long periods of time. I am also unable to walk for short or long periods of time and as a result experience shortness of breath and dizziness, all related to my heart problems. I still take Entresto for my heart and have an implantable cardiac defibrillator in my chest.

In order to properly evaluate your decision, please provide me with the name and credentials of representative who made the decision to discontinue my long term disability, an outline of the records reviewed and all other information to support your decision. I also would like a complete copy of all records pertaining to my case. Additionally, I have included copies of my medical records again from the attending physicians who are also prepared to provide a rebuttal to your decision once you have provided me with the requested information. I also want my case to remain open.

It is my hope that we can settle this matter promptly, as I have been unable to work for years and very much need this money to live on. Until the date my health started to fail, I was a healthy, working, tax-paying citizen, paying into a system that guaranteed me help should I ever need it. I would like nothing better than to work, but my health issues prevent that. Please reconsider my disability claim that you denied on December 6, 2018.

I thank you for your patience and look forward to hearing from you.

Sincerely,

Sherman Carter

PDA

10/23/18

Dr. Lee Faulkner
Fax: 901-682-7243

Re: Sherman Carter
DOB:

Dear Dr. Faulkner:

I am a consulting physician to Lincoln Financial and I have been asked to assess Mr. Carter's functional status. I spoke with you on 10/22/18 at 1:00 PM but was unsuccessful in addressing my concerns with you, as you wanted to consult your records, and agreed to call me back. As my report is due today and I have not yet received a call back, the purpose of this letter is to share with you my opinion regarding Mr. Carter's functional status and obtain additional information from you to help resolve Mr. Carter's disability claim.

Since we were unable to speak again on the phone, I would ask that you answer the following questions:

1. What is the most recent objective assessment of Mr. Carter's LV function (echocardiogram) and etiology of cardiomyopathy (cardiac cath, cardiac MRI, imaging stress test)? Severely depressed LV systolic function with an EF of 20-25% EKG with frequent ventricular ectopy, S/P AICD Nonsustained V. Tach [illegible] by AICD Documentation

2. Is there objective assessment of Mr. Carter's functional capacity and physical ability (stress test, 6 minute walk)? Unable to walk 5 minutes without stopping, due to dizziness and numbness since hip replacement. Patient has dyspnea on exertion. He has 3 pillow orthopnea

3. Your disability forms state that Mr. Carter is totally and permanently disabled due to cardiomyopathy, yet your office notes do not detail symptoms or findings suggesting any more than NYHA class II functional status. What is the basis for your determination that Mr. Carter is disabled and incapable of sedentary work or work with mild or medium level of exertion?

NYHA Functional functional class III

**Please review and respond to this letter.** Because Lincoln Financial is required to make claim decisions in accordance with certain timeframes, we would appreciate a response no more than three (3) business days from receipt of the letter. **Please sign, date, and fax this letter to 207-899-4629.**

Sincerely,

Steven Borzak, MD
Diplomate, American Board of Internal Medicine
Board Certified in Cardiovascular Disease
Active License in FL
Medical Consultant, PDA

**Signature:** Lee E Faulkner, MD **Date:** 01/08/2018

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Date:** 11/01/18 : 11:01am
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 11/01/18
**Name**: Sherman Carter
**Date of Birth**
**Referred By**:

**Vital Signs**:
Bp: 130/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He states that he has been having shortness of breath. He continues having problems standing and frequently has dizzy spells. He also has had a hip replaced a few months ago and has a paresthesia with difficulty walking . He continues to have numbness of his leg and expresses dyspnea on exertion and orthopnea. .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficits

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003
**Major Problem:** Dizziness : ICD10 = R42 / ICD9 = 780.4 / SNOMED = 404640003
**Major Problem:** Paraesthesia : ICD10 = R20.2 / ICD9 = 782.0 / SNOMED = 91019004
**Major Problem:** Dyspnea : ICD10 = R06.00 / ICD9 = 786.09 / SNOMED = 267036007

**Data**:
**ECHO -** Several depressed left ventricular systolic function with an EF of 20 - 25%
Akinesis of inferior wall
Mild Tricuspid insufficiency
Pacing wire in right cardiac chambers

**Plan**:

Continue current medication(s) at same dose

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 52 years **Gender:** M

11/01/2018

---

**Follow-up**: 3 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs, treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 11/01/2018 11:22AM
# REVISED BY Lee E Faulkner, MD (LF) 11/01/2018 11:26AM

Campbell Clinic ORTHOPAEDICS

PATIENT NUMBER: 992736
PATIENT NAME: SHERMAN CARTER
SSN:
DOB:
ADDRESS:

02/25/19

TEL:

---

GREGORY D. DABOV, MD DESOTO

**GDD**

HISTORY OF PRESENT ILLNESS: Mr. Carter comes in today. He is a year out from his left total hip. He notes his right hip has been giving him some trouble. He also has some heart disease. He is currently disabled from his previous heavy work as a truck driver, especially with regards to moving product, etc.

PHYSICAL EXAMINATION: This is a well-developed, well-nourished, very pleasant gentleman in no acute distress. Alert and oriented x3. Cooperative to exam. Navigates the exam room reasonably well. He is somewhat uncomfortable with Stinchfield's on the right. He is nontender with this maneuver on the left. He does have some decreased sensation about his lateral femoral cutaneous nerve on the left. His calves are otherwise soft and nontender. He is motor and sensory are intact. Has equal and palpable pulses. Limited range of motion of his right hip as compared to the left, especially on internal rotation.

IMAGING: AP pelvis and lateral of the left hip show left total hip arthroplasty in good position. Limb lengths and offset look good. Components are well sized and well placed. No signs of loosening or failure.

ASSESSMENT:

1. STATUS POST LEFT TOTAL HIP.
2. OSTEOARTHRITIS, RIGHT HIP.

PLAN: From an orthopedic standpoint, I do believe that Mr. Sherman is permanently disabled from heavy work since his truck driving warehouse work moving heavy product, etc. He understands this. I do want him exercising as far as what his heart doctor wants, mainly walking and maybe riding a bike. He is not to run or jog or do heavy lifting. No squatting, bending, ladder climbing, etc. I do expect his right hip to start acting up. If it does, I want him coming back. I told him to talk to his cardiologist about use of nonsteroidal drugs as more than likely they do not want him taking that kind of medicine. He will return to see me on a p.r.n. basis.

Electronically signed by Gregory D. Dabov, MD
GDD:brandivr
DD: 02/25/19 DT: 02/25/19

**Campbell Clinic**
901-759-3100
7545 Airways Boulevard
Southaven, MS 38671

*992736-18*

Patient Name: CARTER. SHERMAN
DOB:
Age: 51y
Gender: Male

## CERTIFICATE FOR RETURN TO SCHOOL OR WORK

SHERMAN CARTER has been under my care

from 3/7/2018 to PRESENT and is able to return to

work / school on OFF WORK

Remarks: Mr. Sherman had a total hip arthroplasty on 03/07/218

Dr. [signature] Date: March 22, 2018

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life
Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

January 25, 2019

ATTN SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Sherman Carter:

We have received your request for a copy of the Long Term Disability claim file for the above-named insured.

Please see the enclosed CD as it contains the information requested, including a copy of the policy, all file documentation and any correspondence in the file.

To view the CD please pull up the document on your computer and input the secured password referenced below.

Secure password Social Security number (no spaces or dashes)

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com.

Sincerely,

Parnell Walton
Assisting on behalf of
1-800-423-2765
Coordinator, Administrative Services
The Lincoln National Life Insurance Company

©2019 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3269137

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

December 6, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

We are writing in reference to your claim for Long Term Disability.

You provided our office with Dr. Steven Borzak's response to the peer reviewer's questions. The information was sent to the peer reviewer and we requested that an addendum be completed. The doctor reviewed your provider's response and made the following conclusion:

> *"The new data caused me to alter my opinion. Ratner than the data supporting light or sedentary work, the data now supports only sedentary work with no walking, occasional standing, no professional driving, no lifting/carrying greater than 10 pounds ever and greater than 10 pounds occasionally in full time capacity, with respect to the claimant's cardiac condition. "*

If you reference your initial denial letter dated 10/30/2018, a transferable skills assessment was performed on your claim. The Assessment revealed:

Using the Dictonary of Occupation Title as a reference, we found that you would be capable of performing the following occupations:

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3269137

| DOT# | OCCUPATION | WAGE(MEAN) | PHYSICAL DEMAND |
|---|---|---|---|
| 215.367-010 | Assignment Clerk | $20.31/hr | Sedentary |
| 237.367-018 | Information Clerk | $12.58 | Light |
| 654.687-010 | Matrix Inspector | $16.31 | Sedentary |
| 209.562-010 | Clerk, General | $14.36 | Light |
| 222.367-066 | Truckload Checker | $13.68 | Light |

Based on the updated Peer review, you are ONLY capable of performing at a sedentary capacity. However, based on the transferable skills assessment, two sedentary occupations have been identified. As such, the initial denial for benefits beyond 11/05/2018 remains in effect. Based on the clinical findings and vocational findings you are not disabled from any occupation.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

**Appeal Rights**

You, your attorney or a person legally authorized as your representative may appeal the denial by requesting a review of your denied claim. To initiate this process, submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services

The Lincoln National Life Insurance Company

PO Box 2337

Omaha, NE 68103

REF #3269137

Fax: 402-361-1460

Please include the following with your appeal:

1. The policy and claim number;

2. Your reason(s) for appealing; and

3. If applicable, any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results.

Following receipt of your appeal, we will review the claim and provide you with a full written explanation of the decision within 45 days. You may also request copies of records and other information relevant to your claim free of charge.

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional

REF #3269137

The Lincoln National Life Insurance Company

## PDA MEDICAL FILE REVIEW ADDENDUM

**CLAIMANT: Sherman Carter**
**DOB:**
**DOD: 8/7/15**
**CLAIM #:1150128075**
**REPORT DATE: 12/5/18**
**DATE RECEIVED: 12/4/18**
**REFERRED BY: Parnell Walton**
**CLIENT: Lincoln Financial**
**MEDICAL CONSULTANT: Steven Borzak, MD (Cardiology)**

## DISCLAIMER

The opinions expressed by the undersigned are based on review of all the data provided by the referral source and any written or verbal correspondence with the claimant's attending physician(s). This review did not involve an evaluation of the claimant.

## SYNOPSIS

I have reviewed this claim previously, and in my original report dated 10/26/18, opined: The claimant has a history of cardiomyopathy. Dr. Faulkner has opined total and permanent disability, but neither objective findings, nor symptoms and physical findings compatible with such a condition are found in his office notes.

Since the submission of that report, additional records have been received, specifically the AP has responded in writing to the letter I sent and I have been asked to review and indicate if the information alters my previous opinions.

I would refer the reader to the original report mentioned above for details regarding the claimant's medical history, the records reviewed previously and my complete medical analysis.

## REFERRAL QUESTIONS

Does this new information change your prior opinion?

## DOCUMENTS REVIEWED

Dr. Faulkner responded to my query letter 11/4/18. The claimant appealed the adverse determination on 11/15/18. A denial letter 10/30/18 was provided.

## RESTRICTIONS AND LIMITATIONS per attending physician(s)

Dr. Faulkner did not provide any alteration in his assessment of the claimant's R and L.

## MEDICAL HISTORY

Dr. Faulkner stated that the claimant had "severely depressed LV systolic function with an EF of 20-25%" but did not note the date of that assessment. He noted that the claimant has frequent ventricular ectopy on ECG and nonsustained VT on ICD. Dr. Faulkner opined that the claimant was "unable to walk 6 minutes without stopping due to dizziness and numbness since hip replacement. Patient has dyspnea on exertion…[and] 3 pillow orthopnea." He did not note if ventricular ectopy was symptomatic and did not note any sustained arrhythmia nor ICD shocks or therapy. Dr. Faulkner opined that the claimant was NYHA functional class III.

## MEDICAL ANALYSIS

Based on the written response from Dr. Faulkner, I have reached several conclusions. First, I accept that the claimant has NYHA FC III. This would still permit full time employment in sedentary capacity. Second, he noted that the claimant has numbness and dizziness with walking since hip replacement, but it is not clear and was not specified by him that this represents a cardiac limitation, an orthopedic limitation, or both. Third, the presence of ventricular ectopy is not impairing but does reflect the presence of cardiomyopathy. I conclude that my previous opinion is modified: 1. Dr. Faulkner's original and unaltered opinion is that the claimant is totally and permanently disabled, but this opinion is not supported by his response, since class III patients irrespective of EF should be capable of sedentary work. 2. My prior opinion that the claimant could work a light occupation is modified. I now opine that the claimant is capable of full time work based on the available data, but only in sedentary capacity, with no walking, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally. 3. Orthopedic impairment is beyond the scope of this review.

## CONCLUSIONS

**Does this new information change your prior opinion?**

The new data caused me to alter my opinion. Rather than the data supporting light or sedentary work, the data now supports only sedentary work with no walking, occasional standing, no professional driving, no lift/carry greater than 10 pounds ever and < 10 pounds occasionally. but in full time capacity, with respect to the claimant's cardiac condition.

I certify that this report was prepared solely by me and that I have no conflict of interest with this review. I further attest that I have no incentive, financial or otherwise to provide a particular determination, and that my opinion is based on my independent, impartial and professional assessment of the information provided for review.

**Steven Borzak, MD**

**Diplomate, American Board of Internal Medicine**
**Board Certified in Cardiovascular Disease**
**Active License in FL**
**Medical Consultant, PDA**

Sherman Carter

MEMPHIS TN 380
17 NOV 2018 PM 2 L



PULL HERE

HOLD HERE

Claims Shared Services
The Lincoln National Life
Insurance Company
P.O. Box 2337
Omaha, Ne 68103

NOV 2 0 2018

UNITED STATES POSTAL SERVICE®
The Shipping Standard™

68103-233737

# APPEAL

NOV 2 0 2018

TO WHOM THIS MAY CONCERN:

Claimant: Sherman Carter
Policy # 00001004922000000
Claim # 1150128075

My name is Sherman Carter and I am writing you to appeal the recent decision that was made on my long term disability claim with Lincoln National Life Insurance Company. The claim stated the I was able to return to the work force doing Sedentary work. To my understanding this may consist of standing and sitting for long or short periods of time. I also understand that it may consist of lifting 10lbs. Due to the numbness and poor circulation caused from the hip replacement in the left leg it is hard for me to stand and sit for long periods of time. Also when trying to walk for short or long period of time I'm short of breathe and dizziness occurs do the my weak heart muscles. I'm currently taking Entresto twice a day for my heart which causes to me to be tired and weak. I am including with this letter a copy of my last visit with Dr. Lee Faulkner on 11/1/2018 . At this time I am also requesting any and all copies of records pertaining to my case.

Sincerely ,

Sherman Carter
11/15/2018

PDA

10/23/18

Dr. Lee Faulkner
Fax: 901-682-7243

Re: Sherman Carter
DOB:

Dear Dr. Faulkner:

I am a consulting physician to Lincoln Financial and I have been asked to assess Mr. Carter's functional status. I spoke with you on 10/22/18 at 1:00 PM but was unsuccessful in addressing my concerns with you, as you wanted to consult your records, and agreed to call me back. As my report is due today and I have not yet received a call back, the purpose of this letter is to share with you my opinion regarding Mr. Carter's functional status and obtain additional information from you to help resolve Mr. Carter's disability claim.

Since we were unable to speak again on the phone, I would ask that you answer the following questions:

1. What is the most recent objective assessment of Mr. Carter's LV function (echocardiogram) and etiology of cardiomyopathy (cardiac cath, cardiac MRI, imaging stress test)? Severely depressed LV systolic function with an EF of 20-25% EKG with frequent ventricular ectopy, S/P AICD Nonsustained V. Tach @ by AICD Documentation

2. Is there objective assessment of Mr. Carter's functional capacity and physical ability (stress test, 6 minute walk)? Unable to walk 6 minutes without stopping, Due to dizziness and numbness Since hip replacement. Patient has dyspnea on exertion - He has 3 pillow orthopnea

3. Your disability forms state that Mr. Carter is totally and permanently disabled due to cardiomyopathy, yet your office notes do not detail symptoms or findings suggesting any more than NYHA class II functional status. What is the basis for your determination that Mr. Carter is disabled and incapable of sedentary work or work with mild or medium level of exertion?

NYHA Functional functional class III

**Please review and respond to this letter.** Because Lincoln Financial is required to make claim decisions in accordance with certain timeframes, we would appreciate a response no more than three (3) business days from receipt of the letter. **Please sign, date, and fax this letter to 207-899-4629.**

Sincerely,

Steven Borzak, MD
Diplomate, American Board of Internal Medicine
Board Certified in Cardiovascular Disease
Active License in FL
Medical Consultant, PDA

**Signature:** Lee E Faulkner, MD **Date:** 01/01/2018

# YOUR PERSONAL PRESCRIPTION INFORMATION

**Your Walgreens Pharmacy Location**
3177 S Perkins
Memphis, TN 38118
(901)365-4440

IF YOU HAVE QUESTIONS ABOUT YOUR PRESCRIPTION, PLEASE CONTACT YOUR WALGREENS PHARMACIST OR CALL 1-800-WALGREENS.

**PATIENT** SHERMAN CARTER
**BIRTH DATE**
**MEDICATION** ENTRESTO 24-26MG TABLETS
**QUANTITY** 60
**DIRECTIONS** TAKE 1 TABLET BY MOUTH TWICE DAILY

**DOCTOR** D. LAN, MD

**PATIENT ALLERGIES**

**DRUG DESCRIPTION**
PURPLE
FRONT: NVR
BACK: LZ

**INGREDIENT NAME:** Sacubitril and Valsartan (sak UE bi tril & val SAR tan)

**WARNING:** Do not take if you are pregnant. Use during pregnancy may cause birth defects or loss of the unborn baby. If you get pregnant or plan on getting pregnant while taking this drug, call your doctor right away.

**COMMON USES:** It is used to lower the risk of death and having to go to the hospital because of heart failure.

**BEFORE USING THIS MEDICINE:** WHAT DO I NEED TO TELL MY DOCTOR BEFORE I TAKE THIS DRUG? TELL YOUR DOCTOR: If you have an allergy to this drug or any part of this drug. TELL YOUR DOCTOR: If you are allergic to any drugs like this one, any other drugs, foods, or other substances. Tell your doctor about the allergy and what signs you had, like rash; hives; itching; shortness of breath; wheezing; cough; swelling of face, lips, tongue, or throat; or any other signs. TELL YOUR DOCTOR: If you have liver disease. TELL YOUR DOCTOR: If you have ever had a very bad or life-threatening reaction called angioedema. Signs may be swelling of the hands, face, lips, eyes, tongue, or throat; trouble breathing; trouble swallowing; unusual hoarseness. TELL YOUR DOCTOR: If you are taking another drug that has the same drug in it. TELL YOUR DOCTOR: If you are taking of these drugs: Azilsartan, candesartan, eprosartan, irbesartan, losartan, olmesartan, or telmisartan. TELL YOUR DOCTOR: If you are taking or have recently taken any of these drugs: Benazepril, captopril, enalapril, fosinopril, lisinopril, moexipril, perindopril, quinapril, ramipril, or trandolapril. TELL YOUR DOCTOR: If you are taking a drug that has aliskiren in it and you also have high blood sugar (diabetes) or kidney problems. Check with your doctor or pharmacist if you are not sure if a drug you take has aliskiren in it. TELL YOUR DOCTOR: If you are breast-feeding. Do not breast-feed while you take this drug. This is not a list of all drugs or health problems that interact with this drug. Tell your doctor and pharmacist about all of your drugs (prescription or OTC, natural products, vitamins) and health problems. You must check to make sure that it is safe for you to take this drug with all of your drugs and health problems. Do not start, stop, or change the dose of any drug without checking with your doctor.

**HOW TO USE THIS MEDICINE:** HOW IS THIS DRUG BEST TAKEN? Use this drug as ordered by your doctor. Read all information given to you. Follow all instructions closely. Take with or without food. To gain the most benefit, do not miss doses. Keep taking this drug as you have been told by your doctor or other health care provider, even if you feel well. HOW DO I STORE AND/OR THROW OUT THIS DRUG? Store at room temperature. Store in a dry place. Do not store in a bathroom. Keep all drugs in a safe place. Keep all drugs out of the reach of children and pets. Throw away unused or expired drugs. Do not flush down a toilet or pour down a drain unless you are told to do so. Check with your pharmacist if you have questions about the best way to throw out drugs. There may be drug take-back programs in your area. WHAT DO I DO IF I MISS A DOSE? Take a missed dose as soon as you think about it. If it is close to the time for your next dose, skip the missed dose and go back to your normal time. Do not take 2 doses at the same time or extra doses.

**CAUTIONS:** Tell all of your health care providers that you take this drug. This includes your doctors, nurses, pharmacists, and dentists. Avoid driving and doing other tasks or actions that call for you to be alert until you see how this drug affects you. To lower the chance of feeling dizzy or passing out, rise slowly if you have been sitting or lying down. Be careful going up and down stairs. Have your blood pressure checked often. Talk with your doctor. Have blood work checked as you have been told by the doctor. Talk with the doctor. If you are taking a salt substitute that has potassium in it, a potassium-sparing diuretic, or a potassium product, talk with your doctor. Be careful in hot weather or while being active. Drink lots of fluids to stop fluid loss. Tell your doctor if you have too much sweat, fluid loss, throwing up, or loose stools. This may lead to low blood pressure. If you are taking lithium, talk with your doctor. You may need to have your blood work checked more closely while you are taking it with this drug. A very bad reaction called angioedema has happened with this drug. Sometimes, this has been deadly. The chance of angioedema may be higher in black patients. Talk with the doctor.

**POSSIBLE SIDE EFFECTS:** WHAT ARE SOME SIDE EFFECTS THAT I NEED TO CALL MY DOCTOR ABOUT RIGHT AWAY? WARNING/CAUTION: Even though it may be rare, some people may have very bad and sometimes deadly side effects when taking a drug. Tell your doctor or get medical help right away if you have any of the following signs or symptoms that may be related to a very bad side effect: Signs of an allergic reaction, like rash; hives; itching; red, swollen, blistered, or peeling skin with or without fever; wheezing; tightness in the chest or throat; trouble breathing, swallowing, or talking; unusual hoarseness; or swelling of the mouth, face, lips, tongue, or throat. Signs of kidney problems like unable to pass urine, change in how much urine is passed, blood in the urine, or a big weight gain. Signs of a high potassium level like a heartbeat that does not feel normal; change in thinking clearly and with logic; feeling weak, lightheaded, or dizzy; feel like passing out; numbness or tingling; or shortness of breath. Dizziness or passing out. Feeling very tired or weak. WHAT ARE SOME OTHER SIDE EFFECTS OF THIS DRUG? All drugs may cause side effects. However, many people have no side effects or only have minor side effects. Call your doctor or get medical help if any of these side effects or any other side effects bother you or do not go away: Cough. These are not all of the side effects that may occur. If you have questions about side effects, call your doctor. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects at http://www.fda.gov/medwatch.

**OVERDOSE:** If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.

**ADDITIONAL INFORMATION:** If your symptoms or health problems do not get better or if they become worse, call your doctor. Do not share your drugs with others and do not take anyone else's drugs. Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor. Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins. Some drugs may have another patient information leaflet. Check with your pharmacist. If you have any questions about this drug, please talk with your doctor, nurse, pharmacist, or other health care provider.

**KEEP OUT OF REACH OF CHILDREN: STORE IN SAFETY CONTAINER OR SECURE AREA.**

**Call your doctor for medical advice about side eff[...] You may report side effects to FDA at 1-800-FDA-[...]**

Do not flush unused medications or pour down a sink or drain.

WIC# 828188 12T

Sherman Carter

MEMPHIS TN 380

17 NOV 2018 PM 2 L



PULL HERE

Claims Shared Services
The Lincoln National Life
Insurance Company
P.O. Box 2337
Omaha, Ne 68103

NOV 20 2018

HOLD HERE

UNITED STATES POSTAL SERVICE®

The Shipping Standard™

68103-233737

# APPEAL

NOV 2 0 2018

TO WHOM THIS MAY CONCERN:

Claimant: Sherman Carter
Policy # 00001004922000000
Claim # 1150128075

My name is Sherman Carter and I am writing you to appeal the recent decision that was made on my long term disability claim with Lincoln National Life Insurance Company. The claim stated the I was able to return to the work force doing Sedentary work. To my understanding this may consist of standing and sitting for long or short periods of time. I also understand that it may consist of lifting 10lbs. Due to the numbness and poor circulation caused from the hip replacement in the left leg it is hard for me to stand and sit for long periods of time. Also when trying to walk for short or long period of time I'm short of breathe and dizziness occurs do the my weak heart muscles. I'm currently taking Entresto twice a day for my heart which causes to me to be tired and weak. I am including with this letter a copy of my last visit with Dr. Lee Faulkner on 11/1/2018 . At this time I am also requesting any and all copies of records pertaining to my case.

Sincerely ,

Sherman Carter
11/15/2018

PDA

10/23/18

Dr. Lee Faulkner
Fax: 901-682-7243

Re: Sherman Carter
DOB:

Dear Dr. Faulkner:

I am a consulting physician to Lincoln Financial and I have been asked to assess Mr. Carter's functional status. I spoke with you on 10/22/18 at 1:00 PM but was unsuccessful in addressing my concerns with you, as you wanted to consult your records, and agreed to call me back. As my report is due today and I have not yet received a call back, the purpose of this letter is to share with you my opinion regarding Mr. Carter's functional status and obtain additional information from you to help resolve Mr. Carter's disability claim.

Since we were unable to speak again on the phone, I would ask that you answer the following questions:

1. What is the most recent objective assessment of Mr. Carter's LV function (echocardiogram) and etiology of cardiomyopathy (cardiac cath, cardiac MRI, imaging stress test)? Severely depressed LV systolic function with an EF of 20-25%. EKG with frequent ventricular ectopy, S/P AICD. Nonsustained V. Tach by AICD Documentation

2. Is there objective assessment of Mr. Carter's functional capacity and physical ability (stress test, 6 minute walk)? Unable to walk 6 minutes without stopping, due to dizziness and numbness since hip replacement. Patient has dyspnea on exertion - He has 3 pillow orthopnea

3. Your disability forms state that Mr. Carter is totally and permanently disabled due to cardiomyopathy, yet your office notes do not detail symptoms or findings suggesting any more than NYHA class II functional status. What is the basis for your determination that Mr. Carter is disabled and incapable of sedentary work or work with mild or medium level of exertion?

NYHA Functional functional class III

**Please review and respond to this letter.** Because Lincoln Financial is required to make claim decisions in accordance with certain timeframes, we would appreciate a response no more than three (3) business days from receipt of the letter. **Please sign, date, and fax this letter to 207-899-4629.**

Sincerely,

Steven Borzak, MD
Diplomate, American Board of Internal Medicine
Board Certified in Cardiovascular Disease
Active License in FL
Medical Consultant, PDA

**Signature:** Lee E Faulkner, MD **Date:** 01/01/2018

# YOUR PERSONAL PRESCRIPTION INFORMATION

**Your Walgreens Pharmacy Location**
3177 S Perkins
Memphis, TN 38118
(901)365-4440

IF YOU HAVE QUESTIONS ABOUT YOUR PRESCRIPTION, PLEASE CONTACT YOUR WALGREENS PHARMACIST OR CALL 1-800-WALGREENS.

**PATIENT** SHERMAN CARTER
**BIRTH DATE**
**MEDICATION** ENTRESTO 24-26MG TABLETS
**QUANTITY** 60
**DIRECTIONS** TAKE 1 TABLET BY MOUTH TWICE DAILY

**DOCTOR** D. LAN, MD

**PATIENT ALLERGIES**

**DRUG DESCRIPTION**
PURPLE
FRONT: NVR
BACK: LZ

**INGREDIENT NAME:** Sacubitril and Valsartan (sak UE bi tril & val SAR tan)

**WARNING:** Do not take if you are pregnant. Use during pregnancy may cause birth defects or loss of the unborn baby. If you get pregnant or plan on getting pregnant while taking this drug, call your doctor right away.

**COMMON USES:** It is used to lower the risk of death and having to go to the hospital because of heart failure.

**BEFORE USING THIS MEDICINE:** WHAT DO I NEED TO TELL MY DOCTOR BEFORE I TAKE THIS DRUG? TELL YOUR DOCTOR: If you have an allergy to this drug or any part of this drug. TELL YOUR DOCTOR: If you are allergic to any drugs like this one, any other drugs, foods, or other substances. Tell your doctor about the allergy and what signs you had, like rash; hives; itching; shortness of breath; wheezing; cough; swelling of face, lips, tongue, or throat; or any other signs. TELL YOUR DOCTOR: If you have liver disease. TELL YOUR DOCTOR: If you have ever had a very bad or life-threatening reaction called angioedema. Signs may be swelling of the hands, face, lips, eyes, tongue, or throat; trouble breathing; trouble swallowing; unusual hoarseness. TELL YOUR DOCTOR: If you are taking another drug that has the same drug in it. TELL YOUR DOCTOR: If you are taking of these drugs: Azilsartan, candesartan, eprosartan, irbesartan, losartan, olmesartan, or telmisartan. TELL YOUR DOCTOR: If you are taking or have recently taken any of these drugs: Benazepril, captopril, enalapril, fosinopril, lisinopril, moexipril, perindopril, quinapril, ramipril, or trandolapril. TELL YOUR DOCTOR: If you are taking a drug that has aliskiren in it and you also have high blood sugar (diabetes) or kidney problems. Check with your doctor or pharmacist if you are not sure if a drug you take has aliskiren in it. TELL YOUR DOCTOR: If you are breast-feeding. Do not breast-feed while you take this drug. This is not a list of all drugs or health problems that interact with this drug. Tell your doctor and pharmacist about all of your drugs (prescription or OTC, natural products, vitamins) and health problems. You must check to make sure that it is safe for you to take this drug with all of your drugs and health problems. Do not start, stop, or change the dose of any drug without checking with your doctor.

**HOW TO USE THIS MEDICINE:** HOW IS THIS DRUG BEST TAKEN? Use this drug as ordered by your doctor. Read all information given to you. Follow all instructions closely. Take with or without food. To gain the most benefit, do not miss doses. Keep taking this drug as you have been told by your doctor or other health care provider, even if you feel well. HOW DO I STORE AND/OR THROW OUT THIS DRUG? Store at room temperature. Store in a dry place. Do not store in a bathroom. Keep all drugs in a safe place. Keep all drugs out of the reach of children and pets. Throw away unused or expired drugs. Do not flush down a toilet or pour down a drain unless you are told to do so. Check with your pharmacist if you have questions about the best way to throw out drugs. There may be drug take-back programs in your area. WHAT DO I DO IF I MISS A DOSE? Take a missed dose as soon as you think about it. If it is close to the time for your next dose, skip the missed dose and go back to your normal time. Do not take 2 doses at the same time or extra doses.

**CAUTIONS:** Tell all of your health care providers that you take this drug. This includes your doctors, nurses, pharmacists, and dentists. Avoid driving and doing other tasks or actions that call for you to be alert until you see how this drug affects you. To lower the chance of feeling dizzy or passing out, rise slowly if you have been sitting or lying down. Be careful going up and down stairs. Have your blood pressure checked often. Talk with your doctor. Have blood work checked as you have been told by the doctor. Talk with the doctor. If you are taking a salt substitute that has potassium in it, a potassium-sparing diuretic, or a potassium product, talk with your doctor. Be careful in hot weather or while being active. Drink lots of fluids to stop fluid loss. Tell your doctor if you have too much sweat, fluid loss, throwing up, or loose stools. This may lead to low blood pressure. If you are taking lithium, talk with your doctor. You may need to have your blood work checked more closely while you are taking it with this drug. A very bad reaction called angioedema has happened with this drug. Sometimes, this has been deadly. The chance of angioedema may be higher in black patients. Talk with the doctor.

**POSSIBLE SIDE EFFECTS:** WHAT ARE SOME SIDE EFFECTS THAT I NEED TO CALL MY DOCTOR ABOUT RIGHT AWAY? WARNING/CAUTION: Even though it may be rare, some people may have very bad and sometimes deadly side effects when taking a drug. Tell your doctor or get medical help right away if you have any of the following signs or symptoms that may be related to a very bad side effect: Signs of an allergic reaction, like rash; hives; itching; red, swollen, blistered, or peeling skin with or without fever; wheezing; tightness in the chest or throat; trouble breathing, swallowing, or talking; unusual hoarseness; or swelling of the mouth, face, lips, tongue, or throat. Signs of kidney problems like unable to pass urine, change in how much urine is passed, blood in the urine, or a big weight gain. Signs of a high potassium level like a heartbeat that does not feel normal; change in thinking clearly and with logic; feeling weak, lightheaded, or dizzy; feel like passing out; numbness or tingling; or shortness of breath. Dizziness or passing out. Feeling very tired or weak. WHAT ARE SOME OTHER SIDE EFFECTS OF THIS DRUG? All drugs may cause side effects. However, many people have no side effects or only have minor side effects. Call your doctor or get medical help if any of these side effects or any other side effects bother you or do not go away: Cough. These are not all of the side effects that may occur. If you have questions about side effects, call your doctor. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects at http://www.fda.gov/medwatch.

**OVERDOSE:** If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.

**ADDITIONAL INFORMATION:** If your symptoms or health problems do not get better or if they become worse, call your doctor. Do not share your drugs with others and do not take anyone else's drugs. Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor. Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins. Some drugs may have another patient information leaflet. Check with your pharmacist. If you have any questions about this drug, please talk with your doctor, nurse, pharmacist, or other health care provider.

**KEEP OUT OF REACH OF CHILDREN: STORE IN SAFETY CONTAINER OR SECURE AREA.**

**Call your doctor for medical advice about side eff**
**You may report side effects to FDA at 1-800-FDA-**

Do not flush unused medications or pour down a sink or drain.

WIC# 828188 12T

REF #3181145

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

November 2, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

We have applied a portion of your monthly benefit for the period of 10/05/2018 to 10/30/2018 toward your existing overpayment. After crediting $484.17 to the overpayment, the remaining balance is now $27,623.36.

You will receive quarterly updates on this amount until your overpayment has been satisfied in full.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
Assisting on behalf of
1-800-423-2765
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3169499

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life
Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

October 30, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

We have completed our review of your Long Term Disability claim and benefits beyond 10/30/2018 have been denied.

The Policy issued to BarDett, LLC contains, but is not limited to the following:

> *"Total Disability" or "Totally Disabled" will be defined as follows.*
> *1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.*
> *2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.*
>
> *The loss of a professional license, an occupational license or certification, or a driver's license for any reason does not, by itself, constitute Total Disability.*

The Own Occupation Period for this claim ended on 11/05/2017. After a thorough review of the information currently contained in your claim file, we have determined you are capable of performing work in other occupations as of 10/30/2018. Outlined below is the information reviewed which led to our determination.

**<u>Information review and action taken</u>**

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3169499

In our review of your claim, all previously submitted as well as any new documentation is used to make a determination. We evaluated current information from your physician(s), as well as other sources, including vocational information.

The documentation contained in your claim file includes the following:

- Attending Physician Statement signed by Dr. Lee Faulkner form not dated
- Certification of Health Care Provider for FMLA signed by Dr. Gregory Dabov dated 08/31/2015
- ▪ Me
- Group Continuance of Disability form signed by Dr. Lee Faulkner dated 11/21/2016
- Abilities form signed by Dr. Lee Faulkner dated 05/24/2017
- Attending Physician Statement signed by Dr. Lee Faulkner dated 05/29/2017
- Medical records from Dr. Gregory Dabov from 03/19/2018 to 04/23/2018
- Certificate for Return to School or Work form signed by Dr. Gregory Dabov dated 03/22/2018
- Group Continuance of Disability form signed by Dr. Lee Faulkner dated 09/14/2018
- Attending Physician Statement signed by Dr. Gregory Dabov dated 10/01/2018
- ▪ Ext
  Board Certified of Internal Medicine and Board Certified in Cardiovascular Disease dated 10/26/2018

According to the information contained in your claim file, you stopped working on 08/06/2015 due to a diagnosis of osteoarthritis of the left hip. Dr. Gregory Dabov completed an Attending Physician Statement on 10/14/2015 noting that you would require hip surgery, however you would require cardiac surgery first. The cardiac surgery was slated to be completed on 09/18/2015. Your restrictions and limitations were noted as no prolonged walking, standing, or sitting. Based on this information along with the supporting medical records your claim was approved for Long Term Disability benefits.

You remained under the care of Dr. Lee Faulkner for your diagnosis of cardiomyopathy. You obtained cardiology clearance to have left total hip arthroplasty surgery that was performed on 03/07/2018 by Dr. Gregory Dabov. You were seen by Dr. Dabov following your surgery on 04/23/2018. On this date Dr. Dabov indicated that you did not have any major issues, but did report startup pain. Dr. Dabov opinioned that you are permanently disabled from medium or heavy type of work.

You were seen by Dr. Lee Faulkner on 07/30/2018. The medical record noted that you had chest pain when stressed out or when overexerting yourself, but did not have dizziness or syncope. Your blood pressure was noted as 150.80. Your Implantable Cardioverter Defibrillator was checked which revealed no sustained VT.

On 09/14/2018 Dr. Lee Faulkner completed an Attending Physician Statement. He noted that you had diagnosis of cardiomyopathy and hypertension which made you incapable of sedentary activity.

In an effort to obtain a better understanding of your current functionality your claim was sent for an external peer review. The peer review was completed by a physician who is a Diplomate, American Board Certified of Internal Medicine and Board Certified in Cardiovascular Disease. The doctor reviewed the medical information contained in your claim file and opinioned the following:

"There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. Dr. Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath with heavy exertion, but otherwise no symptoms to support a diagnosis of heart failure with more than a mild functional limitation. The available data support heart failure with New York Heart Association Functional Classification II (NYHA FC II). This conclusion is based on the premise that the Ejection (EF) Fraction (but no study was provide for review) is in fact reduced, based on the available data but without the source documentation. Therefore he would be restricted from lifting/carry more than 25 pounds ever, no more than 10-25 pounds occasionally and no restrictions with less than 10 pounds. No limit on standing, walking no more than 4 of 8 hours, and no limit on reaching or stooping. The claimant has an implantable cardioverter defibrillator (ICD) and reportedly non sustained ventricular tachycardia (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met. "

On 10/22/2018 the peer reviewer spoke to Dr. Faulkner to try to get clarity on your condition and treatment. The peer review has noted the following: "I asked if the claimant had ischemic or nonischemic cardiomyopathy and the most recent assessment of LV function. Dr. Faulkner was unsure. I explained the discrepancy between his office notes which described symptoms no worse than NYHA class II, and the disability forms, which apply severe symptoms and total, permanent disability due to heart failure. Dr. Faulkner was unsure how to resolve the discrepancy. He wished to consult his notes and agreed to call me back. I gave him my cell number to contact me directly. To date, I have not received a call back".

Therefore, current restrictions and limitations were offered by the Peer Reviewer, since non where provided from your treating physicians. Your claim was referred to our vocation department for a Transferable Skills Assessment.

**Vocational Overview**

We reviewed your past training, education and work experience to evaluate your capacity to perform work-related activity. The documentation provided suggests you are not limited from working in a sedentary work or light work capacity. The definition of light work capacity, as defined by the Department of Labor, is:

Light work requires walking/standing to a significant degree. In certain occupations it requires sitting most of the time but entails pushing/pulling of arm or leg controls; and/or when the job requires working at a production rate pace entailing the constant pushing/pulling of materials even though the weight of those materials is negligible. Light work may require exertion up to 20 lbs. occasionally (1-33%), exertion up to 10 lbs. frequently (34-66%) and a negligible degree of exertion constantly (67-100%).

The definition of sedentary work capacity, as defined by the Department of Labor, is:

Sedentary work involves sitting most of the time, but may involve walking or standing for brief

periods of time. Jobs are sedentary if walking and standing are only required occasionally (1-33%) and if all other sedentary criteria are met. Sedentary work may require exertion up to 10 lbs. occasionally and a negligible degree of exertion on a frequent (34-66%) or constant (67-100%) basis.

Using The Dictionary of Occupation Titles as a reference, we found that you would be capable of performing the following occupations:

| DOT# | Occupation | Wage (mean) | Physical Demand |
|---|---|---|---|
| 215.367-010 | Assignment Clerk | $20.31 | Sedentary |
| 237.367-018 | Information Clerk | $12.58 | Light |
| 654.687-010 | Matrix Inspector | $16.31 | Sedentary |
| 209.562-010 | Clerk, General | $14.36 | Light |
| 222.367-066 | Truckload Checker | $13.68 | Light |

The preceding list is just a sample of various jobs that you show transferable skills to perform. The list is not all-inclusive and is only a sample of possibilities. The jobs listed are found to exist within your area and are appropriate from the standpoint of adequate salary levels relative to your prior earnings. NOTE: Current hiring or job availability is not a consideration when identifying occupational alternatives; only that the occupations identified exist within the local labor market.

**Summary**

In summary, it is our determination that based upon your age, education, training, past work experience and your current abilities, that you are not prevented from performing work in other occupations, even if you can no longer perform your Own Occupation. Therefore, you no longer meet the definition of disability in this policy and benefits will be denied as of 10/30/2018. Your payment for benefits through 10/30/2018 is being applied to your outstanding over payment balance and your claim is being closed.

Your Own Occupation Period of the policy ended on 11/05/2017. This means to qualify for ongoing Total Disability benefits, you must have restrictions and limitations that render you unable to work in any gainful occupation that your past training, education and experience will reasonably allow. On 11/05/2017 you had not been cleared by cardiology to have your total hip replacement. Since that time, you had your left hip replacement surgery and your claim was re-evaluated to determine your current functionality. Based on our investigation that included both clinical and vocational insight, you are not precluded from performing in any occupation beyond 10/30/2018.

We evaluated this claim by applying the provisions of the policy to the facts and opinions contained in the claim file. We relied upon the following guidelines, internal rules, protocols, standards or other similar criteria in reaching this claim determination: A gainful occupation is one in which an individual is qualified to perform and could reasonably expect to earn income that is at least 60% of his or her pre-disability income within 12 months of returning to work.

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

REF #3169499

**Appeal Rights**

You, your attorney or a person legally authorized as your representative may appeal the denial by requesting a review of your denied claim. To initiate this process, submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103
Fax: 402-361-1460

Please include the following with your appeal:

1. The policy and claim number;
2. Your reason(s) for appealing; and
3. If applicable, any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results.

Following receipt of your appeal, we will review the claim and provide you with a full written explanation of the decision within 45 days. You may also request copies of records and other information relevant to your claim free of charge.

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law.

Your employer's plan has a contractual limitations period of five years, which means that a lawsuit must be brought within five years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is 10/30/2023.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

REF #3169499

Chinese (Simplified)

注意：如果您说普通话，可以选择免费语言支持服务。 请拨打 1-800-423-2765.

Chinese (Traditional)

注意：若您講國語，可使用我們的免費語言支援服務。 請致電 1-800-423-2765.

Tagalog

Pansinin: Kung nagsasalita ka ng Tagalog, mayroon kang magagamit na mga libreng serbisyo ng tulong sa wika. Tumawag sa 1-800-423-2765.

Spanish

Atención: si habla español, tenemos disponibles servicios de apoyo con el idioma sin costo para usted. Llame al 1-800-423-2765.

Navajo

DÍÍ BAA AKÓ NÍNÍZIN: Díí bee yáníłti'go Diné bizaad, saad bee áká'ánida'áwo'dę́ę́' t'áá jiik'eh, ná hólǫ́. Kojį' hódíílnih áǫįóóǫéąą́ǫąíę́ę.

## Transferable Skills Analysis

**Claimant:** Sherman Carter
**Claim #:** 1150128075
**Date:** 10/30/2018
**Policyholder:** BarDett, LLC

This Vocational Rehabilitation Consultant was requested to complete a Transferable Skills Analysis (TSA) to determine Mr. Sherman Carter's transferable work skills and evaluate whether occupations exist at or above the wage requirements noted and at the level of functionality indicated.

The following information obtained from the file was utilized in determining what occupations Mr. Carter is qualified and able to perform: JD, DOT, Educational Background Form dated 4/19/2017, and the Peer Review from Dr. Steven Borzak dated 10/26/2018.

**Education and Training:**
Mr. Carter is a 51-year-old male who has earned a high school diploma and attended Motlow State Community College with a major in Business. Mr. Carter notes he did not graduate. The following previous work history was reviewed: from 8/2012 to 8/2015 he worked as a Driver with AS BareDett; from 2/2005 to 6/2012 he worked as a Forklift Driver with Three Way Trucking; from 2/2003 to 1/2005 he worked as a Machinist with Comp Cam; and from 12/2001 to 11/2003 he worked as a Driver with Stanley Johnson Trucking.

**Work Experience (within the last 15 years):**

| DOT Code | Occupation Title | SVP | Yrs | Str |
|---|---|---|---|---|
| 905.663-014 | Truck Driver, Heavy | 4 | 3 years | M |
| 921.683-050 | Industrial-Truck Operator | 3 | 7 years, 4 months | M |
| 600.281-022 | Machine Builder | 7 | 2 years | M |

**Medical Information:**
According to the Peer Review from Dr. Steven Borzak dated 10/26/2018, Mr. Carter has the following restrictions and limitations:

- No lifting/carrying more than 25 pounds ever, no more than 10-25 pounds occasionally, and < 10 pounds no restrictions.
- No limit on standing; walking no more than 4 of 8 hours, and no limit on reaching or stooping.
- He is restricted from professional driving unless DOT specifications are met.

**Wage Requirement:** $2275/month ($13.12/hour)

**Skills and Abilities:** Knowing how to operate motor vehicles or control movement of marine craft; coordinating eyes, hands, and feet to control movement of vehicle or craft on roads or waterways; observing traffic regulations; being physically able to endure strain of driving for long periods with limited rest stops; and using arithmetic for collecting delivery receipts or money.

**Occupations Mr. Carter can perform in the labor market of Memphis, TN (which is in the wage area of Memphis, TN-MS-AR Metropolitan Statistical Area) include but are not limited to the following:**

| DOT Code | Occupation | SVP | Str | Wage/hour | Source |
|---|---|---|---|---|---|
| 215.367-010 | Assignment Clerk | 3 | S | $20.31 | May 2017 |
| 237.367-018 | Information Clerk | 2 | L | $12.58 | May 2017 |
| 654.687-010 | Matrix Inspector | 3 | S | $16.31 | May 2017 |
| 209.562-010 | Clerk, General | 3 | L | $14.36 | May 2017 |
| 222.367-066 | Truckload Checker | 3 | L | $13.68 | May 2017 |

**Summary:**
A Transferable Skills Analysis was completed using the above noted information. Occupations were identified based upon the medical information from Dr. Steven Borzak, dated 10/26/2018, that meet Mr. Carter's skills, educational/work history, and wage requirement. The limitations outlined by Dr. Borzak, give Mr. Carter reasonable functional capacity to perform the occupations identified.

---

Tracie Grumet, MA, CRC
Vocational Rehabilitation Counselor

Updated 10/30/18

**ABILITY PROFILE:**

| DOT Code | Occupation Title | SVP | Yrs | Mos | Inc | Has CWF | Uses CWF | Str | GOE Code |
|---|---|---|---|---|---|---|---|---|---|
| 905.663-014 | Truck Driver, Heavy | 4 | 3 | 0 | Y | N | N | M | 05.08.01 |
| 921.683-050 | Industrial-Truck Operator | 3 | 7 | 4 | Y | N | N | M | 06.04.40 |
| 600.281-022 | Machine Builder | 7 | 2 | 0 | Y | Y | N | M | 05.05.09 |

**ADJUSTED VARIABLES SUMMARY**

This report summarizes the changes made to the person's ability profile.

| | | Changed From | Changed To |
|---|---|---|---|
| **Specific Vocational Preparation** | | | |
| Maximum | | 7 (2 to 4 years) | No Change |
| Minimum | | 3 (1 to 3 months) | 1 (Short demo only) |
| **General Educational Development** | | | |
| Reasoning | | 4 | No Change |
| Mathematics | | 4 | No Change |
| Language | | 3 | No Change |
| **Physical Demands** | | | |
| Strength | Maximum | M Medium | L Light |
| | Minimum | M Medium | S Sedentary |
| Climbing | | Occasionally | No Change |
| Balancing | | Never | No Change |
| Stooping | | Occasionally | Constantly |
| Kneeling | | Occasionally | No Change |
| Crouching | | Occasionally | No Change |
| Crawling | | Never | No Change |
| Reaching | | Constantly | No Change |
| Handling | | Constantly | No Change |
| Fingering | | Frequently | Constantly |
| Feeling | | Never | Constantly |
| Talking | | Occasionally | Constantly |
| Hearing | | Occasionally | Constantly |
| Tasting/Smelling | | Never | Constantly |
| Near Acuity | | Frequently | Constantly |
| Far Acuity | | Frequently | Constantly |
| Depth Perception | | Frequently | Constantly |
| Accommodation | | Occasionally | Constantly |
| Color Vision | | Frequently | Constantly |
| Field of Vision | | Frequently | Constantly |

## PDA MEDICAL FILE REVIEW

**CLAIMANT: Sherman Carter**
**DOB:**
**DOD: 8/7/15**
**CLAIM #:1150128075**
**REPORT DATE: 10/26/18**
**DATE RECEIVED: 10/12/18**
**REFERRED BY: Parnell Walton**
**CLIENT: Lincoln Financial**
**MEDICAL CONSULTANT: Steven Borzak, MD (Cardiology)**

## DISCLAIMER

The opinions expressed by the undersigned are based on review of all the data provided by the referral source and any written or verbal correspondence with the claimant's attending physician(s). This review did not involve an evaluation of the claimant.

## SYNOPSIS

The claimant has a history of cardiomyopathy. Dr. Faulkner has opined total and permanent disability, but neither objective findings, nor symptoms and physical findings compatible with such a condition are found in his office notes.

## REFERRAL QUESTIONS

1. Are there any physical conditions supported by the clinical evidence that are functionally impairing? If yes, please provide primary and secondary DX and clinical rationale to support.
2. If functional impairment is supported, does this translate into restrictions and limitations? If yes, please provide restrictions and limitations and duration. Please do not provide functional level (sedentary / light / etc.) but report restrictions / limitations and timetable for these.
3. Please advise on when would be appropriate time frame for clinical follow up and is future improvement expected.

## DOCUMENTS REVIEWED

| Date | Document | Source |
|---|---|---|
| Undated, 9/4/18, 5/29/17, 11/21/16 | AP statement | Dr. Lee Faulkner |
| 10/1/18 | AP statement | Dr. Gregory Dabov |
| 4/23/18, 3/19/18 | Orthopedic note | Dr. Dabov |
| 7/30/18, 4/3/17, 9/29/16, 7/5/16, 2/11/16, 11/10/15 | Cardiology office note | Dr. Faulkner |

| | | |
|---|---|---|
| 8/7/15 | RTW note | Memphis Primary Care Specialists |
| 8/7/15, 8/26/15 | Handwritten office note (poorly legible) | |
| 8/31/15 | FMLA paperwork | Dr. Dabov |

**RESTRICTIONS AND LIMITATIONS per attending physician(s)**

Dr. Faulkner opined that the claimant has total, permanent disability.

**ATTENDING PHYSICIAN TELECONFERENCE (when required)**

On 10/19/18 at 1:45 PM ET, I called the office of Dr. Faulkner and got voice mail. I left a message requesting a call back.

On 10/22/18, 1:00 PM ET, I spoke with Dr. Faulkner. I asked if the claimant had ischemic or nonischemic cardiomyopathy and the most recent assessment of LV function. Dr. Faulkner was unsure. I explained the discrepancy between his office notes which described symptoms no worse than NYHA class II, and the disability forms, which apply severe symptoms and total, permanent disability due to heart failure. Dr. Faulkner was unsure how to resolve the discrepancy. He wished to consult his notes and agreed to call me back. I gave him my cell number to contact me directly. To date, I have not received a call back.

**MEDICAL HISTORY**

The claimant is reportedly employed as a truck driver in medium occupation (job description not provided).
The claimant has a history of cardiomyopathy with EF reportedly 20% (data not provided), ICD, hypertension, alcoholism, and left hip replacement 3/7/18.
On 8/7/15 the claimant was noted to have low back pain.
On 8/7/15 the claimant was returned to work as of 8/13/15 with no restrictions or limitations.
On 8/26/15 the claimant was noted to have an abnormal ECG.
On 8/31/15 Dr. Dabov completed FMLA paperwork.
On 11/10/15 Dr. Faulkner saw the claimant for hip replacement and noted no complaints, no chest pain, shortness of breath, orthopnea, palpitations, PND or edema.
On 2/11/16 Dr. Faulkner noted chest pain and shortness of breath with overexertion. Medications were carvedilol 3.125 mg twice daily and lisinopril HCT 10/12.5 daily.
On 7/5/16 Dr. Faulkner noted chest pain with activity lasting 10 minutes but no dyspnea, orthopnea or PND.
On 9/29/16 Dr. Faulkner noted no chest pain, dyspnea, orthopnea or PND. There was no gallop. Alcohol cessation was advised.
On 11/21/16 Dr. Faulkner completed an AP statement noting class 5 impairment.
On 4/3/17 Dr. Faulkner noted no chest pain or shortness of breath. ICD reportedly showed nonsustained VT.
On 5/24/17 and 5/29/17 Dr. Faulkner completed an AP statement noting cardiomyopathy, class 4 impairment, worsening clinical state, and total, permanent disability. He opined lift carry restrictions of 10 pounds or less no more than occasionally and never heavier loads, and “no lifting or straining whatsoever as his condition is worsening over time.”
On 3/19/18 Hajra Motiwala PA noted stable recovery after hip replacement.

On 4/23/18 Dr. Dabov saw the claimant after hip replacement. Dr. Dabov opined that the claimant is "permanently disabled from medium or heavy type work" from an orthopedic perspective.
On 7/30/18 Dr. Faulkner noted chest pain "when stressed out or when overexerting himself" but no dizziness or syncope. Weight was 211, blood pressure 150/80. ICD was checked and follow up requested in 6 months. ICD reportedly showed nonsustained VT.
On 9/4/18 Dr. Faulkner completed an AP statement noting diagnoses of cardiomyopathy and hypertension, and class 5 impairment, incapable of sedentary activity.
On 10/1/18 Dr. Dabov completed an AP statement but the form only said "see notes."
Dr. Faulkner completed an undated AP statement noting diagnoses of hypertension and cardiomyopathy with onset 9/25/05, advised to stop work 8/1/15, initial treatment 9/25/15. He opined that the claimant had lifelong restrictions of no lift/carry more than 5 pounds, no standing, walking, crouching, pulling, pushing, stooping, kneeling or bending. Medical therapy was recommended.
A number of other AP statements were undated by Dr. Faulkner.

## MEDICAL ANALYSIS

The claimant has a diagnosis of cardiomyopathy, though source documentation of cardiac function is not provided. Dr. Faulkner's determination of total and permanent disability is markedly discrepant from his office notes which describe, at worst, NYHA class II functional impairment. Dr. Faulkner has agreed to call me back to resolve this discrepancy but a call has not yet been received.

## CONCLUSIONS

1. **Are there any physical conditions supported by the clinical evidence that are functionally impairing? If yes, please provide primary and secondary DX and clinical rationale to support.**

   There are no objective findings to support the diagnosis of either cardiomyopathy or heart failure. While the EF has been noted in case manager notes to be 20%, no study to this effect is provided or even mentioned in Dr. Faulkner's notes. Further, Dr. Faulkner's notes refer to occasional chest pain, and on one occasion shortness of breath with heavy exertion, but otherwise no symptoms to support a diagnosis of heart failure with more than a mild functional limitation (NYHA Class II). However, Dr. Faulkner's disability forms consistently state that the claimant is permanently and totally disabled due to cardiomyopathy, which is inconsistent with the office notes.

2. **If functional impairment is supported, does this translate into restrictions and limitations? If yes, please provide restrictions and limitations and duration. Please do not provide functional level (sedentary / light / etc.) but report restrictions / limitations and timetable for these.**

   The available data support heart failure with NYHA FC II. This conclusion is based on the premise that EF is in fact reduced, based on the available data but without the source documentation. Therefore he would be restricted from lift/carry more than 25 pounds ever, no more than 10-25 pounds occasionally and < 10 pounds no restrictions; no limit on standing; walking no more than 4 of 8 hours, and no limit on reaching or

stooping. The claimant has an ICD and reportedly nonsustained VT (data not provided). Therefore, he is restricted from professional driving unless DOT specifications are met.

3. **Please advise on when would be appropriate time frame for clinical follow up and is future improvement expected.**

   The data do not support severe impairment due to heart failure. It is surprising that Dr. Faulkner recommended 6 month follow up on 7/30/18 in an individual who has severe impairment due to heart failure. A claimant with heart failure and functional impairment should be evaluated for improvement, treatment adjustment, and potential for RTW every 3 months. It is possible that the claimant could improve with adjustment and revision of evidence-based therapy for heart failure.

I certify that this report was prepared solely by me and that I have no conflict of interest with this review. I further attest that I have no incentive, financial or otherwise to provide a particular determination, and that my opinion is based on my independent, impartial and professional assessment of the information provided for review.

**Steven Borzak, MD**
**Diplomate, American Board of Internal Medicine**
**Board Certified in Cardiovascular Disease**
**Active License in FL**
**Medical Consultant, PDA**

Lincoln Financial Group®

# Fax Transmission

8801 Indian Hills Dr., Omaha, NE 68114

**From:** Name:
Fax Number: 7901
Voice Phone:

**To:** Name: Kameetrice Farrell
Company: LINCOLN FINANCIAL GROUP
Fax Number: 1 800 922 3503
Voice Phone: 678 295 3080

**Fax Notes :**

Date and time of transmission: Wednesday, October 03, 2018 3:18:24 PM

Number of pages including this cover sheet: 04

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient you are hereby notified that any review, disclosure, copying or dissemination of this transmission, or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us. Thank you for your cooperation.

5005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

Physicians of Hearts

# Fax:

To: Lincoln Financial Group | From: Dr. Lee Faulkner
Fax: 402-938-7901 | Pages: 3
Phone: | Date: 10/3/18
Re: | CC:

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

• Comments:

Confidential Information: The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

Lincoln Financial Group

REF #3043267

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 1. Patient Information

| Full Name (First) | (M.I.) | (Last Name) | Social Security Number |
|---|---|---|---|
| Sherman | | Carter | |

| Height | Weight | Blood Pressure | Employer Name |
|---|---|---|---|
| 6'0" | 211 lbs | 150/80 | |

## 2. Diagnosis

Primary ICD diagnostic Code (Required): I 42.9

Primary ICD diagnosis Description: Cardiomyopathy

Secondary ICD Diagnosis Code: I 10.0

Secondary ICD Diagnosis Description: Hypertension

Pregnancy: First Treated __/__/__ Estimated Delivery __/__/__ Date of Delivery __/__/__ ☐ Vaginal ☐ C-Section

Symptoms:

Objective Findings (Include copies of any x-rays, laboratory data, EKG's, MRI's, scans and any clinical findings):

## 3. Disability Circumstances - *Check if applicable*

☑ Illness ☐ Injury ☐ Work Related

If work related or injury, summarize circumstances:

Date of:

| Symptoms first Appeared | Reduced Ability to work | Advised to stop work |
|---|---|---|
| 9, 25, 05 | N/A | 8, 1, 2015 |

| Initial Treatment | Most Recent Treatment | Next Treatment |
|---|---|---|
| 9, 25, 15 | 7, 30, 18 | 1, 29, 19 |

Dates hospital confined: __/__/__ to __/__/__

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.

(Please see FRAUD NOTICES attached)

Oct 03 18, 01:12p p.3

REF #3043267

Lincoln Financial Group

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

**Indicate frequency per day the listed activities below can be used performed using:**
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | O | Standing | N | Crouching | N | Overhead | N |
| 6-10 lbs. | N | Walking | N | Crawling | N | Desk Level | N |
| 11-25 lbs. | N | Sitting | N | Grasping | N | Below Waist | N |
| 26-50 lbs. | N | Balancing | N | Climbing | N | | |
| 51-100 lbs. | N | Stooping | N | Pushing | N | | |
| 100 + lbs. | N | Kneeling | N | Pulling | N | | |
| | | Fingering | N | Bending | N | | |

N/A

What job modifications would allow the patient to return to work?

## 5. Treatment

Medical therapy for now,

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Life long

Describe the patients prognosis for recovery

## 7. Physician's Information

Lee E. Faulkner MD
Name

6005 Park Ave Ste 702
Street Address

Memphis | TN | 38119
City | State | Zip Code

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

N/A

Continence ___/___/___

Dressing ___/___/___

Transferring ___/___/___

Bathing ___/___/___

Toileting ___/___/___

Eating ___/___/___

Date patient experienced loss of Cognitive Functioning: ___/___/___

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

___/___/___ to ___/___/___

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

901-682-7241 | 901-682-7243
Phone Number | Fax Number

Lee E. Faulkner MD (signature) | __/__/__
Signature | Date

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)



00000327 LFPESRD1 00000982

Campbell Clinic ORTHOPAEDICS

FACSIMILE TRANSMITTAL

**To:**
**Company :**
**Fax Number :** 1(877)8433950$
**Phone Number :**

**From:** Jenna Guessford
**Fax Number :** (901) 435-5636
**Phone Number :** (901) 759-3139

**Subject :** Fax

**Pages :** 11
**Sent at :** Monday, October 01, 2018 08:26AM

**COMMENTS:**

***Disclaimer:*** *The documents accompanying this fax transmission contain confidential information belonging to the sender that may be legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this confidential information is prohibited from disclosing this information to any other party. If you have received this transmission in error, please notify the sender immediately and arrange for the return of the documents.*

Lincoln
Financial Group®

# Fax Transmission

8801 Indian Hills Dr., Omaha, NE 68114

| | | |
|---|---|---|
| **From:** | Name: | Brittany Reyes |
| | Fax Number: | 1-877-843-3950 |
| | Voice Phone: | 1-800-423-2765 |
| **To:** | Name: | CAMPBELL CLINIC ORTHOPAEDICS |
| | Company: | |
| | Fax Number: | 19017593193 |
| | Voice Phone: | |

**Fax Notes :**

Date and time of transmission: Monday, August 20, 2018 4:44:16 PM

Number of pages including this cover sheet: 08

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient you are hereby notified that any review, disclosure, copying or dissemination of this transmission, or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us. Thank you for your cooperation.

Lincoln Financial Group®

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

The Lincoln National Life
Insurance Company
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 20, 2018

CAMPBELL CLINIC ORTHOPAEDICS
RELEASE OF INFORMATION
7545 AIRWAYS BLVD
SOUTHAVEN, MS 38671

Re: Policy Number: 000010049220000000
Claim Number: 1150128075
Patient: Sherman Carter
DOB:

**ATTN MED RECORDS/ROI DEPT:**
We are evaluating your patient's disability claim. Please submit the requested records listed below. A signed authorization form is included.

| **Documentation** | **Time Period** |
|---|---|
| Office/Treatment Notes | 5/1/2018 to present |
| Diagnostic Test Results | 5/1/2018 to present |

****Please have Dr. Gregory Dabov fill out all forms that are attached****

Below are the current state statutes for Mississippi: $ 20.00 for pages 1-20; $ 1.00 per page for the next 80 pages; $0.50 per page for all pages thereafter. 10% of the total charge may be added for postage and handling. $ 15.00 may be recovered by the medical provider or hospital or nursing home or other medical facility for retrieving medical records in archives at a location off the premises where the facility/office is located.

**YOU MUST RETURN THIS COMPLETED FORM TO RECEIVE PAYMENT.**

Payment instructions:

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| | Processing Fee | | |
| | Pages - | | |
| | Actual Postage | | |
| | Tax Identification Number | TIN- | |
| | | Total | |

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

- **We must have your Tax Identification Number (TIN) & NPI.**
- **Please fax this remittance form and records to 877-843-3950.**

***Payment Options:***

☐ ***Credit Card***

- If you accept a credit card, ***payment can be made immediately*** upon receipt of your invoice.

☐ ***Direct Deposit*** (Please complete the below)

Direct Deposit Agreement

Authorization Agreement

We hereby authorize Lincoln Financial Group / The Lincoln National Life Insurance Company to initiate automatic deposits to our account at the Financial Institution named below. We also authorize Lincoln Financial Group / The Lincoln National Life Insurance Company to make withdrawals from this account in the event that a credit entry is made in error.

Further, we agree not to hold Lincoln Financial Group / The Lincoln National Life Insurance Company responsible for any delay or loss of funds due to incorrect or incomplete information supplied by us or by our financial institution or due to an error on the part of our financial institution in depositing funds to our account.

This agreement will remain in effect until Lincoln Financial Group / The Lincoln National Life Insurance Company received a written notice of cancellation from us or our financial institution, or until we submit a new direct deposit form.

Account Information

Name of Financial Institution: ______________________

Routing Number: ______________________

Account Number: ______________________

Authorized Signature: ______________________ Date: ______________

☐ ***Checks Only*** (Please note that pre-payment via check could delay payment by up to 30 days)

Please contact Claim Services on our toll free line at **1-800-423-2765** with any questions regarding this request. Thank you for your cooperation.

Sincerely,

Brittany Reyes
Assisting on behalf of Kameetrice Farrell
678-295-3080
Coordinator, Medical Records
The Lincoln National Life Insurance Company

**Lincoln**
Financial Group®

# Authorization For Release Of Informatio

The Lincoln National Life Insurance Compan
PO Box 2609, Omaha, NE 68103-260
toll free (800) 423-2765 Fax (877) 843-395
www.LincolnFinancial.cor

1. In connection with a claim for benefits, I (the undersigned) **authorize** any physician, medical professional, pharmacist c other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance compan government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit pla administrator to release information from the records of:

Name of Insured: Carter Sherman
(Last) (First) (Middle)

Date of Birth: ____ Social Security Number: ____

2. **Information to be released (hereinafter referred to as "My Information"):**
   - data or records regarding my medical history, treatment, prescriptions, consultations [including medical and psychologic reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition may now have or have had];
   - any information regarding insurance coverage, claims or benefits; and/or
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensatio retirement income, financial information, earnings and employment history).

3. **Information to be released to:** The Lincoln National Life Insurance Company ("Lincoln")
PO Box 2609
Omaha, NE 68103-2609

4. **I understand My Information will be used by Lincoln to evaluate and administer my claim for benefits. I also authoriz Lincoln to release My Information as follows:**
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by Lincoln, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing me with wellness, disability or leave related services as part of an employer sponsored benefit plan; c
   - for self-insured disability plans only, to my employer; or
   - for fully insured plans, I understand the the information obtained with this Authorization may be used in discussion between Lincoln and my employer regarding my functional capacity, and any related restrictions and limitations, in orde to facilitate my return to work; or
   - as otherwise may be required by law or as I may further authorize.

5. I understand My Information may be subject to re-disclosure by the recipient and may no longer be protected by federal or stat law. For Colorado claims, the disclosed information may not be re-disclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent Lincoln has taken action i reliance on this Authorization. To initiate revocation of this Authorization, direct all correspondence to Lincoln at the abov address. If written revocation is not received, this Authorization will be considered valid for a period of time not to excee 24 months from the date of my signature below, or the duration of my claim for benefits, whichever is shorter.

7. A photocopy of this Authorization is to be considered as valid as the original. I am entitled to receive a copy of thi Authorization.

**SIGNATURE** Sherman Carter **DATE** 08/13-2018

Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompeten or deceased.) Power of attorney or guardianship must be attached.

**PRINT NAME:** ____

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient ____

**ADDRESS:** ____
(Street)

____ (City) (State) (Zip Code)

**PHONE NO:** ____

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

**1. Patient Information**

| | | | |
|---|---|---|---|
| Full Name (First): Sherman | (M.I.): | (Last Name): Carter | Social Security Number: |
| Height: 6'0" | Weight: 201 | Blood Pressure: | Employer Name: |

**2. Diagnosis**

Primary ICD diagnostic Code (Required): hx (L) total hip arthroplasty

Primary ICD diagnosis Description: Z96.642

Secondary ICD Diagnosis Code:

Secondary ICD Diagnosis Description:

**Pregnancy** __/__/__ First Treated __/__/__ Estimated Delivery __/__/__ Date of Delivery ☐ Vaginal ☐ C-Section

Symptoms: see notes

Objective Findings (Include copies of any x-rays, laboratory data, EKG's, MRI's, scans and any clinical findings): see notes

**3. Disability Circumstances** - *Check if applicable*

☐ Illness ☐ Injury ☐ Work Related

If work related or injury, summarize circumstances: see notes

Date of:

| | | |
|---|---|---|
| Symptoms first Appeared: 11/6/14 | Reduced Ability to work: 3/7/18 | Advised to stop work: 3/7/18 |
| Initial Treatment: 11/6/14 | Most Recent Treatment: 4/23/18 | Next Treatment: N/A |

Dates hospital confined: N/A to __/__/__

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.

(Please see FRAUD NOTICES attached)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

**Indicate frequency per day the listed activities below can be used performed using:**
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | ____ | Standing | ____ | Crouching | ____ | Overhead | ____ |
| 6-10 lbs. | ____ | Walking | ____ | Crawling | ____ | Desk Level | ____ |
| 11-25 lbs. | ____ | Sitting | ____ | Grasping | ____ | Below Waist | ____ |
| 26-50 lbs. | ____ | Balancing | ____ | Climbing | ____ | | |
| 51-100 lbs. | ____ | Stooping | ____ | Pushing | ____ | | |
| 100 + lbs. | ____ | Kneeling | ____ | Pulling | ____ | | |
| | | Fingering | ____ | Bending | ____ | | |

What job modifications would allow the patient to return to work?

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

Continence ____/____/________

Dressing ____/____/________

Transferring ____/____/________

Bathing ____/____/________

Toileting ____/____/________

Eating ____/____/________

Date patient experienced loss of Cognitive Functioning: ____/____/________

## 5. Treatment

see notes

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

see notes

Describe the patients prognosis for recovery

Describe ongoing treatment frequency

Patient able to return to work Full-Time on: N/A

____/____/________ to ____/____/________

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

## 7. Physician's Information

Name: Gregory Dabov

Street Address: 7545 Airways Blvd

City: Southaven State: MS Zip Code: 38671

Phone Number: 9017593100 Fax Number: 9014255634

Signature: [signature] Date: 10/1/18

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alabama.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee, Virginia, and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT AND KANSAS.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

Campbell Clinic ORTHOPAEDICS

PATIENT NUMBER: 992736
PATIENT NAME: SHERMAN CARTER
SSN:
DOB:
ADDRESS:

04/23/18

TEL:

GREGORY D. DABOV, MD DESOTO

**GDD**

Mr. Carter comes in today. He is now 6 weeks out from his left total hip. He has done well with this, having no major issues. He has some startup pain, but for the most part, he is quite pleased. He previously worked as a warehouseman and certainly that is not the type of work I like to get my total hip patients back at. In workup for total hip, we found out he had severe cardiac issues and he has a low ejection fraction. His cardiologist told him he does not want him doing heavy-type work. It is my opinion that he is permanently disabled from medium- or heavy-type of work, which is really all he knows. I do want him getting involved in a good walking program and fitness, doing maybe elliptical machine or stationary bike. I talked about the need for antibiotics about dental procedures. If he has any problems or concerns, I want him to let us know. Otherwise, I will see him back in 10 months with AP pelvis and lateral of the left hip.

Electronically signed by Gregory D. Dabov, MD
GDD:jcvr/bcqa5
DD: 04/23/18 DT: 04/23/18

Campbell Clinic ORTHOPAEDICS

PATIENT NUMBER: 992736
PATIENT NAME: SHERMAN CARTER
SSN:
DOB:
ADDRESS:

03/19/18

TEL:

HAJRA MOTIWALA, PA-C DESOTO

**HM**

PAST MEDICAL HISTORY: Per Campbell Clinic Health history form.

CHIEF COMPLAINT: LEFT HIP.

HISTORY OF PRESENT ILLNESS: Mr. Carter, a 51-year-old male, comes in today regarding his left hip. He underwent left total hip arthroplasty by Dr. Dabov 03/07/2018, now 12 days out at this point. States he has been doing very well. His pain has been well controlled using a walker to ambulate. Has been participating in physical therapy. No other complaints.

PHYSICAL EXAMINATION: No acute distress. Alert and oriented, cooperative on exam. Ambulates with the assistance of a walker. He does not have any active drainage, erythema, or signs of infection associated with his left lower extremity surgical incision, healing appropriately. Neurovascularly intact distally.

IMAGING: AP of the pelvis and lateral of the left hip were obtained and reviewed, dated 03/19/2018. They reveal left total hip arthroplasty to be in good position. No evidence of fracture, loosening or dislocation.

ASSESSMENT: STATUS POST LEFT TOTAL HIP ARTHROPLASTY.

PLAN: I have gone over dental precautions with the patient as well as hip precautions. Advised him to continue with the therapy. Follow up with Dr. Dabov in 4 weeks for further evaluation. He is offered pain medication, states he has enough at this time.

Electronically signed by Hajra Motiwala, PA-C
HM:dlsvr
DD: 03/19/18 DT: 03/19/18

**OPD - PERMANENT RECORD**

REF #3065386

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

September 20, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

Please refer to our letter of 08/21/2018 in which we requested additional information for your disability claim. As of the above date, we have received no response to our request.

The policy issued to BarDett, LLC indicates any request for information must be provided to our office within 45 days.

We must receive the following information in order to continue our review of your claim:

- Medical records from Campbell Clinic Orthopaedic from 05/01/2018 to present
- Attending Physician Statement from Dr. Gregory Daboy

We will allow you an additional 15 days to have the information submitted to our office for review. Without this information, benefits beyond 10/05/2018 cannot be released and it will be necessary to suspend our review of your claim. To ensure this information is received and processed quickly, feel free to use our toll-free fax number 1-877-843-3950.

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3065386

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

REF #3043267

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

September 11, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

We are writing in reference to your claim for Long Term Disability.

Please have your doctor complete and return the attached Attending Physician Statement. The form can be faxed to 402-938-7901.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #3043267

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

**The Lincoln National Life Insurance Company**
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 1. Patient Information

Full Name (First) (M.I.) (Last Name)

Social Security Number

Height

Weight

Blood Pressure

Employer Name

## 2. Diagnosis

Primary ICD diagnostic Code **(Required)**

Primary ICD diagnosis Description

Secondary ICD Diagnosis Code

Secondary ICD Diagnosis Description

**Pregnancy**

____ /____ /_______ First Treated

____ /____ /_______ Estimated Delivery

____ /____ /_______ Date of Delivery

☐ Vaginal ☐ C-Section

Symptoms

Objective Findings (Include copies of any x-rays, laboratory data, EKG's, MRI's, scans and any clinical findings)

## 3. Disability Circumstances - *Check if applicable*

☐ Illness ☐ Injury ☐ Work Related

If work related or injury, summarize circumstances

Date of:

___ /___ /______ Symptoms first Appeared

___ /___ /______ Reduced Ability to work

___ /___ /______ Advised to stop work

___ /___ /______ Initial Treatment

___ /___ /______ Most Recent Treatment

___ /___ /______ Next Treatment

Dates hospital confined: ___ /___ /______ to ___ /___ /______

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.

(Please see FRAUD NOTICES attached)

REF #3043267

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

**The Lincoln National Life Insurance Company**
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

**Indicate frequency per day the listed activities below can be used performed using:**
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| Lifting/Carrying | | | | | | Reaching | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | _____ | Standing | ____ | Crouching | _____ | Overhead | ______ |
| 6-10 lbs. | _____ | Walking | ____ | Crawling | _____ | Desk Level | ______ |
| 11-25 lbs. | _____ | Sitting | ____ | Grasping | _____ | Below Waist | ______ |
| 26-50 lbs. | _____ | Balancing | ____ | Climbing | _____ | | |
| 51-100 lbs. | _____ | Stooping | ____ | Pushing | _____ | | |
| 100 + lbs. | _____ | Kneeling | ____ | Pulling | _____ | | |
| | | Fingering | ____ | Bending | _____ | | |

What job modifications would allow the patient to return to work?

## 5. Treatment

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Describe the patients prognosis for recovery

## 7. Physician's Information

Name

Street Address

City

State

Zip Code

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

Continence _____ /_____ /____________

Dressing _____ /_____ /____________

Transferring _____ /_____ /____________

Bathing _____ /_____ /____________

Toileting _____ /_____ /____________

Eating _____ /_____ /____________

Date patient experienced loss of

Cognitive Functioning: _____ /_____ /__________

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

____ /____ /___________ to ____ /____ /________

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

Phone Number

Fax Number

**Signature**

__ /__ /___

**Date**

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.

(Please see FRAUD NOTICES attached)

REF #3043267

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alabama.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee, Virginia, and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT AND KANSAS.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

Sep 04 18, 11:03a p.1

6005 Park Avenue Suite 702 Memphis TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

Physicians of Hearts

# Fax:

To: Lincoln Financial Group From: Dr. Lee Faulkner

Fax: 877-843-3950 Pages:

Phone: 800-423-2765 Date:

Re: Sherman Carter CC:

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

• Comments:

Confidential Information: The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

# Progress Notes

Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 51 years **Gender:** M

07/30/2018

---

**Date:** 07/30/18 : 02:25pm
**Title: FOLLOW UP OFFICE VISIT**

**Date**: 07/30/18
**Name**: Sherman Carter
**Date of Birth**:
**Referred By**:

**Vital Signs**:
Bp: 150/80
Height: 6', Weight: 211 lbs
BMI: 28.62 kg/m2

**Subjective**:
This 51 year old male presents for follow up visit. He denies chest pain at rest but does experience pain when stressed out or when over exerting himself. He denies syncope and has had no dizziness. He has been under some recent stress due to a random shooting to his house by lone shooter who is still at large in our city. He returns today for interrogation of his AICD single chamber. He has been placed on Entresto 24/26 BID .

**Physical Examination**:
Head: normocephalic, atraumatic
Eyes: conjunctiva clear, EOM intact, PERRL.
Neck: Supple without lymphadenopathy.
Throat: no erythema, exudates or lesions.
Lungs: CTA bilaterally, no wheezes, rhonchi, rales. Breathing unlabored.
Heart: RRR, no murmur
Chest wall: No swelling, ecchymosis, erythema or deformity.
Abdomen: Soft, NT/ND, no HSM, no masses.
Extremities: No deformities, clubbing, cyanosis, or edema.
CNS: No focal deficit

**Impression**:
**Major Problem:** Cardiomyopathy : ICD10 = I42.9 / ICD9 = 425.4 / SNOMED = 85898001
**Major Problem:** Arterial hypertension : ICD10 = I10 / ICD9 = 401.1 / SNOMED = 59621000
**Major Problem:** Ventricular tachycardia : ICD10 = I47.2 / ICD9 = 427.1 / SNOMED = 25569003

**Data:**
**AICD interrogation -** Normal AICD function, Nonsustained Ventricular tachycardia.

**EKG** - Sinus rhythm rate of 60, Nonspecific Twave abnormality

**Plan**:

Continue current medication(s)

**Follow-up**: 6 months

40 minutes spent with patient, greater than 50% of the office visit was dedicated to counseling, reviewing tests & labs,

**Physicians of Hearts**
6005 Park Ave. Suite 702
Memphis, TN 38119
Office: (901) 682-7241 | Fax: (901) 682-7243

**Progress Notes**
Carter, Sherman
**Patient ID:** CARSH000
**DOB:**
**Age:** 51 years **Gender:** M

07/30/2018

---

treatment options and follow up plans.
**Visit Time:** 40

**Procedure:** Office Visit Level 5 : 99215

# SIGNED BY Lee E Faulkner, MD (LF) 07/30/2018 02:43PM

Name:Carter Sherman ID:CA1967 Jul 30, 2018 1:04 PM 60 bpm
Sex:Male Birth date: years
inch lb mmHg
Medication 1:
Medication 2:
Room No:

1100 Sinus rhythm
4068 Nonspecific Twave abnormality
9130 ** borderline ECG **

| | | | |
|---|---|---|---|
| Vent. | rate | | 60 bpm |
| PR | int. | | 158 ms |
| QRS | dur. | | 102 ms |
| QT/QTc | int. | 404/ | 407 ms |
| P/QRS/T | axis | 45/ | 30/ 22 |
| RV5/SV1 | amp. | 1.870/ | 0.995 mV |
| RV5+SV1 | amp. | | 2.865 mV |

Unconfirmed Report
Reviewed by:

10 mm/mV 25 mm/s Filter 100 Hz H 60 d 10 mm/mV 10 mm/mV 10 mm/mV



Lincoln Financial Group®

# Fax Transmission

8801 Indian Hills Dr., Omaha, NE 68114

**From:** Name:
Fax Number: 7901
Voice Phone:

**To:** Name: Kameetrice Farrell
Company: LINCOLN FINANCIAL GROUP
Fax Number: 1 800 922 3503
Voice Phone: 678 295 3080

**Fax Notes :**

---

Date and time of transmission: Tuesday, September 04, 2018 11:49:02 AM

Number of pages including this cover sheet: 03

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient you are hereby notified that any review, disclosure, copying or dissemination of this transmission, or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us. Thank you for your cooperation.

6005 Park Avenue Suite 702 Memphis, TN 38119 Ph: (901) 682-7241
Fax: (901) 682-7243

Physicians of Hearts

# Fax:

To: Lincoln Financial Group ATTN: Kamcetrice Farrell

From: Dr. Lee Faulkner/

Fax: 402-938-7901

Pages: 2

Phone:

Date: 9/4/18

Re:

CC:

☐ Urgent __For Review __Please Comment __Please Reply __Please Recycle

- Comments:

Policy # 00001004922000000
Claim # 115012807S
Sherman Carter

**Confidential Information:** The information in the transmission accompanying this notice is confidential. It is intended only for the use of the individual or entity listed above. If the reader of this message is not the intended recipient, you are here notified that any distribution of the accompanying communication is prohibited.

REF #2991745

Lincoln Financial Group®

The Lincoln National Life Insurance Company
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

**GROUP CONTINUANCE OF DISABILITY**
**(PLEASE see FRAUD NOTICES attached)**

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

00000315 LFPH3GD1 00000970

**Attending Physician's Statement**

1. Patient's Name Sherman Carter Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any) Cardiomyopathy, HTN
3. a) Date of First Treatment Sept. 25, 2005
   b) Date of Most Recent Treatment July 30, 2018
   c) Frequency of Treatments Every 6 months or more
   d) Type of Treatment Rendered Medical – Cardiology
   e) Is surgery scheduled? If so, when? No
4. The patient has been continuously Totally Disabled (unable to perform regular job) from Aug 2015 to present
   The patient has been continuously Partially Disabled (some restrictions or light duty) from N/A to ______
   If the patient is still disabled, when should the patient be able to return to work? Unknown
5. Remarks or Comments: ______
6. List Restrictions and Limitations: Medical therapy for now, Severe limitation.
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   (Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)) [circled]
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – *Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)*
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date 9/4/18 (Month Day Year) Signed X Lee Sullivan MD (Attending Physician, No Stamps, please) /Degree/Specialty Cardiology

Street Address 6005 Park Ave Ste 702
City, State Memphis, TN 38119
Phone Number 901-682-7241
Fax Number 901-682-7243

REF #2991745

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 21, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

We wish to notify you of the need for proof of continued disability regarding your Long Term Disability claim.

**TOTAL DISABILITY BENEFIT**. The Company will pay a Total Disability Monthly Benefit to an Insured Employee, after the completion of the Elimination Period, if he or she:

1. is Totally Disabled;
2. becomes Disabled while insured for this benefit;
3. is under the Regular Care of a Physician; and
4. at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request.

Proof of continued Disability, Regular Care of a Physician, and any Other Income Benefits affecting the claim must be given to the Company. This must be supplied within 45 days after the Company requests it. If it is not, benefits may be denied or suspended.

We have submitted requests for copies of medical records from Dr. Lee Faulkner and Cambell Clinic Orthopedics for the dates of 05/01/2018 to present. Additionally, the attached form was sent to your doctors to complete and return.

As stated in your policy, benefits are payable when proof of continued disability and regular care of a physician are given to the Company. We have made the request to your physicians on your behalf. Please see that the necessary information is submitted to our office within 30 days.

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2991745

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

Enclosure: Group Continuance DISB APS

REF #2991745

Lincoln Financial Group®

**The Lincoln National Life Insurance Company**
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

## GROUP CONTINUANCE OF DISABILITY
## (PLEASE see FRAUD NOTICES attached)

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

### Attending Physician's Statement

1. Patient's Name Sherman Carter ______ Date of Birth ______
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any)

______

______

3. a) Date of First Treatment ______
   b) Date of Most Recent Treatment ______
   c) Frequency of Treatments ______
   d) Type of Treatment Rendered ______
   e) Is surgery scheduled? If so, when? ______
4. The patient has been continuously Totally Disabled (unable to perform regular job) from ______ to ______
   The patient has been continuously Partially Disabled (some restrictions or light duty) from ______ to ______
   If the patient is still disabled, when should the patient be able to return to work? ______
5. Remarks or Comments: ______

______

6. List Restrictions and Limitations: ______

______

7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date ______ (Month Day Year) Signed ______ (Attending Physician, No Stamps, please) /Degree/Specialty ______

Street Address ______

City, State ______

Phone Number ______

Fax Number ______

REF #2991745

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alabama.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT, KANSAS, AND VIRGINIA.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 20, 2018

LEE FAULKNER MD
RELEASE OF INFORMATION
6005 PARK AVE STE 702
MEMPHIS, TN 38119

Re: Policy Number: 00001004922000000
Claim Number: 1150128075
Patient: Sherman Carter
DOB:

**ATTN MED RECORDS/ROI DEPT:**
We are evaluating your patient's disability claim. Please submit the requested records listed below. A signed authorization form is included.

| **Documentation** | **Time Period** |
|---|---|
| Office/Treatment Notes | 6/1/2018 to present |
| Diagnostic Test Results | 6/1/2018 to present |

****Please fill out all forms that are attached****

Below are the state statutes for Tennessee: Provider Records are: $20.00 for the first 5 pages. $.50 per page in excess of 5 pages. Actual cost of postage. If the records are delivered in an digital format the processing fee is limited to $50.00. $20.00 notarization fee for each record sent certified. Hospital Records are: $18.00 for the first 5 pages. $.85 per pages 6 - 50. $0.60 per page for pages 51 - 250. $0.35 for pages 251 & up.

**YOU MUST RETURN THIS COMPLETED FORM TO RECEIVE PAYMENT.**

Payment instructions:

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| | Processing Fee | | |
| | Pages - | | |
| | Actual Postage | | |
| | Tax Identification Number | TIN- | |
| | | Total | |

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

- **We must have your Tax Identification Number (TIN) & NPI.**
- **Please fax this remittance form and records to 877-843-3950**.

***Payment Options:***

☐ ***Credit Card***

- If you accept a credit card, ***payment can be made immediately*** upon receipt of your invoice.

☐ ***Direct Deposit*** *(*Please complete the below)

Direct Deposit Agreement

| Authorization Agreement |
|---|

We hereby authorize Lincoln Financial Group / The Lincoln National Life Insurance Company to initiate automatic deposits to our account at the Financial Institution named below. We also authorize Lincoln Financial Group / The Lincoln National Life Insurance Company to make withdrawals from this account in the event that a credit entry is made in error.

Further, we agree not to hold Lincoln Financial Group / The Lincoln National Life Insurance Company responsible for any delay or loss of funds due to incorrect or incomplete information supplied by us or by our financial institution or due to an error on the part of our financial institution in depositing funds to our account.

This agreement will remain in effect until Lincoln Financial Group / The Lincoln National Life Insurance Company received a written notice of cancellation from us or our financial institution, or until we submit a new direct deposit form.

| Account Information |
|---|

Name of Financial Institution: ______________________________

Routing Number: ______________________________

Account Number: ______________________________

Authorized Signature: ______________________________ Date: ______________________

☐ ***Checks Only*** (Please note that pre-payment via check could delay payment by up to 30 days)

Please contact Claim Services on our toll free line at **1-800-423-2765** with any questions regarding this request. Thank you for your cooperation.

Sincerely,

Brittany Reyes
Assisting on behalf of Kameetrice Farrell
678-295-3080
Coordinator, Medical Records
The Lincoln National Life Insurance Company

Enclosure(s): Group Continuance DISB APS

Lincoln Financial Group®

**The Lincoln National Life Insurance Company**
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

## GROUP CONTINUANCE OF DISABILITY
## (PLEASE see FRAUD NOTICES attached)

TO AVOID DELAY, PLEASE ANSWER ALL QUESTIONS COMPLETELY.
BarDett, LLC IS NOT RESPONSIBLE FOR CHARGES INCURRED FOR COMPLETION OF THIS FORM. IT IS THE INSURED'S RESPONSIBILITY TO PROVIDE PROOF OF CONTINUED DISABILITY AT HIS/HER EXPENSE.

### Attending Physician's Statement

1. Patient's Name Sherman Carter Date of Birth _
2. Diagnosis, Nature of Sickness or Injury (Describe complications, if any)
3. a) Date of First Treatment
   b) Date of Most Recent Treatment
   c) Frequency of Treatments
   d) Type of Treatment Rendered
   e) Is surgery scheduled? If so, when?
4. The patient has been continuously Totally Disabled (unable to perform regular job) from ______ to ______
   The patient has been continuously Partially Disabled (some restrictions or light duty) from ______ to ______
   If the patient is still disabled, when should the patient be able to return to work?
5. Remarks or Comments:
6. List Restrictions and Limitations:
7. Physical Impairment:
   Class 1 – No limitation – capable of heavy work – No restrictions (1-10%):
   Class 2 – Medium manual activity (15 – 30%)
   Class 3 – Slight limitation of functional capacity, capable of light work (35 – 55%)
   Class 4 – Moderate limitations of functional capacity, capable of sedentary/clerical activity (60 – 70%)
   Class 5 – Severe limitation of functional capacity, incapable of minimum (sedentary) activity (75 – 100%)
8. Mental Impairments ( if applicable)
   Class 1 – Patient is able to function under stress and engage in personal relations (no limitations)
   Class 2 – Patient is able to function in most stress situation & engage in most interpersonal relations (slight limitation)
   Class 3 – Patient is able to engage in limited stress situation & limited interpersonal relations (moderate limitation)
   Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
   Class 5 – Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

Date ______ Signed ______ /Degree/Specialty ______
(Month Day Year) (Attending Physician, No Stamps, please)

Street Address ______

City, State ______

Phone Number ______

Fax Number ______

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alabama.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT, KANSAS, AND VIRGINIA.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

Lincoln Financial Group®

# Authorization For Release Of Information

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

1. In connection with a claim for benefits, I (the undersigned) **authorize** any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Name of Insured: Carter Sherman
(Last) (First) (Middle)

Date of Birth: ______ Social Security Number: ______

2. **Information to be released (hereinafter referred to as "My Information"):**
   - data or records regarding my medical history, treatment, prescriptions, consultations [including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage, claims or benefits; and/or
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, retirement income, financial information, earnings and employment history).

3. **Information to be released to:** The Lincoln National Life Insurance Company ("Lincoln")
PO Box 2609
Omaha, NE 68103-2609

4. **I understand My Information will be used by Lincoln to evaluate and administer my claim for benefits. I also authorize Lincoln to release My Information as follows:**
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by Lincoln, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing me with wellness, disability or leave related services as part of an employer sponsored benefit plan; or
   - for self-insured disability plans only, to my employer; or
   - for fully insured plans, I understand the the information obtained with this Authorization may be used in discussions *between Lincoln and my employer regarding my functional capacity, and any related restrictions and limitations, in order* to facilitate my return to work; or
   - as otherwise may be required by law or as I may further authorize.

5. I understand My Information may be subject to re-disclosure by the recipient and may no longer be protected by federal or state law. For Colorado claims, the disclosed information may not be re-disclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent Lincoln has taken action in reliance on this Authorization. To initiate revocation of this Authorization, direct all correspondence to Lincoln at the above address. If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below, or the duration of my claim for benefits, whichever is shorter.

7. A photocopy of this Authorization is to be considered as valid as the original. I am entitled to receive a copy of this Authorization.

**SIGNATURE** Sherman Carter **DATE** 08/13/2018
Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

**PRINT NAME:** ______

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient ______

**ADDRESS:** ______

______ (City) ______ (State) ______ (Zip Code)

**PHONE NO:** ______

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 20, 2018

CAMPBELL CLINIC ORTHOPAEDICS
RELEASE OF INFORMATION
7545 AIRWAYS BLVD
SOUTHAVEN, MS 38671

Re: Policy Number: 00001004922000000
Claim Number: 1150128075
Patient: Sherman Carter
DOB:

**ATTN MED RECORDS/ROI DEPT:**
We are evaluating your patient's disability claim. Please submit the requested records listed below. A signed authorization form is included.

| **Documentation** | **Time Period** |
|---|---|
| Office/Treatment Notes | 5/1/2018 to present |
| Diagnostic Test Results | 5/1/2018 to present |

****Please have Dr. Gregory Dabov fill out all forms that are attached****

Below are the current state statutes for Mississippi: $ 20.00 for pages 1-20; $ 1.00 per page for the next 80 pages; $0.50 per page for all pages thereafter. 10% of the total charge may be added for postage and handling. $ 15.00 may be recovered by the medical provider or hospital or nursing home or other medical facility for retrieving medical records in archives at a location off the premises where the facility/office is located.

**YOU MUST RETURN THIS COMPLETED FORM TO RECEIVE PAYMENT.**

Payment instructions:

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| | Processing Fee | | |
| | Pages - | | |
| | Actual Postage | | |
| | Tax Identification Number | TIN- | |
| | | Total | |

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

- **We must have your Tax Identification Number (TIN) & NPI.**
- **Please fax this remittance form and records to 877-843-3950**.

***Payment Options:***

☐ ***Credit Card***

- If you accept a credit card, ***payment can be made immediately*** upon receipt of your invoice.

☐ ***Direct Deposit*** (Please complete the below)

Direct Deposit Agreement

Authorization Agreement

We hereby authorize Lincoln Financial Group / The Lincoln National Life Insurance Company to initiate automatic deposits to our account at the Financial Institution named below. We also authorize Lincoln Financial Group / The Lincoln National Life Insurance Company to make withdrawals from this account in the event that a credit entry is made in error.

Further, we agree not to hold Lincoln Financial Group / The Lincoln National Life Insurance Company responsible for any delay or loss of funds due to incorrect or incomplete information supplied by us or by our financial institution or due to an error on the part of our financial institution in depositing funds to our account.

This agreement will remain in effect until Lincoln Financial Group / The Lincoln National Life Insurance Company received a written notice of cancellation from us or our financial institution, or until we submit a new direct deposit form.

Account Information

Name of Financial Institution: ______________________________________

Routing Number: ______________________________________

Account Number: ______________________________________

Authorized Signature: ______________________________________________________ Date: _________________________________

☐ ***Checks Only*** (Please note that pre-payment via check could delay payment by up to 30 days)

Please contact Claim Services on our toll free line at **1-800-423-2765** with any questions regarding this request. Thank you for your cooperation.

Sincerely,

Brittany Reyes
Assisting on behalf of Kameetrice Farrell
678-295-3080
Coordinator, Medical Records
The Lincoln National Life Insurance Company

Lincoln Financial Group•

# Authorization For Release Of Information

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

1. In connection with a claim for benefits, I (the undersigned) **authorize** any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Name of Insured: Carter (Last) Sherman (First) ______ (Middle)

Date of Birth: ______ Social Security Number: ______

2. **Information to be released (hereinafter referred to as "My Information"):**
   - data or records regarding my medical history, treatment, prescriptions, consultations [including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage, claims or benefits; and/or
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, retirement income, financial information, earnings and employment history).

3. **Information to be released to:** The Lincoln National Life Insurance Company ("Lincoln")
PO Box 2609
Omaha, NE 68103-2609

4. **I understand My Information will be used by Lincoln to evaluate and administer my claim for benefits. I also authorize Lincoln to release My Information as follows:**
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by Lincoln, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing me with wellness, disability or leave related services as part of an employer sponsored benefit plan; or
   - for self-insured disability plans only, to my employer; or
   - for fully insured plans, I understand the the information obtained with this Authorization may be used in discussions *between Lincoln and my employer regarding my functional capacity, and any related restrictions and limitations, in order* to facilitate my return to work; or
   - as otherwise may be required by law or as I may further authorize.

5. I understand My Information may be subject to re-disclosure by the recipient and may no longer be protected by federal or state law. For Colorado claims, the disclosed information may not be re-disclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent Lincoln has taken action in reliance on this Authorization. To initiate revocation of this Authorization, direct all correspondence to Lincoln at the above address. If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below, or the duration of my claim for benefits, whichever is shorter.

7. A photocopy of this Authorization is to be considered as valid as the original. I am entitled to receive a copy of this Authorization.

**SIGNATURE** Sherman Carter **DATE** 08/13/2018

Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

**PRINT NAME:** ______

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient ______

**ADDRESS:** ______

______ (City) ______ (State) ______ (Zip Code)

**PHONE NO:** ______

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

**The Lincoln National Life Insurance Company**
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 1. Patient Information

Full Name (First) (M.I.) (Last Name) Social Security Number

Height Weight Blood Pressure Employer Name

## 2. Diagnosis

Primary ICD diagnostic Code **(Required)** Primary ICD diagnosis Description

Secondary ICD Diagnosis Code Secondary ICD Diagnosis Description

**Pregnancy** ____ /____ /________ First Treated ____ /____ /________ Estimated Delivery ____ /____ /________ Date of Delivery ☐ Vaginal ☐ C-Section

Symptoms

Objective Findings (Include copies of any x-rays, laboratory data, EKG's, MRI's, scans and any clinical findings)

## 3. Disability Circumstances - *Check if applicable*

☐ Illness ☐ Injury ☐ Work Related

If work related or injury, summarize circumstances

Date of:

___ /___ /______ Symptoms first Appeared

___ /___ /______ Reduced Ability to work

___ /___ /______ Advised to stop work

___ /___ /______ Initial Treatment

___ /___ /______ Most Recent Treatment

___ /___ /______ Next Treatment

Dates hospital confined: ___ /___ /______ to ___ /___ /______

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.

(Please see FRAUD NOTICES attached)

Lincoln Financial Group®

# Long Term Disability Claim Form Physician's Statement

**The Lincoln National Life Insurance Company**
PO Box 2609, Omaha, NE 68103-2609
Toll Free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com
disabilityclaims@lfg.com

## 4. Limitations and Restrictions

Restrictions (what the patient SHOULD NOT do)

Limitations (what the patient CANNOT do)

**Indicate frequency per day the listed activities below can be used performed using:**
N= Never 0% O= Occasionally <33% F= Frequently 34%-66% C= Continuously 67% - 100%

| **Lifting/Carrying** | | | | | | **Reaching** | |
|---|---|---|---|---|---|---|---|
| 1-5 lbs. | _____ | Standing | ____ | Crouching | _____ | Overhead | ______ |
| 6-10 lbs. | _____ | Walking | ____ | Crawling | _____ | Desk Level | ______ |
| 11-25 lbs. | _____ | Sitting | ____ | Grasping | _____ | Below Waist | ______ |
| 26-50 lbs. | _____ | Balancing | ____ | Climbing | _____ | | |
| 51-100 lbs. | _____ | Stooping | ____ | Pushing | _____ | | |
| 100 + lbs. | _____ | Kneeling | ____ | Pulling | _____ | | |
| | | Fingering | ____ | Bending | _____ | | |

What job modifications would allow the patient to return to work?

## 5. Treatment

Describe current and recommended treatment plans including any completed or future surgeries. (Include dates)

## 6. Prognosis

Describe the patients prognosis for recovery

## 7. Physician's Information

Name

Street Address

City State Zip Code

**Activities of Daily Living**

If patient cannot complete these activities of Daily living indicate, when they were first unable to do so. (M/D/Y)

Continence _____ /_____ /____________

Dressing _____ /_____ /____________

Transferring _____ /_____ /____________

Bathing _____ /_____ /____________

Toileting _____ /_____ /____________

Eating _____ /_____ /____________

Date patient experienced loss of

Cognitive Functioning: _____ /_____ /__________

Describe ongoing treatment frequency

Patient able to return to work Full-Time on:

_____ /____ /___________ to _____ /____ /_________

If a specific date is unavailable, please provide a date range you expect a fundamental or marked change.

Phone Number Fax Number

**Signature** __ /__ /___ **Date**

The Lincoln National Life Insurance Company is not responsible for charges incurred due to completion of this form. The patient is responsible for any charges associated with form completion.
(Please see FRAUD NOTICES attached)

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alabama.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee, Virginia, and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT AND KANSAS.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

Lincoln Financial Group®

# Fax Transmission

8801 Indian Hills Dr., Omaha, NE 68114

**From:** Name:
Fax Number: /901
Voice Phone:

**To:** Name: Kameetrice Farrell
Company: LINCOLN FINANCIAL GROUP
Fax Number: 1 800 922 3503
Voice Phone: 678 295 3080

**Fax Notes :**

---

Date and time of transmission: Tuesday, August 14, 2018 5:40:16 PM

Number of pages including this cover sheet: 02

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient you are hereby notified that any review, disclosure, copying or dissemination of this transmission, or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us. Thank you for your cooperation.

Lincoln Financial Group®

# Authorization For Release Of Information

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

1. In connection with a claim for benefits, I (the undersigned) **authorize** any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Name of Insured: CARTER SHERMAN
(Last) (First) (Middle)

Date of Birth: ____________ Social Security Number: ____________

2. **Information to be released (hereinafter referred to as "My Information"):**
   - data or records regarding my medical history, treatment, prescriptions, consultations [including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage, claims or benefits; and/or
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, retirement income, financial information, earnings and employment history).

3. **Information to be released to:** The Lincoln National Life Insurance Company ("Lincoln")
PO Box 2609
Omaha, NE 68103-2609

4. **I understand My Information will be used by Lincoln to evaluate and administer my claim for benefits. I also authorize Lincoln to release My Information as follows:**
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by Lincoln, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing me with wellness, disability or leave related services as part of an employer sponsored benefit plan; or
   - for self-insured disability plans only, to my employer; or
   - for fully insured plans, I understand the the information obtained with this Authorization may be used in discussions *between Lincoln and my employer regarding my functional capacity, and any related restrictions and limitations, in order* to facilitate my return to work; or
   - as otherwise may be required by law or as I may further authorize.

5. I understand My Information may be subject to re-disclosure by the recipient and may no longer be protected by federal or state law. For Colorado claims, the disclosed information may not be re-disclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent Lincoln has taken action in reliance on this Authorization.To initiate revocation of this Authorization, direct all correspondence to Lincoln at the above address. If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below, or the duration of my claim for benefits, whichever is shorter.

7. A photocopy of this Authorization is to be considered as valid as the original. I am entitled to receive a copy of this Authorization.

**SIGNATURE** Sherman Carter **DATE** 08-13-2018

Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

**PRINT NAME:** ____________

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient ____________

**ADDRESS:** ____________
(Street)

____________
(City) (State) (Zip Code)

**PHONE NO:** ____________

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
GLC11609

REF #2954808

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 6, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

This letter is in reference to your claim for Long Term Disability benefits.

While reviewing your claim(s), we have found that we need additional information. Please sign and date the enclosed authorization form and return it to us by 08/21/2018. The completed form can be faxed to 402-938-7901.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2954808

Lincoln Financial Group®

# Authorization For Release Of Information

The Lincoln National Life Insurance Company
PO Box 2609, Omaha, NE 68103-2609
toll free (800) 423-2765 Fax (877) 843-3950
www.LincolnFinancial.com

1. In connection with a claim for benefits, I (the undersigned) **authorize** any physician, medical professional, pharmacist or other provider of health care services, hospital, clinic, other medical or medically related facility; insurance or reinsurance company; government agency; department of labor; acquaintance; group policyholder; employer; or policy or benefit plan administrator to release information from the records of:

Name of Insured: ______________________________
(Last) (First) (Middle)

Date of Birth: ____________ Social Security Number: XXX-XX-____________

2. **Information to be released (hereinafter referred to as "My Information"):**
   - data or records regarding my medical history, treatment, prescriptions, consultations [including medical and psychological reports, records, charts, notes (excluding psychotherapy notes), x-rays, films or correspondence, and any medical condition I may now have or have had];
   - any information regarding insurance coverage, claims or benefits; and/or
   - any information, data or records regarding my activities (including records relating to my Social Security, Workers' Compensation, retirement income, financial information, earnings and employment history).

3. **Information to be released to:** The Lincoln National Life Insurance Company ("Lincoln")
PO Box 2609
Omaha, NE 68103-2609

4. **I understand My Information will be used by Lincoln to evaluate and administer my claim for benefits. I also authorize Lincoln to release My Information as follows:**
   - to its reinsurer, or other persons or organizations performing business or legal services in connection with my claim(s); or
   - to a vendor, approved by Lincoln, which specializes in the application for Social Security Disability Benefits
   - to vendors/consultants providing me with wellness, disability or leave related services as part of an employer sponsored benefit plan; or
   - for self-insured disability plans only, to my employer; or
   - for fully insured plans, I understand the the information obtained with this Authorization may be used in discussions between Lincoln and my employer regarding my functional capacity, and any related restrictions and limitations, in order to facilitate my return to work; or
   - as otherwise may be required by law or as I may further authorize.

5. I understand My Information may be subject to re-disclosure by the recipient and may no longer be protected by federal or state law. For Colorado claims, the disclosed information may not be re-disclosed or reused by the recipient under Colorado law.

6. I understand that I may revoke this Authorization in writing at any time, except to the extent Lincoln has taken action in reliance on this Authorization.To initiate revocation of this Authorization, direct all correspondence to Lincoln at the above address. If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months from the date of my signature below, or the duration of my claim for benefits, whichever is shorter.

7. A photocopy of this Authorization is to be considered as valid as the original. I am entitled to receive a copy of this Authorization.

**SIGNATURE** ______________________________ **DATE** ____________

Claimant/legal representative (Nearest relative, legal guardian, or appointed representative to sign only if claimant/patient is a minor, legally incompetent, or deceased.) Power of attorney or guardianship must be attached.

**PRINT NAME:** ______________________________

Relationship to Claimant/Patient of personal/legal representative signing for Claimant/Patient ____________

**ADDRESS:** ______________________________
(Street)

______________________________
(City) (State) (Zip Code)

**PHONE NO:** ______________________________

REF #2949770

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

August 3, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

We have applied a portion of your monthly benefit for the period of 07/05/2018 to 08/05/2018 toward your existing overpayment. After crediting $581.00 to the overpayment, the remaining balance is now $29,269.53.

You will receive quarterly updates on this amount until your overpayment has been satisfied in full.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
678-295-3020

Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2726075

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life
Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

May 2, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

We have applied a portion of your monthly benefit for the period of 03/05/2018 to 04/05/2018 toward your existing overpayment. After crediting $581.00 to the overpayment, the remaining balance is now $31,593.53.

You will receive quarterly updates on this amount until your overpayment has been satisfied in full.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
678-295-3020

Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

Lincoln Financial Group®

# Fax Transmission

8801 Indian Hills Dr., Omaha, NE 68114

**From:**
Name:
Fax Number: 7901
Voice Phone:

**To:**
Name: Kameetrice Farrell
Company: LINCOLN FINANCIAL GROUP
Fax Number: 1 800 922 3503
Voice Phone: 678 295 3080

**Fax Notes :**

---

Date and time of transmission: Friday, March 23, 2018 1:41:02 PM

Number of pages including this cover sheet: 02

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient you are hereby notified that any review, disclosure, copying or dissemination of this transmission, or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us. Thank you for your cooperation.

**Campbell Clinic**
901-759-3100
7545 Airways Boulevard
Southaven, MS 38671

* 9 9 2 7 3 6 - 1 8 *

Patient Name: CARTER, SHERMAN
DOB:
Age: 51y
Gender: Male

**CERTIFICATE FOR RETURN TO SCHOOL OR WORK**

SHERMAN CARTER has been under my care

from 3/7/2018 to PRESENT and is able to return to

work / school on OFF WORK

Remarks: Mr. Sherman had a total nip arthroplasty on 03/07/218

Dr. [signature] Date: March 22, 2018

Lincoln Financial Group®

# Fax Transmission

8801 Indian Hills Dr., Omaha, NE 68114

**From:** Name:
Fax Number: 7901
Voice Phone:

**To:** Name: Kameetrice Farrell
Company: LINCOLN FINANCIAL GROUP
Fax Number: 1 800 922 3503
Voice Phone: 678 295 3080

**Fax Notes :**

---

Date and time of transmission: Friday, March 23, 2018 1:39:36 PM

Number of pages including this cover sheet: 02

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient you are hereby notified that any review, disclosure, copying or dissemination of this transmission, or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us. Thank you for your cooperation.

**Campbell Clinic**
901-759-3100
7545 Airways Boulevard
Southaven, MS 38671

*992736-18*

Patient Name: CARTER, SHERMAN
DOB:
Age: 51y
Gender: Male

## CERTIFICATE FOR RETURN TO SCHOOL OR WORK

SHERMAN CARTER has been under my care

from 3/7/2018 to PRESENT and is able to return to

work / school on OFF WORK

Remarks: Mr. Sherman had a total hip arthroplasty on 03/07/218

Dr. [signature] Date: March 22, 2018

REF #2566269

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

February 22, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr Carter:

We are writing in reference to your claim for Long Term Disability.

A number of attempts to reach you via phone have been unsuccessful. Please contact me upon receipt of this letter. I can be reached at the number listed below. I am in the office Monday-Friday from 8:00am to 4:30pm EST. In addition, please complete and return the attached Insured Supplemental Statement form. I look forward to hearing from you soon.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Kameetrice Farrell
678-295-3080
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

Enclosure: Insured Supp Statement

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2566269

Lincoln Financial Group®

**The Lincoln National Life Insurance Company**
8801 Indian Hills Drive, Omaha, NE 68114-4066
Toll free (800) 423-2765
www.LincolnFinancial.com

# INSURED'S SUPPLEMENTARY STATEMENT

**PLEASE see FRAUD NOTICES attached.**

(To Avoid Delay Please Answer ALL Questions)

Claimant's Name Sherman Carter Return Form By ______

Policy No 00001004922000000 Claim No 1150128075

When do you expect to be able to return to work in either your own or another occupation?

Describe your current symptoms.

What do you believe is the cause of your continuing disability and what could be done about it?

Describe your current restrictions/limitations specifically and thoroughly.

Describe your present activities.

Do you require another person's active, hands-on help to safely perform activities of daily living? ☐ Yes ☐ No
If "yes", please explain what kind of help you receive and who provides it:

Provide the name, address and telephone number of your current attending physician and the date you were last seen by him/her.

Are you now eligible for, have applied for or are you now receiving benefits from: **(If the answer is "Yes" to any of these questions, provide a date you began receiving benefits and the monthly amount)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Social Security | ☐ Yes ☐ No | ______ | $______ | Unemployment Compensation | ☐ Yes ☐ No | ______ | $______ |
| Dependent Social Security | ☐ Yes ☐ No | ______ | $______ | State Disability Benefits | ☐ Yes ☐ No | ______ | $______ |
| Workers' Compensation | ☐ Yes ☐ No | ______ | $______ | Any other disability benefit-Federal, State | ☐ Yes ☐ No | ______ | $______ |
| Pension Disability or Pension Retirement | ☐ Yes ☐ No | ______ | $______ | Disability Income from Automobile Policy | ☐ Yes ☐ No | ______ | $______ |
| Railroad or Canadian Pension | ☐ Yes ☐ No | ______ | $______ | Statement from injury causing disability | ☐ Yes ☐ No | ______ | $______ |

Please refer to your Policy for definitions:

Are you claiming Total Disability? ☐ Yes ☐ No Dates of Total Disability: From ______ Through ______

Are you claiming Partial Disability? ☐ Yes ☐ No Dates of Partial Disability: From ______ Through ______

Have you performed any type of work? ☐ Yes ☐ No Dates of any Work: From ______ Through ______

Please explain:

The above Statements are true and complete to the best of my knowledge and belief. I hereby authorize any hospital or physician who has treated me, or other person who has attended me or examined me, or any company or government agency to furnish to The Lincoln National Life Insurance Company (or their representatives) any and all information with respect to any illness, injury, medical history, consultations, prescriptions, treatments or benefits, and copies of all applicable records. I have read and understand the attached Fraud Warning Statements. A photostatic copy of this form will be as valid as the original.

Date ______ Telephone Number ______ Social Security # ______

Employee's Signature ______

Address ______

**FRAUD NOTICES. For your protection, certain states require that the following notices appear on this form.**

**Alabama.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Alaska.** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete or misleading information may be prosecuted under state law.

**Arizona.** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Arkansas, Louisiana, Rhode Island and West Virginia.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**California.** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Colorado.** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Delaware.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**District of Columbia.** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida.** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Idaho.** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement or claim containing any false, incomplete or misleading information is guilty of a felony.

**Indiana.** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Kentucky.** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Maine.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Maryland.** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Minnesota.** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**New Hampshire.** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**New Jersey.** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**New Mexico.** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**New York.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Ohio.** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma.** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon.** Any person who knowingly and with intent to defraud any insurance company or other person: (1) files an application for insurance or statement of claim containing any materially false information; or, (2) conceals for the purpose of misleading, information concerning any material fact, may have committed a fraudulent insurance act.

**Pennsylvania.** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Puerto Rico.** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Tennessee and Washington.** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Texas.** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**FOR ALL OTHER STATES EXCLUDING CONNECTICUT, KANSAS, AND VIRGINIA.** A person may be committing insurance fraud, if he or she submits an application or claim containing a false or deceptive statement with intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

REF #2510874

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

January 26, 2018

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

On 10/19/2017, we wrote you regarding the overpayment on your Long Term Disability claim. As of this date, we have not received a refund to our request.

The total overpayment of $32,755.53 is still outstanding. You must return the full refund within 15 days of this letter or contact our office before 02/10/2018 to make appropriate arrangements to refund this amount. Please mail your payment to the following address and include both your policy number and claim number provided in this letter:

Lincoln Financial Group
P.O. Box 26028
Greensboro, NC 27420-6028

If we do not hear from you by 02/10/2018, it will be necessary to withhold your remaining benefits towards the overpayment and refer this matter for collection.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
678-295-3020
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2018 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2310562

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

October 19, 2017

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

On 09/19/17, we wrote you regarding the overpayment on your Long Term claim. As of this date, we have not received a refund to our request.

The total overpayment of $32,755.53 is still outstanding. You must return the full refund within 15 days of this letter or contact our office before 11/19/17 to make appropriate arrangements to refund this amount. Please mail your payment to the following address and include both your policy number and claim number provided in this letter:

Lincoln Financial Group
P.O. Box 26028
Greensboro, NC 27420-6028

If we do not hear from you by 11/19/17, it will be necessary to withhold your remaining benefits towards the overpayment and/or refer this matter for collection.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah 678-295-3020
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

©2017 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2245346

Lincoln Financial Group

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life Insurance Company**
Service Office:
8801 Indian Hills Drive
Omaha, NE 68114-4066
Toll free (800) 423-2765
www.Lincoln4benefits.com

September 19, 2017

SHERMAN CARTER

Re: Policyholder: BarDett, LLC
Policy Number: 00001004922000000
Claim Number: 1150128075
Claimant: Sherman Carter

Dear Mr. Carter:

The LFG Recovery Unit has received notification that you have been awarded Social Security Disability Income at $1,369.00 per month beginning 02/01/16. In addition, we have placed a Social Security Dependent benefit in the amount not less than $386.00 per month from 02/01/16 to 07/01/15.

As you are aware, this benefit from Social Security Disability has been paid for a period during which you had received unreduced Long Term Disability benefits. Therefore, your claim has been overpaid.

**LTD Claim #1150128075 Overpayment $32,755.53**

You are required to repay The Lincoln National Life Insurance Company this amount and we ask that this matter receive your immediate attention. A copy of the calculation is attached.

To assist with the repayment process, please contact John Mattox with Integrated Benefits, Inc. to do a one-time account transfer. He can be reached at 800-535-6575, ext. 206. If he has already contacted you, and this payment has already been made, simply keep this letter for your records.

Please contact me with any questions you may have at extension 3020 when using the tollfree number listed above.

©2017 Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

REF #2245346

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com. You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.

Sincerely,

Gerald Jonah
(678) 295-3020
Sr Claims Examiner, Claims Professional
The Lincoln National Life Insurance Company

REF #2245346

## Benefit Recalculation

| | | | |
|---|---|---|---|
| **Claim Number** | 1150128075 | **Date of Disability** | Aug 07, 2015 |
| **Claimant** | SHERMAN CARTER | **Nature** | Sickness |

### Recalculation Period 1

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Jan 05, 2016 - Apr 05, 2016 | 3 | 0 | $1,950.00 | $5,850.00 |
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Jan 05, 2016 - Apr 05, 2016 | 3 | 0 | $1,950.00 | $5,850.00 |
| Soc Sec (DisPrimary) | Feb 01, 2016 - Apr 05, 2016 | 2 | 4 | $1,369.00 | ($2,920.53) |
| Soc Sec (DisFamily) | Feb 01, 2016 - Apr 05, 2016 | 2 | 4 | $386.00 | ($823.47) |
| | | | | **Total Correction** | ($3,744.00) |
| | | | | **Tax Correction** | $0.00 |
| | | | | **Insured Correction** | ($3,744.00) |

### Recalculation Period 2

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Apr 05, 2016 - Jul 05, 2016 | 3 | 0 | $1,950.00 | $5,850.00 |
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Apr 05, 2016 - Jul 05, 2016 | 3 | 0 | $1,950.00 | $5,850.00 |
| Soc Sec (DisPrimary) | Apr 05, 2016 - Jul 05, 2016 | 3 | 0 | $1,369.00 | ($4,107.00) |
| Soc Sec (DisFamily) | Apr 05, 2016 - Jul 05, 2016 | 3 | 0 | $386.00 | ($1,158.00) |
| | | | | **Total Correction** | ($5,265.00) |
| | | | | **Tax Correction** | $0.00 |
| | | | | **Insured Correction** | ($5,265.00) |

### Recalculation Period 3

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Jul 05, 2016 - Oct 05, 2016 | 3 | 0 | $1,950.00 | $5,850.00 |
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Jul 05, 2016 - Oct 05, 2016 | 3 | 0 | $1,950.00 | $5,850.00 |
| Soc Sec (DisPrimary) | Jul 05, 2016 - Oct 05, 2016 | 3 | 0 | $1,369.00 | ($4,107.00) |
| Soc Sec (DisFamily) | Jul 05, 2016 - Oct 05, 2016 | 3 | 0 | $386.00 | ($1,158.00) |

REF #2245346

## Benefit Recalculation

| | | | |
|---|---|---|---|
| **Claim Number** | 1150128075 | **Date of Disability** | Aug 07, 2015 |
| **Claimant** | SHERMAN CARTER | **Nature** | Sickness |

| | |
|---|---|
| **Total Correction** | ($5,265.00) |
| **Tax Correction** | $0.00 |
| **Insured Correction** | ($5,265.00) |

### Recalculation Period 4

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Oct 05, 2016 - Jan 05, 2017 | 3 | 0 | $1,950.00 | $5,850.00 |
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Oct 05, 2016 - Jan 05, 2017 | 3 | 0 | $1,950.00 | $5,850.00 |
| Soc Sec (DisPrimary) | Oct 05, 2016 - Jan 05, 2017 | 3 | 0 | $1,369.00 | ($4,107.00) |
| Soc Sec (DisFamily) | Oct 05, 2016 - Jan 05, 2017 | 3 | 0 | $386.00 | ($1,158.00) |
| | | | | **Total Correction** | ($5,265.00) |
| | | | | **Tax Correction** | $0.00 |
| | | | | **Insured Correction** | ($5,265.00) |

### Recalculation Period 5

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Jan 05, 2017 - Apr 05, 2017 | 3 | 0 | $1,950.00 | $5,850.00 |
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Jan 05, 2017 - Apr 05, 2017 | 3 | 0 | $1,950.00 | $5,850.00 |
| Soc Sec (DisPrimary) | Jan 05, 2017 - Apr 05, 2017 | 3 | 0 | $1,369.00 | ($4,107.00) |
| Soc Sec (DisFamily) | Jan 05, 2017 - Apr 05, 2017 | 3 | 0 | $386.00 | ($1,158.00) |
| | | | | **Total Correction** | ($5,265.00) |
| | | | | **Tax Correction** | $0.00 |
| | | | | **Insured Correction** | ($5,265.00) |

### Recalculation Period 6

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Apr 05, 2017 - Jul 05, 2017 | 3 | 0 | $1,950.00 | $5,850.00 |

REF #2245346

## Benefit Recalculation

| | | | |
|---|---|---|---|
| **Claim Number** | 1150128075 | **Date of Disability** | Aug 07, 2015 |
| **Claimant** | SHERMAN CARTER | **Nature** | Sickness |

| | | | | | |
|---|---|---|---|---|---|
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Apr 05, 2017 - Jul 05, 2017 | 3 | 0 | $1,950.00 | $5,850.00 |
| Soc Sec (DisPrimary) | Apr 05, 2017 - Jul 05, 2017 | 3 | 0 | $1,369.00 | ($4,107.00) |
| Soc Sec (DisFamily) | Apr 05, 2017 - Jul 01, 2017 | 2 | 26 | $386.00 | ($1,106.53) |
| | | | | **Total Correction** | ($5,213.53) |
| | | | | **Tax Correction** | $0.00 |
| | | | | **Insured Correction** | ($5,213.53) |

### Recalculation Period 7

**Payee** SHERMAN CARTER

| Description | Benefit Duration | Month | Days | Monthly Amount | Amount |
|---|---|---|---|---|---|
| | ***Original Payment*** | | | | |
| Gross Monthly Benefit - LTD | Jul 05, 2017 - Sep 05, 2017 | 2 | 0 | $1,950.00 | $3,900.00 |
| | ***Recalculation*** | | | | |
| Gross Monthly Benefit - LTD | Jul 05, 2017 - Sep 05, 2017 | 2 | 0 | $1,950.00 | $3,900.00 |
| Soc Sec (DisPrimary) | Jul 05, 2017 - Sep 05, 2017 | 2 | 0 | $1,369.00 | ($2,738.00) |
| | | | | **Total Correction** | ($2,738.00) |
| | | | | **Tax Correction** | $0.00 |
| | | | | **Insured Correction** | ($2,738.00) |

LFG
Sherman Carter



Social Security Administration

**Retirement, Survivors and Disability Insurance**

Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: September 15, 2017
Claim Number: HC1

D C

RECEIVED
SEP 18 2017

You are entitled to a monthly child's benefit for February 2016 through June 2017.

**What We Will Pay And When**

- You will receive $11,642.00 around September 16, 2017.
- This is the money you are due for February 2016 through June 2017.

**We Can Only Pay You For A Short Time**

You are no longer entitled to Social Security benefits beginning July 2017. Your benefits are stopping because in that month you are

- 18 years old, and
- not disabled, and
- not a full-time elementary or secondary level school student.

**Your Benefits**

We raised your monthly benefit amount beginning December 2016 because the cost of living increased.

**Health Insurance For Children**

If this notice is for a child under age 19 who is not covered by health insurance, there is a Children's Health Insurance Program that may help. To find out more, you can look on the Internet at www.insurekidsnow.gov or call, toll free, 1-877-KIDS-NOW (1-877-543-7669). The number connects you to your state program.

C See Next Page